UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK; BARRY C.
EDWARDS; JACK FIORITO; ROBIN
GOODMAN; DAVID PRICE; JULIE
ADAMS; BLAKE SIMPSON;
DEAUNDR'E NEWSOME; and
KATRINA RIESGO,

     Plaintiffs,

     v.

RICHARD CORCORAN, in his official
capacity as the Florida Commissioner of
Education; TIMOTHY M. CERIO, in his
official capacity as Member of the Florida
Board of Governors; AUBREY EDGE, in
his official capacity as Member of the
Florida Board of Governors; PATRICIA
FROST, in her official capacity as Member
of the Florida Board of Governors;
EDWARD HADDOCK, in his official
capacity as Member of the Florida Board of
Governors; H. WAYNE HUIZENGA, JR.,
in his official capacity as Member of the
Florida Board of Governors; NASTASSIA
JANVIER, in her official capacity as
Member of the Florida Board of
Governors; KEN JONES, in his official
capacity as Member of the Florida Board of
Governors; DARLENE LUCCIO
JORDAN, in her official capacity as
Member of the Florida Board of
Governors; SYDNEY KITSON, in his
official capacity as Chair of the Florida
Board of Governors; BRIAN LAMB, in his
official capacity as Vice-Chair of the
Florida Board of Governors; ALAN
LEVINE, in his official capacity as
Member of the Florida Board of
Governors; CHARLES H. LYDECKER, in
his official capacity as Member of the
Florida Board of Governors; STEVEN M.
SCOTT, in his official capacity as Member
of the Florida Board of Governors;
WILLIAM SELF, in his official capacity as
Member of the Florida Board of
Governors; ERIC SILAGY, in his official

Case No. 4:21-cv-_____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

capacity as Member of the Florida Board of
Governors; KENT STERMON, in his
official capacity as Member of the Florida
Board of Governors; ANDY TUCK, in his
official capacity as Chair of the Florida
Board of Education; MARVA JOHNSON,
in her official capacity as Vice Chair of the
Florida Board of Education; MONESIA
BROWN, in her official capacity as
Member of the Florida Board of Education;
BEN GIBSON, in his official capacity as
Member of the Florida Board of Education;
TOM GRADY, in his official capacity as
Member of the Florida Board of Education;
RYAN PETTY, in his official capacity as
Member of the Florida Board of Education;
JOE YORK, in his official capacity as
Member of the Florida Board of Education,

  Defendants.

Plaintiffs WILLIAM A. LINK, BARRY C. EDWARDS, JACK FIORITO, ROBIN GOODMAN, DAVID PRICE, JULIE ADAMS, BLAKE SIMPSON, DEAUNDR'E NEWSOME, and KATRINA RIESGO (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants RICHARD CORCORAN, in his official capacity as the Florida Commissioner of Education and Member of the Florida Board of Governors; all sixteen additional members of the Florida Board of Governors, each in their official capacities as a Member of the Board, and all seven members of the Florida Board of Education, each in their individual capacities as a Member of the Board (collectively, "Defendants") and allege as follows:

## NATURE OF THE CASE

1.      "America's public schools are the nurseries of democracy," *Mahanoy Area School Dist. v. B.L.*, -- S. Ct. -- (2021), where truth is distilled out of the "robust exchange of ideas," "rather than through . . . authoritative selection," *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 593, 603 (1967) (addressing the importance of the First Amendment to America's colleges and universities).

2.      Through the recent enactment of HB 233, a law that permits the State to require students, faculty, and staff in the State's public post-secondary schools to register their political views—enacted as a clear message that those that proliferate views with which the Governor disagrees will find their funding in jeopardy— Florida has taken the position that it would prefer "authoritative selection." *Keyishian*, 385 U.S. at 603.

3.      Inspired by surveys in other states in which respondents were asked for their political views, HB 233 requires each institution within the Florida College System and State University System to conduct a yearly survey to identify the political and ideological views within their communities. Fla. Stat. §§ 1001.03(19)(2)(b), 1001.706(13)(2)(b). It also affirmatively prohibits "[a] Florida College System institution or a state university" and the State's Board of Education and Board of Governors from "shield[ing] students, faculty, or staff

- 3 -

from" views "they may find uncomfortable, unwelcome, disagreeable, or offensive." *Id.* at §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f).

4.     HB 233 even goes so far as to create a private right of action for those who feel they have been "shielded" from such speech. In doing so, the law further incentivizes Florida's public institutions of higher education to police the speech in their classrooms in order to avoid having to litigate (and endure the costs and distractions concomitant with such high-profile litigation) cases brought under the new law's alarmingly vague and broad prohibitions.

5.     As the legislative history and statements made in support of the law reveal, HB 233 was passed to target and chill certain viewpoints with which its proponents disagree. Governor DeSantis has made this plain, referring to progressive and liberal views, in particular, as "stale ideology" and "indoctrination" and threatening to cut funding to any institution where such "ideology" is discovered to be widely held.

6.     Florida's Commissioner of Education, Richard Corcoran, was more bellicose: "The war" against the "radical left" "will be won in education;" "Education is our sword. That's our weapon. Our weapon is education. And we can do it. We can get it right;" "It's working in the universities . . . I've censored or fired or terminated numerous teachers" for "indoctrinat[ing] students."

7.    Thus, while the law purports to protect and advance intellectual freedom and viewpoint diversity on Florida's public college and university campuses, it does, and intends to do, the exact opposite.

8.    HB 233 is ideology made law. Without regard for the First Amendment, the law permits the State to collect the private political beliefs of students and compels faculty to espouse or promote views they do not share. And the law does so with the intent of suppressing particular viewpoints by targeting campuses where such viewpoints are widely held with the threat of budget cuts. HB 233 violates the First Amendment protections of those affected and ignores decades of precedent respecting the intellectual freedom of America's campuses.

9.    Without relief from this Court, the First Amendment rights of Plaintiffs—who are faculty and students at the University of Florida ("UF"), University of Central Florida ("UCF"), Florida State University ("FSU"), Florida Agricultural & Mechanical University ("FAMU"), Florida International University ("FIU"), and Santa Fe College—will be violated.

10.    HB 233's Survey and Shielding Provisions will directly harm Plaintiffs by: (1) permitting Defendants to require that Plaintiffs disclose their political associations and ideologies for the invidious purpose of cutting funding to Plaintiffs' colleges and universities; (2) suppressing Plaintiffs' speech and free association by threatening to defund public colleges and universities where their

views and associations predominate; and (3) compelling faculty members to teach and adopt topics and viewpoints they would not otherwise teach or adopt.

11.     Florida has embraced authoritarianism in its university and college education system before, and it did not end well. In the 1950s, the Florida Legislative Investigation Committee (also known as the "Johns Committee") was convened for the purpose of rooting out and discriminating against Marxists, leftists, and Communists in Florida's higher education faculty. The Committee quickly morphed into a hunt to out LGBTQ faculty, scores of whom were terminated as a result. This Court should not permit Florida to go down a similar road again.

