UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| WILLIAM A. LINK, et al., | |
| Plaintiffs, | Case No. 4:21-cv-00271-MW-MAF |
| v. | |
| RICHARD CORCORAN, in his official capacity as the Florida Commissioner of Education, et al., | |
| Defendants. | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM IN SUPPORT

Pursuant to Rule 65,  Plaintiffs seek a temporary restraining order ("TRO") or preliminary injunction prohibiting Defendants from: (1) distributing the Surveys required by Fla. Stat. §§ 1001.03(19)(b) and 1001.706(13)(b) to faculty, staff, or students; (2) collecting or storing any responses to the Surveys; (3) reporting, releasing, or making public any data received from responses to the Surveys; and (4) taking any action based on data received from responses to the Surveys. In support, Plaintiffs state as follows:

### EMERGENCY STATUS

Plaintiffs seek emergency injunctive relief under L.R. 7.1(L) because irreparable harm will occur within nine days, when Defendants and related actors

disseminate the Survey required by House Bill 233 ("HB 233"). For months, Plaintiffs have sought and expected Defendants would supplement their discovery responses to produce draft updates, a final version of the Survey, and their plans to implement the Survey, to no avail. *See* Declaration of Alexi Velez, **Ex. 1** at 11, 22, 24, 27, 31, 37, 91, 415.[1]

Then, late this week, from another source, Plaintiffs received the following schedule for implementation of the Survey:

| March 31, 2022 | Send pre-survey notifications to students and employees. |
| April 4, 2022 | Invitations to students and employees are sent to take the survey. |
| April 7, 2022 | Survey reminders are sent to students and employees. |
| April 8, 2022 | Survey collection closes. |

Declaration of Andrew Gothard, **Ex. 2** at ¶ 3. Around the same time, Plaintiffs received versions of the Surveys titled "final" with metadata indicating they were created in March 2022 from public records requests ("PRRs") to Florida State University ("FSU"), engaged by Defendants to draft the Survey.

When Plaintiffs asked Defendants' counsel if this schedule was accurate and if the surveys FSU titled "final" were final, he responded they were not, but did not provide any information about what the final surveys will contain. **Ex. 1** at 415. Counsel did not deny that the schedule was accurate (indeed, he indicated Plaintiffs' counsel was "naive" for not anticipating it). *Id.*

---

[1] Exhibit pincites reference the exhibit's ECF page number.

Given the above expedited schedule—since confirmed by others—Plaintiffs require emergency relief. The expedited Survey distribution—of which Defendants failed to timely advise Plaintiffs—as well as Defendants' continued failure to provide Plaintiffs with *any* information about the final Survey (or any materials related to it since November), does not permit this matter to be resolved in the ordinary course—nor, unfortunately, with the benefit of the final Surveys that Defendants apparently intend to implement nine days from now.

*     *     *

## INTRODUCTION AND BACKGROUND

Plaintiffs include a faculty union representing more than 25,000 members at twelve state universities and fifteen state and community colleges across Florida (United Faculty of Florida or "UFF"), a youth-focused gun violence prevention organization (March for Our Lives Action Fund or "MFOL"), and eight individuals who are current faculty or students at six of Florida's public colleges or universities.

At issue are Plaintiffs' challenges to HB 233's Survey Provisions,[2] which Plaintiffs allege violate the First Amendment on several independent grounds: (a) unconstitutional viewpoint discrimination, adopted because of the government's disagreement with certain speech, and they empower the government to punish

---

[2] Reference to the Survey Provisions include the Survey created and mandated by those Provisions.

disfavored speech; (b) they pry into Plaintiffs' privately-held beliefs and political associations without being tailored to a sufficiently weighty governmental purpose, and (c) they implicitly threaten Plaintiffs and the institutions where they work and study based on that invasive and unjustifiable inquiry, with retribution from the government and harassment. *See generally* Am. Compl., ECF No. 35.

The Survey Provisions mandate that the Defendant Board of Governors and Board of Education ("Boards") "require each [public] Florida [college or university] to conduct an annual assessment of the intellectual freedom and viewpoint diversity at that institution." Fla. Stat. §§ 1001.03(19)(b), 1001.706(13)(b). The Boards must "compile and publish the assessments by September 1 of each year," beginning in 2022. Fla. Stat. §§ 1001.03(19)(b), 1001.706(13)(b). There are no statutory restrictions on how the information—or the "assessments" of that information—may be accessed or used. *See* Fla. Stat. §§ 1001.03(19)(a)(1), 1001.706(13)(a)(1).

Lest there be any doubt that the Survey is intended to inquire into privately-held beliefs, HB 233 defines "intellectual freedom and viewpoint diversity" to "mean[] the exposure of students, faculty, and staff to, and the encouragement of their exploration of, a variety of *ideological and political perspectives*." Fla. Stat. §§ 1001.03(19)(a)1, 1001.706(13)(a)1 (emphasis added). The law's proponents made no secret that HB 233 is part of their "war" against the "radical left," in which the government is set on punishing schools and faculty perceived as promoting

4

liberal viewpoints. *See, e.g.*, **Ex. 1** at 93. (Gov. DeSantis declaring tax dollars will not be used "moving forward" to support the "indoctrinat[ion]" of students at universities that have become "hotbeds for stale ideology"); **Ex. 1** at 548 (Rep. Sabatini, who co-sponsored the bill, describing the Survey as a tool for "defunding the radical institutions" on campuses that "we've lost . . . to the radical left" and "defunding these insane professors that hate conservatives and hate this country").[3] And materials obtained from FSU show that the survey drafters were instructed that their purpose was to address "***increasing concerns that university instructors, who are, on average, very liberal, instill and perhaps require their student to provide a particular political viewpoint.***" **Ex. 1** at 203.