12.     For all of these reasons, and those discussed below, HB 233 violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise

under the Constitution and laws of the United States and involve the assertion of deprivations, under color of state law, of rights under the U.S. Constitution.

15.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (1) all Defendants are residents of Florida, in which this judicial district is located, and numerous Defendants reside in this judicial district; and (2) a substantial part of the events that gave rise to Plaintiffs' claim occurred in this judicial district.

17.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

18.     All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise been waived.

## **PARTIES**

19.     Plaintiff William A. Link has been employed at UF as the Richard J. Milbauer Professor of History since 2004. He previously taught at the University of North Carolina at Greensboro from 1981 to 2004, where he served as the Head of the History Department from 1998 to 2004, and as an Associate Dean of the College of Arts and Sciences from 1995 to 1998. Throughout his illustrious academic career, Professor Link's research has focused primarily on the history of the American

South, the Progressive Era, as well as the history of education, slavery and the origins of the Civil War, and American Conservatism. He has published nine books on these topics, with his tenth book, about Frank Porter Graham, the former U.S. Senator and President of University of North Carolina, forthcoming this fall. His work has also been widely published in academic journals and in print and online media publications.

20.    Professor Link currently teaches graduate and undergraduate-level courses, including UF's graduate-level Seminar in Southern History, and he also runs the University's annual Milbauer Symposium in Southern History, which facilitates learning environments between students and scholars. The Symposium invites visiting scholars to UF to present original research and ideas, and to participate in a graduate student luncheon. The pedagogical success of Professor Link's courses depends on the ability of faculty, visiting scholars, and students to engage openly, comfortably, and candidly in robust and uncensored academic discourse.

21.    Absent relief, HB 233 will chill Professor Link's own speech, as well as the speech of the visiting scholars and students on which the Milbauer Symposium depends, and the speech of the students enrolled in Professor Link's other courses. Professor Link is also concerned that HB 233 will stifle and suppress his and his colleagues' First Amendment freedoms of speech and association,

particularly in light of credible threats by Defendants and others that tenure, promotion, and college and university funding will be tethered to, and discriminatorily withheld, based on their viewpoints.

22.     Professor Link is also deeply concerned, as a historian, by the ways in which HB 233—and the invidious intent to discriminate based on viewpoint and association that undergirds it—is reminiscent of a dark spot on Florida's own academic history, namely the Johns Committee, *see supra* ¶ 11. As described above, the Johns Committee culminated in the termination of scores of LGBTQ faculty members, including at least 14 at UF alone.

23.     Plaintiff Barry C. Edwards has been employed at UCF as a Lecturer since 2014. Dr. Edwards teaches undergraduate-level courses in the School of Politics, Security, and International Relations on subjects such as "American Constitutional Law: Civil Rights & Civil Liberties," "Guns, Freedom, and Citizenship," and "The American Presidency." Given the nature of the topics on which he teaches, free discussion of political issues is integral to Dr. Edwards's pedagogy. Dr. Edwards's ability to frame political debates and share his own perspectives with students both during and outside of lecture contributes to his effectiveness as an instructor. Moreover, students' ability to engage openly, comfortably, and candidly in classroom conversation on political topics is critical to their learning. Absent relief, the Anti-Shielding Provisions of HB 233 will chill

Dr. Edwards's own speech, as well as the speech of the students enrolled in his courses, and compel Dr. Edwards to express and teach views he does not hold. Dr. Edwards is also concerned that the Survey Provisions of HB 233 will stifle and suppress his and his colleagues' First Amendment freedoms of speech and association, particularly in light of credible threats by Defendants and others that tenure, promotion, and college and university funding will be tethered to, and discriminatorily withheld, based on their viewpoints.

24.     Dr. Jack Fiorito is the J. Frank Dame Professor of Management at FSU, where he has taught for the past thirty years. He teaches and has taught a variety of graduate- and undergraduate-level courses in the College of Business, ranging from data analysis to labor and industrial relations. Dr. Fiorito has published extensively about unions and is a proud union member himself. In a class he teaches that some students refer to as, simply, "the unions course," he has previously faced criticism from a student alleging that he presents a one-sided perspective. Nevertheless, Dr. Fiorito values his flexibility to craft his own syllabus and—as a widely respected scholar in the field of labor relations—assess the academic standards of the materials that he shares with his classes.

25.     Absent relief, Dr. Fiorito is concerned that the Anti-Shielding Provisions of HB 233 will compel certain speech in his classroom, as well as chill Dr. Fiorito's and his students' speech on topics that could be considered political.

Dr. Fiorito is also concerned that the Survey Provisions of HB 233 will stifle and suppress his and his colleagues' First Amendment freedoms of speech and association, particularly in light of credible threats by Defendants and others that tenure, promotion, and college and university funding will be tethered to, and discriminatorily withheld, based on their viewpoints.

26.     Dr. Robin Goodman has been a professor at FSU since 2001. Her classes and scholarship cover a wide range of topics, including postcolonial literature and theory, feminism, and critical and cultural theory. She served twice as the director of the English Department's literature program, once from 2011-2014 and again from 2016-2018. She has published or edited 11 books and written many more articles in academic journals.

27.     Many of Professor Goodman's classes touch on sensitive political topics. For example, in 2016, she taught a class entitled "Third World Cinema," in which the class watched and discussed films based in or portraying the developing world. Often, the films would venture into areas of controversy, including the use of terrorism and guerilla warfare. In one class, Professor Goodman showed "Paradise Now," a Golden Globe-winning film presenting a fictionalized portrayal of two Palestinian men as they prepare for a suicide attack in Israel. In another, students watched and discussed "The Battle of Algiers," a film depicting clashes between Algerian rebels and French paratroopers during the Algerian war.

28.    The day after former President Trump won the 2016 election, Professor Goodman wore black to class. This, along with her decision to show "Paradise Now," "The Battle of Algiers," and similar films, prompted a few students to complain of political bias in the class in their end-of-semester reviews. Professor Goodman had planned to teach the class again in the Spring 2022 semester, but now worries that similar complaints may arise. Under HB 233, such complaints could now form the basis for a civil action against the University. Additionally, if students voice these complaints in HB 233's viewpoint diversity survey, the state of Florida could weaponize the results to cut funding from the University or its English Department. As a direct consequence of these threats, Professor Goodman is now hesitant to teach "Third World Cinema" in Spring 2022.

29.    Absent relief, Professor Goodman is concerned she will need to avoid teaching controversial classes like "Third World Cinema," and instead request a transfer to less controversial courses.