The incendiary narrative that faculty are "indoctrinating" students to adopt left-leaning political viewpoints has long been pushed by right-wing actors, but study after study has disproved these claims. In fact, studies that refute the premise underlying the Survey were among the materials FSU produced in response to Plaintiffs' PRRs. *See, e.g.*, **Ex. 1** at 115 (peer-reviewed study "[finding] no evidence to suggest that faculty members push their own personal political viewpoints in the

---

[3] For more evidence of the State's hostility toward "left-leaning" viewpoints, *see also* **Ex. 1** at 94 (Commissioner Corcoran bragging he has "censored or fired or terminated numerous teachers" for "indoctrinat[ing] students" with left-leaning viewpoints); **Ex. 1** at 95 (trustee implying she was appointed by Governor to serve as a check on faculty ideology in tenure and other promotions).

classroom"); **Ex. 1** at 138 (report on survey results at UNC Chapel Hill finding, "[f]or the most part, students who identify as liberal, moderate, and conservative all agree that instructors encourage participation from across the political spectrum").[4] Nevertheless, the Legislature and Governor insist that Florida's college campuses are hotbeds of liberal indoctrination, and the Survey Provisions appear designed to create "evidence" to support that narrative. *See* **Ex. 1** at 93, 94, 95, 548; *cf. also* **Ex. 4** at ¶¶ 7, 12, 15; **Ex. 2** at ¶ 5; Declaration of Robin Goodman, **Ex. 3** at ¶ 7.

Shortly after Plaintiffs filed suit, Defendants moved to dismiss, arguing that the matter was not ripe and Plaintiffs had no injury because "the survey has yet to be developed." ECF No. 40 at 10, 18-21. This argument ignores significant precedent establishing that (1) the state may not mandate inquiries into its citizens' ideological and political views unless it can meet exacting scrutiny, and (2) a First Amendment injury arises when state laws trigger a concrete and objective risk of enforcement that chills protected activity. *See* ECF No. 43 at 26-37; *see also Baird v. State Bar of Arizona*, 401 U.S. 1, 6 (1971) ("[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First

---

[4] Other studies come to the same conclusion. *See, e.g.*, **Ex. 1** at 227 (peer-reviewed study concluding that, "there is a tendency for students to drift toward the Democratic Party over the course of the semester, yet the direction of the shift appears to be unrelated to either the instructor's actual political loyalties, or to the student's perception of the professor's partisan preferences"); *see also* **Ex. 4**, Declaration of Dr. Sylvia Hurtado at ¶ 14.

Amendment.").

Nevertheless, Plaintiffs have diligently pursued discovery as to the creation, drafting, and plans to implement the Survey. Yet, as of this filing, the most recent draft Survey Defendants produced appears to be from November 2021. *See* **Ex. 1** at 453. Plaintiffs' counsel repeatedly requested Defendants supplement their production to provide more recent drafts and plans for the Survey's timing and administration, in communications with defense counsel dated December 16, 2021, January 4, 2022, January 13, 2022, February 18, 2022, March 3, 2022, March 8, 2022, March 11, 2022, and most recently March 17, 2022. *See* **Ex. 1** at 22, 24, 27, 31, 37. Repeatedly, defense counsel waffled between suggesting that more documents were coming, and that nothing further had come because documents did not exist. *See, e.g.*, **Ex. 1** at 32 (On January 13, defense counsel stated: "The records are being gathered, but I don't have an indication as to how many there are."); *see also* **Ex. 1** at 37 (On March 11, defense counsel stated: "We ran the searches on the same terms and the same custodians as the initial production. If there are documents that we missed in that review, we will produce them as a supplement."); *see also* **Ex. 1** at 13 (On March 17, defense counsel stated: "Obviously, we can't give you document [*sic*] that doesn't yet exist."). Even now, when implementation of the Survey apparently is only nine days away, Defendants have yet to provide any updated drafts, much less the final Surveys.

As of just three days ago, defense counsel was still claiming that, "As far as I know, the surveys are still a work in progress," and while he said that he "received word this afternoon that the student survey is presently targeted to be distributed by the Board of Governors to the universities on April 4," he also stated "I don't know when the staff survey will be distributed to the universities", "and these dates are not set in stone." **Ex. 1** at 11. Even then, no additional documents or specific information came from Defendants, despite Plaintiffs' repeated requests for supplementation of discovery on this precise matter. *See* **Ex. 1** at 22, 24, 27, 31, 37.

During this time frame, Plaintiffs pursued information related to the Survey through PRRs to FSU and, in February, received several more recent Survey drafts that Defendants had not produced to Plaintiffs. *See, e.g.*, **Ex. 1** at 442 (document with filename "FLBOG Staff Survey Dec 7.docx"). Plaintiffs promptly produced these materials *to* Defendants. *See* **Ex. 1** at 450. Yet, even then, Defendants continued to indicate they had nothing more recent to produce. *See, e.*g., **Ex. 1** at 15. At the same time, Defendants' counsel would periodically provide vague—and ever moving—target dates for the final Survey. *See id.* (On March 11, stating: "I have been informed that the surveys should go out at the end of this month"). During this time, Plaintiffs repeatedly conferred with defense counsel to ensure the Survey would be disclosed in advance of the expert disclosure deadline, and sought (and obtained) adjustment of that deadline based on defense counsel's updates about

when the Surveys would be available. *See* **Ex. 1** at 12-13; *see also* ECF No. 64 at 2, 5.