30.    Dr. David Price is and has been a professor at Santa Fe College in Gainesville, Florida, for over twenty-one years. He teaches and has taught a variety of courses in history and political science each semester. In teaching the perspectives that scholars use to interpret the causes of events, Dr. Price has taught and teaches some conclusions that are drawn from scholars using the perspective of critical race theory in his classes, a subject which Defendant Members of the Florida

Board of Education recently unanimously voted to prohibit in the K-12 context. For example, in courses he has taught on American government and history, he has noted that some scholars contend that the Second Amendment was passed for the purpose of legitimizing and empowering slave patrols and other militias which had the primary function of stomping out slave revolts. Defendants, including Commissioner Corcoran, have specifically maligned these viewpoints, which fall under the umbrella of critical race theory, as "crazy liberal stuff," and Commissioner Corcoran has made clear Defendants' intent to censor these viewpoints in Florida's public institutions.[1]

31.     Plaintiff Julie Adams is a rising sophomore at FSU in Tallahassee and uses the pronouns they and them. Adams is active in local politics and passionate about political issues. In particular, they are passionate about and have volunteered with organizations fighting to combat climate change and ensure access to reproductive healthcare, and they have also spoken out about these issues and gun violence before members of the Florida Legislature and, prior to attending college, before administrators at their Florida high school. Adams will be directly harmed by HB 233, as several of their particular viewpoints, expressive associations, and activist affiliations fall squarely within the crosshairs of the ideologies and

---

[1] This Complaint refers to Price, together with Link, Edwards, Fiorito, and Goodman, as the "Faculty Plaintiffs."

viewpoints that HB 233's proponents have gone on record to admit that the law is designed to chill and suppress. In addition to the individual discrimination HB 233 was designed to inflict against Floridians like Adams for their own protected viewpoints, and its attempt to chill their expression of their viewpoints on their public campus, HB 233's survey will ask Adams to disclose their viewpoints to the threatened detriment of their University's funding. HB 233 will chill the speech of their professors and their classmates, as it was designed to do, thereby harming Adams (and their peers) by detracting from the quality of their education. Finally, HB 233 was also designed to (and will, absent relief) chill their peers' involvement on the issues that Adams so passionately supports by discouraging them from joining political clubs and groups. Adams is concerned that those groups committed to eradicating gun violence, reproductive injustice, and harms to our environment will be particularly chilled by the law.

32. Plaintiff Blake Simpson is a rising senior at FAMU, a public Historically Black College and University in Tallahassee. Simpson is passionate about social justice and political causes. For example, in August 2020 he co-organized a protest against police brutality for FAMU students and community members. He also encourages his peers to vote through his involvement as a fellow with Rise, Inc., a national student-led civic engagement organization. Simpson will be directly harmed by HB 233, as several of his particular viewpoints, political

- 14 -

associations, and activist affiliations fall squarely within the crosshairs of the ideologies and viewpoints that HB 233's proponents have gone on record to admit that the law is designed to chill and suppress. In addition to the individual discrimination HB 233 was designed to inflict against Floridians like Simpson for their own protected viewpoints, and its attempt to chill his expression of his viewpoints on his public campus, HB 233 will chill the speech of his professors and his classmates, as it was designed to do, thereby harming Simpson (and his peers) by detracting from the quality of his education. Finally, HB 233 was also designed to (and will, absent relief) chill his peers' involvement in and on the issues that Simpson so passionately supports by discouraging them through viewpoint discrimination from joining political and cause-oriented activities like the protests he co-organized last year.

33.     Plaintiff DeAundr'e Newsome is a rising senior at FAMU. Newsome is passionate about social justice and political causes, and he is an active participant in campus life. For example, he has served on student government and led the peer mentoring program for first-year students at FAMU. Newsome will be directly harmed by HB 233, as several of his viewpoints and political associations fall squarely within the crosshairs of the ideologies and viewpoints that HB 233's proponents have gone on record to admit that the law is designed to chill and suppress. In addition to the individual discrimination HB 233 was designed to inflict

against Newsome for his own protected viewpoints, and its attempt to chill his expression of his viewpoints on his public campus, HB 233 will chill the speech of his professors and his classmates, as it was designed to do, thereby harming Newsome (and his peers) by detracting from the quality of his education. Finally, HB 233 was also designed to (and will, absent relief) chill his peers' involvement in and on the issues that Newsome supports, by discouraging them through viewpoint discrimination from joining political and cause-oriented clubs and groups.

34.     Plaintiff Katrina Riesgo is a rising sophomore at FIU in Miami. Riesgo is passionate about social justice and political causes, particularly in the areas of LGBTQ+ rights and homelessness. She shares her perspectives on political issues in the classroom and at campus events, and she intends to participate more actively in student organizations this fall as COVID-19 vaccination levels rise and college life opens back up. Riesgo will be directly harmed by HB 233, as several of her viewpoints and political associations fall squarely within the crosshairs of the ideologies and viewpoints that HB 233's proponents have gone on record to admit that the law is designed to chill and suppress. In addition to the individual discrimination HB 233 was designed to inflict against Floridians like Riesgo for their own protected viewpoints, and its attempt to chill her expression of her viewpoints on her public campus, HB 233's survey will ask Riesgo to disclose her

viewpoints to the threatened detriment of her University's funding. HB 233 will chill the speech of her professors and her classmates, as it was designed to do, thereby harming Riesgo (and her peers) by detracting from the quality of her education. Finally, HB 233 was also designed to (and will, absent relief) chill her peers' involvement in and on the issues that Riesgo supports, by discouraging them through viewpoint discrimination from joining political and cause-oriented clubs and groups.[2]

35.   Defendant Richard Corcoran is the Florida Commissioner of Education and is sued in his official capacity as Commissioner. Commissioner Corcoran is not an educator by training or career. A former Republican legislator and former Speaker of the Florida House of Representatives, Commissioner Corcoran was appointed at the recommendation of then-Governor-Elect DeSantis, and he has been in that position since January 9, 2019. As the Commissioner of Education, Commissioner Corcoran "is the chief educational officer of the state and the sole custodian of the K-20 data warehouse, and is responsible for giving full assistance to the State Board of Education in enforcing compliance with the mission and goals of the K-20 education system except for the State University System," and his office is tasked with "operat[ing] all statewide functions necessary to

---

[2] This Complaint refers to Riesgo collectively with Adams, Simpson, and Newsome as the "Student Plaintiffs."

support the State Board of Education, including strategic planning and budget development, general administration, assessment, and accountability." Fla. Stat. § 1001.10(1), -(2). As Commissioner of Education, Commissioner Corcoran is also a member of the Florida Board of Governors. Fla. Stat. § 1001.70(1).