On March 22, 2022, the day before defense counsel first advised Plaintiffs of a specific "target date" for the student Surveys (albeit at the same time still claiming the surveys were not yet done, and that it was unknown when the faculty surveys might issue), **Ex. 1** at 11, FSU provided Plaintiffs a second production of 133 documents, including ones titled "FLBOG Faculty Survey (FINAL DRAFT).docx" and "FLBOG Student Survey (FINAL DRAFT).docx." **Ex. 1** at 44, 53. Metadata indicates these documents were created and last edited on March 15, 2022.

Two days later, on March 24, and since confirmed with members at multiple institutions, Plaintiff UFF learned that there is a schedule in place for the administration of all of the Surveys. **Ex. 2** at ¶ 3. That is the schedule reproduced above, which has the Survey period opening nine days from now on April 4 and then quickly closing on April 8. *See id.*

Plaintiffs immediately notified defense counsel again they had learned of this schedule and demanded that Defendants supplement their discovery responses with any and all related materials by no later than March 29, 2022. *See* **Ex. 1** at 91. Plaintiffs followed that shortly with another message attaching the surveys FSU titled as "final" and asking for confirmation that they were the final surveys. **Ex. 1** at 416. Defense counsel responded that the surveys that were marked final by FSU

were not final, but did not provide any further information about what the final surveys will include. *Id.* at 1. He did not deny that Defendants' plan is to implement those still undisclosed surveys nine days from today. *Id.*

## ARGUMENT

Allowing Defendants to implement the Survey on this timeline, much less without providing *any* discovery related to it since November 2021—including the final Surveys they plan to implement in nine days—threatens irreparable harm to Plaintiffs' First Amendment rights. *See* **Ex. 2** at ¶¶ 3-4, 10-12 (Defendants' secrecy and timing makes it impossible for UFF to timely assess, or its members time to consider how to respond to, and whether to participate in, the Survey). Plaintiffs satisfy all standards for a preliminary injunction: they are highly likely to succeed on their challenges to the Survey Provisions; they will suffer irreparable harm absent emergency relief; no harm will befall Defendants should the Court issue relief; and the public interest strongly favors emergency relief.  At the very least, a TRO will preserve the status quo and allow the Court sufficient time to consider whether to enter a preliminary injunction prohibiting the implementation of the Survey until this matter can be resolved at trial.[5]

---

[5] Plaintiffs filed this motion as quickly as possible, upon learning of the schedule and the possibility that FSU had "final" surveys in hand. Plaintiffs have established grounds for issuing a TRO or preliminary injunction. That said, the Court would be well within its power to grant a TRO and order a briefing schedule to consider

## I.  Legal Standard

The district court has broad discretion to issue a TRO or preliminary injunction. *See, e.g.*, *See Carillon Imp., Ltd. v. Frank Pesce Intern. Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted). A party establishes that a TRO or preliminary injunction is necessary upon a showing that: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury unless the relief requested is issued; (3) the threatened injury outweighs possible harm that issuing the requested relief may cause to the adverse party; and (4) entry of the emergency relief would not disserve the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *see also Johnson v. U.S. Dep't of Agriculture*, 734 F.2d 774, 781 (11th Cir. 1984).

## II.  Plaintiffs are likely to succeed on the merits.

The Survey Provisions violate the First Amendment for at least three reasons. Plaintiffs are highly likely to succeed on each theory, but success on even one would require invalidation of the Survey Provisions.

---

whether a preliminary injunction should issue. If the Court does so, Plaintiffs request that the Court order Defendants to provide Plaintiffs with the discovery they have repeatedly been requesting related to the surveys—or, at the very least, the final surveys that are to be distributed—and permit Plaintiffs sufficient time to evaluate those materials and offer additional evidence in support (including potentially expert testimony on the final surveys).

### A.   The Survey Provisions constitute unconstitutional content-based viewpoint discrimination.

The Constitution bars the government from regulating speech "because of agreement or disagreement with the message it conveys." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (cleaned up). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed" are content-based regulations. *Id.* at 643. Content-based laws are subject to strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 164, 171 (2015).

When a law is challenged as content based, a court first "consider[s] whether [the law] 'on its face' draws distinctions based on the message a speaker conveys." *Id.* at 156. Even a facially content-neutral law is unconstitutionally content-based if it (1) "cannot be justified without reference to the content of the regulated speech," or (2) was "adopted by the government because of disagreement with the message [the speech] conveys." *Id.* at 164 (quotation marks omitted). Courts may determine a law's "content-based" aim from "the record and . . . formal legislative findings." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); *see also Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1317 (11th Cir. 2020) ("We may also consider whether the regulation was enacted due to an impermissible motive.").