36.     Defendants Timothy M. Cerio, Aubrey Edge, Patricia Frost, Edward Haddock, H. Wayne Huizenga, Jr., Nastassia Janvier, Ken Jones, Darlene Luccio Jordan, Sydney Kitson, Brian Lamb, Alan Levine, Charles H. Lydecker, Steven M. Scott, William Self, Eric Silagy, and Kent Stermon are sued in their official capacities as Members of the Florida Board of Governors. The Florida Board of Governors of the State University System (the "Board of Governors") is "a body corporate comprised of 17 members as follows: 14 citizen members appointed by the Governor subject to confirmation by the Senate; the Commissioner of Education; the chair of the advisory council of faculty senates or the equivalent; and the president of the Florida student association or the equivalent." Fla. Stat. §1001.70(1). It "has the duty to operate, regulate, control, and be fully responsible for the management of the whole publicly funded State University System." Fla. Stat. § 1001.705(2). Under HB 233, the Board of Governors "shall require each state university to conduct an annual assessment of the intellectual freedom and viewpoint diversity at that institution," and to create a "survey to be used by each state university" for that purpose. Fla. Stat. § 1001.706(13)(b). Under HB 233, the

Board of Governors is prohibited from "shielding" "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.706(13)(a)(2), 1001.706(13)(c). As a result of the Board of Governors' "duty to operate, regulate, control, and be fully responsible for the management of the whole publicly funded State University System," Fla. Stat. § 1001.705(2), the Board of Governors is also responsible for enforcing HB 233's requirement that "a Florida. . . state university may not shield students, faculty, or staff from expressive activities." Fla. Stat. § 1004.097(3)(f).

37.    Defendants Andy Tuck, Marva Johnson, Monesia Brown, Ben Gibson, Tom Grady, Ryan Petty, and Joe York are sued in their official capacities as Members of the Florida Board of Education. The Florida Board of Education is "a citizen board consisting of seven members who are residents of the state appointed by the Governor to staggered 4-year terms, subject to confirmation by the Senate." Fla. Stat. § 1001.01(1). It "is the chief implementing and coordinating body of public education in Florida except for the State University System." Fla. Stat. § 1001.02(1). Under HB 233, the Board of Education "shall require each Florida College System institution to conduct an annual assessment of the intellectual freedom and viewpoint diversity of that institution," and to create a "survey to be used by each institution" for that purpose. Fla. Stat. § 1001.03(19)(b). Under HB

233, the Board of Education is prohibited from "shielding" "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.03(19)(c). As a result of the Board of Education's role as "the chief implementing and coordinating body of public education in Florida except for the State University System," Fla. Stat. § 1001.02(1), the Board of Education is also responsible for enforcing HB 233's requirement that "a Florida college system . . . may not shield students, faculty, or staff from expressive activities." Fla. Stat. § 1004.097(3)(f).

## STATEMENTS OF FACT AND LAW

**A.    Run-up to HB 233: Governor Ron DeSantis and his allies express fear over the existence of liberal viewpoints in academia and seek to curtail their expression.**

38.    The existence and dissemination of liberal and left-wing views on college campuses has long been a source of concern for Governor Ron DeSantis and his allies in the Florida Legislature.

39.    For example, in 2017, then-Congressman Ron DeSantis participated in a U.S. House Committee hearing entitled "Challenges to Freedom of Speech on College Campuses." *Joint Hearing Before the Subcommittee on Healthcare, Benefits and Administrative Services and the Subcommittee of Intergovernmental Affairs of the Committee on Oversight and Government Reform*, 115th Cong.

(2017). While questioning conservative political commentator Ben Shapiro, DeSantis claimed that "the professors [on college campuses] are overwhelmingly on the left. Some are fair. Some are more pushing the ideology." *Id.* at 84.

40.    Congressman DeSantis shortly thereafter expressed his view that "just from a conservative perspective, we look at some of what is going on on college campuses and we don't necessarily like it but, you know, we don't really want government involved in a lot of this anyway," but at the same time acknowledged "we are funding these universities, so the American taxpayer is underwriting a lot of this stuff," prompting him to ask, "is there a role for government, given that we are funding it or is it just the type of thing that, you know, we fund it and we still have got to just keep her [sic] hands off?" *Id.*

41.    A recent quote from Governor DeSantis makes clear how he would answer that question today. At a news conference following his signing into law of HB 233, the Governor claimed that parents have become worried that students will be "indoctrinated" and stated, "[w]e do not want [Florida's universities] . . . as basically hotbeds for stale ideology" and added "[t]hat's not worth tax dollars and not something we're going to be supporting moving forward."

42.    In previous legislative sessions, Republicans in the Florida Legislature introduced legislation similar to HB 233. HB 613, 2020 Fla. H.R. (2020); HB 839, 2019 Fla. H.R. (2019).

43.    As discussed in more detail below, these bills sought to require colleges and universities in Florida to create surveys to measure the level of "intellectual viewpoint diversity" on college campuses.

44.    These bills were crafted with the purpose of suppressing what the sponsors perceived to be the proliferation of liberal and left-wing ideology on college campuses in the state.

45.    The intent behind these pieces of proposed legislation is made clear by the statements of the bills' supporters.

46.    For example, speaking in support of a previous version of HB 233, Representative Byrd, chair of the House Higher Education and Career Readiness Committee, decried what he viewed as indoctrination of college students by liberal faculty members.[3]

47.    The term "indoctrination" has been used repeatedly by the Governor and his allies to describe the dissemination of ideology with which they do not agree and was repeated by HB 233's sponsor, Senator Ray Rodrigues, at the bill signing, where he said the legislation would stop "indoctrination."

---

[3] Coleen Flaherty, *Political "Litmus Tests" in Florida*, Inside Higher Ed (Mar. 18, 2019), https://www.insidehighered.com/news/2019/03/18/academics-oppose-proposed-survey-student-and-faculty-political-beliefs-florida.

48.    Governor DeSantis just recently vetoed a bipartisan bill aimed at promoting civics education because the bill went about its mission "in a way that risks promoting the preferred orthodoxy of two particular institutions."

49.    Although earlier versions of HB 233 were introduced in successive legislative sessions in 2019 and 2020, the bills failed to garner sufficient support in either house.

**B.    Florida enacts HB 233 with the express purpose of targeting ideology with which the Republican legislative majority disagrees.**

**i.    Passage of HB 233 and its Legislative Intent**

50.    Bolstered by gains in the 2020 election, Republicans in the Florida House and Senate passed HB 233 (and its Senate companion SB 264) in March and April 2021—almost entirely along partisan lines[4]—and Governor DeSantis signed the bill into law on June 23, 2021. The law went into effect on July 1, 2021.

51.    Like its predecessors, HB 233 was proposed (and in this case, enacted) with the purpose of rolling back what certain legislators perceived to be a rising tide of liberal and progressive sentiment on Florida's public college and university campuses.

---

[4] Senators Jennifer Bradley and Jeffrey Brandes were the sole dissenting votes from the Republican side of the aisle in the Senate. Representative Rene Plasencia was the only Republican to vote "Nay" in the house. Representative James Bush III was the only Democrat in either chamber to vote in favor of the bill.