Plaintiffs are likely to succeed on their claim that the Survey Provisions constitute invalid content-based viewpoint discrimination, because they were adopted due to the government's disagreement with a certain message—*e.g.*, left-leaning speech within post-secondary institutions and the "threat" that left-leaning faculty are "indoctrinating" students. *See* **Ex. 1** at 93, 94, 95, 548.  Indeed, as materials produced by FSU demonstrate, the survey drafters were instructed that the purpose of the Survey was to address "***increasing concerns that university instructors, who are, on average, very liberal, instill and perhaps require their student to provide a particular political viewpoint.***" **Ex. 1** at 203. And the legislative and contemporaneous public record is littered with evidence that HB 233 is an "ideologically driven attempt[] to suppress a particular point of view." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). For example, Governor DeSantis and Commissioner Corcoran have made plain that the law is intended to be a tool in their ongoing "war" against the "radical left," helping to identify campuses that embrace progressive views for retribution, including potentially budget cuts. *See* **Ex. 1** at 93, 94.

Although *either* renders the Survey Provisions unconstitutional, Plaintiffs are likely to prove that they are content based under *both* the justification and purpose tests. Notably, a content-based purpose invalidates a law *regardless of how or even whether* the State *actually uses it* to suppress the speech it disfavors. The mere

"*possibility* that the [government] is seeking to handicap the expression of particular ideas . . . . would alone be enough to render the [law] presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992) (emphasis added). But, in this case, the evidence, including the "comments and concessions" made by HB 233's sponsors, proponents, and enforcers "elevate the possibility to a certainty," *id*.

"Given the legislature's" and others' "expressed statement of purpose, it is apparent that [the challenged statute] imposes burdens that are based on the content of speech and . . . aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565. HB 233 was enacted to "burden[] a form of protected expression that it found too persuasive" on its public campuses and will leave "unburdened those speakers whose messages are in accord with its own views." *Id.* at 580. The bill's sponsors were explicit: Rep. Sabatini described the Survey as a tool for "defunding the radical institutions" on campuses that "we've lost . . . to the radical left" and "defunding these insane professors that hate conservatives and hate this country." **Ex. 1** at 548.

In addition, as the directions to the Survey drafters further evidence, *see* **Ex. 1** at 203, the law "cannot be justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164 (citation and quotation marks omitted). Comments in drafts of the Surveys that FSU produced also bear this out. Draft questions are repeatedly critiqued for their political slant by reviewers, who observe, for example, that draft questions "read as a political tool rather than a legitimate effort to improve

14

the SUS system." **Ex. 1** at 218. Another notes: "If the goal of the survey is to grind a political axe, it will likely be a success on this front." *Id.* at 220. In other words, the law's clear intention is unavoidable even in its discussion and application.

Even if the Survey Provisions were not *per se* unconstitutional in light of the above, they fail strict scrutiny, which requires "the government prove[] that [the statute is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. That the Survey Provisions cannot survive strict scrutiny is obvious from their context and their face. Their purpose is to address a perceived problem with liberal indoctrination of students, about which the Legislature admittedly had *no* evidence—much less a "strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (finding a "compelling interest" must have been "the legislature's 'actual purpose'" and legislature must have had "a strong basis in evidence"); *see also infra* at II.B.

But even if the Legislature had a compelling reason to enact the Survey Provisions (and none is evidenced by the record), they necessarily fail narrow tailoring—*i.e.*, the Provisions must actually "*advance*" the compelling state interest, and they must do it "by the *least restrictive means* available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984); *see also Reno v. ACLU*, 521 U.S. 844, 846 (1997) (finding a "burden on . . . speech unacceptable if less restrictive alternatives would be at least as effective in achieving the [law's] legitimate purpose"). The Provisions fail this

requirement (1) for all of the reasons they fail the "substantial relation" test, *infra* at II.B, and (2) because there are less-burdensome alternatives available to assess the Legislature's purported concerns. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231-232 (1987). They include routine student evaluations, which produce responses that are in context, and far better suited to make any kind of meaningful assessment of these issues. *See, e.g.*, **Ex. 4** at ¶¶ 9, 16; **Ex. 3** at ¶¶ 4-5, 7. In addition, for myriad reasons, the Survey Provisions are fundamentally flawed vehicles to answer *any* question—much less the questions the Legislature claims to want answered. *See* **Ex. 4** at ¶¶ 7-10. In other words, as conceived and constructed, the Survey Provisions do not even actually advance the state's purported interests, much less by the means least likely to burden speech.

For each of these reasons, Plaintiffs are highly likely to succeed on their content-based First Amendment challenge to the Survey Provisions.

> **B.  The Survey Provisions impermissibly authorize government inquiry into Plaintiffs' beliefs and political associations.**

Separately, "[w]hen a State seeks to inquire about an individual's beliefs and associations" it has a "heavy burden" to justify that inquiry under the First Amendment. *Baird*, 401 U.S. at 6-7. Laws that implicate associational rights are subject to (at least) exacting scrutiny. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). They are unconstitutional unless Defendants

demonstrate that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id*. The Survey Provisions fail both prongs.

The Survey Provisions do not advance an "important government interest." *Id*. As the record demonstrates, the interest that motivated them is a fundamentally illegitimate interest in suppressing liberal and progressive associations and speech. It is also based on a demonstrably false premise: for decades right-wing actors have alleged that students are being indoctrinated with liberal viewpoints, but empirical studies refute it. *See, e.g.*, Stanley Rothman et al., THE STILL DIVIDED ACADEMY at 77-78 (2011) (noting over four years college students become slightly more socially liberal and slightly more economically conservative but "in most of the policy areas, students' aggregate attitudes do not appear to vary much between their first and final years"); **Ex. 1** at 507 (published peer-reviewed study concluding, "[w]e find little evidence . . . that faculty ideology is associated with changes in students' ideological orientation"); **Ex. 1** at 519 (peer-reviewed study concluding "[s]elf-reported ideology does drift left at liberal arts colleges, but this is explained by a peer effect").