52.     This intent is amply illustrated by the remarks of the Senate President and House Speaker in the immediate aftermath of the law's enactment.

53.     Speaking in support of the new law, Senate President Wilton Simpson called Florida universities "socialism factories."

54.     House Speaker Chris Sprowls warned the Board of Governors against pandering to the "woke mob."

55.     Similarly, and in the very same month that the House approved HB 233, Commissioner of Education Corcoran, who will bear significant responsibility for implementing HB 233 for Florida's public colleges, announced that he was responsible for the firing of a Duval County school teacher after the teacher refused to remove a Black Lives Matter flag from her classroom.

56.     Corcoran was recorded giving a speech in which he stated: "The war" against the "radical left" "will be won in education;" "Education is our sword. That's our weapon. Our weapon is education. And we can do it. We can get it right;" "It's working in the universities . . . I've censored or fired or terminated numerous teachers" for "indoctrinat[ing] students;" "We made sure [the teacher] was terminated."

57.     The teacher who Corcoran ensured was removed from teaching because she espoused views that Corcoran viewed as "indoctrination" has since filed a lawsuit, alleging that the action taken against her violated her First

Amendment rights. *See Donofrio v. Duval County Public Schools*, No. 3:21-cv-00414 (M.D. Fla. 2021).

### ii.   The Survey Provisions

58.   This lawsuit concerns two sets of provisions in HB 233: the Survey Provisions and the Anti-Shielding Provisions.

59.   The Survey Provisions define "Intellectual Freedom and Viewpoint Diversity" as "the exposure of students, faculty, and staff to, and the encouragement of their exploration of, a variety of ideological and political perspectives." Fla. Stat. §§ 1001.03(19)(a)(1), 1001.706(13)(a)(1).

60.   The Survey Provisions command that the Board of Governors of the State University System ("Board of Governors") and the State Board of Education for the Florida College System ("Board of Education")[5] require each school within their control "to conduct an annual assessment of the intellectual freedom and viewpoint diversity at that institution." Fla. Stat. §§ 1001.03(19)(b), 1001.706(13)(b).

61.   Under the Survey Provisions, each board is to "select or create an objective, nonpartisan, and statistically valid survey to be used by each [college or

---

[5] The Board of Governors of the State University System "has the duty to operate, regulate, control, and be fully responsible for the management of the whole publicly funded State University System." Fla. Stat. § 1001.705(2). The State Board of Education "is the chief implementing and coordinating body of public education in Florida except for the State University System." Fla. Stat. § 1001.02(1).

university] which considers the extent to which competing ideas and perspectives are presented and members of the [college or university] community feel free to express their beliefs and viewpoints on campus and in the classroom." Fla. Stat. §§ 1001.03(19)(b), 1001.706(13)(b).

62.     The Survey Provisions require the Board of Governors and Board of Education to "compile and publish the assessments on September 1 of each year, beginning on September 1, 2022" and grants the Boards power to adopt rules to implement the Survey Provisions.

63.     The Survey Provisions fail to include any guarantees that the students, faculty, or staff who take the survey compiled by one of the boards will submit their answers anonymously.

64.     In fact, during the hearing on SB 264 (HB 233's Senate equivalent) on the Senate floor, Senator Rodrigues (the bill's primary sponsor), refused a Senate colleague's request to amend the bill to guarantee surveys will be anonymous (he did, however, claim that he would be willing to cosponsor a bill in the *future* to address those concerns). *Hearing on SB 264 before Senate*, Fla. S. 2021 at 00:29:56 (Fla. 2021) (Statements of Senators Lori Berman and Ray Rodrigues) ("Senator Berman: I read through the bill and there's nothing in this bill that says it has to be anonymous. And I have a lot of trouble with you saying it's going to be anonymous when I don't see anything in the legislation. What can you tell me to make me feel

more comfortable that it will actually be truly anonymous, would you be willing to change your bill in this point? . . . Senator Rodrigues: [A]t this point, I would not be interested in amending the bill, however if that's a deep concern of yours, I'd be happy to co-sponsor a bill *next year* doing your thing."), https://thefloridachannel.org/videos/4-1-21-senate-session/ (emphasis added).

65.     Nor do the Survey Provisions explain whether participation in a survey will be voluntary.

66.     The structure and history of the Survey Provisions, as well as statements in their support, suggest that information compiled under the Survey Provisions will require respondents to disclose their political beliefs.

67.     First, the Survey Provisions require the assessments to ask respondents about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." A survey making such an inquiry in the name of "viewpoint diversity" would be pointless unless it also made some inquiry into what those "beliefs and viewpoints" are.

68.     Second, several of the surveys that served as the inspiration for the Survey Provisions included questions about respondents' political views. For example, the Florida House of Representatives Staff Analysis of HB 233 cites a survey conducted by College Pulse in 2020. *Staff Analysis of HB 233*, Fla. H.R. 2021 at 5 (Fla. Mar. 10, 2021). The survey, according to the House staff analysis,

found that "[s]tudents who identified as Conservative were more likely to report a prior self-censorship incident." *Id.*

69.     The Staff Analysis of HB 233 also cites a survey conducted by the University of North Carolina at Chapel Hill, which concluded "students across all political perspectives, worried about how students and faculty will respond to their political views, engaged in self-censorship." *Id.*

70.     Representative Ray Rodrigues, the primary sponsor of HB 233 and its predecessors from previous legislative sessions, told the Tampa Bay Times in April 2019 that the Survey Provisions proposal was inspired by a survey conducted by the University of Colorado, which asked students and faculty to anonymously identify their race, ethnicity, religious affiliation, sexual orientation and political party.

71.     Finally, at a recent Board of Trustees meeting of Florida Atlantic University, a board member—and appointee of Governor DeSantis—stated that the Board of Trustees should be able to consider political ideology as a factor in whether to sign off on a promotion or tenured appointment, and that she had been appointed by Governor DeSantis "for a reason," implying the reason was to serve as a check on faculty ideology in granting tenure and other promotions.[6]

---

[6] Florida Atlantic University, *FAU Board of Trustees Meeting* (Apr. 20, 2021), https://fau.mediasite.com/Mediasite/Play/459345b79fdd4735b2cda709ee1786d91d

72.     The Survey Provisions neither explain nor put any limitations on how the Governor, Florida Legislature, or boards might use the results of the survey.

73.     Remarks by Governor DeSantis in support of HB 233 indicate that results will be used to cut funding from public colleges and universities, if survey results suggest that a given school has not done enough to foster "intellectual freedom and viewpoint diversity."

### i.     The Anti-Shielding Provisions

74.     The second set of provisions from HB 233 at issue in this lawsuit are the Anti-Shielding Provisions. The Anti-Shielding Provisions define "Shield" to mean the limitation of "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2).