Defendants may yet insist HB 233 furthers a "legitimate interest in gauging the intellectual freedom and viewpoint diversity." *See* ECF No. 40 at 24. This assertion is belied by comments of legislators and the Governor, as discussed, and by the statements of the drafters of the Survey themselves. Draft questions are

17

repeatedly derided by commentors to the drafts, including in notations that:

- A draft of the student survey was "problematic" and should be "completely revamped so that it is a legitimate and useful tool, not to mention a good use of taxpayer money." **Ex. 1** at 219.

- "The Terminology [sic] used is overly political and will likely prime political responses." *Id*. at 218.

- That questions were "political question[s], not . . . survey question[s]." *Id*. at 218-219.

- That questions were "confusing," unclear, vague, or "not a useful question." *Id*. at 219.

- That an entire section was "baffl[ing]" *Id*. at 220.

- That questions served no purpose "beyond probing the relative conservativeness or progressiveness [sic] of a student." *Id*. at 221.

- "The survey lacks specificity in ways that are confusing and make the survey read as a political tool rather than a legitimate effort to improve the SUS system." *Id.* at 218.

- "If the goal of the survey is to grind a political axe, it will likely be a success on this front." *Id*. at 220.

That the drafters were having so much trouble writing questions that were even passably legitimate is understandable—that is the task that they were given. There is no plausible basis for concluding that the Legislature intended that the Survey be anything other than a "political tool" "to grind a political axe."

Even HB 233's proponents admitted having no basis to investigate "intellectual freedom" or "viewpoint diversity." Representative Roach admitted

there was no evidence of a lack of intellectual freedom or viewpoint diversity at Florida's colleges. **Ex. 1** at 458 (17:5-23) (stating he was "not alleging that" Florida universities are "falling far short of that ideal expression and commitment to the First Amendment"). Nor was he certain the Survey would provide meaningful insight. He acknowledged it would likely suffer from self-selection bias, *id.* at 459 (37:3-9) (admitting the "people that are most inclined to fill out a survey of this type are someone who feels like they're aggrieved or the super-politically active groups on campus"), and that the response rate might be so low the entire survey would be illegitimate. *Id.* (37:18-23) ("I would suspect if you had only 10 percent of a student body fill out the survey, and that percent of students did not represent a cross section of that university, it probably would not be statistically valid and would be subject to challenge.").[6]

Even taking the State's claimed interest in "viewpoint diversity" at face value, without more, "viewpoint diversity" is an empty concept, capable of encompassing *every* viewpoint, even ones completely debunked. The Survey has no means by which to distinguish between, *e.g.*, legitimate different views on string theory, from views of Holocaust deniers. Pursuing such "diversity" as its own end is incompatible

---

[6] Notably, the survey conducted at UNC Chapel Hill, which Rep. Roach referenced as inspiration, had a response rate of 3.09 percent among students who were not provided a financial incentive to participate. **Ex. 1** at 126.

with the purpose of higher education. *See, e.g.*, **Ex. 1** at 534 ("[S]ome ideas don't deserve a hearing, and one of the primary roles of the university is to distinguish between those that do—and should continue to be explored and built upon—and those that should not be seriously entertained by any legitimate institution of higher education."); **Ex. 4** at ¶ 15; **Ex. 3** at ¶ 8.

As a result, even if intended to foster intellectual diversity, HB 233 would remain invalid because "[t]here is a dramatic mismatch . . . between the interest" Defendants assert and the law Florida created "in service of that end." *Bonta*, 141 S. Ct. at 2386. By imposing a Survey to capture political affiliation and viewpoints with a clear interest in stamping out liberal and progressive beliefs, HB 233 will achieve precisely the opposite end. *See generally Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (noting "constant and heavy" pressure that would fall on teachers "to avoid any ties which might displease those who control [their] professional destiny"); *see also Bonta*, 141 S. Ct. at 2388.

### C. The Survey Provisions unconstitutionally threaten reprisal for protected First Amendment activity.

For similar reasons, Plaintiffs are likely to prove the Survey violates the First Amendment because it subjects protected activity to retributive harm from the government as well as invites public harassment. *See, e.g.*, Am. Compl., ECF No. 35 ¶¶ 63-80, 134, 137, 156. Indeed, the Survey Provisions appear designed to create

"evidence" for the baseless, dangerous narrative that faculty are indoctrinating students with "radical leftist" ideas. **Ex. 1** at 93, 94, 95, 548. This threat is itself a First Amendment harm. *See Bonta*, 141 S. Ct. at 2388.

Government reprisal is not a speculative risk. HB 233's co-sponsor, Representative Sabatini described HB 233 as a tool for "defunding the radical institutions" on campuses that "we've lost . . . to the radical left" and "defunding these insane professors that hate conservatives and hate this country." **Ex. 1** at 548, and the Survey Provisions have no safeguards against this type of use. Such "ideologically driven attempts to suppress a particular point of view" by cutting or withholding funding "are presumptively unconstitutional." *Rosenberger*, 515 U.S. at 830 (quotations omitted).

These risks persist even if the Survey is administered anonymously: it will necessarily collect information related to Plaintiffs' private affiliations and – even if Plaintiffs refuse to take part – imposes a severe "risk of reprisal" for whatever it is the government (or others) claim to glean from the results of the Survey, "creat[ing] an unnecessary risk of chilling' in violation of the First Amendment." *Bonta*, 141 S. Ct. at 2388 (quotations and citation omitted). Already, Governor DeSantis and Commissioner Corcoran have practically promised retaliation against Plaintiffs' speech. *See, e.g*., **Ex. 1** at 93-95; *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165-66 (2014) (threat of even false complaints can give rise to an injury).