75.     The Anti-Shielding Provisions provide that the Board of Education and Board of Governors "may not shield students, faculty, or staff" at colleges and universities "from free speech protected under the First Amendment to the United States Constitution, Art. I of the State Constitution, or s. 1004.097." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c).

76.     Similarly, the Anti-Shielding Provisions mandate that "a Florida college system or state university may not shield students, faculty, or staff from expressive activities." Fla. Stat. § 1004.097(3)(f).

77.    "Expressive activities," while not defined under Florida law, is discussed under the same subsection as the third Anti-Shielding Provision, which states they "include, but are not limited to, any lawful oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio record in outdoor areas of campus. Expressive activities protected by this section do not include defamatory or commercial speech." Fla. Stat. § 1004.097(3)(a).

78.    HB 233 provides a cause of action for any person injured under the Anti-Shielding Provisions "[a]gainst a public institution of higher education based on the violation of the individual's expressive rights." Fla. Stat. § 1004.097(4), (4)(a). A successful action would be entitled to declaratory and injunctive relief, reasonable court costs, and attorney fees. *Id.*

79.    Thus, the law further incentivizes schools seeking to avoid such liability, or incurring attorneys' fees to defend against it, to police the speech of their faculty to ensure that it does not somehow offend the vague prohibitions set forth in the Anti-Shielding Provisions.

**C. Both the Survey Provisions and the Anti-Shielding Provisions impact Plaintiffs' expressive and associational rights**

80.    Absent relief, HB 233's Survey Provisions will directly harm the Faculty Plaintiffs and the Student Plaintiffs by: (1) permitting Defendants to require that Plaintiffs disclose their political associations and ideologies for the invidious purpose of cutting funding to Plaintiffs' colleges and universities; (2) suppressing Plaintiffs' speech and free association by threatening to defund public colleges and universities where their views and associations predominate; (3) compelling faculty members to teach and express topics and viewpoints they would not otherwise teach or express; and (4) subjecting schools and faculty to time-consuming, expensive, and personally ruinous lawsuits purportedly based on their failure to comply with the extraordinarily vague Anti-Shielding Provisions.

81.    The Faculty Plaintiffs' speech has been suppressed by their objectively reasonable fear that their viewpoints are disfavored under the law and will be targeted for defunding.

82.    In addition, the law's Anti-Shielding provisions will compel them to either teach and espouse views they do not hold, or risk violating HB 233's Anti-Shielding Provisions.

83.    The Anti-Shielding provisions will also require them to choose between including new material in their lectures that they would have otherwise excluded, or else face similar consequences. If they do change their syllabi as a

result, they will also necessarily have to exclude material they had planned on including to make room for the new material.

84.     At any time, they may now be faced with defending their curriculum decisions in a lawsuit brought under the Anti-Shielding Provision's new private right of action against the institutions for which they work.

85.     Finally, the Faculty Plaintiffs are also injured by the law's suppression of their colleagues' speech and the speech of their students, both of which are critical to the success of the lectures and programs they administer.

86.     The Student Plaintiffs' associational rights are also harmed by HB 233. By permitting the government to require the Student Plaintiffs to reveal their political views and associations, and by targeting those views and associations as a basis for defunding the schools they attend, HB 233 intrudes upon their ability to freely associate with the many expressive organizations in which they are members, suppresses the ability for those organizations to recruit new members, and chills Student Plaintiffs' and their associations' ability to freely express themselves.

87.     Student Plaintiffs are also injured by the law's stifling of free expression campus-wide, which will inhibit the free exchange of ideas critical to learning environments.

## **CLAIMS FOR RELIEF**

## **COUNT I**

### **First Amendment and Equal Protection**
### **U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
### **Freedom of Speech: Viewpoint Discrimination**

88.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 87 as though fully set forth herein.

89.    "It is axiomatic that the" First Amendment bars the government from regulating "speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 828 (1995). This includes government efforts to "impose[] financial burdens on certain speakers based on the content of their expression." *Id.* "[I]n light of [the Court's] precedents . . . ideologically driven attempts to suppress a particular point of view" by cutting or withholding funding "are presumptively unconstitutional." *Id.* at 830.

90.    HB 233 defies this rule: The law aims to identify public institutions of higher education where liberal and progressive views predominate for targeted defunding. Though the law may appear "content neutral," HB 233 is in fact a content-based law that "cannot be justified without reference to the content of the regulated speech" and that was "adopted by the government because of disagreement with the message [the speech]" it attempts to suppress "conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quotation marks omitted).

- 33 -

91.     The law mandates that Florida's public schools of higher education create, at the direction of the Board of Governors and Board of Education, a survey of political views held by the students, faculty, and staff on their campuses. As Governor DeSantis and Commissioner Corcoran have explained, Defendants' interest in doing so lies in their aim to wage "war" against the "radical left" by identifying State institutions harboring liberal or progressive views—views which the Governor called "stale ideology"— for budget cuts.

92.     In other words, "[t]he State has burdened a form of protected expression that it found too persuasive" on its public campuses and will leave "unburdened those speakers whose messages are in accord with its own views." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011) (invalidating law after reviewing its stated legislative intent).

93.     HB 233 creates many tools for the suppression of speech. In addition to the Survey, the law prevents faculty from "shielding" students from "uncomfortable, unwelcome, disagreeable, or offensive," speech. HB 233 enforces this provision through a novel mechanism. The law permits students to "record video or audio of class lectures . . . in connection with" complaints they intend to file with "the public institution of higher education where the recording was made." Fla. Stat. § 1004.097(3)(g). And anyone who feels that their expressive rights have somehow been violated has a private right of action against the educational

institution that includes a fee shifting provision should they win. Fla. Stat. § 1004.097(4)(a).

94.     Together, these provisions chill faculty members from speaking on viewpoints counter to the ideology instantiated by the law's "shielding" provision by threatening them with complaints supported by recorded lectures and even civil litigation that their institutions will have to defend.

95.     But the law also chills speech by virtue of its vagueness. The statute leaves undefined "uncomfortable, unwelcome, disagreeable, or offensive," leaving faculty members to guess at their meaning. The result will be a faculty reluctant to speak on views counter to those adopted by the "shielding" law, fearful of overstepping blurry boundaries.

96.     Even brave faculty are likely to find themselves discouraged or influenced by the institutions for which they work, which are now incentivized to police speech to avoid lawsuits newly authorized by HB 233.

97.     In this light, HB 233 is merely the tool by which Defendants and the State can more surgically defund or chill those viewpoints with which they disagree.

98.     The injuries HB 233 causes to both Faculty Plaintiffs and Student Plaintiffs are substantial. By coupling the expression of liberal and progressive views on campus to budget cuts and complaints, Defendants have chilled Plaintiffs' speech.