Allowing the Survey to be administered, and data collected, is also likely to invite harassment of Plaintiffs—an increasingly serious problem in a country where "indoctrination" claims like the Governor's fuel attacks on academics who are viewed to be too liberal. *See* E**x. 1** at 237 (published peer-reviewed study discussing targeted harassment campaigns against professors based on left-of-center views); *see also* **Ex. 1** at 420 (published peer-reviewed paper collecting examples of right-wing harassment of left-leaning professors). This, too, constitutes a serious risk of harm to First Amendment rights. *Bonta*, 141 S. Ct. at 2388 ("Such risks [of harassment] are heightened in the 21st century and seem to grow with each passing year, as 'anyone with access to a computer [can] compile a wealth of information about' anyone else . . . ." (quoting *Doe v. Reed*, 561 U.S. 186, 208 (2010) (Alito, J., concurring)); *see also* **Ex. 2** at ¶ 9.[7]

Plaintiffs face an impossible choice. Defendants will say the Survey is voluntary, but if Plaintiffs choose not to respond, they risk the results being skewed by those who have repeatedly sowed this same false narrative. *See* **Ex. 2** at ¶ 11; **Ex. 3** at ¶ 9. Plaintiffs may feel compelled to participate to attempt to protect against Defendants creating fodder for their ongoing "war" against the "radical left," a war

---

[7] Although Plaintiffs submit substantial evidence of this risk, they need not show that they or their members will be "subjected to harassment and reprisals" unless "the challenged regime is narrowly tailored to an important government interest." *Bonta*, 141 S. Ct. at 2389. Defendants cannot make this showing.

that is increasingly resulting in professors being doxxed, harassed, and even fired. **Ex. 1** at 251-256 (discussing harassment of professors for political views); Ralph Wilson & Isaac Kamola, FREE SPEECH AND KOCH MONEY: MANUFACTURING A CAMPUS CULTURE WAR 126 (Pluto Press 2021) (discussing "junk science" survey used by right wing media to portray university students as hostile to freedom of speech).

Inaccurate, deeply flawed surveys are routine fodder for far-right activists pushing the narrative that higher education is hostile to conservatives. In 2017, Professor John Villasenor of UCLA published the results of an "opinion poll" he conducted that he claimed evaluated the state of free speech on university campuses. He claimed to find that a "surprisingly large fraction of students believe it is acceptable to act—including resorting to violence—to shut down expression they consider offensive," **Ex. 1** at 463; Wilson & Kamola, *supra* at 126. Though polling experts denounced Villasenor's methodology and declared his survey "junk science," **Ex. 1** at 470, right wing media outlets latched on to it to promote their preferred narrative of higher education. Wilson & Kamola, *supra* at 126. *See also* Michael Berube, WHAT'S LIBERAL ABOUT THE LIBERAL ARTS? CLASSROOM POLITICS AND "BIAS" IN HIGHER EDUCATION 67-69 (2006). The same will likely happen here, even—perhaps especially—if the results are unreliable, unrepresentative, or incoherent.

### III.   Plaintiffs will suffer irreparable harm absent emergency relief.

Absent relief, Plaintiffs will suffer irreparable harm to their First Amendment rights. Time is of the essence. The record evidences a substantial threat that any data obtained from the Survey will be used to justify retaliation against the institutions where Plaintiffs teach and study, and carries significant risk that Plaintiffs will be irreparably injured in a host of other ways.

Many of these risks will follow regardless of the Survey's final design; given the Survey's illegitimate purpose and clear political aims, its resulting "data" is virtually guaranteed to be invalid, making any "conclusions" or decisions made based on it presumptively unreliable. *See, e.g.*, **Ex. 4** at ¶¶ 7-16; **Ex. 3** at ¶ 7; **Ex. 2** at ¶ 5. But the draft Surveys produced by Defendants (as of November 2021) and FSU (more recently) raise additional and significant concerns. *See, e.g.*, **Ex. 4** at ¶¶ 10-13; **Ex. 3** at ¶¶ 8-11; **Ex. 2** at ¶¶ 6-8, 11-12. Permitting Defendants to proceed without allowing Plaintiffs the opportunity to make the case that the Surveys as designed are further flawed, exacerbates the risk of harm they already face.

Irreparable harm arises where "adequate compensatory or other corrective relief will [not] be available at a later date, in the ordinary course of litigation." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (same). Defendants' violation of Plaintiffs' First Amendment rights therefore "constitute[s] per se irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (quoting *Johnson v. Bergland*, 586 F.2d 992, 995 (4th Cir. 1978)); *see also FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury."). As Plaintiffs' supporting declarations and verified interrogatory responses show, this harm impacts Plaintiffs in tangible ways—classroom discussion will be chilled; student activism discouraged; and the teaching of important, but sensitive, subjects irreparably hampered.