99.   For example, because of the law's vague "shielding" provision and because of the State's threat that disfavored views on campus will be subject to budget cuts, the Faculty Plaintiffs will be forced to either adopt and teach views that they otherwise wouldn't, or face the consequences of the new law, including but not limited to lawsuits against their institutions and possible loss of funding. And all Plaintiffs will be chilled from speaking on issues expressly targeted by the law for fear that their viewpoints will be shown in the Survey to be widely-held on campus and thereby cause their institutions to lose funding.

100.   Because the law discriminates on the basis of viewpoint, the law is presumptively unconstitutional and may be sustained only if Defendants submit a compelling interest and prove the law is narrowly tailored to achieving its aim. The law cannot withstand such scrutiny.

101.   Defendants lack a compelling interest or proof of narrow tailoring to justify a law squarely aimed at the suppression of a viewpoint with which they disagree. Indeed, Defendants' stated interest, fostering intellectual diversity, is sharply belied by HB 233's text and the comments of its sponsors. The law will suppress intellectual diversity by chilling liberal and progressive viewpoints on Florida's public institutions of higher education.

102.   Plaintiffs therefore respectfully request injunctive and declaratory relief to resolve the serious and concrete injuries they suffered to their right to free speech by Defendants' enforcement of HB 233.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a)   declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 233 violates the First and Fourteenth Amendments to the United States Constitution;

b)   preliminarily and permanently enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing HB 233;

c)   awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)   granting such other and further relief as the Court deems just and proper.

## COUNT II

**First Amendment and Equal Protection**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Freedom of Association**

103.   The Student Plaintiffs reallege and incorporate by reference paragraphs 1 through 87 as though fully set forth herein.

104.   The First Amendment, by way of the Fourteenth Amendment, bars Defendants from abridging the right to free association.

105.   As the Supreme Court reaffirmed this term, the right to freely associate "may be violated . . . where individuals are punished for their political affiliation" and "where members of an organization are denied benefits based on the organization's message." *Americans for Prosperity Found. v. Bonta*, No. 19-251, 594 U.S. ___, slip op. at 6 (2021) (majority opinion).

106.   So too may the right be burdened, however, where a law compels the "disclosure of affiliation with groups engaged in advocacy." *Id.* "Inviolability of privacy in group association," the Court has explained, "may in many circumstances be indispensable to preservation of freedom of association." *Nat'l Ass'n for Advancement of Colored People v. State of Ala. Ex rel. Patterson*, 357 U.S. 449, 460 (1958). As a consequence, "[w]hen a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 7 (1971).

107.   HB 233 violates the Student Plaintiffs' right to free association in each of these ways.

108.   Echoing the civil rights abuses perpetrated by Florida's own "Johns Committee"—which was designed for the unconstitutional purpose of targeting faculty based on Marxist, leftist, and Communist viewpoints but evolved to target faculty based on their sexual orientation as well—and the loyalty oaths and

McCarthyism of our Nation's past, Florida has passed HB 233, a law permitting the State to survey the political views on Florida's public system of higher education. It was passed with the intent to suppress liberal and progressive views and associations on Florida's public post-secondary campuses by targeting them for budget cuts.

109.    Take Governor DeSantis's and Commissioner Corcoran's words for it: The Governor has expressly threatened that college campuses that he views as "indoctrination" and "hotbeds for stale ideology," would not be supported by "tax dollars . . . moving forward." And Commissioner Corcoran explained that "[t]he war" against the "radical left" "will be won in education" and that using education as a "sword" is "working in the universities."

110.    Lest the Governor's euphemisms distract from his message, by "indoctrination" and "stale ideology" he means liberal and progressive views—that much is apparent from his statements surrounding, and conduct leading up to, the passage of HB 233. *See supra* ¶¶ 38-73. Commissioner Corcoran needs no translation.

111.    Laws designed to punish privately held political beliefs and associations have been tried and rejected. Courts have recognized that sweeping invasions of privacy "discourage citizens from exercising rights protected by the Constitution," *Baird*, 401 U.S. at 7, even where "[t]he governmental action

challenged may appear to be totally unrelated to protected liberties," *Patterson*, 357 U.S. at 461.

112.   Employing this reasoning, the Supreme Court has rejected government attempts to intrude upon the NAACP's membership list and the beliefs of teachers in recognition of the chilling effect such laws carry.

113.   The Student Plaintiffs share a historical lineage with these former plaintiffs. HB 233, which bears a striking family resemblance to the repudiated McCarthyism of our past, including the ways in which it was enacted to target Florida faculty at that time, permits Defendants to survey political views on public colleges and universities with the intent of targeting liberal associations, and the campuses on which they exist, for political retribution, including the Governor has explicitly warned, by defunding them.

114.   Worse, the law permits Defendants to require the Student Plaintiffs and their constituents to reveal their privately held beliefs, and consequently the persons and organizations with whom they are associated. As they have in the past, privacy violations of this kind will cause Florida's public college students and faculty to fear being outed, persecuted, or otherwise punished for their beliefs, and such laws thereby chill free association on campus.

115.   For example, the law will inhibit the Student Plaintiffs' ability to freely associate on campus and restrict the ability of the expressive organizations to which

they belong from building membership to pursue collective efforts. The law has threatened consequences to any organization and any of its members willing to speak on issues it disfavors. The result is that the Student Plaintiffs will be chilled from joining political organizations and the expressive efforts of organization to which they do belong will be suppressed.

116.   This is true *even if* the survey itself is ultimately anonymous, and *even if*, the survey is ultimately discretionary—two features the statute does *not* require despite an attempt to amend the law to include at least anonymous responses.

117.   HB 233's threat to the Student Plaintiffs' freedom to associate can rise solely from the aggregate data the survey collects. Defendants have made plain that they intend to suppress disfavored viewpoints on public campuses where they are widely held. To realize this aim, Defendants need only campus-wide statistics, not individualized responses—though of course Defendants could produce a greater chilling effect and more easily suppress speech by requiring non-anonymized responses.

118.   Because of these burdens on the Student Plaintiffs' fundamental rights, HB 233 is subject to—at the very least—exacting scrutiny. *Bonta*, No. 19-251, 594 U.S. ___, slip op. at 7 (2021) (plurality opinion). The law, therefore, must be struck down unless Defendants' can demonstrate the law is "narrowly tailored to the government's asserted interest." *Id.* at 9 (majority opinion).

119.   Defendants and other proponents of the law have suggested the law is motivated by an interest in fostering intellectual diversity. Assuming arguendo this interest is sufficiently weighty to survive exacting scrutiny, HB 233 is not a narrowly-tailored means of achieving such an end. In fact, it achieves just the opposite: HB 233 will suppress intellectual diversity by chilling Plaintiffs' willingness to associate with ideas expressly disfavored by the law and its sponsors.

120.   The Student Plaintiffs therefore respectfully request injunctive and declaratory relief to resolve the serious and concrete injuries they suffered to their right to free association by Defendants' enforcement of HB 233.