Courses Dr. Goodman teaches at FSU, for example, address sensitive subjects. *See* **Ex. 3** at ¶ 3. Her role as a professor requires her to voice many different divergent viewpoints on controversial topics, without necessarily endorsing those views. *Id.* ¶ 4. She never has and never would consider a student's political views, or how those views might diverge from her own, in grading, assessing, or interacting with students. *Id.* Nonetheless, in evaluations, some have expressed that Dr. Goodman's teaching on these sensitive topics reflects certain political views. *Id.* ¶¶ 4-5. Such evaluations are an appropriate vehicle for considering such concerns in proper context. *Id*. In contrast, asking highly generalized Survey questions about

personal perceptions in a format that takes those perceptions entirely out of context makes it impossible to evaluate them in any meaningful way. *Id.* at ¶¶ 5, 7-8; *see also* **Ex. 4** at ¶¶ 10, 13, 15, 16 (noting importance in achieving valid and meaningful survey results accounting for student's particular sensitivities and the crucial role learning to become comfortable with difficult topics plays in higher education). Yet, those out of context statements could lead to cuts in funding. **Ex. 3** at ¶¶ 7, 9. Dr. Goodman fears the Survey will further stifle her classroom speech, particularly on controversial topics. *Id.* ¶ 8.

That injury is made worse by confusing and contradictory directions about what speech is permitted, required, or risks retribution. **Ex. 3** at ¶ 11. A separate provision of HB 233 bars faculty from "shielding" students from speech that makes them uncomfortable. *Id.* But, drafts of the Survey would invite students to report instances when instructors make them uncomfortable. *Id.* At the same time, the Legislature has taken aim at teaching anything it deems "critical race theory," apparently on the basis that it makes some students uncomfortable. *Id.* Faculty are thus placed in an impossible position: refusing to teach uncomfortable subject-matter exposes them to HB 233's Anti-Shielding Provisions but choosing to teach the same material invites negative survey responses. *Id.* This nonsensical legal landscape means that Dr. Goodman and many other Florida faculty members "risk breaking a law whichever way [they] turn," *id.*, chilling their ability to engage in a free flow of

ideas with students and colleagues.

The other faculty-member Plaintiffs also teach and study important, politically-sensitive topics and are similarly threatened with irreparable injury. University of Central Florida processor Barry Edwards teaches courses on civil rights and firearm regulation. *See* **Ex. 1** at 5-7. Teaching these topics requires creating a space where students can engage openly, comfortably, and candidly on important contemporary political topics. *See* **Ex. 4** at ¶ 13. But Professor Edwards fears that HB 233, and the Surveys it mandates, will impede or prohibit his teaching of these subjects. *See* **Ex. 1** at 20-21. Similarly, Dr. David Price of Santa Fe College teaches courses that often discuss viewpoints that Defendants strongly disfavor, such as historical scholarship contending that the Second Amendment was enacted to empower slave patrols. *See* **Ex. 1** at 478-480. Dr. Price believes that HB 233 is intended to chill and punish speech like that regularly heard in his classroom. *See id.*; *see also* **Ex. 1** at 295-297 (Prof. Jack Fiorito expressing concern that "HB 233 targets the teaching, research into, and academic expression and exploration" of Plaintiff's views); **Ex. 1** at 342-345 (similar for Prof. William Link).

Even the American Educational Research Association ("AERA"), a century-old organization that researches education policy, has concluded that HB 233 has *already* "cast a pall over higher education [in Florida]." **Ex. 1** at 549. For example, in "one Florida public institution barring faculty from testifying in voting rights and

mask-mandated court cases and pressuring faculty to remove race-related language from course materials and destroy COVID-19 data." *Id.*

Dissemination of the Surveys will also discourage protected speech by students. Julie Adams, a sophomore at FSU who uses they/them pronouns, speaks and organizes on issues including climate change, reproductive health, and firearm regulation. *See* **Ex. 1** at 360-362. Adams fears that completing the Survey will require them to disclose their political affiliations, and will ultimately to be used to cut funding from schools like FSU, making them hesitant to be as vocal about their views. *See id.* at 368-371, 376-377. Blake Simpson, a senior at Florida A&M University, is likewise concerned that HB 233 targets and chills progressive speech about social justice, civil rights, and police brutality—issues around which he frequently organizes his fellow students. *See* **Ex. 1** at 389-390.

It does not matter whether the Survey is anonymous or voluntary, if the data is kept secure and protected, or if Defendants insist the data will only be released or reported or analyzed in aggregate form. *See, e.g.*, *Bonta*, 141 S. Ct. at 2388 ("Our cases have said that disclosure requirements can chill association 'even if there is no disclosure to the general public.' . . . While assurances of confidentiality may reduce the burden of disclosure to the State, they do not eliminate it.") (cleaned up) (quoting *Shelton*, 364 U.S. at 486). The concern of disclosure to the State alone is particularly threatening here, where the Governor and Legislature acted with intent to suppress

28

views with which they disagree.

But there is also the risk of third-party access to the information. HB 233 does not exempt the Survey or its results from the state's "Sunshine Law," which allows access to governmental proceedings and documents. *See* Fla. Stat. § 119.011(12) (providing general rule that "all documents . . . made or received pursuant to law" are public records); *Nat'l Collegiate Athletic Ass'n v. Associated Press*, 18 So. 3d 1201, 1207 (Fla. 1st DCA 2009), *review denied*, 37 So. 3d 848 (Fla. 2010) (records received by a State University generally considered public records); *cf.* Fla. Stat. § 1012.91 (exempting university personnel records from public disclosure *except for* student assessments contained in "the State University System Student Assessment of Instruction *or comparable instrument*") (emphasis added). As a result, virtually anyone could obtain Survey data and use it for any purpose—including the fabrication of "evidence" of "bias" in education or to harass faculty, as discussed *infra*.