**WHEREFORE**, the Student Plaintiffs respectfully request that this Court enter judgment:

a)   declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 233 violates the First and Fourteenth Amendments to the United States Constitution;

b)   preliminarily and permanently enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing HB 233;

c)   awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)   granting such other and further relief as the Court deems just and proper.

## COUNT III

**First Amendment and Equal Protection**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Freedom of Speech: Compelled Speech**

121.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 87 as though fully set forth herein.

122.   The First Amendment's guarantee of free speech encompasses in equal measure both the right to speak and the right not to speak. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'") (quoting *Board of Education v. Barnette*, 319 U.S. 624, 637 (1943)).

123.   As a corollary to the right not to speak, it is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.*

124.   With respect to the rights of the faculty members, including the Faculty Plaintiffs, HB 233 violates this fundamental rule. HB 233's Anti-Shielding Provisions prohibit "[a] Florida College System institution or a state university"

from "shield[ing] students, faculty, or staff from expressive acts," Fla. Stat. § 1004.097(3)(f), and prohibit the Board of Governors and State Board of Education from "shield[ing] students, faculty, or staff from free speech protected under the First Amendment to the United States Constitution, Art. I of the State Constitution, or s. 1004.097." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c). "Shield," in turn, is defined as "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2), 1004.097(2)(f).

125.  Taking the statute's words at face value, faculty members (as employees of Florida College system institutions and state universities), are not permitted under the new law to "limit students' . . . access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive," to the extent such ideas and opinions qualify as "expressive activities," which includes, without limitation, "any lawful oral or written communication of ideas." Fla. Stat. § 1004.097(3)(a).

126.  Shielding, so defined, is common in postsecondary education. In creating the syllabus for a semester, a professor must decide what to cover and what to omit. By omitting material, faculty members, of necessity, limit students' access to certain ideas or opinions. And in certain cases, the material omitted by faculty

members from a syllabus may include a "written communication of ideas," such as an academic article, and the article may be one that "students' may find uncomfortable, unwelcome, disagreeable, or offensive."

127.  By way of illustration, consider a professor teaching a course on the 2020 Election. In creating a syllabus, the professor might exclude choose to exclude writings advocating the "Big Lie" that the 2020 election was stolen or posts from online forums arguing that the votes of racial minorities should not be counted. The professor's decision to exclude the writings from the syllabus would contravene HB 233's anti-shielding provisions—so long as the professor decides to exclude them for the reason that they are "uncomfortable, unwelcome, disagreeable, or offensive." To avoid violating HB 233, the professor would have no choice but to include the writings in the syllabus and discuss them in class.

128.  Moreover, the Anti-Shielding provisions are vague and likely to chill the expression of faculty members. Again, the statute does not define "uncomfortable, unwelcome, disagreeable, or offensive." Faculty members— uncertain of whether course material falls within the ambit of those terms—will err on the side of caution and include in their courses any marginally relevant material that could conceivably be understood as "uncomfortable, unwelcome, disagreeable, or offensive." The result will be even more compelled speech from faculty members.

129.   As Professors, the Faculty Plaintiffs, would similarly be forced under the Anti-Shielding provisions to alter their syllabi in order to cover topics they would have otherwise excluded. This, in turn, will require them to drop from their syllabi materials they would usually cover, in order to make room for materials covered by the Anti-Shielding provisions. Such alterations will detract from students' classroom experience and hinder their understanding of the topics taught.

130.   It is paradigmatic compelled speech to coerce faculty in such a manner, yet this is precisely what HB 233 does. To avoid violating the Anti-Shielding provisions, faculty will discuss topics which they otherwise would not discuss, assign reading they otherwise would not assign, and invite guest speakers they otherwise would not invite.

131.   This is no idle threat. HB 233 permits students to "record video or audio of class lectures . . . in connection with" complaints they intend to file with "the public institution of higher education where the recording was made." Fla. Stat. § 1004.097(3)(g). It also threatens the institutions at which violations of the Anti-Shielding law are believed to have taken place with costly, time-consuming and damaging litigation. Fla. Stat. § 1004.097(4)(a). In this way, it strongly incentivizes institutions to police their faculty's speech. And if they do not do it, it encourages every student to do so, fully armed with the threat of retribution through litigation. Under dogged observation, faculty will vigilantly weigh their every word.

132.   The Anti-Shielding Provisions therefore violate the Faculty Plaintiffs' First Amendment right not to speak. Because HB 233 compels speech, it constitutes a content-based regulation of speech, and is therefore subject to strict scrutiny. *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (treating law that compels speech as content-based regulation on speech); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (holding that content-based regulations on speech are subject to strict scrutiny).

133.   Thus, the Anti-Shielding provisions can only survive if they "further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011)).

134.   The State's only colorable interest in enforcing the Anti-Shielding provisions is exposing students to as wide a variety of viewpoints and opinions as possible.

135.   Assuming for the sake of argument that such an interest is compelling, the Anti-Shielding provisions are not narrowly tailored to reach such a goal. In order to comply with the provisions, college faculty will have to choose to forego covering other topics and viewpoints in order to preserve space in the syllabus for "ideas and opinions" that students may find "uncomfortable, unwelcome, disagreeable, or offensive."

136.   Stated otherwise, the Anti-Shielding provisions will in many cases *narrow* the range of viewpoints and opinions to which Florida college students are exposed. Since the Anti-Shielding provisions will in many cases in fact undermine the supposed compelling interest underlying them, they are not narrowly tailored to serve that interest. *See, e.g.*, *Thomas v. Schroer*, 248 F. Supp. 3d 868, 887 (W.D. Tenn. 2017) ("The Court is unpersuaded that the Billboard Act advances the State's compelling interest, and finds the on-premises/off-premises distinction actually undermines the State's articulated interests in practice . . . . The Court need not inquire further. If the Billboard Act does not advance the State's compelling interests, it is not narrowly tailored and thus is unconstitutional.").

137.   Because the Anti-Shielding provisions compel speech and do not pass strict scrutiny, they violate the Faculty Plaintiffs' right to free speech secured by the First Amendment.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

    a)    declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 233 violates the First and Fourteenth Amendments to the United States Constitution;

    b)    preliminarily and permanently enjoining Defendants, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing HB 233;

    c)       awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

    d)       granting such other and further relief as the Court deems just and proper.

Dated: July 2, 2021.            Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
King, Blackwell, Zehnder
& Wermuth, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Alexi Velez*
Christopher Bryant*
Christina Ford
Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
avelez@perkinscoie.com

cbryant@perkinscoie.com
christinaford@perkinscoie.com
jjasrasaria@perkinscoie.com
spencerklein@perkinscoie.com
jposimato@perkinscoie.com

*Counsel for Plaintiffs*

*\*Motions for Pro Hac Vice Forthcoming*