In addition, the draft Surveys produced thus far seek demographic information that could lead to the easy identification of certain responding faculty members. *See* **Ex. 2** at ¶ 7. They include questions about data as "sex or gender," "sexual orientation," "religious affiliation," and the nature of each member's "faculty appointment" and whether they are "tenured." *Id.* Identities of many faculty members—particularly non-white and LGBTQ+ faculty—could readily be

29

discerned from answers to such questions when cross-checked against faculties at individual schools. *Id.* This significantly exacerbates the risk of harassment, particularly for non-white or LGBTQ+ faculty, imposing further risk of severe, irreparable injury. *E.g.*, *Bonta*, 141 S. Ct. at 2388.

Moreover, Defendants are required to report Survey "results" in September, which Florida's leaders have made plain they intend to use to punish or suppress disfavored viewpoints. At the very least, the junk science that Defendants peddle with these Surveys threatens to further fuel a false narrative that has put academic freedom and Plaintiffs' free speech and associational rights under direct and severe attack. To accomplish those harms, Defendants need only campus-wide statistics.

Indeed, permitting Defendants to collect Survey data poses an additional irreparable harm to Plaintiffs, namely that any collected data—regardless of its incompleteness or unreliability—will swiftly be used to support policies that harm Plaintiffs and their institutions, including cutting their funding. *See, e.g.*, **Ex. 2** at ¶ 5, 10; **Ex. 3** at ¶¶ 7-9. Significant harm will be done by the mere collection of "data," which may later be misused by those seeking to use it as a cudgel against Plaintiffs. The Court must act now to prevent this irreparable harm.

## IV.    Defendants will not suffer any harm from the requested relief.

Defendants will suffer no harm if the Surveys are temporarily enjoined while litigation progresses. First, defense counsel claimed even a few days ago that the

Surveys were not yet final. Even then, he communicated that the April 4 deadline for dissemination of the Surveys "was not set in stone." **Ex. 1** at 11. There is no reason why Defendants need to implement the Surveys nine days from now, nor any justification to permit doing so without allowing Plaintiffs the opportunity to review the final Surveys and present further evidence to this Court, if warranted, to support preliminary injunctive relief.

The only deadline pertinent is that the Surveys' results must be reported by September 2022. *See* Fla. Stat. §§ 1001.03(19)(b), 1001.706(13)(b). Defendants do not need five months to distribute the Survey and aggregate the results.

This is precisely the type of case warranting temporary relief "to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits." *Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974); *accord Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). Apparently to stymie review, Defendants have been withholding the final Survey at the heart of this case, and plan to rush its implementation before this Court can consider its constitutionality. They will not be injured by an order requiring them to allow this litigation to proceed in normal course.

## V.     The public interest favors the requested relief.

"[I]t is always in the public interest to protect First Amendment liberties." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)). Defendants' plan to circulate the Survey as soon as April 4 is an imminent attack on First Amendment freedoms at Florida's public institutions of higher learning; the public interest is best served by allowing this Court to consider the constitutionality of that activity before faculty and students are asked to take part in the Survey. *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1230 (11th Cir. 2017) ("[T]he public interest is always served in promoting First Amendment values.") (quoting *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001)). Defendants cannot point to any countervailing public interest in distributing the Survey in nine days because the "vindication of constitutional rights . . . serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

The gross disparity in harms reflects the public's interest in emergency relief here. Whereas Plaintiffs face the imminent and irreparable First Amendment harms, Defendants face no harm from the requested relief because "it is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th

Cir. 2020). Even if Defendants faced *any* prospect of harm from Plaintiffs' requested relief, a threatened First Amendment injury "outweighs whatever damage the injunction may cause the State." *Net Choice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1095 (N.D. Fla. 2021) (noting when "a plaintiff is likely to prevail on the merits of a First Amendment claim, the[] other prerequisites to a preliminary injunction are usually met"). The public interest factor, as with each other factor, therefore strongly supports Plaintiffs' requested relief.

## CONCLUSION

For the reasons stated, the Court should grant Plaintiffs' motion.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a temporary restraining order restraining, or, in the alternative, a preliminary injunction enjoining Defendants, their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control, and all other persons within the scope of Federal Rule of Civil Procedure 65, from: (1) distributing the Surveys required by Fla. Stat. §§ 1001.03(19)(b) and 1001.706(13)(b) to faculty, staff, or students; (2) collecting or storing any responses to the Surveys; (3) reporting, releasing, or making public any data received from responses to the Surveys; and (4) taking any action based on data received from responses to the Surveys.

## LOCAL RULE 7.1(B) CERTIFICATION

Plaintiffs' counsel notified Defendants' counsel yesterday afternoon of Plaintiffs' intent to seek the requested injunctive relief on an emergency basis, and Plaintiffs' counsel requested Defendants' position. While Defendants' counsel responded yesterday evening preliminarily, Defendants' counsel has not confirmed whether Defendants oppose the requested relief. Defendants will presumably oppose the relief requested in this Motion.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned, Frederick Wermuth, certifies that this motion contains 7964 words, excluding the case style and certifications.

Respectfully submitted this 26th day of March, 2022.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.
Thomas A. Zehnder
Florida Bar No. 0063274
Robyn M. Kramer
Florida Bar No. 0118300
King, Blackwell, Zehnder
  & Wermuth, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Alexi M. Velez*
Noah Baron*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
avelez@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2022 I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111
Counsel for Defendants