# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK, et al.,

    Plaintiffs,

      v.

RICHARD CORCORAN, in his official capacity as the Florida Commissioner of Education, et al.,

    Defendants.

Case No. 4:21-cv-00271-MW-MAF

## DECLARATION OF ALEXI M. VELEZ IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER OR IN THE ALTERNATIVE FOR PRELIMINARY INJUNCTION

I, Alexi M. Velez, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over the age of 18 and competent to make this declaration. I am an attorney with the law firm of Elias Law Group LLP and am admitted to practice law in the District of Columbia, New Jersey, Pennsylvania, and before multiple federal courts of appeals and district courts. I am admitted before this District *pro hac vice* in the above-captioned matter and am an attorney for Plaintiffs. I submit this declaration to provide the Court true and correct copies of certain documents submitted in connection with Plaintiffs' Emergency Motion for Temporary Restraining Order or in the Alternative for Preliminary Injunction and Order to Show Cause.

2.      Exhibit A is a true and correct copy of a March 23, 2022 email from Defendants' counsel, George Levesque, to Plaintiffs' counsel.

3.      Exhibit B is a true and correct copy of a December 16, 2021 email from Plaintiffs' counsel, Fritz Wermuth, to Defendants' counsel.

4.      Exhibit C is a true and correct copy of a January 4, 2022 email from Plaintiffs' counsel, Fritz Wermuth, to Defendants' counsel.

5.       Exhibit D is a true and correct copy of a January 13, 2022 email from Plaintiffs' counsel, Fritz Wermuth, to Defendants' counsel.

6.      Exhibit E is a true and correct copy of a March 3, 2022 email from Plaintiffs' counsel, Fritz Wermuth, to Defendants' counsel.

7.      Exhibit F is a true and correct copy of a March 17, 2022 email from Plaintiffs' counsel, Noah Barron, to Defendants' counsel.

8.      Exhibit G is a true and correct copy of the document titled "FLBOG Faculty Survey (FINAL DRAFT).docx," which is Bates stamped FSU001776-1783 and was produced to Plaintiffs by Florida State University ("FSU") on March 22, 2022.

9.      Exhibit H is a true and correct copy of the document titled "FLBOG Student Survey (FINAL DRAFT).docx," which is Bates stamped FSU001796-1803 and was produced to Plaintiffs by FSU on March 22, 2022.

10.     Exhibit I is a true and correct copy of the document titled "FLBOG Student Survey (DRAFT) with comments.docx," which is Bates stamped FSU001733-1739 and was produced to Plaintiffs by FSU on March 22, 2022.

11.     Exhibit J is a true and correct copy of is a true and correct copy of the document titled "FLBOG Student Survey (DRAFT)_LA.docx," which is Bates stamped FSU001740-1750 and was produced to Plaintiffs by FSU on March 22, 2022.

12.     Exhibit K is a true and correct copy of is a true and correct copy of the document titled "FLBOG Student Survey (February 2022) THSnotes.docx," which is Bates stamped FSU002003-2009 and was produced to Plaintiffs by FSU on March 22, 2022.

13.     Exhibit L is a true and correct copy of a March 24, 2022 email from Plaintiffs' counsel, Fritz Wermuth, to Defendants' counsel.

14.     Exhibit M is a true and correct copy of the video file titled "6_22_21 Now Speaking - Governor Ron DeSantis & Lieutenant Governor Jeanette Nuñez at the Florida American Legion Boys State - The Florida Channel.mp4," which is Bates stamped PL_000004.

15.     Exhibit N is a true and correct copy of the video file titled "Education is Freedom Richard Corcoran_youtube.com-watch-v-HVujpIator0.mp4," which a recording of Defendant Commissioner Richard Corcoran's remarks in a presentation

titled "Education is Freedom" made at Hillsdale College and is Bates stamped PL_000006.

16.     Exhibit O is a true and correct copy of the video file titled "FAU BOT Meeting 4_20_21.mp4," which is a recording of the Florida Atlantic University Board of Trustees public meeting occurring on April 20, 2021 and Bates stamped PL_000007.

17.     Exhibit P is a true and correct copy of David La Falce & SimonPeter Gomez, *Political Attitudes in the Classroom: Is Academia the Last Bastion of Liberalism?*, 3 J. OF POLITICAL SCIENCE EDUCATION 1, 18 (2007), which is Bates stamped FSU000256-27   and was produced to Plaintiffs by FSU on March 22, 2022.

18.     Exhibit Q is a true and correct copy of Jennifer Larson et al., *Free Expression and Constructive Dialogue at the University of North Carolina at Chapel Hill* 18-20 (March 2, 2020), which is Bates stamped FSU001810-1889 and was produced to Plaintiffs by FSU on March 22, 2022.

19.     Exhibit R is a true and correct copy of the Institutional Review Board ("IRB") Protocol entitled "The State of Florida's State University Systems Intellectual Freedom and Viewpoint Diversity Survey," which is Bates stamped FSU001967-1983 and was produced to Plaintiffs by FSU on March 22, 2022.

20.    Exhibit S is a true and correct copy of the document titled "FLBOG Student Survey (DRAFT) with DR Comments.docx," which is Bates stamped FSU000121-127 and was produced to Plaintiffs by FSU on March 8, 2022.

21.    Exhibit T is a true and correct copy of Matthew Woessner & April Kelly-Woessner, *I Think My Professor is a Democrat: Considering Whether Students Recognize and React to Faculty Politics*, 42 PS: POLITICAL SCIENCE AND POLITICS 343 (Apr. 2009)**.**

22.    Exhibit U is a true and correct copy of McCarthy & Isaac Kamola, *Sensationalized Surveillance: Campus Reform and the Targeted Harassment of Faculty* 14-19, NEW POLITICAL SCIENCE, DOI: 10.1080/07393148.2021.1996837 (2021).

23.    Exhibit V is a true and correct copy of Plaintiff Barry Edwards's Verified Responses and Objections to Defendants' First Set of Interrogatories.

24.    Exhibit W is a true and correct copy of Plaintiff Jack Fiorito's Verified Responses and Objections to Defendants' First Set of Interrogatories.

25.    Exhibit X is a true and correct copy of Plaintiff William Link's Verified Responses and Objections to Defendants' First Set of Interrogatories.

26.    Exhibit Y is a true and correct copy of Plaintiff Julie Adams's Verified Responses and Objections to Defendants' First Set of Interrogatories.

27.    Exhibit Z is a true and correct copy of Plaintiff Blake Simpson's Verified Responses and Objections to Defendants' First Set of Interrogatories.

28.    Exhibit AA is a true and correct copy of a March 25, 2022 email from Defendants' counsel, George Levesque, to Plaintiffs' counsel.

29.    Exhibit BB is a true and correct copy of Isaac Kamola, *Dear Administrators: To Protect Your Faculty from Right-Wing Attacks, Follow the Money*, 10 AAUP J. OF ACADEMIC FREEDOM 4-8 (2019).

30.    Exhibit CC is a true and correct copy of the document titled "FLBOG Staff Survey Dec 7.docx," with is Bates stamped FSU000205-210.

31.    Exhibit DD is a true and correct copy of a February 10, 2022 email from Plaintiffs' counsel, Alexi Velez, to Defendants' counsel.

32.    Exhibit EE is a true and correct copy of a Monday, November 15, 2021 email from Jon Rogers to various individuals with email addresses using a Florida Board of Governors domain name attaching a November 15, 2021 version of the student survey, which is Bates stamped Defendants_007101.

33.    Exhibit FF is a true and correct excerpt from a certified transcript of February 17, 2021 meeting of the Florida House Post-Secondary Education & Lifelong Learning Subcommittee, which is Bates stamped PL_002924-3019.

34.    Exhibit GG is a true and correct copy of John Villasenor, *Views among college students regarding the First Amendment: Results from a new survey*,

Brookings Institution (Sept. 18, 2017), https://www.brookings.edu/blog/fix
gov/2017/09/18/views-among-college-students-regarding-the-first-amendment-
results-from-a-new-survey/.

35.     Exhibit HH is a true and correct copy of Lois Beckett, *'Junk science':*
*experts cast doubt on widely cited free speech survey*, The Guardian (Sept. 22, 2017),
https://www.theguardian.com/us-news/2017/sep/22/college-free-speech-violence-
survey-junk-science.

36.     Exhibit II a true and correct copy of Plaintiff David Price's Verified
Responses and Objections to Defendants' First Set of Interrogatories.

37.     Exhibit JJ is a true and correct copy of Mack D. Mariani & Gordon J.
Hewitt, *Indoctrination U.? Faculty Ideology and Changes in Student Political*
*Orientation*, 41 PS: POLITICAL SCIENCE & POLITICS 773 (Oct. 2008).

38.     Exhibit KK is a true and correct copy of Matthew Woessner & April
Kelly-Woessner, *Why College Students Drift Left: The Stability of Political Identity*
*and Relative Malleability of Issue Positions Among College Students*, 54 PS:
POLITICAL SCIENCE & POLITICS 657 (Oct. 2020).

39.     Exhibit LL is a true and correct copy of Michael Bérubé & Jennifer
Ruth, *When Professors' Speech is Disqualifying: Should academic freedom really*
*protect those who make false and morally repellent claims? It's time for a rethink*,
The New Republic (March 21, 2022).

40.   Exhibit MM is a true and correct copy of the video interview Ybeth Bruzul, *New Florida bill calls for annual evaluations of all university viewpoints*, Spectrum News 13 (July 18, 2021), available at https://www.mynews13.com/fl/orlando/political-connections/2021/07/16/political-connections?cid=share_fb&fbclid=IwAR3SNMHL5SOQGh1cXeCPhRCERjTAarfftJB6rf8g-egSS3VAtPiCrK3-uLY.

41.   Exhibit NN is a true and correct copy of AERA, *AERA Statement on the Significance of Academic Freedom in a Divisive Political Climate* (Feb. 22, 2022), available at https://www.aera.net/Newsroom/AERA-Statement-on-the-Significance-of-Academic-Freedom-in-a-Divisive-Political-Climate.


I declare under penalty of perjury that the foregoing is true and correct.

DATED: March 26, 2022                    /s/ *Alexi M. Velez*
                                         Alexi M. Velez*
                                         ELIAS LAW GROUP LLP
                                         10 G Street NE, Suite 600
                                         Washington, D.C. 20002
                                         Telephone: (202) 968-4654
                                         avelez@elias.law

                                         *Counsel for Plaintiffs*

                                         *Admitted Pro Hac Vice*

# EXHIBIT A

**Alexi Velez**

| | |
|---|---|
| **From:** | George Levesque <George.Levesque@gray-robinson.com> |
| **Sent:** | Wednesday, March 23, 2022 5:45 PM |
| **To:** | Angie Price; Fritz Wermuth; Tim Moore, Jr. |
| **Cc:** | Melissa Hill; Robyn Kramer; Elisabeth Frost; Noah Baron |
| **Subject:** | RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request |

Thanks for sharing.  To be clear, we are not moving to request any extension; however, we won't oppose the motion.  It should not be styled as a joint motion.  The summarization includes statements with which we would disagree, but as a matter of courtesy and professionalism, we are not opposing the relief you are requesting.

Also, since you make reference to this in your motion, I received word this afternoon that the student survey is presently targeted to be distributed by the Board of Governors to the universities on April 4.  I don't know when the staff survey will be distributed to the universities.  As far as I know, the surveys are still a work in progress, and these dates are not set in stone.

George

| | T | 850-577-9090 |
|---|---|---|
| | D | 850-577-6969 |
| | F | 850-577-3311 |

**George Levesque**
Shareholder

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**From:** Angie Price <APrice@kbzwlaw.com>
**Sent:** Wednesday, March 23, 2022 5:20 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

Hey George – here's our motion for your review before we file.

Angie Price | Paralegal
aprice@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P . A .
Tel: 407-422-2472

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Wednesday, March 23, 2022 3:43 PM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, we do not oppose the motion.

|  | **T** 850-577-9090 |
|  | **D** 850-577-6969 |
| **George Levesque** | **F** 850-577-3311 |
| Shareholder | |

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Tuesday, March 22, 2022 9:35 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

Hi George,

In light of the status of the productions and final survey, we think it makes sense to seek modification of the case management schedule, without altering the trial date. We propose to file a joint motion requesting the Court approve the following modified schedule. Please let us know whether you will join in this request. Thanks.

| Task | Scheduling Order Deadline | Proposed New Deadline |
|------|---------------------------|-----------------------|
| **Plaintiffs' Expert Witness Disclosure and Reports** | March 31, 2022 | **April 14, 2022** |
| **Defendants' Expert Witness Disclosure and Reports** | May 2, 2022 | **May 16, 2022** |
| **Plaintiffs' Rebuttal Expert Witness Disclosure and Reports** | Within the time set by Rule 26(a)(2)(d)(ii) (June 1, 2022) | **June 1, 2022** |

| Discovery Deadline (Fact and Expert Discovery) | June 8, 2022 | **June 15, 2022** |
|---|---|---|
| Deadline to file Motions for Summary Judgment and Other Dispositive Motions | June 29, 2022 | Same |
| Deadline for Pretrial Disclosures, including Witness and Exhibit Lists | August 17, 2022 | Same |
| Motions in Limine and *Daubert* Motions Deadline | August 31, 2022 | Same |
| Trial | September 19, 2022 | Same |

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Thursday, March 17, 2022 1:03 PM
**To:** Noah Baron <nbaron@elias.law>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Noah,
The surveys should be distributed to the students and faculty at the end of this month.

To your second question, I'm unable to provide a date for production. We understand your request for the supplement to our prior discovery responses to include the final survey that is distributed and the documents leading up to the final version. We are working on gathering those missing documents from the last production. Obviously, we can't give you document that doesn't yet exist, but once the final survey is finalized and distributed, we will provide those records to you as well.

George

**George Levesque**
Shareholder

T 850-577-9090
D 850-577-6969
F 850-577-3311

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**From:** Noah Baron <nbaron@elias.law>
**Sent:** Thursday, March 17, 2022 10:37 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Angie Price <aprice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

George,

Thanks for getting back to us. Fritz is out this week but I wanted to follow up with a few questions.

- Can you clarify what you mean by "the surveys should go out at the end of this month"? Does that mean that the survey will be distributed to faculty/staff/students at the end of the month, or does that mean that the supplemental production with the final drafts will be sent to *us* at the end of the month?

- If it is the former – that the surveys should be distributed by the end of March – can you provide us a specific date on which we can expect to receive the supplemental production, including any additional communications your clients have about the surveys and the process of preparing them, as well as the final drafts of the surveys?

As the second bullet above indicates, but I want to make sure is clear, we are seeking not only the final surveys, but a supplement of your production of documents for *all requests*, and especially those requests relating to the survey, which Fritz mentioned in his prior email. Please let me know if a conversation would be helpful.

Thanks,

**Noah Baron**
Associate
Elias Law Group
10 G St NE Ste 600
Washington DC 20002
202-968-4556

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Friday, March 11, 2022 11:22 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <aprice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, I have been informed that the surveys should go out at the end of this month.

We'll look into the issue related to the surveys.  We ran the searches on the same terms and the same custodians as the initial production.  If there are documents that we missed in that review, we will produce them as a supplement to the original production.

George

**T**  850-577-9090
**D**  850-577-6969
**F**  850-577-3311

**George Levesque**
Shareholder

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, March 11, 2022 10:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Thank you, George. We are aware of the documents that you reference. Both are dated in September of 2021. The most recent documents related to surveys we have been able to find in any of Defendants productions are from October 2021. Please let me know asap if you are aware of any more recent materials related to the survey that have been produced. We have been unable to locate anything. This is particularly concerning given that we have received more recent materials in response to public records requests. I am attaching some of those more recent drafts here; they were previously produced by us to you pursuant to your Second Set of Requests for Production to Plaintiffs. Those PRR responses also indicate that the survey will be finalized and actually distributed by February 2022 (See Defendants_001242). Given the existence of these documents, and this new information about the timeframe, Plaintiffs reasonably believe that your clients have documents responsive to our requests not yet produced. Please consult with your clients again. It is critical that they produce all materials related to the survey as requested by our discovery requests (See Plaintiff's First Requests for Production at Nos. 2 and 6, as well as Plaintiff's First Set of Interrogatories Nos. 1, 2, 7, 8, and 9).

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, March 8, 2022 9:55 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim

Moore, Jr. <tim.moore@gray-robinson.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz,  Draft surveys were indeed included in the supplemental production.  I believe the records you were looking for are Defendants_007335-42 (Student Survey) and Defendants_007247-54 (Faculty Survey).

I'm not aware of the current status of the survey, but I have inquired and can provide an update once I know more.

George

| | |
|---|---|
| | **T** 850-577-9090 |
| | **D** 850-577-6969 |
| | **F** 850-577-3311 |
| **George Levesque** | |
| Shareholder | |

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Thursday, March 3, 2022 11:28 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

Hi George,

Please let me know the status of the final survey, which I know you were expecting to be available late February or early March.   Also, your supplement did not appear to include draft of the survey.  We request that you provide all drafts as part of the supplement.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Monday, February 21, 2022 9:04 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, we expect to make a supplemental production this week.

Your reading of the order is consistent with ours. Also, I wanted to raise one more point about the order – it appears the order reinstates mediation, requiring it to start within 14 days of the close of discovery.  In addition to calculating the wrong date for the close of discovery, it appears the court overlooked that it had previously relieved us of those obligations, and that order (ECF No. 59) was not referenced in any way in the current order.

While I believe this is just an oversight, I welcome your thoughts on how you would like to proceed.

**George Levesque**
Shareholder

**T** 850-577-9090
**D** 850-577-6969
**F** 850-577-3311

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, February 18, 2022 10:36 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Hi George and Tim,

Please provide an update on the status of your supplemental discovery responses.

Also, I would like to confirm that you read the Court's attached order (ECF No. 69) as I do, which is that he accepted the proposed deadlines in our motion (ECF No. 64), even though he only specifically referenced the discovery deadline.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Thursday, January 13, 2022 7:24 PM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz,

We are working on supplementing the Board of Governor's responses for the requests identified below.  The records are being gathered, but I don't have an indication as to how many there are.

George



**George Levesque**
Shareholder

**T** 850-577-9090
**D** 850-577-6969
**F** 850-577-3311

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Thursday, January 13, 2022 4:04 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Hi George,

I'm circling back to get your response to our request that you supplement your responses regarding the survey materials (as referenced below).  Please let us know the status of the supplement.

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, January 4, 2022 3:21 PM
**To:** Melissa Hill <mhill@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, apologies for the delay.  To your second question, I believe we produced the requested document.  The first attachment is the document you reference, the second document, Bates No. Defendants_000339, is the Update Memorandum #1 that was previously produced.

To your first question, we're looking at your request, and I hope to have a response later this week.

George

| | |
|---|---|
| | T  850-577-9090 |
| | D  850-577-6969 |
| | F  850-577-3311 |
| **George Levesque** | |
| Shareholder | |

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Melissa Hill <mhill@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:20 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

+ Angie Price.

Melissa Hill | Paralegal
mhill@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P . A .
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:11 AM

**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Hi George and Tim,

Happy New Year.  I am following up on my email below to check the status of your effort and response.  Please let us know your response as soon as possible.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** Fritz Wermuth
**Sent:** Thursday, December 16, 2021 6:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill (mhill@kbzwlaw.com) <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT B

**Alexi Velez**

| | |
|---|---|
| **From:** | Fritz Wermuth <FWermuth@kbzwlaw.com> |
| **Sent:** | Thursday, December 16, 2021 6:43 AM |
| **To:** | George Levesque; Tim Moore, Jr. |
| **Cc:** | Melissa Hill; Noah Baron |
| **Subject:** | Link/UFF v. Corcoran et al.  -- Discovery Supplementation Request |

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT C

**Alexi Velez**

| | |
|---|---|
| **From:** | Fritz Wermuth <FWermuth@kbzwlaw.com> |
| **Sent:** | Tuesday, January 4, 2022 10:11 AM |
| **To:** | George Levesque; Tim Moore, Jr. |
| **Cc:** | Melissa Hill; Noah Baron |
| **Subject:** | RE: Link/UFF v. Corcoran et al.  -- Discovery Supplementation Request |

Hi George and Tim,

Happy New Year.  I am following up on my email below to check the status of your effort and response.  Please let us know your response as soon as possible.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** Fritz Wermuth
**Sent:** Thursday, December 16, 2021 6:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill (mhill@kbzwlaw.com) <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801

Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT D

**Alexi Velez**

| | |
|---|---|
| **From:** | Fritz Wermuth <FWermuth@kbzwlaw.com> |
| **Sent:** | Thursday, January 13, 2022 4:04 PM |
| **To:** | George Levesque; Melissa Hill; Tim Moore, Jr. |
| **Cc:** | Noah Baron; Angie Price |
| **Subject:** | RE: Link/UFF v. Corcoran et al.  -- Discovery Supplementation Request |

Hi George,

I'm circling back to get your response to our request that you supplement your responses regarding the survey materials (as referenced below).  Please let us know the status of the supplement.

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, January 4, 2022 3:21 PM
**To:** Melissa Hill <mhill@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, apologies for the delay.  To your second question, I believe we produced the requested document.  The first attachment is the document you reference, the second document, Bates No. Defendants_000339, is the Update Memorandum #1 that was previously produced.

To your first question, we're looking at your request, and I hope to have a response later this week.

George



| | |
|---|---|
| **T** | 850-577-9090 |
| **D** | 850-577-6969 |
| **F** | 850-577-3311 |

**George Levesque**
Shareholder

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Melissa Hill <mhill@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:20 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

+ Angie Price.

Melissa Hill | Paralegal
mhill@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P . A .
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:11 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Hi George and Tim,

Happy New Year.  I am following up on my email below to check the status of your effort and response.  Please let us know your response as soon as possible.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P . A .

**From:** Fritz Wermuth
**Sent:** Thursday, December 16, 2021 6:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill (mhill@kbzwlaw.com) <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:
- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT E

**Alexi Velez**

| | |
|---|---|
| **From:** | Fritz Wermuth <FWermuth@kbzwlaw.com> |
| **Sent:** | Thursday, March 3, 2022 11:28 AM |
| **To:** | George Levesque |
| **Cc:** | Noah Baron; Angie Price; Melissa Hill; Tim Moore, Jr. |
| **Subject:** | RE: Link/UFF v. Corcoran et al.  -- Discovery Supplementation Request |

Hi George,

Please let me know the status of the final survey, which I know you were expecting to be available late February or early March.  Also, your supplement did not appear to include draft of the survey.  We request that you provide all drafts as part of the supplement.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Monday, February 21, 2022 9:04 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, we expect to make a supplemental production this week.

Your reading of the order is consistent with ours. Also, I wanted to raise one more point about the order – it appears the order reinstates mediation, requiring it to start within 14 days of the close of discovery.  In addition to calculating the wrong date for the close of discovery, it appears the court overlooked that it had previously relieved us of those obligations, and that order (ECF No. 59) was not referenced in any way in the current order.

While I believe this is just an oversight, I welcome your thoughts on how you would like to proceed.



| | |
|---|---|
| **T** 850-577-9090 | |
| **D** 850-577-6969 | |
| **F** 850-577-3311 | |

**George Levesque**
Shareholder

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, February 18, 2022 10:36 AM

1

**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

Hi George and Tim,

Please provide an update on the status of your supplemental discovery responses.

Also, I would like to confirm that you read the Court's attached order (ECF No. 69) as I do, which is that he accepted the proposed deadlines in our motion (ECF No. 64), even though he only specifically referenced the discovery deadline.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Thursday, January 13, 2022 7:24 PM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz,
We are working on supplementing the Board of Governor's responses for the requests identified below. The records are being gathered, but I don't have an indication as to how many there are.

George



**George Levesque**
Shareholder

T   850-577-9090
D   850-577-6969
F   850-577-3311

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Thursday, January 13, 2022 4:04 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

This message originated outside of GrayRobinson.

Hi George,

I'm circling back to get your response to our request that you supplement your responses regarding the survey materials (as referenced below).  Please let us know the status of the supplement.

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.


Fritz Wermuth | Shareholder
[fwermuth@kbzwlaw.com](mailto:fwermuth@kbzwlaw.com)
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, January 4, 2022 3:21 PM
**To:** Melissa Hill <mhill@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, apologies for the delay.  To your second question, I believe we produced the requested document.  The first attachment is the document you reference, the second document, Bates No. Defendants_000339, is the Update Memorandum #1 that was previously produced.

To your first question, we're looking at your request, and I hope to have a response later this week.

George


**George Levesque**
Shareholder



T  850-577-9090
D  850-577-6969
F  850-577-3311

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Melissa Hill <mhill@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:20 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

+ Angie Price.

Melissa Hill | Paralegal
mhill@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:11 AM
**To:** George Levesque <george.levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Hi George and Tim,

Happy New Year.  I am following up on my email below to check the status of your effort and response.  Please let us know your response as soon as possible.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
K I N G ,   B L A C K W E L L ,   Z E H N D E R   &   W E R M U T H ,   P.A.

---

**From:** Fritz Wermuth
**Sent:** Thursday, December 16, 2021 6:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill (mhill@kbzwlaw.com) <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:
- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT F

**Alexi Velez**

| | |
|---|---|
| **From:** | Noah Baron <nbaron@elias.law> |
| **Sent:** | Thursday, March 17, 2022 10:37 AM |
| **To:** | George Levesque; Fritz Wermuth; Tim Moore, Jr. |
| **Cc:** | Angie Price; Melissa Hill; Robyn Kramer; Elisabeth Frost |
| **Subject:** | RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request |

George,

Thanks for getting back to us. Fritz is out this week but I wanted to follow up with a few questions.

- Can you clarify what you mean by "the surveys should go out at the end of this month"? Does that mean that the survey will be distributed to faculty/staff/students at the end of the month, or does that mean that the supplemental production with the final drafts will be sent to *us* at the end of the month?

- If it is the former – that the surveys should be distributed by the end of March – can you provide us a specific date on which we can expect to receive the supplemental production, including any additional communications your clients have about the surveys and the process of preparing them, as well as the final drafts of the surveys?

As the second bullet above indicates, but I want to make sure is clear, we are seeking not only the final surveys, but a supplement of your production of documents for *all requests*, and especially those requests relating to the survey, which Fritz mentioned in his prior email. Please let me know if a conversation would be helpful.

Thanks,

**Noah Baron**
Associate
Elias Law Group
10 G St NE Ste 600
Washington DC 20002
202-968-4556

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Friday, March 11, 2022 11:22 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <aprice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, I have been informed that the surveys should go out at the end of this month.

We'll look into the issue related to the surveys.  We ran the searches on the same terms and the same custodians as the initial production.  If there are documents that we missed in that review, we will produce them as a supplement to the original production.

George

**T** 850-577-9090
**D** 850-577-6969
**F** 850-577-3311

**George Levesque**
Shareholder

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, March 11, 2022 10:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Thank you, George. We are aware of the documents that you reference. Both are dated in September of 2021. The most recent documents related to surveys we have been able to find in any of Defendants productions are from October 2021. Please let me know asap of you are aware of any more recent materials related to the survey that have been produced. We have been unable to locate anything. This is particularly concerning given that we have received more recent materials in response to public records requests. I am attaching some of those more recent drafts here; they were previously produced by us to you pursuant to your Second Set of Requests for Production to Plaintiffs. Those PRR responses also indicate that the survey will be finalized and actually distributed by February 2022 (See Defendants_001242). Given the existence of these documents, and this new information about the timeframe, Plaintiffs reasonably believe that your clients have documents responsive to our requests not yet produced. Please consult with your clients. It is critical that they produce all materials related to the survey as requested by our discovery requests (See Plaintiff's First Requests for Production at Nos. 2 and 6, as well as Plaintiff's First Set of Interrogatories Nos. 1, 2, 7, 8, and 9).

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, March 8, 2022 9:55 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz,  Draft surveys were indeed included in the supplemental production.  I believe the records you were looking for are Defendants_007335-42 (Student Survey) and Defendants_007247-54 (Faculty Survey).

I'm not aware of the current status of the survey, but I have inquired and can provide an update once I know more.

George



**George Levesque**

Shareholder

GrayRobinson, P.A. • 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Thursday, March 3, 2022 11:28 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Hi George,

Please let me know the status of the final survey, which I know you were expecting to be available late February or early March.  Also, your supplement did not appear to include draft of the survey.  We request that you provide all drafts as part of the supplement.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Monday, February 21, 2022 9:04 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, we expect to make a supplemental production this week.

Your reading of the order is consistent with ours. Also, I wanted to raise one more point about the order – it appears the order reinstates mediation, requiring it to start within 14 days of the close of discovery.  In addition to calculating the wrong date for the close of discovery, it appears the court overlooked that it had previously relieved us of those obligations, and that order (ECF No. 59) was not referenced in any way in the current order.

While I believe this is just an oversight, I welcome your thoughts on how you would like to proceed.



**George Levesque**
Shareholder

**T** 850-577-9090
**D** 850-577-6969
**F** 850-577-3311

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, February 18, 2022 10:36 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

---

**This message originated outside of GrayRobinson.**

---

Hi George and Tim,

Please provide an update on the status of your supplemental discovery responses.

Also, I would like to confirm that you read the Court's attached order (ECF No. 69) as I do, which is that he accepted the proposed deadlines in our motion (ECF No. 64), even though he only specifically referenced the discovery deadline.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Thursday, January 13, 2022 7:24 PM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz,
We are working on supplementing the Board of Governor's responses for the requests identified below.  The records are being gathered, but I don't have an indication as to how many there are.

George



**George Levesque**
Shareholder



GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301

**T** 850-577-9090
**D** 850-577-6969
**F** 850-577-3311

---

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Thursday, January 13, 2022 4:04 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Melissa Hill <mhill@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

---

Hi George,

I'm circling back to get your response to our request that you supplement your responses regarding the survey materials (as referenced below).  Please let us know the status of the supplement.

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** George Levesque <George.Levesque@gray-robinson.com>
**Sent:** Tuesday, January 4, 2022 3:21 PM
**To:** Melissa Hill <mhill@kbzwlaw.com>; Fritz Wermuth <FWermuth@kbzwlaw.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Fritz, apologies for the delay.  To your second question, I believe we produced the requested document.  The first attachment is the document you reference, the second document, Bates No. Defendants_000339, is the Update Memorandum #1 that was previously produced.

To your first question, we're looking at your request, and I hope to have a response later this week.

George

| | T | 850-577-9090 |
| | D | 850-577-6969 |
| | F | 850-577-3311 |

**George Levesque**
Shareholder

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Melissa Hill <mhill@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:20 AM
**To:** Fritz Wermuth <FWermuth@kbzwlaw.com>; George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Noah Baron <nbaron@elias.law>; Angie Price <APrice@kbzwlaw.com>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

**This message originated outside of GrayRobinson.**

+ Angie Price.

Melissa Hill | Paralegal
mhill@kbzwlaw.com
K I N G ,  B L A C K W E L L ,  Z E H N D E R  &  W E R M U T H ,  P . A .
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Tuesday, January 4, 2022 10:11 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** RE: Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Hi George and Tim,

Happy New Year.  I am following up on my email below to check the status of your effort and response.  Please let us know your response as soon as possible.  Thanks.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

---

**From:** Fritz Wermuth
**Sent:** Thursday, December 16, 2021 6:43 AM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** Melissa Hill (mhill@kbzwlaw.com) <mhill@kbzwlaw.com>; Noah Baron <nbaron@elias.law>
**Subject:** Link/UFF v. Corcoran et al. -- Discovery Supplementation Request

Dear Counsel,

I hope this e-mail finds you well. I write to you to request supplemental and ongoing production of documents relating to the Survey Provision. *See* Fed. R. Civ. P. 26(e)(1)(A).

As you may recall, Plaintiffs previously propounded discovery requests seeking:

- Documents "related to the Survey Provisions and the Survey that it requires." *E.g.*, Corcoran Request for Production No. 2.
- Documents "regarding or related to the ideological makeup or viewpoint diversity of faculty, students, and staff in Florida's public post-secondary schools." *E.g.*, Corcoran Request for Production No. 6.

Your responses to those requests were served on October 25, 2021, about two months ago. Because the design of the survey appears to be ongoing, we ask that you conduct another search for responsive documents.

We also ask that you conduct another search for a document we believe may have been inadvertently omitted from your last production. In that production, you provided documents relating to the Survey Provision which indicate the existence of "Update Memorandum #1," which was to provide an update on progress related to the design of the survey and provide a "summary of the core literature shaping the project." Bates No. Defendants_001503. However, we were unable to identify such a document in the documents produced.

Regards,

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT G

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
<span style="color:red">**Faculty Survey**</span>

## Opening Message for Survey

In Spring 2021, the Florida Legislature passed HB233 to promote Intellectual
Freedom and Viewpoint Diversity within the State of Florida's State University
System. The Florida Board of Governors (FLBOG) was asked to create "an
objective, nonpartisan, and statistically valid survey to be used by each institution
which considers the extent to which competing ideas and perspectives are
presented and members of the college community, including students, faculty,
and staff, feel free to express their beliefs and viewpoints on campus and in the
classroom."

The goal of this anonymous survey is to obtain opinions on intellectual freedom
and viewpoint diversity at *[university name]*, drawing on your experiences as a
faculty member there. You will be asked a number of questions about these
topics and about yourself. Your participation is voluntary. You are free not to
answer any question or to withdraw from the study at any time. This survey
should take approximately 10 minutes to complete.

Responses will be analyzed for the entire institution and findings will be reported
by the FLBOG to the State Legislature as required. Only grouped responses will be
reported; any data or results that might compromise a respondent's identity will
not be published.

## Intellectual Freedom and Viewpoint Diversity

On my campus, how often are students encouraged to consider a wider variety of
viewpoints and perspectives on social and political issues?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

1

On my campus, how often do university events and presentations on social and
political issues present only one side of the issue?

- All of the Time
- Most of the Time
- About Half the Time
- Only Some of the Time
- Never
- Don't Know

On my campus, how often do *instructors* present social and political issues in an
unfair and one-sided manner?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

On my campus, how often do *instructors* create an environment that is hostile to
certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

On my campus, how often do *students* create an environment that is hostile to
certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely

2

FSU001777

- Never
- Don't Know

On my campus, how often do *staff* create an environment that is hostile to certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

**Freedom of Expression on Campus**

Think about teaching a class session that centered upon a discussion of a *Non-Controversial* issue. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion
- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

Think about teaching a class session that centered upon a discussion of a controversial issue on *Race*. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion
- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

Think about teaching a class session that centered upon a discussion of a controversial *Political* issue. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion

3

- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

Think about teaching a class session that centered upon a discussion of a controversial issue on *Religion*. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion
- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

Think about teaching a class session that centered upon a discussion of a controversial issue on *Gender*. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion
- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

Think about teaching a class session that centered upon a discussion of a controversial issue on *Sexual Orientation*. How comfortable or reluctant would you feel about leading the discussion on this topic?

- I would be very comfortable leading this discussion
- I would be somewhat comfortable leading this discussion
- Neutral
- I would be somewhat reluctant leading this discussion
- I would be very reluctant leading this discussion

As you think about leading the discussion on one of these *controversial* issues during a class, how concerned would you be that the following would occur?

Students would criticize my views as offensive.
- Not at all concerned
- Slightly concerned

4

- Somewhat concerned
- Very concerned
- Extremely concerned

Someone would post critical comments about my views on social media.
- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned

**Your Political Views**

Generally speaking, you would say that you think of yourself as a…

- Republican
- Independent
- Democrat

On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?

1. Extremely liberal
2. Somewhat liberal
3. Moderate leaning liberal
4. Moderate
5. Moderate leaning conservative
6. Somewhat conservative
7. Extremely conservative

Thinking about *students* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?

- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

5

FSU001780

Thinking about *faculty* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?

- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

Thinking about *staff* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?

- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

**Demographic Information**

In which college is your primary appointment?

- Get list of colleges from each institution

What is your present academic rank?

- Full Professor
- Associate Professor
- Assistant Professor
- Instructor/Lecturer/Specialized Faculty (non-tenure track)
- Prefer Not to Answer

Are you tenured?

- Yes
- No
- Not Applicable
- Prefer Not to Answer

Which of the following describes your race? You can select as many as apply.

6

- American Indian or Alaska Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other
- Prefer Not to Answer

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female/Woman
- Male/Man
- Transgender Female/Woman
- Transgender Male/Man
- Gender Variant/Non-conforming
- Prefer Not to Answer

What is your sexual orientation?

- Heterosexual/Straight
- Asexual
- Bisexual
- Gay
- Lesbian
- Pansexual
- Queer
- Not Listed Above
- Prefer Not to Answer

What is your primary religious affiliation, if any?

- Evangelical Protestant
- Mainline Protestant

FSU001782

- Historically Black Protestant
- Catholic
- Latter Day Saints / Mormon
- Orthodox Christian
- Jehovah's Witness
- Other Christian
- Unitarian / Universalist
- Jewish
- Muslim
- Buddhist
- Hindu
- Other religion
- Atheist
- Agnostic
- No religious affiliation / None
- Prefer Not to Answer

Which of the following describes your faculty appointment?

- Tenure track, untenured faculty member
- Tenured faculty member
- Specialized/Non-tenure track

8

# EXHIBIT H

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
**<span style="color:red">Student Survey</span>**

## Opening Message for Survey

In Spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

The goal of this anonymous survey is to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a student there. You will be asked a number of questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 10 minutes to complete.

Responses will be analyzed for the entire institution and findings will be reported by the FLBOG to the State Legislature as required. Only grouped responses will be reported; any data or results that might compromise a respondent's identity will not be published.

## Intellectual Freedom and Viewpoint Diversity on My Campus

On my campus, how often are students encouraged to consider a wider variety of viewpoints and perspectives on social and political issues?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

1

On my campus, how often do university events and presentations on social and political issues present only one side of the issue?

- All of the Time
- Most of the Time
- About Half the Time
- Only Some of the Time
- Never
- Don't Know

On my campus, how often do *instructors* present social and political issues in an unfair and one-sided manner?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

On my campus, how often do *instructors* create an environment that is hostile to certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

On my campus, how often do *students* create an environment that is hostile to certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely

2

FSU001797

- Never
- Don't Know

On my campus, how often do *staff* create an environment that is hostile to certain social or political views?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know

## Freedom of Expression on My Campus

Think about being at your school in a class that was discussing a *Non-Controversial* issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about *Race*. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial *Political* issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views

3

FSU001798

- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about *Religion*. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about *Gender*. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about *Sexual Orientation*. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

If you were to speak up and give your views on one of these CONTROVERSIAL issues during a class discussion, how concerned would you be that the following would occur?

The instructor would criticize my views as offensive.

4

FSU001799

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned

The instructor would give me a lower grade because of my views.

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned

Other students would criticize my views as offensive.
- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned

Someone would post critical comments about my views on social media.
- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned

**Your Political Views**

Generally speaking, you would say that you think of yourself as a…

- Democrat
- Independent
- Republican

On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?

5

1. Extremely liberal
2. Somewhat liberal
3. Moderate leaning liberal
4. Moderate
5. Moderate leaning conservative
6. Somewhat conservative
7. Extremely conservative

Thinking about *students* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?

- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

Thinking about *faculty* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?
- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

Thinking about *staff* at your institution, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?
- Most are to the left of me
- Most are to the right of me
- Most have positions close to mine
- About as many are to the left of me as to the right of me
- Don't know

**Information About You**

What college is home to your primary major or program of study?

- Get list of colleges from each institution

6

At what level are you in your studies?

- Freshman
- Sophomore
- Junior
- Senior
- Graduate Student
- Prefer Not to Answer

Which of the following describes your race? You can select as many as apply.

- American Indian or Alaska Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other
- Prefer Not to Answer

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female/Woman
- Male/Man
- Transgender Female/Woman
- Transgender Male/Man
- Gender Variant/Non-conforming
- Prefer Not to Answer

What is your sexual orientation?

- Heterosexual/Straight
- Asexual
- Bisexual

7

FSU001802

- Gay
- Lesbian
- Pansexual
- Queer
- Not Listed Above
- Prefer Not to Answer

What is your primary religious affiliation, if any?

- Evangelical Protestant
- Mainline Protestant
- Historically Black Protestant
- Catholic
- Latter Day Saints / Mormon
- Orthodox Christian
- Jehovah's Witness
- Other Christian
- Unitarian / Universalist
- Jewish
- Muslim
- Buddhist
- Hindu
- Other religion
- Atheist
- Agnostic
- No religious affiliation / None
- Prefer Not to Answer

8

# EXHIBIT I

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
**Student Survey**

<u>**Opening Message for Survey**</u>

In Spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

The goal of this anonymous survey is to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a student there. You will be asked a number of questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 10 minutes to complete.

Responses will be analyzed for the entire institution and findings will be reported by the FLBOG to the State Legislature as required. Only grouped responses will be reported; any data or results that might compromise a respondent's identity will not be published.

<u>**Intellectual Freedom and Viewpoint Diversity on My Campus**</u>

On my campus, panel discussions and presentations on social and political issues typically seem one-sided.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR1]:** Hi Tim, Let me reiterate the concerns that I have already articulated about this survey. As decades of survey research have shown, good surveys have the potential to illuminate critical issues regarding a workplace or community. The COACHE survey is a great example in this regard. A bad survey can create confusion, problems and sow discord. While I do not know what the implications of this survey will be, I do know that this is not a good survey. The dependent variable (intellectual freedom and viewpoint diversity) is not defined at all and several relevant independent variables are missing.

The problems that I outlined previously:

The Terminology used is overly political and will likely prime political responses. Terms such as "intolerant" and "hostile" should not be included in a survey that is intended to explore what the SUS does well and where it needs to improve. It is particularly concerning that these loaded terms were not defined for respondents.

The survey lacks specificity in ways that are confusing and make the survey read as a political tool rather than a legitimate effort to improve the SUS system. For example, I'm not sure why we would ask faculty if readings only present one side of a controversial issue when disciplines

**Commented [DR2]:** The phrase "intellectual freedom and viewpoint diversity" require definition. I recommend dropping the phrase entirely since it is political and can only be defined in political ways. Specifically, this phraseology suggests that faculty and students should evaluate a college/university according to the "air time" progressive and conservative talking points get on campus. It assumes that the equal exposure to the ideas associated with the two dominant political parties is the sine qua non of educational quality.

The use of the phrase "intellectual diversity" is better since it can be defined and contextualized. We know, for example, that intellectual diversity is not about evaluating the theoretical debates and developments associated with a particular discipline. Intellectual diversity exists when campuses provide a place where faculty and students ask questions and have the ability to approach a problem, whatever its nature, from a variety of perspectives.  Debra

**Commented [DR3]:** This is a political question, not a survey question. What kind of panel discussion and presentations? Those sponsored by RSO's? What is the temporal context here? It seems like we would have respondents tell us the extent to which they pay attention to what's happening on campus, where they get information regarding panels/presentations from and provide a clear sense of what kinds of panels/discussions are the reference point. What is meant by "one-sided?" If they survey is asking respondents to think about presentations inside a department or center, how care respondents supposed to evaluate this?

FSU001733

On my campus, courses have readings which present only one side of a controversial issue.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR4]:** Again, this is a political question. An appropriate survey question would ask about the mix of readings (academic to non-academic) read in class, and, MORE IMPORTANTLY, are learners given guidance disciplinary frameworks – meaning they are told how someone from "X" discipline would read the material or what they would focus on to understand, in this case, a controversial issue.

On my campus, courses present social and political issues in an unfair and one-sided manner.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR5]:** Same comment. What is meant by unfair and one-sided when it comes to course material? A legitimate survey would probe to assess whether students are learning disciplinary appropriate perspectives and the makeup of their coursework, which is also key to fostering intellectual diversity and students ready to succeed in the workforce.

On my campus, professors are intolerant of certain political and social viewpoints.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR6]:** What is meant by intolerant? As noted above, one assumption undergirding this survey is that higher education is about political parties and their viewpoints. Certainly, there are students who get politically involved, something that isn't asked about on the survey, but this not a useful question. Useful questions, in this case, would ask about respective disagreement in the classroom and the extent to which they are happening – not to mention ask students about their own participation in practices that foster intellectual diversity.

On my campus, there are courses in which the professor creates an environment that is hostile to certain political or social views.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR7]:** This is a confusing question. What is meant by "hostile/" Is something hostile because a student finds it personally or intellectually challenging? If their politics doesn't neatly map onto the course material? If so, that seems extraordinarily problematic since secondary education is supposed to be challenging and our students need to be challenged so that they can be competitive in the rapidly changing global economy.

**Freedom of Expression on My Campus**

Think about being at your school in a class that was discussing a NON-CONTROVERSIAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about RACE. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial POLITICAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about RELIGION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

**Commented [DR8]:** This entire section baffles me since it is unclear what "freedom of expression" on campus has to do with a random class that a respondent is being asked to think about. Classrooms and campus are not the same spaces. Classrooms are places where students learn more about a topic from a specific disciplinary perspective. Campus provides the environment where students get involved in groups and clubs, explore internship and research opportunities, and attend talks and panels sponsored by RSOs as well as other entities on campus. If the goal of the survey is to grind a political axe, it will likely be a success on this front. If the survey is a legitimate assessment of the SUS, it should make these distinctions and ask questions about campus life and, in this case, student involvement in it.

FSU001735

Think about being at your school in a class that was discussing a controversial issue about GENDER. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about SEXUAL ORIENTATION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

**Your Political Views**

Generally speaking, you would say that you think of yourself as a...

- Democrat
- Independent
- Republican

On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?

1. Extremely liberal
2. Somewhat liberal
3. Moderate leaning liberal
4. Moderate
5. Moderate leaning conservative
6. Somewhat conservative
7. Extremely conservative

I believe that through hard work, everybody can succeed in American society.

- Strongly Agree

**Commented [DR9]:** What purpose do these questions serve beyond probing the relative conservativeness or progressiveness of a student? Does it contribute the exploration of the dependent variable?

- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that racial discrimination is no longer a major problem in America.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that undocumented immigrants should be denied access to public education.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that that universities have the right to ban extreme speakers from campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that dissent is a critical component of the political process.

- Strongly Agree
- Somewhat Agree
- Neutral

- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that colleges should prohibit racist/sexist speech on campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Demographic Information**

Which of the following describes your race? You can select as many as apply.

- American Indian or Alaska Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female/Woman
- Male/Man
- Transgender Female/Woman
- Transgender Male/Man
- Gender Variant/Non-conforming
- Prefer Not to Answer

What is your sexual orientation?

**Commented [DR10]:** So much relevant information missing such as year in school, number of courses taken, major, level of involvement on campus (e.g., number of RSOs to which they belong) and so on.

FSU001738

- Heterosexual/Straight
- Asexual
- Bisexual
- Gay
- Lesbian
- Pansexual
- Queer
- Not Listed Above
- Prefer Not to Answer

What is your primary religious affiliation, if any?

- Evangelical Protestant
- Mainline Protestant
- Historically Black Protestant
- Catholic
- Latter Day Saints / Mormon
- Orthodox Christian
- Jehovah's Witness
- Other Christian
- Unitarian / Universalist
- Jewish
- Muslim
- Buddhist
- Hindu
- Other religion
- Atheist
- Agnostic
- No religious affiliation / None
- Prefer Not to Answer

FSU001739

# EXHIBIT J

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
<span style="color:red">**Student Survey**</span>

**Opening Message for Survey**

In Spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

The goal of this anonymous survey is to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a student there. You will be asked a number of questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 10 minutes to complete.

Responses will be analyzed for the entire institution and findings will be reported by the FLBOG to the State Legislature as required. Only grouped responses will be reported; any data or results that might compromise a respondent's identity will not be published.

**Commented [LA1]:** This suggests that individual data will not be released.

**Intellectual Freedom and Viewpoint Diversity on My Campus**

On my campus, panel discussions and presentations on social and political issues typically seem one-sided.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA2]:** Do undergrads have panel discussions, what's a panel discussion. –where are these presentations and discussions not sure what undergrads will be thinking of here

**Commented [LA3]:** What does neutral mean. Lickert scales are icky. How about something like

All of the time
Most of the time
About ½ the time
Only some of the time
Never
Don't Know

FSU001740

On my campus, some or there are courses have readings which present only one side of a socially or politically controversial issue.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA4]:** There are suggests 1, do we want a low of 1? Some is more than 1, but not many.....also could do a how many question here.

**Commented [LA5]:** Ditto.....maybe we just get rid of the lickert scale

On my campus, courses present social and political issues in an unfair and one-sided manner.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA6]:** Do we mean instructors and teachers?

On my campus, [there are] or some professors [who] are intolerant of certain political and social viewpoints.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA7]:** Same as above there are suggests 1, some is more than 1

On my campus, there are courses in which the professor creates an environment that is hostile to certain political or social views.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

On your campus, how often are students  encouraged to consider a wider variety of viewpoints and perspectives?
_____ Very frequently
_____ Frequently
_____ Occasionally
_____ Rarely
_____ Very rarely
_____ Never
15

**Freedom of Expression on My Campus**

Think about being at your school in a class that was discussing a NON-CONTROVERSIAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about RACE. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial POLITICAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

FSU001742

Think about being at your school in a class that was discussing a controversial issue about RELIGION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about GENDER. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about SEXUAL ORIENTATION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

**<u>Your Political Views</u>**

Generally speaking, you would say that you think of yourself as a...

- Democrat
- Independent
- Republican

On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?

1. Extremely liberal

FSU001743

2. Somewhat liberal
3. Moderate leaning liberal
4. Moderate
5. Moderate leaning conservative
6. Somewhat conservative
7. Extremely conservative

Do we want any of the consequences – I also find what the report does that students are very worried about each other?

7.

I believe that through hard work, everybody can succeed in American society.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA8]:** Not sure about keeping

I believe that racial discrimination is no longer a major problem in America.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA9]:** Consider cutting

I believe that undocumented immigrants should be denied access to public education.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [LA10]:** Consider cutting

I believe that that universities have the right to ban extreme speakers from campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that dissent is a critical component of the political process.

| Commented [LA11]: Dissent....debate? |

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that colleges should prohibit racist/sexist speech on campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

| Commented [LA12]: Cut? |

**Demographic Information**

Which of the following describes your race? You can select as many as apply.

- American Indian or Alaska Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female/Woman
- Male/Man
- Transgender Female/Woman
- Transgender Male/Man
- Gender Variant/Non-conforming
- Prefer Not to Answer

What is your sexual orientation?

- Heterosexual/Straight
- Asexual
- Bisexual
- Gay
- Lesbian
- Pansexual
- Queer
- Not Listed Above
- Prefer Not to Answer

What is your primary religious affiliation, if any?

- Evangelical Protestant
- Mainline Protestant
- Historically Black Protestant
- Catholic
- Latter Day Saints / Mormon
- Orthodox Christian
- Jehovah's Witness
- Other Christian
- Unitarian / Universalist
- Jewish
- Muslim
- Buddhist

FSU001746

- Hindu
- Other religion
- Atheist
- Agnostic
- No religious affiliation / None
- Prefer Not to Answer

Class rank

Freshman

Sophomore

Junior

Senior

Graduate

Major (pull down) –Heterodox has the following:

Business Health Profession Social Science Engineering Biological Science Arts Education Humanities Physical Science Mathematics/ Statistics Religion/ Theology Something else Prefer not to say Total

Should we consider these:

Thinking about STUDENTS at your college/university, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?
_____ Most are to the left of me
_____ Most are to the right of me
_____ Most have positions close to mine
_____ About as many are to the left of me as to the right of me
_____ **Don't know**
Thinking about FACULTY at your college/university, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?
_____ Most are to the left of me

FSU001747

_____ Most are to the right of me
_____ Most have positions close to mine
_____ About as many are to the left of me as to the right of me
_____ **Don't know**
Thinking about ADMINISTRATORS at your college/university, would you say most are politically to the left of you (more liberal) or politically to the right of you (more conservative)?
_____ Most are to the left of me
_____ Most are to the right of me
_____ Most have positions close to mine
_____ About as many are to the left of me as to the right of me
_____ **Don't know**

## Appendix C: Viewpoint Diversity Module. –Considers implications
14

Not sure about these.

Consequence Items If you were to speak up and give your views on one of these CONTROVERSIAL issues during a class discussion, how concerned would you be that the following would occur :

The professor would criticize my views as offensive.

_____ Not at all concerned

_____ Slightly concerned

_____ Somewhat concerned

_____ Very concerned

_____ Extremely concerned

The professor would give me a lower grade because of my views.

_____ Not at all concerned

_____ Slightly concerned

_____ Somewhat concerned

_____ Very concerned

_____ Extremely concerned

The professor would say my views are wrong.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned

_____ Extremely concerned

Other students would criticize my views as offensive.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned
Someone would post critical comments about my views on social media.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned

Someone would file a complaint claiming that my views violated a campus harassment policy or code of conduct.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned

Think about being at your school in a class that was discussing a NON-CONTROVERSIAL issue.
How comfortable or reluctant would you feel about speaking up and giving your views on this topic?
_____ I would be very comfortable giving my views.
_____ I would be somewhat comfortable giving my views.
_____ I would be somewhat reluctant giving my views.
_____ I would be very reluctant giving my views. I
f you were to speak up and give your views about a NON-CONTROVERSIAL issue during a class discussion, how concerned would you be that the following would occur:
The professor would criticize my views as offensive.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned
The professor would give me a lower grade because of my views.
_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned
The professor would say my views are wrong.

**Commented [LA13]:** Not sure this applies here or not.

FSU001749

_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned

Other students would criticize my views as offensive.

_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned

Someone would post critical comments about my views on social media.

_____ Not at all concerned
_____ Slightly concerned
_____ Somewhat concerned
_____ Very concerned
_____ Extremely concerned

•

# EXHIBIT K

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
<span style="color:red">**Student Survey**</span>

**Opening Message for Survey**

In spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

This anonymous survey is intended to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a student there. You will be asked questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 5 minutes to complete.

*Note: You must be 18 years of age or older may participate in this survey.*

Responses will be analyzed for the institution and only grouped responses will be reported. Any data or results that might compromise a respondent's identity will not be published.

By completing this survey, you are consenting to participate in this study.

**Intellectual Freedom and Viewpoint Diversity on My Campus**

In your experience, how often are students encouraged to consider a wide variety of viewpoints and perspectives in the classroom?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely

**Commented [THS1]:** Add here the suggested consent-type language, while preserving your language above:

We will not record your name or any information that shows your identity. We will securely store your information. Your email addresses used to contact you are not ever linked to any response, and the email address file is kept separate from response data. All data will be securely collected, transmitted and stored using password, encryption and other authentication protection.

<span style="color:red">If you plan to obtain the Certificate of Confidentiality, then add the following: this research is covered by a Certificate of Confidentiality from the National Institutes of Health, which protects against any compelled disclosure of information about you in any legal or court action. Go here to learn more.</span>

<span style="color:red">If you have any questions, please contact *[list investigator's name, FSU e-mail, and telephone number]*. [*If the researcher is a student, include the faculty advisor's name, FSU e-mail and phone number as well*].</span>

The FSU Institutional Review Board has approved of this study. If you have any questions about your rights as a research participant, you may contact the IRB at (850) 644-7900 or humansubjects@fsu.edu.

1

FSU002003

- Never
- Don't Know
- Prefer Not to Answer

In your experience, how often are there opportunities to consider a wide variety of viewpoints and perspectives *outside of the campus classroom* (such as in clubs, student organizations, and at campus events)?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know
- Prefer Not to Answer

In your experience how often do *instructors* create an environment that is supportive of a range of viewpoints?

- Always
- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Don't Know
- Prefer Not to Answer

In your experience, how often do *students* create an environment that is supportive of a range of viewpoints?

- Always
- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely

2

FSU002004

- Never
- Don't Know
- Prefer Not to Answer

**<u>Freedom of Expression on My Campus</u>**

Think about being in a class that was discussing a *Non-Controversial* issue. How comfortable would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views
- Prefer Not to Answer

Think about being in a class that was discussing a controversial or difficult issue in your primary area of study. How comfortable would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views
- Prefer Not to Answer

Think about being in a class that was discussing a controversial or difficult *political* issue. How comfortable would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views
- Prefer Not to Answer

3

FSU002005

If you were to speak up and give your views on one of these controversial or difficult issues during a class discussion, how concerned would you be that the following would occur?

The instructor would criticize my views.

- Not at all concerned
- Somewhat concerned
- Very concerned
- Extremely concerned
- Prefer Not to Answer

Other students would criticize my views.
- Not at all concerned
- Somewhat concerned
- Very concerned
- Extremely concerned
- Prefer Not to Answer

Someone would post critical comments about my views on social media.
- Not at all concerned
- Somewhat concerned
- Very concerned
- Extremely concerned
- Prefer Not to Answer

4

FSU002006

FSU002007

Are you more likely or less likely to share your views on a controversial issue in the following settings?

| Setting | Much More Likely | Somewhat More Likely | Somewhat Less Likely | Much Less Likely | Prefer Not to Answer |
|---|---|---|---|---|---|
| The college classroom | | | | | |
| At a meal with friends | | | | | |
| At a family gathering | | | | | |
| At a workplace with colleagues | | | | | |
| On social media (e.g. Twitter, Instagram, or Facebook) | | | | | |

5

**Information About You**

At what level are you in your studies?

- Freshman
- Sophomore
- Junior
- Senior
- Graduate Student
- Prefer Not to Answer

Where would you place yourself on the following scale?

- Conservative
- Moderate
- Liberal
- None of the Above
- Prefer Not to Answer

Which of the following describes your race? You can select as many as apply.

- American Indian or Alaskan Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other
- Prefer Not to Answer

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female
- Male
- Neither best describes me

6

FSU002008

- Prefer Not to Answer



7

FSU002009

# EXHIBIT L

**Alexi Velez**

| | |
|---|---|
| **From:** | Fritz Wermuth <FWermuth@kbzwlaw.com> |
| **Sent:** | Thursday, March 24, 2022 8:02 PM |
| **To:** | George Levesque; Tim Moore, Jr. |
| **Cc:** | Elisabeth Frost; Florida Campus Speech; Angie Price; Kimberly Healy; Robyn Kramer |
| **Subject:** | Link v. Corcoran -- Discovery Supplement |

George,

We received information this afternoon that faculty are being told that the surveys of students, faculty, and staff will be administered on the following timeline:

- Mar. 31, 2022 – Institutions send pre-survey notifications to students and employees
- Apr. 4, 2022 – Invitations to students and employees are sent to take the surveys.
- Apr. 7, 2022 – Survey reminders are sent to students and employees.
- April 8, 2022 – Survey collection closes.

As you know, we have been asking that Defendants supplement your discovery responses as it relates to the survey, including any draft surveys, documents, and communications related to the same, for months. We made this request in correspondence dated December 16, 2021, January 4, 2022, January 13, 2022, February 18, 2022, March 3, 2022, March 8, 2022, March 11, 2022 and most recently March 17, 2022. As we have noted, the most recent materials we have from Defendants relating to the survey are dated October 2021 – about 5 months ago.

Repeatedly, you have told us that more material would be coming, and repeatedly nothing has come. In the meantime, we have continued to pursue every option for obtaining these materials and have received – and even *produced to you* – substantial materials through public records requests that make it clear that over the course of all of these months, when Defendants have produced nothing new related to the survey, the drafting and plan for its implementation have been significant, substantive, and ongoing.

Given what we have received – including over the past few days from third parties, and the information we now have about the timeline for the administration of the survey – it must have been obvious to your clients, who you presumably informed of their discovery obligations, that there are significant additional materials responsive to our discovery requests related to the surveys and that they are (and have been, for months) under a clear obligation to produce.  With the imminent survey rollout that we just learned about, it is also incredible to think that the surveys are not at this point finalized. And it is clear that there are now in fact (and have been for some while) plans for the survey's implementation—another topic that we specifically asked about in our interrogatories directed to Defendants, yet at no point have Defendants supplemented their responses to provide any new information on that, either.

Of course, during the months since Defendants produced survey drafts and months that we have sent repeated requests for supplementation, Defendants have been under a continuing obligation under Fed. R. Civ. P. 26(e)(1) to supplement their responses to our RFPs and interrogatories in a timely manner when they learn that in some material respect the disclosure or response is incomplete or incorrect. We are well past timely at this point. I am reiterating my request that Defendants promptly supplement their responses to our discovery requests, including specifically as it relates to the following requests and interrogatories. While Defendants' obligation to supplement incomplete or incorrect discovery responses is ongoing and applies to all requests, we are specifically asking that Defendants supplement their responses to the RFPs and interrogatories listed below

by **no later than March 29, 2022**. If Defendants refuse to do so, we will be filing a motion to compel with the Court. Please advise when we can discuss this very serious issue at your earliest convenience.

**First Requests for Production to Board of Governors, Board of Education, and Commissioner Corcoran:**

- **REQUEST NO. 2:** All documents and communications related the Survey Provisions and the Survey that it requires. This includes any documents or communications related to any state interests that you believe the Survey Provisions or the Survey furthers.

**First Set of Interrogatories to Board of Governors, Board of Education, and (in substantively similar form to) Commissioner Corcoran:**

- **INTERROGATORY NO. 2:** State and describe <u>your involvement in, and all plans you have related to the creation, drafting, implementation, enforcement, or use of the Survey</u>. Your response should include a detailed description of any involvement you had in the development or passage of legislation involving the Survey; your understanding of the intended or potential use of the Survey, including specifically by you, the Florida Board of Governors, the Governor, the Legislature, or Florida's post-secondary schools<u>; any plans for enforcement of HB 233 's Survey Provisions</u>, including specifically in the event that schools, students, or faculty decline, resist, or refuse to take part in the Survey; and <u>any timeline (even rough or preliminary) for developing any of the foregoing. Your answer should include the identities of those individuals and/or entities that have been or you anticipate will be involved at each stage of the Survey's creation, drafting, implementation, or use, and the scope or anticipated scope of their involvement and responsibilities</u>.

- **INTERROGATORY NO. 8:** State and describe your intentions for handling information collected through the Survey, including but not limited to, the collecting, storing, sharing, security, deleting, and evaluation of the same.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

## **Exhibit M**

Placeholder for Videotaped Recording, Bates numbered PL_000004


"6_22_21 Now Speaking - Governor Ron DeSantis & Lieutenant Governor Jeanette Nuñez at the Florida American Legion Boys State - The Florida Channel.mp4," available at https://thefloridachannel.org/videos/6-22-21-now-speaking-governor-ron-desantis-lieutenant-governor-jeanette-nunez-at-the-florida-american-legion-boys-state/

## **Exhibit N**

Placeholder for Videotaped Recording, Bates numbered PL_000006

Defendant Commissioner Richard Corcoran's remarks in a presentation titled "Education is Freedom" made at Hillsdale College, available at
https://www.youtube.com/watch?v=HVujpIator0

## **Exhibit O**

Placeholder for Videotaped Recording, Bates numbered PL_000007

Florida Atlantic University Board of Trustees public meeting occurring on April 20, 2021, available at
https://fau.mediasite.com/Mediasite/Play/459345b79fdd4735b2cda709ee1786d91d

# EXHIBIT P





**Journal of Political Science Education**

ISSN: 1551-2169 (Print) 1551-2177 (Online) Journal homepage: https://www.tandfonline.com/loi/upse20

# Political Attitudes in the Classroom: Is Academia the Last Bastion of Liberalism?

David La Falce & SimonPeter Gomez

**To cite this article:** David La Falce & SimonPeter Gomez (2007) Political Attitudes in the Classroom: Is Academia the Last Bastion of Liberalism?, Journal of Political Science Education, 3:1, 1-20, DOI: 10.1080/15512160601115513

**To link to this article:** https://doi.org/10.1080/15512160601115513

📅  Published online: 01 Feb 2007.

✏️  Submit your article to this journal ↗

📊  Article views: 152

🔍  View related articles ↗

📑  Citing articles: 1 View citing articles ↗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=upse20

FSU000256

Journal of Political Science Education, 3:1–20, 2007
Copyright © 2007 Taylor & Francis Group, LLC
ISSN: 1551-2169
DOI: 10.1080/15512160601115513



# Political Attitudes in the Classroom: Is Academia the Last Bastion of Liberalism?

DAVID LA FALCE
SIMONPETER GOMEZ

Buffalo State College

*Academia is under attack from those who believe that college professors are uniformly leftist politically, which creates an environment of bias against conservative students and professors. Advocates have proposed an "Academic Bill of Rights" that may lead to policies to achieve intellectual diversity in faculty hiring and tenure decisions. However, little rigorous scientific research has been conducted on the political attitudes of students and faculty. Based on a survey of students and professors at the State University College at Buffalo, we find evidence that the "intellectual diversity" movement is unfounded. In particular, we find that the political views of students and professors are quite diverse, and that professors do not impose their political views upon the classroom. Our research points to the need to extend our model to other universities to place our results in a larger context, and provide valid data for use in the burgeoning intellectual diversity debate.*

**Keywords**   faculty attitudes, intellectual diversity, political socialization, student attitudes

## Introduction

Are college professors significantly more liberal than their students? Do professors push their own ideological viewpoints on students in the classroom? These questions are relevant and must be answered in a rigorous, scientific way, because academia faces an increasingly hostile attack from those who see it as the last bastion of liberalism. This attack has most recently manifested itself in the form of an "Academic Bill of Rights" propagated by David Horowitz of the Center for the Study of Popular Culture. Seventeen states and the federal government have either considered, are considering or have adopted principles based on this bill of rights that purports to protect "intellectual diversity," but may be used to mandate the hiring of faculty based primarily on their political affiliation or ideology.[1] For example, the language of legislation that university presidents agreed to adopt, thereby eliminating the need for actual passage, states "all faculty shall be hired, fired, promoted, and granted tenure . . . with a view toward fostering a plurality of methodologies and perspectives" (Senate Resolution 661).

Horowitz has essentially advocated this very thing in his writings, stating that "the exclusion of conservatives from college faculties (is) a violation of academic freedom, and an offense to the very concept of a liberal education" (Horowitz 2002, 1), and that "(b)y adding the categories of political and religious affiliation to Title IX

Address correspondence to David La Falce, Volunteer and Service Learning Center, Buffalo State College, 1300 Elmwood Avenue, Buffalo, NY 14222. E-mail: Lafadm24@ buffalostate.edu

FSU000257

and other existing legislation, the means are readily available—without jeopardizing the integrity and independence of the university system—to redress an intolerable situation involving illegal and unconstitutional hiring methods" (Horowitz 2002, 2). Others argue for litigation to get more conservative and "Christian" faculty;

> At prominent colleges across the country, the vast majority of professors are committed liberals. Many humanities and social science departments at leading universities do not have so much as a single registered Republican among their ranks. These stark statistics do more than just confirm what conservatives have always suspected. They potentially may allow Republicans to pursue legal action against universities by using the logic and law of the civil rights movement. (Lee 2002)

Such statements presuppose at least two things; that faculty are not politically diverse in any meaningful way, and that they use the classroom to politically indoctrinate students. However, to be accepted as true such claims must be supported by scientific research. Yet, there are very few studies that directly address the question of faculty political attitudes, and even fewer that measure the level of classroom indoctrination.

Our study surveys students and professors at the State University College at Buffalo (BSC), in Buffalo, New York, in order to determine how similar the two groups are in their political ideology and attitudes on specific issues, as well as the extent to which professors impose their own personal political views in the classroom. This study is among the first of its type, and we introduce a survey and methodology that can be applied to other colleges and universities to answer questions of political diversity on those campuses.

We find that at BSC, both students and faculty are quite diverse in terms of political ideology and attitudes. Specifically, we find that there are more faculty who self-identify as conservative than students, and that there are many issues on which students and faculty agree—such as humanitarian intervention, school vouchers, and abortion—and some issues on which they disagree. Moreover, we find no evidence to suggest that professors are imposing their own political views on students in the classroom; in fact many students surveyed responded that they did not know the political ideology of their professors. Our results undermine the "intellectual diversity" movement's claims that American colleges and universities have become one-party campuses. They also point to the need to extend our analysis to other universities, especially those undergoing scrutiny for a lack of political diversity among the faculty.

We proceed in the following manner. In the first section, we test the hypothesis that the students understand the meaning of the political labels liberal, moderate, and conservative, by comparing their self-reported political ideology with views on specific issues. In the second section, we do the same thing with the faculty. In the third section we compare the attitudes of students and professors to show in what ways they differ, and to test the extent to which the faculty impose their views on the students. Finally, we summarize our findings and discuss the implications of our research on the intellectual diversity movement, and we make some suggestions for future research.

## Past Research

The purpose of our research is to better understand the political differences between students and faculty at BSC. We attempt to statistically examine political attitudes

that may or may not affect teacher-student relationships and how these differences and similarities shape the learning environment. Although there is very little research in this field of study, ''the weight of evidence suggests that colleges and universities play some role in shaping the attitudes of students'' (Dey 1996, 96). Dey relies heavily on the work of Weidman (1989) in which he uses the relative impact on peer and faculty views on student attitudes, taking into account interpersonal interactions.

It should be recognized that an important agent of political socialization is college, as Astin, Korn, and Dey (1991) point out in their study of faculty-student relationships at the institutional level. However, there is very little research about individual political attitudes at the institutional level. Some of the most prominent research in this field was gathered and analyzed by the Higher Education Research Institute (HERI) at the University of California, Los Angeles (1990). Their survey research deals primarily with gathering student information using the Student Information Form, (SIF) and is designed to longitudinally asses the impact of college on the student population. HERI is mainly interested in trends dealing with student attitudes over time. Our research differs in that it attempts to understand faulty-student academic relationships by evaluating sociopolitical attitudes.

A more recent college impact study (Schiff 1993) points to a conceptual distinction between political self-identification and levels of agreement with sociopolitical issues, but the study found that the college experience exerts the same influence on both sets of attitudes. The Pascarella and Terenzini (1991) study finds evidence that suggests that college tends to promote liberalism; however, they do not compare the attitudes of students and professors on specific sociopolitical issues. That is do the students differ with the faculty on certain sociopolitical issues. Peters and Droddy (2003) conducted a panel study of the impact of law school, but found no evidence that it influences student attitudes.

Research on college faculty suggests that, in the aggregate, their political attitudes have changed very little over time, but it may appear to be more liberal due to changing norms and social patterns overall in society (Hamilton and Hargens 1993) and tend to be more critical of dominant societal norms and more reformist in their orientations (Lipset 1982).

There are two studies that are perhaps most similar to our own, Boyer (1987) and Horowitz (2002). Boyer (1987) surveyed a random sample of students and faculty at certain American colleges in 1976 and again in 1984 and found that, while faculty tended to identify themselves as more liberal than students (42% to 25%), both groups were about the same in terms of their self-identification as conservative (31% for the faculty and 36% for the students). According to Boyer, differences were much greater than those found in the 1976 survey, perhaps an indication that faculty members are becoming more liberal while students are becoming increasingly conservative.

David Horowitz (2002) looks at the party identification of faculty at 32 colleges and universities. He finds that registered Democrats outnumber registered Republicans by a margin of 10 to 1. The study was done by examining the voter registration rolls for the counties in which the institution was located, and matching them to lists of tenured or tenure track faculty at the institutions. Horowitz's study is beset with problems, which is troubling, as it has been cited many times by politicians and activists who conclude from this study that there is an ''intellectual diversity'' problem that requires political intervention to fix.

First, Horowitz employs a poor sampling frame. He only looks at faculty in six departments: Economics, English, History, Philosophy, Political Science, and

FSU000259

Sociology. Members of other departments are systematically excluded from the sample. Second, he uses voter registration rolls in the county in which the college is located. Professors who live in other counties, or who are not registered to vote in the state because they are not state residents or are not U.S. citizens, are also excluded from the sample. For example, Horowitz's sample for UCLA contains only 299 professors, a small fraction of the 3,167 professors at the institution.

A third problem with the study is that it only looks at party affiliation, which is an unreliable measure of a person's political ideology. A more appropriate method would be to use ideological self-identification, which represents a larger diversity of views, from very liberal, to moderate, to very conservative, and then compare them to attitudes on specific issues, yet Horowitz does not attempt this.

Horowitz also only looks at one side of the coin; he ignores the political attitudes of students. Without this, one cannot make any conclusions about the political leanings of the faculty relative to the students, one way of estimating if the faculty on campus is politically biased. In short, Horowitz's study and others that have been done using the same methodology on other campuses (e.g., Klein and Stern 2005) are of very limited utility in determining the ideological leanings of professors and students. Most disturbing is that Horowitz concludes from his study and others that since Democrat faculty outnumber Republican faculty, these professors use the classroom to indoctrinate students. As he states:

> What is knowledge if it is thoroughly one-sided, or intellectual freedom if it is only freedom to conform? And what is a ''liberal education,'' if one point of view is for all intents and purposes excluded from the classroom? How can students get a good education, if they are only being told one side of the story? The answer is they can't. (Horowitz 2002, 4)

However, Horowitz does not present any measure that shows professors impose their own viewpoints in the classroom, nor does he cite any other evidence to support this claim. Therefore his broad and seemingly damning conclusions are ones that his limited and extremely flawed data do not support.

While there have been studies on the attitudes of faculty, and studies on the attitudes of students, lead by the HERI studies, to our knowledge no study has directly compared the two. Our study is a first attempt at this underexamined area of research. We analyze the similarities in the political and social attitudes of the faculty and students at one college, the State University College at Buffalo, in an effort to make conclusions about the popular hypothesis, stated as a truism by many members of the popular media, that professors are significantly more liberals than students. In addition, we present what we believe is the first assessment of the extent to which student perceptions of the ideological leanings of the faculty, and faculty perceptions of the ideological leanings of the students, agree with reality.

## Constructing and Administering the Survey

The data used in the study came from a 49-question survey that was administered to a random sample of Buffalo State College students and a *separate* sample of Buffalo State College faculty members in the summer and fall of 2001. We chose to administer the surveys through the mail because we were not allowed access to the phone

numbers of students, nor did we have the personnel to carry out a large-scale phone process.

The mail-in method has many drawbacks. First, it is not possible to know who completed the survey. We assume that the student completed the survey but there is no way to guarantee that another person, a family member or friend perhaps, actually filled it out. Second, this method generally results in a lower response rate, especially if there is no follow-up mailing as in our study. Third, with mail-in surveys it is not possible to clear up any misunderstandings about a question. This may affect the validity of the responses as what the student thought the question was asking and what the question intended to ask may not be the same thing. However, limited financial, technical, and human resources mandated we use the mail-in method.

The sampling frame for the student sample was all undergraduate students who were registered for any classes in the spring 2001 semester. There were a total of 9,252 students in the sampling frame. From this we selected a random sample of 1,500 students.[2] The first mailing took place on July 1st, and the second occurred one week later.[3] No follow-up mailing was conducted, due to financial constraints. We began to receive completed surveys in the mail within a week and continued to receive surveys from the students through December 2001.[4]

We received a total of 302 responses. This calculates to a response rate of 20%, where 300 surveys were fully completed (more than 80% of all the questions were answered), two surveys were partially complete (between 50% and 80% of all of the questions were answered), no surveys were considered ''break-offs'' (less than 50% of questions completed), and all of the nonreturned surveys were considered to be of unknown eligibility (we did not receive any information on the fate of the nonreturned surveys).[5]

A 20% response rate may be troubling to some as the research suggests that a response rate of at least 50% is desirable for proper analysis (Babbie 2002; Brownlee 1975; Miller 1991). The problem that may arise is the nonrespondents could differ from the respondents in politically significant ways, although whether this possibility actually occurs is never known. These differences may lead to the sample being unrepresentative of the target population and may undermine any inferences we draw. However, given the population we were analyzing, mainly college students aged 18 to 24 and the mail-in survey technique, such a low response rate is not unusual.

The response rate was influenced by many factors that were beyond our control. First, mail-in surveys generally result in a lower response rate than other survey techniques. Unfortunately, the size of our budget and available resources made it impossible to use any other technique.

In addition, we were dealing with a target population of students roughly from the ages of 18 to 24. This demographic is among the most volatile in terms of its living habits. It is not unusual for a college student to move from home to on campus, to off campus all in the same calendar year. This is significant because when using the mail-in survey to named respondents technique, the named respondent is the person whose name is listed in an official directory or their spouse. If the named respondent is not at the address, usually because the person moved, the survey is returned unopened. These respondents are then removed from the sample entirely so that they have no impact on the final response rate.

However, our surveys were mailed to the permanent address on file at the college. This address was generally the address for the parent or guardian of the named

FSU000261

respondent. It is likely that in many cases a parent, guardian or some other family member received the survey but since the student was no longer living at that address it never made its way into the hands of the student, and since it was accepted by a person at the address, it was not returned to us unopened.

Unfortunately, it is impossible to know exactly how many surveys never reached the named respondent and, therefore, should be removed from the sample entirely. Our calculation of the response rate is the most conservative possible, one where all unreturned surveys are counted as nonreturns, not as nondeliverable (and thus eliminated from the calculations entirely). This means that the 20% response rate we calculated is the lowest that it could possibly be, but, in actuality, it may be much higher, perhaps as high as 60% if only half of the mailed surveys never reached the named respondent, which is not an unreasonable assumption given the nature of the population we are measuring.

The faculty sample was selected from a sampling frame of all full- and part-time faculty listed in the spring 2001 Buffalo State College Directory, a total of 670. Faculty members' on-campus addresses were used to reduce postage costs. A random sample of 300 faculty members was mailed surveys on August 27, 2001.[6] No follow-up mailing was done. We received a total of 198 faculty surveys, for a response rate of 66%.[7]

It should be noted that the events of September 11th occurred toward the end of survey collection and it may have impacted respondent attitudes despite the fact that over 90% of the student surveys were returned before 9/11. To assess whether or not 9/11 impacted the survey results we divided both the student and the faculty sample into two separate groups, those that were returned the week before 9/11 and those that were received the week after. We conducted difference of proportions tests for the two sets of groups for the three questions that directly measured foreign policy attitudes.[8] The results showed that there were no significant differences between the two groups. No faculty surveys were returned before the tragic events of 9/11.

One way to assess the representativeness of our student and faculty samples is to compare the samples to their respective populations. The college compiles data on the demographic characteristics of the student body every fall, which we can use as only a rough baseline as our sample was taken from a sampling frame of students enrolled in the spring. The enrollment summary conducted by BSC found the student population to be 58% female and 42% male. Our sample was 69% female and 31% male. Racial characteristics found by the college were as follows: 11% African American, 1% Asian, Hispanic 4%; we found 3% African American, 1% Asian, 2% Hispanic, although these differences may be due to our inclusion of two more category choices than the college's enrollment summary, Caribbean and Multiracial.

For the faculty sample, the college compiles data on the demographic characteristics every fall. These data can be used for rough comparison to our sample that was compiled from a sampling frame of faculty teaching in the spring semester of 2001. Comparing the age distribution of the faculty sample with the population is not possible because the college uses age categories that do not correspond to those on the survey. The college uses 30 and under, 31–40, 41–50, etc. Our survey used 20–29, 30–39, 40–49, and so on.

Fifty-nine percent of the sample was male and 41% was female, percentages that exactly match the percentages in the faculty population. In terms of racial and ethnic origin, our sample is also representative of the faculty population. Ninety-one percent of the faculty respondents reported they were white, as compared to 91% in

the faculty population, 4% reported they were African American, as compared to 4% in the population, 3% reported they were Asian/Pacific Islanders as compared to 3% in the population, and 2% of the sample was Hispanic, as compared to 2% of the population. Such a similarity is remarkable given a response rate of 66%, a rate that is considered good, but not ideal. These comparisons lead us to conclude that we can be very confident that the survey results for the faculty are representative of the population.

## Student Attitudes

In this section we will compare students' self-reported ideology (liberal, moderate, conservative) with their attitudes on four specific issues; humanitarian intervention, the death penalty, gun control, and school vouchers. We expect that students will not demonstrate much ideological consistency because the research suggests that they are younger and more inexperienced politically and that they have yet to solidify their political worldview.

In each analysis we treat nominal responses as ordinal; ''disagree'' or ''oppose'' are interpreted as less support for the given issue, and ''agree'' or ''support'' are interpreted as more support for the issue, by doing so we can use Kendall's tau-c as the measure of association for all of the cross-tabulations.[9] Kendall's tau-c is the appropriate statistic to use when tables have an unequal number of columns and rows.

### Hypothesis One: Liberal Students will be More Likely to Support Humanitarian Intervention than Conservative Students

Table 1 shows the relationship between political ideology and attitudes on the four political issues. For the comparison of ideology and support for humanitarian intervention, the Kendall's tau-c of $-0.201$ is significant, which means that students who describe themselves as liberals are more likely to support intervention, and conservatives are more likely to oppose intervention. As one can see, 67% of liberals support intervention in other countries when human rights violations occur, but 65% of conservatives oppose it. So it appears that on the issue of humanitarian intervention, students do demonstrate ideological consistency.

### Hypothesis Two: Liberal Students will be More Likely to Oppose the Death Penalty than Conservative Students

When comparing students' self-reported ideology with support for the death penalty, we find a negative relationship (tau-c $= -0.103$). This means that liberals are less likely to support it, while conservatives are more likely to do so. However, the relationship just misses the 0.05 cutoff for acceptable significance, reaching only 0.08, which means that a students' ideology is not a good predictor of their views on the death penalty, even though in terms of percentages liberals and conservatives are different, as 80% of conservatives but only 62% of liberals support it.

A *p* value of 0.08 may appear to be close enough to the 0.05 threshold to be considered a significant difference between the two groups, but this would be an incorrect interpretation of the probability level for two reasons. First, the difference of proportions test has rather large sample sizes for both the students and the faculty; it is generally easier to reject the null hypothesis as the sample size increases. So to be

FSU000263

*D. La Falce and S. P. Gomez*

**Table 1.** Relationship between student ideology and political attitudes (percentages)

| | Ideological self-placement | | |
| --- | --- | --- | --- |
| | Liberal[a] | Moderate | Conservative[b] |
| **Support for Humanitarian Intervention** | | | |
| Disagree | 33 | 47 | 65 |
| Agree | 67 | 53 | 36 |
| Total | 100 | 100 | 100 |
| Number of cases | (57) | (115) | (31) |
| Kendall's tau-c $= -0.201$, $p = 0.004$ | | | |
| **Support for the Death Penalty** | | | |
| Oppose | 38 | 33 | 80 |
| Favor | 62 | 68 | 21 |
| Total | 100 | 100 | 100 |
| Number of cases | (60) | (160) | (39) |
| Kendall's tau-c $= -0.103$, $p = 0.08$ | | | |
| **Support for Federal Gun Control Legislation** | | | |
| Oppose | 7 | 6 | 21 |
| Favor | 93 | 94 | 79 |
| Total | 100 | 100 | 100 |
| Number of cases | (74) | (173) | (42) |
| Kendall's tau-c $= -0.70$, $p = 0.08$ | | | |
| **Support for School Vouchers** | | | |
| Oppose | 43 | 37 | 26 |
| Favor | 57 | 63 | 77 |
| Total | 100 | 100 | 100 |
| Number of cases | (44) | (94) | (31) |
| Kendall's tau-c $= 0.114$, $p = 0.129$ | | | |
| **Student Political Perception of the Faculty** | | | |
| Liberal | 28 | 21 | 53 |
| Moderate | 12 | 24 | 16 |
| Conservative | 11 | 6 | 0 |
| Don't know | 47 | 49 | 31 |
| Total | 100 | 100 | 100 |
| Number of cases | (74) | (178) | (45) |
| Kendall's tau-c $= 0.027$, $p = 0.527$ | | | |

[a]Liberal is total of students who chose strongly liberal, liberal, or somewhat liberal.
[b]Conservative is total of students who chose strongly conservative, conservative, or somewhat conservative.
*Notes*: Due to rounding percentages may not add up to 100% in some cases.
Question wording is listed in Appendix A.

unable to reject the null hypothesis of no difference between the students and the faculty given the large sample sizes represents a significant finding. Second, a *p* value of 0.08 means that there is roughly a 1 in 12 chance of making a type one error, while a *p* value of 0.05 represents only a 1 in 20 chance. A *p* value of 0.08 therefore means

that there is more than a 50% greater chance of making a type one error. This is a risk we are unwilling to take, which is why we adhere strictly to the 0.05 level.

The lack of significance may be due to the fact that majorities across all three categories support the death penalty. Polls consistently show that a strong majority of Americans support the death penalty. So the students appear to be displaying the same level of ideological inconsistency as the general public.

### Hypothesis Three: Liberal Students will Favor Federal Gun Control Legislation More than Conservative Students

When comparing ideology and support for gun control, students do show some signs of ideological consistency, but as with the death penalty, the results are not significant ($p = 0.08$).

The lack of significance in this case may be a result of clear majorities across all three ideological categories strongly supporting gun control and that there is little difference between liberals and moderates on this issue. Yet as one can see there are distinct differences between liberals and conservatives; 93% of liberals support gun control, as compared to 79% of conservatives. So either gun control is one of those issues that cut across ideological lines, or we have found more support for the claim that not many students actually know what the ideological labels mean.

### Hypothesis Four: Liberal Students will be Less Supportive of School Vouchers than Conservative Students

Here there appears to be very little support for the hypothesis. While the measure of association is positive, meaning that as one moves across the ideological scale from liberal to conservative support for school vouchers increases, the results are not significant ($p = 0.129$). So the percentage differences are not significant enough for us to conclude that the students show ideological consistency on the issue of school vouchers. This may be caused by the fact that a large percentage of students in the sample (61%) were enrolled in the college's education program, and most intend to work in the public school system.

We can conclude from our empirical analysis of the students that their political attitudes on certain sociopolitical issues tend to be ideologically inconsistent, since the relationship between ideology and attitudes was not significant for three of the four issues we examined; the death penalty, gun control, and school vouchers, although the probabilities were quite close. Self-identified liberals as well as conservatives did not stay within ideological lines consistently. It appears that the alternative hypothesis may be correct: students, for the most part, do not fully understand what the labels mean. Another possible reason may be that their views on issues are not very well cemented because of their age. The college years are a critical period in the political socialization process (Jennings and Niemi 1982; Stembler 1961; Stephens and Long 1970), subsequently their views in this study reflect that.

## Summarizing Faculty Attitudes

In this section, we will investigate some explanations for faculty attitudes on some chosen political issues. The primary purpose of this section is to determine the extent to which professors' attitudes can be predicted from their self-reported political

FSU000265

ideology. If the faculty understand what the labels "liberal, "moderate," and "conservative" mean then there should be a strong correlation between their ideological self-reports and their positions on specific issues. We can then use this information with that from the students to make conclusions about which group, the faculty or the students, better understands the common political labels. Political ideology will be compared to position on four issues; the death penalty, humanitarian intervention, gun control, and school vouchers. In general, we expect that, given the high levels of education of the faculty, their political attitudes will be consistent with their ideological self-identifications.

### Hypothesis One: Liberal Professors will be more Likely to Support Humanitarian Intervention than Conservative Professors

The results of the analysis of ideology on the four attitudes are presented in Table 2. The measure of association, Kendall's tau-c, for the relationship between ideology and attitude toward humanitarian intervention is significant and negative ($-0.33$). This means that among the faculty, one's position on humanitarian intervention is dependent upon one's political ideology. Self-described liberals are much more likely to support humanitarian intervention than either moderates or conservatives. Sixty-four percent of liberals support intervening in countries when human rights violations occur, as compared to 55% of moderates and only 19% of conservatives. One can conclude that there is ideological consistency among the faculty on the issue of humanitarian intervention.

### Hypothesis Two: Liberal Professors will be More Likely to Oppose the Death Penalty than Conservative Professors

There is a significant, positive relationship between ideology and support for the death penalty (tau-c = 0.43, significant beyond 0.001 level). Conservatives are more supportive of the death penalty than either moderates or liberals. Seventy-eight percent of self-identified conservatives support it, as compared to 53% of moderates and only 25% of liberals. Again, the faculty show clear ideological consistency. One can predict a professor's views on the death penalty reasonably well with knowledge of their political ideology.

### Hypothesis Three: Liberal Professors will Favor Federal Gun Control Laws More than Conservative Professors

Again, the results suggest clear ideological consistency among the faculty; liberals', moderates', and conservatives' views on gun control demonstrate that the professors' views on this issue conform to what one would expect to find if the respondents truly understand the meaning of the labels. We found that there is a significant negative relationship between ideology and support for federal gun control laws (tau-c = $-0.120$). Liberals are more likely to favor gun control than conservatives (96% to 76%); however, the relationship is weak due to the strong support for gun control across all ideological categories. Again, our hypothesis that the faculty is ideologically consistent in its political views is confirmed.

FSU000266

**Table 2.** Relationship between faculty ideology and political attitudes (percentages)

| | Ideological self-placement | | |
|---|---|---|---|
| | Liberal[a] | Moderate | Conservative[b] |
| **Support for Humanitarian Intervention** | | | |
| Disagree | 36 | 46 | 81 |
| Agree | 64 | 55 | 19 |
| Total | 100 | 100 | 100 |
| Number of cases | (75) | (22) | (26) |
| Kendall's tau-c $= -0.33$, $p = 0.001$ | | | |
| **Support for the Death Penalty** | | | |
| Oppose | 76 | 47 | 22 |
| Favor | 25 | 53 | 78 |
| Total | 100 | 100 | 100 |
| Number of cases | (98) | (34) | (32) |
| Kendall's tau-c $= 0.43$, $p = 0.001$ | | | |
| **Support for Federal Gun Control Legislation** | | | |
| Oppose | 4 | 3 | 24 |
| Favor | 96 | 97 | 76 |
| Total | 100 | 100 | 100 |
| Number of cases | (109) | (37) | (33) |
| Kendall's tau-c $= -0.12$, $p = 0.02$ | | | |
| **Support for School Vouchers** | | | |
| Oppose | 87 | 39 | 23 |
| Favor | 13 | 61 | 77 |
| Total | 100 | 100 | 100 |
| Number of cases | (91) | (28) | (30) |
| Kendall's tau-c $= 0.56$, $p = 0.001$ | | | |
| **Faculty Political Perception of the Students** | | | |
| Liberal | 19 | 32 | 38 |
| Moderate | 27 | 38 | 32 |
| Conservative | 43 | 11 | 15 |
| Don't know | 11 | 19 | 15 |
| Total | 100 | 100 | 100 |
| Number of cases | (105) | (37) | (34) |
| Kendall's tau-c $= -2.30$, $p = 0.001$ | | | |

[a]Liberal is total of students who chose strongly liberal, liberal, or somewhat liberal.
[b]Conservative is total of students who chose strongly conservative, conservative, or somewhat conservative.
*Notes*: Due to rounding percentages may not add up to 100% in some cases.
Question wording is listed in Appendix A.

### Hypothesis Four: Liberal Professors will be Less Supportive of School Vouchers than Conservative Professors

It appears that there is strong support for the hypothesis. The coefficient of Kendall's tau-c is 0.56, this means that liberals are much less likely to support

FSU000267

*D. La Falce and S. P. Gomez*

vouchers than either moderates or conservatives. As the table indicates, 87% of liberal professors oppose vouchers, while 39% of moderates and only 23% conservatives do, a difference that is statistically significant. In the case of school vouchers, the faculty again holds views that are ideologically consistent.

One can generally conclude that it appears that the political attitudes of the members of the faculty at Buffalo State College are closely associated with their self-identified ideological position. In all four cases that we examined, the faculty demonstrated positions on political and social issues that are ideologically consistent, as we hypothesized at the outset. Self-identified liberal professors hold views that one would expect, as do moderates and conservatives. Given this information we can generally conclude that the faculty do understand the meaning of political ideology.

Another interesting comparison to be made is how the political ideology of a professor influences the perception of the political ideology of the student body. We have no prior expectations of the relationship, so stating a hypothesis is inappropriate, rather this should be taken as an inductive analysis that could then spur some theory building and hypothesis testing in future studies. The results of the comparison of a professor's ideological self-identification and the perception of the ideology of the students are presented in Table 3.

Given the large number of cells in the table, we are dealing with some cells with small frequencies, so that only a small change in a few observations could have an impact on the percentages; however, some intriguing patterns emerge from the data. Overall, it appears that a professor's ideology appears to have a significant and negative impact on the perception of the ideology of the student body, based on the tau-c of -0.23 ($p = 0.00$). Professors who call themselves liberal are more likely to identify the students as conservative (43%), than any other ideology. Moderate professors

**Table 3.** Comparison of student opinion of faculty with faculty self-identification (percentages)

| Ideology | Student opinion of faculty[a] | Faculty self-identification[b] |
|---|---|---|
| Liberal | 27[c] | 58 |
| Number of observations | (82) | (109) |
| Moderate | 19 | 20 |
| | (59) | (38) |
| Conservative | 6[d] | 19 |
| | (19) | (35) |
| Don't know | 46 | 4 |
| | (139) | (7) |
| Number of cases | 299 | 190 |

[a]Question: "Based on your experiences what do you perceive the political attitudes of the faculty to be? (strongly liberal, liberal, somewhat liberal, moderate, somewhat conservative, conservative, strongly conservative, don't know)

[b]Question: "Where would you place yourself on the following scale? (liberal, moderate, conservative)

[c]Liberal is total of students who chose strongly liberal, liberal or moderately liberal.

[d]Conservative is total who chose strongly conservative, conservative, or moderately conservative.

FSU000268

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 110 of 552

are more likely to perceive the students as moderate (38%). Self-identified conservative professors are more likely to respond that the student body is liberal (38%).

With the exception of moderates, it appears that professors are more likely to perceive the students as being the opposite of their own ideology. Why is this? One explanation could be that students who disagree with their professors are more likely to make their views known in class, while students who agree with their professors see less reason to speak out. Professors may then generalize from the outspoken students in their classes to the whole student body. This explanation limits itself to in-class interactions, and it is likely that perceptions are also influenced by other factors such as the tone of the student newspaper, discussions with colleagues, personal interactions with students, and the general campus environment.

It is also possible that the question itself is artificial in at least two respects; first, it asks professors, who may only have contacts with a small fraction of the over 9,000 students at Buffalo State College in any given semester, to make a general conclusion about all of them. Second, it asks professors for an opinion on a subject that they may never have thought about before, so their responses may change once they have had time to reflect on the question. So we must be cautious in our interpretation of the results.

While more studies must be done before one could make any definitive conclusions about the causes of this relationship, the relationship itself is quite striking. Moreover, the implications for teaching and learning could be vast, and that may extend to areas such as how ideological predispositions influence teaching style, classroom interactions, and even grading. This important finding, that a professor's ideology may influence the perception of the students' ideology, and its impact on pedagogy, demonstrates the relevance of our study and points to the need for future studies to investigate this relationship more fully.

## Comparing the Attitudes of Students and Faculty

Table 4 presents the responses of the students and of the faculty on a selection of the 49 questions asked in the survey. Each question presented measures a political concept or attitude that is relevant in the current American political landscape, such as school vouchers, humanitarian intervention, free trade, and the death penalty, or helps to see the political differences among the two groups, such as political ideology and vote in the 2000 presidential election. The first column of table 4 displays a summary of the questions asked. The second and third columns present the percentages of faculty and students who responded with the given attitude with the total number of respondents in parentheses. For example 94% of professors at Buffalo State reported that they voted in the 2000 election or 183 of the 195 individuals who answered that question in some way.

It should be noted that the number of responses varied from question to question for both the students and faculty sample. The results for a difference of means test, a statistical technique for determining if there is a significant difference between the two groups in the populations from which the samples were drawn, are reported in column four. A ''yes'' signifies that we can state with 95% confidence that there is a significant difference between the two groups on that question.

A number of findings are evident. First, there are some striking similarities between the two groups on political ideology. Nineteen percent of the faculty surveyed responded that they were politically conservative, as compared to 15% of the students. There is no statistical difference between these two percentages at the

FSU000269

*D. La Falce and S. P. Gomez*

**Table 4.** Comparison of professor and student attitudes on chosen issues (percentages)

| Question[a] | Faculty | Students | Significant difference[b] |
|---|---|---|---|
| Say they are Politically Liberal Number of Observations | 59 (190) | 25 (190) | Yes |
| Say they are Politically Conservative | 19 (189) | 15 (299) | No |
| Say they are Politically Moderate | 20 (189) | 60 (299) | Yes |
| Voted in 2000 Election | 94 (195) | 69 (301) | Yes |
| Voted for Gore | 71 (183) | 47 (211) | Yes |
| Voted for Bush | 20 (183) | 42 (211) | Yes |
| Voted for Nader | 3 (6) | 8 (17) | Yes |
| Get a Majority of Political Information from TV | 29 (157) | 53 (236) | Yes |
| Think They Have No Say in Government | 16 (192) | 32 (298) | Yes |
| Support the Death Penalty | 36 (192) | 58 (297) | Yes |
| Support Free Trade | 64 (190) | 30 (300) | Yes |
| Support Humanitarian Intervention | 36 (185) | 37 (294) | No |
| Government Should Not Regulate Mass Media | 66 (183) | 60 (297) | No |
| Favor School Vouchers | 29 (194) | 36 (301) | No |

[a]Question wording is in Appendix A.
[b]$p = 0.05$ or less.

conventional 0.05 level. This finding allows us to refute the hypothesis that the faculty is significantly less conservative than the students. In terms of their levels of conservativeness, they are essentially equal.

Similarities between students and professors also extend to certain issues. When asked for their views on United States military intervention to stop human rights abuses in other countries, 36% of the faculty and 37% of the students supported such interventions. In terms of their respective support for this aspect of what international relations scholars call liberal internationalism, there is no difference between the two groups. Students and professors are also remarkably similar in their views on two other issues that we report. Sixty-six percent of the professors and 60% of the students surveyed report that they oppose government regulation of the media. A difference of means test shows that there is no statistically significant difference between the two samples on this question.

Similarities exist in terms of the level of support for school vouchers as well. Twenty-nine percent of professors and 36% of the students reported they support school vouchers. Again, a difference that is not significant. This is a hot-button issue on campus as there are a large number of education majors at Buffalo State College, most of who anticipate teaching in public schools when they graduate. Because of this, one finds that the students are more sophisticated on this topic than one might find on other campuses where teacher education is not such a dominant program. Students and professors also demonstrate similar levels of support for federal gun control laws; both groups are quite liberal on this issue.

However, the similarities do not hold on all attitudes and behaviors. There are many issues on which the students and professors disagree significantly. The students

at BSC are more liberal in their attitudes toward free trade; they are significantly more supportive of placing restrictions on free trade than the faculty. When it comes to political efficacy, the extent to which a person thinks he or she has an influence in government, twice as many students as faculty reported that they think they have no say (32% to 16%). This finding is not surprising, since a common hypothesis as to why young people do not participate in politics in large numbers is because they think their influence does not matter, that politicians do not care what they think. Since the faculty represent one of the most educated segments of American society, at least in terms of years of schooling, it is not surprising that fewer of them feel they do not have a say in government.

Differences in political efficacy may help explain the differences in percentages of faculty and students who stated they voted in the 2000 presidential election. Only 69% of the students who were registered to vote said they did in the 2000 presidential election, as compared to 94% of the faculty. Sixty-nine percent for students seems rather high, given that nationally only about 32% of voters aged 18–24 voted in the 2000 election according the Federal Election Commission (http://www.fec.gov/pages/agedemog.htm). It is not unusual for individuals to overreport their voting propensity, and it may be more common for it to occur among groups that historically do not vote in large numbers (Burden 2000). We think that is what we are seeing in the student sample, that more students are reporting they voted than actually did.

It is also possible that faculty members are overreporting their voting propensity in the 2000 election. Again, as Burden (2000) points out, this behavior is common among all groups. However, it is possible that professors as a population do vote much more than the population as a whole or even their own age cohorts. Of course a limitation of survey research is that one can never be sure when overreporting is occurring, and it could be related to the low turnout rate in the faculty sample, though some recent studies have refuted this hypothesis (e.g., McDonald 2003).

We found another alarming difference in where students and faculty receive a majority of their political information. Fifty-three percent of students say they receive a majority of their political information from television, as opposed to only 29% of the faculty (the single greatest source of political information for the faculty is the print media at 46%). This finding is not surprising, as more educated people are less likely to rely on TV for their political news.

As noted above, the students and professors were similar in terms of their support for conservative ideology, but the ideological similarity ends there. Three times as many students say they are political moderates (60% to 20%) and fewer of them label themselves as liberals (25% as compared to 59% of the faculty). These differences also seem to extend to voting behavior. Twice as many students report they voted for George W. Bush in the 2000 presidential election (42% to 20%). And a significantly smaller percentage of students say they voted for Al Gore. Although in both groups, the difference in support for the candidates was larger than in the general population.

What is interesting is that 8% of the students reported they voted for Ralph Nader as compared to only 3% of the faculty, a difference that is statistically significant. This may be evidence that supports the Nader campaign's hypothesis that he did not take away votes from Gore in 2000, rather a large proportion of those who voted for Nader came from young people who had never voted before, and they may not have voted if he had not been in the race (General Election Committee, Nader for President 2004).

FSU000271

One of the purposes of this study was to find out if the attitudes of students and faculty differ significantly. We found that in some respects they do not, as in their level of support for humanitarian intervention, school vouchers, gun control, government regulation of the media, and conservative ideology. But in other respects, however, we did find major attitudinal differences. Buffalo State students report lower levels of political efficacy and are more likely to get the majority of their political information from television.

More importantly, the students were less liberal and more moderate than the faculty, and these differences translated into larger support for Bush and Nader in the 2000 election and less support for Gore, relative to the faculty. While it may be difficult to generalize from one school to the entire population of colleges and universities, what these findings demonstrate is that *if* the "liberal" faculty is indoctrinating the students, as some conservative commentators are wont to claim, they are not doing a good job of it, at least not at Buffalo State College.

## Political Ideology of the Faculty and the Students: Perception vs. Reality

Table 3 presents a comparison of the student's perception of the faculty's ideological leanings with faculty members' self-reports. The main purpose of this comparison is to gauge how well the students could identify the political ideology of their professors, our hypothesis being that students are more likely to overestimate the liberalness of the faculty and underestimate their conservativeness, due to the popular portrayal of academia as the "last bastion of liberalism." In order to test this hypothesis we asked students the following question: "based on your experiences, what do you perceive to be the political attitudes of the faculty at Buffalo State College?"

There are at least two striking finding from this comparison. First, students seem to grossly underestimate the percentage of liberal professors. Fifty-nine percent of the faculty identify themselves as liberal, but only 25% of the students thought their professors were liberal. The students' estimate of the faculty's liberalness was off by over 50%. This would seem to refute our hypothesis that the students would think the faculty is more liberal than they actually are due to media portrayals. However, while 19% of those professors surveyed identified themselves as politically conservative, the students thought the percentage of conservative faculty to be only 6%, again, an underestimate by the students of over 50%. While this finding appears to support our hypothesis, it also points to a more interesting reality. Taken as a whole, these two results may indicate that the faculty does a good job of hiding their personal political views from the students. Another finding that supports this conclusion is that 46% of the students surveyed reported they did not know the political ideology of their professors.

There are three possible explanations for these results. First, it is possible that the students do not know what the labels liberal, moderate, and conservative mean. Second, it is possible that a significant portion of students surveyed took classes where political issues were not generally discussed. For example, students who take a large number of natural science courses may never be provided with sufficient evidence to make any inferences about a professor's political ideology. If one assumes that political and social issues are more likely to be discussed in social science courses, then the fact that only 17% of the students surveyed were social science majors may account for the disparity between the perception and reality.

FSU000272

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 114 of 552

A third and more interesting explanation, pedagogically, is that the faculty does a good job of hiding their political views from the students. This explanation is related to the larger pedagogical debate over whether faculty members *should* make their personal political views known in the classroom. On one side of this issue are those who say that if a professor reveals his or her political ideology to the students it could hamper learning. Students who do not share the political ideology of the professor will tune that professor out and be less receptive to the educational outcomes the instructor is trying to achieve.

Or, students who share the ideology of the professor may accept what the professor says as true and thus not probe and question their own political views, which would also hinder learning. Even worse, students who do not agree with the professor's political ideology may simply retreat into an intellectual shell, fearful of revealing their disagreement for fear of grade retribution or public humiliation. The best course for a professor to take, according to this view, is always to be the "devil's advocate," arguing all sides of an issue and challenging students regardless of their own personal views.

The other side of the pedagogical argument is that college students are adults who are capable of differentiating between when a professor is advocating a particular point of view and when a professor is relating theories or ideas relevant to the course material. In this view, students are independent thinkers, savvy and intelligent enough to digest many ideas and viewpoints at once, all without undermining their own educational experiences or learning outcomes. While we do not attempt to settle this debate here, our findings are interesting in that they provide direct evidence that can inform this larger philosophical issue.

The original intent of this study was to shed light on two things. First, to what extent are the political and social attitudes of the students and faculty different from each other? We found that in some respects they are, but that in other respects they are remarkably similar. Second, we wanted to expose the assertion that academia is the last bastion of liberalism to the harsh light of empirical testing. We found that this perception is incongruent with reality. The faculty and students are much more diverse in their attitudes, behavior, and ideology than is popularly assumed. In some respects the faculty at Buffalo State is more liberal than the students, for example in terms of its support for the death penalty and for the democratic candidate in the 2000 election. But in other respects, such as school vouchers and humanitarian intervention, the attitudes of students and professors are quite similar. In terms of support for free trade, the students hold views that are significantly more liberal than the professors. Most surprisingly, at Buffalo State College, the percentage of conservative professors outnumbers the percentage of conservative students.

It also appears that students cannot accurately assess the ideological leanings of the faculty. While we cannot pinpoint the reasons for this based on these data, it provides some empirical grist for the debate over whether or not professors should make their political views known to students. It is our hope that this admittedly preliminary analysis of the professor-student relationship is replicated on other campuses in order to more fully understand this important pedagogical issue.

## Conclusions

We have conducted the most systematic survey to date of the political attitudes of college students and professors, albeit at one institution; Buffalo State College.

FSU000273

We found that, inter alia, while there are more self-identified liberals among the faculty than the students, there are also more conservatives. Further, we found that on specific political issues, the attitudes of both students and faculty are quite diverse. On some issues faculty are more right-leaning than the students, and others they are more left-leaning, and there are some issues upon which both groups agree. Moreover, we found no evidence to suggest that faculty members push their own personal political viewpoints in the classroom.

We suggest that future research extend our analysis to other institutions, especially those under pressure from the "intellectual diversity" movement, to determine the validity of the "liberal bastion" hypothesis at other institutions. We suggest also examining student-faculty politics at other public universities, as well as other types of schools, such as private, church-related, and doctoral universities. Interesting comparisons could be made both within and across these institutional types; we expect there will be variations in the political attitudes of students and faculty across these institutions.

## Notes

1. The eighteen are Alabama, California, Colorado, Florida, Georgia, Indiana, Maine, Maryland, Massachusetts, Minnesota, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, and Washington.

2. We used sampling without replacement so that no student received more than one survey.

3. The Campus Bulk Mail Service could only accommodate 750 mailings at a time.

4. The Campus Bulk Mail Service terminated our mailbox at the end of the fall 2001 semester, so no more responses were received past that date.

5. According to the American Association for Public Opinion Research *Standard Definitions: Final Disposition of Case Codes and Outcome Rates for Surveys* (3rd edition) the following formula was used: $(I + P)/(I + P) + (R) + (UO)$.

6. Sampling without replacement was used in the faculty sample as well.

7. The faculty response rate was calculated using the same formula as for the students, where $I = 197$, $P = 1$, $R = 0$, and $UO = 472$.

8. The three questions were "The U.S. should intervene in other countries where human rights violations occur" (agree, disagree, don't know/no opinion); This country would be better off if we just stayed home and did not concern ourselves with problems in other parts of the world" (agree, disagree, don't know/no opinion); "Do you believe that the government should spend more time and resources in finding alternative energy resources, for example solar, wind or hydroelectric power and the like?" (yes, no don't know/no opinion).

9. Treating the variables in this way does not change the significance or the strength of the relationships.

## References

Astin, A. W., W. S. Korn, and E. L. Dey. 1991. *The American College Teacher: National norms for the 1989–1990 HERI Faculty Survey*. Los Angeles: Higher Education Research Institute.

Babbie, Earl. 2002. *The Basics of Social Research*. Belmont, CA: Wadsworth.

Boyer, Ernest L. 1987. *College: The Undergraduate Experience in America*. New York: John Wiley.

Brownlee, K. A. 1975. "A Note on the Effects of Nonresponse on Surveys." *Journal of the American Statistical Association* 52(227): 29–32.

Burden, Barry C. 2000. "Voter Turnout and the National Election Studies." *Political Analysis* 8(4): 389–398.

Dey, E. L. 1996. "Undergraduate Political Attitudes; An Examination of Peer, Faculty, and Social Influences." *Research in Higher Education* 37(1): 535–552.

General Election Committee, Nader for President 2004. "Why Ralph: Frequently Asked Questions." Votenader.org <www.votenader.org/why_ralph/index.php/cid=3> (November 12, 2006).

Hamilton, R. S. and L. L. Hargens. 1993. "The Politics of the Professors: Self-Identifications, 1969–1984." *Social Forces* 71(3): 603–627.

Horowitz, David. 2002. "Missing Diversity on America's Campuses." F*rontpagemagazine.com.* < http://www.frontpagemag.com/Articles/ReadArticle.asp?ID=1003> . (September 3, 2002).

Jennings, M. Kent, and Richard G. Niemi. 1982. *Generations and Politics*. Princeton, NJ: Princeton University Press.

Klein, Daniel B., and Charlotta Stern. 2005. "How Politically Diverse Are the Social Sciences and Humanities?" *Academic Questions* 18(1): 40–52.

Lee, Kenneth. 2002. "Time to Fight Back." *Diversity*. <http://www.taemag.com/issues/articleid.16857/article_detail.asp>

Lipset, Seymour Martin. 1982. "The Academic Mind at the Top: The Political Behavior and Values of Faculty Elites." *Public Opinion Quarterly* 46(2): 143–168.

McDonald, Micheal P. 2003. "On the Over-Report Bias of the National Election Study." *Political Analysis* 11(2): 180–186.

Miller, Vernon D. 1991. *A Quasi-Experimental Study of Newcomers' Information Seeking Behaviors During Organizational Entry*. Working Paper. Michigan State University.

Pascarella, E. T. and P. T. Terenzini. 1991. *How College Affects Students*. San Francisco: Jossey-Bass.

Peters, C. Scott and J. D. Droddy. 2003. "The Effects of Law School on Political Attitudes: Some Evidence from the Class of 2000." *Journal of Legal Education* 53: 33–47.

Schiff, T. W. 1993. "Political Identification and Political Attitudes of American College Students." *Public Opinion Quarterly* 54: 476–507.

Stembler, Charles H. 1961. *Education and Attitude Change: The Effect of Schooling on Prejudice Against Minority Groups*. New York: Institute of Human Relations.

Stephens, William N. and C. Stephens Long. 1970. "Education and Political Behavior." In *Political Science Annual: An International Review*, vol. 2, ed. James A. Robinson. Indianapolis: Bobbs-Merrill.

The American Association for Public Opinion Research. 2004. *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys*. 3rd edition. Lenexa, KN: AAPOR.

Weidman, J. 1989. *Undergraduate Socialization: Handbook of Theory and Research*. Vol. 5. New York: Agathon.

## Appendix A: Question Wording

*Ideological self-placement*. Where would you place yourself on the following scale: (strongly liberal, liberal, somewhat liberal, strongly conservative, conservative, somewhat conservative, don't know)?

*Humanitarian intervention*. Do you agree or disagree with the following statement: The U.S. should intervene in other countries where human rights violations occur (agree, disagree, don't know, no opinion)?

*Support for the death penalty*. Do you favor or oppose the death penalty for persons convicted of murder (favor, oppose, no opinion)?

*Support for school vouchers*. Do you favor or oppose school vouchers (favor, oppose, don't know, no opinion)?

*Student political perception of the faculty*. Based on your experiences what do you perceive the political attitudes of the faculty at Buffalo State College to be

(strongly liberal, liberal, somewhat liberal, strongly conservative, conservative, somewhat conservative)?

*Faculty political perception of students*. Based on your experiences what do you perceive the political attitudes of the students at Buffalo State College to be (strongly liberal, liberal, somewhat liberal, strongly conservative, conservative, somewhat conservative)?

*Support for gun control legislation*. Would you favor or oppose a federal law, which would require a person to obtain a permit before he/she could purchase a gun (favor, oppose, no opinion)?

*Vote in 2000*. Did you vote in the last presidential election (yes, no)?

*Vote choice in 2000*. Whom did you vote for in the last presidential election of 2000 (Bush, Gore, Brown, Nader, Buchanan, other)?

*Political information*. Where do you receive the majority of your political information (radio, television, Internet, print, in the classroom, other)?

*Political efficacy*. Do you agree or disagree with the following statement: People like me do not have any say in what the government does (agree, disagree, neither agree nor disagree)?

*Support for free trade*. Do you agree or disagree with free trade (agree, disagree, no opinion)?

*Support for abortion*. Do you agree or disagree with the Supreme Court's ruling legalizing abortion (agree, disagree)?

FSU000276

# EXHIBIT Q

# FREE EXPRESSION AND CONSTRUCTIVE DIALOGUE AT THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL

A report by

Jennifer Larson, Department of English and Comparative Literature
Mark McNeilly, Kenan-Flagler Business School
Timothy J. Ryan, Department of Political Science[1]

March 2, 2020[*]

[1] Authors are listed alphabetically and contributed equally. We thank J Ehlinger for valuable assistance in data analysis as well as construction of this report. We thank the Office of Institutional Research and Assessment for assistance administering our survey research, the Provost's office for financial support. Additionally, we are extremely grateful to numerous colleagues—too many to name here—who read and provided invaluable feedback on previous drafts of this report.

[*] This update to the Feb. 5 draft of our report adds a note clarifying how to interpret the results we report in Finding 11 below.

FSU001810

## Table of Contents

EXECUTIVE SUMMARY ...............................................................................................................................1

INTRODUCTION........................................................................................................................................3

    WHY WE CONDUCTED THE RESEARCH ......................................................................................................3

    WHAT MAKES THIS PROJECT DISTINCTIVE..............................................................................................5

    SURVEY OF UNC UNDERGRADUATES .....................................................................................................6

    FOCUS GROUPS ..................................................................................................................................10

PRINCIPAL FINDINGS.............................................................................................................................12

    1) 30.8% OF STUDENTS FEEL THEY HAVE BECOME MORE LIBERAL DURING THEIR COLLEGE YEARS; 15.9% FEEL THEY HAVE BECOME MORE CONSERVATIVE; AND 47.8% FEEL THEIR IDEOLOGICAL LEANINGS HAVE NOT CHANGED....................................12

    2) IN MOST CLASSES, POLITICS RARELY COMES UP. ...............................................................................14

    3) STUDENTS GENERALLY PERCEIVE COURSE INSTRUCTORS TO BE OPEN MINDED AND ENCOURAGING OF PARTICIPATION FROM BOTH LIBERALS AND CONSERVATIVES. ..............................................................................18

    4) STUDENTS ALMOST UBIQUITOUSLY PERCEIVE POLITICAL LIBERALS TO BE A MAJORITY ON CAMPUS. ............................21

    5) BOTH LIBERAL AND CONSERVATIVE STUDENTS WORRY ABOUT HOW STUDENTS AND FACULTY WILL RESPOND TO THEIR POLITICAL VIEWS, AND STUDENTS ACROSS POLITICAL PERSPECTIVES ENGAGE IN SELF-CENSORSHIP.............................23

    6) ANXIETIES ABOUT EXPRESSING POLITICAL VIEWS AND SELF-CENSORSHIP ARE MORE PREVALENT AMONG STUDENTS WHO IDENTIFY AS CONSERVATIVE. ................................................................................................28

    7) STUDENTS WORRY MORE ABOUT CENSURE FROM PEERS THAN FROM FACULTY. ...............................................31

    8) STUDENTS HARBOR DIVISIVE STEREOTYPES ABOUT ONE ANOTHER. ...............................................................31

    9) STUDENTS ACROSS IDEOLOGIES REPORT COMMONLY HEARING DISPARAGING COMMENTS ABOUT POLITICAL CONSERVATIVES........33

    10) MANY RESPONDENTS ARE OPEN TO ENGAGING SOCIALLY WITH STUDENTS WHO DON'T SHARE THEIR POLITICAL VIEWS, BUT A SUBSTANTIAL MINORITY IS NOT......................................................................................35

    11) APPROXIMATELY 19% OF SELF-IDENTIFIED LIBERALS AND 3% OF SELF-IDENTIFIED MODERATES AND CONSERVATIVES ENDORSE BLOCKING A SPEAKER THEY DISAGREE WITH...................................................................37

    12) STUDENTS ACROSS THE POLITICAL SPECTRUM EXPRESS INTEREST IN HAVING MORE OPPORTUNITIES FOR CONSTRUCTIVE DIALOGUE— IN PARTICULAR CONVERSATIONS THAT INCLUDE CONSERVATIVE SPEAKERS..................................42

GENERAL DISCUSSION............................................................................................................................45

RECOMMENDATIONS.............................................................................................................................48

APPENDIX A: RECRUITMENT MESSAGE ...................................................................................................50

APPENDIX B: QUESTION WORDING..........................................................................................................52

APPENDIX C: FOCUS GROUP PROTOCOL .................................................................................................62

APPENDIX D: CLASS CLASSIFICATION SCHEME .........................................................................................64

APPENDIX E: RESULTS FOR INCENTIVIZED SAMPLE ONLY..........................................................................67

FSU001811

# Executive Summary

In the Spring of 2019, we conducted an investigation to better understand students' experiences with free speech and constructive dialogue at the University of North Carolina at Chapel Hill. The investigation had two components: 1) a survey that all UNC undergraduates were invited to complete and 2) in-depth focus group interviews with members of three politically active student organizations. Our investigation led to twelve principal findings, which we discuss at length in the following report. This summary does not aim to encapsulate *all* of the study's results, but to highlight four thematic conclusions that emerge from these findings:

*1)* *Students say that (when politics come up in class) the majority of their UNC professors do try to discuss both sides of political issues and encourage opinions from across the political spectrum.*

A common theme in public discourse about colleges is that, given faculty political leanings, instructional time is used in a heavy-handed way to instill specific political views into students. Our results do not support this view. The student survey responses suggest there are few classes in which politics comes up regularly (Finding 2). Furthermore, when politics comes up, both students who identify as liberal and students who identify as conservative generally perceive their instructors as open-minded and encouraging of participation from students across the political spectrum (Finding 3).

*2)* *The current campus climate does not consistently promote free expression and constructive dialogue across the political spectrum.*

While the first theme above undermines some common critiques of higher education, our research nevertheless points to some areas of concern. Specifically, although most students perceive that instructors generally adopt an inclusive posture in the classroom, many students also worry that if they express their sincere political views openly, instructors and/or peers will think less of them, or do something to embarrass them. Some students even worry their course grades might be affected, and a substantial proportion of students—24.1% to 67.9%, depending on student ideology—report engaging in self-censorship (Finding 5). Overall, though, students report worrying more about censure from fellow students than faculty (Finding 7). The survey results also showed that students harbor negative stereotypes about students who disagree with them (Finding 8), are unwilling to interact socially with people who hold opposing political views, and even disagree that UNC needs political diversity at all (Finding 10). Finally, a substantial proportion of students—over 25%—reported that they would endorse blocking or interrupting events featuring speakers with whom they disagree (Finding 11).

*3)* *Although students across the political spectrum report facing challenges related to free expression, these challenges seem to be more acute for students who identify as conservative.*

Compared to self-identified liberals, self-identified conservative students express greater concern about potential academic consequences that might stem from expressing their views (Finding 6). Students across ideologies report commonly hearing disparaging comments about political conservatives (Finding 9) and conservative students are at greater risk of social isolation (Finding

1

FSU001812

10). Additionally, self-identified liberal students are more likely than self-identified conservatives to endorse blocking a campus speaker with whom they disagree (Finding 11).

### 4)  *Students across the political spectrum want more opportunities to engage with those who think differently.*

Students want more opportunities for constructive dialogue with ideologically dissimilar others, and, in particular, they express interest in having more speakers with conservative views on campus in particular (Finding 12).

This investigation's results do not align with any particular narrative about the culture for free expression at universities such as UNC. We hope our findings give pause to those who are eager to characterize universities as wellsprings for progressive orthodoxy as well as to those who dismiss any possibility that the academy's progressive lean might have endemic consequences for students' academic and social experiences. In the full report's concluding section, we offer recommendations for the campus to consider as it decides how best to foster a fully inclusive environment in which ideas can be contested with energy and vigor.

FSU001813

# Introduction

In Fall 2018, The University of North Carolina at Chapel Hill's Faculty Council passed a resolution endorsing the University of Chicago Principles for protecting and promoting free speech on college campuses. Discussions surrounding this resolution focused on the potential impact of this endorsement as well as the impetus for it: Did UNC have a free speech problem? If so, what did that problem look like? Were anecdotes from students—both conservative and liberal—who claimed to have been silenced indicative of a broader experience? We realized that the Faculty Council's resolution needed to signal the beginning of an evidence-based approach to investigating UNC's climate for free expression and constructive dialogue. We also sought to begin a discussion about how UNC could foster a campus environment that is tolerant and inclusive and where a wide array of views are aired in service of a search for truth.

The pages that follow report results and conclusions from a year-long investigation of UNC undergraduates' experiences concerning political expression on campus. We make substantial progress in characterizing free expression challenges at UNC. For instance, we show that both self-identified liberal and self-identified conservative students feel that UNC instructors create classroom atmospheres that welcome student participation from across the political spectrum. At the same time, a substantial proportion of students—in particular students who identify as conservative—worry about the social ramifications of expressing their sincere views, both inside and outside the classroom. Taken as a whole, this report underlines the complexity of free expression issues on a diverse college campus, while also identifying opportunities for improvement.

## *Why We Conducted the Research*

This project starts from the premise that the culture surrounding free expression at a university such as UNC is of great importance to the institution's pedagogical mission. We are hardly the first to note that expressing unpopular views can reveal critical blind spots in prevailing thought patterns or that the eccentric opinion of today can become the orthodoxy of tomorrow. But a culture that is favorable toward free expression serves a pedagogical role even when the views being expressed are wrong. When one person proffers an incorrect idea and someone else refutes it, both parties better apprehend *why* the correct view must true. Under the right circumstances—those that institutions of higher learning strive to bring about—this exercise also deepens appreciation for a truth-seeking process grounded in civility and reason.

Coming from this perspective, we undertook this study for four more specific reasons:

1. We wanted to better understand what UNC's culture for free expression looks like in the current, politically-charged moment. We have all seen expression issues play out in the classroom: there are students who are eager to share their opinions on current issues and others who are hard to draw out. We have also witnessed incidents that reveal students' intense feelings about political issues. For instance, in 2015, students shouted over journalist Clarence Page's remarks on race and inclusion to read a list of demands.[2] And in 2019, an undergraduate physically assaulted a pro-life

---

[2] See Jane Wester, "Students ask administrators to act on systemic racism," *The Daily Tar Heel*. Available online at https://www.dailytarheel.com/article/2015/11/students-ask-administrators-to-act-on-systemic-racism.

3

FSU001814

activist displaying a sign on campus.[3] These and other episodes raise difficult questions about how to regulate speech in an educational environment. Yet, it is hard to know what these and other incidents imply about the *typical* experience at UNC or about the campus orientation toward free exchange in general.

2. We were aware of a national debate about issues of free expression on college campuses and wanted to better understand UNC's potential place in this debate. It has been argued—often by the political right—that American universities deliberately socialize students into a progressive worldview. Books advancing such theories have dramatic titles such as *Indoctrination U: The Left's War Against Academic Freedom* (Encounter Books, 2007) and *Brainwashed: How Universities Indoctrinate America's Youth* (Thomas Nelson, 2010). Following a series of events in which conservative speakers were disrupted or disinvited from speaking engagements, President Trump even issued an executive order related to campus free speech issues, calling it an "historic action to defend American students and American values that have been under siege."[4] Commentators on the political left responded that such concerns were misplaced, arguing that the campus free speech crisis is a "myth"[5] and that those who argue otherwise are "grifters."[6]

A better understanding of UNC is informative for this broader debate. UNC is a leading university that attracts engaged students from diverse backgrounds and that maintains a rigorous academic environment. It is also a taxpayer-supported public institution, meaning it has an especially strong mandate to handle political disputes evenhandedly.[7] Finally, UNC operates within a complex political context: North Carolina is politically divided—one of the pivotal "swing states" in all recent presidential elections. And since UNC, by law, draws at least 82% of its students from within the state, the students are divided as well. UNC therefore serves as a microcosm through which to understand the pressures and controversies that are unfolding in the state and nationally.

3. As we reviewed recent discussions about free expression on college campuses—and there has been no shortage of these—we noticed a paucity of reliable information. Specific episodes—a protest here, a disinvitation there—are interpreted and reinterpreted *ad nauseum* by narrowly-focused commentators eager to cast higher education in a uniquely positive or negative light. These episodes are often captivating, but they reveal little about the real extent and character of any specific, tangible problems. Even where there have been efforts to quantify aspects of free expression culture on college campuses, we saw numerous opportunities to investigate fresh topics or to ask questions in ways that would address limitations of the previous efforts—as we discuss further below.

---

[3] See Julie Wilson, "Anti-abortion group member at UNC attacked; 2 facing charges," *ABC11.com*. Available online at https://abc11.com/anti-abortion-group-member-at-unc-attacked;-2-facing-charges/5303214/.

[4] See Susan Svrluga, "Trump signs executive order on free speech on college campuses." *Washington Post*. Available online at https://www.washingtonpost.com/education/2019/03/21/trump-expected-sign-executive-order-free-speech/.

[5] E.g. Zack Beauchamp, "The myth of a campus free speech crisis," *Vox.com*. Available online at https://www.vox.com/policy-and-politics/2018/8/31/17718296/campus-free-speech-political-correctness-musa-al-gharbi.

[6] Mari Uyehara, "The Free Speech Grifters," *GQ.com*. Available online at https://www.gq.com/story/free-speech-grifting.

[7] In fact, in 2017, the North Carolina General Assembly adopted legislation stating, among other things, that it is not the proper role of institutions in the University of North Carolina system "to shield individuals from speech protected by the First Amendment, including, without limitation, ideas and opinions they find unwelcome, disagreeable, or even deeply offensive" (NC Gen Stat §116-300).

4

FSU001815

4. We believe that the composition of our research team improves the quality of our effort and, as a result, the credibility of our findings. As our departmental affiliations reflect, we are an interdisciplinary team. We each approached this project with different classroom experiences and perspectives on UNC campus culture. We are also politically diverse—which we believe helped us limit potential blind spots in what questions we posed and how we interpreted our results.[8] We are committed to providing transparent information to inform a discussion about how UNC can best foster a culture that equips students with the intellectual agility necessary to face the challenges awaiting them after graduation. We hope readers considering the results we present below resist the urge to position our research as falling on one "side" in the debates about free expression—in North Carolina or nationally. We do not see them that way.

## What Makes This Project Distinctive

As noted above, much of the recent commentary on campus free expression issues has been driven by particular controversial episodes that have generated a flurry of media attention. Alongside the episodic coverage, however, there have been occasional efforts to examine the culture and climate concerning free expression at American universities more systematically. While we cannot undertake a comprehensive review of all such work, we will briefly highlight some elements of our project that distinguish it from others.

Most importantly, our research focuses on the daily, lived experiences of students at UNC. In the following discussions, we examine what happens in the typical classroom—how students perceive their instructors and peers—as well as what they see and hear on campus in general. We also examine students' orientations toward political disagreement by exploring what stereotypes they hold toward political opponents and what actions they consider to be appropriate when confronted with disagreement.

Most past research on campus free expression has not focused on students' experiences. For instance, one much-discussed analysis centered on surveys of the American public at large—examining whether tolerance of unpopular groups (e.g. "communists" and "racists") have changed over time and whether college graduates appear to be more open-minded than non-graduates.[9] These results are sociologically intriguing, but they simply have little to say about students' daily experiences on college campuses. Elsewhere, researchers have attempted to catalogue incidents in which speakers were disinvited or faculty were fired because of their political opinions.[10] These results merit discussion, but they are open to several interpretations, and again, do not speak directly to students' experiences.

Two studies—both conducted in conjunction with the Gallup organization—do seek to examine students directly.[11] However, both of these studies focus on questions that are more general in

---

[8] After releasing this report, we expect to publish short essays outlining and explaining our own individual perspectives on the findings herein.

[9] See Matthew Yglesias, "Everything we think about the political correctness debate is wrong," *Vox.com*. Available online at https://www.vox.com/policy-and-politics/2018/3/12/17100496/political-correctness-data.

[10] Jeffrey Adam Sachs, "There Is No Campus Free Speech Crisis: A Close Look at the Evidence," *Niskaken Center: Commentary*. Available online at https://niskanencenter.org/blog/there-is-no-campus-free-speech-crisis-a-close-look-at-the-evidence/.

[11] Gallup. 2016. "Free Expression on Campus: A Survey of U.S. College Students and U.S. Adults." Available online at https://knightfoundation.org/reports/free-speech-campus/ ; Gallup. 2018. "The University of Nebraska System

FSU001816

nature than ours are, and they do not examine how students' experiences depend on their own political leanings.

## *Survey of UNC Undergraduates*

Our investigation centers on a carefully constructed, in-depth survey of undergraduate students. We use this survey to examine classroom experiences at UNC, students' orientation toward political disagreement, and their opinions about UNC's culture of free expression more generally. Here, we describe who our respondents were, how we approached them, and other operational details.

*Recruitment*

One difficulty that commonly arises in survey research is *self-selection*: individuals who are most interested in the survey's topic are most likely to complete the questionnaire. Such overrepresentation can result in biased conclusions. It seemed quite plausible that students who are politically active or who felt aggrieved by particular experiences would be most likely to respond to a survey invitation; this could easily exaggerate the true extent of free expression challenges at UNC. So, we adopted a recruitment procedure designed to combat selection bias issues, as well as provide insight into how much selection biases could influence related studies.

Students were recruited to participate in the "2019 Free Expression and Civil Discourse"[12] survey in two waves. In the first wave, 2000 undergraduate students were offered a monetary incentive to complete the survey. Offering an incentive typically diminishes selection issues since it provides individuals who lack intrinsic motivation to complete a survey with an extrinsic motivation.[13] Students were contacted via their university email addresses and invited to participate in a 15-minute survey, for which they would be compensated with an $10 Amazon e-gift card. They had one week to complete the survey, and they were sent two reminder emails during that time to encourage participation.[14] The invitation list was a random sample, stratified by students' self-reported gender and class year.[15] There were 519 complete responses, for a completion rate of 25.95%.

After the incentivized portion of the study was completed, we invited all remaining UNC undergraduates (N=18,343) to complete the same study, but without a monetary incentive. As with the incentivized respondents, these students had one week to complete the instrument. There were 568 complete responses, for a completion rate of 3.09%.

---

Climate Study." Available online at

https://nebraska.edu/~/media/UNCA/docs/news/NU_2018_Climate_Study_Full_Report.pdf.

[12] We have since renamed our project to "Free Expression and Constructive Dialogue," a title which we believe better reflects our goals.

[13] See Eleanor Singer and Cong Ye. 2012. "The Use and Effects of Incentives in Surveys" eds. Douglas S Massey and Roger Tourangeau. *The ANNALS of the American Academy of Political and Social Science* 645(1): 112–41.

[14] For 800 invitees, we increased the incentive offered in the final reminder to $15. The completion rate among this group of 800 was 26.25%. The completion rate among the 1,200 respondents offered $10 in all three emails was nearly identical: 25.75%. Hence, the effect of a $5 increase on response rates appears to be small.

[15] The invitation list was provided by UNC's Office of Institutional Research and Assessment, and we are thankful for their assistance in conducting this research.

FSU001817

We conducted the unincentivized portion of the study for three reasons. First, we wanted to maximize the total number of survey responses received, as this would better position us to conduct subgroup analyses (such as analyses of students majoring in specific areas or of liberal- versus conservative-identifying students). Second, we wanted to give all students the opportunity to share their views and experiences, but our budget did not allow us to provide an incentive to all 20,000+ UNC undergraduates. Third, comparing response patterns in the incentivized and unincentivized portions of the sample provides some insight on how our conclusions might have differed if selection into the survey sample relied only on students' intrinsic motivation.

When students were invited to participate in the study, they were sent an email soliciting their views on "free expression at UNC." The invitation explained that a UNC research team was "conducting a survey of students' experiences encountering and engaging with different viewpoints on campus. We're writing to find out about *your* perspective on these topics." (Appendix A shows the full text of recruitment messages.) We chose language that allowed participants to make an informed consent decision, but we did not outline the study's details. This, too, was an effort to encourage responses from all students—not just those who might be eager for an opportunity to express grievances.

Table 1 reports demographic characteristics for the incentivized and unincentivized portions of the sample. Table 1 also reports characteristics of the pooled sample (a weighted average of the first two columns). It also reports UNC benchmarks (where these are available) for the demographics we examine.

For most characteristics, differences between our sample and UNC benchmarks appear to be small, and neither the incentivized nor the unincentivized sample falls reliably closer to the target. For instance, the incentivized sample somewhat overrepresents female students, but the unincentivized sample somewhat overrepresents whites. Both the incentivized and unincentivized administrations of the survey somewhat overrepresent students who have arrived at UNC recently.[16] Still, we take Table 1 as evidence that our sample represents a meaningful cross section of student opinion at UNC.

Because neither the incentivized nor the unincentivized portions of our sample are reliably closer to UNC benchmarks, the analyses we present will focus on the pooled sample described in column 3 of Table 1. In other words, we use all available survey responses. Focusing on the pooled sample has two major advantages: it simplifies and condenses the presentation of our results substantially, and it roughly doubles our available data, making estimates more precise and improving our ability to conduct subgroup analyses. However, we recognize that the incentivized and unincentivized portions of the sample might differ in ways not reflected in Table 1. For this reason, we repeated all of our analyses, restricting our focus to respondents who were offered an incentive to complete the survey. The results of this additional work support the same conclusions. To be transparent on this point, Appendix E repeats all of our main analyses among incentivized respondents only.

The conventionally calculated 95% margin of error in our study is plus-or-minus 2.97 percentage points for the pooled sample, 4.11 percentage points for the unincentivized sample, and 4.30

---

[16] We do not think this modest imbalance is problematic for the conclusions we reach below—student class year does not appear to be strongly predictive of the outcomes we examine—but our dataset allows for secondary analyses stratified by class year if these are of interest. Please see footnote 18 below for more details on this comparison.

FSU001818

percentage points for the incentivized sample. Margin of error statistics such as these characterize uncertainty in proportions attributable to sampling error; they do not reflect uncertainly attributable to other factors, such as selection bias.

*Data Transparency*

The results below required a number of analytical choices that others, of course, might approach differently. Within one year of the release of our final report, we will make available the dataset we analyzed, along with the analysis files necessary to reproduce our quantitative results. Thus, readers who wish to conduct additional (or alternative) analyses are welcome to do so. However, our public dataset will include redactions (questions that provide finely grained demographic information, open-ended responses, etc.) to prevent deductive identification of respondents.

8

FSU001819

Table 1: Sample Properties

| | FECD Survey | | | UNC Benchmark[17] |
|---|---|---|---|---|
| | Unincentivized | Incentivized | Pooled | |
| **Entering year** | | | | |
| 2018 or 2019 | 34.6% | 29.5% | 32.2% | 24.4%[18] |
| 2017 | 27.4 | 29.3 | 28.3 | 20.7 |
| 2016 | 17.2 | 21.4 | 19.2 | 26.8 |
| 2015 or earlier | 20.7 | 19.7 | 20.2 | 28.4 |
| **Residence** | | | | |
| In-state | 82.7% | 82.2% | 82.5% | 82.3% |
| Out-of-state | 17.3 | 17.8 | 17.5 | 17.7 |
| **Gender** | | | | |
| Female | 60.7% | 67.0 | 63.7 | 59.4% |
| Male | 38.1 | 32.1 | 35.2 | 40.6 |
| Neither | 1.2 | 1.0 | 1.1 | --[19] |
| **Race** | | | | |
| White | 73.3% | 60.5% | 67.2% | 63.2% |
| Black | 7.7 | 9.3 | 8.5 | 8.2 |
| Hispanic | 5.6 | 8.5 | 7.0 | 8.8 |
| Asian | 8.8 | 16.6 | 12.5 | 14.7 |
| Other | 4.6 | 5.0 | 4.8 | 5.6 |
| **Partisanship** | | | | |
| Republican | 15.5% | 10.7% | 13.2% | |
| Democrat | 38.3 | 43.6 | 40.9 | |
| Independent | 46.2 | 45.7 | 45.9 | |
| **Ideology** | | | | |
| Conservative | 22.9% | 15.9% | 19.6% | |
| Liberal | 60.2 | 65.6 | 62.7 | |
| Middle of the road | 17.0 | 18.5 | 17.7 | |
| N (Complete cases) | 568 | 519 | 1,087 | |

---

[17] Benchmark statistics come from the Office of Institutional Research and Assessment's Analytic Reports tool at https://oira.unc.edu/reports/.

[18] Respondents to the FECD survey reported what year they began their studies at UNC. The UNC benchmark, in contrast, is derived from a student's academic standing. As such, the categories are not perfectly comparable. For instance, students who transferred to UNC from another institution might have enough transfer credit to hold senior standing but would have stated at UNC in 2018 (at the same time as many first-year students). This difference in categories likely explains some of the overrepresentation of recently-entering students in our sample.

[19] We are not aware of any UNC benchmark for non-binary gender identity.

9

FSU001820

*Focus Groups*

To add more depth to our analysis of issues related to free expression and constructive dialogue at UNC, we also conducted focus group interviews. Focus groups complement survey results by giving students an opportunity to elaborate on their thoughts, to provide concrete examples of specific experiences and observations, and/or to reveal new issues that warrant further attention in this specific study and/or future research. Yet, because we concentrated narrowly on political interests for these focus groups, we do not interpret the information gathered in these interviews to represent students' experiences more generally.

To determine which groups to invite for focus group interviews, we looked through a public directory of UNC student groups and identified the groups that appeared to have political interests. We identified and invited eight such groups. We emailed the main student contacts asking if they would be willing to organize approximately 8-10 group members to be interviewed about ways to "better understand UNC-CH students' backgrounds, what they want to get out of their education, and their experiences encountering and engaging with different viewpoints on the UNC-CH campus."

Out of the eight groups contacted, three groups responded favorably to our requests and arranged a time to meet a moderator (one of the report authors) at an on-campus location to conduct the focus group. Two groups did not respond, one group responded outside of the timeframe required for inclusion in the study, one group was not interested in participating, and another group replied that they had disbanded. Of the groups that met with us, one was conservative, and two were liberal—with one of the liberal groups have a more left-leaning and reformist orientation.[20]

We conducted focus group interviews on the following dates:
- Conservative – April 5, 2019
- Liberal #1 – April 5, 2019
- Liberal #2 – April 12, 2019

When students arrived for the focus group interviews, they were seated around a conference table. Cookies were provided. Once all students had arrived the moderator began the session by explaining the interview objectives. Students were also asked to sign a consent form, and they were informed that the session would be recorded but that they would not be individually identified on the recording or the transcript of that recording. Before proceeding, the moderator confirmed all attendees understood the consent form and agreed to its terms.

After these introductory remarks, the moderator proceeded with a semi-structured focus group protocol. There were approximately two-dozen questions (Appendix C) covering several different themes. Each question served as a conversation starter. Students could speak to each other and elaborate on different ideas or highlight shared experiences. The moderator could ask clarification and follow-up questions as necessary/appropriate. Each focus group had 3-4 participants; all were

---

[20] We were disappointed that were unable to conduct interviews with a larger number of groups. Our timing unfortunately coincided with the end of the semester, and students' inevitable busyness at this time likely contributed at least in part to their lack of response.

FSU001821

generally open, talkative, and engaged, and students consistently elaborated on each other's ideas. The sessions lasted about 60 minutes. Once the planned questioning was complete, the moderator asked students if they had anything else that they wished to add, thanked them for their participation, and dismissed the group.

After all the focus groups were complete, we transcribed of each session to facilitate closer analysis. Privacy considerations preclude releasing full transcripts since we guaranteed anonymity, and students occasionally revealed identifying details about themselves in their responses. But we provide illustrative quotes—occasionally redacted or edited for clarity or privacy—as appropriate below.

FSU001822

## Principal Findings

Our research led us to twelve principal conclusions, which we discuss in detail below.

### *1) 30.8% of students feel they have become more liberal during their college years; 15.9% feel they have become more conservative; and 47.8% feel their ideological leanings have not changed.*

As noted above, critics of American colleges and universities argue that these institutions serve as engines for liberal socialization. Although it has been nearly six decades since conservative commentator William F. Buckley quipped that he would rather be governed by the first two thousand names in the telephone directory than the faculty at Harvard University,[21] charges of liberal "indoctrination" have intensified, and conservatives have developed a far more negative view of higher education as an institution.[22] Against this backdrop, we ask: Is it true that UNC students become more liberal during their college years? And if so, how much more liberal? Do students *generally* move to the left, or is there offsetting movement to both the left and right?

The results below suggest general stability or *moderate* change rather that the cascade of drastic change (conservatives becoming liberal or liberals become radicals) that some alarmist narratives suggest.

#### Methods
The ideal way to answer these questions would be to conduct a panel survey that measures students' political attitudes upon their arrival at UNC, then again throughout their college careers, and finally, at graduation. We needed, however, to adopt an alternative approach for a shorter timeframe. As part of our survey instrument, we asked students to report their current ideological leanings on a seven-point scale that allowed them to rank themselves on a spectrum ranging from "extremely conservative" to "extremely liberal."[23] We also asked them to recall their ideological leanings "when you first came to UNC." The response options were the same for both questions, which allows us to construct a simple difference measure—one score subtracted from the other—that characterizes how ideological leanings changed over time. Of course, this approach assumes unbiased recollection of the past leanings, but in the absence of panel data, that is an assumption we are willing to make.[24]

---

[21] Buckley's exact quote has several permutations. See https://quoteinvestigator.com/2017/10/31/telegovern/

[22] Pew Research Center. 2019. "The Growing Partisan Divide in Views of Higher Education." Available online at https://www.pewsocialtrends.org/essay/the-growing-partisan-divide-in-views-of-higher-education/

[23] The question format a standard approach that has been used in many iterations of the American National Election Study. See Appendix B for question wording. Aside from identifying as liberal or conservative, respondents could also say they were "None of these" (1.57%) or "Haven't thought much about this" (2.31%). We exclude such students from analyses of ideological subgroups.

[24] How accurate does individuals' recall of their prior attitudes tend to be? The answer varies a lot. But there is reason to think that people recall political view more accurately than many other attitudes. Political identities are generally fairly stable, making changes easier to remember. In addition, political attitudes are often associated with specific objective behaviors—such as club memberships or vote choice in a presidential election—that aid recall. For a discussion of the methodological issues, see Tom W. Smith. 1982. "Recalling Attitudes: An Analysis of Retrospective Questions on the 1982 General Social Survey," National Opinion Research Center, University of Chicago.

FSU001823

Figure 1: Students' Ideological Shifts Over Time



Note: Scores represent how many increments on a seven-point liberal/conservative ideological measure a person moved. A score of zero indicates no change. The "Unidentified column" represents students who selected "None of these" or "Haven't thought much about this" for their ideological position in either the previous or current ideology question.

The approach is also premised on students having a workable understanding of what the terms "liberal" and "conservative" mean. While many people do not have a deep understanding of these terms, they capture a general notion of left and right in politics as well as aspects of a person's self-concept.[25] That is the sense in which we employ them here.

### Analysis

The top-left panel of Figure 1 depicts students' ideological shifts over time. In this panel, a score of 0 signifies no change in political leanings from the start of the student's time at the UNC to the time of the survey responses. Scores to the right of zero signify that a respondent became more conservative. For instance, students who reported that they identified as "Conservative" when they came to UNC and identify as "Extremely conservative" as of today have shifted one notch to the right on our seven-point ideological scale. Scores to the left of zero reflect liberalization. The "unidentified" column of each panel identifies students who responded with the option "None of these" or "Haven't thought much about this" for either the past or present measure.

_____

[25] For a full discussion, see Kinder, Donald R, and Nathan P. Kalmoe. 2017. *Neither Liberal nor Conservative: Ideological Innocence in the American Public.* University of Chicago Press, as well as Mason, Lilliana. 2018. *Uncivil Agreement: How Politics Became Our Identity* (Chicago: University of Chicago Press).

FSU001824

The remaining panels of Figure 1 present similar analyses, broken down by what students remember their initial ideological orientation to be. This subgroup analysis accounts for the reality that any trends in the top-left panel could be a by-product of UNC students being disproportionately liberal to begin with. It also allows us to assess how much the trends in the top-left panel are driven by *amplification* of existing views (e.g. an initially liberal student becoming even more liberal) versus *conversion* to a different view (e.g. an initially conservative student shifting to become liberal).

Figure 1 ostensibly supports the notion that students become more liberal at UNC. In the top-left panel, for instance, 30.8% of responses, excluding the "unidentified" column, fall left of zero, while only 15.9% fall right. This indicates that students who feel they became more liberal outnumber those who feel they became more conservative approximately 2:1. The trend toward liberalization particularly occurs among students who report starting UNC as moderates and those who report starting UNC as conservative. In contrast, students who report starting UNC as liberal show little movement. For these students, nearly equal proportions moved left and right (21.9% left compared to 20.3% right). Thus, Figure 1's data initially seem to provide more evidence of conversion than amplification.

With just a minor shift in emphasis, however, the evidence for a leftward shift becomes less impressive. Specifically, while more students move left than move right, the most common pattern—irrespective of a student's starting position—is no change at all. Nearly half our respondents (47.8%) reported no ideological shift from the start of their time at the UNC to the time of the survey responses. Additionally, 78.9% of the students moved just one notch or less on our seven-point scale.

We wish to emphasize that we present the trends in Figure 1 primarily as context rather than as definitive evidence for specific conclusions about UNC's culture. Research shows that major life transitions likely influence individuals' political ideologies,[26] and the transition from adolescence to young adulthood might in itself be enough to shift people to the left. Thus, a trend toward liberalization might theoretically be seen not only among UNC students, but also among students who attended conservative institutions or among those who did not attend college at all. Additionally, ideological change is not *per se* evidence of indoctrination or similar. As we discuss in our concluding section, some will argue that ideological change is a natural result of intellectual breadth, evidentiary reasoning, and so forth. The findings that follow, therefore, shift the focus to more direct, concrete information about students' experiences on campus.

## *2) In most classes, politics rarely comes up.*

To examine UNC's culture for free expression directly, we turned our attention to what goes on in UNC's classrooms. We wanted to understand if and to what extent the classroom atmosphere is politicized: How ubiquitous are political conversations? How much do instructors reveal about their own political views, and how assertive are they in their attempts to persuade others? Are skepticism and debate encouraged, or are they stifled? And how much do students' perceptions of these patterns depend on their own political views?

---

[26] See Kinder, Donald R. 2006. "Politics and the Life Cycle." *Science* 312(5782): 1905–8 for a discussion.

FSU001825

The analyses below find that instructors generally exercise restraint in revealing their political views. Furthermore, the data imply that, while politics plays a role in many classes, politically-focused class discussions are not ubiquitous or inescapable. These results cut against the notion that UNC faculty pervasively attempt to socialize their students into particular political viewpoints.

**Methods**

We began by assessing where and with what frequency political conversations happen. Studies of the political leanings of the professoriate—across the country in general as well as at UNC specifically—routinely find that, in the vast majority of academic disciplines, it leans to the left.[27] Some who express concerns about these imbalances presume that the political atmosphere on college campuses is widely politicized.[28] How much of this presumption reflects truth? And to the extent political conversations arise at UNC, are they concentrated in certain academic areas, or are they more ubiquitous?

The most straightforward survey techniques make understanding the prevalence and nature of political conversations difficult. For instance, if we were simply to ask students, "How often does politics come up in your classes?", they might have difficulty aggregating all the classes they have taken and condensing their thoughts down to a reliable number. Thus, we developed a technique that allows us to characterize the *typical* class at UNC and to describe how experiences in the typical class vary across disciplines. The approach was to randomly sample *one class* that students took in the Fall of 2018 and ask a series of detailed questions about that particular class.

The procedure we developed works as follows: our instrument asked respondents to report how many classes (from one to five) they took in Fall 2018. Then, the survey software asked them to provide a label for each class they took. These labels did not need to have a standard format. For instance, one respondent might write "Poli100," while another might write "Introduction to Gov in the United States" (POLI 100 is, in fact, "Introduction to Government in the United States" at UNC). The labels simply needed to be recognizable to the respondent. After a respondent entered labels for all of their classes, the computer randomly chose one class about which to ask detailed questions. The survey software notified the respondent about the selection with the following text:

> For the next several questions, we will ask about **one** of the courses you took last semester. Based on a random draw, the computer has selected [label student entered] as the course you will focus on for your answers. If you would like to answer questions about a different course, there is an opportunity to do so later in the survey. But for now, please focus on the course you had in mind when you wrote [label student entered].

Notably, this approach gave us a random sample of course *enrollments*, not of *courses*. (The latter would have been the case if we had obtained a list of all classes offered and then randomly sampled

---

[27] On the professoriate in general, see Cardiff, Christopher F, and Daniel B Klein. 2005. "Faculty Partisan Affiliations in All Disciplines: A Voter-Registration Study." *Critical Review* 17(3-4): 237–55; Langbert, Mitchell. 2018. "Homogenous: the Political Affiliations of Elite Liberal Arts College Faculty." *Academic Questions* 31(2): 186–97; Rothman, Stanley, S Robert Lichter, and Neil Nevitte. "Politics and Professional Advancement Among College Faculty." *The Forum* 3(1). On UNC in particular, see Dent, Alex. 2016. "At UNC Chapel Hill, 17 Departments Have Zero Registered Republican Professors, Analysis Finds." Available at https://www.thecollegefix.com/unc-chapel-hill-16-departments-zero-registered-republican-professors-analysis-finds/

[28] E.g., "Six Ideas to De-Politicize the American Campus." *The Martin Center for Academic Renewal*. Available online at https://www.jamesgmartin.center/2018/05/six-ideas-to-de-politicize-the-american-campus/.

FSU001826

classes from that list.) In our approach, a class is more likely to be selected if more students took it, simply because it will appear more often in the pool of class choices from which the survey software chose. This approach presents no inferential problem given our objectives. A class many students take leaves a bigger imprint on campus life and therefore *should* carry more weight in our analysis. We emphasize this point only to elucidate what we mean below when we describe the proportion of classes that have certain characteristics.

After providing the notification about the selected class, we asked respondents, "How often did political topics come up in this class?"[29] We also asked them, "How often did the instructor for this course say or do something (such as commenting on a current political topic or discussing the instructor's moral perspective) that seemed to reflect the instructor's political leanings?" The response options for both questions were "Never," "A few times throughout the semester," "Perhaps every week or two," "Most class meetings," and "Almost every class meeting."

**Analysis**

Table 2 below reports the responses. Column 1 shows that, in approximately 40% of classes, respondents said that politics did not come up at all. They reported politics coming up in "most class meetings" or more often than that in only about 21% of classes. Similarly, the data in column 2 show that, in more than half of classes, the instructors never revealed their political views. Courses in which the instructor revealed political views regularly—such as in most class meetings—are quite rare (7.5%). Thus, this table suggests that while politics is a common topic in class, it is by no means a ubiquitous one.

Table 2: Politics in the Classroom

|  | Politics came up | Instructor offered an opinion |
| --- | --- | --- |
| Never | 39.5% | 54.6% |
| A few times | 29.3 | 30.8 |
| Perhaps every week or two | 10.0 | 7.0 |
| Most class meetings | 8.9 | 5.4 |
| Almost every class meeting | 12.3 | 2.1 |
| Total | 100.0 | 100.0 |
| N | 1,235 | 1,236 |

We also wanted to understand in what *type* of classes politics is more or less likely to be discussed. Of course, almost every Political Science and Public Policy class will discuss politics. Politics will also at least occasionally be relevant to the course focus in subject areas such as Sociology, Economics, and History, among others. Conversely, politics might come up rarely if at all in subject areas such as Math, Chemistry, and Computer Science.[30]

---

[29] This question wording leaves it up to the interviewee to decide what counts as "politics." We preferred this "eye of the beholder" approach to one in which we might provide an explicit definition of politics, since our focus is students' *own* perceptions of their educational environment.

[30] We do not mean to imply that political topics should be *verboten* in these subject areas. Sometimes politics can be relevant in nonobvious ways. For instance, a participant in one of our focus groups described how a class on

FSU001827

Table 3: How Often Does Politics Come Up?, by Subject Area

|  | Human- ities | Social Sciences | Health Sciences | Natural Sciences | Cultural Studies[31] | Foreign Language |
|---|---|---|---|---|---|---|
| Never | 20.7% | 19.5% | 55.6% | 70.6% | 0.0% | 29.1% |
| Few | 40.2 | 29.7 | 31.9 | 20.2 | 20.6 | 44.2 |
| Week or two | 13.8 | 15.1 | 2.8 | 2.9 | 20.6 | 12.8 |
| Most meetings | 12.6 | 11.4 | 6.9 | 3.6 | 23.5 | 9.3 |
| Every | 12.6 | 24.3 | 2.8 | 2.7 | 35.3 | 4.7 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.00 | 100.0 |
| N | 246 | 370 | 72 | 415 | 34 | 86 |

To understand how discussion depends on class type, we asked respondents to report what department offered the randomly chosen course. We used these responses to classify the courses into six broad areas: humanities, social sciences, health sciences, natural sciences, cultural studies[32], and foreign languages.[33] Appendix D lists what subjects fell into each of these broad headings.

Table 3 reports how often politics comes up in courses, categorized by broad subject area. This table clearly shows that politics is a more common focus in some areas than others. For more than half of the classes in the health sciences and natural sciences, for example, politics never comes up, and very few respondents indicated that politics is commonly discussed in these areas. In the humanities and social sciences, though, the distribution is more even: politics comes up commonly in some courses, but rarely in others.

One subject area that stands out in Table 3 is a category that we have called "cultural studies."[34] We examined the courses in this category separately because they are a common focal point in

Biostatistics assessed whether public policies led to disparities in health outcomes along dimensions of race, gender, and class.

[31] See a footnote above on the formulation of this category.

[32] Although most of the broad areas we examine coincide with standard UNC classifications, "cultural studies" does not. Our cultural studies category includes courses listed under African, African American, and Diaspora Studies; American Studies; Arabic Studies; Asian Studies; German Studies; Latin American Studies; and Women and Gender Studies. We wanted to examine courses in these areas separately, given speculation that departments with a substantive focus on demographic categories might have courses that are highly political in nature. We wanted to examine this possibility, and if it were true, we wanted these courses not to distort understanding of the other broad headings. Our use of this label is not to be confused with the Cultural Studies Program—an interdisciplinary program facilitated by UNC's Department of Communication. (We thank Lawrence Grossberg for helping us avoid this confusion.)

[33] For this analysis, we have put aside sundry other classes that students listed, but which are not classes in the conventional sense: experiential learning, internships, directed studies, study abroad experiences, and so forth. We also excluded cases where the student's open-ended response was uninterpretable. These exclusions represent 1.02% percent of the randomly chosen classes.

[34] As Appendix D shows, the cultural studies category includes classes from African, African American, and Diaspora Studies; Women and Gender Studies; Asian Studies; American Studies; Arabic Studies; German Studies; and Latin American Studies.

FSU001828

discussions about political biases on college campuses.[35] We find that these classes are indeed political—the most politicized category we examine. However, only 34 of them were sampled, representing less than 3% of the classes we examine, so they likely do not typify students' experiences at UNC.

### 3) Students generally perceive course instructors to be open minded and encouraging of participation from both liberals and conservatives.

Even if faculty lean substantially to the left, this imbalance is less concerning if instructors foster a classroom atmosphere that welcomes disagreement and dialogue. Aside from *whether* politics is discussed is the matter of *how* it is discussed. When controversial topics come up in a classroom, do instructors adopt a stance that signals a willingness to engage with disagreement? Do they encourage participation from across the political spectrum?

On balance, this section accumulates further evidence against the notion that UNC faculty pervasively attempt to socialize particular political attitudes into their students. For the most part, students who identify as liberal, moderate, and conservative all agree that instructors encourage participation from across the political spectrum. There are important deviations from this trend, but these are the exception and thus do not characterize the typical experience in a UNC classroom.

**Methods**

We attempted to assess UNC instructors' orientation toward political disagreement with two questions about the randomly selected class. First, we asked respondents to agree or disagree with the statement, "The course instructor encouraged participation from liberals and conservatives alike." This question aimed to capture perceptions of instructors' evenhandedness in inducing and facilitating class participation. Next, we asked respondents to agree or disagree with the statement, "The course instructor was interested in learning from people with opinions that differed from the instructor's own opinions." This question aimed to characterize an instructor's epistemic stance in the classroom: did they regard different viewpoints as effrontery or opportunity? Both of these questions offered six response choices: a range of options from "Strongly disagree" to "Strongly agree" and an option for "This question is totally irrelevant for this class." This final option helped ensure that respondents would only provide agree/disagree responses for cases where the questions relevant.

**Analysis**

Table 4 and Table 5 present our findings. We segmented the results by respondent ideology, using the agreement scale measure described above.[36] The questions we analyze here—those about encouraging participation from liberals and conservatives—are essentially irrelevant for classes in which politics never came up. Therefore, to focus our analysis, we limit the crosstabulation to the 60.5% of cases in which the respondent said that politics came up in class more than "never" (using

---

[35] For instance, some people recently tried to criticize an area of inquiry they pejoratively termed "grievance studies" by submitting farcical manuscripts to some academic journals. See https://www.chronicle.com/article/What-the-Grievance/244753.

[36] For these results and the rest in this report that use ideological segmentation, we use *current* ideology, not ideology upon entering UNC.

18

FSU001829

the question described in the previous section—see Table 2). This restriction leaves us with 619 cases to examine.

The results are, we think, encouraging. Only a small proportion of students (never more than 14.2%, broken down by ideology) disagree with the two statements we offered. Furthermore, differences between the columns are fairly modest. Self-identified liberal students are more likely to agree with the two statements than other students, but the proportions agreeing never differ by more than about twelve percentage points. Moreover, since Table 4 and Table 5 exclude 39.5% of cases where students thought that politics "never" came up, if anything, they risk overstating the extent to which instructors create an ideologically hostile classroom atmosphere.

The sentiment that the tables describe above was generally echoed in the focus groups we conducted. For instance, in one of the liberal focus groups, one student remarked:

> I think there are a lot of professors who pride (themselves) to not bring politics in the classroom, even though they might know that they could since people would generally agree with what they might say. I think that's because they know that the culture of the school is what it is. They try—they try harder to not bring it into the classroom.

Another student in this group replied:

> [S]imilar to you [talking to the previous speaker], no one's ever forced their opinion on me. Everyone tries to stay neutral as much as they can. And when students had differences of opinion, usually I find that the professor will back off and just let it kind of happen.

A student in the conservative focus group agreed:

> I've never had a professor so openly off to the left where they would shut down another student. I think that even if they are a liberal professor, liberal professors generally do value that discussion, which is a good thing. I do think that's very good, but I've never had a professor like to actively shut down conversation.

While students in our focus groups agreed that their instructors typically keep their opinions in check, there were exceptions. For instance, a student in the conservative focus group said,

> There are some professors who do very good job of maintaining a very neutral stance, and I've had other professors that do not do as good of a job and tend to promote personal opinions and values in their classes where they may not be as productive or valuable to the conversation.

A student in the liberal focus group also said:

> I've had professors like directly bash Trump in some of my classes.

19

FSU001830

Table 4: The Instructor Encouraged Participation from Liberals and Conservatives Alike, by
Respondent Self-identification

| | Ideological Self-Identification | | |
| | Liberal | Moderate | Conservative |
|---|---|---|---|
| Strongly disagree | 0.3% | 0.9% | 4.4% |
| Somewhat disagree | 1.8 | 2.7 | 6.2 |
| Neither | 5.6 | 15.9 | 10.6 |
| Somewhat agree | 10.0 | 15.0 | 9.7 |
| Strongly agree | 49.0 | 34.5 | 41.6 |
| Irrelevant | 33.4 | 31.0 | 27.4 |
| Total | 100.0 | 100.0 | 100.0 |
| N | 392 | 113 | 113 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

Table 5: The Course Instructor was Interested in Learning from People with Opinions that Differed
from the Instructor's Own, by Respondent Self-identification

| | Ideological Self-Identification | | |
| | Liberal | Moderate | Conservative |
|---|---|---|---|
| Strongly disagree | 1.8% | 4.4% | 7.1% |
| Somewhat disagree | 3.8 | 7.1 | 7.1 |
| Neither | 4.1 | 9.7 | 12.3 |
| Somewhat agree | 20.1 | 24.8 | 15.9 |
| Strongly agree | 52.7 | 38.1 | 40.7 |
| Irrelevant | 17.6 | 15.9 | 16.8 |
| Total | 100.0 | 100.0 | 100.0 |
| N | 393 | 113 | 113 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

FSU001831

### 4) Students almost ubiquitously perceive political liberals to be a majority on campus.

So far, we have presented evidence that politics does not come up in many classes. We also examined how often UNC instructors offer their own political views and whether students perceive instructors to encourage participation from liberal and conservative students alike. The results suggest that instructors keep their views to themselves and encourage involvement from students across the ideological spectrum. From these results, one might suppose that students are unaware of or uncertain about the political leanings among instructors and peers, or that politics is ancillary to student life. Here, we assess how students perceive the political leanings of their peers and instructors.

We find that students perceive the descriptive reality: that faculty and students both lean substantially to the left.

**Methods**

Our evidence draws from additional questions that we posed in connection to the randomly selected class. First, we asked students, "Based exclusively on the person's behavior in the classroom (and not any preconceptions you might hold), what would you guess the course instructor's political leanings to be?" We also asked, "Based exclusively on their comments and behavior in class, and not on other things, how would you describe the political leanings of students in the class, on balance?" Table 6 and Table 7 report students' answers to these questions.

Table 6: Based on Behavior, Was the Instructor Liberal or Conservative?

| | |
|---|---|
| Strong liberal | 16.3% |
| Liberal | 33.4 |
| Moderate | 6.2 |
| Conservative | 1.9 |
| Strong conservative | 0.7 |
| Other | 0.6 |
| Unsure | 40.9 |
| Total | 1,236 |

Table 7: Based on Behavior, How Would you Describe Students' Political Leanings?

| | |
|---|---|
| Very liberal | 15.4% |
| Lean liberal | 29.1 |
| Even mixture of liberals and conservatives | 9.8 |
| Lean conservative | 0.8 |
| Very conservative | 0.3 |
| Politics didn't come up / Question is irrelevant | 44.6 |
| Total | 1,145 |

21

FSU001832

**Analysis**

Table 6 shows that many instructors do not reveal their political views. A substantial plurality (40.9%) of students were unsure of their instructor's political leanings. However, if an instructor's leanings were revealed, those leanings were almost certain to be liberal. Table 6 indicates that less than 3% of instructors were perceived to be conservative, and perceived liberal instructors outnumber perceived conservatives by nearly a 20:1 ratio.

Table 7 shows similar patterns for perceptions about peers. In many classes, again, politics did not come up. However, in cases where the classmate's political leanings were revealed, the class was perceived to be liberal. Less than 2% of respondents perceived their peers to be conservative.

Remarks from the focus group interviews corroborated these perceptions. For instance, in one of the liberal groups, a student remarked,

> [A]t this point my college career, it's like I'm always under the impression that the classes are a hundred percent liberal. When I feel like that can't really be the case. It makes me think of who's not in the conversation.

Similarly, a student in the conservative focus group said,

> I would say that the University of North Carolina does lean to the left in pretty much every regard. How do I know this? Well I don't know that I have ever had a conservative professor teaching me in any of my classes.

In one sense, these results are unsurprising. As we discuss above, there is abundant evidence that college faculty—both in general and at UNC—lean to the left. The same is true for students. As such, our data merely corroborate that the individuals who participated in our studies perceive the descriptive reality. But we think the perceptions are still important to note for two key reasons. First, the extent of the imbalance is striking. If the perceptions reported in Table 6 do, in fact, reflect reality and less than 3% of UNC instructors are conservative, a students could easily never have a conservative instructor in the course of earning a degree. With so few conservative instructors, how often do liberal students hear well-articulated conservative ideas, as opposed to merely stylized depiction thereof? Do students become aware of potential blind spots held on both the left and the right? We raise these questions not to answer them, but to point out possible points of concern given the imbalance revealed in Table 6.

Second, the fact that students so readily perceive the ideological leanings of the community around as liberal them raises concerns about possible development and reinforcement of narrowly focused social norms and expectations. When people perceive themselves to be similar to those around them—or to share similar goals to the people around them—they feel a sense of common purpose and group identity.[37] Group identity, in turn, is a well-known antecedent to outgroup dismissal and derogation.[38] In the present context, the shared expectation that UNC instructors and students are generally liberal might help foster a culture in which liberal premises are assumed to be

---

[37] For instance, see Grace Wai-man Ip, Chi-yue Chiu, and Ching Wan. 2006. "Birds of a Feather and Birds Flocking Together: Physical Versus Behavioral Cues May Lead to Trait- Versus Goal-Based Group Perception." *Journal of Personality and Social Psychology* 90(3): 368–81.

[38] The literature on prejudice, discrimination, and group identity is vast. For one entry point, see Dominic Abrams and Michael A Hogg. 2006. *Social Identifications: a Social Psychology of Intergroup Relations and Group Processes*. Routledge. As used here, "outgroup" refers to a group to which one does not belong and against which one might compete.

FSU001833

shared, where conservative ideas need to be taken a bit less seriously; and in which explicit derogation of conservative people is a bit less taboo. Several of the points we develop below hint that these patterns do indeed occur at UNC.

### 5) Both liberal and conservative students worry about how students and faculty will respond to their political views, and students across political perspectives engage in self-censorship.

Above, we show that instructors are generally perceived as encouraging participation from students who hold many different political views. Does it follow that students feel comfortable expressing viewpoints with which others might disagree? Not necessarily. Our analyses below suggest that many students worry about the consequences of expressing sincere political views and that they engage regularly in self-censorship.

### Methods

Once again, our analysis focuses on the class that was chosen at random from among students' Fall 2018 course lists. For the randomly chosen class, we asked students about six negative consequences that might stem from sharing their "sincere political views." We asked them "How concerned were you that, if you stated your sincere political views, the instructor would give you a lower grade?"; "[…] would have a lower opinion of you?"; or "[…] would embarrass you in front of the class?" We then asked similar questions about peer-related concerns: "How concerned were you that, if you stated your sincere political views, the other students would have a lower opinion of you?"; "[…] would post comments about you on social media?"; or "someone would file a complaint that your comments violated a campus harassment policy of code of conduct?"

### Analysis

Table 8 reports how students answered the first three of these questions—those focused on concerns about instructors. Similar to Table 4, we focus on the classes for which this question is pertinent by limiting our analysis to the 60.5% of classes for which students say that politics came up at some point during the semester.

Consistent with the results described in Findings 2 and 3 above, most students were not concerned that expressing their sincere views would affect their course grade (or they believed that the concern was irrelevant to the course the instrument asked about). Still, the proportions that harbor concern are not negligible. For liberal students, the proportion that are at least slightly concerned ranges from 6.2% to 12.5%, depending on the indicated consequence. The proportions for moderate and conservative students are higher—a result we will examine more closely in the next section.

Students' concerns appear to be more acute when applied to peers. Table 9 reports how students answered the three peer-focused questions, again focusing on the 60.5% of classes where politics came up at some point during the semester. In these classes, over 25% of liberal students, over 55% of moderate respondents, and over 75% of conservative student indicated that they were at least slightly concerned that "other students in the class would have a lower opinion" of them as a direct result of sharing their political perspectives. These numbers are lower for concerns about social media posts and harassment/conduct reporting, but even these elements continue to raise significant concerns for conservative students, as we discuss in Finding 6 below.

FSU001834

The most important survey question for this topic, though, asked students to consider "about how many times did you keep an opinion related to class to yourself because you were worried about the potential consequences of expressing that opinion?"  Table 10 shows that substantial proportions of students—24.1% to 67.9%, depending on student ideology—engage in self-censorship. A substantial percentage of respondents not only indicate that they self-censor, but that they do so multiple times in a single class.

FSU001835

FSU001836

Table 8: Students' Concerns About Instructors, by Respondent Self-identification

| | Instructor would lower grade Ideological Self-Identification | | | Instructor would lower opinion Ideological Self-Identification | | | Instructor would embarrass you Ideological Self-Identification | | |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|---|---|
| Not concerned | 82.0% | 64.6% | 54.0% | 76.1% | 50.4% | 44.4% | 77.9% | 63.7% | 55.8% |
| Slightly concerned | 3.8 | 7.1 | 14.2 | 7.9 | 16.8 | 13.3 | 6.6 | 9.7 | 9.8 |
| Somewhat concerned | 1.3 | 5.3 | 7.1 | 2.8 | 8.9 | 7.1 | 1.5 | 3.5 | 8.9 |
| Moderately concerned | 0.8 | 2.7 | 8.9 | 1.5 | 4.4 | 18.6 | 1.5 | 7.1 | 9.7 |
| Extremely concerned | 0.3 | 5.3 | 8.0 | 0.3 | 4.4 | 10.6 | 0.3 | 1.8 | 8.9 |
| Irrelevant | 11.9 | 15.0 | 8.0 | 11.4 | 15.0 | 6.2 | 12.2 | 14.2 | 7.1 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 394 | 113 | 113 | 394 | 113 | 113 | 394 | 113 | 113 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

25

FSU001837

Table 9: Students' Concerns About Other Students, by Respondent Self-identification

| | Students would lower opinion Ideological Self-Identification | | | Students would post on social media Ideological Self-Identification | | | Students would file a complaint Ideological Self-Identification | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
| Not concerned | 62.2% | 25.7% | 15.0% | 78.7% | 62.8% | 46.9% | 83.5% | 70.8% | 52.2% |
| Slightly concerned | 17.3 | 26.6 | 16.8 | 6.4 | 15.0 | 15.9 | 2.0 | 5.3 | 15.9 |
| Somewhat concerned | 3.3 | 15.9 | 12.4 | 1.8 | 2.7 | 8.0 | 1.0 | 7.0 | 8.0 |
| Moderately concerned | 4.3 | 9.7 | 13.3 | 1.8 | 4.4 | 11.5 | 0.3 | 3.5 | 5.3 |
| Extremely concerned | 1.3 | 6.2 | 32.7 | 0.3 | 2.7 | 8.0 | 0.3 | 0.9 | 11.5 |
| Irrelevant | 11.7 | 16.0 | 9.7 | 11.2 | 12.4 | 9.7 | 13.0 | 12.4 | 7.1 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 394 | 113 | 113 | 394 | 113 | 113 | 393 | 113 | 113 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

26

Table 10: How Often Students Kept an Opinion Related to Class to Themselves, by Respondent Ideological Self-identification

|  | Ideological Self-identification | | |
|  | Liberal | Moderate | Conservative |
| Never | 75.9% | 51.3% | 32.1% |
| Once | 9.9 | 20.4 | 9.8 |
| 2-5 times | 12.7 | 18.6 | 27.7 |
| 6-10 times | 0.0 | 5.3 | 13.4 |
| More than 10 times | 1.5 | 4.4 | 17.0 |
| Total | 100.0 | 100.0 | 100.0 |
| N | 395 | 113 | 112 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

Conversations about free expression on college campuses also commonly focus on self-censorship arising from cultural or social factors. Thus, we also examined results for the self-censorship question broken down by self-reported gender and race. The results appear in Table 11. In some instances, this approach results in small subgroupings that strain how far we can push our data. Nevertheless, the between-group differences are more muted than those above. Thus, these data do not establish racial or gender biases as a source of UNC students' anxieties about self-expression.

Table 11: How Often Students Kept an Opinion Related to Class to Themselves, by Gender and Race

|  | Gender identity | | | Racial identity | | | | |
|  | Male | Female | Non-binary | White | Black | Latino/a | Asian | Other |
| Never | 55.0% | 68.3% | 55.6% | 63.2% | 69.8% | 59.5% | 66.7% | 66.7% |
| Once | 12.9 | 10.6 | 22.2 | 11.0 | 14.0 | 11.9 | 13.3 | 10.0 |
| 2-5 times | 18.7 | 15.6 | 22.2 | 16.8 | 16.3 | 19.1 | 16.7 | 13.3 |
| 6-10 times | 4.8 | 2.8 | 0.0 | 4.5 | 0.0 | 0.0 | 1.7 | 0.0 |
| > than 10 times | 8.6 | 2.6 | 0.0 | 4.5 | 0.0 | 9.5 | 1.7 | 10.0 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 209 | 423 | 9 | 464 | 43 | 42 | 60 | 30 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

We conclude this section by noting two important caveats concerning the results above. First, while we are able to document differences in students' perceptions that they are holding back sincere views, we do not know what those views are. Perhaps students are holding views back because they wish to reflect on them further; out of sensitivity for others' feelings; out of a desire to exhibit some form of solidarity; or because they are concerned about causing emotional distress in others. Some

FSU001838

might wonder whether these are views that *should* be held back. This matter is difficult to investigate empirically and by nature involves difficult value judgment.

Second, our questions focus on student *perceptions*. Perceptions, of course, do not always emerge from reality. Our discussion, therefore, is not dispositive of the notion that the anxieties students report feeling (i.e. that UNC professors *will* lower grades based on students' political beliefs or that peers *will* judge them) are rooted in specific experiences.

But perceptions merit attention in their own right. As we argued at the outset, sharing diverse viewpoints serves an indispensable pedagogical and epistemological function. That a substantial proportion of respondents fear social sanction, or even outright grading penalties, for sharing their views raises significant questions about how completely this function is being fulfilled.

We also note that there is something of a disjuncture between the results we present here and the previously discussed finding that instructors are perceived to encourage engagement from across the political spectrum. We speculate about potential explanations for this disjuncture in our concluding section.

## *6) Anxieties about expressing political views and self-censorship are more prevalent among students who identify as conservative.*

While the evidence above suggests that *both* liberal and conservative students sometimes feel as if their opinions aren't valued or welcome by peers and professors, we also wish to examine whether these experiences are shared unevenly. This section examines the potentially divergent experiences of students on the political left versus political right.

The results suggest that, compared to self-identified liberals, self-identified conservatives feel less welcome to express their political perspectives—both in UNC classes and on campus in general.

### Analysis

Stark liberal/conservative divides emerge from the data reported in Table 8 – Table 10. For instance, 12.5% of self-identified liberal students worried that expressing sincere views would cause an instructor to have a lower opinion of them, but 49.6% of self-identified conservative students felt this way. And while 26.2% percent of self-identified liberals worried about losing the esteem of their peers, 75.2% of self-identified conservatives had the same concern. Most alarmingly, the proportion of self-identified conservatives who censored themselves at least once (67.9%) is almost three times as large as the proportion of self-identified liberals who did the same (24.1%).

A liberal/conservative divide in experiences concerning free expression is even more evident when we shift our frame of reference from a single randomly selected class to experiences over the full span of students' time at UNC. After the questions pertaining to a specific class, the survey instrument asked students to "think about your **entire** time as a student at UNC, from the time you first came to UNC until now." We asked them how often they worried that expressing sincere views would result in 1) receiving a lower grade, 2) other students having a lower opinion of them, and 3) having critical comments posted on social media. Table 12 presents how students responded to these questions.

FSU001839

Consistent with the results described in Finding 5 above, a remarkable number of students across political ideologies indicated that they felt such worry at least "once or twice." Yet, more conservative students feel this worry, and they feel it more often. Only 21.2% of self-identified conservative students—compared to 77.5% of self-identified liberal students and 49.5 of self-identified moderate students—report that they have never felt worried. And 31.0 % of self-identified conservative respondents reported feeling such worry "several" times or "most weeks," versus 1.5% of self-identified liberal respondents and 10.9% of self-identified moderate respondents.

As with the data discussed in Finding 5 above, these sentiments are amplified for peers. A remarkable number of students across the ideological spectrum indicated that they felt such worry at least "once or twice." But whereas 50.5% of self-identified liberal respondents have "never" felt worried, only 9.9% of self-identified conservative respondents selected this option. The highest percentage of self-identified conservative respondents (32.5%), rather, reported feeling worried "most weeks," the most frequent option; 1.69% of self-identified liberal respondents selected this option.

Self-identified Conservative students appear to be especially concerned about "critical comments" on social media. More than half of the self-identified conservative respondents (53.7%) indicated that they worried about such comments "at least one or twice," but fewer than a quarter of self-identified liberal respondents (19.9%) and fewer than half (40.2%) of self-identified moderate students shared this concern.

The members of our conservative focus group repeatedly reflected on this theme, alluding to substantial social risks associated with expressing their political views:

> A lot of conservatives don't feel comfortable speaking out, and I have to say this because I'm pretty outwardly conservative. I have stickers on my laptop, but, you know, it's obvious that I am conservative, and people will come up to me all the time and tell me "oh, I'm conservative too, but I don't feel like I can speak about that in class."

Another student remarked:

> I feel like a large number of those conservatives on campus are not comfortable presenting those views for fear of ridicule in class as well as in the student body. Which is a shame.

Still another said:

> [T]here are times when in class discussions, if you're outwardly conservative, sometimes you have to dial what you say back for fear of ridicule by your peers and your professor at the same time. And, uh, and of course I'm not someone who tries to like push political discussion in every facet of my life. So, I mean, it's not as hard for me to withhold political views in like everyday conversation. But when politics come up, you have to find the…you kind of have to tip toe around it. You know, you have to say what you believe, but you also have to say it in a way that you're protecting yourself from being called…a racist or a Nazi or some other derogative names. Just because you believe in a small government, so you really have to tiptoe around the way you present your views.

The asymmetry between left-leaning and right-leaning students' concerns about expressing sincere views raises significant questions about whether a full range of political views are finding voice in campus discussions.

FSU001840

FSU001841

Table 12: Students' Concerns During Entire Time at UNC, by Student Ideological Self-identification

| | *Would receive a lower grade* Ideological Self-Identification: | | | *Peers would lower opinion* Ideological Self-Identification: | | | *Critical comments on social media* Ideological Self-Identification: | | |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|---|---|
| Never | 77.5% | 49.5% | 21.2% | 50.5% | 16.3% | 9.9% | 81.1% | 59.8% | 46.3% |
| Once or twice a year | 16.5 | 23.4 | 25.6 | 29.1 | 25.0 | 9.4 | 12.9 | 19.6 | 15.8 |
| Few per semester | 4.5 | 16.3 | 22.2 | 13.9 | 28.3 | 17.2 | 4.0 | 12.0 | 14.8 |
| Several per semester | 1.2 | 7.1 | 20.2 | 4.8 | 21.7 | 31.0 | 1.4 | 5.4 | 15.3 |
| Most weeks | 0.3 | 3.8 | 10.8 | 1.7 | 8.7 | 32.5 | 0.6 | 3.3 | 7.9 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 650 | 184 | 203 | 649 | 184 | 203 | 650 | 184 | 203 |

Note: The response options for all questions were "Never," "Once or twice a year," "A few times per semester," "Several times per semester," and "Most weeks, or more often than that."

30

### 7) Students worry more about censure from peers than from faculty.

As we note above, concerns about free expression on college campuses often focus narrowly on *faculty*. This focus is understandable; faculty have positions of power. They dictate course agendas, prescribe readings, evaluate student work, and often serve as role models. And yet the focus on faculty might be in error. In our investigation, there are signs that constraints on free expression derive at least as much from students' peers as from faculty. We elucidate those patterns in this section.

Taken together, the peer-focused data further support the conclusion that students struggle to engage in constructive dialogue with their peers and that developing student skills in this area is a pressing campus need.[39]

**Analysis**

Here, we do not present additional tables, but instead emphasize some patterns evident in the results above. Comparing Table 8 and Table 9, we note that peer-focused concerns generally appear more profound than faculty-focused concerns. For instance, students across political ideologies are much more concerned that peers will think less of them than they are that faculty will think less of them, or even that faculty will lower their grades. Furthermore, in Table 12, concerns about losing standing among peers seem particularly acute.

These concerns were also evident in the focus groups we conducted. A participant in the one of the liberal focus group stated:

> [L]ast year when Sebastian Gorka came to campus, like me and my friend who were both like very liberal, like were planning to go to the event, like sit in the back row and just kind of take a look. But honestly there are so many protests outside of it that like we're making us feel really bad about going. It kind of just backed [sic] away and like not go.

When discussing conservatives, a participant in the other liberal focus group said,

> […] they can stop supporting Trump if they want more friends.

### 8) Students harbor divisive stereotypes about one another.

At the national level, Republicans and Democrats citizens tend to make drastic assumptions about each other. For instance, one recent study found Republicans, on average, estimated that 38% of Democrats are lesbian, gay, or bisexual (the best estimate is 6%), and Democrats estimated that 44% of Republicans make more than $250,000 per year (the true figure is approximately 2%).[40] These estimates likely emerge from stereotypes that media and politicians perpetuate, but the misconceptions are notable because can help underscore the prevailing narrative that Republicans and Democrats are fundamentally different *types* of people, such that differences among them are unbridgeable.

---

[39] For overlapping conclusions drawn from a separate study at Dartmouth College, see
https://www.thedartmouth.com/article/2018/05/a-survey-of-dartmouths-political-and-free-speech-climate
[40] Ahler, Douglas J, and Gaurav Sood. 2018. "The Parties in Our Heads: Misperceptions About Party Composition and Their Consequences." *Journal of Politics* 80(3): 964–81.

FSU001842

We wanted to get a sense, then, of assumptions that liberal and conservative students at UNC make about each other, as it seemed possible such assumptions might be less drastic in a community such as UNC's than on the national stage. Liberal and conservative UNC students go through rites of passage, such as first-year orientation, with each other. They live in the same dorms, attend the same classes, cheer for the same beloved athletic teams, and even have shared adversaries (e.g. Duke University). Yet, we find that such shared experiences do not fully dispel negatives views toward people who disagree about politics; students from across the political spectrum harbor substantial negative stereotypes about each other.

**Methods**

To get a sense of what stereotypes respondents harbor about each other, we asked them to report how well they thought various words and phrases describe "students on the liberal side of the political spectrum" and "students on the conservative side of the political spectrum." Whether students were first asked to describe liberal peers or first asked to describe conservative peers was randomized. The order of the phrases that might describe liberals and conservatives was also randomized. The ten phrases are listed in Table 13. The response options were "Not well at all," "Slightly well," "Moderately well," "Very well," and "Extremely well." For ease of presentation, we calculate the proportion of students who said that each phrase describes the opposing group moderately, very, or extremely well. The resulting proportions are what is reported in Table 13.

Table 13: Stereotypes of Liberal and Conservative Students at UNC

|  | Liberal-identifying students' perception of conservative students | Conservative-identifying students' perception of liberal students |
|---|---|---|
| *Positive Traits* |  |  |
| Well-educated | 49.9% | 76.2% |
| Open-minded | 8.0 | 27.7 |
| Well-informed | 24.2 | 44.3 |
| Tolerant | 9.7 | 28.6 |
| Intelligent | 52.6 | 73.4 |
| *Negative traits* |  |  |
| Racist | 68.9% | 29.1% |
| Sexist | 69.7 | 33.0 |
| Immoral | 39.6 | 37.0 |
| Condescending | 70.5 | 81.8 |
| Follow others without thinking | 69.7 | 78.7 |

Note: Cells entries indicate the percentage of respondents saying that the trait describes a group moderately well, very well, or extremely well.

**Analysis**

Table 13's data shows that students are hesitant to apply positive stereotypes to the ideological outgroup (self-identified liberals' ratings of conservatives, and vice-versa). For instance, only 27.7% of self-identified conservatives say that liberal students are "open-minded," and only 8% of self-identified liberals say that conservative students are "open-minded." In addition, respondents

FSU001843

commonly applied negative attributes to students in the outgroup. Particularly striking is how readily self-identified liberal students—well over half—applied freighted terms such as "racist" and "sexist" to conservative peers. Self-identified Conservatives' responses on these questions were not symmetrical; only about 30% of self-identified conservatives said that liberal peers were "racist" or "sexist."

In our focus group interviews, we asked students about the possibility of developing social ties with students who hold different political views. During this part of the interview, a participant from one of the liberal focus groups reported assuming that conservatives are, almost as a matter of definition, bigoted:

> If I know someone is conservative, I automatically think that, oh well, they don't like [identity]. They don't want [identity] making your own choices. They don't like [other identity] people. And so, I know that they won't like those two things about me. So, I'm, well, I don't know if I can be your friend.

The frequency and types of negative assumptions represented here warrant further attention, particularly with regard to both the stereotyping itself and how the fear of being pre-judged relates to the trends described in Findings 5-7 above. Are students across the political spectrum self-censoring *because* they perceive their colleagues to be close-minded or intolerant? Or, do they hold back because they fear being immediately labeled racist, sexist, condescending, or uninformed? Or, both?

## 9) Students across ideologies report commonly hearing disparaging comments about political conservatives.

Finding 6 above shows that, compared to self-identified liberal students, self-identified conservative UNC students have more concerns about expressing their sincere political views and are more likely to engage in self-censorship. Finding 3 casts some doubt on the notion that instructors actively discourage conservatives from speaking up. A theme in Findings 5-7, on the other hand, is that students are quite concerned with responses from their peers. This finding expands the examination of peer relationships by considering the broader campus culture as surrounds free expression and the particular challenges that various social groups might face. The evidence below suggests that UNC community members have not internalized norms of respect and civility toward conservatives to the same extent they have toward other groups.

### Methods
Specifically, we examined how often students hear disparaging comments about various groups on campus. Toward the end of the survey, our instrument asked respondents, "About how often do you hear someone at UNC make disrespectful, inappropriate, or offensive comments about each of the following groups?" Twelve groups (listed below) were presented in random order. For each group, the respondent could indicate hearing such comments, "Never," "Once or twice a year," "A few times per semester," "Several times per semester," or "Most weeks, or more often than that."

### Analysis
To simplify presentation, Table 14 presents the proportions of respondents indicating that they hear disrespectful, inappropriate, or offensive comments *at least* several times per semester.

33

FSU001844

Table 14: How Often Does Respondent Hear Inappropriate
Comments?, by Respondent Ideological Self-identification

| | Respondent ideological Self-Identification: | | |
| | Liberal | Moderate | Conservative |
| --- | --- | --- | --- |
| Women | 32.4% | 17.5% | 10.3% |
| Men | 24.6 | 39.0 | 52.2 |
| Whites | 22.0 | 40.1 | 60.1 |
| African Americans | 19.8 | 9.4 | 7.4 |
| Hispanics or Latinos | 11.6 | 4.9 | 5.9 |
| Asians | 10.7 | 8.7 | 6.4 |
| Students born outside the US | 10.3 | 6.0 | 4.9 |
| Christians | 20.4 | 32.8 | 44.6 |
| Muslims | 14.2 | 9.3 | 8.4 |
| LGBT individuals | 21.5 | 13.0 | 10.9 |
| Political liberals | 21.2 | 11.4 | 11.9 |
| Political conservatives | 57.1 | 67.8 | 82.8 |
| N | 644 | 181 | 201 |

Note: Cell entries represent the proportion of students saying that they hear disrespectful, inappropriate, or offensive comments about the listed group several times per semester, or more often than that. The number of respondents for a particular item varies slightly due to item nonresponse.

For several groups, the proportion of students who say they hear inappropriate comments several times or more per semester is below 20%, regardless of the respondent's political leanings. Such groups include African Americans, Hispanics or Latinos, Asians, Students born outside the U.S., and Muslims. For several other groups, the proportions of students who report hearing inappropriate comments is somewhat higher—and sometimes self-identified liberals and self-identified conservatives disagree about how commonly a given group is disparaged. Political conservatives, though, stand apart in Table 14; substantially more students report hearing someone at UNC making inappropriate comments directed at political conservatives than at any other group. Even students who identify as liberal report hearing inappropriate comments directed at conservatives more often than at any of the eleven other groups offered.[41]

Since the risk for misunderstanding seems especially high for these results, we wish to emphatically clarify what they *do not* imply. First, they do not imply that difficulties faced by the groups with lower rates of offensive comments are, in any way, insignificant. Second, they do not imply that political conservatives globally face greater challenges at UNC than the other groups listed or that conservatives have greater reason to be aggrieved about their social circumstances than the other groups listed. There is no doubt an array of challenges not reflected in the table above— challenges related to overall inclusion, finding a welcoming friend network, feeling understood, being able to partake in activities, and so forth. Also, inappropriate remarks directed at each of the

---

[41] The results in Table 14 coincide with recent social scientific research showing that Americans generally have much less apprehension about acting in discriminatory ways toward political opponents than they do toward other (nonpolitical) social groupings. See Iyengar, Shanto, and Sean J Westwood. 2015. "Fear and Loathing Across Party Lines: New Evidence on Group Polarization." *American Journal of Political Science* 59(3): 690–707.

FSU001845

groups listed in the table are not strictly comparable; disrespectful comments likely hurt more when they are directed at immutable aspects of a person's identity, rather than at political opinions.

With these caveats in mind, we note that the results above raise concerns about intergroup relationships. Does the prevalence of disparaging remarks directed at conservatives open doors to more intense forms of disparagement, or outright discrimination? Does it lead students to hold an exaggerated perception of how wide the rift between liberals and conservatives really is, and thereby miss opportunities for consensus?[42] If UNC stakeholders seek to nurture a campus climate more conducive to constructive dialogue, these issues are worth greater examination and reflection.

### 10) Many respondents are open to engaging socially with students who don't share their political views, but a substantial minority is not.

In addition to considering the prevalence of specific stereotypes and remarks, we also wanted to examine students' broader orientation toward political diversity at UNC. In particular, we wanted to better understand the extent to which political disagreements permeate into campus social life—whether students are able to have meaningful and constructive conversations about political topics despite political differences. At the most basic level, they help students understand each other's perspectives on contentious issues. But beyond this, such interactions can help people to *individuate*—to see opponents are distinctive people, rather than simply the embodiment of a stereotype.[43] On the other hand, students distancing themselves from opponents may lead to social isolation or development of a zero-sum "us versus them" orientation toward political discourse.

We find that, while many students recognize intellectual diversity's value and are willing to include their ideological opposites in their personal and academic life, many others seek social distance.

#### Methods

Our survey instrument asked students what kind of social interactions they are willing to have with political liberals and conservatives. (All respondents were asked about both groups, in a random order.) We asked whether they would be willing to have someone from each of these groups as a friend, whether they would be willing to share a room with them, whether they would be willing to date them, and whether they enjoy taking classes with students from the group. There were five response options ranging from "Strongly disagree" to "Strongly agree." Together, these questions constitute a context-appropriate measure of what psychologists call *preference for social distance*.[44]

---

[42] A social psychological literature on metaperceptions—people's guesses about what *others* think of them—is relevant here. For a recent political application that highlights a tendency to overestimate the negativity with which an outgroup regards an ingroup, see Appleby, Jacob. 2018. "Do They Like Us? Meta-stereotypes and Meta-evaluations Between Political Groups." Ph.D. Dissertation, University of Minnesota.

[43] On outgroup homogeneity and individuation, see Thomas M. Ostrom and Constantine Sedikides. 1992. "Out-Group Homogeneity Effects in Natural and Minimal Groups.." *Psychological Bulletin* 112(3): 536; Susan T. Fiske, Steven L Neuberg, Ann E Beattie, and Sandra J Milberg. 1987. "Category-Based and Attribute-Based Reactions to Others: Some Informational Conditions of Stereotyping and Individuating Processes." *Journal of Experimental Social Psychology* 23(5): 399–427.

[44] See Iyengar, Shanto, Gaurav Sood, and Yphtach Lelkes. 2012. "Affect, Not Ideology: a Social Identity Perspective on Polarization." *Public Opinion Quarterly* 76(3): 405–31.

FSU001846

**Analysis**

The top half of Table 15 reports how students answered questions about the political outgroup (self-identified liberal students' answers about conservatives and vice-versa), by respondent ideology. More than half of respondents say they are willing to be friends with or room with someone from the outgroup or would enjoy taking classes with students from the outgroup. Fewer students express a willingness to date a member of the outgroup. At the same time, substantial proportions of students say they are unwilling to engage socially with students from the outgroup and do not enjoy taking classes with them.

We also asked students whether faculty and students from the political outgroup are an important part of the campus community. Again, most respondents—86% of students who identify as conservative and 72.5% of students who identify as liberal say that they are, but a disappointing number—14.4% of students who identify as conservative and 21.9% of students who identify as liberal—say that UNC would be better without the political outgroup.

As seen in other findings detailed above, Table 15 contains evidence of asymmetry, with students who identify as conservative having a friendlier orientation toward liberals than vice-versa. For all rows in Table 15, the proportion of students who identify as conservative and who are favorably disposed toward social interaction with political opponents (column 4) is noticeably higher than students who identify as liberal and who are favorably disposed toward social interaction with political opponents (column 2).

Our focus group interviews also reflected some of the ambivalence about social interactions with the political outgroup. Most respondents, for example, were willing to acknowledge a need for political diversity on campus, as this remark from one of the liberal focus groups illustrates:

> I disagree with most of their [conservatives'] viewpoints. I mean, coming from just my point of view, but I think it's definitely helped me to have a diversity (of) political opinion and talk on our campus. I mean I wish they would speak up a little bit more in class every now and then. It just like kind (of) to facilitate a healthy discussion. So, I don't really have a problem with them being in my classes or like speaking up every now and then.

Some participants nevertheless expressed that they had no interest in social interactions with the outgroup:

> I don't think I could be friends with the conservatives personally, because I know that our values are completely different. I mean I think that conservatives should be allowed to exist or whatever. But I'm not going to…I wouldn't put someone in my support group that is someone who hates poor people.

These results build on Findings 5, 6, and 9 above in supporting the conclusion that conservative students at UNC face particular obstacles to integrating themselves into the broader campus community. Positive social engagement across political boundaries may increase all students' respect for each other and their capacity to engage in constructive dialogue.

FSU001847

Table 15: Broader Orientations Toward Political Outgroup, by Respondent Ideological Self-identification

| | Self-identified liberals | | Self-identified conservatives | |
|---|---|---|---|---|
| | Disagree | Agree | Disagree | Agree |
| *Social distance* | | | | |
| Would have outgroup member as a friend | 23.4% | 63.0% | 3.0% | 92.1% |
| Would have outgroup member as a roommate | 35.2 | 51.8 | 5.9 | 83.7 |
| Enjoys taking classes with students from the outgroup | 21.0 | 51.4 | 15.4 | 67.3 |
| Would date member of the outgroup | 60.2 | 25.0 | 30.2 | 55.5 |
| *Community inclusion* | | | | |
| Students from outgroup are important to campus community | 9.5 | 72.5 | 3.5 | 86.0 |
| Faculty from outgroup are important to campus community | 13.4 | 64.8 | 6.9 | 81.2 |
| | Would be better without | Would be worse without | Would be better without | Would be worse without |
| UNC would be better without students from the outgroup | 21.9 | 48.6 | 14.4 | 61.4 |

Note: For all items except the final one, response options were, "Strongly disagree," "Somewhat disagree," "Neither agree nor disagree," "Somewhat agree," and "Strongly agree." The percentages do not add up to 100% because, for simplicity, we omit the "neither agree nor disagree" category. For the final item, the response options were "UNC would be [much better / a little better / neither better nor worse / a little worse / much worse] without [liberals / conservatives]." Percentages within groups do not tally to 100% because the neutral category is omitted. This analysis includes approximately 649 liberal and 202 conservative students. (The precise N varies slightly due to item nonresponse.)

## 11) Approximately 19% of self-identified liberals and 3% of self-identified moderates and conservatives endorse blocking a speaker they disagree with.[*]

The prospects for constructive dialogue in a diverse community depend critically on what community members regard to be acceptable channels for expressing disagreement. When people with differing views are willing to engage, they frequently learn from each other. On the other hand,

---

[*] In the Feb. 5 draft of this report, this finding read, "Over 25% of students endorse blocking a speaker they disagree with." That statement accurately describes the proportion of students who selected "somewhat appropriate," "appropriate," or "entirely appropriate" in response to the "create obstruction" and "form a picket line" items below. However, Table 17 below reports proportions that are calculated in a more restrictive way: only "appropriate" and "entirely appropriate" are coded as endorsement of blocking a speaker. We have updated the wording of the finding to render it consistent with the table and avoid confusion.

FSU001848

when people feel they do not have opportunities to express their sincere views, they tend to become frustrated and resentful. Also, limited opportunities to hear others' sincere views deprives audiences—especially those who might be undecided about a particular topic—the opportunity to weigh one argument against another and come to their own conclusions. This opportunity is a long-standing tenet of knowledge-generating discourse.[45] Many regard at least some recent episodes on American college campuses—disinvited visitors, interrupted speakers, and even spats of violence—as significant departures from this ideal.

We wanted to better understand how UNC students engage with political disagreement: what they regard as acceptable means of expressing dissent and what core principles of tolerance and free expression they embrace. For the most part, we find that students agree about what are appropriate and inappropriate actions to take when confronting political disagreement. But a small group of students see speaker disruption as appropriate, where most others do not.

**Methods**

One obstacle we confronted in trying to understand UNC students' orientation toward political tolerance is that views on tolerance are notoriously difficult to measure. In general, people favor tolerance in the abstract. For instance, according to a 2015 Pew Research Center Poll, 71% of Americans agreed that "it is very important that people can say what they want without state/government censorships,"[46] and 78% of college students interviewed in one survey favored creating "an open learning environment where students are exposed to all types of speech and viewpoints, even if it means allowing speech that is offensive or biased against certain groups of people."[47] Such abstract endorsements, though, do not transfer to particular circumstances. For instance, a classic political science study finds that although large proportions of Americans endorse abstract tolerance, they were far less comfortable endorsing free speech by specific controversial groups—e.g., communists, atheists, the Black Panthers, abortion and anti-abortion activists.[48] In other words, tolerance is easier to preach than to practice.

We employed a technique designed to measure UNC students' tolerance for specific views with which they disagree.[49] The technique had two stages. In the first stage, students were presented with ten specific political beliefs (listed in a random order) "that people at UNC might hold." From this list, each respondent was asked to choose the one political belief "that you find **most objectionable**."

The ten items we presented to respondents are shown in Table 16. We chose five positions that a liberal student might hold, and five that a conservative student might hold. We also attempted to cover several different topical areas in the hope that all respondents would see at least one political position that they strongly disliked. Some of the positions refer to national political issues—e.g.

---

[45] See John Stuart Mill, *On Liberty* (1859), for the classic statement of these ideas.

[46] https://www.pewresearch.org/global/2015/11/18/global-support-for-principle-of-free-expression-but-opposition-to-some-forms-of-speech/

[47] Gallup, "Free Expression on Campus: A Survey of U.S. College Students and U.S. Adults." Available online at https://www.knightfoundation.org/media/uploads/publication_pdfs/FreeSpeech_campus.pdf.

[48] Sullivan, John, James Piereson, and George E. Marcus. 1979. "An Alternative Conceptualization of Political Tolerance: Illusory Increases 1950s-1970s." *American Political Science Review* 73(3): 781–94.

[49] See Sullivan et al. (1979) for the origins of this approach.

FSU001849

immigration policy—and some of them allude to significant controversies specific to UNC.[50] It was not our intention to choose items that *most* or *typical* liberal/conservative students at UNC hold, nor did we attempt to select the most extreme viewpoints in order to manufacture artificial controversy. Rather, we attempted to choose views that are genuinely controversial and that a critical mass of individuals on our campus really do hold. These are views that students will encounter as they navigate their academic and social lives.

Table 16: Controversial Political Positions Presented to Survey Respondents

*Positions liberal students might hold*

1) The Silent Sam statue should be destroyed
2) University admissions should give preference to applicants from disadvantaged racial groups in order to help alleviate past injustices
3) Most undocumented/illegal immigrants should be granted amnesty and eventually equal rights as US citizens
4) A Christian wedding cake maker should be required to design cakes for same-sex weddings, even if the cake maker is opposed to same-sex marriage
5) The government has a responsibility to make sure every citizen has equal access to affordable health care

*Positions conservative students might hold*

6) The Silent Sam statue should be restored to its original location
7) Affirmative action should end, and an applicant's race should not carry any weight in university admissions
8) The United States should build a wall on its southern border to decrease undocumented/illegal immigration
9) Same-sex marriages should not be recognized as valid in the United States
10) There is no convincing evidence of human-caused global climate change

Note: Controversial positions were listed in a random order.

After respondents chose the view that they considered most objectionable, their responses were recorded, and they advanced to the next screen.[51] Here, the respondents were asked to focus exclusively on the chosen view: "Please think about people at UNC who believe [statement selected on the previous screen]. How appropriate would it be to take each of the following actions?" There were eight actions listed in a random order. Two of the eight—publishing a critical essay or asking a challenging question—are generally considered to be respectful and constructive forms of engagement. Two more actions—interrupting a speaker or blocking entrance to a campus event—

---

[50] "Silent Sam" is a Confederate monument that stood in a prominent position on UNC's campus for many years. At the time of our survey, it had been torn down in a student protest, but its future disposition remains a major campus controversy.)

[51] Which items did respondents choose? This question is somewhat beyond our scope, since the purpose of "Most objectionable position" item is to populate the tolerance items that followed, and not, to understand what positions students see as most objectionable *per se*,. But for the curious reader, the most commonly selected items among students who identified as liberal were #10 (33.5%) followed by #9 (25.4%) followed by #8 (22.4%). Among students who identified as conservative the most commonly selected items were #4 (23.2%) followed by #2 (22.2%) followed by #3 (17.2%). The facts that neither groups landed uniformly on a single item reduces any potential concern that our conclusions rely too much on responses to just one particularly controversial position.

FSU001850

have been used by groups around the country, but are generally prohibited by student conduct codes, including UNC's. The remaining four actions—vandalizing a dorm or office; shoving a student; and hurling verbal abuse—clearly violate student conduct codes and are potentially actionable under criminal statutes.

40

Table 17: Students' Responses to Objectionable Political View

| | Ideological Self-Identification | | |
|---|---|---|---|
| | Liberal | Moderate | Conservative |
| Write an opinion piece explaining the reasons for your disagreement and submit it to a campus publication. | 88.6% | 76.6% | 84.7% |
| Ask a challenging question of a speaker who endorsed the idea. | 90.3 | 79.9 | 86.2 |
| Create an obstruction, such that a campus speaker endorsing this idea could not address an audience. | 19.2 | 3.3 | 3.0 |
| Form a picket line to block students from entering an event where a speaker will argue for this idea. | 18.7 | 2.7 | 1.0 |
| Write graffiti on the dorm room of a student who endorses this idea. | 1.5 | 1.1 | 0.5 |
| Write graffiti on the office of a faculty member who endorses this idea. | 3.2 | 0.0 | 1.0 |
| Yell profanity at a student who endorses this idea as he or she walks across campus. | 3.5 | 0.0 | 0.5 |
| Shove a student who endorses this idea when they are speaking about it outside on campus. | 1.5 | 0.5 | 1.0 |
| N | 651 | 184 | 203 |

Note: Cell entries represent the proportion of respondents saying that it would be "appropriate" or "entirely appropriate" to take the specified action. The precise N varies slightly due to item nonresponse.

Table 17 reports the proportion of students who indicate that they regard each of these actions as either "appropriate" or "entirely appropriate." There are some points of consensus. Across the political spectrum, students generally see writing an opinion piece and asking a question as appropriate forms of engagement.[52] For the bottom four actions, which are the most serious breaches of conduct, the proportions of students who regard them as appropriate are very small—so low, in fact, that it is difficult to rule out mundane possibilities such as that some respondents accidentally clicked the wrong button on their computer screens.[53]

Rows 3 and 4 show Table 17's more striking results. First, students who identify as liberal more frequently indicated that obstructing speakers was an appropriate option for expressing disagreement. Specifically, 19.2% these students endorse such actions, whereas trace numbers—approximately 3%—of moderates or conservatives do. These results notwithstanding, the vast majority of students who identify as liberal (over 80%) do *not* endorse speaker obstructions. For this reason, it would be erroneous to say students who identify as liberal endorse disruptive behavior

[52] We are somewhat surprised that these proportions are not even higher than they are. One possibility is that some respondents interpreted the word "appropriate" to mean "effectual" or "likely to be successful" rather than (our intention) "within the bounds of permissible conduct." This possibility represents a caveat—although we believe it to be a small one since such misunderstanding likely applies only to very few respondents and since such misunderstanding likely applies uniformly across items and ideological categories.

[53] For the "shove a student" item—the most serious action in our array—thirteen respondents said this action was appropriate or entirely appropriate. An additional thirty said it was somewhat appropriate.

FSU001852

while students who identify conservative do not. In fact, *all* subgroups generally believe disruptions are inappropriate.

### 12) Students across the political spectrum express interest in having more opportunities for constructive dialogue—in particular conversations that include conservative speakers.

Finally, we sought to examine what actions might be taken to support a culture of free expression and constructive dialogue at UNC. The findings above imply some possibilities, and we discuss those possibilities in more depth below. Here, we report how students responded to three specific questions about opportunities to hear and engage with outside speakers. We find broad support for increasing campus opportunities to engage in constructive dialogue—especially opportunities that increase opportunities to hear conservative perspectives.

**Methods**

Near the end of the survey instrument, we asked students, "How many opportunities does UNC provide for students to have outside speakers visit campus and articulate liberal perspectives?" We repeated the same question for "conservative perspectives." We also asked, "How many opportunities does UNC provide for students to engage constructively with people who disagree with them?" For all questions, the response options were, "Far too few opportunities," "Somewhat too few opportunities," "About the right number of opportunities," "Somewhat too many opportunities," and "Far too many opportunities."

**Analysis**

Table 18 reports how students answered this question. Only 6.9% of students who identify as liberal say that UNC has too many liberal speakers, and less than 1% of students who identify as conservative (just one respondent in our sample) say that there are too many conservative speakers.[54] What is most remarkable here, though, is the extent to which responses from across the political spectrum reach a consensus—in-group bias notwithstanding. An overwhelming 91.6% of students who identify as conservative say that UNC invites too few conservative speakers. To an impressive extent, students who identify as liberal  agree. More students who identify as liberal (37.4%) say that there are too few conservative speakers than say that there are too many (15.5%). Furthermore, more students who identify as liberal say that there are too few conservative speakers (37.4%) than say that there are too few liberal speakers (21.5%). Students who identify as moderate agree, too: 63.4% of students who identify as moderate in our sample indicated that there are too few opportunities to hear conservative speakers, but only 2.7% indicated that there were too many—a more than 20:1 ratio.[55]

---

[54] It is common for questions that contrast opposing groups (e.g. liberals and conservatives) to elicit some in-group bias, and that pattern is apparent here.

[55] We acknowledge some potentials limitations in Table 18's results: they show students' *perceptions* of what speakers visit campus, not the actual mixture of speakers. If we could take a full census of all the speakers invited to UNC and attempt to classify them by ideological leaning (or lack thereof), perhaps an entirely different picture would emerge. It is nevertheless clear that students generally crave more opportunities to engage with opposing viewpoints.

FSU001853

One member of the conservative focus group spoke favorably of events that present liberal and conservative speakers together on the same platform and indicated that such events can both neutralize protests and facilitate constructive discussions:

> […] I find the issue is that every time a conservative speaker comes to campus there's a lot of protesting. I think if we have more speakers come to campus and especially alongside of, you know, conservative and liberal speakers together, people will be more willing to listen to them. Part of the issue is that they hear things from other students or from whoever from the media and they sort of bring these preconceived notions about them, you know, this person is just a racist so I can put this in there. But if they actually sat down and listened to them, they might realize they aren't really that.

On the other hand, when asked about a potential "Free Speech Week," that would include speakers from the political right, students in of the liberal focus group expressed skepticism. Specifically, one student worried such an effort would "put the left and right on equal footing," which would be improper because "I don't think much of the right is using logical arguments" and "it would basically just promote far right-wing ideologies."

These results reveals substantial enthusiasm for more constructive disagreement or dialogue across the political spectrum. Yet, given the concerns raised in the student group focus groups, efforts to change the mixture of speaker events on campus should emphasize such events' *constructive* goals in order to avoid misunderstanding about the events' motives or expectations.

FSU001854

Table 18: Students' View of Campus Opportunities to Hear Political Perspectives, by Respondent Ideology

| | Self-identified liberals | | | Self-identified moderates | | | Self-identified conservatives | | |
|---|---|---|---|---|---|---|---|---|---|
| | Too few | About right | Too many | Too few | About right | Too many | Too few | About right | Too many |
| Hear liberal perspectives | 21.5% | 71.6% | 6.9% | 10.4% | 57.9% | 31.7% | 9.9% | 31.5% | 58.6% |
| Hear conservative perspectives | 37.4 | 47.1 | 15.5 | 63.4 | 33.9 | 2.7 | 91.6 | 7.9 | 0.5 |
| Engage with disagreement | 58.0 | 39.5 | 2.5 | 61.8 | 36.0 | 2.2 | 75.9 | 22.2 | 2.0 |

Note: Response options were, "Far too few opportunities," "Somewhat too few opportunities," "About the right number of opportunities," "Somewhat too many opportunities," and "Far too many opportunities." For simplicity, the table above collapses together students who said there were "somewhat" and "far" too many/few opportunities.

44

## General Discussion

Throughout the analysis above, our purpose has been to characterize UNC students' perspectives on the university's culture for free expression—what has happened to them inside and outside of class, their attitudes toward political disagreement, and their interest in cultural change. To this point, we have stuck narrowly to the particular patterns we uncovered. In the discussion that follows, we conclude with a broader reflection that considers these in light of our own experiences at UNC and in higher education more generally.

Like many universities, UNC has a faculty that leans substantially to the left.[56] But for the most part, these views do not manifest themselves in the university's classrooms in the way that many critics assume. As we discuss in Findings 2 and 3 above, politics is not a regular topic of conversation in most classes, instructors do not regularly offer political opinions, and even when politics comes up, most instructors are perceived—even by students who identify as conservative—as encouraging participation from liberals and conservatives alike. This result aligns with what we typically hear in private discussions among faculty. Although many faculty members make no secret of their political leanings or their opinions about controversial topics, they also take great pride in their role as educators and see creating a balanced and inclusive classroom atmosphere as key to that mission. To be sure, the term "inclusive atmosphere" might connote myriad different ideas across the faculty, but when faculty discuss classroom political dynamics, remarks such as "I make sure everyone is included," or "If nobody states the conservative perspective, then I do it," are common. All of these findings and observations should inspire optimism about and pride in our community.

However, an important upshot from our findings is that, good intentions notwithstanding, instructors could easily fail to perceive important free-expression issues that might not be immediately evident in their courses. As revealed in Findings 5, 6, and 7, student concerns about expressing political views are quite prevalent, and a common coping mechanism is to withdraw and self-censor. Thus, a classroom silence that an instructor might perceive as tacit agreement (or perhaps lackadaisical indifference) might, least for some students, actually come from apprehension about the consequences of expressing specific viewpoints.

This apparent disjuncture between instructors' and students' perspective informs a major theme in the recommendations we provide below: UNC instructors should be more intentional and explicit about their approaches to free expression, as well as about articulating the principles they endorse and their process for adhering to them. Although instructors might care deeply about free expression issues and commit to grading evenhandedly, for instance, students might come to the class expecting otherwise, either on the basis of stereotypes or a past negative experience. We suspect instructors can disabuse students of such misperceptions with practices such as explaining their orientation toward expression issues on the first day of class, including syllabus statements that affirm a commitment to neutrality in assessment, or providing (and using) grading rubrics that specify clear, politically neutral criteria. Such actions would not only help encourage participation, but also establish an expectation that deriding or belittling students for expressing sincere political views has no place in higher education. We believe these steps also have the potential to elevate the

---

[56] See references under Finding 2 above.

FSU001856

quality of classroom discussion and class work as students will understand that their class contributions will be evaluated based exclusively on merit.

Another important insight from our report is that, compared to students who self-identify as liberal, self-identified conservative students do in fact face distinct challenges related to viewpoint expression at UNC. Several of these relate to *peer* judgments and sanctions, rather than faculty behavior. Self-identified conservative students are more concerned about censure for expressing their views (Finding 6). They are more often associated with certain negative stereotypes (Finding 8), and respondents see them as more regularly subject to derision (Finding 9). They might face greater risk of social alienation (Finding 10), and speakers that share their views likely face greater risk of obstruction or de-platforming (Finding 11). We see these results as a source of concern, and we hope they inspire a conversation about how the campus can become more accepting of conservative students as well as more willing to hear and engage with conservative ideas.

Some might disagree with how we interpret the results above. One perspective we expect to encounter is that disproportionate hostility toward conservative ideas arises naturally in an enlightened intellectual community. As the argument goes, conservative ideas are historically steeped in elitism and prejudice. A college education aims to reveal this history and to demonstrate how conservatism continues, even in the present, to perpetuate inequality and oppression. As students come to understand this legacy, they naturally respond to conservatism with hostility. Therefore, to frame disproportionate hostility toward conservative ideas as a problem to be solved invalidates a rational response and undermines a critical mechanism for positive social change.

We recognize that this perspective stems from genuine harm and injustice, including injustices that continue today. And yet, it is shortsighted. At a basic level, it brushes aside the enormous variety in ideas that could be filed under the heading of "conservatism." Conservatism is variously associated with Judeo-Christian moral teachings, an ethic of individualism, skepticism toward change, federalism, nationalism, a preference against government regulation, a free trade orientation, capitalism, and representative democracy—to name just a few strains of thought. One need not accept all, or even most, of these ideas to recognize their credible intellectual history or to acknowledge that at least some merit robust discussion in a liberal arts education. An education that lacked them would be narrower in scope and would lead to an incomplete understanding of the intellectual history of the ideas that continue to shape the world today.

But one need not agree with us on this point to regard the asymmetrical experience of college conservatives as a source of concern. It is a source for concern, too, under a widely shared vision of what values a university should embody. Who would dispute that universities should be places where each idea is considered on its own terms, and not prejudged? Where sincerely held conclusions can be offered up for vigorous and civil contestation? Where students are assumed to be arguing in good faith and where they feel valued and respected, even should they turn out to be wrong? These are core tenets of constructive dialogue because they recognize each person's innate fallibility, because they respect all members of a community as having something valuable to share, and because they arrest human tendencies toward sectarianism, partisanship, and resentment.

Steps to improve UNC's culture for free expression might take many forms, certainly more than we can hope to enumerate here. But as a starting point, we hope our report draws increased attention to the particular mores and expectations that can develop—even unintentionally—in a community where most of the community members share common viewpoints, especially on

FSU001857

political issues. All three of us have seen UNC students, faculty, and/or administrators make assumptions about others' political views. We have seen speakers casually disparage conservative ideas in front of students and colleagues on the assumption that everyone in the room would welcome the remark. Students and colleagues have asked us to support political causes we would, in fact, not endorse. We've heard people mischaracterize events in the news and go unchallenged. We did not view these occurrences as intentionally malicious, and we imagine they also happen off campus and on other campuses. They are examples, though, of the overreach that tends to occur when people miscalculate the extent to which individual community members share the majority's views. These mistakes merit special attention at universities, where the ability to consider and contest a full span of ideas is a cardinal value. In the recommendations that follow, we discuss potential ways to develop this ability.

In closing, we emphasize that the wrong way to interpret our report would be to see it as pitting liberals against conservatives. Although our report highlights disparate challenges campus conservatives face, many liberal and moderate students face the very same challenges—most importantly, they are all worried, to some extent, about expressing sincere views in their classes. Moreover, although we document ways in which political hostility emerges disproportionately from the political left at UNC, this hostility often comes from a *minority* of campus liberals. Students who identify as liberal and who say they would be friends or roommates with a conservative student, and/or who think conservatives are important to the campus community, substantially outnumber those who do not (Table 15). Over 80% of students who identify as liberal say it is not appropriate to de-platform speakers proffering objectionable views (Table 17). And the students who identify as liberal and who want more conservative speakers far outnumber those who want fewer (Table 18). Some may be tempted to use our findings as yet another volley for one side or the other in the campus free expression debate. This would be disappointing because it would ignore the substantial cross-ideological agreement about what our campus should strive to be.

This agreement manifests itself in many forms throughout our findings, and we see it as a hopeful entry point for productive and healing dialogue. But even the most troubling survey results help reveal the key questions we should be asking to better understand free expression issues and to think about what role classes and campus programming need play in promoting free expression. We may never have or agree on the answers to these questions—many of them have been asked and re-asked for decades, or even centuries—but by listening with open minds to the many voices on campus, we will improve our campus and ourselves.

FSU001858

## Recommendations

Here, we offer initial recommendations based on the above findings and analysis. The recommendations are broad, and we intend them to be taken not as a formal or final proposal, but rather as the start of conversations about how to improve the climate for free expression and constructive dialogue at UNC.

**1) Remind students of the importance of free expression and teach them appropriate ways to engage in constructive dialogue.**

It is imperative students understand the importance of free expression for learning and for becoming informed citizens. It is also crucial they develop attitudes and skills, including listening, reflection, resilience, and constructive argumentation. Potential implementation actions include:

- First-year orientation programming focused on the value of free expression and constructive dialogue in a productive and inclusive learning environment. This programming would also inform students of their and others' free speech rights, as well as explain and model appropriate methods for expressing disagreement.[57]
- Regularly clarify and communicate university policies related to free expression via an annual online refresher on campus free speech.
- Offer student training sessions on how to effectively voice their ideas in classes.
- Work with groups across campus to create and promote social gatherings that attract students from different political groups and that focus on social engagement rather than politics.

**2) Support faculty by offering suggestions for and training on how to foster a welcoming and inclusive environment in the classroom. Potential implementation actions include:**

- Adding a section to syllabi that 1) establishes a commitment to encouraging free expression and constructive dialogue and 2) explains how this commitment will be evident in the course, as well as processes that ensure fair and impartial grading
- Encouraging faculty to engage in deliberation and debate in the classroom. Such efforts might have natural overlap with efforts to increase active and inclusive learning in UNC classrooms.
- Creating workshops that help instructors improve their ability to model epistemic humility, active listening, honest reflection, intellectual resilience, and constructive dialogue.
- Incorporating questions about classroom free expression issues into students' end-of-semester evaluations.[58]

---

[57] Indeed, some of this curriculum is required by the state law mentioned in footnote 7.

[58] One of us (Ryan) has piloted potential measures on his own and is happy to share the results.

48

FSU001859

**3) Provide students, faculty, and staff more opportunities to hear external speakers presenting ideas from across the political, social and cultural spectrum.**

UNC currently relies on professors, students, and administrators to invite guest speakers. This practice might result in an imbalance among invited speakers. A potential implementation action for this item is the creation of a campus office that would:

- report to and be funded by the Provost's office.
- have the mission of organizing campus events (debates, forums, panels, lectures) on important political, social, and cultural issues with speakers representing views from across ideological spectrum with an eye toward slating events with speakers from under-represented groups.
- publicize these events widely on campus and record them with the purpose of hosting and sharing them on a public website.
- encourage and foster connections between speakers and classroom discussion.
- ensure these events were open and available to all students, faculty, and staff who wish to attend.

**4) Expand research on free expression and constructive dialogue to include issues confronting faculty, staff, and the administrators; and perform the research at regular intervals to track progress and identify emerging issues.**

To better understand other facets of free expression on campus, it would be helpful to expand the scope of the research by also surveying faculty and administration about their attitudes and behaviors.

To determine what progress is being made vis-à-vis free expression and constructive dialogue on campus and what new issues may be arising, it would also be helpful to build a time series by repeating some of our measures on a regular basis—perhaps biannually.

FSU001860

# Appendix A: Recruitment Message

Incentivized respondents:

Subject: Earn $10 for your views on free expression at UNC

Dear ${m://FirstName},

We are a UNC research team conducting a survey of students' experiences encountering and engaging with different viewpoints on campus. You have been randomly selected for an invitation to this survey.

The survey takes approximately 15 minutes to complete. If you decide to participate, you will be asked questions about your experiences inside and outside of classrooms, as well as what experiences are important to have as part of your education.

**To thank you for your participation, we are able to offer an Amazon e-gift card valued at $10 to each participant who completes the full survey.** You will receive this e-gift card via email 1-2 weeks after you complete the survey.

Participation is anonymous. No identifying information will be associated with your survey responses or made public.

Follow this ${l://SurveyLink?d=link} to see consent-related information and to begin the survey. Or copy and paste this URL below into your internet browser: ${l://SurveyURL}

This survey will be open for you to complete until March 27 at noon.

Thank you for your help with this research,

Jennifer Larson, Department of English & Comparative Literature
Mark McNeilly, Kenan-Flagler Business School
Timothy Ryan, Department of Political Science
   Follow the link to opt out of future emails:

${l://OptOutLink?d=Click here to unsubscribe}


Unincentivized respondents:

Subject: We're seeking your views on free expression at UNC

Dear ${m://FirstName},

We are a UNC research team conducting a survey of students' experiences encountering and engaging with different viewpoints on campus. We're writing to find out about *your* perspective on these topics.

FSU001861

The survey takes approximately 15 minutes to complete. If you decide to participate, you will be asked questions about your experiences inside and outside of classrooms, as well as what experiences are important to have as part of your education.

Participation is anonymous. No identifying information will be associated with your survey responses or made public.

Follow this ${l://SurveyLink?d=link} to see consent-related information and to begin the survey. Or copy and paste this URL below into your internet browser: ${l://SurveyURL}

This survey will be open for you to complete until April 19 at noon.

Thank you for your help with this research,

Jennifer Larson, Department of English & Comparative Literature
Mark McNeilly, Kenan-Flagler Business School
Timothy Ryan, Department of Political Science

Follow the link to opt out of future emails:
${l://OptOutLink?d=Click here to unsubscribe}

FSU001862

## Appendix B: Question Wording

*Count of classes*

How many classes did you take at UNC in the Fall of 2018--the most recently completed semester?

- 0
- 1
- 2
- 3
- 4
- 5 (or more)

*Class labels*

In the spaces below, please write the names of each course you took in the Fall of 2018. The name doesn't need to match the name listed in the course catalogue exactly. This is just to help us ask you questions about specific classes.

[There were open-ended response boxes for the number of classes indicated in the "Count of classes" item.]

*Introduction to class-specific items*

For the next several questions, we will ask about **one** of the courses you took last semester. Based on a random draw, the computer has selected **${e://Field/class}** as the course you will focus on for your answers. If you would like to answer questions about a different course, there is an opportunity to do so later in the survey. But for now, please focus on the course you had in mind when you wrote **${e://Field/class}.**

[The text ${e://Field/class} was filled in with one of the labels provided for the "Class labels" item.]

*Class department*

What department was this course part of? Please write the department name below. [Open-ended response.]

*Frequency of political topics*

How often did political topics come up in this class?

- Never
- A few times throughout the semester
- Perhaps every week or two

FSU001863

- Most class meetings
- Almost every class meeting

*Frequency of instructor's political comments*

How often did the instructor for this course say or do something (such as commenting on a current political topic or discussing the instructor's moral perspective) that seemed to reflect the instructor's political leanings?

- Never
- A few times throughout the semester
- Perhaps every week or two
- Most class meetings
- Almost every class meeting

*Perceived political leanings of instructor*

Based **exclusively** on the person's behavior in the classroom (and not any preconceptions you might hold), what would you guess the course instructor's political leanings to be? If the instructor did not engage in any politically revealing behavior, please select, "I'm unsure."

- Strong conservative
- Leans conservative
- Moderate / Middle of the road
- Leans liberal
- Strong liberal
- Some other political leaning
- I'm unsure

*Instructor's encouragement of liberal/conservative participation*

The course instructor encouraged participation from liberals and conservatives alike.

- Strongly disagree
- Somewhat disagree
- Neither agree nor disagree
- Somewhat agree
- Strongly agree
- This question is totally irrelevant for this class

*Instructor's interest in learning from disagreement*

The course instructor was interested in learning from people with opinions that differed from the instructor's own opinions.

FSU001864

- Strongly disagree
- Somewhat disagree
- Neither agree nor disagree
- Somewhat agree
- Strongly agree
- This question is totally irrelevant for this class

*Concerns about grading*

How concerned were you that, if you stated your sincere political views, the instructor would give you a lower grade?

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Moderately concerned
- Extremely concerned
- This question is totally irrelevant for this class

*Concerns about instructor's opinion*

How concerned were you that, if you stated your sincere political views, the instructor would have a lower opinion of you?

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Moderately concerned
- Extremely concerned
- This question is totally irrelevant for this class

*Concerns about embarrassment*

How concerned were you that, if you stated your sincere political views, the instructor would embarrass you in front of the class?

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Moderately concerned
- Extremely concerned
- This question is totally irrelevant for this class

*Perception of students' political leanings*

FSU001865

Based **exclusively** on their comments and behavior in class, and not on other things, how would you describe the political leanings of students in the class, on balance? If nothing political ever came up in this class, choose the final response option.

- Very conservative  (1)
- Lean conservative  (2)
- Roughly even mixture of liberals and conservatives  (3)
- Lean liberal  (4)
- Very liberal  (5)
- This question is totally irrelevant for this class  (6)

*Concerns about students lowering opinion*

How concerned were you that, if you stated your sincere political views, the other students in the class would have a lower opinion of you?

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Moderately concerned
- Extremely concerned
- This question is totally irrelevant for this class

*Concerns about being accused of a code of conduct violation*

How concerned were you that, if you stated your sincere political views, someone would file a complaint that your comments violated a campus harassment policy or code of conduct?

- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Moderately concerned
- Extremely concerned
- This question is totally irrelevant for this class

*Students' self-censoring*

Finally, in the class **${e://Field/class}**, about how many times did you keep an opinion related to class to yourself because you were worried about the potential consequences of expressing that opinion?

- Never
- Once
- Between two and five times
- Between six and ten times

FSU001866

- More than ten times

*Introduction to section on overall UNC experiences*

Now, please think about your **entire** time as a student at UNC, from the time you first came to UNC until now.

*Concerns about grading during entire time at UNC*

During your entire time at UNC, how often have you worried that, if you stated your sincere political views, a course instructor would give you a lower grade?

- Never
- Once or twice a year
- A few times per semester
- Several times per semester
- Most weeks, or more often than that

*Concerns about students lowering opinions during entire time at UNC*

During your entire time at UNC, how often have you worried that, if you stated your sincere political views, the other students in the class would have a lower opinion of you?

- Never
- Once or twice a year
- A few times per semester
- Several times per semester
- Most weeks, or more often than that

*Concerns about critical posts on social media during entire time at UNC*

During your entire time at UNC, how often have you worried that, if you stated your sincere political views, someone would post critical comments about you on social media?

- Never
- Once or twice a year
- A few times per semester
- Several times per semester
- Most weeks, or more often than that

*Frequency of hearing disrespectful comments*

About how often do you hear someone at UNC making disrespectful, inappropriate, or offensive comments about each of the following groups?

FSU001867

[This question was a grid response, with the following response options: Never; Once or twice a year; a few times per semester; several times per semester; most week, or more often than that. The groups, listed in a random order, were: Women, Men, Whites, African Americans, Asians; Hispanics or Latinos; Lesbian, Gay, Bisexual, or Transgender individuals; Students born outside the U.S.; Muslims; Christians; Political liberals; Political conservatives.]

*Selection of an objectionable view*

Below is a list of political beliefs that people at UNC might hold. Of these, which one do you find **most objectionable**?

- The Silent Sam statue should be restored to its original location
- The United States should build a wall on its southern border to decrease undocumented/illegal immigration
- Affirmative action should end, and an applicant's race should not carry any weight in university admissions
- There is no convincing evidence of human-caused global climate change
- Same-sex marriages should not be recognized as valid in the United States
- Most undocumented/illegal immigrants should be granted amnesty and eventually equal rights as US citizens
- The Silent Sam statue should be destroyed
- University admissions should give preference to applicants from disadvantaged racial groups in order to help alleviate past injustices
- The government has a responsibility to make sure every citizen has equal access to affordable health care
- A Christian wedding cake maker should be required to design cakes for same-sex weddings, even if the cake maker is opposed to same-sex marriage

*Appropriateness of actions toward an objectionable view*

Please think about people at UNC who believe [statement chosen in the item above] How appropriate would it be to take each of the following actions?

[This question was a grid response, with the following response options: Not appropriate; Somewhat appropriate; Appropriate; Entirely appropriate. The actions listed in a random order were: Write an opinion piece explaining the reasons for your disagreement and submit it to a campus publication; Ask a challenging question of a speaker who endorsed the idea; Create an obstruction, such that a campus speaker endorsing this idea could not address an audience; Form a picket line to block students from entering an event where a speaker will argue for this idea; Write graffiti on the dorm room of a student who endorses this idea; Write graffiti on the office of a faculty member who endorses this idea; Shove a student who endorses this idea when they are speaking about it outside on campus; Yell profanity at a student who endorses this idea as he or she walks across campus.]

FSU001868

*Stereotypes of liberal and conservative students*

[The following prompt was presented with both liberals and conservatives as the target. The order of the ideological groups was randomized.]:

Next, we would like your opinion about students on the [liberal/conservative] side of the political spectrum. How well do each of the following words or phrases describe political [liberals/conservatives]?

[This question was a grid response, with the following response options: Not well at all; Slightly well; Moderately well; Very well; Extremely well. The adjectives, presented in a random order, were Well-educated; Open-minded; Well-informed; Tolerant; Intelligent; Racist; Sexist; Immoral; Condescending; Follow others without thinking.]

*Opportunities to hear liberal speakers*

How many opportunities does UNC provide for students to have outside speakers visit campus and articulate liberal perspectives?

- Far too few opportunities
- Somewhat too few opportunities
- About the right number of opportunities
- Somewhat too many opportunities
- Far too many opportunities

*Opportunities to hear conservative speakers*

How many opportunities does UNC provide for students to have outside speakers visit campus and articulate conservative perspectives?

- Far too few opportunities
- Somewhat too few opportunities
- About the right number of opportunities
- Somewhat too many opportunities
- Far too many opportunities

*Opportunities to engage with political disagreement*

How many opportunities does UNC provide for students to engage constructively with people who disagree with them.

- Far too few opportunities
- Somewhat too few opportunities
- About the right number of opportunities

FSU001869

- Somewhat too many opportunities
- Far too many opportunities

*Ideological self-placement—upon coming to UNC and today*

Below are two scales that represent political leanings from extremely liberal to extremely conservative.

On the first scale, please indicate what your political leanings were **when you first came to UNC**.

- Extremely liberal
- Liberal
- Slightly liberal
- Moderate; middle of the road
- Slightly conservative
- Conservative
- Extremely conservative
- None of these
- Haven't thought much about this

*Social distance measures—Introduction*

[The social distance questions were presented twice—once for political liberals and once for political conservative—in a random order.]

Please think about [political liberals / political conservatives]. How much do you agree or disagree with each of the following statements?

*Social distance—Willingness to be friends*

I would be willing to have a person from this group as a close personal friend.

- Strongly disagree
- Somewhat disagree
- Neither agree nor disagree
- Somewhat agree
- Strongly agree

*Social distance—Willingness to be roommates*

I would be willing to have a person from this group as a roommate.

[Same response options.]

*Social distance—Willingness to date*

FSU001870

I would be willing to date someone from this group.

[Same response options.]

*Social distance—Enjoy taking classes*

I enjoy taking classes with students from this group.

[Same response options.]

*Social distance—Students' importance to campus community*

Students from this group are an important part of the campus community.

[Same response options.]

*Social distance—Faculty's importance to the campus community*

Faculty from this group are an important part of the campus community.

[Same response options.]

*Social distance—UNC better without*

Is UNC better with political [liberals / conservatives] as part of the campus community, or would UNC be better without political liberals?

- UNC would be much better without liberals
- UNC would be a little better without liberals
- UNC would be neither better nor worse without liberals
- UNC would be a little worse without liberals
- UNC would be much worse without liberals

*Year of entry*

In what year did you begin your studies at UNC?

- 2019
- 2018
- 2017
- 2016
- 2015
- 2014
- Earlier than 2014

FSU001871

*Gender*

Are you...

- Male
- Female
- Neither best describes me

*Residency*

When you applied to UNC, were you...

- An in-state applicant
- An out-of-state applicant
- An international applicant

*Partisan self-identification*

Generally speaking, do you usually think of yourself as a Democrat, a Republican, an independent, or what?

- Strong Democrat
- Democrat
- Independent, but lean Democratic
- Independent
- Independent, but lean Republican
- Republican
- Strong Republican
- Other
- Don't know

*Race*

With which race or ethnicity do you most identify?

- Native American
- Asian
- Black
- Hispanic / Latino
- White
- Other

FSU001872

# Appendix C: Focus Group Protocol

Focus groups were asked the following questions in semi-structured format. (The moderator had the freedom to ask clarifications and follow-ups.)

*Warm-up Questions*

1) In your own words what is the goal of your group?

2) What topics do you discuss in your group? What have been hot topics of conversation?

*Climate Questions*

1) Do you think UNC is primarily a moderate, liberal or conservative campus? How do you know?
   a) Do professors and/or students assume everyone is liberal or no?

2) How often do political, gender, race or religious topics come up in classes where this is not the subject of the class?
   a) Who tends to bring them up? The professor? The students?
   b) Is there a diversity of viewpoints expressed in those classes? Why or why not?
   c) Do professors encourage a diverse range of viewpoints?

3) Are you comfortable sharing your views in class? In your dorm/apartment? On social media? On campus? Why or why not?

4) What are your views on the topic of free speech? Should all currently legal types of speech be allowed on campus or not? If not, why not?

5) Which do you think is more important for the university to do: To protect students from ideas and words that might distress them or expose them to new ideas that may challenge their beliefs?

6) How should students deal with viewpoints they hear on campus with which they disagree, offend them or they think could offend others?

7) Do you think there is anything you can learn from discussing political ideas with someone with beliefs opposed to yours?

8) How would you create a better climate for improving viewpoint diversity and civil discourse on campus?

9) What do you think of the following ideas in terms of creating a better climate for viewpoint diversity and civil discourse on campus?

FSU001873

a) Add a question to the student feedback survey for the professor to see if they encourage diverse points of view from students, listen to those whom with they disagree and encourage constructive debate on hot button political issues.

b) Add sessions in orientation on free speech and constructive public discourse.

c) UNC Free Speech week which would feature speakers from across the political spectrum on various topics.

d) Create an Office of Public Policy Events on campus that would Organizing, publicizing, and staging debates, group forums, and individual lectures that address from multiple, divergent, and opposing perspectives an extensive range of public policy issues widely discussed and debated in society at large.

10) Is there anything else you'd like to discuss or share with us?

FSU001874

## Appendix D: Class Classification Scheme

Humanities (20.25%)
- Music
- History
- Philosophy
- English
- Religion
- Arts
- Drama
- Art History
- Information and Library Sciences
- Classics
- Comparative Literature
- Linguistics

Social Sciences (29.79%)
- Psychology
- Education
- Media & Journalism
- Economics
- Sociology
- Business
- Public Policy
- Political Science
- Information and Library Sciences
- Global Studies
- European Studies
- Peace, War, and Defense
- Communications
- Interdisciplinary Studies
- City and Regional Planning

Health Sciences (5.86%)
- Health Policy
- Exercise & Sports Sciences
- Lifetime Fitness
- Nursing
- Nutrition
- Allied Health Sciences
- Student Recreation

FSU001875

Natural Sciences (33.31%)

- Biology
- Math
- Physics
- Chemistry
- Statistics
- Environment and Ecology
- Biomedical Engineering
- Geography
- Clinical Laboratory Science
- Anthropology
- Computer Science
- Archaeology
- Geology
- Dentistry
- Astronomy
- Marine Sciences
- Applied Physical Sciences

Cultural Studies (2.74%)

- African, African American, and Diaspora Studies (AAAD)
- Women and Gender Studies
- Asian Studies
- American Studies
- Arabic Studies
- German Studies
- Latin American Studies

Foreign Language (7.04%))

- Spanish
- Latin
- French
- Romance Studies
- Russian
- Chinese
- Arabic
- Japanese
- Germanic and Slavic Languages

FSU001876

Other classes (1.02%)

- Experiential and Special Studies
- Honors Capstone
- Study Abroad
- Indecipherable or uninterpretable text (N=10)

FSU001877

# Appendix E: Results for Incentivized Sample Only

The tables below replicate the equivalent tables in the main text, but the analysis is restricted to respondents who were offered an incentive for participation.

Table E2: Politics in the Classroom

|  | Politics came up | Instructor offered an opinion |
|---|---|---|
| Never | 42.9% | 56.3% |
| A few times | 27.9 | 30.5 |
| Perhaps every week or two | 11.6 | 7.0 |
| Most class meetings | 8.2 | 4.7 |
| Almost every class meeting | 9.5 | 1.5 |
| Total | 100.0 | 100.0 |
| N | 527 | 528 |

Table E3: How Often Does Politics Come Up?, by Subject Area

|  | Human-ities | Social Sciences | Health Sciences | Natural Sciences | Cultural Studies | Foreign Language |
|---|---|---|---|---|---|---|
| Never | 18.5% | 21.3% | 58.8% | 74.9% | 0.0% | 40.0% |
| Few | 44.4 | 26.0 | 29.4 | 17.7 | 14.3 | 46.7 |
| Week or two | 17.6 | 22.0 | 2.9 | 2.1 | 14.3 | 6.7 |
| Most meetings | 13.9 | 12.0 | 2.9 | 3.2 | 21.4 | 0.0 |
| Every | 5.6 | 18.7 | 5.9 | 2.1 | 50.0 | 6.7 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| N | 108 | 150 | 34 | 187 | 14 | 30 |

FSU001878

Table E4: The Instructor Encouraged Participation from Liberals and Conservatives Alike, by
Respondent Ideological Self-identification

|  | Ideological Self-identification | | |
|---|---|---|---|
|  | Liberal | Moderate | Conservative |
| Strongly disagree | 0.6 | 0.0 | 2.4 |
| Somewhat Disagree | 1.7 | 5.7 | 12.2 |
| Neither | 5.8 | 18.9 | 7.3 |
| Somewhat Agree | 8.7 | 11.3 | 9.8 |
| Strongly agree | 51.2 | 37.7 | 46.3 |
| Irrelevant | 32.0 | 26.4 | 22.0 |
| Total | 100.0% | 100.0% | 100.0% |
| N | 172 | 53 | 41 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

Table E5: The Course Instructor was Interested in Learning from People with Opinions that
Differed from the Instructor's Own, by Respondent Ideological Self-identification

|  | Ideological Self-identification | | |
|---|---|---|---|
|  | Liberal | Moderate | Conservative |
| Strongly disagree | 1.2% | 5.7% | 4.9% |
| Somewhat Disagree | 2.3 | 9.4 | 7.3 |
| Neither | 3.5 | 9.4 | 9.8 |
| Somewhat Agree | 18.6 | 28.3 | 22.0 |
| Strongly agree | 58.1 | 37.7 | 43.9 |
| Irrelevant | 16.3 | 9.4 | 12.2 |
| Total | 100.0% | 100.0% | 100.0% |
| N | 172 | 53 | 41 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

FSU001879

Table E6: Based on Behavior, Was the Instructor Liberal or Conservative?

| | |
|---|---|
| Strong Liberal | 15.2% |
| Liberal | 33.1 |
| Moderate | 5.5 |
| Conservative | 1.9 |
| Strong Conservative | 1.1 |
| Other | 0.4 |
| Unsure | 42.8 |
| | |
| Total | 528 |

Table E7: Based on Behavior, How Would you Describe Students' Political Leanings?

| | |
|---|---|
| Very Liberal | 11.1% |
| Lean liberal | 29.2 |
| Even mixture of liberals and conservatives | 11.6 |
| Lean conservative | 1.0 |
| Very conservative | 0.4 |
| Politics didn't come up / Question is irrelevant | 46.6 |
| | |
| Total | 517 |

69

FSU001880

FSU001881

Table E8: Students' Concerns About Instructors, by Respondent Ideological Self-identification

| | Instructor would lower grade Ideological Self-Identification | | | Instructor would lower opinion Ideological Self-Identification | | | Instructor would embarrass you Ideological Self-Identification | | |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|---|---|
| Not concerned | 85.0% | 54.7% | 53.7% | 79.2% | 47.2% | 51.2% | 79.8% | 60.4% | 68.3% |
| Slightly concerned | 2.3 | 11.3 | 14.6 | 6.4 | 15.1 | 17.1 | 5.8 | 15.1 | 9.8 |
| Somewhat concerned | 1.7 | 11.3 | 9.8 | 2.9 | 15.1 | 9.8 | 1.2 | 1.9 | 9.8 |
| Moderately concerned | 0.6 | 1.9 | 9.8 | 1.2 | 5.7 | 12.2 | 2.3 | 9.4 | 0.0 |
| Extremely concerned | 0.0 | 3.8 | 2.4 | 0.0 | 1.9 | 2.4 | 0.0 | 0.0 | 2.4 |
| Irrelevant | 10.4 | 17.0 | 9.8 | 10.4 | 15.1 | 7.3 | 11.0 | 13.2 | 9.8 |
| | | | | | | | | | |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 173 | 53 | 41 | 173 | 53 | 41 | 173 | 53 | 41 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

FSU001882

Table E9: Students' Concerns About Other Students, by Respondent Ideological Self-identification

| | Students would lower opinion Ideological Self-Identification | | | Students would post on social media Ideological Self-Identification | | | Students would file a complaint Ideological Self-Identification | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
| Not concerned | 61.3% | 30.2% | 24.4% | 80.4% | 60.4% | 56.1% | 83.7% | 66.0% | 61.0% |
| Slightly concerned | 20.8 | 24.5 | 19.5 | 5.2 | 17.0 | 14.6 | 2.9 | 3.8 | 7.3 |
| Somewhat concerned | 3.5 | 17.0 | 7.3 | 1.7 | 5.7 | 7.3 | 1.2 | 7.6 | 12.2 |
| Moderately concerned | 2.9 | 11.3 | 17.1 | 1.2 | 1.9 | 7.3 | 0.0 | 7.6 | 7.3 |
| Extremely concerned | 0.0 | 5.7 | 17.1 | 0.0 | 3.8 | 2.4 | 0.0 | 1.9 | 2.4 |
| Irrelevant | 11.6 | 11.3 | 14.6 | 11.6 | 11.3 | 12.2 | 12.2 | 13.2 | 9.8 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 173 | 53 | 41 | 173 | 53 | 41 | 172 | 53 | 41 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

Table E10: How Often Students Kept an Opinion Related to Class to Themselves, by Respondent Ideological Self-identification

| | Ideological Self-Identification | | |
|---|---|---|---|
| | Liberal | Moderate | Conservative |
| Never | 79.8% | 41.5% | 32.5% |
| Once | 6.4 | 32.1 | 17.5 |
| 2-5 times | 12.7 | 17.0 | 25.0 |
| 6-10 times | 0.0 | 3.8 | 17.5 |
| More than 10 times | 1.2 | 5.7 | 7.5 |
| Total | 100.0 | 100.0 | 100.0 |
| N | 173 | 53 | 40 |

Note: Analysis is limited to classes for which the respondent indicated that politics came up more than "never."

FSU001883

Table E12: Students' Concerns During Entire Time at UNC, by Respondent Ideological Self-identification

| | Would receive a lower grade | | | Peers would lower opinion | | | Critical comments on social media | | |
| | Ideological Self-Identification | | | Ideological Self-Identification | | | Ideological Self-Identification | | |
| | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|---|---|
| Never | 77.3 | 48.4 | 28.2 | 52.0 | 16.5 | 12.8 | 80.4 | 60.4 | 56.4 |
| Once or twice a year | 16.2 | 27.5 | 29.5 | 29.3 | 33.0 | 12.8 | 13.0 | 23.1 | 16.7 |
| Few per semester | 5.3 | 18.7 | 23.1 | 13.7 | 27.5 | 21.8 | 4.7 | 9.9 | 9.0 |
| Several per semester | 0.6 | 3.3 | 14.1 | 3.7 | 17.6 | 33.3 | 1.2 | 5.5 | 14.1 |
| Most weeks | 0.6 | 2.2 | 5.1 | 1.3 | 5.5 | 19.2 | 0.6 | 1.1 | 3.9 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N | 322 | 91 | 78 | 321 | 91 | 78 | 322 | 91 | 78 |

Note: The response options for all questions were "Never," "Once or twice a year," "A few times a year," "Several times per semester," and "Most weeks, or more often than that."

73

FSU001884

Table E13: Stereotypes of Liberal and Conservative Students at UNC

| | Self-identified liberals' perception of conservative students | Self-identified conservatives' perception of liberal students |
|---|---|---|
| *Positive Traits* | | |
| Well-educated | 50.2% | 71.8% |
| Open-minded | 7.8 | 28.2 |
| Well-informed | 27.4 | 48.7 |
| Tolerant | 11.3 | 29.5 |
| Intelligent | 53.9 | 75.6 |
| *Negative traits* | | |
| Racist | 69.5% | 29.5% |
| Sexist | 67.3 | 29.5 |
| Immoral | 37.8 | 28.2 |
| Condescending | 70.7 | 74.4 |
| Follow others without thinking | 71.6 | 66.7 |

Note: Cells entries indicate the percentage of respondents saying that the trait describes a group moderately well, very well, or extremely well.

74

FSU001885

Table E14: How Often Does Respondent Hear Inappropriate
Comments?, by Respondent Ideological Self-identification

| | Ideological Self-Identification | | |
| --- | --- | --- | --- |
| | Liberal | Moderate | Conservative |
| Women | 33.1% | 14.4% | 9.0% |
| Men | 25.1 | 37.8 | 51.3 |
| Whites | 23.4 | 41.6 | 52.6 |
| African Americans | 21.6 | 9.1 | 6.4 |
| Hispanics or Latinos | 12.5 | 2.2 | 5.1 |
| Asians | 10.6 | 13.3 | 9.0 |
| Students born outside the US | 9.0 | 8.8 | 3.8 |
| Christians | 21.4 | 35.6 | 33.3 |
| Muslims | 12.1 | 10.0 | 10.3 |
| LGBT individuals | 21.1 | 14.3 | 10.3 |
| Political liberals | 19.7 | 7.7 | 15.6 |
| Political conservatives | 60.6 | 64.4 | 76.9 |
| N | 322 | 91 | 78 |

Note: Cell entries represent the proportion of students saying that they hear disrespectful, inappropriate, or offensive comments about the listed group several times per semester, or more often than that. The number of respondents for a particular item varies slightly due to item nonresponse.

FSU001886

Table E15: Broader Orientations Toward Political Disagreement, by Respondent Ideological Self-identification

| | Self-identified liberals | | Self-identified conservatives | |
|---|---|---|---|---|
| | Disagree | Agree | Disagree | Agree |
| *Social distance* | | | | |
| Would have outgroup member as a friend | 21.1% | 63.7% | 5.1% | 87.2% |
| Would have outgroup member as a roommate | 36.0 | 51.2 | 5.1 | 80.8 |
| Enjoys taking classes with students from the outgroup | 20.9 | 51.1 | 15.4 | 65.4 |
| Would date member of the outgroup | 61.8 | 24.8 | 23.1 | 56.4 |
| | | | | |
| *Community inclusion* | | | | |
| Students from outgroup are important to campus community | 6.5 | 73.9 | 2.6 | 84.6 |
| Faculty from outgroup are important to campus community | 10.6 | 64.9 | 3.9 | 80.8 |
| | Would be better without | Would be worse without | Would be better without | Would be worse without |
| UNC would be better without students from the outgroup | 19.3 | 46.7 | 12.8 | 60.3 |

Note: For all items except the final one, response options were, "Strongly disagree," "Somewhat disagree," "Neither agree nor disagree," "Somewhat agree," and "Strongly agree." For the final item, the response options were "UNC would be [much better / a little better / neither better nor worse / a little worse / much worse] without [liberals / conservatives]." Percentages within groups do not tally to 100% because the neutral category is omitted.

FSU001887

Table E17: Students' Responses to Objectionable Political View

| | Ideological Self-Identification | | |
| --- | --- | --- | --- |
| | Liberal | Moderate | Conservative |
| Write an opinion piece explaining the reasons for your disagreement and submit it to a campus publication. | 86.6% | 71.4% | 85.9% |
| Ask a challenging question of a speaker who endorsed the idea. | 88.1 | 73.6 | 82.1 |
| Create an obstruction, such that a campus speaker endorsing this idea could not address an audience. | 15.3 | 3.3 | 2.6 |
| Form a picket line to block students from entering an event where a speaker will argue for this idea. | 17.1 | 3.3 | 0.0 |
| Write graffiti on the dorm room of a student who endorses this idea. | 1.2 | 2.2 | 0.0 |
| Write graffiti on the office of a faculty member who endorses this idea. | 1.9 | 0.0 | 0.0 |
| Yell profanity at a student who endorses this idea as he or she walks across campus. | 2.2 | 0.0 | 0.0 |
| Shove a student who endorses this idea when they are speaking about it outside on campus. | 1.3 | 1.1 | 0.0 |
| N | 322 | 91 | 78 |

Note: Cell entries represent the proportion of respondents saying that it would be "appropriate" or "entirely appropriate" to take the specified action. The precise N varies slightly due to item nonresponse.

FSU001888

FSU001889

Table E18: Students' View of Campus Opportunities, by Respondent Ideological Self-identification

| | Self-identified liberals | | | Self-identified moderates | | | Self-identified conservatives | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Too few | About right | Too many | Too few | About right | Too many | Too few | About right | Too many |
| Hear liberal perspectives | 21.5 | 71.7 | 6.9 | 11.0 | 63.7 | 25.3 | 9.0 | 35.9 | 55.1 |
| Hear conservative perspectives | 38.9 | 46.7 | 14.3 | 60.4 | 38.5 | 1.1 | 88.5 | 11.5 | 0.0 |
| Engage with disagreement | 60.6 | 51.7 | 8.0 | 59.3 | 40.7 | 0.0 | 70.5 | 26.9 | 2.6 |

Note: Response options were, "Far too few opportunities," "Somewhat too few opportunities," "About the right number of opportunities," "Somewhat too many opportunities," and "Far too many opportunities." For simplicity, the table above collapses together students who said there were "somewhat" and "far" too many/few opportunities.

# EXHIBIT R

PROTOCOL TITLE:

## INSTRUCTIONS:

- *Use "TEMPLATE SBS PROTOCOL (HRP-503(SBS))" to prepare a document with the information from the following sections.*
- *Depending on the nature of your study, some sections may not be applicable to your research. If so mark as "NA". For example, research involving a retrospective chart review may have many sections with "NA."  For subsections, like 1.x or 8.x, you can delete it if it's not applicable.*
- *When you write a protocol, keep an electronic copy. You will need to modify this copy when making changes.*
- *As you are writing the protocol, remove all instructions in italics so that they are not contained in the final version of your protocol.*
- *Omit starred (*) items if this is the activation of a protocol at a new site or sites that will be overseen by a principal investigator who will take separate and full responsibility for that site or those sites. Complete by describing information specific to the site(s). Do not repeat information in the approved protocol that applies to all site(s).*

## PROTOCOL TITLE:

*The State of Florida's State University Systems Intellectual Freedom and Viewpoint Diversity Survey*

## PRINCIPAL INVESTIGATOR:

Tim Chapin
*College of Social Science and Public Policy*
*850-644-2839*
*tchapin@fsu.edu*

## VERSION NUMBER/DATE:

*Version 1/2/1/2022*

## REVISION HISTORY

| Revision # | Version Date | Summary of Changes | Consent Change? |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Revised: January 7, 2021

FSU001967

PROTOCOL TITLE:

# Table of Contents

1.0    Study Summary ...................................................................................3
2.0    Objectives* ........................................................................................4
3.0    Background* .......................................................................................4
4.0    Study Endpoints* ...............................................................................4
5.0    Study Intervention/Investigational Agent ..........................................4
6.0    Procedures Involved* .........................................................................5
7.0    Data and Specimen Banking* .............................................................5
8.0    Sharing of Results with Subjects* ......................................................6
9.0    Study Timelines* ................................................................................6
10.0   Inclusion and Exclusion Criteria* ......................................................6
11.0   Vulnerable Populations* .....................................................................6
12.0   Local Number of Subjects ..................................................................7
13.0   Recruitment Methods ..........................................................................7
14.0   Withdrawal of Subjects* .....................................................................7
15.0   Risks to Subjects* ...............................................................................7
16.0   Potential Benefits to Subjects* ...........................................................8
17.0   Data Management* and Confidentiality ..............................................8
18.0   Provisions to Monitor the Data to Ensure the Safety of Subjects* .......8
19.0   Provisions to Protect the Privacy Interests of Subjects .......................9
20.0   Compensation for Research-Related Injury.........................................9
21.0   Economic Burden to Subjects..............................................................9
22.0   Consent Process ..................................................................................9
23.0   Process to Document Consent in Writing..........................................12
24.0   Setting ...............................................................................................13
25.0   Resources Available ..........................................................................13
26.0   Multi-Site Research* .........................................................................13

Revised: January 7, 2021

FSU001968

PROTOCOL TITLE:

## 1.0    Study Summary

| Study Title | *The State of Florida's State University Systems Intellectual Freedom and Viewpoint Diversity Survey* |
|---|---|
| Study Design | Public Opinion Survey |
| Primary Objective | Fulfill Legislative mandate |
| Secondary Objective(s) | Contribute to research on Intellectual Freedom and Viewpoint Diversity |
| Research Intervention(s) | |
| Study Population | Population of SUS Students, Faculty, and Staff |
| Sample Size | ~340,000 students; ~19,000 faculty; ~50,000 staff |
| Study Duration for individual participants | < 5 minutes |
| Study Specific Abbreviations/ Definitions | |

Revised: January 7, 2021

FSU001969

PROTOCOL TITLE:

## 2.0 Objectives*

2.1 *Describe the purpose, specific aims, or objectives.*

**The primary objective of this study is to implement a Statewide University System survey on intellectual freedom and viewpoint diversity to all students, faculty and staff to assess whether members of the university community feel free to express their beliefs and viewpoints on campus and in the classroom.**

**This study is in response to HB233 passed by the Florida legislature in 2021 which requires the FLBOG to annually conduct such a survey.**

**The secondary objective is to contribute to a growing literature on viewpoint diversity on college campuses.**

2.2 *State the hypotheses to be tested.*

**The hypotheses to be tested include the relationships between demographic and political ideology and the belief in viewpoint diversity.**

## 3.0 Background*

3.1 *Describe the relevant prior experience and gaps in current knowledge.*

**University education and research requires an open learning environment that allows for the free expression of ideas and debate. Over the last 7 years, there has been increasing concerns that university instructors, who are, on average, very liberal, instill and perhaps require their student to provide a particular political viewpoint. As part of these concerns, there has been a growing research interesting in empirically assessing these claims. For example, Heterodox Academy funds an annual national student survey on viewpoint diversity and the University of North Carolina did an extensive study on this question with student surveys and focus groups.[i]**

3.2 *Describe any relevant preliminary data.*

**We have no preliminary data.**

3.3 *Provide the scientific or scholarly background for, rationale for, and significance of the research based on the existing literature and how will it add to existing knowledge.*

**Other organizations and universities have already taken steps to provide useful empirical data on these questions which we have informed surveys for this study. The Florida study is expanding the scope of the investigation to include both staff and faculty surveys in addition to student surveys and will provide detailed information**

Revised: January 7, 2021

FSU001970

PROTOCOL TITLE:

*on the state of viewpoint diversity in the Statewide University System.*

## 4.0   Study Endpoints*

4.1   *Describe the primary and secondary study endpoints.*

**The endpoints for this study are the survey used for each group to assess viewpoint diversity.**

## 5.0   Study Intervention

1.1   Description: *Describe the study intervention that is being evaluated.*

**This is not an experimental study it is descriptive. We are trying to understand the relationships and correlations between demographic and political variables and viewpoint diversity.**

## 6.0   Procedures Involved*

6.1   *Describe and explain the study design.*

**We will implement an opinion survey to the population of students, staff, and faculty in the State University System about their attitudes toward and experience with campus viewpoint diversity.**

6.2   *Provide a description of all research procedures being performed and when they are performed, including procedures being performed to monitor subjects for safety or minimize risks.*

**Sample members will be sent an email at their university email address requesting their voluntary participation is our study/survey.  No one will be required to take the survey and only one email request will be made.**

**Students will see a screen that explains the study and their participation. If they agree to participate they will click on a Qualtrics link and be taken to the survey.**

**This is a minimal risk study. Sample members can, of course, report to the FSU IRB if they have concerns or questions and the PIs will also be available to answer any questions or concerns.**

6.3   *Describe:*

- *Procedures performed to lessen the probability or magnitude of risks.*

  **We describe and explain the study to the sample members before they consent to the survey. Surveys are ubiquitous in society and in this case the surveys are not asking sensitive**

Revised: January 7, 2021

FSU001971

PROTOCOL TITLE:

> *questions and the survey is completely deidentified so individual respondents are protected.*

- *The source records that will be used to collect data about subjects. (Attach all surveys, scripts, and data collection forms.)*

6.4 *What data will be collected during the study and how that data will be obtained.*

> **Individual opinions will be collected through a Qualtrics survey.**

6.5 *If there are plans for long-term follow-up (once all research related procedures are complete), what data will be collected during this period.*

> **There are no plans for a follow up per se with these respondents, but the legislation requires such a survey be completed every year.**

## 7.0 Data and Specimen Banking*

7.1 *If data or specimens will be banked for future use, describe where the specimens will be stored, how long they will be stored, how the specimens will be accessed, and who will have access to the specimens.*

> **The data will be stored in a secure location with password protected computers. Only the researchers and their student team associated with this project will have access to the individual data.**

7.2 *List the data to be stored or associated with each specimen.* **NA**

7.3 *Describe the procedures to release data or specimens, including: the process to request a release, approvals required for release, who can obtain data or specimens, and the data to be provided with specimens.*

> **Data will only be released in aggregate form to ensure the safety and protection of respondent data.**

## 8.0 Sharing of Results with Subjects*

8.1 *Describe whether results (study results or individual subject results, such as results of investigational diagnostic tests, genetic tests, or incidental findings) will be shared with subjects or others (e.g., the subject's primary care physicians) and if so, describe how the results will be shared.*

> **The report from this project will be made public.**

## 9.0 Study Timelines*

9.1 *Describe:*

Revised: January 7, 2021

FSU001972

PROTOCOL TITLE:

- *The duration of an individual subject's participation in the study.*

   **Less than 5 minutes**

- *The duration anticipated to enroll all study subjects.*

   **The email sample will be provided from each SUS institution to the FLOBOG and all emails will be sent a link to participate.**

## 10.0   Subject Population*

*10.1  Describe generally the individuals that will be included in your study.*

**All students, faculty, and staff within the SUS.**

*10.2  Describe any subject populations that will be specifically targeted, or specifically excluded from your sample.*

*10.3  Indicate specifically whether you will include or exclude any of the following special populations: (You may not include members of these populations as subjects in your research unless you include them in the description of your subject population.)*

**No special or sensitive populations are included within our study.**

- **Adults unable to consent**
- **Individuals who are not yet adults (infants, children, teenagers)**
- **Pregnant women**
- **Prisoners**

## 11.0   Vulnerable Populations*

- *NA*

## 12.0   Local Number of Subjects

*12.1  Indicate the total number of subjects to be accrued locally, if known.*

**There are approximately 340,000 students, 50,000 staff, and 19,000 faculty who are members of this population.**

## 13.0   Recruitment Methods

*13.1  Describe when, where, and how potential subjects will be recruited. If recruitment will involve a non-FSU site, describe whether site approval for recruitment is required, and attach documentation of site approval.*

Revised: January 7, 2021

FSU001973

PROTOCOL TITLE:

> *All students registered for classes at any SUS will be invited through their university email to participate in the student survey. Similarly, all staff and faculty at SUS institutions will be invited through their university email to participate in the staff and faculty survey.*

13.2  *Describe the source of subjects.*

> *Emails provided by all SUS institutions to the principal investigators by the FLBOG.*

13.3  *Describe the methods that will be used to identify potential subjects. Student sample members will be identified as registered students at their local university and their emails will be provided to us. They will be identified as staff and faculty at their local university and their emails will be provided to us.*

13.4  *Describe materials that will be used to recruit subjects. They will receive an email with instructions to go to a deidentified link to answer the survey questions.*

13.5  *Describe as applicable whether and how subjects will be paid, earn course or other credits, reimbursed or provided with any financial or other incentive, token or gift for taking part in the research. Include a description and schedule of the total amount or value as well as the timing of any payments, credits, reimbursement or other incentive, token or gift. Indicate how if at all any amount is pro-rated for research visit or activity completion, and whether and how subjects' refusal to answer any question or subjects' withdrawal from or discontinuing taking part in the study or any study activity will reduce or preclude subjects from earning part or all of such any payment, credit, reimbursement or other incentive, token or gift.*

> *Also describe the proposed method (how, by whom, form etc.) of payment/disbursement. While payment should not be contingent upon completion of the entire study, a proportion or progressive partial payment as an incentive for completion of the study is acceptable.*

> *Refer to this FSU link regarding use of gift cards: https://procurement.fsu.edu/vendors/NationalGiftCard.*

> *Refer to this FSU Controller link regarding use of cash payments for human subject incentive payments: https://controller.vpfa.fsu.edu/services/accounts-payable/unencumbered-payments/employee-cash-advance-requests.*

> *NA*

13.6  *Describe as applicable whether and how student subjects will be provided with course or other academic credit for taking part in the study. Include a description about whether student subjects' refusal*

Revised: January 7, 2021

FSU001974

PROTOCOL TITLE:

> *to answer any question or withdrawal from or discontinuing taking part in the study or any study activity will reduce or preclude student subjects from earning part or all of such credit.*
>
> *NA*

## 14.0   Withdrawal of Subjects*

**14.1**  *Describe anticipated circumstances under which subjects will be withdrawn from the research without their consent.*
**Respondents can choose to participate by clicking on the link or not. They are not required to participate and participation is voluntary. Once a respondent completes a survey their survey will not be able to be withdrawn because it is not identifiable to us.**

*14.2*  *Describe procedures that will be followed when subjects withdraw from the research, including partial withdrawal from procedures with continued data collection.*
**See above.**

## 15.0   Risks to Subjects*

*15.1*  *List the reasonably foreseeable risks, discomforts, hazards, or inconveniences to the subjects related the subjects' participation in the research. Include as may be useful for the IRB's consideration, a description of the probability, magnitude, duration, and reversibility of the risks. Consider physical, psychological, social, legal, and economic risks. For each of these risks, describe in detail how the risks will be minimized.*

*If information about the study's actual purpose will in any way be withheld from study subjects, you are required to describe here that you will: (a) as part of the consent process provide subjects with a statement to the effect that subjects may not be made aware of some features about the study, such as its exact purpose, study questions and materials, or subjects' responses that you would like to collect, and that subjects will be provided with additional information about the study at the end of their participation or at any time they withdraw, (b) debrief subjects at the end of their participation or at any time they withdraw, and (c) provide the IRB with a copy of all materials that will be used to debrief subjects.*

**There are very minimal inconveniences for the respondents. They can choose to participate or not, and the questions are not of a sensitive nature that would create discomfort or hazards.**

*15.2*  *If applicable, indicate which procedures may have risks to the subjects that are currently unforeseeable.*

*15.3*  *If applicable, indicate which procedures may have risks to an embryo or fetus should the subject be or become pregnant.*

Revised: January 7, 2021

FSU001975

PROTOCOL TITLE:

*15.4  If applicable, describe risks to others who are not subjects.*

## 16.0   Potential Benefits to Subjects*

*16.1  Describe the potential benefits that individual subjects may experience from taking part in the research. Include as may be useful for the IRB's consideration, the probability, magnitude, and duration of the potential benefits.*

**Students may benefit from communicating their opinions on these questions, which are meant to inform and improve their education. Faculty and staff may benefit from communicating their opinions on these questions, which are meant to inform and improve the workplace.**

*16.2  Indicate if there is no direct benefit. Do not include benefits to society or others. Also, payment to research subjects for participation in studies is not considered a benefit so do not list payment to research subjects in this section; if a recruitment incentive will be offered, described this in section 13 under Recruitment Methods.*

## 17.0   Data Management* and Confidentiality

*17.1  Describe the data analysis plan, including any statistical procedures or power analysis.*

**The analysis will focus on frequencies, crosstabs, and possibly regression to identify statistically significant variables.**

*17.2  Describe the steps that will be taken to secure the data (e.g., training, authorization of access, password protection, encryption, physical controls, certificates of confidentiality, and separation of identifiers and data) during storage, use, and transmission.*

**Team members have completed CITI training and work on secure password protected computers. The data are completely deidentified upon receipt and therefore we have no ability to identify respondents. All data will be aggregated for purposed of presentation and any small cell sizes will be combined with other categories if they could identify a respondent.**

*17.3  Describe any procedures that will be used for quality control of collected data.*

**Data will be cleaned for nonresponse and surveys with no completes will be deleted.**

*17.4  Describe how data or specimens will be handled study-wide:*

- *What information will be included in that data or associated with the specimens?*
- *Where and how data or specimens will be stored?*

Revised: January 7, 2021

FSU001976

PROTOCOL TITLE:

- *How long the data or specimens will be stored?*
- *Who will have access to the data or specimens?*
- *Who is responsible for receipt or transmission of the data or specimens?*
- *How data or specimens will be transported?*

***Data will be collected through a secure Qualtrics survey site and be downloaded to directly to team member computers for analysis. The data will be stored and secured on these computers and may be accessed for comparison with future studies.***

## 18.0   Provisions to Monitor the Data to Ensure the Safety of Subjects*

*This section is required when research involves more than Minimal Risk to subjects.*

*18.1  Describe:*

- *The plan to periodically evaluate the data collected regarding both harms and benefits to determine whether subjects remain safe.  The plan might include establishing a data monitoring committee and a plan for reporting data monitoring committee findings to the IRB and the sponsor.*
- *What data are reviewed, including safety data, untoward events, and efficacy data.*
- *How the safety information will be collected (e.g., with case report forms, at study visits, by telephone calls with participants).*
- *The frequency of data collection, including when safety data collection starts.*
- *Who will review the data.*
- *The frequency or periodicity of review of cumulative data.*
- *The statistical tests for analyzing the safety data to determine whether harm is occurring.*
- *Any conditions that trigger an immediate suspension of the research.*

***Respondents are protected by the deidentified nature of their responses and aggregate analysis of the data will add additional protections.***

## 19.0   Provisions to Protect the Privacy Interests of Subjects

*19.1  Describe the steps that will be taken to protect subjects' privacy interests.  "Privacy interest" refers to a person's desire to place limits on whom they interact or whom they provide personal information.*

Revised: January 7, 2021

FSU001977

PROTOCOL TITLE:

19.2 *Describe what steps you will take to make the subjects feel at ease with the research situation in terms of the questions being asked and the procedures being performed. "At ease" does not refer to physical discomfort, but the sense of intrusiveness a subject might experience in response to questions, examinations, and procedures.*

19.3 *Indicate how the research team is permitted to access any sources of information about the subjects.*

**The only source of information the researchers have is the email and the respondent data, which are kept separate and are never linked.**

## 20.0   Compensation for Research-Related Injury

20.1 *If the research involves more than Minimal Risk to subjects, describe the available compensation in the event of research related injury.*

20.2 *Provide a copy of contract language, if any, relevant to compensation for research-related injury.*

*NA*

## 21.0   Economic Burden to Subjects

21.1 *Describe any costs that subjects may be responsible for because of participation in the research.*

*NA*

## 22.0   Consent Process

22.1 *Indicate whether you will you be obtaining consent, and if so describe:*

- *Where will the consent process take place.*
- *Any process to ensure ongoing consent.*
- *Whether you will be following "SOP: Informed Consent Process for Research (HRP-090)." If not, describe:*
  - *The role of the individuals listed in the application as being involved in the consent process.*
  - *The time that will be devoted to the consent discussion.*
  - *Steps that will be taken to minimize the possibility of coercion or undue influence.*
  - *Steps that will be taken to ensure the subjects' understanding.*

**Consent will be obtained on the first page of the survey, before any questions have been administered, through use of the following language: "By completing this survey, you are consenting to participate in this study." This is a very common approach to obtaining consent for online surveys such as this.**

Revised: January 7, 2021

FSU001978

PROTOCOL TITLE:

### *Non-English Speaking Subjects*

- *Indicate what language(s) other than English are understood by prospective subjects or representatives.*
- *If subjects who do not speak English will be enrolled, describe the process to ensure that the oral and written information provided to those subjects will be in that language. Indicate the language that will be used by those obtaining consent.*

### *Waiver or Alteration of Consent Process (consent will not be obtained, required information will not be disclosed, or the research involves deception)*

- *Review the "CHECKLIST: Waiver or Alteration of Consent Process (HRP-410)" to ensure you have provided sufficient information for the IRB to make these determinations.*

### *The survey will state that subjects who are not yet adults (under 18 due to early admission to a university) are not eligible for participation in the survey.*

- *Describe the criteria that will be used to determine whether a prospective subject has not attained the legal age for consent to treatments or procedures involved in the research under the applicable law of the jurisdiction in which the research will be conducted. (E.g., individuals under the age of 18 years.)*
  - *For research conducted in the state, review "SOP: Legally Authorized Representatives, Children, and Guardians (HRP-013)" to be aware of which individuals in the state meet the definition of "children."*
  - *For research conducted outside of the state, provide information that describes which persons have not attained the legal age for consent to treatments or procedures involved the research, under the applicable law of the jurisdiction in which research will be conducted. One method of obtaining this information is to have a legal counsel or authority review your protocol along the definition of "children" in "SOP: Legally Authorized Representatives, Children, and Guardians (HRP-013)."*
- *Describe whether parental permission will be obtained from:*
  - *Both parents unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only*

Revised: January 7, 2021

FSU001979

PROTOCOL TITLE:

> *one parent has legal responsibility for the care and*
> *custody of the child.*
> o *One parent even if the other parent is alive, known,*
> *competent, reasonably available, and shares legal*
> *responsibility for the care and custody of the child.*

- *Describe whether permission will be obtained from individuals*
  *other than parents, and if so, who will be allowed to provide*
  *permission. Describe the process used to determine these*
  *individuals' authority to consent to each child's general*
  *medical care.*
- *Indicate whether assent will be obtained from all, some, or*
  *none of the children. If assent will be obtained from some*
  *children, indicate which children will be required to assent.*
- *When assent of children is obtained describe whether and how*
  *it will be documented.*

### *Cognitively Impaired Adults*

- *Describe the process to determine whether an individual is*
  *capable of consent. The IRB allows the person obtaining assent*
  *to document assent on the consent document and does not*
  *routinely require assent documents and does not routinely*
  *require children to sign assent documents.*

### *Adults Unable to Consent*

- *List the individuals from whom permission will be obtained in*
  *order of priority. (E.g., durable power of attorney for health*
  *care, court appointed guardian for health care decisions,*
  *spouse, and adult child.)*
  - o *For research conducted in the state, review "SOP:*
    *Legally Authorized Representatives, Children, and*
    *Guardians (HRP-013)" to be aware of which individuals*
    *in the state meet the definition of "legally authorized*
    *representative."*
  - o *For research conducted outside of the state, provide*
    *information that describes which individuals are*
    *authorized under applicable law to consent on behalf of a*
    *prospective subject to their participation in the*
    *procedure(s) involved in this research. One method of*
    *obtaining this information is to have a legal counsel or*
    *authority review your protocol along the definition of*
    *"legally authorized representative" in "SOP: Legally*
    *Authorized Representatives, Children, and Guardians*
    *(HRP-013)."*

Revised: January 7, 2021

FSU001980

PROTOCOL TITLE:

- *Describe the process for assent of the subjects. Indicate whether:*
  - o *Assent will be required of all, some, or none of the subjects. If some, indicated, which subjects will be required to assent and which will not.*
  - o *If assent will not be obtained from some or all subjects, an explanation of why not.*
  - o *Describe whether assent of the subjects will be documented and the process to document assent. The IRB allows the person obtaining assent to document assent on the consent document and does not routinely require assent documents and does not routinely require subjects to sign assent documents.*

### *Adults Unable to Consent*

- *For HUD uses provide a description of how the patient will be informed of the potential risks and benefits of the HUD and any procedures associated with its use.*

## 23.0   Process to Document Consent in Writing

*23.1   Describe whether you will be following "SOP: Written Documentation of Consent (HRP-091)." If not, describe whether and how consent of the subject will be documented in writing.*

*23.2   If your research presents no more than minimal risk of harm to subjects and involves no procedures for which written documentation of consent is normally required outside of the research context, the IRB will generally waive the requirement to obtain written documentation of consent.*

*23.3   (If you will document consent in writing, attach a consent document. If you will obtain consent, but not document consent in writing, attach a consent script. Review "CHECKLIST: Waiver of Written Documentation of Consent (HRP-411)" to ensure that you have provided sufficient information. You may use "TEMPLATE CONSENT DOCUMENT (HRP-502)"to create the consent document or script.)*

## 24.0   Setting

*24.1   Describe the sites or locations where your research team will conduct the research.*

- *Identify where your research team will identify and recruit potential subjects.*

### *Emails provided from SUS.*

Revised: January 7, 2021

FSU001981

PROTOCOL TITLE:

- *Identify where research procedures will be performed.*

  **Offices at FSU.**

- *Describe the composition and involvement of any community advisory board.* **NONE**
- *For research conducted outside of the organization and its affiliates describe:*
  - *Site-specific regulations or customs affecting the research for research outside the organization.*
  - *Local scientific and ethical review structure outside the organization.*

- *Describe non-FSU site approval to conduct research at any non-FSU site or location, and attach approval documentation. If no such approval was required, so state and be prepared to provide documentation. Studies involving non-FSU sites, institutions or agencies, such as TMH, CRMC, FAMU, state agencies and other organizations, may require those sites' IRB, research review or other approvals. Before submitting your studies for FSU IRB review, you must contact such sites to ascertain their review requirements and comply accordingly. The FSU IRB may require documentation of such site contact. Collaborations involving TMH are subject to specific requirements; click* here *for more information.*

## 25.0   Resources Available

*25.1   Describe the resources available to conduct the research: For example, as appropriate:*

- *Justify the feasibility of recruiting the required number of suitable subjects within the agreed recruitment period. For example, how many potential subjects do you have access to? What percentage of those potential subjects do you need to recruit?*

  **The state statute requires we survey the population of students, faculty, and staff within the state university system.**

- *Describe the time that you will devote to conducting and completing the research.*
  **Oversight of the survey and its implementation. Research time conducting analysis and writing time to write the report.**
- *Describe your facilities.*
  **The Department of Political Science has a computer lab where students may work. Otherwise they are working in university offices.**

Revised: January 7, 2021

FSU001982

PROTOCOL TITLE:

- *Describe the availability of medical or psychological resources that subjects might need as a result of an anticipated consequences of the human research.*
  ***NA***

- *Describe your process to ensure that all persons assisting with the research are adequately informed about the protocol, the research procedures, and their duties and functions.*
  ***Our team has regular meetings to ensure knowledge with the research design.***

---

[i] See: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/viewer.html?pdfurl=https%3A%2F%2Ffecdsurveyreport.web.unc.edu%2Fwp-content%2Fuploads%2Fsites%2F22160%2F2020%2F02%2FUNC-Free-Expression-Report.pdf&clen=1259266&chunk=true & https://heterodoxacademy.org/campus-expression-survey/.

Revised: January 7, 2021

FSU001983

# EXHIBIT S

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
**Student Survey**

<u>**Opening Message for Survey**</u>

In Spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

The goal of this anonymous survey is to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a student there. You will be asked a number of questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 10 minutes to complete.

Responses will be analyzed for the entire institution and findings will be reported by the FLBOG to the State Legislature as required. Only grouped responses will be reported; any data or results that might compromise a respondent's identity will not be published.

<u>**Intellectual Freedom and Viewpoint Diversity on My Campus**</u>

On my campus, panel discussions and presentations on social and political issues typically seem one-sided.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR1]:** Hi Tim, Let me reiterate the concerns that I have already articulated about this survey. As decades of survey research have shown, good surveys have the potential to illuminate critical issues regarding a workplace or community. The COACHE survey is a great example in this regard. A bad survey can create confusion, problems and sow discord. While I do not know what the implications of this survey will be, I do know that this is not a good survey. The dependent variable (intellectual freedom and viewpoint diversity) is not defined at all and several relevant independent variables are missing.

The problems that I outlined previously:

The Terminology used is overly political and will likely prime political responses. Terms such as "intolerant" and "hostile" should not be included in a survey that is intended to explore what the SUS does well and where it needs to improve. It is particularly concerning that these loaded terms were not defined for respondents.

The survey lacks specificity in ways that are confusing and make the survey read as a political tool rather than a legitimate effort to improve the SUS system. For example, I'm not sure why we would ask faculty if readings only present one side of a controversial issue when disciplines

**Commented [DR2]:** The phrase "intellectual freedom and viewpoint diversity" require definition. I recommend dropping the phrase entirely since it is political and can only be defined in political ways. Specifically, this phraseology suggests that faculty and students should evaluate a college/university according to the "air time" progressive and conservative talking points get on campus. It assumes that the equal exposure to the ideas associated with the two dominant political parties is the sine qua non of educational quality.

The use of the phrase "intellectual diversity" is better since it can be defined and contextualized. We know, for example, that intellectual diversity is not about evaluating the theoretical debates and developments associated with a particular discipline. Intellectual diversity exists when campuses provide a place where faculty and students ask questions and have the ability to approach a problem, whatever its nature, from a variety of perspectives. Debra

**Commented [DR3]:** This is a political question, not a survey question. What kind of panel discussion and presentations? Those sponsored by RSO's? What is the temporal context here? It seems like we would have respondents tell us the extent to which they pay attention to what's happening on campus, where they get information regarding panels/presentations from and provide a clear sense of what kinds of panels/discussions are the reference point. What is meant by "one-sided?" If they survey is asking respondents to think about presentations inside a department or center, how care respondents supposed to evaluate this?

FSU000121

On my campus, courses have readings which present only one side of a controversial issue.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR4]:** Again, this is a political question. An appropriate survey question would ask about the mix of readings (academic to non-academic) read in class, and, MORE IMPORTANTLY, are learners given guidance disciplinary frameworks – meaning they are told how someone from "X" discipline would read the material or what they would focus on to understand, in this case, a controversial issue.

On my campus, courses present social and political issues in an unfair and one-sided manner.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR5]:** Same comment. What is meant by unfair and one-sided when it comes to course material? A legitimate survey would probe to assess whether students are learning disciplinary appropriate perspectives and the makeup of their coursework, which is also key to fostering intellectual diversity and students ready to succeed in the workforce.

On my campus, professors are intolerant of certain political and social viewpoints.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR6]:** What is meant by intolerant? As noted above, one assumption undergirding this survey is that higher education is about political parties and their viewpoints. Certainly, there are students who get politically involved, something that isn't asked about on the survey, but this not a useful question. Useful questions, in this case, would ask about respective disagreement in the classroom and the extent to which they are happening – not to mention ask students about their own participation in practices that foster intellectual diversity.

On my campus, there are courses in which the professor creates an environment that is hostile to certain political or social views.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

**Commented [DR7]:** This is a confusing question. What is meant by "hostile/" Is something hostile because a student finds it personally or intellectually challenging? If their politics doesn't neatly map onto the course material? If so, that seems extraordinarily problematic since secondary education is supposed to be challenging and our students need to be challenged so that they can be competitive in the rapidly changing global economy.

**Freedom of Expression on My Campus**

Think about being at your school in a class that was discussing a NON-CONTROVERSIAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about RACE. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial POLITICAL issue. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about RELIGION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

**Commented [DR8]:** This entire section baffles me since it is unclear what "freedom of expression" on campus has to do with a random class that a respondent is being asked to think about. Classrooms and campus are not the same spaces. Classrooms are places where students learn more about a topic from a specific disciplinary perspective. Campus provides the environment where students get involved in groups and clubs, explore internship and research opportunities, and attend talks and panels sponsored by RSOs as well as other entities on campus. If the goal of the survey is to grind a political axe, it will likely be a success on this front. If the survey is a legitimate assessment of the SUS, it should make these distinctions and ask questions about campus life and, in this case, student involvement in it.

Think about being at your school in a class that was discussing a controversial issue about GENDER. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

Think about being at your school in a class that was discussing a controversial issue about SEXUAL ORIENTATION. How comfortable or reluctant would you feel about speaking up and giving your views on this topic?

- I would be very comfortable giving my views
- I would be somewhat comfortable giving my views
- Neutral
- I would be somewhat reluctant giving my views
- I would be very reluctant giving my views

**Your Political Views**

Generally speaking, you would say that you think of yourself as a...

- Democrat
- Independent
- Republican

On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?

1. Extremely liberal
2. Somewhat liberal
3. Moderate leaning liberal
4. Moderate
5. Moderate leaning conservative
6. Somewhat conservative
7. Extremely conservative

I believe that through hard work, everybody can succeed in American society.

- Strongly Agree

**Commented [DR9]:** What purpose do these questions serve beyond probing the relative conservativeness or progressiveness of a student? Does it contribute the exploration of the dependent variable?

- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that racial discrimination is no longer a major problem in America.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that undocumented immigrants should be denied access to public education.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that that universities have the right to ban extreme speakers from campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that dissent is a critical component of the political process.

- Strongly Agree
- Somewhat Agree
- Neutral

- Somewhat Disagree
- Strongly Disagree
- Don't Know

I believe that colleges should prohibit racist/sexist speech on campus.

- Strongly Agree
- Somewhat Agree
- Neutral
- Somewhat Disagree
- Strongly Disagree
- Don't Know

## Demographic Information

Which of the following describes your race? You can select as many as apply.

> **Commented [DR10]:** So much relevant information missing such as year in school, number of courses taken, major, level of involvement on campus (e.g., number of RSOs to which they belong) and so on.

- American Indian or Alaska Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female/Woman
- Male/Man
- Transgender Female/Woman
- Transgender Male/Man
- Gender Variant/Non-conforming
- Prefer Not to Answer

What is your sexual orientation?

- Heterosexual/Straight
- Asexual
- Bisexual
- Gay
- Lesbian
- Pansexual
- Queer
- Not Listed Above
- Prefer Not to Answer

What is your primary religious affiliation, if any?

- Evangelical Protestant
- Mainline Protestant
- Historically Black Protestant
- Catholic
- Latter Day Saints / Mormon
- Orthodox Christian
- Jehovah's Witness
- Other Christian
- Unitarian / Universalist
- Jewish
- Muslim
- Buddhist
- Hindu
- Other religion
- Atheist
- Agnostic
- No religious affiliation / None
- Prefer Not to Answer

FSU000127

# EXHIBIT T

# I Think My Professor is a Democrat: Considering Whether Students Recognize and React to Faculty Politics

**Matthew Woessner,** *Penn State University, Harrisburg*

**April Kelly-Woessner,** *Elizabethtown College*

**ABSTRACT** Notwithstanding political science professors' concerted efforts to remain politically neutral in the classroom, we find evidence that students are able to successfully identify the partisan loyalties of their professors. Furthermore, we find that there is a tendency for students to drift toward the Democratic Party over the course of the semester, yet the direction of the shift appears to be unrelated to either the instructor's actual political loyalties, or to the student's perception of the professor's partisan preferences. Given that political science professors appear to exert no real influence on students' party loyalties, it is unclear whether efforts to diversify the field by hiring more Republican professors would actually reduce the "liberalizing" effects of higher education.

There is a general consensus among leaders in higher education that a college experience ought to provide students with opportunities for personal growth and development, in addition to a set of marketable skills. Often, the concept of personal growth involves some degree of "values clarification" and a sense of social responsibility. The American Association of Colleges and Universities, for example, recently initiated the Core Commitments program, which "asserts that ethical, civic and moral development should not be addressed separately from students' basic responsibilities as learners."[1] The goal of producing ethical, moral graduates raises legitimate questions about the role of college professors in defining morality and in shaping students' values. Political scientists, who cannot avoid discussions of moral controversies in their classrooms, often disagree about whether this education should involve political advocacy (see, for example, the exchange between Gardner [1998], Weaver [1998], West [1998], and Myers and Tronto [1998]).

In recent years, anyone who has raised a legitimate question about the interplay between professors' own values and their instruction of students has run the risk of being associated with activist David Horowitz. Following his rather aggressive public assault on the university, academics have responded by circling the wagons. Having easily dismissed the anecdotal *evidence* of professional misconduct cited by Horowitz and his supporters, defenders of the university deem all *questions* about professorial influence to be equally as dubious. As social scientists, we ought not conclude that the average college professor attempts to politically indoctrinate students, based on a few isolated incidents; but nor should we dismiss all concerns about political bias in the classroom merely because we have concluded that a few extreme accounts are not representative of political science education as a whole. Even if we assume that the vast majority of college professors are responsible professionals who attempt to present balanced material, it is still possible that their views influence students in subtle ways.

In fact, when the question of influence is framed in positive terms, researchers find evidence of success. Lottes and Kuriloff (1994, 33) conclude that the social science literature demonstrates "that during college, attitudes and values tend to become more open, humanitarian, altruistic, tolerant, and liberal." The authors conduct their own study of students at one prestigious university and find that students score higher on measures of liberalism, social conscience, and feminist attitudes after four years of college. While the gains in overall liberalism were relatively small, students show greater gains in specific areas, such as a 25% increase in tolerance for homosexuality. Lottes and Kuriloff attribute the change to positive growth, stating that "students become more humanitarian and skilled in their application of principled reasoning to judge issues … better educated people tend to be personally more secure and therefore better able to tolerate diversity" (1994, 51).

**Matthew C. Woessner** *is an associate professor of public policy at Penn State Harrisburg. He can be reached at mcw10@psu.edu.*

**April Kelly-Woessner** *is an associate professor of political science at Elizabethtown College. She can be reached at kellya@etown.edu.*

*Together, the Woessners have published several articles on politics in higher education. Their most recent work, "Left Pipeline: Why Conservatives Don't Get Ph.D.'s," is set to appear in* Reforming the PC University *(AEI Press) later this year. They are currently working on a book, along with coauthor Stanley Rothman, tentatively titled* Conflict and Consensus in the American University *(Johns Hopkins University Press), which examines differing perspectives on social equity, partisan politics, and institutional power among students, faculty, and college administrators.*

doi:10.1017/S1049096509090453

Others attribute change toward more liberal views as a positive and direct benefit of specific courses. For example, Bryant (2003) uses data from the Higher Education Research Institute (HERI) to demonstrate that college tends to "liberalize" students' gender-role attitudes, with students enrolled in humanities courses and/or women's studies making greater gains than others. While gender equality may be an almost-universal value, it is important to note that the study finds students entering college with a high commitment to gender egalitarianism. The fact that their views become even more progressive may indicate that they have moved closer to what some may consider a radical position.

Some research demonstrates that attitude change may occur as the result of a single course experience. Whaples (1995) finds that students who complete an introductory economics course are more likely to regard the price-setting mechanisms of a free market as fair. Wylie and Parcell (1982) find that students are significantly more liberal after completing an introductory sociology course. The authors argue that this attitude change is desirable in sociology, as students are required to adopt a "universalistic perspective," which assumes social problems are the result of unjust, inequitable social arrangements rather than individual choice. According to the authors: "As instructors we can and should monitor our progress and effectiveness in achieving the attitudinal objectives of our courses ... Our commitment to social justice and social change dictates that we earnestly strive to "liberalize" our students" (Wylie and Parcell 1982, 419).

The authors also make several arguments that are eerily familiar to those engaged in the current Horowitz-evoked debate. They argue that students in social science disciplines are more likely to experience a liberalizing effect and hypothesize that this is because faculty in the social sciences are more liberal than other faculty.

Despite some evidence of change on specific attitudinal scales, there is significant debate over whether the college experience changes people's general ideology or partisanship. Given the general consensus that college professors tend towards the left of the ideological spectrum and affiliate most frequently with the Democratic Party (Cardiff and Klein 2005; Rothman, Lichter, and Nevitte 2005; Princeton Survey Research Associates 2001), we might expect students to shift their own identifications accordingly. Yet, a recent study suggests that, over the course of four years, students' political orientations do not change dramatically (Mariani and Hewitt 2008). The researchers do observe some movement among students, with an 8-percentage-point gain on the left side of the scale, but they conclude that this shift is not dramatic enough to justify claims of widespread indoctrination. While this seems to be a reasonable conclusion, the authors are examining aggregate trends over four years. It is possible that the little movement the authors observe is concentrated among certain groups of students. For example, political science students may, as a result of having frequent political discussions with their professors, be more susceptible to influence, whereas accounting students may be completely immune from such influence. Examined more precisely, we might see evidence of significant movement in certain disciplines. It is important to note that the Mariani and Hewitt study uses the same data as the Bryant (2003) article, which finds significant liberalization of gender attitudes among students in the humanities. We believe that, if professors' politics do influence students' political positions more generally, it is most likely to occur in those settings where political issues are frequently discussed. Thus, our analysis examines shifts in individual students' partisan leanings over the course of one semester, during which they are enrolled in a political science course. Our analysis adds to the Mariani and Hewitt study in that it allows us to look beyond aggregate trends and examine the impact of individual student-faculty relationships.

We constructed a survey of political science students and their professors, in the hopes of answering two important questions. The first question centers on the extent to which political science professors maintain a position of neutrality in the classroom. We hypothesize that political scientists attempt to present multiple perspectives and avoid discussion of their own political views. Yet, even if this is the case, we do not know to what extent students pick up cues that reveal their professors' true political orientations. If students cannot ascertain the political leanings of their professors, then we might conclude that political science professors are capable of maintaining professional neutrality, despite the contentious subjects dealt with in their classroom discussions.

The second question centers on whether shifts in a student's partisan affiliation correlate with the professor's admitted political orientation. We discussed some evidence that women's studies courses produce support for feminism and that sociology courses produce support for a "universalistic perspective" on social problems. These attitude changes are directly linked to the content of these courses. But political science courses routinely deal with a wide range of social problems, requiring students to explore multiple dimensions of their political ideology. We might expect that a liberalizing effect in political science would be more general and result in a change in students' political self-identification.

## RESEARCH DESIGN

In the summer of 2006 we distributed letters to 200 professors selected randomly from the directory of the American Political Science Association, asking them to take part in a study by completing a survey and distributing a questionnaire to students in their undergraduate courses. More than 60 instructors responded to our initial request. Of those, 26 indicated that they could not participate because they were not teaching undergraduates and 15 respondents declined to participate. Altogether, 24 political science professors from 17 public and 7 private institutions, located in 13 states, took part in the study.[2] Under the Carnegie classifications, five of the professors came from baccalaureate colleges, six of the professors came from masters colleges and universities, and 13 came from universities classified as research institutions. Surveys were distributed to a total of 69 upper- and lower-division courses with the average class returning 23 valid surveys.

The brief professorial survey asked faculty participants to rate both their partisan and ideological leanings, as well as their attitudes concerning the appropriateness of discussing their personal views with students. The more extensive student surveys asked students to rate their own politics, the politics of their professor, and several measures of political interest. Furthermore, whereas the main faculty survey measures the professors' views at one point in time, we distributed student surveys at the beginning and at the end of the academic semester, allowing us to track changes in students' affiliations over time.

In order to facilitate the merger of early- and late-semester surveys while maintaining subject anonymity, we built a series of innocuous questions into each of the surveys that, when taken together, create a unique demographic fingerprint. These questions included sex, birth month, college standing, number of brothers, number of sisters, birth order, and the first letter of their mother's maiden name. When answered honestly, there remained only a remote probability that, within a given class, two students would record the same combination of responses. Both waves of the survey also included three open-ended questions that gave the researchers additional points of comparison (including a small handwriting sample) that we used to help confirm the pairing of surveys.[3] Over the course of two semesters (fall 2006 and spring 2007), we collected a total of 1,982 end-of-semester surveys, 1,603 of which we definitively matched to an early semester survey, giving the blind matching an 81% success rate.

## OVERVIEW OF THE FACULTY PARTICIPANTS

Because faculty members self-selected into our survey, we had initial concerns about the political distribution of faculty in the sample. Table 1 provides a breakdown of the faculty participants' self-identified political affiliations. The vast majority of faculty participants (79%) described themselves as Democrats, with nearly half indicating their identification as a "strong Democrat." Three faculty participants (12%) indicated that they are "Independents," while two volunteers (8%) identified themselves as "strong Republicans." The limited number of Republicans in our sample is consistent with large voter registration studies of college faculty. For example, Cardiff and Klein (2005) report that 19 of 225 political scientists in their sample, or 8%, were registered Republicans. Ideologically, the participating professors in our study tend to lean left, with 79% of respondents identifying themselves as "liberal" and 8%

## Table 1
## Overview of Survey Results

| PARTISANSHIP | STRONG DEMOCRAT | MODERATE DEMOCRAT | INDEPENDENT | MODERATE REPUBLICAN | STRONG REPUBLICAN | n |
|---|---|---|---|---|---|---|
| Professor's Actual Partisan Identification | 46% | 33% | 13% | 0% | 8% | 24 |
| Student Assessment of Professor's Partisan Identification (2nd Wave) | 12% | 49% | 16% | 21% | 1% | 1,555 |

| IDEOLOGY | STRONGLY LIBERAL | FAIRLY LIBERAL | MODERATE | FAIRLY CONSERVATIVE | STRONGLY CONSERVATIVE | n |
|---|---|---|---|---|---|---|
| Professor's Overall Ideological Self-Placement | 33% | 46% | 13% | 4% | 4% | 24 |
| Social Policy | 58% | 21% | 13% | 4% | 4% | 24 |
| Economic Policy | 25% | 46% | 17% | 8% | 4% | 24 |
| Foreign Policy | 25% | 38% | 29% | 4% | 4% | 24 |
| Student Assessment of Professor's Overall Ideological Self-Placement (2nd Wave) | 9% | 40% | 36% | 14% | 1% | 1,578 |

| PROFESSOR'S VIEWS CONCERNING THE DISCUSSION OF PERSONAL BELIEFS | FREQUENTLY | OCCASIONALLY | RARELY | NEVER | | n |
|---|---|---|---|---|---|---|
| How often is it appropriate to discuss personal beliefs during class? | 0% | 25% | 67% | 8% | | 24 |
| How often is it appropriate to discuss personal partisan affiliation during class? | 0% | 17% | 50% | 33% | | 24 |
| How often is it appropriate to discuss personal political beliefs OUTSIDE class? | 25% | 54% | 17% | 4% | | 24 |
| How often is it appropriate to discuss personal partisan affiliation OUTSIDE class? | 17% | 46% | 29% | 8% | | 24 |

| PROFESSOR'S VIEWS ABOUT PRESENTING "BOTH SIDES" OF POLITICAL CONTROVERSIES | JUST ABOUT ALWAYS | MOST OF THE TIME | SOME OF THE TIME | RARELY/NEVER | | n |
|---|---|---|---|---|---|---|
| How often do you strive to present both sides of a partisan/ideological controversy? | 50% | 42% | 8% | 0% | | 24 |

| STUDENT RECOLLECTIONS OF POLITICS IN THE CLASSROOM | NO | YES | | | | n |
|---|---|---|---|---|---|---|
| Does student recall instructor "telling the class which political party he/she normally favors"? | 89% | 11% | | | | 1,572 |

describing themselves as "conservative." This ideological distribution is also consistent with a national survey of college faculty, in which 81% of political science professors define themselves as liberal (Rothman, Lichter, and Nevitte 2005).

Faculty participants in our survey indicated a strong reluctance to express their political views in class, with 75% of respondents indicating that they think it is "rarely" or "never" appropriate to discuss their personal political beliefs and 83% indicating that they believe it is "rarely" or "never" appropriate to discuss their partisan affiliation. Outside of the classroom, attitudes toward expressing personal political views are markedly different. Among faculty respondents, 79% indicated that they "frequently" or "occasionally" discuss their personal political views outside of class, while 63% "frequently" or "occasionally" talk about their partisan affiliation. Finally, notwithstanding their strong partisan views, a vast majority of faculty (92%) indicated that they "just about always" or "most of the time" strive to "present both sides of a partisan/ideological controversy."

It is possible that the professors in our survey are sensitive to claims of political bias in the academy and are exaggerating their neutrality. However, student survey responses lend some credibility to professors' claims about the inappropriateness of discussing partisan leanings in the classroom. When asked on the late-semester survey whether their professors discussed their political views, 89% of the student-respondents indicated that they had no recollection of the instructor ever telling the class "which political party he/she normally favors."

## ASSESSING FACULTY POLITICS

We found in previous studies that students' experiences in the classroom were related to the degree of political conflict they perceived between themselves and their professor (Kelly-Woessner and Woessner 2006; 2008). Students who believe they are at political odds with the professor are more critical of the course and report that they learn less than their peers. We argue that perception of conflict is important but we were not able to directly test whether students' perceptions of faculty politics are accurate. The professors in this survey appear to strive for objectivity in the classroom, indicating that they discuss both sides of an issue and that they believe it is not appropriate to discuss their personal beliefs. In this environment, we might expect students' assessments of their professors' politics to be somewhat limited.

The results in Table 2 appear to lend credence to the notion that students are not completely in the dark about their professors' political views. Among the students in our sample, 27% precisely identified their professors' partisan orientation when measured on a five-point scale. However, three-quarters of the students were able to guess their professor's partisanship within one unit of their actual rating, for example guessing a moderate Republican when the professor is actually a strong Republican. The majority of students identified their professor's party, but underestimated the strength of their professor's loyalties, rating them as moderate partisans more often than is warranted (see Table 1).

It does appear that students' judgments are based on some assessment of the facts, as students who are confident in their ability to rate the professor do predict better than the students who lack confidence. Of those who indicated that they were "not at all confident," only 15% precisely identify their professor's political views, whereas those who indicated they were "positive" are exactly right 45% of the time and within one point of the profes-

*Table 2*
## Students' Assessment of Professor's Party Identification

| | STUDENT'S CONFIDENCE IN ASSESSING PROFESSOR'S PARTY ID | | | | STUDENT REPORTS FOLLOWING GOVERNMENT AND PUBLIC AFFAIRS | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Not at All Confident | Somewhat Confident | Very Confident | Positive | Hardly at All | Only Now and Then | Some of the Time | Most of the Time | |
| >2 Too DEMOCRAT | 1% | 3% | 1% | 1% | 2% | 2% | 3% | 2% | 2% |
| +2 Too DEMOCRAT | 3% | 2% | 4% | 0% | 0% | 1% | 2% | 3% | 2% |
| +1 Too DEMOCRAT | 15% | 18% | 21% | 29% | 12% | 15% | 18% | 22% | 19% |
| Exactly Correct | 15% | 26% | 31% | 45% | 14% | 20% | 26% | 31% | 27% |
| +1 Too REPUBLICAN | 29% | 32% | 31% | 15% | 23% | 29% | 31% | 30% | 30% |
| +2 Too REPUBLICAN | 21% | 9% | 8% | 8% | 16% | 15% | 11% | 8% | 11% |
| >2 Too REPUBLICAN | 15% | 10% | 5% | 2% | 33% | 20% | 8% | 4% | 9% |
| Tilt Republican | 46% | 28% | 17% | −4% | 58% | 46% | 27% | 14% | 26% |
| Within + or −1 Unit | 59% | 76% | 82% | 88% | 49% | 63% | 75% | 83% | 75% |
| n | 272 | 774 | 355 | 121 | 43 | 262 | 613 | 619 | 1,537 |
| Percent | 18% | 50% | 23% | 8% | 3% | 17% | 40% | 40% | 100% |

Students' Assessment Professor's Party ID

*Table 3*

## Mixed Model* Predicting Error in the Assessment of Professor's Partisanship [Late Semester]

| INDEPENDENT VARIABLES | COEFFICIENT |
|---|---|
| (Constant) | 1.114*** |
| | (0.267) |
| Student sex | 0.045 |
| | (0.047) |
| Class standing | 0.001 |
| | (0.027) |
| Expected grade | −0.080 |
| | (0.046) |
| Follows government and public affairs [E] | −0.064* |
| | (0.031) |
| Avoids political discussions [E] | −0.004 |
| | (0.025) |
| First course with instructor | 0.052 |
| | (0.083) |
| Confidence in professor's partisan affiliation [L] | −0.181*** |
| | (0.029) |
| Recall instructor telling class his/her partisan preference [L] | −0.177* |
| | (0.084) |
| Paid attention in class | −0.003 |
| | (0.028) |
| Strength of professor's partisanship (actual) | 0.338*** |
| | 0.064 |
| n | 1,274 |

*Classroom variations set as the basis for the "random effects" in the mixed model.
[E] = Early-semester survey; [L] = Late-semester survey.
Standard errors listed in (parenthesizes) were *$p < 0.05$. **$p < 0.01$, ***$p < 0.001$

sor 88% of the time. The vast majority of students have some degree of confidence in their assessment of the professor. Given that students don't recall specific mention of the professor's partisanship, they appear to be successfully picking up on other cues. We might expect that students who are most politically aware are better able to detect subtle displays of partisanship. This appears to be the case. Students who are most likely to successfully identify their professors' political leanings. Students who follow public affairs "most of the time" were able to pinpoint the exact position of their professor 31% of the time and fell within one point of their professor's self-rating 83% of the time.

When placed side by side in a mixed model with a number of other controls, both the students' confidence in their assessments and the extent to which they follow public affairs stand out as statistically significant predictors of assessment error. Perhaps, not surprisingly, those few students who seem to have remembered the instructors mentioning their partisan affiliations did predict better than those who do not. Looking to Table 3, the best predictor of assessment error is the strength of the professor's partisanship. Students tended to be further off the mark in assess-

ing their professor's politics when the professor identified as a strong partisan. Looking back to Table 1, we see that students' rankings tended to underestimate their professors' partisan affiliations. Whereas the majority of professors in the sample identified as strong partisans, the majority of students rated their instructors as moderates. This may mean that professors are somewhat successful in their attempts to conceal their own beliefs. However, we conclude that students are able to sniff out their professors' general affiliations but merely underestimate the strength of those affiliations.[4]

Finally, it is worth noting that, from the first wave of the study (typically administered in the second week of the semester) to the final wave of the study (usually distributed in the last two weeks of class), we see a relatively modest increase in the accuracy of student assessments. When asked to judge their professor's partisanship in the second week of class, 23% of students were exactly right, while 69% were correct within one unit. More than 10 weeks later, the accuracy improves to 27% for perfect guesses and 75% for near-perfect guesses. Similarly, early semester assessments of the professor's partisanship were only somewhat better among students who reported having had the professor in a prior semester. This result seems to indicate that, while students' assessments do improve over time, these somewhat accurate assessments of the professor's politics are made rather quickly. This is especially noteworthy, given the obvious attempts at neutrality among the professors in the sample.

### POLITICAL PERSUASION IN THE CLASSROOM

The fact that most students in the study seem roughly aware of their professor's political leanings raises interesting questions about whether that knowledge has any substantive impact upon their own beliefs. Professors are authority figures and sometimes role models for young people. At the formative stages of their political development, might the ideological preferences of the professor have a measurable impact upon the students' views?

Table 4 provides a breakdown of partisan shifts among students from the early-semester survey to the late-semester survey, completed approximately 10 weeks later. In such a relatively short period of time, one might not expect to see a remarkable shift in partisan affiliations. Yet, overall, some 28% of students provided a different answer to the second-wave survey than they offered in the first. Except for strong Republicans, who tended to change their responses 37% of the time, other partisans tended to stand by their original assessment at a rate of four to one. As there is nowhere else to go, those who initially identified themselves as strong partisans either maintained initial self-assessment or drifted toward the political center. Moderate partisans on both ends of the spectrum also tended to move toward the middle. Students who originally indicated an independent position were the most likely to move, with twice as many moving towards the Democrats as compared to the Republicans.

Of 1,541 respondents captured in Table 1, there is a modest, but statistically significant, drift toward the Democrats. Indeed, both strong Democrats and moderate Democrats tended to drift toward the GOP, an average of 0.31 units and 0.08 units respectively. However, the leftward movement of both independents and Republicans offset the Democrats' movement to the right. On average, independents moved 0.15 units toward the Democrats, while moderate Republicans moved 0.19 units in the direction of the Democrats. The most dramatic shift occurred among strong

*Table 4*

## Shifts in Student Party Identification from Early to Late Semester

| PARTISAN MOVEMENT | STUDENT'S PARTY IDENTIFICATION (EARLY SEMESTER) | | | | | PROFESSOR'S PARTY IDENTIFICATION | | | TOTAL |
| | Strong Democrat | Moderate Democrat | Independent | Moderate Republican | Strong Republican | Democrat | Independent | Republican | |
|---|---|---|---|---|---|---|---|---|---|
| Shift > 1 Unit Dem | | | 6% | 7% | 6% | 3% | 4% | 2% | 3% |
| Shift 1 Unit Dem | | 11% | 15% | 13% | 31% | 13% | 11% | 12% | 13% |
| **No Change** | **75%** | **73%** | **68%** | **74%** | **63%** | **72%** | **70%** | **77%** | **72%** |
| Shift 1 Unit GOP | 21% | 12% | 10% | 7% | | 11% | 13% | 6% | 10% |
| Shift > 1 Unit GOP | 4% | 3% | 1% | | | 1% | 2% | 2% | 2% |
| Lower 95% Confidence | −0.21 | −0.02 | 0.22 | 0.26 | 0.56 | 0.02 | −0.06 | −0.03 | 0.02 |
| **Mean Units Shift Dem** | **−0.31*** | **−0.08*** | **0.15*** | **0.19*** | **0.44*** | **0.06*** | **0.03** | **0.07** | **0.06*** |
| Upper 95% Confidence | −0.40 | −0.13 | 0.08 | 0.13 | 0.32 | 0.10 | 0.11 | 0.17 | 0.09 |
| *n* | *183* | *484* | *354* | *415* | *105* | *1117* | *261* | *163* | *1541* |
| Percent | *12%* | *31%* | *23%* | *27%* | *7%* | *72%* | *17%* | *11%* | *100%* |

*$p < 0.05$, **$p < 0.01$, ***$p < 0.001$

Republicans, who moved nearly a one-half unit in the direction on the Democrats (0.44 units overall).

It is important to note that a trend toward the Democratic Party hardly constitutes evidence of political persuasion, unless it can be shown that this movement is somehow correlated with the views of the faculty participants. This is especially true given the political environment in which the study was conducted. By the estimates of the Gallup organization, over the eight months of the study, President's Bush's overall job approval numbers had fallen from 39% (September 7, 2006) to 33% (May 10, 2007). The breakdown of student partisan change by professors' partisan identification suggests that student partisan change had little to do with the professor's politics. Whereas the average direction of political movement varies systematically by the student's initial partisan designation, with an overall tendency towards regression to the mean, there is virtually no difference in student movement based on the professor's partisan identification. Among the 1,117 students whose professors identify as either moderate Democrats or strong Democrats, there is a shift of 0.06 units ± 0.04 units away from the GOP. Among the 261 students whose instructors identified themselves as independents, there is a statistically *insignificant* change of 0.03 units ± 0.08 units away from the GOP. For the 163 students whose professors identified themselves as Republicans,[5] there is a statistically *insignificant* change of 0.07 units ± 0.10 units away from the GOP.

Indeed, the shift toward the Democrats and away from the GOP is statistically significant under the Democratic professors, where it is not under either the independent or Republican professors. However, this is largely a function of the sample size rather than due to the magnitude of the effect. Naturally, in a profession where Democratic faculty greatly outnumber independents or Republicans, there are more students in the study who were taught by Democratic professors. This substantially larger sample size permits a more precise estimation of the partisan shift. Given the enormous overlap in the confidence bands among the three groups, a simple one-way ANOVA reveals that there is no statistical difference in the partisan movement among the three groups of students (F = 1.358, *p* = 0.237).

When placed in a statistical model along with a series of other controls, the results look much the same. Table 5 shows three mixed models in which the classroom variations are set as the basis for the "random effects." In addition to different measures of the professor's partisanship, the models include controls for the students' sex, religiosity, class standing, and expected grade, as well as the extent to which they follow "government and public affairs," whether they tend to avoid political discussion out of a dislike for conflict, whether this was the first course with the instructor, their initial partisan identification, and the professor's sex.

Each of the models is an effort to capture potentially different conceptualizations of political influence. Model 1 assumes that students would be driven toward the Democratic Party by professors who identify as Democrats. As such, it predicts the student's partisan movement using absolute measures of the professor's partisan identification, as well as the student's perception of the professor's partisan leanings. In this instance, if the student thought the professor was a moderate Democrat, the variable labeled "perceived" would simply be scored as a 2. Model 2 assumes that a student would only move toward the Democratic Party if the professor is more closely aligned with the party than is the student. Accordingly, model 2 measures perceived and actual partisanship relative to the student's views. In this example, if the student felt that the professor was a moderate Democrat, while the student was a strong Democrat, it would be scored as a +1 (i.e., one unit more Republican). If the student felt that the professor was a moderate Democrat, while the student was a moderate Republican, it would be scored as a −2 (i.e., two units more Democrat). Model 3 sets aside measures of perceived partisanship and instead uses four measures of the professor's political beliefs from the faculty survey. These include party affiliation and ideological placement on three distinct policy dimensions.

Aside from the constant, there are three statistically significant predictors in the models. Women tend to move toward the Democrats more so than men. More religious students tend to move toward the Republicans more so than the less religious. As noted in Table 4, party affiliation is negatively correlated with movement. The more Republican a student, the higher the probability

*Table 5*
## Mixed Model* Predicting Direction of Student's Partisan Shift

| INDEPENDENT VARIABLES | | | MODEL 1 | MODEL 2 | MODEL 3 |
|---|---|---|---|---|---|
| (Constant) | | | 0.532** | 0.532** | 0.564** |
| | | | (0.178) | (0.178) | (0.177) |
| Student's sex | | | −0.081* | −0.081* | −0.082* |
| | | | (0.037) | (0.037) | (0.037) |
| Importance of religion in student's everyday life [E] | | | 0.046* | 0.046* | 0.048** |
| | | | (0.019) | (0.019) | (0.019) |
| Class standing | | | −0.016 | −0.016 | −0.006 |
| | | | (0.019) | (0.019) | (0.020) |
| Expected grade [E] | | | −0.004 | −0.004 | −0.011 |
| | | | (0.037) | (0.037) | (0.037) |
| Follows government and public affairs [E] | | | 0.004 | 0.004 | 0.010 |
| | | | (0.025) | (0.025) | (0.025) |
| Avoids political discussions [E] | | | −0.033 | −0.033 | −0.030 |
| | | | (0.020) | (0.020) | (0.020) |
| First course with instructor | | | −0.032 | −0.032 | −0.041 |
| | | | (0.061) | (0.061) | (0.061) |
| Student's party identification [E] | | | −0.175*** | −0.177*** | −0.178*** |
| | | | (0.017) | (0.028) | (0.017) |
| Professor's sex | | | −0.031 | −0.031 | −0.017 |
| | | | (0.046) | (0.046) | (0.052) |
| Professor's partisanship | Perceived [E] | | 0.004 | | |
| | | | (0.021) | | |
| | Actual | | −0.007 | | −0.008 |
| | | | (0.017) | | (0.036) |
| Partisanship relative to student | Perceived [E] | | | 0.004 | |
| | | | | (0.021) | |
| | Actual | | | −0.007 | |
| | | | | (0.017) | |
| Professor's ideological self-placement | Social policy | | | | 0.039 |
| | | | | | (0.040) |
| | Economic policy | | | | 0.028 |
| | | | | | (0.040) |
| Foreign policy | | | | | −0.066 |
| | | | | | (0.043) |
| n | | | 1,232 | 1,232 | 1,298 |

*Classroom variations set as the basis for the "random effects" in the mixed model. [E] = Early Semester Survey
Standard errors listed in (parentheses) were *$p < 0.05$, **$p < 0.01$, ***$p < 0.001$

the student will move toward the Democratic Party, and vice versa. Whereas sex and religiosity are modest predictors of partisan movement, the student's original partisan position accounts for virtually all of the model's explanatory power.

It is worth noting that, in each of the models, the various measures of professors' politics fail to predict changes in students' political affiliations. This holds for perceived partisanship, actual partisanship, relative measures of partisanship, and the three measures of ideology. Students may be drifting toward the Democrats but, based on the results of these regression models, there is no evidence that this movement is correlated with (let alone caused by)

the views of their political science instructors. This finding is further reinforced by the lack of variation in political drift illustrated in Table 4.

### CONCLUSION AND DISCUSSION

Prior research into the political dynamics of the classroom finds credible links between perceptions of a professor and overall satisfaction with the course (Kelly-Woessner and Woessner 2006). However, previous studies say little about students' ability to identify their professors' political views, let alone how those views may influence students' political beliefs. The present study provides evidence that students' assessments of their professors' politics, while imperfect, roughly correspond to the instructors' actual beliefs. Overall, students who pay more attention to politics tend to make fewer mistakes in their assessment of their professors. Students are pretty good at assessing the accuracy of their estimations. One of the more surprising discoveries is that, within our sample, strongly partisan professors were the hardest to identify. Students consistently underestimated the political convictions of their instructors when the professors identified as strong Republicans or strong Democrats.

The students in this study did exhibit a small, statistically significant shift toward the Democratic Party over the course of the semester. However, this shift does not appear to correlate either with the student's assessment of their instructor or with the professor's actual beliefs, thus undermining the notion that the change was brought about (intentionally or unintentionally) by the professors in the study.

While these results tend to run counter to claims of academic indoctrination, the findings do not constitute definitive proof that a predominantly left-leaning professoriate plays no role in students' political socialization. Indeed, the study design is subject to limitations that suggest potentially important avenues for future research. First, the 24 professors who took part in this study indicated that, within the classroom, they generally try to shield their own political beliefs from students. Although they seemed much

more open to discussing their personal political views outside of the classroom, this kind of self-restraint probably minimized professors' political influence. It is conceivable that professors who tend to engage in political evangelism would opt not to participate in a study of classroom politics, either because they recognize the social pressure not to politicize their classrooms, or because they feel the study would not apply to someone who advertises their political affiliation. To be certain that these findings apply broadly to professors throughout the discipline of political science, it would be useful to conduct a large-scale survey measur-

ents or early socialization and may have emotional attachments to a party that are not rational. Students may also not be aware of conflict between their party identification and their positions on various issues. Thus, we might find that political science professors have some influence over students on specific policy issues, similar to what other researchers have found to occur in the humanities and sociology courses.

Fourth, we recognize that political bias in the classroom could manifest as something other than overt advocacy on the part of the professor. While almost 90% of student-respondents have no

> *One of the more surprising discoveries is that, within our sample, strongly partisan professors were the hardest to identify. Students consistently underestimated the political convictions of their instructors when the professors identified as strong Republicans or strong Democrats.*

ing, among other things, professors' propensities to withhold personal opinion. If the results indicate that most professors tend to exercise restraint with respect to discussing their own political views, these results can be more widely applied. Even if future studies reveal that a sizable percentage of college professors regularly engage in partisan advocacy, these findings still provide evidence that, among those who trying to maintain a nonpartisan atmosphere, it is possible to educate students without inadvertently shaping their partisan preferences.

If political science professors do endeavor to set aside their political views, there is little reason to believe that the typical student would be meaningfully influenced by the dominance of left-leaning faculty within the profession. This does not mean that politics does not affect the classroom however, as we (Kelly-Woessner and Woessner 2006; 2008) demonstrate that perceptions of disagreement between students and professors have a negative impact on students' experiences and learning. Our current study demonstrates that those perceptions of disagreement are accurate and not simply the result of students assigning contrary positions to professors they dislike. Given the overrepresentation of Democrats among college faculty, this means that Republican students are more likely to experience the negative effects of conflict in the classroom.

Second, this study looked specifically at political views among students in political science courses, largely on the assumption that if political views do change over the course of a semester, it would most likely occur in the context of a class on government. However, there is a counter hypothesis that deserves some consideration. Political scientists are accustomed to dealing with diverse viewpoints and political controversy. Although the discipline surely includes some openly partisan instructors, when compared to the humanities (e.g., English, history, ethnic studies, gender studies, etc.) its practitioners may be better equipped to teach political controversies without resorting to brazen advocacy (see Ceaser and Maranto 2008). The dualistic nature of political controversies makes it relatively easy to identify and present "both sides" of the argument. Having failed to find evidence of persuasion among political science professors, it might be useful to examine the impact of professors' political orientations on students in other academic disciplines.

Third, it is possible that student partisanship is rather inflexible. Students acquire partisan attachments through their par-

memory of the professor discussing personal partisan affiliation, political preferences may indeed be communicated in more subtle ways. For example, professors may (consciously or unconsciously) assign reading material with an ideological slant that, over time, might subtly influence students' overall political views. However, since we assume that Republican professors are less likely to choose left-leaning texts, the fact that their students also seemed to drift toward the Democratic Party undermines the likely importance of assigned reading materials. Yet, whether or not the professor discusses personal politics in the classroom, the independent impact of reading materials is probably minimized by a harsh reality of undergraduate education; students cannot be influenced by texts they refuse to read.

Ironically, these findings seem to provide ammunition for individuals on both sides of the "politics in the classroom" controversy. Students in our sample do move to the left, with independents being twice as likely to move towards the Democrats as towards the Republicans. Although the movement is small, it is over the course of a single semester and we might expect greater movement over the course of four years. For those concerned about the impact of an ideologically homogeneous professorate, the fact that students can readily identify their professors' leanings suggests that, even with the best of intentions, political science education may have an ideological slant. Republican students would be well aware that the faculty does not represent their viewpoints. Yet, notwithstanding the cues that students apparently use to assess their professor's ideological leanings, there is no evidence that an instructor's views instigate political change among students. The professor's politics does not correlate with either the direction or magnitude of the students' partisan movement. Instead, we found very complex shifts in political affiliation, with partisans tending to regress toward the political center and independents moving in both directions, albeit more often trending towards the Democrats.

As the instructors in this study appear to exert no real influence on students' party loyalties, it is unclear whether efforts to diversify the field by hiring more Republican professors would actually reduce the liberalizing effects of higher education. Such efforts to diversify political science instruction might fall short of expectations if the newly hired conservative instructors express the same commitment to neutrality within the classroom as the professors in our sample.

Our results suggest that researchers should consider how collegiate experiences, other than classroom instruction, might influence students' ideological development. If these findings hold outside of political science, there may yet be subtle influences exerted by peer groups, college-life choices, and campus culture, which shape the political socialization of college students. Whether a student's leftward movement is a function of college life or classroom instruction, academia's liberalizing influence may have important societal implications. Robert Maranto (2007), for example, argues that ideology impacts academics' research agendas. As a consequence, a lack of ideological diversity makes universities "intellectually dull places imbued with careerism rather than the energy of contending ideas."

Although it may not be a revelation to political science educators, it does seem that students are fairly clever in that they can roughly identify their professor's politics without necessarily adopting those views as their own. While professors may find complete neutrality in the classroom to be unattainable, it appears that a fair-minded political science education is not synonymous with political indoctrination. ∎

**NOTES**

*We thank our research assistants, Kathleen Winters, Nadizda Ivanova, and Benjamin Adelman, for all of their valuable work and assistance. We would like to acknowledge a debt of gratitude to the dozens of political science faculty throughout the country who took the time to distribute our survey to their undergraduate students. This research was funded through grants from both the Penn State Harrisburg Research Council and the Penn State Harrisburg School of Public Affairs.*

1. Quoted from the AAC&U Web site at www.aacu.org/core_commitments/dimensions.cfm.

2. Altogether, the study included one faculty participant from Arizona, one from California, one from Connecticut, three from Illinois, one from Kansas, two from Massachusetts, two from New Hampshire, four from New York, one from Oregon, three from Pennsylvania, one from Tennessee, two from Texas, and two from Virginia.

3. In one of the three open-ended questions, students were asked to name the first president of the United States. Because virtually every student in the study wrote the word "Washington" on both the early- and late-semester surveys, it was very easy to use their handwriting as final conformation of a suspected match.

4. If we break partisanship into two categories, Democrat versus Republican, 67% of students assigned the correct party to Democratic professors and 66% correctly categorized their Republican professors.

5. It should be noted that both of the GOP professors in the study identified themselves as a "Strong Republican."

**REFERENCES**

Bryant, Alyssa N. 2003. "Changes in Attitudes Towards Women's Roles: Predicting Gender-Role Traditionalism Among College Students." *Sex Roles* 48 (3/4): 131–42.

Cardiff, Christopher F., and Daniel B. Klein. 2005. "Faculty Partisan Affiliations in All Disciplines: A Voter-Registration Study." *Critical Review: An Interdisciplinary Journal of Politics and Society* 17 (3 & 4): 237–55.

Ceaser, James W., and Robert Maranto. 2008. "Why Political Science Is Left but not PC: Causes of Disunion and Diversity." In *Reforming the Politically Correct University*, ed. R. Maranto, R. Redding, and F. Hess. Washington, D.C.: AEI Press.

Gardner, Paul. 1998. "Teaching at Its Best: A Passionate Detachment in the Classroom." *PS: Political Science and Politics* 31 (4): 802–04.

Kelly-Woessner, April and Matthew Woessner. 2006. "My Professor is a Partisan Hack: How Perceptions of a Professor's Political Views Affect Student Course Evaluations." *PS: Political Science and Politics* 39 (3): 495–501.

————. 2008. "Conflict in the Classroom: Considering the Effects of Partisan Difference on Political Education." *Journal of Political Science Education* 4 (3): 265–85.

Lottes, Ilsa L., and Peter J. Kuriloff. 1994. "The Impact of College Experience on Political and Social Attitudes." *Sex Roles* 31 (1/2): 31–54.

Maranto, Robert. 2007. "As a Republican, I'm on the Fringe." *The Washington Post*, December 9, B01.

Mariani, Mack D., and Gordon J. Hewitt. 2008. "Indoctrination U? The Effect of Faculty Ideology on Changes in Student Political Orientation." *PS: Political Science and Politics* 41 (4): 773–83.

Myers, JoAnne, and Joan C. Tronto. 1998. "Truth and Advocacy: A Feminist Perspective." *PS: Political Science and Politics* 31 (4): 808–10.

Princeton Survey Research Associates. 2001. "National Survey on Government Endeavors." Washington, D.C.: Brookings Institution. www.brook.edu/comm/reformwatch/rw04_surveydata.pdf.

Rothman, Stanley, S. Robert Lichter, and Neil Nevitte. 2005. "Politics and Professional Advancement among College Faculty." *The Forum* 3 (1), Article 2.

Weaver, Mark. 1998. "Weber's Critique of Advocacy in the Classroom." *PS: Political Science and Politics* 31 (4): 799–801.

West, Ellis M. 1998. "Some Proposed Guidelines for Advocacy in the Classroom." *PS: Political Science and Politics* 31 (4): 805–07.

Whaples, Robert. 1995. "Changes in Attitudes among College Economics Students about the Fairness of the Market." *Journal of Economic Education* 26 (4): 322–38.

Wylie, Mary Lou, and Stanley R. Parcell. 1982. "A Study of Attitude Change in College Classes." *Teaching Sociology* 9 (4): 411–22.

# APPENDIX: Coding for Mixed-Model Variables

| MIXED-MODEL VARIABLE | LOW VALUE | HIGH VALUE |
|---|---|---|
| **Sex (Student)** | Male | Female |
| | 0 | 1 |
| **Sex (Professor)** | Male | Female |
| | 0 | 1 |
| **Class Standing** | Freshman | Senior |
| | 1 | 4 |
| **Expected Grade** | F | A |
| What grade do you expect to earn in this class? | 0 | 4 |
| **Follows Government and Public Affairs** | Hardly at All | Most of the Time |
| How often do you follow what is going on in government and public affairs? | 1 | 4 |
| **First Course with the Instructor** | No | Yes |
| Is this the first course you have taken from this instructor? | 0 | 1 |
| **Confidence in Professor's Partisan Affiliation** | Not at All Confident | Positive |
| How confident are you in your assessment of your instructor's partisan affiliation? | 1 | 4 |
| **Recall Instructor Telling Class Personal Partisan Preference** | No | Yes |
| Did your instructor tell the class which political party he/she normally favors? | 0 | 1 |
| **Paid Attention in Class** | Almost Never | Almost Always |
| I paid attention in class and listened carefully to the instructor. | 1 | 5 |
| **Avoids Political Discussions** | Almost Never | Frequently |
| How often do you avoid political discussions out of concern that they could lead to arguments? | 1 | 4 |
| **Strength of Professor's Partisanship (Actual)** | Independent | Strong Partisan |
| | 0 | 2 |
| **Importance of Religion in Student's Life** | Not at All Important | Very Important |
| How important is religion in your everyday life? | 1 | 4 |
| **First Course with Instructor** | No | Yes |
| Is this the first course you have taken from this instructor? | 0 | 1 |
| **Student/Professor Partisanship (Perceived and Actual)** | Strong Democrat | Strong Republican |
| | 1 | 5 |
| **Professor's Partisanship Relative to Student (Perceived and Actual)** | Professor Four Units More Democrat | Professor Four Units More Republican |
| | -4 | 4 |
| **Faculty's Ideological Self-Placement** | Strongly Liberal | Strongly Conservative |
| (Social, economic, and foreign policy) | 1 | 5 |

# EXHIBIT U



## New Political Science

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/cnps20

# Sensationalized Surveillance: Campus Reform and the Targeted Harassment of Faculty

Samantha McCarthy & Isaac Kamola

**To cite this article:** Samantha McCarthy & Isaac Kamola (2021): Sensationalized Surveillance: Campus Reform and the Targeted Harassment of Faculty, New Political Science, DOI: 10.1080/07393148.2021.1996837

**To link to this article:** https://doi.org/10.1080/07393148.2021.1996837

Published online: 08 Nov 2021.

Submit your article to this journal ☞

View related articles ☞

View Crossmark data ☞

NEW POLITICAL SCIENCE
https://doi.org/10.1080/07393148.2021.1996837





# Sensationalized Surveillance: Campus Reform and the Targeted Harassment of Faculty

Samantha McCarthy[a] and Isaac Kamola[b]

[a]School of Social Work, Policy, and Practice, University of Chicago, Chicago, USA; [b]Political Science, Trinity College, Hartford, USA

**ABSTRACT**

Campus Reform is a right-wing website that hires students to write articles accusing universities and faculty members of "liberal bias." These pieces circulate widely within the right-wing media ecosystem, where they can inspire self-deputized online vigilantes to harass faculty members and college administrators to sanction their faculty members. We argue that Campus Reform is part of a well-funded and well-organized panoptic network that engages in the sensationalized surveillance of faculty. This paper first develops our concept of sensationalized surveillance. We then offer a comprehensive institutional history of Campus Reform – demonstrating that it originates with, and continues to operate as, a conservative political technology. We then explore the details of how this surveillance apparatus functions and conclude by examining the disciplining effects Campus Reform has on faculty.

In recent years Republican politicians, conservative think tanks, and right-wing "news" outlets have launched a relentless attack on colleges and universities, describing them as "radical," "socialist," and hostile to conservative students and ideas. This manufactured outrage has been so effective that it has transformed support for higher education into a partisan issue.[1] The claim that college campuses are rife with Leftist indoctrination is based on a growing litany of anecdotes about seemingly outrageous statements and actions by faculty.[2] For example, conservative media outlets have amplified stories about comments faculty have made about race, a blog post about white supremacists' fetish of ancient statuary,

---

**CONTACT** Isaac Kamola ✉ Isaac.kamola@trincoll.edu ▣ Political Science, Trinity College, 300 Summit St., Hartford, CT, USA

[1]See: Kim Parker, "The Growing Partisan Divide in Views of Higher Education," (Pew Research Center, 2019); Ralph Wilson and Isaac Kamola, *Free Speech and Koch Money: Manufacturing a Campus Culture War*. London: Pluto Press, 2021.

[2]Scott Jaschik, "Saida Grundy, Moving Forward," *Inside Higher Ed*, August 24, 2015; Steve Kolowich, "What Is a Black Professors in America Allowed to Say?," *The Guardian*, August 3 2017; Colleen Flaherty, "The Dangers of Filtered Speech," *Inside Higher Ed*, June 22, 2017; Marwa Eltagouri, "Professor Who Tweeted, 'All I Want for Christmas Is White Genocide,' Resigns after Year of Threats," *The Washington Post*, December 29, 2017; Chris Quintana, "For One Scholar, an Online Stoning Tests the Limits of Public Scholarship," *The Chronicle of Higher Education*, June 16, 2017; Isaac Kamola, "Dear Administrators: To Protect Your Faculty from Right-Wing Attacks, Follow the Money," *Journal of Academic Freedom* 10 (2019); Nell Gluckman, "The Outrage Peddlers Are Here to Stay," *Chronicle of Higher Education*, November 17, 2020; L.D. Burnett, "Right-Wing Trolls Attacked Me. My Administration Buckled," ibid., October 15.

© 2021 Caucus for a New Political Science

irreverent tweets about President Trump and Vice President Pence, a parody of the neo-Nazi concept of "white genocide," and false allegations that Black faculty members have called for the death of white people.

These scandalizing stories serve a clear political purpose: they smugly position conservatives as the commonsense alternative to a supposedly unhinged and radical academic "elite." However, faculty members at the center of these maelstroms are often sanctioned by their institution and receive a deluge of threats and hate mail, including vile threats of physical harm. Such harassment campaigns – some which garner public attention, others which are endured in private – can have substantial effects on faculty, everything from impinging on teaching and research to requiring leaves of absence to recoup from the emotional toll. Some faculty face institutional retaliation and even loss of employment. These manufactured controversies also create a chilling effect across the academy.

Many stories fueling this online outrage originate with, or are amplified by, Campus Reform – a right-wing website specifically created to identify "liberal bias" on college campuses.[3] Neither of us had heard of Campus Reform prior to June 21, 2017, when our campus was shut down after receiving credible threats of violence. The previous day Campus Reform published a piece falsely accusing a Trinity College professor of calling for the death of white people. The piece was picked up by Breitbart, The Blaze, Washington Times, and other right-wing outlets, before landing on Tucker Carlson's show.[4] The professor was placed on administrative leave against his will (and in violation of the faculty governance procedures) and eventually left the state after the doxing of his home address. After the dust settled, the school reported losing $200,000 in donations and student tuition.

While Campus Reform presents itself as a media organization, we argue it should instead be understood as a surveillance apparatus. Campus Reform hires a network of students and staff to surveil faculty, on campus, in the classroom, and online, looking for so-called liberal bias. In doing so, it generates a steady stream of hyperbolic, moralizing, and often grossly inaccurate content which circulates widely within the right-wing media ecosystem, where it often encourages online vigilantes, as well as college administrators caught up in the maelstrom, to take action against those faculty members being surveilled.[5] We call this strategy sensationalized surveillance.

This paper draws from research conducted as part of the Faculty First Responders project, started in January 2020. After a number of friends and colleagues had experienced targeted harassment following stories published by Campus Reform, Kamola – with the help of research assistants Aaron Supple, Nanci Alejandra López Flores, and Jason Farrell – began monitoring Campus Reform on a daily basis, sending e-mails to those faculty members Campus Reform accused of exhibiting liberal bias. These e-mails provide faculty with information about who Campus Reform is and how faculty and administrators

[3]Peter Schmidt, "Higher Education's Internet Outrage Machine," *The Chronicle of Higher Education*, September 8, 2015.
[4]For an overview of this attack, see: Kamola, "Dear Administrators"; Isaac A. Kamola, "Crashing the Academic Conversation," *The Chronicle of Higher Education*, July 9, 2017; Johnny Eric Williams, "The Academic Freedom Double Standard:'Freedom' for Courtiers, Suppression for Critical Scholars," *Journal of Academic Freedom* 9 (2018).
[5]To be clear, we are not arguing that Campus Reform encourages or otherwise organizes the targeted harassment of faculty. Only that their sensational pieces successfully motivate people to take action. To our knowledge, they have not taken steps to moderate the hateful comments below stories nor have they condoned the harassment that often follows from their sensationalized coverage.

might effectively respond.[6] McCarthy served as a research assistant from May 2020-January 2021, monitoring the website daily and building a database that includes all Campus Reform stories published during that time. This database became the groundwork for fielding a survey, in conjunction with the American Association of University Professors (AAUP), of all faculty targeted by Campus Reform in 2020. In addition to conducting content analyses and examining archived webpages, McCarthy also conducted interviews with two former correspondents – college student writers hired by Campus Reform – and six faculty members targeted by Campus Reform.[7]

In this article we first develop our concept of sensationalized surveillance, a panoptic form of power whereby an institutionalized and well-funded surveillance apparatus feeds outrage narratives into the right-wing media ecosystem. The second section challenges the claim that Campus Reform is primarily a journalistic outlet. By looking at its funders, hiring practices, and organizational strategy, it becomes evident that Campus Reform should be understood as a partisan surveillance apparatus – part of a larger "political technology." The final section demonstrates the considerable disciplining effects of Campus Reform's sensationalized surveillance.

## Sensationalized Surveillance and the Right-Wing Media Ecosystem

Michel Foucault famously drew upon Bentham's sketch of the panopticon – a prison built by positioning cells around an all-seeing central tower – to describe modern policing and surveillance. The warden, located within the tower, could keep prisoners under constant surveillance. And since misconduct was met with punishment, surveilled prisoners eventually learned to internalize their own policing out of constant fear of being watched.[8] In recent decades scholars have expanded Foucault's metaphor to describe to the disciplining function of digital surveillance, including National Security Agency (NSA) spying operations and corporate data harvesting.[9]

Campus Reform engages in a similar kind of panopticon surveillance. Faculty across the United States are at risk of being surveilled by its network of campus correspondents who monitor their social media and attend their courses or public talks. However, for Foucault, surveillance alone does not change behavior but must be complimented with the constant threat of disciplinary action by the warden. While Campus Reform itself takes on the surveillance role, the disciplinary function is outsourced: to higher education administrators as well as an inspired group of online vigilantes who feel emboldened by the narrative forwarded by Campus Reform. There are numerous examples of higher education administrators sanctioning faculty, terminating their employment, placing them on

[6]For more, see: Faculty First Responders, https://facultyfirstresponders.com.

[7]As per guidance from Trinity College's Institutional Review Board, every effort has been taken to anonymize the interviewees (including using pseudonyms). Recent Campus Reform websites referenced in this article have archived and screenshots taken, as needed to preserve the record.

[8]Michel Foucault, *Discipline and Punish: The Birth of the Prison*, trans. Alan Sheridan (New York: Random House, 1995).

[9]For an overview of the application of Foucault to the study of surveillance, see: Gilbert Caluya, "The Post-Panoptic Society? Reassessing Foucault in Surveillance Studies," *Social Identities* 16, no. 5 (2010); Manuela Farinosi, "Deconstructing Bentham's Panopticon: The New Metaphors of Surveillance in the Web 2.0 Environment," *tripleC: Communication, Capitalism & Critique* 9, no. 1 (2011); Alberto Romele et al., "Panopticism Is Not Enough: Social Media as Technologies of Voluntary Servitude," *Surveillance & Society* 15, no. 2 (2017); David Murakami Wood, "Beyond the Panopticon? Foucault and Surveillance Studies," in *Space, Knowledge and Power: Foucault and Geography*, ed. Jeremy W. Crampton and Studart Elden (Burlington, VT: Ashgate Publishing, 2007).

leave, or publicly condemning their speech as a result of stories run by Campus Reform. These actions are celebrated by Campus Reform. As the organization's leader, Morton Blackwell, states in the CampusWire newsletter: "Campus Reform gets results. Campus Reform exposés have forced colleges to change their policies for the better. Professors have been reprimanded and even fired."[10]

The most common source of disciplinary action, however, comes from self-deputized online vigilantes who regularly bombard faculty with targeted harassment. Praying on white resentment, toxic masculinity, and resistance to cultural and racial change, the platform reassures supporters that they have a right to be angry and resentful – and that their anger should be directed at "Liberals" and "Radical professors." Campus Reform therefore facilitates the disciplining of faculty by rallying online supporters through sensationalized stories fed into the right-wing media ecosystem.

Hence, unlike the prison which houses both surveillance and disciplining functions, Campus Reform surveils through a panoptic *network*. At the center, a well-funded surveillance apparatus keeps tabs on those faculty it considers deviant. However, the disciplining warden in this panoptic network resides not in the tower but rather in the college administrators and online right-wing news consumers who self-deputize themselves for the task of providing distributed punishment. This panoptic network merges changes in social media and the now-robust right-wing media ecosystem – which regularly blurs the distinction between reporting and political mobilization.[11]

Scholars have argued that, rather than centralized surveillance, social media and Web 2.0 have blurred "the distinction between those who watch and those who are being watched."[12] As a result, online surveillance and discipline is commonly distributed through a peer-to-peer "chilling effect." For example, studies demonstrate that individuals often refrain from posting political opinions to avoid unwanted argument, debate, and harassment and many people change their offline activities for fear of what might appear online.[13] Sometimes distributed surveillance technologies have allowed marginalized communities to surveil the powerful from below (i.e., "sousveillance)[14] thereby making visible otherwise unseen instances of police violence, sexual harassment, and everyday racism.

While distributed digital surveillance and disciplining often take place informally through peer-to-peer networks, organized political networks across the political spectrum have also emerged to surveil their political adversaries. For example, a loosely organized "digital united front" doxes and publicly shames online fascists and neo-Nazis.[15] The Southern Poverty Law Center, Media Matters, and Right-Wing Watch similarly monitor

[10]Morton Blackwell, "Keep up with what's happening on campuses," *CampusWire*, Leadership Institute, September 24, 2021. Accessed October 5, 2021, https://isaackamola.domains.trincoll.edu/items/show/10.

[11]Olivier Jutel, "Donald Trump, American Populism and Affective Media," in *Routledge Handbook of Global Populism*, ed. Carlos de la Torre (New York: Routledge, 2018), 250.

[12]Farinosi, "Deconstructing Bentham's Panopticon," 65.

[13]Ivan Manokha, "Surveillance, Panopticism, and Self-Discipline in the Digital Age," *Surveillance & Society* 16, no. 2 (2018), 229; Elizabeth Stoycheff et al., "Privacy and the Panopticon: Online Mass Surveillance's Deterrence and Chilling Effects," *New Media & Society* 21, no. 3 (2019); Jeremy Weissman, *The Crowdsourced Panopticon: Conformity and Control on Social Media* (Rowman & Littlefield Publishers, 2021).

[14]Steve Mann and Joseph Ferenbok, "New Media and the Power Politics of Sousveillance in a Surveillance-Dominated World," *Surveillance & Society* 11, no. 1/2 (2013). We understand the Faculty First Responder project as a form of sousveillance.

[15]Tanner Mirrlees, "The Alt-Right's Platformization of Fascism and a New Left's Digital United Front," *Democratic Communiqué* 28, no. 2 (2019), 38–42.

white supremacist groups and right-wing media. The assumption is that exposing bad behavior will help moderate it. In contrast, right-wing political groups have created a number of surveillance apparatuses, many of which focus on college campuses. Project Veritas produces highly doctored video content targeting groups like ACORN, NPR, and Planned Parenthood. Turning Point USA maintains the "Professor Watchlist" to "expose and document … leftist propaganda in the classroom."[16] Campus Watch, maintained by the Middle East Forum, identifies faculty deemed insufficiently pro-American or overly critical of Israel.[17] Canary Mission similarly monitors college campuses for evidence of antisemitism, which often includes support for the Boycott, Disinvestment, Sanction (BDS) movement.[18] Right-wing panoptic networks are often particular potent because they enjoy both considerable institutional funding and work closely with – and serve as a pipeline for – right-wing media organizations.

In their analysis of right-wing media, Benkler, Faris, and Roberts analyzed millions of news articles and social media posts collected from the 2016 election and identified two distinct media ecosystems in the U.S. The largest, the mainstream media, is organized around *The New York Times*, the *Washington Post*, and CNN, and generally follow "longstanding journalistic norms."[19] In contrast, the right-wing media ecosystem, organized around Breitbart, *Fox News*, and The Daily Caller, enjoy a tentative relationship to journalistic standards. Because their content is primarily disseminated through social media it is "much more susceptible … to disinformation, lies, and half-truths."[20] This media ecosystem also succeeds at forging highly affective relationships with its audience, whereby news consumers construct a shared identity around their media purveyor. For example, during Obama's presidency, *Fox News* and the Koch-funded astroturf group Freedom Works helped harness the "organic libidinal rage" among the right, blurring the boundary between news purveyors, consumers, and participants. Fox promoted Tea Party rallies, their viewers provided the "free labor" as protestors and social media activists, and then these become Fox News's content. This feedback loop created "an audience that consumes out of identity and enjoyment."[21] The right-wing panoptic network that targetes higher education is similarly institutionalized in well-funded activist organizations with direct pipelines into the right-wing media ecosystem.

Campus Reform, a project of the Leadership Institute (LI), not only trains many of the journalists within this right-wing media ecosystem, but also serves as a specialized on-ramp for sensationalized stories about professors and university policies. In fact, many right-wing outlets simply regurgitate Campus Reform content almost verbatim.[22] As reported by the *Harvard Crimson*, Campus Reform even recruits students to appear on Fox News – often writing the "talking points" (note: *not* "interview questions") that the Fox anchor and student interviewees work from.[23] Campus Reform stories also spread on

[16]Turning Point USA (2018) "Professor Watchlist." At www.professorwatchlist.org/aboutus (last accessed June 2021).
[17]Campus Watch, "About," Middle East Forum. https://www.meforum.org/campus-watch/about (last accessed June 2021).
[18]Canary Mission, "About Us." https://canarymission.org/about (last accessed June 2021).
[19]Yochai Benkler, Robert Faris, and Hal Roberts, *Network Propaganda: Manipulation, Disinformation, and Radicalization in American Politics* (Oxford University Press, 2018), 15.
[20]Ibid., 13.
[21]Jutel, "Donald Trump, American Populism and Affective Media," 256.
[22]Kamola, "Dear Administrators," 17.
[23]Malaika K. Tapper, "Inside the Conservative Media Outlet Feeding Harvard Students to Fox News," *Harvard Chrimson*, March 5, 2020.

Reddit, Parler as well as QAnon forums[24] such as the GreatAwakening.win and Patriots. win. The result is a right-wing media machine that is "well-oiled, fast moving, and made up of parts that work cohesively."[25] These stories, created within a partisan activist organization, are written in a tone of moralized outrage and widely distributed through the right-wing media ecosystem. As such, they often inspire individual digital "wardens" to take action against those faculty identified as too radical, anti-American, or otherwise socially or politically deviant.

In our survey we found that the vast majority of faculty written about by Campus Reform work at large research institutions, are disproportionately tenured, with African American faculty receiving greater attention relative to their overall representation in the academy. Seventy-eight percent of Campus Reform stories cover comments made on social media. And the vast majority of faculty featured in Campus Reform stories are targeted because of their comments on race (42%) or because of comments about electoral or political matters (23.7%), which often involves criticizing Republican politicians on social media.[26]

Because media consumers/activists within this right-wing media ecosystem provide the decentralized garrison of potential wardens, Campus Reform can continue to present itself as a news outlet (since it doesn't publicly advocate or encourage harassment). However, a look at its history, funders, and content reveal that Campus Reform should be understood as a partisan surveillance apparatus that specializes in monitoring faculty and academic institutions within a right-wing panoptic network.

## What Is Campus Reform?

While Campus Reform dons the self-appointed mantel of "America's leading site for college news," it is actually a partisan organization that specializes in surveilling faculty and academic institutions. Campus Reform is a project of the Leadership Institute (LI). Morton Blackwell created the LI in 1979 to train conservative activists "in campaigns, fundraising, grassroots organizing, youth politics, and communications." Today it boasts over "47 types of training schools, workshops, and seminars; a free employment placement service; and a national field program that trains conservative students to organize campus groups."[27]

Blackwell is a major fixture in the conservative movement.[28] In 1981 he co-founded the Council for National Policy (CNP), along with Paul Weyrich–who also founded the Heritage Foundation, the American Legislative Exchange Council (ALEC), and the Moral Majority– and Richard Viguerie, who pioneered the Republican strategy of political direct marketing. The CNP has transformed the American right by bringing together "the manpower and media of the Christian right with the finances of Western plutocrats and the strategy of

[24]Alice Speri, "A Billionaire-Funded Website with Ties to the Far Right Is Trying to 'Cancel' University Professors," *The Intercept*, April 10, 2021.

[25]Brandi Lawless and Kristen L Cole, "Troll Tracking: Examining Rhetorical Circulation of Anti-Intellectual Ideologies in Right-Wing Media Attacks," *Communication, Culture, and Critique* 14, no. 1 (2021), 151.

[26]Hans-Joerg Tiede, Samantha McCarthy, Isaac Kamola, and Alyson K. Spurgas, "Whom Does Campus Reform Target and What Are the Effects?," *Academe* online, American Association of University Professors, 2021.

[27]Leadership Institute, "About the Leadership Institute." https://www.leadershipinstitute.org/aboutus/

[28]Anne Nelson, *Shadow Network: Media, Money, and the Secret Hub of the Radical Right*. New York: Bloomsbury Publishing, xiv.

right-wing Republican political operatives." Blackwell understands the CNP and LI as institutions for seizing political power. Following the defeat of Goldwater in 1964, Blackwell developed the insight that "'being right' was irrelevant to political victory." Rather, electoral victory is actually "determined by the number and the effectiveness of the activists and leaders on the respective side." Developing effective activists and leaders, however, requires creating "political technology." Blackwell divides the necessary political technology into "communication technology and organization technology … with no neat line of separation between communication and organization."[29] Campus Reform, therefore, is a communications technology which, by Blackwell's own admission, is no different than other right-wing political technologies.

Today, the LI claims to have "trained more than 200,000 conservative activists, leaders, and students" through its "more than 1,700 conservative campus groups and newspapers."[30] Its alumni include Mitch McConnell, former Virginia Governor Jim Gilmore, Karl Rove, Grover Norquist, Ralph Reed, and numerous current and past members of congress.[31] (As well as a number of noted leaders in the white supremacists movement).[32] Appealing to donors, the LI points to alumni Mike Pence and Project Veritas's James O'Keefe as having succeeded "because [of] Leadership Institute donors like you."[33] Beneath each Campus Reform story runs a statement: "They say your views are dangerous, hateful, fearful, or racist … It is time for conservatives young and old to unite as a single voice to boldly proclaim what we stand for and oppose the mob."[34]

Campus Reform treats society, and higher education in particular, as a Manichean battlefield between "us" (i.e., "conservatives") versus "them" ("liberals"). Upon this campus battlefield Campus Reform, quite literally, seeks to score victories. They define a "victory" as "any situation in which a college changes a policy, fires someone, or otherwise responds to concerns raised by the reporting on its site."[35] A previous Editor-in-Chief boasted that stories written by Campus Reform "resulted in 84 policy changes on campus" between 2015–2018.[36] Blackwell's 2019 Christmas letter to LI donors further tallied 26 victories that year, "including the cancellation of politically-correct schemes and the advance of conservative programs on campuses."[37] Campus Reform's Facebook page regularly declares victory, often linking to a story with the simple caption "VICTORY!"[38] Crucially, these so-called victories regularly occur when campus administrators fall victim to, or buy into, the Campus Reform's narrative and therefore engage in disciplinary action against their faculty or capitulate on issues of campus policy.

[29]Blackwell quoted in: Nelson, *Shadow Network*, 26.

[30]Leadership Institute, "About the Leadership Institute," available at: https://leadershipinstitute.org/aboutus/.

[31]The Leadership Institute, "Training: Get the Knowledge You Need to Win and Succeed," 2005. Archived at: https://web.archive.org/web/20050911041426/http://www.leadershipinstitute.org/02TRAINING/training.htm; SourceWatch, "The Leadership Institute," Center for Media and Democracy, 2018. Available at: https://www.sourcewatch.org/index.php?title=The_Leadership_Institute

[32]Speri, Alice, "A Billionaire-Funded Website with Ties to the Far Right is Trying to 'Cancel' University Professors," *The Intercept*, April 10, 2021.

[33]The Leadership Institute, "Strike the Spark: Create a Legacy of Conservative Leadership for America," 2021. Available at: https://secured.leadershipinstitute.org/legacy/.

[34]From the "What You Stand For is What Defines You" statement at the bottom of each Campus Reform story. www.campusreform.org (last accessed June 8, 2021).

[35]Schmidt, "Higher Education's Internet Outrage Machine."

[36]Sterling Beard's LinkedIn Profile, accessed October 13, 2020 https://www.linkedin.com/in/sterling-beard-73b88436/

[37]Morton Blackwell, "Peace on earth, and good will towards men," Christmas Letter to donors. The Leadership Institute, November 22, 2019. Accessed October 5, 2021, https://isaackamola.domains.trincoll.edu/items/show/11.

[38]Campus Reform's Facebook page, accessed April 21, 2021. https://www.linkedin.com/in/sterling-beard-73b88436/

The Leadership Institute is funded by wealthy right-wing and libertarian donors. In 2020, LI's total revenue was $23.6 million (up from $19.3 million the year before), with $5.9 million going to Campus Reform (up from $1.3 million the year before).[39] According to publicly available 990 tax documents between 1995 and 2017, the Leadership Institute received donations from a number of right-wing foundations, including the Ed Uihlein Family Foundation ($1.16 million), the Lynde and Harry Bradley Foundation ($950,000), DonorsTrust ($848,788) and Donors Capital Fund ($630,500), and various Koch family foundations ($302,292).[40] The Uihlein Family Foundation has been called "the Koch brothers' of Wisconsin politics."[41] The Bradley Foundation lavishly funds organizations that promote school choice, welfare work requirements, anti-labor legislation, and climate change denial.[42] Donors Trust and the affiliated Donors Capital Fund specialize in anonymizing the identity of donors, garnering the moniker of "dark-money ATM for the conservative movement."[43]

As a piece of partisan political technology, Campus Reform should be understood as playing the specialized role of surveilling college campuses and producing content to fed into the right-wing media/political infrastructure.

## Campus Reform as Sensational Surveillance

Campus Reform has not always purported to be a news outlet. The Leadership Institute launched Campus Reform on September 15, 2009 as a "new social networking site for conservative student activists," containing subsites for each of the 2,446 four-year colleges in America. These sites were intended to serve as social media nodes "to help student groups promote conservative principles and fight liberal abuses at colleges and universities across the country."[44] Blackwell claimed this new platform would increase the number of battles fought against "leftist abuses on college campuses" and, "based on long experience, conservative students will win most of those new battles."[45] Campus Reform's original mission statement made clear that the site was intended to "give conservatives powerful new weapons in their fight for the hearts and minds of the next generation of citizens, politicians, and members of the media."[46]

During the early years, articles and blog posts constituted a small part of the website and were written by staff members. Instead, the site mainly provided support for campus activists, opportunities to rate faculty, and listed jobs in

---

[39]Leadership Institute, "Our 2019 Audited Financial Statements" and "Our 2020 form 990," line 12: https://leadershipinstitute.org/aboutus/finance.cfm.

[40]DeSmog, "The Leadership Institute (LI)," available at: https://www.desmog.com/leadership-institute/

[41]Daniel Bice, "Uihleins Spend Big to Help Ron Johnson Defend Senate Seat from Russ Feingold," *Milwaukee Journal Sentinel*, October 4, 2015.

[42]Daniel Bice, "Hacked Records Show Bradley Foundation Taking Its Conservative Wisconsin Model National," *Milwaukee Journal Sentinel*, May 5 2017; Jane Mayer, *Dark Money: The Hidden History of the Billionaires Behind the Rise of the Radical Right* (New York: Anchor Books, 2017).

[43]Andy Kroll, "The Dark-Money ATM of the Conservative Movement," *Mother Jones*, February 5, 2013; Pam Vogel, "The Conservative Dark-Money Groups Infiltrating Campus Politics," Media Matters, https://www.mediamatters.org/research/2017/03/29/conservative-dark-money-groups-infiltrating-campus-politics/215822#cr.

[44]Leadership Institute, "News & Updates: CampusReform.org to Challenge Dominance of College Leftists," September 15, 2009. Archived at https://web.archive.org/web/20100620063526/http://leadershipinstitute.org/news/?NR=1522 (last accessed March 5, 2021).

[45]Ibid.

[46]Campus Reform, "About," 2009. Archived at: https://web.archive.org/web/20090905232127/http://www.campusreform.org/about (last accessed February 11, 2021).

conservative organizations.[47] It also included a survey of "liberal abuse," asking students to identify whether their campus "eliminat[ed...] single-sex bathrooms in dormitories," created transgendered bathrooms, "[e]nforced diversity in every area except for the adherence to or the teaching of conservative principles," and mandated "[c]ompulsory freshman orientation programs and 'sensitivity training' designed by leftist[s] to undermine traditional values."[48]

In 2013, Campus Reform altered their mission statement and drastically rede-signed the website. The website moved from muted red and blue tones to black and bright red (See Figures 1 and 2). The new mission statement described Campus Reform as "America's leading site for college news" and a watchdog organization committed to "expos[ing] bias, abuse, waste, and fraud on the nation's college campuses" through a team of student journalists who uphold "rigorous journalism standards and strive[] to present each story with accuracy, objectivity, and public accountability."[49]

Following the evolution of the website's menus and content links, however, demon-strates just how closely the platform remained true to its right-wing activist roots, even while attempting to pose as a news organization. This is demonstrated by the "Send a Tip" tab – the current replacement for the "Take Action" tab – which encourages informants to



**Figure 1.** Campus reform logo (March 9, 2013).



**Figure 2.** Campus reform logo (April 4, 2013).

[47]Ibid.
[48]Campus Reform, "Leftist Abuses and Bias on Campus," 2009. Archived at https://web.archive.org/web/20090901233109/http://www.surveymonkey.com/s.aspx?sm=ZSGPNM9JfSmzSrySE3cDAw_3d_3d (last accessed February 11, 2021).
[49]Campus Reform, "Mission," 2013. Archived at: https://web.archive.org/web/20130429135341/http://www.campusreform.org/about/ (last accessed February 15, 2021).

"blow the whistle on liberal abuse or wrongdoings taking place on an American college campus."[50] Throughout 2013, Campus Reform also cycled through many iterations of its "Resources" and "Activism Resources" links which provided students with activism ideas like "effective sign-making" and directing them to the Leadership Institute's resources page containing much of the same information for activists.[51] As the Campus Reform website evolved it retained many of the original activist elements, even as they became increasingly obscured by its presentation as a news site.

Additionally, their current newsletter advertisement – appearing below each published article – is riddled with activist language including that "Conservative students on college campuses are marginalized, threatened, and silenced by threatening students who oppose their views, or radicalized liberal professors or administrators." The form asks readers to register for the newsletter if they stand "for protections for conservative students who are illegally being threatened on college campuses" and "for the federal funding to be pulled from colleges and universities when they silence conservative views or students."[52] Those signing up for the newsletter receive an e-mail from Blackwell claiming "It's not enough for conservatives to have the right principles . . . To win elections and the war of ideas, conservatives require effective political skills and tactics . . . Much of this work starts on college campuses, where the battle for America's future is most heated."[53]

Between 2012 and 2014, Campus Reform also expanded its surveillance capacity with the creation of the Campus Correspondent program. Campus Reform had started paying students to write stories for the platform in 2012, just before the revamp, evidenced by a blog post asking "Are you a conservative student on campus who witnessed a liberal abuse by a professor, student or administrator on your campus?"[54] This "Contributing Writer Program" paid $50 per story published, and $100 if it included photo or video evidence. In February 2014, the first person with the title "Campus Correspondent" was added to the staff listed on the site.[55] The Correspondent Program expanded rapidly since its inception, and by June of 2014 six correspondents were listed as staff.[56] A previous Editor-in-Chief, and subsequent Director of Journalism Training at Campus Reform, boasted about the growth of the Campus Correspondent Program, claiming that the platform "went from publishing 489 articles in 2013 to 1675 articles in 2017" with the articles attributed to campus correspondents rising from 70 in 2014 to 807 in 2017.[57]

[50]Campus Reform, "Send us a confidential tip." https://www.campusreform.org/tip (last accessed June 8, 2021).
[51]Campus Reform, "Campus Reform," 2013. Archived at: https://web.archive.org/web/20130429061238/http://www.campusreform.org/ (last accessed June 8, 2021). Using this weblink, one can follow the archived changes to the Campus Reform website by scrolling through the timeline at the top of the page. For a specific analysis of the changes to the Campus Reform website in 2013 see: McCarthy, Sam, "Campus Reform or Sensationalized Surveillance: The Right-Wing Media Outlet Fueling Faculty Harassment," Senior Thesis, Trinity College, 2021.
[52]Campus Reform, "What You Stand for is What Defines You" (located below the article), April 26, 2021. Archived at: https://web.archive.org/web/20210506105428if_/https://www.campusreform.org/article?id=17375.
[53]Morton Blackwell, "You're signed up for Leadership Institute emails," CampusWire, Leadership Institute, accessed October 5, 2021, https://isaackamola.domains.trincoll.edu/items/show/1.
[54]Campus Reform, "Fall 2012 Contributing Writer Program" 2013. Archived at https://web.archive.org/web/20130828060035/http://www.campusreform.org/blog/?ID=3147 (last accessed February 11, 2021).
[55]Campus Reform, "Campus Reform Staff," February 2014. Archived at: https://web.archive.org/web/20140208064802/http://campusreform.org/about/ (last accessed February 15, 2021).
[56]Campus Reform, "Campus Reform Staff," June 2014. Archived at: https://web.archive.org/web/20140626085043/https://www.campusreform.org/about/ (last accessed February 15, 2021).
[57]Beard, LinkedIn.

As of March 2021, there are 84 correspondents listed on the site.[58] In 2020 we logged 1572 articles published by Campus Reform and only 348 were written by staff or faculty contributors, meaning that the remaining 77.9% of stories were written by Campus Correspondents.[59]

The platform underwent an additional redesign in late 2020, with changes that make the platform appear even more like a news outlet – with a template that now closely mimics mainstream news websites. While Campus Reform claims to be a journalistic organization, they clearly conflate journalism with partisan and activist surveillance, summed up in the call "Get paid to hold your school accountable!" and "Be the eyes and ears on your campus."[60]

### Staffing a Surveillance Apparatus

Understanding how Campus Reform recruits, trains, and compensates campus correspondents is key to understanding how it works as a surveillance apparatus. Two former Campus Reform correspondents, Cory Young and Leah Thompson, described a hiring process that was not very competitive or selective. Young described "just one interview and [. . .] it was more of just a general competence screening." Thompson had a call with one staff member "just to make sure everyone is on the same page" about their mission and what kinds of stories they are looking for.[61]

The Campus Reform contract, which Thompson shared, states that: "Campus Reform Campus Correspondent agrees to help produce content for Campus Reform through exposing and reporting on incidents of liberal bias and abuse occurring on U.S. college campuses."[62] In other words, correspondents are *contractually obligated* to approach their topic through the prism of exposing "liberal abuse." Once hired, correspondents earn easy money through a pay-by-the-article compensation scheme. Each correspondent begins at the lowest tier (Bronze), where they earn $50 for each of the first four articles that Campus Reform publishes. They also receive a profile page, personalized business cards, and access to a development training. The next 5–14 articles (Silver tier) earn correspondents $75 per article as well as access to resume prep, a recommendation letter, a personalized Campus Reform "press pass," weekly group mentorship calls, and priority over "Level 1 story pitches." Each story thereafter (Gold) nets $100 each and includes access to one-on-one mentorship calls, an official Campus Reform e-mail (which allows them to receive Twitter verification), admission to a two-day all-expenses-paid media and journalism training event, top priority for story pitches or media opportunities, a promo reel of their media interviews, access to morning editorial meetings, and invitations to exclusive Leadership Institute events and excursions. A "Tipster" can make $50 per each approved tip. And each tier requires the correspondents to meet an (unspecific) writing proficiency

[58]Campus Reform, "Campus Correspondents," 2021. https://www.campusreform.org/correspondents (last accessed March 13, 2021).

[59]Kamola, Isaac, Sam McCarthy, and Aaron Supple, "All Stories 2020–Faculty First Responders" spreadsheet, Faculty First Responders. Data available upon request.

[60]Leadership Institute, "What's Going on in the National Field Program?" https://leadershipinstitute.org/campus/ (last accessed March 5, 2021).

[61]Cory Young, personal interview with Samantha McCarthy, October 26, 2020, via *Zoom*; Leah Thompson, personal interview with Samantha McCarthy, December 18, 2020, via *Zoom*.

[62]Campus Reform. "Campus Correspondent Agreement," 2017. Retrieved via personal interview December 18, 2020 with Sam McCarthy, via Zoom.

standard.[63] Based on our calculations, the most prolific writer of 2020 made approximately $26,250 with the 253 articles written between May, when he started, and December 31, 2020. In fact, on just one day in December 2020, he published eleven articles – earning $1,100. Young rightly notes that this system allows Campus Reform to deploy a less competitive hiring process because "since they pay by the story, [...] it wasn't costly for them to hire someone who wasn't that good."[64]

Correspondents are responsible for finding and pitching their own stories. This often entails scrolling through campus newspapers and faculty social media accounts as well as setting up Google Alerts for keys words that conform to Campus Reform's desired content, such as "gender-neutral bathrooms," "College Palestine," or "Free Speech."[65] Correspondents then pitch stories to editors, which both Young and Thompson noted was not very difficult. After writing the content, editors approved the article, requested changes, or sometimes put the piece on a shared Google Document to edit collaboratively.[66] The entire process "only takes a couple hours of work generally."[67]

Because Campus Reform is clear about the content it publishes, this free-lance army of student correspondents becomes a fairly inexpensive method to surveil faculty. In the process correspondents becomes particularly "attune[d...] to key words, topics, and trends that focus on political correctness and identity."[68] Rather than demanding well-researched and well-reported stories, which can take days and weeks to write, this payment and editorial structure allows Campus Reform to collect a sizable amount of content that fits its desired partisan narrative.

It also produces formulaic content. Each story is less than 600 words, includes similar or repetitive images and videos, as well as sensationalized headlines. They generally lack context or interviews from the people actually involved.[69] The few quotes actually included often come from representatives of similarly right-wing political organizations (such as Young Americans for Liberty, Speech First, etc.). Headlines regularly use quotation marks to cast doubt and skepticism, making the tone of outrage clear even before clicking on the article. In her discussion of similar headlines posted by Campus Watch, Professor Durrani describes how "quotation marks around certain keywords featured in my work seem to index a dubious validity of the terms themselves, suggesting that scholarship on these topics is 'insane,' according to the author, the magazine, and their audience."[70] Stories that accuse faculty of liberal bias often link directly to their personal profiles and social media accounts, seeming to encourage readers to make direct contact.

---

[63]Ibid. Some elements have been previously reported in: Tapper, "Inside the Conservative Media Outlet Feeding Harvard Students to Fox News"; Schmidt, "Higher Education's Internet Outrage Machine."

[64]Young, interview.

[65]Young, interview; Thompson, interview; Tapper, "Inside the Conservative Media Outlet Feeding Harvard Students to Fox News." For a discussion of how "automated search bot" are used by right-wing groups to surveil faculty, see: Mariam Durrani, "Digital Infrastructures of the Internet Outrage Machine: An Autoethnography of Targeted Faculty Harassment," *American Anthropologist* (2021), 3.

[66]Thompson, interview.

[67]Young, interview.

[68]Tapper, "Inside the Conservative Media Outlet Feeding Harvard Students to Fox News."

[69]Campus Reform stories often note that the correspondent reached out to faculty for comment and did not receive a response. Numerous faculty have complained to us, however, that they never receive a request for comment, requests came with little lead time, or were made by someone other than the student correspondent. Similarly, many faculty members do not consider Campus Reform a credible news organization and therefore decline to provide comment.

[70]Durrani, "Digital Infrastructures of the Internet Outrage Machine," 2.

Campus Reform's network of campus correspondents, paid to surveil the academy for evidence of liberal bias, has little incentive to provide the full context, often contributing distorted stories that emphasize outrage but not understanding. For example, one article criticized a professor for suggesting in a tweet that she would consider preventing students known to use hate speech from taking her class. Campus Reform reported this story as simply an obvious example of outrage. Missing, however, was the fact that this tweet was written within a broader campus context in which a video of an incoming student using racial slurs was made public, causing public outcry, a tone-deaf university response, and continued campus unrest in the context of wider Black Lives Matter protests. This broader context was never included in the Campus Reform coverage, or the versions of the story picked up by other outlets.

Another story, following the October 2020 presidential debate, focused on faculty tweets that called Trump's treatment of the female moderator "cringe worthy."[71] The author of the tweets, a scholar who studies female political candidates, was pointing out the gendered nature of Trump's actions. However, the Campus Reform piece ignored the argument behind these tweets, and instead notes – seemingly as a non sequitur – that the professor's website states that she seeks "to include course material from an equal spread of male and female scholars." While presented as simply an accurate summary of a few tweets, the comments section betrays the intended affect. One comment reads "Oh, Look!! It's three manhating feminists living their perpetually offended lives" and "Being a college professor equals being a circus clown."[72]

Sometimes Campus Reform stories go beyond decontextualization and simply manu-facture outrage out of whole cloth. One article accused a faculty member on Biden's COVID Task Force of questioning the efficacy of vaccines, a conclusion arrived at by juxtaposing two unrelated op-eds. The faculty member – a Harvard-educated public health expert and chair of health policy at Wharton Business School (where the Campus Reform correspondent is a student) – wrote one op-ed years before the coronavirus pandemic discussing his personal wishes to avoid an unnecessary prolonging of life, and therefore his plan to refuse the flu vaccine at the age of 75 – a decision he made abundantly clear represents his own personal ethical considerations.[73] The second op-ed, written in January 2020, also before the pandemic, discusses his father who passed away at the age of 92 from an incurable brain tumor, and following a decision not to pursue further medical treatment. The Campus Reform story grossly misrepresents and sensatio-nalizes these otherwise thoughtful reflections on end-of-life care to concoct a false narrative that the faculty member and public health expert does not support the use of vaccinees for older patients.

These represent just a few in a long litany of decontextualized, overstated, or flat-out invented stories. Sloppy journalism and exaggerated headlines are, of course, not unique to Campus Reform. However, unlike more traditional "yellow journalism," tabloid news-papers, and click-bait websites, Campus Reform does not traffic in sensationalism to sell

[71]Zeisloft, Ben, "Profs Outraged Over Trump Being Nice to Female Debate Moderator Kristen Welker," *Campus Reform*, October 23.
[72]Comments post to: Ibid.
[73]Ezekiel J Emanuel, "Why I Hope to Die at 75," *The Atlantic*, October 15, 2014; Ezekiel Emanuel, "My 92-Year-Old Father Didn't Need More Medical Care," ibid., January 2, 2020. The Campus Reform version can be found here: Zeisloft, Ben, "Biden COVID Task Force Member, UPenn Prof Questions Benefits of Vaccines for People over 75a," *Campus Reform*, November 13. https://www.campusreform.org/article?id=16161

subscriptions or attract advertising revenue. Rather, the site – lacking any advertising at all – is a partisan nonprofit completely dependent on private donations.[74] As such, sensationalism has a political, rather than profit, motive.

Campus Reform surveils faculty, and gathers, writes, and circulates highly sensationalized stories well-suited for circulation within the right-wing media ecosystem. As these stories circulate, they whip up online vigilantism capable of disciplining faculty through a barrage of targeted harassment. Such harassment can have considerable disciplining effects.

## Disciplining of Faculty

*"lard filled house N****r b****h"*

– From an e-mail received by Mark Walker

Self-identified Black femme Professor Mary Walker explained that e-mails like this one, sent to her work e-mail, are typical. Walker has been featured in multiple Campus Reform articles, some of which have made it to *Fox News*, meaning she now regularly expects these types of communications.[75] Walker is not alone. Many faculty members across the country have been, currently are, or expect to become targets of such harassment. While Campus Reform provides the surveillance apparatus, online harassers provide the disciplining function.

In 2020, 274 articles published by Campus Reform targeted at least one faculty member for some aspect of their speech, totaling 338 targeted individuals. Most of these stories, 78 percent, focus on speech in the public forum – such as social media, opinion-editorials, letters to the editor, and public speeches (explicitly contradicting Campus Reform's stated mission of exposing bias on campus). Just nine percent of respondents were targeted for classroom speech and eight percent for research publications.[76] Even former Campus Reform correspondent Young noted the hypocrisy of this tactic, pointing out that getting a professor fired for a tweet is "a huge mistake and it really runs counter to the stated goals and beliefs" of Campus Reform.[77] Faculty targeted by Campus Reform are 62.8% white, 14.6% are African American, 7% are Asian or Pacific Islander, 5.5% are Hispanic, and 10.1% identify as multiracial or as another race or ethnicity. African Americans are disproportionately targeted given that they make up just 6% of full-time faculty nationally, and many Black faculty are the subject of more than one story.[78]

Being the subject of a Campus Reform article often carries adverse consequences, although specifics, severity, and duration vary depending on the topic, the race and gender identity of the author, and whether other outlets pick the story up. Forty percent of faculty reported receiving threats of harm following

---

[74]For a discussion of the economic incentives behind "yellow journalism," see: Richard L. Kaplan, "Yellow Journalism." *The International Encyclopedia of Communications*, vol. XI, Wolfgang Donsbach, ed., 2008, 5369–5370; Sharon McQueen, "From Yellow Journalism to Tabloids to Clickbait: The Origins of Fake News in the United States," in *Information Literacy and Libraries in the Age of Fake News*, Denise E. Agosto, ed. Santa Barbara: Libraries Unlimited, 2018, 12–35.

[75]Mary Walker, personal interview with Samantha McCarthy, October 28, 2020, via *Zoom*.

[76]Tiede et al., "Whom Does Campus Reform Target and What Are the Effects?"

[77]Young, interview. We would, of course, disagree with the sentiment that this runs counter to Campus Reform's "goals" which, after all, is to rack up "victories."

[78]Tiede et al., "Whom Does Campus Reform Target and What Are the Effects?"

a Campus Reform story (and an additional 10% reported receiving unwanted and harassing contact but did not consider them threatening). Of the 40% that did received threats, 89% received them by e-mail, 57% by direct message over social media, 45% by phone, and 11% by mail.[79] Five of the six faculty interviewed reported receiving unwanted communications. While not personally receiving unwanted harassment, the sixth faculty member's institution received unwanted e-mails and the other faculty member featured in the article – and the main subject of the story – was the subject of harassment.[80]

The volume of targeted harassment corelates directly with whether the Campus Reform story is picked up within the right-wing media ecosystem. The majority of survey respondents, 65.3%, reported the article being picked up by at least one other outlet.[81] In addition to news sites, two of the faculty interviewed described the story traveling to online forums, and one faculty was discussed on a right-wing militia site.[82] The more coverage a story gets outside of Campus Reform, the more numerous and vicious unwanted communications are.

Harassment also varies depending on what the faulty member said – or was portrayed to have said – and how they identify. According to the survey, 64.1% of respondents who identify as gay, lesbian, bisexual, queer, or other received threats while only 35.8% who identify as straight did. Faculty with marginalized identities tend to receive hate mail condemning who they are, rather than what they said. These messages often contain stereotyping and slurs. *[The following five paragraphs contain graphic details of racist, misogynistic, and homophobic hate]*

Campus Reform targeted Professor Emily Mack for one of her tweets that circulated through the media, into online forums, and eventually to *Fox News*. A woman of Asian descent, many of the unwanted communications she received were racist and xenopho- bic. Mack received one e-mail with an extremely racist slur directed at Asian Americans. The body of the message read: "Thanks to you nasty people we have massive diseases every year. You are dirty and disgusting and live like shit-infested animals. Take your self- righteous yellow ass and go fuck yourself!"[83] Another e-mail stated that the "Article just underscores why Asians are not working out in America. Not sure how foreigners get employed in US universities but it needs to stop."[84] Comments in the online forum are also riddled with sexist language like "B***h probably has 'A' cups. Straight 'no' from me."[85] As the article spread through the media, the e-mails came in "waves." Mack said it was clear from the communications that some people were "sort of stalking" her and she "got terrified that they were going to find [her] address somehow" especially because "the hate that they have is not for anything you've said it's just for, you know, existing essentially."[86] Fearing her and her family's safety in the midst of the harassment, they left home to stay with family.

[79]Ibid.
[80]Walker, interview; Thompson, interview.
[81]Tiede et al., "Whom Does Campus Reform Target and What Are the Effects?"
[82]Victoria Lyons, personal interview with Samantha McCarthy, November 4, 2020, via *Zoom.* Speri, "A Billionaire-Funded Website with Ties to the Far Right Is Trying to 'Cancel' University Professors."
[83]Emily Mack, personal interview with Samantha McCarthy, November 2, 2020, via *Zoom.*
[84]Ibid.
[85]From online messaging board. Citation not provided to preserve anonymity.
[86]Mack, interview.

Similarly, Professor Alan Ronald, a Black man, was targeted over a tweet and was flooded with death threats by e-mail, on his work phone, and at home. Some threats came from white supremacists and frightened his family to the point that they also left their home for a few days. While Ronald said he felt bad for the stress it caused his family, receiving death threats "is an everyday occurrence" for him.[87]

Mary Walker similarly experiences unwanted communications regularly and across platforms which has caused her to develop a routine for dealing with them, but that does not make the hate and harassment any less severe. Walker recounted a recent e-mail she received at work which read:

> Die from Corona. You fat black racist, fat pig. No wonder you're a d**e. No man in his right mind would ever touch your smelly fat, fat communist fat ass. If it wasn't for affirmative action, your fat ugly bucktooth ass would be cleaning toilets instead of brainwashing stupid ass white kids. Damn you are one ugly fat black fat ugly b***h. How much do you pay your girlfriend to eat your fat ass out, commit suicide b***h, go Trump, kill yourself when he wins.

When there is slew of messages like this one, Walker will take some space from social media, have friends or her partner go through the messages, and talks with her therapist about it.

In the comments section of the survey, one transgender faculty member recounted messages that dead-named them, called them sick, and told them they should be committed to a mental institutionalized for their transness.[88] Many faculty members said they received death threats, some said messages were anti-Semitic, and one professor said they received e-mails targeting them for their sexuality and HIV+ status. One faculty member stated that "After their piece was published, their 'readers' harassed me without end." Another called the experience "one of the most awful moments of my professional career." And another faculty member remembered that the "actions of Campus Reform and other right-wing sites were highly disruptive to my life for a period of time." One faculty member experienced "incessant attacks, including death threats, and I was not able to go to my office for a month." Another described being "alarmed and frightened" upon receiving handwritten hate mail at their home address.[89] Some faculty commented that their experience was traumatic, and others said it negatively impacted their mental or physical health.

There are reasons to believe the Campus Reform is – or should be – aware of the kind of hateful and violent response their stories provoke. In addition to media coverage that details the onslaught of hate that these stories invoke,[90] the publications themselves often include hateful comments posted directly beneath the articles. Fairly typical comments include: she "does not look 100% black," "she has a slave surname," and "Senior Professor of brown vagina odor."[91] A comment under an article written about another Black woman faculty member engages in outright threats of violence

---

[87] Alan Ronald, personal interview with Samantha McCarthy, November 19, 2020, via *Zoom*.
[88] Tiede, Hans-Joerg, Samantha McCarthy, Isaac Kamola, and Alyson K. Spurgas, "Campus Reform Survey Results" [unpublished raw data]. American Association of University Professors, February 22, 2021.
[89] Ibid.
[90] For example: Gluckman, "The Outrage Peddlers Are Here to Stay."
[91] Comments posted to: Caroline Shaver, "Prof Who Said White People 'Take up Space' Now Says Whites Can't Decide What's Racist." *Campus Reform*, January 24, 2020. https://www.campusreform.org/?ID=14268 (last accessed April 11, 2021).



> I will not shoot one black ape Thug I will unload my clip and load many others before I stop murdering this anti-American racist scum, these black African Apes that have no business being in this country be careful who you threaten Negroes there's more of us than you, and the white scum that are with you are considered wiggers anyway we will kill them first and leave you for last, watch who you're threatening in response to your BLM white haters I tell you (n*****rs beware).[92]

And under one story about multiple faculty members supporting Black Lives Matter:

> It's time to start killing the treasonous professors . . . .If they incite cop killing, I'm going to murder those bastards, no joke. Each and every reader of this post ought take stock of the universities closest to you, note the names and addresses of key players in those universities, and get prepared to act with lethal force if those bastards incite the youth to harm Our Police. This is no threat, it's a fucking promise. Look up the addresses where the bastards live. Give them fair warning. If they persist in allowing this Treason and propaganda of hatred against Our Police, fucking kill them if you can.[93]

The fact that such comments remain on the site indicates either Campus Reform's gross negligence in moderation or their tacit support for hateful outrage and violent threats. Whatever the intent, these stories create a climate of fear and intimidation, especially aimed at those faculty who research, teach, and speak publicly about issues of race, gender, and class.

Such comments also help explain why the Leadership Institute has historically been attractive to prominent white supremacists. Matthew Heimbach, leader of the white nationalist Traditionalist Workers Party, told reporters that the Leadership Institute "trained this entire next generation of white nationalists."[94] And at various times the Leadership Institute employed far-right and white-supremacist activists, including Keven DeAnna, founder of the Youth for Western Civilization, Martin Christopher Rojas, who wrote more than five hundred publications for white supremacist outlets, and Michael J. Thompson, the Campus Reform employee who "was also a frequent contributor to online white supremacist publications."[95] Blackwell publicly distanced the Leadership Institute from these former employees, and claimed that the organization was unaware of their racist views at the time. However, the Leadership Institute's track record of hiring white supremacists and also producing content that encourages racist and violent hate mail is not coincidental.

Many faculty members report that targeted harassment following Campus Reform stories made them fear for the safety of themselves and their family. Many experienced trauma and expressed considerable anxiety about losing their jobs. Overall, less than half of faculty, 45.3 percent, felt supported by their institution, and 12.4 percent said they faced some form of punitive action by their administration. Three faculty in 2020 reported losing their job due to a Campus Reform story.[96]

[92]Comments posted to: Zeisloft, "Profs Outraged Over Trump Being Nice to Female Debate Moderator Kristen Welker."
[93]Comments posted to: Lacey Kestecher, "Professors Nationwide Offer Assistance, Advice, and Support to Antifa-like Rioters." *Campus Reform*, June 1, 2020. https://www.campusreform.org/?ID=14959 (last accessed April 11, 2021).
[94]Luke, O'Brien, "My Journey to the Center of the Alt-Right," *Huffington Post*, November 3, 2016.
[95]Speri, Alice, "A Billionaire-Funded Website with Ties to the Far Right is Trying to 'Cancel' University Professors," *The Intercept*, April 10, 2021.
[96]Tiede et al., "Whom Does Campus Reform Target and What Are the Effects?"

Walker described her previous institution as one where the administration left her "to the wolves" and she definitely felt like her job was "in limbo." Walker was made to feel that her public speech was putting her job at risk and colleagues advised her to quiet down until after tenure.[97] At her new institution, however, Walker feels well supported and the administration has been very vocal about protecting her freedom of speech. She makes it clear, however, that she is one of the lucky ones as many institutions care more about their public image than protecting their faculty. Walker has friends at other institutions who "have either lost their jobs or had their jobs threatened or have left institutions because they felt so unsupported as they were being harassed."[98]

Ronald described his college president publicly condemning his speech as hateful and an incitement to violence – essentially parroting Campus Reform's mischaracterization of his comments. This lack of public support seemed to inflame the situation further as Ronald explained that he received more incendiary messages as a result.[99] Too often administrations respond by debating the nature of the faculty members speech, which "not only encourage[s] greater self-censorship … but also ignores the broader political strategy at work."[100]

An actual or feared deluge of hate mail, as well as concern about institutional retaliation, often produce a "chilling effect." In line with Foucault's observation that prisoners learn to self-discipline beneath a surveilling warden's gaze, many faculty report engaging in self-censorship and the self-disciplining of their speech. Of all survey respondents, 24.1 percent reported that they curtailed their social media presence as a result of the story. Among faculty who received threats, this number is 38.6 percent. Smaller percentages – 5.9% and 3.0% – of faculty change their teaching and research as a result of Campus Reform stories but, once again, these number climb dramatically when looking at those who received threats of harm (12.1% and 6% respectively).[101]

Professor Mack, for example, discussed changing her behavior on social media as a result of the story and subsequent backlash. She deleted all of her social media accounts in the midst of the harassment. Over time, she reactivated the accounts but has made her Facebook and Instagram private while also removing her last name, making it harder to find her. On Twitter, Mack is more cautious about what she likes or retweets, avoiding anything that might be "construed in some way or the other as being really political or polarizing."[102] She recognizes she has a lot on the line, including her family and her job. Because she fears repercussions incited by Campus Reform, Mack engages in self-censoring on social media as she assumes they could be surveilling her at any time.

Even if faculty do not change their behavior, numerous faculty members nonetheless reported feeling surveilled by Campus Reform, with faculty acknowledging that this disproportionately impacts those without tenure or job security. For example, one professor commented that his college president publicly condemned their speech following a Campus Reform story. And while this public

[97]Walker, interview.
[98]Walker, interview.
[99]Ronald, interview.
[100]Kamola, "Dear Administrators," 15.
[101]Tiede et al., "Whom Does Campus Reform Target and What Are the Effects?"
[102]Mack, interview.

admonishment did not affect their speech, "it has had a chilling effect on campus speech, since other faculty – particularly junior faculty – have seen that if you support equality and freedom for Palestinians, the president will denigrate you and your teaching in public."[103]

This surveillance goes beyond just social media. Wilbur Riley recalled a Campus Reform correspondent who attended classes or campus events as a "political operative under the cover of being a student."[104] Walker acknowledged that being targeted has made her "meta-aware" that she is being "watched."[105] Professor Jacob Anderson referred to the website as a "multimillion dollar surveillance operation" that hopes to "create a chilling effect."[106] Riley similarly said that "it may be chilling for people who don't have job security" and the real concern is how much it impacts faculty without tenure.[107] Walker reports having colleagues tell her, "you might want to quiet down, like before tenure … not … like, you're going to lose your job, but there was definitely these suggestions … [that] you are putting your job at risk."[108] As Ronald knows firsthand though, tenure does not guarantee that faculty will not still face consequences like losing tenure or not being granted funding or promotions.[109]

Faculty are aware that, if they continue to speak on social media, Campus Reform could publish an article about them at any time. Walker recalls tweeting something recently and thinking to herself immediately that Campus Reform is "going to have a field day" with it.[110] Anderson acknowledged that, as a contingent faculty member who plans to continue being a public-facing scholar, he is aware that the stakes are high. He noted that just because the first story about him had only mild impacts, that does not mean there will not "be negative consequences … on down the line."[111]

## Conclusion

The targeted harassment of faculty and the use of institutional sanctions to silence academic speech is, unfortunately, not new. Academic repression has long been a part of the American academy, even as the nature and intensity of such attacks vary over time.[112] During the early twentieth century academics who expressed pacifist, socialist, or communist views were routinely blacklisted and subjected[113] to relentless "investigations,

---

[103]Tiede, et al. "Campus Reform Survey Results."

[104]Wilbur Riley, personal interview with Samantha McCarthy, November 2, 2020, via *Zoom*.

[105]Walker, interview.

[106]Jacob Anderson, personal interview with Samantha McCarthy, November 12, 2020, via *Zoom*.

[107]Riley, interview.

[108]Walker, interview.

[109]Ronald, interview.

[110]Walker, interview.

[111]Anderson, interview.

[112]For a comprehensive overview of academic repression within American higher education, see: Anthony J. Nocella II, Steven Best, and Peter McLaren (eds), *Academic Repression: Reflections from the Academic Industrial Complex*. Oakland: AK Press, 2010.

[113]Barrow, Clyde W., *Universities and the Capitalist State: Corporate Liberalism and the Reconstruction of American Higher Education, 1894–1928*. University of Wisconsin Press, 1990, 232; Clyde W. Barrow, Isaac Kamola, and Heather Steffen, "Class, Politics, and Higher Education: Universities and the Capitalist State Thirty Years On," *Journal of Academic Freedom*, vol. 12, 2021, 7.

hearings, testimony, and newspaper reports," in a political strategy Clyde Barrow calls "terror without violence." During World War I countless academics lost their jobs because they expressed insufficient support for the war.[114] And after World War II, the academy largely "accommodated itself to the demands" of McCarthyism and Cold War anti-communist hysteria, as faculty were fired or silenced for fear of retaliation.[115] In the decades following the social and cultural revolutions of the 1960s, the Right engaged in a protracted culture war against scholars who advocated expanding the humanities and social sciences beyond the traditional Western canon. And after the terrorist attacks of September 11, 2001, a wave of hyper-nationalist academic repression took aim at critics of American foreign policy.

The sensationalized surveillance of Campus Reform shares many similarities with previous waves of academic repression. What is new, however, is the creation of a robust partisan surveillance apparatuses, paid for by undisclosed dark money donors. The panopticon has not only been privatized but now operates to score victories for the radical wing of a political party. The result is a distributed feedback loop whereby the surveillance apparatus pumps moralizing outrage into a right-wing media ecosystem, self-deputized vigilantes meet out their version of justice, and administrators are called upon to respond. Thereby creating new stories, protests, and controversy. In this context, faculty are often disciplined for making statements mainstream to their academic discipline, and even for statements they didn't make (but were concocted by college students contracted at $50 to identify liberal bias). One doesn't need to be a member of the Communist Party, or any political organization to face retaliation. One only needs to present a research paper or make an off-handed comment on social media. However, because the politicization of outrage is the goal, the effects are similar: harassment, "terror without violence," and, in a number of cases, institutional sanction and retaliation.

Schrecker argues that the political harassment of faculty during McCarthyism and the Red Scare was largely successful in creating a docile academy, "silenc[ing] an entire generation of radical intellectuals and snuff[ing] out all meaningful opposition to the official version of the Cold War."[116] Today, the academy faces similar, if more privatized and distributed, harassment. However, the goal is similar: for outside, partisan groups to determine what is taught, researched, and learned on campus.

How should faculty and institutions respond to organizations that, like Campus Reform, specialize in the sensationalized surveillance of faculty? At an institutional level, colleges and universities should work to inoculate themselves from the effects of targeted harassment. Working through channels of shared governance, faculty and administrators can develop clear policies and protocols, using AAUP guidelines, to protect faculty from the effects of sensationalized surveillance. Faculty and administrators should also do every-thing they can to support faculty being targeted and refuse complicity in sanctioning faculty based on allegations made by these highly partisan groups. As faculty, we must vocally defend academic freedom and provide mutual support to our colleagues who find themselves the targets of harassment. And rather than responding to the content of

[114]Carol S. Gruber, *Mars and Minerva: World War I and the Uses of the Higher Learning in America.* Baton Rouge: Louisiana State University Press, 1975, 174.

[115]Ellen W. Schrecker, *No Ivory Tower: McCarthyism and the Universities.* Oxford University Press, 1986, 340.

[116]Schrecker, *No Ivory Tower,* 341.

Campus Reform stories – which are commonly ideologically-motivated distortions – we must make sure that our audiences (administrators, students, parents, journalists, alumni, and the broader public) know what Campus Reform is, who funds them, and how their strategy of sensationalized surveillance works. We should also develop strong academic unions and professional organizations that are uncompromising in their defense of academic freedom.

But most importantly, we must continue doing the work that Campus Reform finds so threatening. As one faculty commented, "While I believe Campus Reform does have a chilling effect overall, I refuse to be cowed."[117]

## Acknowledgments

Sam would like to thank both Dr. Isaac Kamola and Dr. Alyson Spurgas for their continuous support throughout the last two years on this project and for being incredible mentors and advisors throughout my undergraduate career. Isaac would like to thank Ralph Wilson, Sam Parsons, and Nancy MacLean who have supported this work through their activism, research, and brilliance. And to Hank Reichman, Hans-Joerg Tiede, and Alyson Spurgas. The Connecticut state conference and the national office of the AAUP have all been incredible sources of support. Thanks to Aaron Supple, Nanci Alejandra López Flores, and Jason Farrell who, along with my brilliant co-author Sam, diligently read entirely too much Campus Reform (you all deserve medals for your service). We'd also like to thank the editors at *New Political Science*, Judith Grant and Claire Snyder-Hall, as well as two anonymous reviewers for their support and critical comments.

## Disclosure Statement

No potential conflict of interest was reported by the author(s).

[117]Tiede, et al., "Campus Reform Survey Results."

# EXHIBIT V

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

       *Plaintiffs*,

   v.

RICHARD CORCORAN, et al.,

       *Defendants.*

Case No. 4:21-cv-271-MW/MAF

**PLAINTIFF BARRY EDWARDS' RESPONSES
AND OBJECTIONS TO DEFENDANTS'
FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Barry Edwards ("Plaintiff"), by and through his attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

**PRELIMINARY STATEMENT**

Discovery is ongoing, and Plaintiff has not completed his investigation. These responses and objections are based on the information and documents currently

---

[1] The parties conferred and Defendants' counsel agreed that Plaintiffs should have until January 7, 2022 to respond to these interrogatories and the other discovery that Defendants served on November 8, 2021.

1

available to Plaintiff, and Plaintiff reserves his rights to alter, supplement, amend, or otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.     Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement his responses and objections.

2.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in his possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.     Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient,

less burdensome, or less expensive; (2) they seek answers or information that may be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.     Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.     Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.     Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is

disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

8.     Plaintiff further objects to this interrogatory to the extent that it would require him to divulge information or documents protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which guarantees the privacy of the "education records" of students at post-secondary educational institutions. Under FERPA, "education records" has a broad definition, encompassing all documents "directly related to a student" and "maintained by . . . a person acting for [an educational] agency or institution." 20 U.S.C. § 1232g(a)(4). As a professor, Plaintiff is such a person. Plaintiff cannot produce covered information or documents unless four requirements are met. First, the disclosure must be "in compliance with [a] judicial order, or pursuant to any lawfully issued subpoena." *Id.* at 1232g(b)(2)(B). Second, "parents and the students" must be "notified of all such orders or subpoenas in advance of the compliance" with that order or subpoena. *Id.* Third, a protective order must be in place to "restrict[] disclosure of the information to the purposes of the litigation." *C.T. v. Liberal Sch. Dist.*, No. 06-2093-JWL, 2008 WL 394217, at *4 (D. Kan. Feb. 11, 2008). Fourth, "the party seeking disclosure" must "demonstrate a genuine need for the information that outweighs the privacy interest of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977); *accord Daywalker v. Univ. of Texas Med. Branch at Galveston*, No. 3:20-CV-00099, 2021 WL 4099827, at *3 (S.D. Tex. Sept. 9, 2021). None of

4

these requirements are met: Defendants' First Set of Interrogatories to Barry Edwards are neither a court order nor a subpoena; Defendants have produced no evidence that they have notified parents or students of these interrogatories; there is no protective order in place relating to student records; and Defendants have not demonstrated a "genuine need" for the information. Accordingly, Plaintiff cannot comply with any interrogatory that seeks disclosure of information or documents encompassed by FERPA.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target viewpoints with which Governor Ron DeSantis ("Governor"), Defendant Commissioner Corcoran ("Corcoran"), and others in Florida government disagree, including specifically viewpoints they deem to be progressive or liberal viewpoints. To achieve these aims, HB 233 broadly targets the teaching, research into, and academic expression and exploration of viewpoints the Governor, Corcoran, and others in Florida government view as "left-wing," even in

the context of historical, philosophical, or economic instruction. HB 233 also targets viewpoints the Governor, Corcoran, and others in Florida government associate with what they perceive to be "liberal college professors" like Plaintiff, regardless of whether—or perhaps because—those viewpoints are supported by overwhelming data and/or have broad academic or historical support.

These include viewpoints regularly taught by Plaintiff. For example, Plaintiff teaches a course about firearms in the United States: "Guns, Freedom, and Citizenship." It features social science research on the impact of guns on public health and research on the efficacy of gun control. This is a subject strongly disfavored by Governor's party (also the majority party in the current Legislature). Indeed, Florida Republicans have previously passed legislation (later found to be unconstitutional) that restricted what physicians could say to patients about firearm ownership. *See* Rebecca Hersher *Court Strikes Down Florida Law Barring Doctors From Discussing Guns With Patients*, NPR (Feb. 17, 2017), https://www.npr.org/sections/thetwo-way/2017/02/17/515764335/court-strikes-down-florida-law-barring-doctors-from-discussing-guns-with-patient. HB 233 specifically is part of a broader right-wing drive to push back on what they view as progressive influences in education, including to impede or even prohibit teaching the subjects and viewpoints that Plaintiff actively teaches.

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its

enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). In Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." HB 233 also protects—and even advances and attempts to legitimize through governmental favoritism—the baseless narrative that post-secondary faculty are "indoctrinating" students with progressive beliefs and political viewpoints with which the Governor, the majority in the Legislature, and many among the Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35.

As part of HB 233's protection of "uncomfortable, unwelcome, disagreeable, or offensive" speech, HB 233 protects the ability of—and even encourages— students to disrupt Plaintiff's teaching and the education experience with comments that either do not substantively contribute to the learning environment or, possibly,

8

actively harm the learning environment by diverting the class discussion, intimidating or harassing students or Plaintiff, or forcing Plaintiff to spend his limited instruction time addressing ideas that would not otherwise include in his curriculum, including ideas with which he does not agree, does not believe are well-founded, or even ideas that have been widely debunked. For example, HB 233 may protect the ability of Plaintiff's students to seriously discuss the baseless conspiracy theory that victims of mass shootings are "crisis actors," or may require Plaintiff to include such ideas in his curriculum when he otherwise would not.

HB 233 puts Plaintiff in an impossible situation, threatening him and his institution with retribution if his teaching is perceived as not including "uncomfortable, unwelcome, disagreeable, or offensive" viewpoints, whatever those may be, inducing Plaintiff to include such ideas in his curriculum when he otherwise would not. Nor is it confined to just Plaintiff's teaching (which alone would be unlawful). HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a).

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of

9

HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students,

faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

11

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it seems likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid,"

12

as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

13

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appears to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that they have about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten their First Amendment rights.

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within

14

the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey would "say something along the lines of: 'Where are you on the political spectrum?'" FAC ¶ 74. He also made clear that the purpose of the survey was to tell people "[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." *Id*. at ¶ 80. Similarly, the Governor, who supported the passage of HB 233 and signed it into law, indicated that the results of the survey would be used to cut funding from post-secondary educational institutions that, in his view, had not done enough to foster "intellectual freedom and viewpoint diversity." *Id*. at ¶ 79. Plaintiff also refers Defendants to the rest of the Amended Complaint including, in particular,

15

paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the drafts of the survey produced by Defendants in discovery thus far include questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because inquiries by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id*. at 6-7. That is

precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession or that is otherwise obtainable from sources that are source more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required

17

[him] to espouse views [he] do[es] not promote." However, the plain text of HB 233 threatens Plaintiff if he does not engage in speech in which he would not otherwise engage, making him and the institution where he teaches vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2). The result is that Plaintiff may be compelled to teach or espouse views with which he disagrees—or perhaps even *agrees*, but would not otherwise teach or express in a given moment, absent the threats posed by HB 233. It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* HB 233 sets up an impossible task, rendering safe only those persons who somehow manage to anticipate all possible criticism that they are not teaching or discussing or covering "all sides," or else risk injury to themselves or their institutions. In Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." Given the topical nature of Plaintiff's work, he has serious concerns that it will cause him to be specifically targeted under

HB 233.

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 27, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [i.e., Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on his own associations and could

also cause others not to associate with him or to cease associating with him if they believed that any and all confidential disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join an association or resigned from an association because of HB 233, including the date and your reason for not joining or resigning.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to

disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your disclosure, the identity of the requestor, contents of the request, and your response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [his] associations." As noted, the survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their

political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida faculty lists of all of their associations for any type of use or future disclosure threatens Plaintiff with forced disclosure of this association and operates to chill his protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have prohibited a student from recording a lecture, including the date, class, circumstances surrounding the prohibition, and reason for your prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not aware of any "instances where [he] . . . prohibited a student from recording a lecture." Plaintiff can recall only one or two instances where a student has asked to record a lecture in one of his classes; in all instances Plaintiff granted the request. The stated purpose of the requested recordings was to allow the student to listen to the lecture again for academic purposes; the students indicated to Plaintiff that they would not post the recordings online. Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it is overbroad, unduly burdensome, and disproportionate to the needs of this case. This interrogatory is not limited in time. As phrased, the interrogatory seeks information reaching back decades, and which has no bearing whatsoever on this matter. Plaintiff further objects to this interrogatory to the extent that it would require him to divulge information or documents protected by FERPA. Plaintiff further objects to the interrogatory to the extent it seeks information relating to reasonable accommodations made for disabled students. Such information is protected against disclosure under federal law and by the right to privacy guaranteed by the Art. I, § 23 of the Florida Constitution. *Cf. Gomillion v. State*, 267 So. 3d 502, 506 (Fla. 2d DCA 2019) ("[I]n Florida, medical records are protected as private by

our state constitution.").

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where you revised your curriculum or syllabus because of HB 233, including the date you revised your curriculum or syllabus, how the curriculum or syllabus was revised, and the specific provision in HB 233 that required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

HB 233 has substantially affected Plaintiff's decisions in relation to course material and assignments. For example, for Plaintiff's class, "American Constitutional Law," Plaintiff was choosing a video to use regarding Shay's Rebellion. Because of HB 233, Plaintiff felt he could not use content that discussed a connection between Shay's Rebellion and the problems of debt and poverty in the early Republic; as a result, he instead used a simple NBC News Learn video instead of one with more critical analysis. Plaintiff has also altered some of his assignments to students because of HB 233. Previously, Plaintiff often asked students to analyze data on politically or socially controversial subjects. But because of HB 233, Plaintiff has instead changed the assignments to be more abstract and to have less

context so as to avoid being drawn into tangential debates over a possible "hidden political message" in the assignment, or accusations of "political bias" if he gives a student a lower grade for providing an answer more focused on their personal political opinions than the scientific analysis requested.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances where you previously limited students, faculty members, or staff members from ideas which they may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be permitted to limit such access.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

Plaintiff routinely "limit[s] students . . . from ideas which they may [find] to be uncomfortable, unwelcome, disagreeable, or offensive." In class, Plaintiff advises students not to express such ideas because they are corrosive to an open and effective

learning environment, because avoiding the expression of such ideas helps them learn to think critically, and because avoiding expression of such ideas helps them learn to express their ideas in a scholarly and professional manner. For example, Plaintiff has rules for class discussions which include requests that students avoid the use of profanity or personal attacks on other students. Likewise, Plaintiff limits the range of ideas and viewpoints acceptable in response to course assignments: coursework must be responsive to the prompt and not be mere expressions of personal opinions. When Plaintiff makes decisions about his syllabus, he is necessarily limited by time and space in the topics he can cover and the readings he can assign; accordingly, Plaintiff must make editorial decisions about what readings or topics to include or exclude, including based in part on what ideas those readings express. Similarly, when Plaintiff makes statements, sends e-mails, or engages in any other communicative act, he necessarily must make similar editorial decisions as to what to include or exclude from his communication. Accordingly, Plaintiff reasonably does not make affirmative efforts to include views he does not believe would be conducive to learning, fruitful classroom discussion, or civil communication. It would be impracticable for Plaintiff to list every single instance where Plaintiff did not make such an effort.

      In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this

case. Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121. For similar reasons, the interrogatory is also objectionably overbroad. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). In addition, this interrogatory has no time limitation, seeking information relating to "instances" across all years of Plaintiff's many years of teaching. Requiring Plaintiff to identify all such instances would be burdensome. Plaintiff further objects to the scope of the interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it would be impossible for Plaintiff to "identify" every single instance in which Plaintiff excluded some viewpoint in one way or another in a forum that could come within HB 233's extraordinarily broad reach.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 7, 2022.                    Respectfully submitted,

                                           /s/ *Frederick S. Wermuth*
                                           Frederick S. Wermuth
                                           Florida Bar No. 0184111
                                           Thomas A. Zehnder
                                           Florida Bar No. 0063274
                                           Robyn M. Kramer
                                           Florida Bar No. 0118300
                                           KING, BLACKWELL, ZEHNDER &
                                               WERMUTH, P.A.
                                           P.O. Box 1631
                                           Orlando, FL 32802-1631
                                           Telephone: (407) 422-2472
                                           Facsimile: (407) 648-0161
                                           fwermuth@kbzwlaw.com
                                           tzehnder@kbzwlaw.com
                                           rkramer@kbzwlaw.com

                                           Marc E. Elias*
                                           Elisabeth C. Frost*
                                           Alexi M. Velez*
                                           Jyoti Jasrasaria*
                                           Spencer Klein*
                                           Joseph Posimato*
                                           Noah Baron*
                                           ELIAS LAW GROUP LLP
                                           10 G Street NE, Suite 600
                                           Washington, D.C. 20002
                                           Telephone: (202) 968-4490
                                           melias@elias.law
                                           efrost@elias.law
                                           avelez@elias.law
                                           jjasrasaria@elias.law
                                           sklein@elias.law
                                           jposimato@elias.law
                                           nbaron@elias.law

                                           *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 7, 2022 I served a copy of the

foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111


## SERVICE LIST

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

**VERIFICATION OF ANSWERS TO INTERROGATORIES**

I, Barry C. Edwards, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

*Barry C. Edwards*

_____
Barry C. Edwards

1/11/2022

_____
Date

# EXHIBIT W

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

        *Plaintiffs*,

    v.

RICHARD CORCORAN, et al.,

        *Defendants.*

Case No. 4:21-cv-271-MW/MAF

---

**PLAINTIFF JACK FIORITO'S RESPONSES AND
OBJECTIONS TO DEFENDANTS'
FIRST SET OF INTERROGATORIES**

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Jack Fiorito ("Plaintiff"), by and through his attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

**PRELIMINARY STATEMENT**

Discovery is ongoing, and Plaintiff has not completed his investigation. These responses and objections are based on the information and documents currently

---

[1] The parties conferred and Defendants' counsel agreed that Plaintiffs should have until January 7, 2022 to respond to these interrogatories and the other discovery that Defendants served on November 8, 2021.

1

available to Plaintiff, and Plaintiff reserves his rights to alter, supplement, amend, or otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.     Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement his responses and objections.

2.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in his possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.     Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient,

2

less burdensome, or less expensive; (2) they seek answers or information that may be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.      Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.      Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.      Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is

3

disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

8.     Plaintiff further objects to Defendants' interrogatories to the extent that they would require him to divulge information or documents protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which guarantees the privacy of the "education records" of students at post-secondary educational institutions. Under FERPA, "education records" has a broad definition, encompassing all documents "directly related to a student" and "maintained by . . . a person acting for [an educational] agency or institution." 20 U.S.C. § 1232g(a)(4). As a professor, Plaintiff is such a person. Plaintiff cannot produce covered information or documents unless four requirements are met. First, the disclosure must be "in compliance with [a] judicial order, or pursuant to any lawfully issued subpoena." *Id.* at 1232g(b)(2)(B). Second, "parents and the students" must be "notified of all such orders or subpoenas in advance of the compliance" with that order or subpoena. *Id.* Third, a protective order must be in place to "restrict[] disclosure of the information to the purposes of the litigation." *C.T. v. Liberal Sch. Dist.*, No. 06-2093-JWL, 2008 WL 394217, at *4 (D. Kan. Feb. 11, 2008). Fourth, "the party seeking disclosure" must "demonstrate a genuine need for the information that outweighs the privacy interest of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977); *accord Daywalker v. Univ. of Texas Med. Branch at Galveston*, No. 3:20-CV-00099, 2021 WL 4099827, at *3 (S.D. Tex. Sept. 9, 2021). None of

these requirements are met: Defendants' First Set of Interrogatories to Jack Fiorito are neither a court order nor a subpoena; Defendants have produced no evidence that they have notified parents or students of these interrogatories; there is no protective order in place relating to student records; and Defendants have not demonstrated a "genuine need" for the information. Accordingly, Plaintiff cannot comply with any request that seeks disclosure of information or documents encompassed by FERPA.

## <u>INTERROGATORIES</u>

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target progressive and liberal views, including some regularly taught by Plaintiff, such as the importance of unions and collective bargaining. In fact, Defendant Commissioner Corcoran ("Corcoran") has specifically called teachers unions such as UFF "downright evil," and accused them of them of being "crazy people" and "fixated on halting innovation and competition" in response to their opposition to his political agenda. More broadly, HB 233 targets the teaching, research into, and academic expression and exploration of views that

the Governor Ron DeSantis ("Governor"), Corcoran, and others in Florida government view as "left-wing," even in the context of historical, philosophical, or economic instruction. HB 233 also targets viewpoints the Governor, Corcoran, and others in Florida government associate with what they perceive to be "liberal college professors" like Plaintiff, regardless of whether—or perhaps because—those viewpoints are supported by overwhelming data and/or have broad academic or historical support.

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech about issues or that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all of that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this

interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). In Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives."

7

HB 233 also protects – and even advances and attempts to legitimize through governmental favoritism – the baseless narrative that post-secondary faculty are "indoctrinating" students with viewpoints with which the Governor, the majority in the Legislature, and many among Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35.

As part of HB 233's protection of "uncomfortable, unwelcome, disagreeable, or offensive" speech, HB 233 protects the ability of – and even encourages – students to disrupt Plaintiff's teaching and the education experience with comments that either do not substantively contribute to the learning environment or, possibly, actively harm the learning environment by diverting the class discussion, intimidating or harassing students or Plaintiff, or forcing Plaintiff to spend his limited instruction time addressing ideas that he would not otherwise include in his curriculum, including ideas that he does not agree are well-founded. For example, HB 233 may effectively require Plaintiff to teach Corcoran's contention that unions are "fixated on halting innovation and competition," a view with which Plaintiff disagrees.

HB 233 puts Plaintiff in an impossible situation, threatening him and his institution with retribution if his teaching is perceived as not including "uncomfortable, unwelcome, disagreeable, or offensive" viewpoints, whatever those may be, inducing Plaintiff to include such ideas in his curriculum when he otherwise would not. Nor is it confined to just Plaintiff's teaching (which alone would be

unlawful). HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a).

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents

affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the

middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a....? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it seems likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid," as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this

response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appear to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that it has about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten their First Amendment rights.

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the

enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey would "say something along the lines of: 'Where are you on the political spectrum?'" FAC ¶ 74. He also made clear that the purpose of the survey was to tell people

"[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." *Id.* at ¶ 80. Similarly, the Governor, who supported the passage of HB 233 and signed it into law, indicated that the results of the survey would be used to cut funding from post-secondary educational institutions that, in his view, had not done enough to foster "intellectual freedom and viewpoint diversity." *Id.* at ¶ 79. Plaintiff also refers Defendants to the rest of the Amended Complaint including, in particular, paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the drafts of the survey produced by Defendants in discovery thus far include questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that

you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because broad inquiries into political associations by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id*. at 6-7. That is precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession or that is otherwise obtainable from sources that are source more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to

espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required [him] to espouse views [he] do[es] not promote." However, Plaintiff observes that the plain text of HB 233, including through its vague Anti-Shielding Provisions, threatens Plaintiff if he does not engage in speech in which he would not otherwise engage, making him and the institution at which he teaches vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2).

Plaintiff regularly teaches and publishes about unions and collective bargaining. Corcoran has specifically called teachers unions such as UFF "downright evil," and accused them of them of being "crazy people" and "fixated on halting innovation and competition" in response to their opposition to his political agenda. Plaintiff has serious concerns that his work will cause him to specifically be

targeted under HB 233, and he will face retribution if refuses to teach or espouse views with which he disagrees—or perhaps even *agrees*, but *would not otherwise teach or express* in any given moment, absent the threats posed by HB 233.

Specifically, Plaintiff is concerned that HB 233 may force him to narrow the scope of the perspectives he teaches, effectively "shielding" students from the liberal views HB 233 targets. For example, in an early chapter of the text Plaintiff uses for his course "Management of Labor and Industrial Relations," MAN 4401, the text's author, Professor John W. Budd ("Budd"), lays out four "schools of thought" on employment relations in a chapter entitled "Labor Unions:  Good or Bad?"  These are:

1.   The Mainstream Economics School (sometimes called "neoclassical economics school");

2.   The Human Resource Management School;

3.    The Industrial Relations School (sometimes called "institutional labor economics school"); and

4.    The Critical Industrial Relations School (sometimes called "Marxist industrial relations school").

As Budd points out, answers to the chapter title's question vary with each school of thought, but, in Plaintiff's view, all have some legitimacy as a perspective on employment relations, perhaps to varying degrees in different parts of the world with differing employment relations systems. Plaintiff believes that students need to

18

be aware of the differing perspectives of these schools in order to have a more complete understanding of the subject matter and how differing systems address the need to provide efficiency, equity, and voice. Budd's text, in Plaintiff's view, justly favors the Industrial Relations School and its pluralist perspective in assuming that each of the major parties to employment relations—management, employees, unions, and government—plays a legitimate role in employment relations, while acknowledging the legitimacy of all four schools of thought. However, given the statements of proponents of HB 233, and in particular the anti-union viewpoints to which they have given voice, Plaintiff is concerned that he may not be able to teach or espouse some of the perspectives in Budd's text, such as the Critical Industrial Relations School.

Plaintiff is also concerned because, before the passage of HB 233, a student criticized Plaintiff's teaching as one-sided (in the student's view). HB 233 allows these types of complaints, based on viewpoint, to be weaponized against Plaintiff and his institution, with the force of state-sponsored law. It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* HB 233 sets up an impossible task, rendering safe only those persons

who somehow manage to cover *all* opposing viewpoints to anything they teach or say, or else risk injury to themselves or their institutions. For example, in Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." .

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 28-29, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [i.e., Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff

further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed that any and all confidential disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join an association or resigned from an association because of HB 233, including the date and your reason for not joining or resigning.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and

General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your disclosure, the identity of the requestor, contents of the request, and their response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and

General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [his] associations." As noted, the survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida faculty lists of all of their associations for any type of use or future disclosure threatens Plaintiff with forced disclosure of this association and operates to chill his protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

23

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have prohibited a student from recording a lecture, including the date, class, circumstances surrounding the prohibition, and reason for your prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not aware of any "instances where [he] . . . prohibited a student from recording a lecture." Only approximately two or three students have requested to record Plaintiff's lectures in Plaintiff's long career of teaching. Plaintiff has agreed on each occasion. However, those students have only ever requested to record audio of his lectures—not video, which is substantially more intrusive. In addition, consistent with College of Business policy, Plaintiff has requested that students not use their cell phones in class. However, for the Spring 2022 semester, Plaintiff took care to include in his syllabus a statement that nevertheless, students may record his lectures consistent with HB 233. Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it is overbroad, unduly burdensome, and disproportionate to

24

the needs of this case. This interrogatory is not limited in time. As phrased, the interrogatory seeks information reaching back decades, and which has no bearing whatsoever on this matter. Plaintiff further objects to this request to the extent that it would require him to divulge information or documents protected by FERPA. Plaintiff further objects to the interrogatory to the extent it seeks information relating to reasonable accommodations made for disabled students. Such information is protected against disclosure under federal law and by the right to privacy guaranteed by the Art. I, § 23 of the Florida Constitution. *Cf. Gomillion v. State*, 267 So. 3d 502, 506 (Fla. 2d DCA 2019) ("[I]n Florida, medical records are protected as private by our state constitution.").

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where you revised your curriculum or syllabus because of HB 233, including the date you revised your curriculum or syllabus, how the curriculum or syllabus was revised, and the specific provision in HB 233 that required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

As a result of HB 233, Plaintiff has updated his syllabus for Management of

25

Labor and Industrial Relations, MAN 4401, which he is teaching this semester, to include a statement that students may record his lectures consistent with HB 233. Furthermore, for the reasons already addressed, Plaintiff is concerned that under the threats posed to his institution by HB 233, he could receive pressure to make revisions or changes in the future.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances where you previously limited students, faculty members, or staff members from ideas which they may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be permitted to limit such access.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

Under the extraordinary breadth (and vague framing) of HB 233, Plaintiff necessarily "limit[s] students . . . from ideas which they may [find] to be uncomfortable, unwelcome, disagreeable, or offensive." For example, Plaintiff limits the range of ideas and viewpoints acceptable in response to course assignments: coursework must be responsive to the prompt and not be mere expressions of personal opinions.

Furthermore, when Plaintiff makes decisions about his syllabus, he is necessarily limited by time and space in the topics he can cover and the readings he can assign; accordingly, Plaintiff must make editorial decisions about what readings or topics to include or exclude, including based in part on what ideas those readings express. Similarly, when Plaintiff makes statements, sends e-mails, or engages in any other communicative act, he necessarily must make similar editorial decisions as to what to include or exclude from his communication. Accordingly, Plaintiff reasonably does not make affirmative efforts to include views he does not believe would be conducive to learning, fruitful classroom discussion, or civil communication, and under the extraordinary breadth (and vague framing) of HB 233, by not including that information, Plaintiff recognizes he may be viewed as "shielding" students from it.

Nonetheless, throughout his career Plaintiff has endeavored to ensure that his students are exposed to a range of legitimate perspectives in his courses—but he is concerned that HB 233 may force him to narrow the scope of those perspectives,

effectively "shielding" students from the liberal views HB 233 targets. For example, in an early chapter of the text Plaintiff uses for his course "Management of Labor and Industrial Relations," MAN 4401, the text's author, Professor John W. Budd, lays out four "schools of thought" on employment relations in a chapter entitled "Labor Unions: Good or Bad?" These are:

1.    The Mainstream Economics School (sometimes called "neoclassical economics school");

2.    The Human Resource Management School;

3.    The Industrial Relations School (sometimes called "institutional labor economics school"); and

4.    The Critical Industrial Relations School (sometimes called "Marxist industrial relations school").

As Budd points out, answers to the chapter title's question vary with each school of thought, but, in Plaintiff's view, all have some legitimacy as a perspective on employment relations, perhaps to varying degrees in different parts of the world with differing employment relations systems. Plaintiff believes that students need to be aware of the differing perspectives of these schools in order to have a more complete understanding of the subject matter and how differing systems address the need to provide efficiency, equity, and voice. Budd's text, in Plaintiff's view, justly favors the Industrial Relations School and its pluralist perspective in assuming that each of the major parties to employment relations—management, employees,

28

unions, and government—plays a legitimate role in employment relations, while acknowledging the legitimacy of all four schools of thought. However, given the statements of proponents of HB 233, and in particular the anti-Marxist and anti-union viewpoints to which they have given voice, Plaintiff is concerned that he may not be able to teach or espouse some of the perspectives in Budd's text, such as the Critical Industrial Relations School.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this case. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). In addition, this interrogatory has no time limitation, seeking information relating to "instances" across all years of Plaintiff's many years of teaching. Requiring Plaintiff to identify all such instances would be burdensome. Plaintiff further objects to the scope of the interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it would be impossible for Plaintiff to "identify" every single instance in which Plaintiff

excluded some viewpoint in one way or another in a forum that could come within HB 233's Anti-Shielding Provisions' extraordinarily broad reach. Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 7, 2022.                   Respectfully submitted,

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
Robyn M. Kramer
Florida Bar No. 0118300
KING, BLACKWELL, ZEHNDER &
    WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias*
Elisabeth C. Frost*
Alexi M. Velez*

30

Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
Noah Baron*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
avelez@elias.law
jjasrasaria@elias.law
sklein@elias.law
jposimato@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 7, 2022 I served a copy of the

foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

## <u>SERVICE LIST</u>

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, Jack Fiorito, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

_Jack Fiorito_
_____
Jack Fiorito


1/11/2022
_____
Date

# EXHIBIT X

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

      *Plaintiffs*,

    v.

RICHARD CORCORAN, et al.,

      *Defendants.*

Case No. 4:21-cv-271-MW/MAF

---

## PLAINTIFF WILLIAM LINK'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff William A. Link ("Plaintiff"), by and through his attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

## PRELIMINARY STATEMENT

Discovery is ongoing, and Plaintiff has not completed his investigation. These responses and objections are based on the information and documents currently

---

[1] The parties conferred and Defendants' counsel agreed that Plaintiffs should have until January 7, 2022 to respond to these interrogatories and the other discovery that Defendants served on November 8, 2021.

1

available to Plaintiff, and Plaintiff reserves his rights to alter, supplement, amend, or otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.      Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement his responses and objections.

2.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in his possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.      Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient,

2

less burdensome, or less expensive; (2) they seek answers or information that may be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.     Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.     Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.     Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is

3

disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

8.      Plaintiff further objects to this interrogatory to the extent that it would require him to divulge information or documents protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which guarantees the privacy of the "education records" of students at post-secondary educational institutions. Under FERPA, "education records" has a broad definition, encompassing all documents "directly related to a student" and "maintained by . . . a person acting for [an educational] agency or institution." 20 U.S.C. § 1232g(a)(4). As a professor, Plaintiff is such a person. Plaintiff cannot produce covered information or documents unless four requirements are met. First, the disclosure must be "in compliance with [a] judicial order, or pursuant to any lawfully issued subpoena." *Id*. at 1232g(b)(2)(B). Second, "parents and the students" must be "notified of all such orders or subpoenas in advance of the compliance" with that order or subpoena to the extent the request involves student information. *Id*. Third, a protective order must be in place to "restrict[] disclosure of the information to the purposes of the litigation." *C.T. v. Liberal Sch. Dist.*, No. 06-2093-JWL, 2008 WL 394217, at *4 (D. Kan. Feb. 11, 2008). Fourth, "the party seeking disclosure" must "demonstrate a genuine need for the information that outweighs the privacy interest of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977); *accord Daywalker v. Univ. of Texas Med. Branch at Galveston*, No. 3:20-CV-00099, 2021

4

WL 4099827, at *3 (S.D. Tex. Sept. 9, 2021). None of these requirements are met: Defendants' First Set of Interrogatories to William A. Link are neither a court order nor a subpoena; Defendants have produced no evidence that they have notified parents or students of these interrogatories; there is no protective order in place relating to student records; and Defendants have not demonstrated a "genuine need" for the information. Accordingly, Plaintiff cannot comply with any interrogatory that seeks disclosure of information or documents encompassed by FERPA.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target viewpoints to which the Governor Ron DeSantis ("Governor"), Defendant Commissioner Corcoran ("Corcoran"), and others in Florida government are opposed, including specifically viewpoints that they deem to be progressive or liberal. To achieve these aims, HB 233 broadly targets the teaching, research into, and academic expression and exploration of viewpoints the Governor, Corcoran, and others in Florida government view as "left-wing," even in

the context of historical, philosophical, or economic instruction. HB 233 also targets viewpoints the Governor, Corcoran, and others in Florida government associate with what they perceive to be "liberal college professors" like Plaintiff, regardless of whether—or perhaps because—those viewpoints are supported by overwhelming data and/or have broad academic or historical support.

These include viewpoints regularly taught by Plaintiff, whose own work primarily focuses on the history of the American South, the Progressive Era, the history of education, slavery, and the origins of the Civil War, and American Conservatism. Indeed, news reports from around the time of the bill's passage recognized that HB 233 is part of a broader right-wing drive to push back on progressive influences in education, including specifically to impede or even prohibit teaching, researching, or writing about the history of slavery, a subject that Plaintiff has long taught at the graduate and undergraduate levels. Contemporaneous statements by Florida lawmakers, including Florida House Speaker Chris Sprowls, make clear that one of the specific aims of this and similar legislation recently enacted by the Florida Legislature (and pushed by the Florida Governor) is to attack the teaching of professors of history, like Plaintiff, in particular. In their view, "liberal" professors have been failing to teach students "what our real history is and what our legacy is." More recent statements, including by the Governor himself, make clear that Florida intends to suppress speech specifically about the history of slavery and its enduring consequences for the nation. Just last week it was reported

that the Governor described teachings that propose that America's history of slavery and racism have effects on current-day laws and practices, as "state-sponsored or corporate-sanctioned racism."

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech about issues or that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). For example, in Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives."

HB 233 also protects – and even advances and attempts to legitimize through governmental favoritism – the baseless narrative that post-secondary faculty are "indoctrinating" students with viewpoints with which the Governor, legislative

8

majority, and many among Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35.

As part of HB 233's protection of "uncomfortable, unwelcome, disagreeable, or offensive" speech, HB 233 protects the ability of – and even encourages – students to disrupt Plaintiff's teaching and the education experience with comments that either do not substantively contribute to the learning environment or, possibly, actively harm the learning environment by diverting the class discussion, intimidating or harassing students or Plaintiff, or forcing Plaintiff to spend his limited instruction time addressing ideas that he would not otherwise include in his curriculum, including ideas that he does not agree are well-founded or even ideas that have been widely debunked. For example, HB 233 may effectively require Plaintiff to teach views about the history of slavery that the Governor himself has endorsed and published, but which Plaintiff, like many historians, views as historically unsound, such as the notion that the Three-Fifths Compromise "benefitted anti-slavery states" or that the "philosophical foundations of the [unamended] Constitution [were] incompatible with slavery," despite the fact that the Constitution specifically protected slavery until it was amended in 1865.

HB 233 puts Plaintiff in an impossible situation, threatening him and his institution with retribution if his teaching is perceived as not including "uncomfortable, unwelcome, disagreeable, or offensive" viewpoints, whatever those may be, inducing Plaintiff to include such ideas in his curriculum when he otherwise

9

would not. Nor is it confined to just Plaintiff's teaching (which alone would be unlawful). HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a).

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment

threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one)

12

Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it seems likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid," as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession or is otherwise obtainable from sources that are more convenient, less burdensome, or less

expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appear to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that it has about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten his First Amendment rights.

14

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey

would "say something along the lines of: 'Where are you on the political spectrum?'"
FAC ¶ 74. He also made clear that the purpose of the survey was to tell people
"[what] to be honest, we already know, which is that we've lost these campuses to
the radical left" and to justify "defunding the radical institutions on these campuses"
and "insane professors that hate conservatives and hate this country." *Id*. at ¶ 80.
Similarly, the Governor, who supported the passage of HB 233 and signed it into
law, indicated that the results of the survey would be used to cut funding from post-
secondary educational institutions that, in his view, had not done enough to foster
"intellectual freedom and viewpoint diversity." *Id*. at ¶ 79. Plaintiff also refers
Defendants to the rest of the Amended Complaint including, in particular,
paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the most recent drafts of the survey
produced by Defendants in discovery thus far include questions such as: "Generally
speaking, you would say that you think of yourself as a … Republican, Independent,
Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely
conservative, and 4 is exactly in the middle, where would you place yourself?"
Defendants_002971-002972. Defendants' production also reveals that the survey is
based on other surveys which include similar questions, such as: "How would you
describe your views? Radical left; liberal; moderate; conservative;
ultraconservative"; "How would you characterize your political views? (Mark one)
Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1

to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210. Accordingly, Plaintiff anticipates that any final draft of the survey will include similar questions.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because inquiries by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id*. at 6-7. That is precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or Defendants' knowledge or possession or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required [him] to espouse views [he] do[es] not promote." However, Plaintiff observes that the plain text of HB 233, including through its vague Anti-Shielding Provisions, threatens Plaintiff if he does not engage in speech in which he would not otherwise engage, making him and the institution at which he teaches vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2). The result is that Plaintiff may be compelled to teach or espouse views with which he disagrees—or perhaps even *agrees*, but *would not otherwise*

*teach or express* in any given moment, absent the threats posed by HB 233. It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.*

As previously noted, Plaintiff teaches and publishes about the history of the American South, the Progressive Era, the history of education, slavery, and the origins of the Civil War, and American Conservatism. HB 233 is part of a broader right-wing drive to push back on progressive influences in education, including specifically to impede or even prohibit teaching, research, or writing about the history of slavery, and instead force instructors to teach revisionist right-wing views of history—particularly as it relates to slavery and race relations—or else be vulnerable to retribution enabled and encouraged by HB 233. These subjects are among some of the most often vilified by the Governor, Florida's legislative majority, and others within Florida's current government.

Plaintiff has serious concerns that he will be pressured or compelled to spend his limited instruction time addressing ideas that he would not otherwise include in his curriculum, including ideas that he does not agree are well-founded or even ideas that have been widely debunked. HB 233 may effectively require Plaintiff to teach

or espouse views about the history of slavery that the Governor himself has endorsed and published, but which Plaintiff, like many historians, views as historically unsound, such as the notion that the Three-Fifths Compromise "benefitted anti-slavery states" or that the "philosophical foundations of the [unamended] Constitution are incompatible with slavery," despite the fact that the Constitution specifically protected slavery until it was amended in 1865. Given the topical nature of Plaintiff's work, he has serious concerns that it will cause him to be specifically targeted under HB 233, and that he will face retribution.

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 23-26, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what it means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*,

Fla. Stat. § 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed that any and all confidential disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join an association or resigned from an association because of HB 233, including the date and your reason

for not joining or resigning.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your

disclosure, the identity of the requestor, contents of the request, and your response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [his] associations." The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida faculty lists of all of their associations for any type of use or future disclosure, threatens Plaintiff with forced disclosure of this association and operates to chill his protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of

third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have prohibited a student from recording a lecture, including the date, class, circumstances surrounding the prohibition, and reason for your prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not aware of any "instances where [he] . . . prohibited a student from recording a lecture." Indeed, Plaintiff cannot recall any instances where students sought to record his lectures, with the exception of students who recorded lectures pursuant to a reasonable accommodation for a disability. If students had requested to record Plaintiff's lectures for academic purposes, he would have granted the request; however, if the purpose of the recording were for the purpose of documenting his political sentiments, he would not have been comfortable granting the request. Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this

24

interrogatory because it is overbroad, unduly burdensome, and disproportionate to the needs of this case. This interrogatory is not limited in time. As phrased, the interrogatory seeks information reaching back decades, and which has no bearing whatsoever on this matter. Plaintiff further objects to this interrogatory to the extent that it would require him to divulge information or documents protected by FERPA. Plaintiff further objects to the interrogatory to the extent it seeks information relating to reasonable accommodations made for disabled students. Such information is protected against disclosure under federal law and by the right to privacy guaranteed by the Art. I, § 23 of the Florida Constitution. *Cf. Gomillion v. State*, 267 So. 3d 502, 506 (Fla. 2d DCA 2019) ("[I]n Florida, medical records are protected as private by our state constitution.").

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where you revised your curriculum or syllabus because of HB 233, including the date you revised your curriculum or syllabus, how the curriculum or syllabus was revised, and the specific provision in HB 233 that required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any "instances where [he] revised [his] curriculum or syllabus because of HB 233." However, for the reasons already addressed, Plaintiff is concerned that under the threats posed to his institution by HB 233, he could receive pressure to make revisions or changes in the future.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances where you previously limited students, faculty members, or staff members from ideas which they may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be permitted to limit such access.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

Plaintiff routinely "limit[s] students . . . from ideas which they may [find] to

be uncomfortable, unwelcome, disagreeable, or offensive." In class, Plaintiff advises students not to express such ideas because they are corrosive to an open and effective learning environment, because avoiding the expression of such ideas helps them learn to think critically, and because avoiding expression of such ideas helps them learn to express their ideas in a scholarly and professional manner. For example, Plaintiff has rules for class discussions which include requests that students avoid the use of profanity or personal attacks on other students. Likewise, Plaintiff limits the range of ideas and viewpoints acceptable in response to course assignments: coursework must be responsive to the prompt and not be mere expressions of personal opinions. When Plaintiff makes decisions about his syllabus, he is necessarily limited by time and space in the topics he can cover and the readings he can assign; accordingly, Plaintiff must make editorial decisions about what readings or topics to include or exclude, including based in part on what ideas those readings express. Similarly, when Plaintiff makes statements, sends e-mails, or engages in any other communicative act, he necessarily must make similar editorial decisions as to what to include or exclude from his communication. Accordingly, Plaintiff reasonably does not make affirmative efforts to include views he does not believe would be conducive to learning, fruitful classroom discussion, or civil communication. It would be impracticable for Plaintiff to list every single instance where Plaintiff did not make such an effort.

In addition to the General Objections set forth above, Plaintiff objects to this

interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this case. Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id.* at ¶ 121. For similar reasons, the interrogatory is also objectionably overbroad. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). In addition, this interrogatory has no time limitation, seeking information relating to "instances" across all years of Plaintiff's many years of teaching. Requiring Plaintiff to identify all such instances would be burdensome. Plaintiff further objects to the scope of the interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it would be impossible for Plaintiff to "identify" every single instance in which Plaintiff excluded some viewpoint in one way or another in a forum that could come within HB 233's Anti-Shielding Provisions' extraordinarily broad reach.

28

Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 7, 2022.                    Respectfully submitted,

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
Robyn M. Kramer
Florida Bar No. 0118300
KING, BLACKWELL, ZEHNDER &
    WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias*
Elisabeth C. Frost*
Alexi M. Velez*
Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
Noah Baron*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law

29

avelez@elias.law
jjasrasaria@elias.law
sklein@elias.law
jposimato@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 7, 2022 I served a copy of the foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

## SERVICE LIST

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, William A. Link, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

_William A. Link_
_____
William A. Link


1/11/2022
_____
Date

# EXHIBIT Y

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

        *Plaintiffs*,

    v.

RICHARD CORCORAN, et al.,

        *Defendants.*

Case No. 4:21-cv-271-MW/MAF

---

## PLAINTIFF JULIE ADAMS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

---

    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Julie Adams ("Plaintiff"), by and through their attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

### PRELIMINARY STATEMENT

    Discovery is ongoing, and Plaintiff has not completed their investigation. These responses and objections are based on the information and documents currently available to Plaintiff, and Plaintiff reserves their rights to alter, supplement,

---

[1] The parties conferred and Defendants' counsel agreed that this Plaintiff should have until January 14, 2022 to respond to these interrogatories and a subset of other discovery that Defendants served on November 8, 2021.

amend, or otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.      Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement their responses and objections.

2.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in their possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.      Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient, less burdensome, or less expensive; (2) they seek answers or information that may

2

be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.     Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.     Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.     Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target progressive and liberal views, including those held by Plaintiff, such as their belief, consistent with scientific consensus, that climate change is real and driven by human activity, that all persons should have access to reproductive healthcare, and that the government must enact commonsense legislation to address the epidemic of gun violence in this country. *See* FAC ¶ 35. For example, in September 2021, Republicans in the Florida state legislature, with the support of Governor Ron DeSantis ("Governor"), introduced legislation that would prohibit most abortions in the state. Similarly, in May 2021, the Governor signed legislation prohibiting gun violence prevention regulations, including "unwritten" ones, by local and municipal governments.

More broadly, HB 233 targets the teaching, research into, and academic expression and exploration of views that the Governor, Defendant Commissioner Corcoran ("Corcoran"), and others in Florida government view as "left-wing," even in the context of historical, philosophical, or economic instruction. HB 233 also

4

targets viewpoints the Governor, Corcoran, and others in Florida government associate with what they perceive to be "liberal college professors" and "liberal college students" like Plaintiff.

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech about issues or that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all of that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this

response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). For example, in Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." Given HB 233's sweeping language, it may require professors in Florida to do the same. Plaintiff is Jewish and would indeed find such views "uncomfortable, unwelcome, disagreeable, or offensive."

In addition, as part of HB 233's protection of "uncomfortable, unwelcome, disagreeable, or offensive" speech, HB 233 protects the ability of—and even

6

encourages—students to disrupt teaching in the classes Plaintiff attends, with comments that either do not substantively contribute to the learning environment or, possibly, actively harm the learning environment by diverting the class discussion, intimidating or harassing students (including Plaintiff), and effectively requiring that Florida's post-secondary institutions credit and give credence to even ideas and conspiracies that are baseless and have been widely debunked—potentially including, but not limited to, anti-Semitic conspiracy theories which would create a hostile learning environment for Plaintiff, who is Jewish.

Moreover, the special protection of "uncomfortable, unwelcome, disagreeable, or offensive" ideas that HB 233's Anti-Shielding Provisions require is not limited to the classroom. Those provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). By its terms, it would even seem to require Plaintiff to give floor time and oxygen to theories that target their own humanity and dignity.

HB 233 also protects – and even advances and attempts to legitimize through governmental favoritism – the baseless narrative that post-secondary faculty are "indoctrinating" students with viewpoints with which the Governor, the majority in

the Legislature, and many among Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35. Indeed, the purpose of HB 233's Survey Provision is explicitly to tell people "[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." FAC ¶ 80.

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents

9

affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the

middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a....? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it is likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid," as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this

response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appear to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that it has about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten their First Amendment rights.

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the

enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey would "say something along the lines of: 'Where are you on the political spectrum?'" FAC ¶ 74. He also made clear that the purpose of the survey was to tell people

13

"[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." *Id*. at ¶ 80. Similarly, the Governor, who supported the passage of HB 233 and signed it into law, indicated that the results of the survey would be used to cut funding from post-secondary educational institutions that, in his view, had not done enough to foster "intellectual freedom and viewpoint diversity." *Id*. at ¶ 79. Plaintiff also refers Defendants to the rest of the Amended Complaint including, in particular, paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the drafts of the survey produced by Defendants in discovery thus far include questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that

14

you usually think of yourself as a….? Democrat; Independent; Republican."
Defendants_002200-002210.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because broad inquiries into political associations by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id*. at 6-7. That is precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession or that is otherwise obtainable from sources that are source more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to

espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required [them] to espouse views [they] do not promote." However, Plaintiff observes that the plain text of HB 233, including through its vague Anti-Shielding Provisions, threatens Plaintiff if they do not engage in speech in which they would not otherwise engage, making them and the institution which they attend vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2).

By its terms, it would seem to require Plaintiff to give floor time and oxygen to views with which they disagree and even theories that target their own humanity and dignity. For example, HB 233 may require Plaintiff to express viewpoints in class discussions which Plaintiff views as "uncomfortable, unwelcome, disagreeable or offensive" and which Plaintiff does not wish to express—such as conspiracy

16

theories without basis in evidence or viewpoints contrary to Plaintiff's own dignity.

In addition, even outside of the classroom HB 233 may require Plaintiff to give voice to, or invite others to give voice to, views that are "uncomfortable, unwelcome, disagreeable or offensive" and whose views are contrary to Plaintiff's deeply held beliefs and which Plaintiff does not wish to promote. Furthermore, even if Plaintiff were not required to express views with which they *disagree*, Plaintiff may be required to express views with which they *agree*, but *would not otherwise express* in any given moment, absent the threats posed by HB 233.

It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* HB 233 sets up an impossible task, rendering safe only those persons who somehow manage to cover *all* opposing viewpoints to anything they say, or else risk injury to themselves or their institutions.

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 35, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what

means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [i.e., Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." The interrogatory is also vague and confusing to the extent it implicates the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121.

Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on their own associations and could also cause others not to associate with them or to cease associating with them if those others believed that any and all confidential

18

disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join a political or cause-oriented club, group, activity, or event or left a club, group, activity, or event because of HB 233, including the date, name of club, group, activity, or event, and your reason for not joining or leaving.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations

which are protected by the First Amendment privilege. Requiring Plaintiff to disclose their associations would have a chilling effect, beyond that created by HB 233, on their own associations and could also cause others not to associate with them or to cease associating with them if those others believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your disclosure, the identity of the requestor, contents of the request, and their response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [their] associations." As noted, the survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty,

or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida students lists of all their associations for any type of use or future disclosure threatens Plaintiff with forced disclosure of this association and operates to chill their protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose their associations would have a chilling effect, beyond that created by HB 233, on their own associations and could also cause others not to associate with them or to cease associating with them if those others believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have been prohibited from recording a lecture, including the date, class, and circumstances surrounding the

prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has never requested to record a lecture and is therefore not aware of any "instances where [they] [were] prohibited from recording a lecture." Plaintiff also has no personal knowledge of any other student who has requested to record a lecture. Plaintiff notes that some professors have made announcements in class, or have included statements in the syllabus, that students should not record lectures without permission from the lecturer. Furthermore, Plaintiff understands that it is, or until recently was, the policy of Florida State University that students are, or until recently were, prohibited from recording lectures without permission of the lecturer. Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it is overbroad, unduly burdensome, and disproportionate to the needs of this case. This interrogatory is not limited in time, seeking information reaching back decades, and which has no bearing whatsoever on this matter.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where course curriculum or syllabus was

revised because of HB 233, including the date revised, how the curriculum or syllabus was revised, and the specific provision in HB 233 that you believe required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not personally aware of any "instances where course curriculum or syllabus was revised because of HB 233." As a student, Plaintiff is not privy to decisions that their faculty or institutions may make about revising any syllabus or curriculum, much less any of the detailed information sought by this interrogatory. Moreover, Plaintiff has no recollection of any instructor sharing any responsive information with them.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances that occurred on a public university or college campus where you were limited from ideas which you may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be limited from.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

It would be impossible for Plaintiff to identify every instance in which they were "limited from ideas which [they] may have found to be uncomfortable, unwelcome, disagreeable, or offensive" at "a public university or college campus." In most instances, if Plaintiff were successfully "limited from" an idea, Plaintiff would definitionally have no such knowledge.

Plaintiff does recall two specific instances in which they were aware that they were being "limited from ideas which [they] may have found to be uncomfortable, unwelcome, disagreeable, or offensive." First, in Plaintiff's first semester at Florida State University, Plaintiff was enrolled in a theatrical design class. Plaintiff's professor indicated to the class prior to the final exam that a video clip on the final exam may be something with which the students may not be comfortable and that if a student does feel uncomfortable with that the student could ask the professor for an alternative video clip for the exam. On the final exam, students were asked to

analyze a clip of the video and song *Springtime for Hitler* from the film *The Producers*. As a Jewish person, Plaintiff did not feel comfortable discussing, for example, the positive aspects of the Nazi costume design in the video. As a result, Plaintiff requested from the professor the alternative video clip, which the professor provided.

Another instance arose in Plaintiff's lighting design class during the Fall 2021 semester. In that course, the professor provided trigger warnings for some of the plays for which students were going to be asked to design. For example, the professor indicated that one script, *Best Enemies*, included racist language and that the plot involved a Ku Klux Klan member and civil rights activist working together in a small town; likewise, the professor indicated that in another script, *27 Wagons Full of Cotton*, included racial slurs and implied sexual assault and domestic abuse.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this case. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat.

25

§ 1004.097(3)(a). Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 14, 2022.                    Respectfully submitted,

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
Robyn M. Kramer
Florida Bar No. 0118300
KING, BLACKWELL, ZEHNDER &
    WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias*
Elisabeth C. Frost*
Alexi M. Velez*
Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
Noah Baron*

26

ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
avelez@elias.law
jjasrasaria@elias.law
sklein@elias.law
jposimato@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2022 I served a copy of the

foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

## SERVICE LIST

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

27

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, Julie Adams, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

_____

Julie Adams

2/7/2022

_____

Date

# EXHIBIT Z

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

      *Plaintiffs*,

      v.

RICHARD CORCORAN, et al.,

      *Defendants.*

Case No. 4:21-cv-271-MW/MAF

---

## PLAINTIFF BLAKE SIMPSON'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Blake Simpson ("Plaintiff"), by and through his attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

### PRELIMINARY STATEMENT

Discovery is ongoing, and Plaintiff has not completed his investigation. These responses and objections are based on the information and documents currently available to Plaintiff, and Plaintiff reserves his rights to alter, supplement, amend, or

---

[1] The parties conferred and Defendants' counsel agreed that this Plaintiff should have until January 14, 2022 to respond to these interrogatories and a subset of other discovery that Defendants served on November 8, 2021.

1

otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.     Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement his responses and objections.

2.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.     Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in his possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.     Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient, less burdensome, or less expensive; (2) they seek answers or information that may

2

be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.     Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.     Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.     Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

<u>**INTERROGATORIES**</u>

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target progressive and liberal views, including those held by Plaintiff, such as his passion for social justice and civil rights and opposition to police brutality. *See* FAC ¶ 36. For example, in April 2021, Governor Ron DeSantis ("Governor") signed into law a statute that redefined the state's prohibition on rioting to target protests against police brutality.

More broadly, HB 233 targets the teaching, research into, and academic expression and exploration of views that the Governor, Defendant Commissioner Corcoran ("Corcoran"), and others in Florida government view as "left-wing," even in the context of historical, philosophical, or economic instruction. HB 233 also targets viewpoints the Governor, Corcoran, and others in Florida government associate with what they perceive to be "liberal college professors" and "liberal college students" like Plaintiff. This includes the teachings of scholars of sociology, law, and history (as well as countless other disciplines) about the long-term and persistent impacts of racism in America, including how that racism permeates and

4

impacts the country's institutions on every level.

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). HB 233 may require professors to teach as fact the Governor's ahistorical views that the Three-Fifths Compromise "benefited anti-slavery states" or that it is unfair to criticize the Founding Fathers for including provisions in the Constitution that protected slavery. Plaintiff is a student at a Historically Black College, Florida Agricultural & Mechanical University ("FAMU"), and such viewpoints are indeed "uncomfortable, unwelcome, disagreeable, or offensive" to him and would contribute to a racially hostile learning environment.

In addition, as part of HB 233's protection of "uncomfortable, unwelcome,

6

disagreeable, or offensive" speech, HB 233 protects the ability of—and even encourages—students to disrupt teaching in the classes Plaintiff attends, with comments that either do not substantively contribute to the learning environment or, possibly, actively harm the learning environment by diverting the class discussion, intimidating or harassing students (including Plaintiff), and effectively requiring that Florida's post-secondary institutions credit and give credence to even ideas and conspiracies that are baseless and have been widely debunked—potentially including, but not limited to, racist viewpoints which would create a hostile learning environment for Plaintiff, who is Black.

Moreover, the special protection of "uncomfortable, unwelcome, disagreeable, or offensive" ideas that HB 233's Anti-Shielding Provisions require is not limited to the classroom. Those provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). By its terms, it would even seem to require Plaintiff, as an activist, to give floor time and oxygen to theories that target his own humanity and dignity.

HB 233 also protects – and even advances and attempts to legitimize through governmental favoritism – the baseless narrative that post-secondary faculty are

7

"indoctrinating" students with viewpoints with which the Governor, the majority in the Legislature, and many among Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35. Indeed, the purpose of HB 233's Survey Provision is explicitly to tell people "[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." FAC ¶ 80.

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

8

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents

9

affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the

middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it is likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid," as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this

response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appear to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that it has about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten his First Amendment rights.

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the

enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey would "say something along the lines of: 'Where are you on the political spectrum?'" FAC ¶ 74. He also made clear that the purpose of the survey was to tell people

"[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." *Id*. at ¶ 80. Similarly, the Governor, who supported the passage of HB 233 and signed it into law, indicated that the results of the survey would be used to cut funding from post-secondary educational institutions that, in his view, had not done enough to foster "intellectual freedom and viewpoint diversity." *Id*. at ¶ 79. Plaintiff also refers Defendants to the rest of the Amended Complaint including, in particular, paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the drafts of the survey produced by Defendants in discovery thus far include questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that

14

you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because broad inquiries into political associations by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id*. at 6-7. That is precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession or that is otherwise obtainable from sources that are source more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to

espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required [him] to espouse views [he] do[es] not promote." However, Plaintiff observes that the plain text of HB 233, including through its vague Anti-Shielding Provisions, threatens Plaintiff if he does not engage in speech in which he would not otherwise engage, making him and the institution which he attends vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2).

By its terms, it would seem to require Plaintiff, as an activist, to give floor time and oxygen to views with which he disagrees and even theories that target his own humanity and dignity. For example, HB 233 may require Plaintiff to express viewpoints in class discussions which Plaintiff views as "uncomfortable, unwelcome, disagreeable or offensive" and which Plaintiff does not wish to

16

express—such as conspiracy theories without basis in evidence or viewpoints contrary to Plaintiff's own dignity.

In addition, Plaintiff is volunteers and associates with various political organizations to advance the causes in which he believes. For example, in August 2020, Plaintiff co-organized a protest against police brutality for FAMU students and community members. If Plaintiff were to organize a similar protest now, under HB 233's broad and vague provisions Plaintiff may very well be required to include in that protest viewpoints and speakers representing viewpoints in *support* of police brutality. HB 233 may therefore require Plaintiff, in the course of Plaintiff's activism, to give voice to, or invite others to give voice to, views that are "uncomfortable, unwelcome, disagreeable or offensive" and views that are contrary to Plaintiff's deeply held beliefs and which Plaintiff does not wish to promote. Furthermore, even if Plaintiff were not required to express views with which he *disagrees*, Plaintiff may be required to express views with which he *agrees*, but *would not otherwise express* in any given moment, absent the threats posed by HB 233.

It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements

of fact the speaker would rather avoid." *Id.* HB 233 sets up an impossible task, rendering safe only those persons who somehow manage to cover *all* opposing viewpoints to anything they say, or else risk injury to themselves or their institutions.

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 36, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [i.e., Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." The interrogatory is also vague and confusing to the extent it implicates the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id.* at ¶ 121.

Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat.

18

§ 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if those others believed that any and all confidential disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join a political or cause-oriented club, group, activity, or event or left a club, group, activity, or event because of HB 233, including the date, name of club, group, activity, or event, and

your reason for not joining or leaving.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if those others believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your

disclosure, the identity of the requestor, contents of the request, and their response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [his] associations." As noted, the survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida students lists of all their associations for any type of use or future disclosure threatens Plaintiff with forced disclosure of this association and operates to chill his protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if those others believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number

of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have been prohibited from recording a lecture, including the date, class, and circumstances surrounding the prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has never requested to record a lecture and is therefore not aware of any "instances where [he] [was] prohibited from recording a lecture." Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it is overbroad, unduly burdensome, and disproportionate to the needs of this case. This interrogatory is not limited in time, seeking information reaching back decades, and which has no bearing whatsoever on this matter.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where course curriculum or syllabus was revised because of HB 233, including the date revised, how the curriculum or syllabus was revised, and the specific provision in HB 233 that you believe required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not personally aware of any "instances where course curriculum or syllabus was revised because of HB 233." As a student, Plaintiff is not privy to decisions that the faculty or institutions may make about revising any syllabus or curriculum, much less any of the detailed information sought by this interrogatory. Moreover, Plaintiff has no recollection of any instructor sharing any responsive information with him.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this

response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances that occurred on a public university or college campus where you were limited from ideas which you may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be limited from.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

It would be impossible for Plaintiff to identify every instance in which he was "limited from ideas which [he] may have found to be uncomfortable, unwelcome, disagreeable, or offensive" at "a public university or college campus." In most instances, if Plaintiff were successfully "limited from" an idea, Plaintiff would definitionally have no such knowledge.

Nonetheless, under the extraordinary breadth (and vague framing) of HB 233, Plaintiff is likely necessarily "limited from ideas which [he] may have found to be uncomfortable, unwelcome, disagreeable, or offensive." For example, instructors may ask students not to express ideas that are corrosive to an open and effective learning environment or to express ideas only in a scholarly and professional manner.

In addition to the General Objections set forth above, Plaintiff objects to this

interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this case. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 14, 2022.                    Respectfully submitted,

                                            /s/ *Frederick S. Wermuth*
                                            Frederick S. Wermuth
                                            Florida Bar No. 0184111
                                            Thomas A. Zehnder
                                            Florida Bar No. 0063274
                                            Robyn M. Kramer
                                            Florida Bar No. 0118300
                                            KING, BLACKWELL, ZEHNDER &
                                               WERMUTH, P.A.

P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias*
Elisabeth C. Frost*
Alexi M. Velez*
Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
Noah Baron*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
avelez@elias.law
jjasrasaria@elias.law
sklein@elias.law
jposimato@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2022 I served a copy of the

foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111


## SERVICE LIST

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, Blake Simpson, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

_____

Blake Simpson

1/26/2022

_____

Date

# EXHIBIT AA

**Alexi Velez**

| | |
|---|---|
| **From:** | George Levesque <George.Levesque@gray-robinson.com> |
| **Sent:** | Friday, March 25, 2022 7:32 PM |
| **To:** | Fritz Wermuth; Tim Moore, Jr. |
| **Cc:** | Elisabeth Frost; Florida Campus Speech; Angie Price; Kimberly Healy; Robyn Kramer |
| **Subject:** | RE: Link v. Corcoran -- Discovery Supplement |

Fritz,

This response was delayed due to the fact that I was in an all-day hearing that ran late.  I will provide a more full throated response at a later time because we certainly disagree with many of the characterizations of both our obligations and the descriptions contained in your last two emails addressing these issues.

To the two most pressing questions for the crisis you have created—First, the surveys you attached this afternoon are not the final survey.  I'm told that they are the surveys that would have been produced in our original production and are not the final survey.  As I indicated just Wednesday, the student surveys are a work in progress but were targeted for April 4.  As I indicated last week, we were expecting them to be distributed later this month.  To say that you just learned this might be the potential timeline is naive.

Second, I have raised your request with the client, but I do not have an answer.

George



**George Levesque**
Shareholder

T  850-577-9090
D  850-577-6969
F  850-577-3311

GrayRobinson, P.A. ▪ 301 South Bronough Street, Suite 600, Tallahassee, Florida 32301



This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Fritz Wermuth <FWermuth@kbzwlaw.com>
**Sent:** Friday, March 25, 2022 2:50 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** efrost@elias.law; Florida Campus Speech <floridacampusspeech@elias.law>; Angie Price <APrice@kbzwlaw.com>;

Kimberly Healy <khealy@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Subject:** RE: Link v. Corcoran -- Discovery Supplement

**This message originated outside of GrayRobinson.**

George,

We have two important issues on which we need responses from you right away.  First, we identified the two attached surveys – one to faculty and one to students – in a production received from FAU earlier this week.  Metadata in the files indicate that they are final.  We request that you confirm whether these documents are final forms (except for insertion of particular university names) or that they reflect the final substance of the survey questions.

Second, given the imminent survey schedule set forth below, which came as a surprise to us yesterday, we plan to pursue injunctive relief on an emergency basis, unless you can provide credible assurance that the final surveys are not going to be distributed on or before the schedule set forth below and the surveys will be distributed on a later, non-imminent schedule that would permit sufficient time to brief and argue a preliminary injunction motion on a standard briefing schedule.

Given the apparent need for immediate injunctive relief arising from the attached survey documents and referenced schedule, and absent credible assurance otherwise, we consider it necessary to seek a temporary restraining order on an emergency basis.  Please provide responses to the forgoing two matters before close of business today, and confirm whether you oppose the injunctive relief we plan to seek.  If we do not have your response by 5pm, we will seek emergency relief based on the forgoing information and assumption that you oppose such relief.


Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
K I N G ,  B L A C K W E L L ,  Z E H N D E R  &  W E R M U T H ,  P. A .

**From:** Fritz Wermuth
**Sent:** Thursday, March 24, 2022 8:02 PM
**To:** George Levesque <George.Levesque@gray-robinson.com>; Tim Moore, Jr. <tim.moore@gray-robinson.com>
**Cc:** efrost@elias.law; Florida Campus Speech <floridacampusspeech@elias.law>; Angie Price <APrice@kbzwlaw.com>; Kimberly Healy <khealy@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Subject:** Link v. Corcoran -- Discovery Supplement

George,

We received information this afternoon that faculty are being told that the surveys of students, faculty, and staff will be administered on the following timeline:

- Mar. 31, 2022 – Institutions send pre-survey notifications to students and employees
- Apr. 4, 2022 – Invitations to students and employees are sent to take the surveys.
- Apr. 7, 2022 – Survey reminders are sent to students and employees.
- April 8, 2022 – Survey collection closes.

As you know, we have been asking that Defendants supplement your discovery responses as it relates to the survey, including any draft surveys, documents, and communications related to the same, for months. We made this request in correspondence dated December 16, 2021, January 4, 2022, January 13, 2022, February 18, 2022,

March 3, 2022, March 8, 2022, March 11, 2022 and most recently March 17, 2022. As we have noted, the most recent materials we have from Defendants relating to the survey are dated October 2021 – about 5 months ago.

Repeatedly, you have told us that more material would be coming, and repeatedly nothing has come. In the meantime, we have continued to pursue every option for obtaining these materials and have received – and even *produced to you* – substantial materials through public records requests that make it clear that over the course of all of these months, when Defendants have produced nothing new related to the survey, the drafting and plan for its implementation have been significant, substantive, and ongoing.

Given what we have received – including over the past few days from third parties, and the information we now have about the timeline for the administration of the survey – it must have been obvious to your clients, who you presumably informed of their discovery obligations, that there are significant additional materials responsive to our discovery requests related to the surveys and that they are (and have been, for months) under a clear obligation to produce. With the imminent survey rollout that we just learned about, it is also incredible to think that the surveys are not at this point finalized. And it is clear that there are now in fact (and have been for some while) plans for the survey's implementation—another topic that we specifically asked about in our interrogatories directed to Defendants, yet at no point have Defendants supplemented their responses to provide any new information on that, either.

Of course, during the months since Defendants produced survey drafts and months that we have sent repeated requests for supplementation, Defendants have been under a continuing obligation under Fed. R. Civ. P. 26(e)(1) to supplement their responses to our RFPs and interrogatories in a timely manner when they learn that in some material respect the disclosure or response is incomplete or incorrect. We are well past timely at this point. I am reiterating my request that Defendants promptly supplement their responses to our discovery requests, including specifically as it relates to the following requests and interrogatories. While Defendants' obligation to supplement incomplete or incorrect discovery responses is ongoing and applies to all requests, we are specifically asking that Defendants supplement their responses to the RFPs and interrogatories listed below by **no later than March 29, 2022**. If Defendants refuse to do so, we will be filing a motion to compel with the Court. Please advise when we can discuss this very serious issue at your earliest convenience.

**First Requests for Production to Board of Governors, Board of Education, and Commissioner Corcoran:**

- **REQUEST NO. 2:** All documents and communications related the Survey Provisions and the Survey that it requires. This includes any documents or communications related to any state interests that you believe the Survey Provisions or the Survey furthers.

**First Set of Interrogatories to Board of Governors, Board of Education, and (in substantively similar form to) Commissioner Corcoran:**

- **INTERROGATORY NO. 2:** State and describe your involvement in, and all plans you have related to the creation, drafting, implementation, enforcement, or use of the Survey. Your response should include a detailed description of any involvement you had in the development or passage of legislation involving the Survey; your understanding of the intended or potential use of the Survey, including specifically by you, the Florida Board of Governors, the Governor, the Legislature, or Florida's post-secondary schools; any plans for enforcement of HB 233 's Survey Provisions, including specifically in the event that schools, students, or faculty decline, resist, or refuse to take part in the Survey; and any timeline (even rough or preliminary) for developing any of the foregoing. Your answer should include the identities of those individuals and/or entities that have been or you anticipate will be involved at each stage of the Survey's creation, drafting, implementation, or use, and the scope or anticipated scope of their involvement and responsibilities.

3

- **INTERROGATORY NO. 8:** State and describe your intentions for handling information collected through the Survey, including but not limited to, the collecting, storing, sharing, security, deleting, and evaluation of the same.

Fritz Wermuth | Shareholder
fwermuth@kbzwlaw.com
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
25 East Pine St | P.O. Box 1631 | Orlando, FL 32801
Tel: 407-422-2472 | Fax: 407-648-0161
kbzwlaw.com

This email is confidential, intended only for the named recipient(s) above and may contain information and attachments that are privileged or otherwise exempt from disclosure under applicable law.  If you have received this email in error, please advise the sender and permanently delete this email and any attachments from your system. Thank you.

# EXHIBIT BB



Back to Volume Ten Contents

# Dear Administrators: To Protect Your Faculty from Right-Wing Attacks, Follow the Money

Isaac Kamola

## Abstract

At first glance, the large number of recent media controversies concerning public comments made by college faculty appear spontaneous. However, upon closer look, these attacks follow an identical script and originate from the same handful of political and media outlets. Following the money makes it possible to see these attacks on scholars as manufactured by well-funded, well-organized right-wing donors. The Koch brothers, and donors in their orbit, spend considerable money to transform colleges and universities. One part of this strategy includes attacking, marginalizing, and delegitimizing scholars critical of free-market capitalism and white supremacy. This paper examines ten high-profile attacks on faculty, demonstrating the common script across them. It then explores the specific case of Campus Reform's attack on Professor Johnny Williams at Trinity College in 2017, examining specifically how college administrators focused on the content of Williams' posts rather than the political motivations behind the attack. I argue that following the money leads to a more successful political strategy for warding off well-funded, ideologically motivated attacks on faculty.

Trustees, administrators, alumni, students, and even some faculty might be forgiven for thinking that institutions of higher education have suddenly become bastions for professors who harbor crazy communist views, foment hysterical political correctness and trigger warnings, and coddle the whims of their most fragile

Copyright American Association of University Professors, 2019

students. From reading the news, it appears that American higher education has been reduced to a venue for espousing liberal ideology, as charismatic professors urge their students to commit acts of violence against white people. This narrative has become so powerful that even higher education has become a partisan issue, with 58 percent of Republicans viewing colleges and universities negatively.[1] It is important to understand, however, that this view of higher education has been largely manufactured by a small handful of wealthy, ultra-libertarian donors.

Christopher Newfield powerfully argues that the conservative antitax movement of the 1980s and 1990s actually found it incredibly difficult to defund public universities given that most Americans understood these institutions as playing a central role in creating a large, inclusive, and affluent middle class.[2] As a result, the culture wars of the 1980s and 1990s, fueled by politicians and conservative operatives who condemned "postmodernism" and "identity politics" in higher education, became the opening salvo in a campaign to delegitimize—and ultimately defund—the public university.

Today a similar culture war rages, this time led by a closely networked group of institutions created using dark money donations from a small handful of billionaires. These investments are part of a much larger political strategy designed to transform college campuses by punishing critics of free market capitalism and white supremacy. This strategy has included unleashing a maelstrom of viral outrage targeted at specific faculty (often faculty of color). These attacks are often presented as organic expressions of moral outrage. Most often, however, these attacks are instead part of well-organized political strategy designed to influence the ideas that circulate on college campuses.

In this essay, I argue that defending American higher education against the narrative that the academy is "politically correct," intolerantly liberal, and militantly antiwhite requires attending to the political and economic forces behind this constructed narrative. As I will show, the spasms of moral outrage directed at the "liberal" academy are manufactured by a handful of well-organized and well-funded activist organizations and ideological media outlets. If sunlight is the best disinfectant, defending faculty and campuses from orchestrated attacks must include making the well-funded and covert "outrage machine"[3] itself—rather than the particular merits of an individual faculty member's speech—the main story. While this article focuses on viral attacks on faculty, I should note that strategies shift rapidly, and recent attacks on universities have also

---

[1] Pew Research Center, "Sharp Partisan Divisions in View of National Institutions," July 10, 2017, https://www.people-press.org/2017/07/10/sharp-partisan-divisions-in-views-of-national-institutions/.
[2] Christopher Newfield, *Unmaking the Public University: The Forty-Year Assault on the Middle Class* (Cambridge, MA: Harvard University Press, 2008).
[3] Peter Schmidt, "Higher Education's Internet Outrage Machine," *Chronicle of Higher Education*, September 8, 2015, https://www.chronicle.com/article/Higher-Educations-Internet/232879.

included "free speech" provocations. The same donors, and same organizations, are behind these attacks as well.

While formally addressed to administrators, this article speaks to all college constituencies who find themselves fending off politically motivated right-wing attacks, or who want to defend themselves from such attacks in the future. The first section demonstrates the common script that these attacks follow: a right-wing group captures something said, posted, or tweeted by a faculty member, these statements are then decontextualized and wrapped in moral outrage, broadcast through the right-wing media ecosystem, and eventually find their way to the "mainstream" (or "actual") media. The second section documents how the same small group of billionaire-funded actors—Campus Reform, the College Fix, Turning Point USA, Breitbart News Network, and others—manufacture these controversies as part of a much larger strategy of strengthening donor influence over universities. The third section offers an autopsy of one attack I witnessed firsthand. In 2017 Campus Reform accused Trinity College professor Johnny Williams of advocating violence against white people.[4] The discussion in the media, online, and on campus turned immediately toward what Williams did (and did not) say, whether it was appropriate, whether it was protected by academic freedom, and whether the administration's response was appropriate. Missing from this conversation was a robust and informed discussion of what Campus Reform is, why it targeted Williams, its underlying aims, and who funds the organization. I am quite confident that had the administrative response started with these questions—rather than focusing on the relative merits of Williams's speech—our institution would have weathered the storm better than it did. The article concludes with some strategic advice for how to respond to such attacks in the future.

## Right-Wing Attacks Have a Common Script

Over the past few years American higher education has endured a rash of high-profile, seemingly spontaneous, social media-driven firestorms. However, if one examines the details in each case, clear patterns emerge. Most attacks are leveled against faculty of color, or those whose research and teaching focuses on issues of race. Most start with a handful of organizations explicitly created to monitor and intimidate college faculty (most prominently Campus Reform and the College Fix); from there they travel to sympathetic right-wing websites and news outlets (also created by activist donors committed to undermining public institutions

---

[4] For Williams's account, see Johnny Eric Williams, "The Academic Freedom Double Standard: 'Freedom' for Courtiers, Suppression for Critical Scholars," *Journal of Academic Freedom* 9 (2018), https://www.aaup.org/JAF9/academic-freedom-double-standard-"freedom"-courtiers-suppression-critical-scholars.

like universities), before arriving at Fox News. Most attacks that gain traction involve college administrations sanctioning faculty and condemning their speech.  To get a sense of the similarities across these attacks, let us look at a sample of the highest-profile examples:

1.  In the spring of 2015 tweets from Saida Grundy—recently hired as an assistant professor of sociology and African American studies at Boston University—were posted on the website SoCawlege.com, a blog "funded by a conservative watchdog group."[5] On May 7 the College Fix website covered Grundy's tweets stating that "white masculinity isn't a problem for america's colleges, white masculinity is THE problem."[6] The *Washington Times* and Fox News picked up the story on May 9, focusing on the tweets "Every MLK week I commit myself to not spending a dime in white-owned businesses" and "Why is white America so reluctant to identify white college males as a problem population?"[7] BU president Robert A. Brown released a statement saying that Grundy's comments "reduce individuals to stereotypes on the basis of a broad category such as sex, race or ethnicity."[8] On June 4, 2015, Campus Reform followed up on these stories by examining the "same racial animus and hostility towards young white males" in Grundy's PhD dissertation.[9]

2.  On December 24, 2016, now former Drexel associate professor George Ciccariello-Maher parodied the neo-Nazi concept of "white genocide" (that is, the alt-right/Nazi claim that interracial mixing and multiculturalism "dilute" the white race) with the sarcastic tweet "All I Want for Christmas is White Genocide." This and other tweets were picked up by

[5] Saida Grundy, "A History of White Violence Tells Us Attacks on Black Academics Are Not Ending (I Know Because It Happened to Me)," *Ethnic and Racial Studies* 40, no. 11 (2017): 1867; Anonymous [Nick Pappas], "Boston University Assistant Professor Saida Grundy Attacks Whites, Makes False Statements on Twitter," http://socawlege.com/boston-university-assistant-professor-saida-grundy-attacks-whites-makes-false-statements-on-twitter/, accessed January 16, 2018.
[6] Jennifer Kabbany, "Black Studies Prof Says Slavery 'White People Thing' and 'White College Males the Problem Population,'" College Fix, May 7, 2015, https://www.thecollegefix.com/black-studies-prof-says-slavery-white-people-thing-and-white-college-males-the-problem-population/.
[7] Kellan Howell, 2015. "Saida Grundy, Boston University Professor: White Males a 'Problem Population,'" *Washington Times*, May 9, 2015, https://www.washingtontimes.com/news/2015/may/9/saida-grundy-boston-university-professor-white-mal/; Maxim Lott, "Boston University Prof Flunks 'White Masculinity' in Controversial Tweets," *Fox News U.S.*, May 9, 2015, http://www.foxnews.com/us/2015/05/09/boston-university-prof-flunks-white-masculinity-in-controversial-tweets.html.
[8] Scott Jaschik, "Regret over Tweets on Race," *Inside Higher Ed*, May 13, 2015. https://www.insidehighered.com/news/2015/05/13/professor-center-debate-over-her-tweet-white-male-students-expresses-regret.
[9] Peter Hasson, "Prof. Bashed Whites on Social Media, in Dissertation," Campus Reform, June 4, 2015, https://www.campusreform.org/?ID=6548.

Breitbart, from where the story quickly spread through other alt-right websites.[10] Drexel

released a statement declaring that Ciccariello-Maher's "comments are utterly reprehensible,

deeply disturbing and do not in any way reflect the values of the university."[11] In October

2017, after a white, male, middle-aged gunman killed fifty-nine concertgoers in Las Vegas,

Ciccariello-Maher tweeted that blame for such violence should be placed on "the white

supremacist patriarchy, stupid"—a comment he fully explained in a column published in the

*Washington Post*.[12] This tweet was picked up by the Daily Caller[13] and eventually made its way

to Fox News and other outlets. The article for the College Fix started by calling Ciccariello-

Maher an "instructor [who] previously advocated 'white genocide.'"[14] Drexel placed him on

leave due to, in the words of Drexel's spokeswomen, a "growing number of threats directed

at Professor George Ciccariello-Maher, and increased concerns about both his safety and the

safety of Drexel's community."[15] In December 2017 Ciccariello-Maher announced he was

leaving Drexel.[16]

3.    On February 8, 2017, Breitbart ran a story about a California State University–

Fullerton professor of anthropology, Eric Canin, pushing College Republicans who were

protesting a rally in opposition to President Donald Trump's travel ban.[17] A video provided

---

[10] Warner Todd Huston, "Drexel University Professor's Christmas Wish: 'All I Want for Christmas Is White Genocide,'" *Breitbart*, December 25, 2016, http://www.breitbart.com/big-government/2016/12/25/drexel-univ-professors-christmas-wish-want-christmas-white-genocide/.

[11] Scott Jaschik, "Drexel, Twitter and Academic Freedom," *Inside Higher Ed*, January 3, 2017, https://www.insidehighered.com/news/2017/01/03/drexel-issues-new-statement-about-academic-freedom-and-inclusivity.

[12] George Ciccariello-Maher, "Conservatives Are the Real Campus Thought Police Squashing Academic Freedom," *Washington Post*, October 10, 2017, https://www.washingtonpost.com/news/posteverything/wp/2017/10/10/conservatives-are-the-real-campus-thought-police-squashing-academic-freedom/?utm_term=.9a0068f44283.

[13] Rob Shimshock, "Prof: Vegas Massacre 'Is What Happens When' White People 'Don't Get What They Want," *Daily Caller*, October 2, 2017, http://dailycaller.com/2017/10/02/prof-vegas-massacre-is-what-happens-when-white-people-dont-get-what-they-want/.

[14] Daniel Payne, "Professor Asks: 'What Makes White Men So Prone' to Mass Shootings?," College Fix, November 8, 2017, https://www.thecollegefix.com/professor-asks-makes-white-men-prone-mass-shootings/.

[15] Chris Quintana, "Drexel Puts Professor on Leave after Tweet about Las Vegas Draws Conservative Ire," *Chronicle of Higher Education's "The Ticker,"* October 10, 2017, https://www.chronicle.com/blogs/ticker/drexel-puts-professor-on-leave-after-tweet-about-las-vegas-draws-conservative-ire/120540.

[16] Andy Thomason, "Drexel Professor Whose Charged Tweets Drew Fire from the Right Will Leave the University," *Chronicle of Higher Education*, December 28, 2017, https://www.chronicle.com/article/Drexel-Professor-Whose-Charged/242124.

[17] Ariana Rowlands, "Police Investigate after Fullerton Lecturer Allegedly Assaults College Republican," *Breitbart*, February 8, 2017, http://www.breitbart.com/tech/2017/02/08/college-republican-makes-citizen-arrest-fullerton-professor-assaults-student/.

by College Republicans was posted on the Campus Reform website by Peter Van Voorhis—a former "Campus Reform Correspondent" and contributor to the *Washington Examiner*, Daily Wire, the College Fix, TheBlaze, and other outlets.[18] Eventually making its way into the *Washington Times* and other right-wing media, the story morphed into Canin punching a student. Canin—who worked on a contingent contract—was terminated from his position and only reinstated after the faculty union demanded arbitration. The arbiter found no evidence that Canin had hit the student.[19]

4.   On May 8, 2017, the *American Conservative* ran a piece based on a five-year-old radio segment by Tommy Curry, a professor at Texas A&M. Curry was a regular radio commentator on the Redding News Review and, in this segment, discussed how contemporary black political movements have idealized nonviolence, without acknowledging historical examples in which "white vigilantism" demanded black self-defense. The *American Conservative* mischaracterized this discussion as being about "when it is appropriate to kill white people."[20] Within three days, this sensationalized headline quickly spread through The_Donald subreddit, Gateway Pundit, Stormfront, Infowars, Blaze Radio, the *Washington Examiner*, Red Alert Politics, Daily Caller, and Campus Reform.[21] The coverage caused considerable backlash among alumni and donors, leading university president Michael K. Young to announce that Curry's comments included "disturbing comments about race and violence" that stood "in stark contrast to Aggie core values. . . . We stand against the advocacy of violence, hate, and killing."[22]

5.   On May 25, 2017, Campus Reform ran a story about the commencement address given at Hampshire College by Princeton University professor Keeanga-Yamahtta Taylor.[23]

---

[18] Peter Van Voorhis, "CSUF Prof Allegedly Assaults Conservative Students on Campus," Campus Reform, February 9, 2017, https://www.campusreform.org/video/?ID=8763.

[19] Colleen Flaherty, "Correcting the Record," *Inside Higher Ed*, July 19, 2017, https://www.insidehighered.com/news/2017/07/19/cal-state-fullerton-reinstates-lecturer-after-arbitrator-finds-no-evidence-most.

[20] Rod Dreher, "When Is It OK to Kill Whites?," *American Conservative*, May 8, 2017, www.theamericanconservative.com/dreher/when-is-it-ok-to-kill-whites/.

[21] Steve Kolowich and Brian O'Leary, "How a Challenge to Tommy Curry Set Off a Chain Reaction," *Chronicle of Higher Education*, July 26, 2017, https://www.chronicle.com/interactives/curry-timeline.

[22] Quoted in Steve Kolowich, "Tough Talk," *Chronicle of Higher Education*, July 26, 2017, https://www.chronicle.com/article/Who-s-Left-to-Defend-Tommy/240757.

[23] Anthony Gockowski, "Prof Tells Grads Trump Is a 'Racist, Sexist Megalomaniac,'" Campus Reform, May 25, 2017, https://wwwt.campusreform.org/?ID=9232.

Three days later Fox News ran a story about her "Anti-POTUS Tirade."[24] Based on threats made against her safety, Taylor canceled public talks in Seattle and San Diego.[25]

6.   On June 8, 2017, Campus Reform published a piece criticizing University of Iowa professor Sarah Bond's essay in the online art forum Hyperallergic, in which she criticized the ways Identity Evropa and other alt-right groups deploy classical Greek imaginary. Bond argued that ancient statuary was actually richly painted, and the embrace of white marble statues as embodying Western civilization only emerged during the 1800s among those seeking to conflate "barbarism and color," on the one hand, and "civility and whiteness," on the other.[26] The Campus Reform piece "remixed" Bond's argument to read that "white statues are racist," an interpretation that was picked up by TheBlaze and *National Review* and culminated in death threats and numerous vile emails, Twitter messages, and blog comments.[27]

7.   On June 14, 2017, Campus Reform published a piece on Syracuse University professor Dana Cloud, who, at a counterprotest to the "anti-Sharia law" rally hosted by the anti-Muslim hate group ACT for America, tweeted, "We almost have the fascists in on the run. Syracuse people come down to the federal building to finish them off." Campus Reform accused Cloud of issuing "a veiled call for violence against a conservative group," while commenting that she is a "self-proclaimed socialist" and "featured on Turning Point USA's Professor Watchlist."[28] The story resulted in "a torrent of angry emails and threats" directed at Cloud.[29]

8.   As discussed in greater detail below, on June 20, 2017, Campus Reform misrepresented social media posts by Trinity College professor of sociology Johnny Williams

---

[24] *Fox News*, "Princeton Professor Goes on Anti-POTUS Tirade," May 28, 2017, http://video.foxnews.com/v/5451382191001/.
[25] Fernanda Zamudio-Suárez, "Princeton U. Professor Cancels Lectures after Fox News Labels Her as Anti-Trump," *Chronicle of Higher Education's "The Ticker,"* June 1, 2017, https://www.chronicle.com/blogs/ticker/princeton-u-professor-cancels-lectures-after-fox-news-labels-her-as-anti-trump/118743.
[26] Sarah E. Bond, "Why We Need to Start Seeing the Classical World in Color," Hyperallergic, June 7, 2017, https://hyperallergic.com/383776/why-we-need-to-start-seeing-the-classical-world-in-color/.
[27] Chris Quintana, "For One Scholar, an Online Stoning Tests the Limits of Public Scholarship," *Chronicle of Higher Education*, June 16, 2017, https://www.chronicle.com/article/For-One-Scholar-an-Online-/240384.
[28] Neetu Chandak, "Prof Urges Students to 'Finish Off' Anti-Sharia Protesters," Campus Reform, June 14, 2017, https://www.campusreform.org/?ID=9312.
[29] Peter Schmidt, "Professors' Growing Risk: Harassment for Things They Never Really Said," *Chronicle of Higher Education*, June 22, 2017, https://www.chronicle.com/article/Professors-Growing-Risk-/240424.

as calling for the killing of white people. The college was closed after numerous threats of violence were called in, and the administration placed Williams on mandatory leave.

9.   On July 31, 2017, the *Washington Times* and the College Fix published stories about Montclair State University contract professor Kevin Allred tweeting that Trump was "a fucking joke" and "I wish someone would just shoot him outright."[30] The university denied that Allred worked there, despite an email trail and online faculty profile proving otherwise. Allred replied that his tweets were a "hyperbolic expression" no "worse than what 'the president'" engages in every day.[31]

10.   In August 2017, Mark Bray, visiting professor at Dartmouth University and author of *Antifa: The Anti-fascist Handbook*, was being widely interviewed in the aftermath of the Unite the Right rally in Charlottesville, Virginia, at which an alt-right sympathizer drove his car into a crowd of counterdemonstrators, killing Heather Heyer and wounding dozens more. In one interview for *Meet the Press*, Bray argued that "we've tried ignoring neo-Nazis in the past. We've seen how that turned out in the '20s and '30s. . . . A lot of people are under attack, and sometimes they need to be able to defend themselves."[32] Campus Reform accused Bray of endorsing violence, prompting a response from Dartmouth president Philip J. Hanlon, who described Bray as "supporting violent protest" and "condemn[ed] anything but civil discourse in the exchange of opinions and ideas. . . . the endorsement of violence in any form is contrary to Dartmouth values."[33] Hanlon's statement was issued without informing Bray or engaging with his research.

These attacks share a number of underlying commonalities. First, the same handful of actors are responsible for initiating and circulating these attacks. Second, all the attacks demonstrate a profound failure or unwillingness to consider, or gross neglect of, the actual claims made by the scholar. They instead offer a

---

[30] Michael Jones, "Women's Studies Scholar Says of Trump: 'I Wish Someone Would Just Shoot Him Outright," College Fix, July 31, 2017, https://www.thecollegefix.com/post/35045/; Bradford Richardson, "Women's Studies Professor Wants Trump Shot," *Washington Times*, July 31, 2017, https://www.washingtontimes.com/news/2017/jul/31/kevin-allred-womens-studies-professor-wants-donald.
[31] Scott Jaschik, "Twitter Blowback: Lost Job and Lost Money," *Inside Higher Ed*, August 2, 2017, https://www.insidehighered.com/news/2017/08/02/montclair-state-removes-courses-adjunct-whose-tweet-became-controversial.
[32] Derek Hawkins, "A Dartmouth Antifa Expert Was Disavowed by His College President for 'Supporting Violent Protest,' Angering Many Faculty," *Washington Post*, August 29, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/08/28/a-dartmouth-antifa-expert-was-disavowed-by-his-college-president-for-supporting-violent-protest-angering-many-faculty.
[33] Sandor Farkas, "Dartmouth Scholar Endorses Antifa Violence," Campus Reform, August 21, 2017, https://www.campusreform.org/?ID=9616.

rush to judgment that neatly fits a predetermined narrative. And, finally, most administrators responded to these attacks by engaging the allegations themselves, namely discussing the merits of what their faculty had said or written. In most cases, colleges and universities never identified the political and ideological motivations undergirding these attacks.

In short, these attacks follow a common logic: stoke outrage in ways that fuel the now-common narrative that college professors are recklessly irresponsible and dangerous. These individual attacks, however, also have a larger political objective. They use these examples to generally discredit colleges and universities, painting them as places that shelter and enable deviant and socially unacceptable ideas. The result is a manufactured narrative wielded by billionaire donors to suggest that parents, students, state governments, foundations, and other funders of higher education demand greater oversight over these apparently untrustworthy and unruly faculty.

## To Understand This Common Script . . . Follow the Money

In the above examples, the same few groups keep reappearing. So who are these groups? Who funds them? And why? To answer these questions it is helpful to identify three kinds of groups: those explicitly created and funded to target and monitor faculty, those that amplify these niche attack pieces within the right-wing online ecosystem, and those that push these stories into the national conversation. Let's start with the first category:

### Campus Reform

Campus Reform is part of the Leadership Institute (LI), a group that trains conservative and libertarian activists on college campuses. The LI provides training workshops and seminars to conservative student activists, provides funding to bring speakers and organizers to campus, offers a Conservatism 101 curriculum aimed at "bring conservative philosophy to campuses across the country," and offers training in running college elections and developing conservative campus publications.[34] It supports campus conservative groups through its National Field Program, and boasts supporting more than 1,700 college newspaper and student groups.[35]

---

[34] Leadership Institute, home page, https://www.leadershipinstitute.org/campus/, accessed April 23, 2019.
[35] SourceWatch, "The Leadership Institute,"
https://www.sourcewatch.org/index.php?title=The_Leadership_Institute, accessed April 23, 2019.

The Leadership Institute is part of the State Policy Network, a group of think tanks and political groups funded by the Koch donor network.[36] The LI's primary source of funding comes from the Donors Capital Fund, Donors Trust, and the Charles Koch Foundation.[37] Donor Trust and its affiliated Donors Capital Fund have been called the "the Dark-Money ATM of the Conservative Movement," taking hundreds of millions of dollars from donors and channeling these anonymized funds into groups advocating free-market and ultralibertarian political objectives.[38] In 2016 the Leadership Institute spent $15.8 million on its political campus activities,[39] much of it coming from dark-money sources.

Campus Reform, one project overseen by the Leadership Institute, claims that "liberal bias is rampant on America's college campuses" and hires student correspondents that it recruits with language like "Get paid to hold your school accountable!" and "Be the eyes and ears on your campus. Launch your investigative journalism career!"[40] Campus Reform refers to "victories" as those situations "in which a college changes a policy, fires someone, or otherwise responds to concerns raised by the reporting on its site."[41] It produces stories with sensationalized headlines, and presents material in an ominous black, gray, and red palette. Reproductions of documents—such as screenshots of social media media—are emblazoned with a menacing Campus Reform logo. Campus Reform solicits tips from "the Leadership Institute's network of nearly 1,600 conservative groups on college campuses," and pays so-called student journalists fifty dollars to report on their own institutions.[42]

Why would the Koch donor network fund the Leadership Institute and Campus Reform? Since the 1970s Charles and David Koch have created (and funded) a range of academic, journalistic, legal, policy, judicial, and advocacy organizations explicitly designed to use their vast wealth to push federal and state policies toward greater deregulation, larger tax cuts, and drastic reductions in social spending—a set of economic priorities described by critics as "property supremacy"[43] and "ultra-free-market."[44] Unable to convince

---

[36] SourceWatch, "The Leadership Institute."
[37] Pam Vogel, "The Conservative Dark-Money Groups Infiltrating Campus Politics," *Media Matters*, March 29, 2017, https://www.mediamatters.org/research/2017/03/29/conservative-dark-money-groups-infiltrating-campus-politics/215822#cr.
[38] Vogel, "The Conservative Dark-Money Groups."
[39] SourceWatch, "The Leadership Institute."
[40] Leadership Institute, "What's Going On in the National Field Program?," https://www.leadershipinstitute.org/campus/, accessed April 23, 2019.
[41] Schmidt, "Higher Education's Internet Outrage Machine."
[42] Schmidt, "Higher Education's Internet Outrage Machine."
[43] Nancy MacLean, *Democracy in Chains: The Deep History of the Radical Right's Stealth Plan for America* (New York: Viking, 2017).
[44] Theda Skocpol and Alexander Hertel-Fernandez, "The Koch Network and Republican Party Extremism," *Perspective on Politics* 14, no. 3 (2016): 681–99.

majorities of voters of the merits of these ideas, the Kochs created and funded a vast integrated network of institutions designed to change the national conversation toward their ultralibertarian political and economic priorities.[45] A sampling of these institutions include Americans for Prosperity, the American Enterprise Institute, the Federalist Society, the Heritage Foundation, Americans for Tax Reform, the American Legislative Exchange Council, and the Heartland Institute.[46] Donor Trust and Donors Capital Fund also fund student groups on college campuses (including Young Americans for Liberty and Students for Liberty) as well as academic centers (such as George Mason University's Mercatus Center and the Institute for Humane Studies).[47]

This vast network cannot function without both academic research legitimizing far-right ideas and an ideologically motivated talent pool to populate this vast integrated network of institutions. Charles Koch's strategist Richard Fink described universities as creating the "intellectual raw materials" necessary to achieve social transformation.[48] In many instances, faculty, students, and university administrations have resisted Koch-funded centers and programs on campus, maintaining control over faculty governance and autonomy over the curriculum, classroom, and research. Attacks on faculty, and more recently "campus free speech" provocations (funded by the same organizations), are part of a strategy seeking to delegitimize the academy and, in doing so, opening this key institution to greater donor influence over academic programs, centers, and curricula. This handful of ultraright billionaires sees their donations as financial investments in a long-term political struggle to eviscerate the state's capacity to enact redistributive and regulative policies. To this end, they see universities as critical institutions that need to be occupied, pacified, and repurposed.

It is not surprising, therefore, that other organizations responsible for manufacturing faculty attacks are also funded by this same right-wing, ultralibertarian political movement.

*The College Fix*

The Student Free Press Association oversees the College Fix, a website that operates as a smaller version of Campus Reform. The Student Free Press Association is funded by DonorsTrust and Donors Capital Fund,

---

[45] Skocpol and Hertel-Fernandez, "The Koch Network"; SourceWatch, "Koch Brothers: The Center for Media and Democracy 2018," https://http://www.sourcewatch.org/index.php/Koch_Brothers, accessed February 15, 2019.
[46] Andy Kroll, "Exposed: The Dark-Money ATM of the Conservative Movement," *Mother Jones*, February 5, 2013.
[47] Vogel, "The Conservative Dark-Money Groups."
[48] Alex Kocht, "Charles Koch Gave $50 Million to Higher Ed in 2016: What Did He Buy?," *International Business Times*, December 8, 2017.

and enjoys ties to the DeVos family.[49] Its $400,000 budget makes it possible to hire three editors who work with fifty student correspondents across the country.[50]

*Turning Point USA*

Turning Point USA (TPUSA) claims to be simply a "student movement for free markets and limited government."[51] However, its major focus has been on combating so-called liberal bias on college campuses, institutions that founder Charlie Kirk calls "islands of totalitarianism."[52] TPUSA publishes the "Professor Watchlist," which seeks to highlight the "radical agenda in lecture halls."[53] The watchlist is compiled based on stories circulated by Campus Reform, the College Fix, David Horowitz's Freedom Center, Project Veritas, and Fox News.[54] TPUSA has actively taken over student governments at forty colleges and universities in 2016–17 and is committing $2.2 million to expand to 122 campuses.[55]

Billionaires Bruce Rauner and Foster Friess appear to be the primary funders of Turning Point USA and largely responsible for the group's budget increases from $52,000 in 2012 to $5.5 million in 2016.[56] By 2017 the budget reached $8 million, and likely included funding from the fossil fuel industry (which might explain why TPUSA organizes against carbon disinvestment efforts on college campuses).[57] TPUSA is also a partner of the Leadership Institute, as well as other advocacy groups affiliated with the Koch donor network.[58]

*Breitbart News*

Although not part of the Koch network, and often hostile to positions advocated by the Koch brothers (especially on issues of immigration and mass incarceration), Breitbart News has become a megaphone for amplifying attacks originating with Campus Reform and the College Fix. Formerly headed by Steve Bannon, chief executive of Trump's presidential campaign and later White House chief strategist, Breitbart received substantial funding from hedge fund billionaire Robert Mercer. Known for his "extreme views on small

---

[49] Vogel, "The Conservative Dark-Money Groups."
[50] Schmidt, "Higher Education's Internet Outrage Machine."
[51] Turning Point USA, home page, https://www.tpusa.com, accessed April 23, 2019.
[52] Jane Mayer, "A Conservative Nonprofit That Seeks to Transform College Campuses Faces Allegations of Racial Bias and Illegal Campaign Activity," *New Yorker*, December 21, 2017.
[53] Turning Point USA, "Professor Watchlist," https://www.professorwatchlist.org, accessed April 23, 2019.
[54] Vogel, "The Conservative Dark-Money Groups."
[55] Mayer, "A Conservative Nonprofit"; Michael Vasquez, "Inside a Stealth Plan for Political Influence," *Chronicle of Higher Education*, May 7, 2017.
[56] Vasquez, "Inside a Stealth Plan."
[57] Mayer, "A Conservative Nonprofit."
[58] Vogel, "The Conservative Dark-Money Groups."

government and wealth," Mercer believes, as one colleague explained, "that human beings have no inherent value other than how much money they make. . . . If someone is on welfare they have negative value. If he earns a thousand times more than a schoolteacher, then he's a thousand times more valuable."[59] Robert, and his daughter Rebekah, funded not only Trump's presidential campaign but also the United Kingdom's pro-Brexit campaign and Cambridge Analytica.[60] With Mercer funding, Breitbart News is now one of the largest media organizations on the Internet, and the self-proclaimed home of the Alt-Right.

*Washington Times*

The Reverend Sun Myung Moon, who professes a religious calling to fight against communism, owns the Washington, DC, newspaper. The paper played a major role during the culture wars of the 1990s and enjoys a long track record of misleading and inaccurate reporting.[61] The *Washington Times* contributes to the American Legislative Exchange Council, a Koch organization that develops model antitax, antiwelfare, antilabor, antienvironmental, and antiregulation legislation.[62]

*Daily Caller*

Many stories critical of college professors circulate through the Daily Caller, a media platform created by Tucker Carlson and former Dick Cheney aide, Neil Patel. This website has proven highly profitable in part due to a dubious funding arrangement. Most of the Daily Caller's fifty reporters work for the tax-exempt, nonprofit Daily Caller News Foundation. This 501(c)(3) generates most of the content for the for-profit

---

[59] Kyle Swenson, "Rebekah Mercer, the Billionaire Backer of Bannon and Trump, Chooses Sides," *Washington Post*, January 5, 2018.
[60] Jane Mayer, "The Reclusive Hedge-Fund Tycoon behind the Trump Presidency," *New Yorker*, March 17, 2017. "Cambridge Analytica, a political data firm hired by President Trump's 2016 election campaign, gained access to private information on more than 50 million Facebook users. The firm offered tools that could identify the personalities of American voters and influence their behavior"; Kevin Granville, "Facebook and Cambridge Analytica: What You Need to Know as Fallout Widens," *New York Times*, March 19, 2018, https://www.nytimes.com/2018/03/19/technology/facebook-cambridge-analytica-explained.html.
[61] Heidi Beirich and Bob Moser, "The *Washington Times* Has History of Hyped Stories, Shoddy Reporting and Failing to Correct Errors," *Southern Poverty Law Center*, Summer 2003, https://www.splcenter.org/fighting-hate/intelligence-report/2015/washington-times-has-history-hyped-stories-shoddy-reporting-and-failing-correct-errors.
[62] SourceWatch, "*Washington Times*," *Center for Media and Democracy*, https://www.sourcewatch.org/index.php?title=Washington_Times, accessed April 14, 2019.

media site.[63] As a result, tax-deductible donations to the Daily Caller News Foundation—$3 million in 2015, for example—serve to subsidize the for-profit business.[64] Between 2012 and 2017 the Koch Family Foundation contributed $2.68 million to Daily Caller News Foundation. Other donors include: Charles Koch Institute ($30,000), Donor Trust ($130,000), and other foundations closely aligned with the Koch donor network, including the Lynde and Harry Bradley Foundation ($100,000 in 2014), Diana Davis Spencer Foundation ($150,000 in 2015), and Searle Freedom Trust ($260,000 between 2014 and 2015).[65]

*Fox News*

Fox News is often the final destination of the various stories manufactured in this ultralibertarian, billionaire-funded echo chamber. Once a professor's comments have been stripped of their actual content and turned into hyperbolic evidence of anticonservative bias, they are ready for prime time. Sean Hannity and Tucker Carlson have become the primary vectors for distributing attacks against college professors. Since 2016, after the firing of Roger Ailes for sexual predation, Hannity and Carlson increasingly drive Fox's messaging.[66]

Understanding how these various groups are funded, and what motivates them politically, helps us better understand the attacks faculty face. These attacks are clearly against faculty who engage in conversations about race, class, gender, sexual orientation, and whiteness. The objective of these "terroristic targeting and smear campaigns" is to "pressure" scholars "to remain silent, self-censor themselves, or moderate their speech, teaching, and writing about systemic oppression."[67] Attacks on faculty are also designed to fundamentally delegitimize the university as a particular kind of institution. Billionaire libertarians fund these attacks not only to intimidate critical scholarship but also to win greater donor influence over higher education in generally. In short, these attacks are part of a broader claim: *We* (the wealthy) should determine the speech on campus, not *you* (the faculty).

Unfortunately, many administrators have responded to these attacks by debating, and most often condemning, the content of their faculty members' speech. Such responses not only encourage greater self-

---

[63] Callum Borchers, "Charity Doubles as a Profit Stream at the Daily Caller News Foundation," *Washington Post*, June 2, 2017.
[64] Borchers, "Charity Doubles as a Profit Stream."
[65] SourceWatch, "*The Daily Caller News Foundation*," Center for Media and Democracy, https://www.sourcewatch.org/index.php?title=The_Daily_Caller_News_Foundation#Funding, accessed August 28, 2019.
[66] Jane Mayer, "The Making of the Fox News White House," *New Yorker*, March 4, 2019.
[67] Williams, "The Academic Freedom Double Standard," 3.

censorship among critically-minded scholars but also ignores the broader political strategy at work. In doing so, administrators, faculty, students, and the wider public miss the fact that these attacks are strategies deployed by a small, well-funded political network organized to fundamentally transform society, a transformation that requires fundamentally remaking colleges and universities.

Looking at a particular case makes it possible to better see the limitations that occur when administrators respond by debating the merits of faculty speech, rather than articulating the true motivations behind these attacks.

## An Autopsy of a Right-Wing Attack: The Case of Professor Johnny Williams

On June 20, 2017, Campus Reform published a piece accusing Trinity professor Johnny Williams of calling for the death of white people. The following day the story ran in Breitbart below an image of Congressman Steve Scalise after he had been shot on June 14 in Alexandria, Virginia, at a congressional Republican baseball game. The article included the headline "Trinity College Professor on Congressional Baseball Shooting: 'Let Them F*cking Die.'"[68] The story also appeared on the Daily Caller, TheBlaze, in the *Washington Times*, and other right-wing outlets before eventually reaching Tucker Carlson's show.[69] Turning Point USA also placed Williams on its "Professor Watchlist," citing the piece published by Campus Reform.[70]

Trinity College campus was closed on June 21 after individuals called campus to threaten violence, which only fueled additional national coverage. Williams left the state after receiving threats against him and his family, and the administration suspended him against his will.[71] The Trinity College AAUP chapter (of which I was the president) and the national AAUP vigorously defended Williams, who was later exonerated after a review process. In subsequent emails Trinity acknowledged that the incident caused $200,000 in lost donations and the withdrawal of sixteen students.[72] In the end, Campus Reform's attack successfully sent the

---

[68] Tom Ciccotta, "Trinity College Professor on Congressional Baseball Shooting: 'Let Them F*cking Die,'" *Breitbart*, June 21, 2017, https://www.breitbart.com/tech/2017/06/21/trinity-college-professor-on-congressional-baseball-shooting-let-them-fcking-die/.

[69] Tucker Carlson is an alumnus of Trinity College.

[70] Kathleen Megan, "Attacks on Trinity Profess: Free Speech or Intimidation?," *Hartford Courant,* June 25, 2017, https://www.courant.com/education/hc-trinity-professor-national-perspective-20170622-story.html.

[71] Kathleen Megan, "Trinity Puts Professor On Leave Following Social Media Fire Storm," *Hartford Courant,* June 26, 2017, https://www.courant.com/news/connecticut/hc-trininty-professor-placed-on-leave-0627-20170626-story.html.

[72] Joanne Berger-Sweeney, "President Joanne Berger-Sweeney's Statements Concerning Professor Johnny Williams," July 31, 2017, https://www.trincoll.edu/NewsEvents/NewsArticles/pages/WilliamsUpdatesSummer2017.aspx.

message that a black professor who openly condemns white supremacy should be considered the cause of potential physical, and real financial harm.

The awesome speed and overwhelming character of this attack, however, stemmed from the fact that this "controversy" was completely manufactured within a small, ultra-libertarian-funded media ecosystem. This political operation is designed to discredit and undermine the social legitimacy of black scholars like Williams but also, in the process, of colleges and universities more generally. To this end, Williams's actual words got willfully rewritten (*not* merely "misinterpreted") to fit a well-worn (and well-funded) script of an out-of-control and potentially dangerous academic in need of greater external constraint.

The initial Campus Reform piece, written by Anthony Gockowski, claimed that "Trinity College Professor Johnny Eric Williams appeared to endorse the idea that first responders to last week's congressional shooting should have let the victims 'fucking die' because they are white."[73] The operative phrase is "appeared to endorse" because, if one takes the time to read Williams's social media post, and actually engage with his argument, it becomes painfully evident that this is not the case. However, the mere mention that Williams "appears" to have said something hyperbolic nonetheless created the intended social media outrage.

Campus Reform selected three posts (among thousands) from Williams's Facebook page. The first was a reposted article from June 16 titled "Let Them Fucking Die" written by the anonymous Son of Baldwin and first published on the blogging platform Medium.[74] The other two posts were Williams's responces to the shooting of Charleena Lyles in Seattle. The Son of Baldwin piece starts with the observation that Representative Scalise, who associates with white supremacist groups and owns a long anti-LBGTQ legislative record, was saved by a queer African American security guard, Crystal Griner. This follows a long, established pattern: black and queer people repeatedly risk their lives to save white people, without receiving social benefits for doing so. Campus Reform never addresses the actual content of the lengthy and thoughtful argument. Instead, Gockowski evacuated the argument of its meaning, cherry-picking passages that serve the political and ideological project of Campus Reform and the Koch-funded Leadership Institute.

Gockowski's piece then tenuously connects this vacated reading of the Son of Baldwin article to two posts Williams wrote later in the day, one using the article title as a hashtag. The Campus Reform hit piece never intended to examine the arguments explored, implicated, or debated within these three pieces, or to

[73] Anthony Gockowski, "Prof Calls Whites 'Inhuman Assholes,' Says 'Let Them Die,'" Campus Reform, June 20, 2017, https://www.campusreform.org/?ID=9334.

[74] Son of Baldwin, "Let Them Fucking Die," Medium, June 16, 2017, https://medium.com/@SonofBaldwin/let-them-fucking-die-c316eee34212.

engage with Williams's scholarship on the topic of race and racism in America.[75] Nor does the Campus Reform article mention the broader academic and popular discussion about white supremacy.[76]

Once published, the Campus Reform "story" circulated rapidly through the right-wing media ecosystem, becoming even further stripped of content. The June 20 Daily Caller repeats the Campus Reform article nearly word for word.[77] Similarly, the June 28 *Washington Times* version included a picture of people gathered near the baseball field where the shooting took place.[78] The article again repeats the Campus Reform story nearly verbatim, even demonstrating its own lack of reporting when it notes: "The educational watchdog Campus Reform and TheBlaze both reached out to the professor for comment Tuesday to no avail."[79] In other words, the *Washington Times* did not contact either Williams or Trinity but merely repeated Campus Reform's account. This version ends with the most provocative material from the Son of Baldwin piece cited in a way that seemingly attributes the words to Williams—or leaving it vague enough as to encourage such a misreading.

On June 21, the president of Trinity, Joanne Berger-Sweeney, issued a statement noting that "To be clear, both personally and on behalf of the College that I represent, I do not condone hate speech or calls to incite violence."[80] After discussing the Medium post, Berger-Sweeney stated, "The piece culminated with a call to show indifference to the lives of bigots. That call was reprehensible, and any such suggestion is abhorrent and wholly contrary to Trinity's values."[81] On his June 22 Fox show Tucker Carlson called Williams "an open bigot, who singles out and torments kids based on their race." He ranted about the "left" ruining his alma mater using the "usual combination of lower standards, frivolous standards, low-grade

[75] For example, Johnny Williams, "Talking About Race without Talking About Race: Color Blindness in Genomics," *American Behavioral Scientist* 59 no. 11 (2015): 1496–1517; and Williams, *Decoding Racial Ideology in Genomics* (Lanham, MD: Lexington, 2016).

[76] See Williams, *The Academic Freedom Double Standard*.

[77] Justin Caruso, "Professor Calls White People Inhuman," Daily Caller, June 20, 2017, https://dailycaller.com/2017/06/20/professor-calls-white-people-inhuman, accessed August 28, 2019.

[78] Douglas Ernst, "Trinity College Professor Calls White People 'Inhuman': 'Let Them F-ing Die,'" *Washington Times*, June 28, 2017, https://www.washingtontimes.com/news/2017/aug/2/trinity-college-johnny-eric-williams-anti-white-f- (since removed as requested by Trinity College).

[79] Douglas Ernst, "Trinity College Professor Calls White People 'Inhuman': 'Let Them F-ing Die,'" *Washington Times*, June 21, 2017, https://www.washingtontimes.com/news/2017/jun/21/johnny-eric-williams-trinity-college-professor-cal.

[80] Joanne Berger-Sweeney, "Statement Regarding Social Media Posts by Faculty Member," Trinity College, June 21, 2017, www.trincoll.edu/AboutTrinity/CommunityLetters/Pages/StatementSocialMedia21June17.aspx.

[81] Berger-Sweeney, "Statement Regarding Social Media Posts."

authoritarianism, not to mention the addition of semi-literate buffoons like Professor Johnny Williams . . . Would you send your kids?"[82]

On June 26 Berger-Sweeney announced that Trinity was placing Williams on leave "effective immediately" and that the dean of faculty would conduct a review. In response, Trinity's AAUP chapter released a statement demanding that the administration "issue: a public apology to Johnny Williams; a denouncement of the attacks against him; and offer an unequivocal endorsement of academic freedom."[83] The national AAUP also issued a letter condemning the administration's decision, pointing out that "the action taken against Professor Williams is entirely at odds with normative standards of academic due process."[84]

On July 14, after considerable campus organizing by the AAUP chapter and news that the national AAUP was sending a committee of inquiry to campus, the dean of faculty issued his report.  This report examined Williams's speech, and the relevant policies in the Faculty Manual and Employee Handbook, before exonerating him of all wrongdoing.[85] However, in her public announcement of this report, Berger-Sweeney once again returned to the merits of Williams's speech:

> Let me be clear: While I support Professor Williams's right to express his opinions . . . Nevertheless, the words used in that hashtag not only offend me personally, they also contradict our fundamental institutional values and run counter to our efforts to bridge divides and to promote understanding[86]

The three official statements from the president, and the dean's report, all focused on whether Williams actually called for the death of white people, and whether such speech is protected by academic freedom. Missing from the conversation was a clear analysis of who Campus Reform is, the political and ideological motivations behind the attacks, and a clear understanding of whose funding made it possible to transform a

---

[82] Tucker Carlson, "The Left Wrecked My Alma Mater, Trinity College," *Fox News*, June 22, 2017, https://video.foxnews.com/v/5480749711001/#sp=show-clips, accessed August 28, 2019.

[83] Hank Reichman, "Trinity AAUP Statement on the Decision to Place Professor Johnny Williams on Leave," *Academe Blog*, June 27, 2017, https://academeblog.org/2017/06/27/trinity-aaup-statement-on-the-decision-to-place-professor-johnny-williams-on-leave/.

[84] Hans-Joerg Tiede, letter to Joanne Berger-Sweeney, AAUP, June 27, 2017, https://www.aaup.org/sites/default/files/files/Trinity-Williams-6-27-17.pdf, accessed August 28, 2019.

[85] Tim Cresswell, "Review of the June 18, 2017, Actions of Professor Johnny Williams and College Policy," Trinity College, July 2017, https://www.trincoll.edu/AboutTrinity/offices/president/Documents/FinalWilliamsReport12July17.pdf.

[86] Joanne Berger-Sweeney, "Statement and Report Concerning Professor Johnny Williams," Trinity College, July 14, 2017, https://www.trincoll.edu/AboutTrinity/CommunityLetters/Pages/ProfWilliams14July17.aspx.

gross and willful misreading of a handful of social media posts into a "crisis" that played out on national television.

How might we respond better? A number of helpful articles have examined practical, interpersonal strategies.[87] The suggestions laid out below, however, speak more broadly to questions of institutional strategy.


## How to Respond Differently

Campus Reform, the College Fix, and other watchdog outlets, as well as those platforms that circulate their content, have a political and ideological objective in discrediting faculty—especially those who critique white supremacy, patriarchy, and free-market capitalism. Because the organizations launching attacks on faculty are politically motivated, they have no actual intention of engaging with the actual content of academic speech. As such, administrations should not ground their response in an interpretation of what their faculty member did (and didn't) say. Instead, administrations should respond by "following the money." Namely, they should make clear who is mounting the attacks, and why. When the issue was framed as "Did Professor Williams actually call for killing white people?" then Campus Reform has already won. Instead, administrations, faculty, students, alumni, journalists, and the broader public should respond by clearly naming who is carrying out the attack, why, and then offer unconditional support for their faculty. Here are some guidelines to consider:


*Trust the faculty being attacked.*

The groups originating these attacks seek to undermine the credibility of specific academics. Therefore, when a group like Campus Reform publishes a story attacking a faculty member, everyone should assume that this is a politically motivated piece of hackery, and treat it as such. Giving Campus Reform the benefit of the doubt, often at the expense of a faculty member of color, is itself a form of white supremacy.[88]

Chancellor Kent Syverud of Syracuse University provided a perfect example of an administrator trusting his faculty. In response to the attack on Dana Cloud described above, Syverud wrote that "Cloud's statement 'is susceptible to multiple interpretations,'" that he "rejected calls to denounce, censor, or dismiss her," and

---

[87] See, for example, Eric Anthony Grollman, "Scholars under Attack," *Inside Higher Ed*, July 9, 2015, https://www.insidehighered.com/advice/2015/07/09/essay-how-support-scholars-under-attack; and Matthew Boedy, "Responding to Conservative Watchdogs," *Academe Blog*, April 19, 2019, https://academeblog.org/2019/04/19/responding-to-conservative-watchdogs/.
[88] I examine this argument in Isaac Kamola, "Crashing the Academic Conversation," *Chronicle of Higher Education*, July 9, 2017.

"Our faculty must be able to say and write things—including things that provoke some or make others uncomfortable—up to the very limits of the law."[89]

*Publicly defend academic freedom and faculty governance.*

Higher education is premised on academic freedom, which secures the ability of faculty to teach classes and produce knowledge without fear of financial, political, or institutional retaliation. Academic freedom is grounded in the premise that, because of their training, scholars have attained a level of expertise, reviewed by their peers, which contributes to meaningful academic and social dialogue. It presumes that having a wide range of voices engaged in topics of social concern—no matter how controversial—produces the best outcomes.

As Joan Scott reminds us, however, it is important to maintain the difference between academic freedom and free speech. Whereas free speech protects "one's opinion, however unfounded, however ungrounded," academic freedom is a norm of professionalism that involves "thoughtful, critical articulation of ideas, the demonstration of proof based on rigorous examination of evidence, the distinction between true and false, between careful and sloppy work, the exercise of reasoned judgment."[90] While Campus Reform and the College Fix have every right to produce hackneyed misrepresentations of faculty speech, within the academy such writing cannot be given equal weight as the statements and utterances of faculty, speaking on topics they have spent decades studying. As Scott notes, "This is not elitism but expertise, the production of knowledge informed by disciplined research."[91] Just as one does not crowdsource cures to infectious diseases, society should listen to faculty—not online mobs—if it wants to understand, for example, "the history and sociology of race, gender, sexuality, and class."[92]

In contrast, the right-wing donor class has a political, ideological, and economic interest in discrediting their critics. Unleashing well-funded right-wing attacks against college faculty is one strategy to coerce an academic institution into adopting the values preferred by the donors funding the attacks. Ultra-libertarian donors have successfully used the language of "free speech" as the lever to create a false equivalency between the speech of faculty and their own ideological and donor-funded attacks.[93] If free speech, rather than

---

[89] Schmidt, "Professors' Growing Risk."
[90] Joan W. Scott, "On Free Speech and Academic Freedom," *Journal of Academic Freedom* 8 (2017): 4.
[91] Scott, "On Free Speech," 7.
[92] Scott, "On Free Speech," 8.
[93] As funders (and beneficiaries) of the *Citizens United* Supreme Court case, these libertarian donors view their financial investments as speech. Therefore, when demanding greater "free speech" on campus, they are

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 440 of 552

academic freedom, is the primary concern, then Johnny Williams, Campus Reform, and Milo Yiannopoulos all have the equal right to contribute to a conversation about race. However, rather than entertaining these different interpretations, the response should be: "Campus Reform is a bully that, using dark money, seeks to determine the kinds of conversations taking place in the classroom and in scholarly debate. A free society requires rigorous and free inquiry, not threats and harassment from well-funded external agitators."

*Refer to these events as attacks. Name the attacker.*

I used to refer to the summer of 2017 at Trinity College as "the Johnny Williams incident." One day Williams corrected me, saying, "Hey, this was never about me. This was always about Campus Reform." This is a powerful insight and draws needed attention to the politics around naming the attackers. Grundy similarly argues that using the language of "attack" acknowledges the violence experienced by faculty during these extreme, nonstop, racialized, and gendered waves of malice—a continuation of the Jim Crow policing of black bodies in traditionally "white" spaces.[94]

Organizations like Campus Reform, the College Fix, and Turning Points USA exist to "combat" the university as currently organized. If students, faculty, and administrators ignore the underlying political motivations behind these attacks and seek instead to walk some fine line created by parsing an apologetic middle ground, we effectively give merit to weaponized claims created to undermine the academic freedom of faculty. Furthermore, when administrations sanction faculty based on these attacks, they demonstrate that these strategies work.

The best response is a counterattack; make the story about the groups orchestrating these incidents. In particular, draw out the connections between dark-money donors and the political, ideological, and economic motives undergirding these attacks.

*Be (preemptively) organized.*

At Trinity it was clear that neither faculty nor administration had any idea how to handle the Campus Reform attack. The response was muddled and created institutional distrust, as the administration tried to have it both ways: supporting academic freedom in private yet publicly admonishing Williams to placate donors. Instead, administrations should develop strategies for responding to these attacks, and work with faculty governance

---

essentially articulating a vision of greater donor spending (that is, speech) throughout all aspects of higher education.

[94] Grundy, "A History of White Violence," 1867.

organizations to develop clear protocols. At Trinity, for example, the administration invented its own ad hoc response in violation of policies laid out in the faculty manual. Preemptive planning by administrations, and steadfast defense of academic freedom among faculty, can increase the chances that institutions will not capitulate to—and therefore validate—these attacks.

Faculty should also never assume that administrators will publicly and unconditionally protect their academic freedom (unless forced to do so). At Trinity our AAUP chapter released statements, fielded petitions, held forums, contacted media, and put pressure on the administration not to capitulate to the considerable pressures calling for the firing of Williams. Because these attacks are organized and political, an organized and political response is required.

* * * * *

"Follow the money" is the best strategy for defending against these right-wing attacks. When the public learns about dark money on campus, they are often repulsed. Therefore, rather than letting an outlet like Campus Reform define the discussion, the story should be about how a handful of billionaire donors use their resources to shape conversations on college campuses. When this argument becomes the main line of response, then the right-wing shouting about "snowflakes," "trigger warnings," and "free speech" becomes seen for what it actually is: a cynically political ploy. I have faith that creating a stark contrast between the protection of academic freedom and dark-money efforts to undermine it creates a firm foundation upon which to defend the university against those who, like Charles Koch, view higher education is little more than an obstacle to their desired political and economic outcomes.

*Isaac Kamola is an associate professor of political science at Trinity College in Hartford, Connecticut. His research examines critical globalization studies, the political economy of higher education, and African anticolonial theory. He is president and cofounder of his campus AAUP chapter and author of* Making the World Global: US Universities and the Production of the Global Imaginary.

# EXHIBIT CC

**Florida Board of Governors**
**Intellectual Freedom and Viewpoint Diversity Assessment Project**
<span style="color:red">**Staff Survey**</span>

## Opening Message for Survey

In spring 2021, the Florida Legislature passed HB233 to promote Intellectual Freedom and Viewpoint Diversity within the State of Florida's State University System. The Florida Board of Governors (FLBOG) was asked to create "an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the college community, including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom."

This anonymous survey is intended to obtain opinions on intellectual freedom and viewpoint diversity at *[university name]*, drawing on your experiences as a staff member there. You will be asked questions about these topics and about yourself. Your participation is voluntary. You are free not to answer any question or to withdraw from the study at any time. This survey should take approximately 5 minutes to complete.

Responses will be analyzed for the institution and only grouped responses will be reported. Any data or results that might compromise a respondent's identity will not be published.

## Intellectual Freedom and Viewpoint Diversity on My Campus

In your experience, how often are students encouraged to consider a wide variety of viewpoints and perspectives in the classroom?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Never
- Don't Know
- Prefer Not to Answer

1

FSU000205

In your experience, how often are there opportunities for students to consider a wide variety of viewpoints and perspectives *outside of the campus classroom* (such as in clubs, student organizations, and at campus events)?

- Very Frequently
- Frequently
- Occasionally
- Rarely
- Very Rarely
- Never
- Prefer Not to Answer

In your experience how often do *instructors* create an environment that is supportive of a range of viewpoints?

- Always
- Very Frequently
- Frequently
- Occasionally
- Rarely
- Never
- Don't Know
- Prefer Not to Answer

In your experience, how often do *students* create an environment that is supportive of a range of viewpoints?

- Always
- Very Frequently
- Frequently
- Occasionally
- Rarely
- Never
- Don't Know
- Prefer Not to Answer

2

FSU000206

**<u>Freedom of Expression on Campus</u>**

Think about a time within your workplace in which a *non-controversial* issue was being discussed. How comfortable or reluctant would you feel about contributing to the discussion on this topic?

- I would be very comfortable contributing to this discussion
- I would be somewhat comfortable contributing to this discussion
- Neutral
- I would be somewhat reluctant contributing to this discussion
- I would be very reluctant contribute to this discussion
- Prefer Not to Answer

Think about a time within your workplace in which a *controversial* issue was being discussed. How comfortable or reluctant would you feel about contributing to the discussion on this topic?

- I would be very comfortable contributing to this discussion
- I would be somewhat comfortable contributing to this discussion
- Neutral
- I would be somewhat reluctant contributing to this discussion
- I would be very reluctant contribute to this discussion
- Prefer Not to Answer

As you think about contributing to a discussion on one of these *controversial* issues, how concerned would you be that the following would occur?

Colleagues would criticize my views as offensive.
- Not at all concerned
- Slightly concerned
- Somewhat concerned
- Very concerned
- Extremely concerned
- Prefer Not to Answer

Someone would post critical comments about my views on social media.
- Not at all concerned
- Slightly concerned
- Somewhat concerned

3

FSU000207

- Very concerned
- Extremely concerned
- Prefer Not to Answer



FSU000208

Are you more likely or less likely to share your views on a controversial issue in the following settings?

| Setting | Much More Likely | Somewhat More Likely | Somewhat Less Likely | Much Less Likely | Prefer Not to Answer |
|---|---|---|---|---|---|
| In the workplace with colleagues | | | | | |
| At a meal with friends | | | | | |
| At a family gathering | | | | | |
| On social media (e.g. Twitter, Instagram, or Facebook) | | | | | |

5

FSU000209

**Information About You**

Where would you place yourself on the following scale?

- Conservative
- Moderate
- Liberal
- None of the Above
- Prefer Not to Answer

Which of the following describes your race? You can select as many as apply.

- American Indian or Alaskan Native
- Asian or Asian-American
- Black or African American
- Caucasian or White
- Pacific Islander
- Mixed
- Other
- Prefer Not to Answer

Are you of Hispanic, Latino/a/x, or Spanish origin?

- Yes
- No
- Prefer Not to Answer

With which sex or gender identity do you most identify?

- Female
- Male
- Neither best describes me
- Prefer Not to Answer

6

FSU000210

# EXHIBIT DD

**Alexi Velez**

| | |
|---|---|
| **From:** | Alexi Velez |
| **Sent:** | Thursday, February 10, 2022 5:42 PM |
| **To:** | George.levesque@gray-robinson.com; tim.moore@gray-robbison.com; patrick.hagen@gray-robinson.com |
| **Cc:** | Fritz Wermuth; Thomas Zehnder; Elisabeth Frost; Jyoti Jasrasaria; Joseph Posimato; Spencer Klein; Noah Baron; Raisa Cramer; Angie Price; Melissa Hill; Kimberly Healy; Robyn Kramer; Elizabeth Poston; Spencer McCandless; Grieb, Garrett (Perkins Coie) |
| **Subject:** | Link et al. v. Corcoran et al., Case No. 4:21-cv-00271-MW-MAF, Pls' Prod. Vol. VI. |

Counsel:

You should have just received a secure file transfer link from my colleague Garret Grieb directing you to Plaintiffs' sixth production of documents, which is Bates stamped FSU000001-FSU000237.

Subject to and without waiving Plaintiffs' prior written objections, this production is responsive to Request Number 3 of Defendants' Second Request for Production of Documents to Plaintiffs.

The password to extract the files from the .zip is ==f e p 9 K 7 i ! W w i r q n %==

Sincerely,
**Alexi M. Velez**
Elias Law Group LLP
10 G St NE Ste 600
Washington DC 20002
202-968-4654

(pronouns: she/her/hers)

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

_____
**From:** Alexi Velez
**Sent:** Wednesday, February 2, 2022 4:31 PM
**To:** George.levesque@gray-robinson.com; tim.moore@gray-robbison.com; patrick.hagen@gray-robinson.com
**Cc:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Thomas Zehnder <TZehnder@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>; Jyoti Jasrasaria <jjasrasaria@elias.law>; Joseph Posimato <jposimato@elias.law>; Spencer Klein <sklein@elias.law>; Noah Baron <nbaron@elias.law>; Raisa Cramer <rcramer@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Kimberly Healy <khealy@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>; Elizabeth Poston <eposton@elias.law>; Spencer McCandless <smccandless@elias.law>; Grieb, Garrett (Perkins Coie) <GGrieb@perkinscoie.com>
**Subject:** RE: Link et al. v. Corcoran et al., Case No. 4:21-cv-00271-MW-MAF

Counsel:

You should have just received a secure file transfer link from my colleague Garret Grieb directing you to Plaintiffs' fourth production of documents, which is Bates stamped FL_SEN000001 - FL_SEN001258.

Subject to and without waiting Plaintiffs' prior written objections, this production is responsive to Request Number 3 of Defendants' Second Request for Production of Documents to Plaintiffs.

Sincerely,
**Alexi M. Velez**
Elias Law Group LLP
10 G St NE Ste 600
Washington DC 20002
202-968-4654

(pronouns: she/her/hers)

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

_____

**From:** Alexi Velez
**Sent:** Tuesday, January 11, 2022 2:09 PM
**To:** George.levesque@gray-robinson.com; tim.moore@gray-robbinson.com; patrick.hagen@gray-robinson.com
**Cc:** Fritz Wermuth <FWermuth@kbzwlaw.com>; Thomas Zehnder <TZehnder@kbzwlaw.com>; Elisabeth Frost <efrost@elias.law>; Jyoti Jasrasaria <jjasrasaria@elias.law>; Joseph Posimato <jposimato@elias.law>; Spencer Klein <sklein@elias.law>; Noah Baron <nbaron@elias.law>; Raisa Cramer <rcramer@elias.law>; Angie Price <APrice@kbzwlaw.com>; Melissa Hill <mhill@kbzwlaw.com>; Kimberly Healy <khealy@kbzwlaw.com>; Robyn Kramer <rkramer@kbzwlaw.com>
**Subject:** Link et al. v. Corcoran et al., Case No. 4:21-cv-00271-MW-MAF

Counsel:

Attached is a cover letter regarding the Plaintiffs' initial production of documents numbered PL000001-PL000501, which I will be sending momentarily via the V-Sync secure file transfer platform. The cover letter includes instructions for accessing the production via V-Sync.

Regards,
**Alexi M. Velez**
Elias Law Group LLP << File: 2022.01.11 Production Cover Letter_RE Link et al. v. Corcoran et al. .pdf >>
10 G St NE Ste 600
Washington DC 20002
202-968-4654

(pronouns: she/her/hers)

CONFIDENTIAL: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# EXHIBIT EE

Date:         Mon, 15 Nov 2021 10:22:33 AM -0500

Sent:         Mon, 15 Nov 2021 10:22:29 AM -0500

Subject:     Intellectual diversity survey

From:       Rogers, Jon

To:          Criser III, Marshall <Marshall.Criser@flbog.edu >; Jones, Tim <Tim.Jones@flbog.edu >; England, Christy <Christy.England@flbog.edu >; Shirley, Vikki <Vikki.Shirley@flbog.edu >; Jones, Jason <Jason.Jones@flbog.edu >;

Attachments:  FLBOG Student Survey (Nov 15 2021).docx; image001.jpg

F.Y.I.

In preparation for tomorrow's ZOOM call, Tim Chapin has provided an updated draft survey with a few final edits that are highlighted (see attached).

*Jon*

**Jon Rogers, PhD**
**Assistant Vice Chancellor**
**Special Projects**

Board of Governors
State University System of Florida
325 W. Gaines St. Suite 1614
Tallahassee, Florida 32399
850-245-0609
www.flbog.edu



# EXHIBIT FF

Page 1

Florida House Post-Secondary

February 17th, 2021

Audio Transcription

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 7

1    survey is not designed to solicit a certain opinion or

2    produce a certain result.  And we want to make sure

3    that it's objective, nonpartisan, and statistically

4    valid; and if it's not, we'll challenge the survey.

5            REPRESENTATIVE BELL:  Okay.  Thank you.

6            CHAIR MARIANO:  Thank you.

7            Representative Tant for a question.  You're

8    recognized.

9            REPRESENTATIVE TANT:  Thank you, Madam Chair.

10           Representative Roach, how will the survey

11   results be used?  And like, how are they evaluated?

12   How are they used?  Are professors going to lose their

13   jobs?  Like, what is the purpose of -- what are the

14   results of the survey?

15           CHAIR MARIANO:  You're recognized.

16           REPRESENTATIVE ROACH:  Thank you,

17   Representative Tant, for that very good question.  So

18   we are not putting a prescription in this bill on any

19   actions or any policy decisions to be made as a result

20   of this survey.

21           And for those of you who may be on the fence

22   about being up or down on this bill, I want to make it

23   very clear that I am not asking you and this bill is

24   not asking you to make a policy decision here today.

25   But what I am asking you to do is to evaluate whether

PL_002930

Page 8

1    we have a problem on our college campuses.  Before we

2    attempt to propose any legislative fix, we want to

3    ascertain, one, is there a problem, and what is the

4    nature of the problem.  And this survey seeks simply to

5    gather empirical data rather than anecdotal data to

6    make that determination.

7            So members of this legislature now will not

8    be making any policy decisions if this bill were to

9    become law.  Again, the first published results will be

10   released, if this becomes law, in September of 2022.

11   And so there will be a new legislature convening then

12   in new districts, which will make any decisions about

13   what policies should or could be done.

14           And I might also add as a side remark, if you

15   want to be a part of that legislature, a great way to

16   start would be to vote for this good bill.

17           CHAIR MARIANO:  For a follow-up, you're

18   recognized.

19           REPRESENTATIVE TANT:  Yes, ma'am.  Thank you.

20           The other question that I have goes to the

21   filming of the lectures.  Are students allowed to film

22   other students?  I know we're talking about filming the

23   lecture for the purposes of educational reasons,

24   according to your bill.  But if a student --

25           CHAIR MARIANO:  Representative Tant, if we

Page 17

1    university presidents and the chair of the Florida

2    College System Council of Presidents signed resolutions

3    affirming their commitment to providing free speech on

4    campus.

5              So despite those declarations, and despite

6    the commitment of our administrators to free speech on

7    campus, there have been some national and some

8    individual state surveys, not in Florida, that have

9    identified that other universities are falling far

10   short of that ideal expression and commitment to the

11   First Amendment.

12             And we simply don't know if we're doing that

13   in the state of Florida.  And I'm not alleging that we

14   are.  I'm asking this body to allow us to ask that

15   question and gather empirical data to see if we have a

16   problem, and if we're keeping that marketplace of ideas

17   open on our college campuses, and if there's anything

18   that we need to do to, to ensure that that we are doing

19   that or any policies we need to do.  But I'm not asking

20   you to make a policy decision.  I'm asking you to ask a

21   question and allow for the gathering of empirical data

22   to ask that question on our campuses.  I hope that

23   addressed your question, Ranking Member.

24             RANKING MEMBER THOMPSON:  It does.  Thank

25   you.

PL_002940

Page 37

1  objective, nonpartisan, statistically valid piece of

2  this.

3          And look, there are paid statisticians that

4  do these things.  And if you had a survey that was

5  filled out by only 10 percent of the student population

6  -- and look, I will acknowledge that probably the

7  people that are most inclined to fill out a survey of

8  this type are someone who feels like they're aggrieved

9  or the super-politically active groups on campus.

10          And I think that, you know, when we look at

11  some of the better surveys, the one at University of

12  North Carolina, was just conducted in March of 2020,

13  just barely a year ago, they did in-depth focus group

14  interviews with members of the three most politically

15  active student organizations.  So that was a little bit

16  more in depth than what we're proposing here.

17          But -- I'm going to caveat my answer by

18  saying I'm not an expert.  But I would suspect if you

19  had only 10 percent of a student body fill out the

20  survey, and that 10 percent of students did not

21  represent a cross section of that university, it

22  probably would not be statistically valid and would be

23  subject to challenge.

24          And again, I'm going to come back to the

25  university presidents, university themselves, have the

PL_002960

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 460 of 552

Page 96

```
 1                    C E R T I F I C A T I O N

 2

 3            I, Alicia Jarrett, court-approved

 4      transcriber, hereby certify that the foregoing is a

 5      correct transcript from the electronic sound recording

 6      provided for transcription and prepared to the best of

 7      my ability.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23      _____

24      ALICIA JARRETT, AAERT NO. 428      DATE:  March 21, 2022

25
```

PL_003019

# EXHIBIT GG

# BROOKINGS

FixGov

## Views among college students regarding the First Amendment: Results from a new survey

John Villasenor Monday, September 18, 2017

College students' views of the First Amendment are of profound importance for multiple reasons. First, colleges and universities are places where intellectual debate should flourish. That can only occur if campuses are places where viewpoint diversity is celebrated, and where the First Amendment is honored in practice and not only in theory. Second, what happens on campuses often foreshadows broader societal trends. Today's college students are tomorrow's attorneys, teachers, professors, policymakers, legislators, and judges. If, for example, a large fraction of college students believe, however incorrectly, that offensive speech is unprotected by the First Amendment, that view will inform the decisions they make as they move into positions of increasing authority later in their careers.

College students' views on the First Amendment are important for another reason as well: Students act as *de facto* arbiters of free expression on campus. The Supreme Court justices are not standing by at the entrances to public university lecture halls ready to step in if First Amendment rights are curtailed. If a significant percentage of students believe that views they find offensive should be silenced, those views will in fact be silenced.

To explore the critical issue of the First Amendment on college campuses, during the second half of August I conducted a national survey of 1,500 current undergraduate students at U.S. four-year colleges and universities. The survey population was geographically diverse, with respondents from 49 states and the District of Columbia.

# A surprisingly large fraction of students believe it is acceptable to act—including resorting to violence—to shut down expression they consider offensive.

I plan to publish a detailed analysis of the results in an academic paper, but given the long time delays associated with academic publishing, and the timeliness of the topic, I believe it is important to get some of the key results out into the public sphere immediately.

The survey results establish with data what has been clear anecdotally to anyone who has been observing campus dynamics in recent years: Freedom of expression is deeply imperiled on U.S. campuses. In fact, despite protestations to the contrary (often with statements like "we fully support the First Amendment, *but*…), freedom of expression is clearly not, in practice, available on many campuses, including many public campuses that have First Amendment obligations.

Before getting to the specifics of the results, it is helpful to include some brief reminders regarding the scope of the First Amendment in light of some key Supreme Court precedents. The First Amendment is very broad. There are, however, some exceptions. Under the 1969 *Brandenburg v. Ohio* <u>decision</u>, speech that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" is outside First Amendment protection. "True threats" are also unprotected (see the 1969 *Watts v. United States* <u>decision</u>; see also the 2003 <u>ruling</u> in *Virginia v. Black*). There are other exceptions as well; for example, obscenity can fall outside the scope of First Amendment protection.

With that as background, here are some of the key survey results:

## "Hate speech"

While "hate speech" is odious, as long as it steers clear of well-established exceptions to the First Amendment such as those noted above, it is constitutionally protected. The survey results, however, indicate that many college students believe that hate speech is unprotected.

Here is the question asked in the survey, with results presented in both aggregate form (in the column labeled "all"), as well as by political affiliation, college/university category (public vs. private), and gender.

*Does the First Amendment protect "hate speech"?*

|  |  | Political Affiliation | | | Type of College | | Gender | |
|--|--|-----|-----|-----|--------|---------|--------|------|
|  | All | Dem | Rep | Ind | Public | Private | Female | Male |
| Yes | 39 | 39 | 44 | 40 | 38 | 43 | 31 | 51 |
| No | 44 | 41 | 39 | 44 | 44 | 44 | 49 | 38 |
| Don't know | 16 | 15 | 17 | 17 | 17 | 13 | 21 | 11 |

(The values in the table identify the responses by percent, weighted for gender. Percentages are rounded to two digits, so in some cases the total will not be exactly 100. For more details regarding the survey see the explanation at the end of this article.)

One of the noteworthy observations from this data is that across all three political affiliations listed in the table, fewer than half of the respondents indicated a belief that hate speech is constitutionally protected. The very significant gender variation in the responses is also noteworthy.

## Controversial speakers

One way to examine tolerance to offensive speech is to explore views on what actions students deem permissible to prevent it from occurring. The next two questions are based on the following scenario:

*A public university invites a very controversial speaker to an on-campus event. The speaker is known for making offensive and hurtful statements.*

The survey included a set of questions considering student views regarding actions aimed at disrupting the speech:

*A student group opposed to the speaker disrupts the speech by loudly and repeatedly shouting so that the audience cannot hear the speaker. Do you agree or disagree that the student group's actions are acceptable?*

|  | All | Political Affiliation | | | Type of College | | Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Dem | Rep | Ind | Public | Private | Female | Male |
| Agree | 51 | 62 | 39 | 45 | 51 | 51 | 47 | 57 |
| Disagree | 49 | 38 | 61 | 55 | 49 | 49 | 53 | 43 |

The responses to the above question show a very distinct variation across political affiliation, with 62 percent of Democrats but "only" 39 percent of Republicans agreeing that it was acceptable to shout down the speaker. More generally, I find the numbers in the above table to be highly concerning, because they show that a very significant fraction of students, across all categories, believe it is acceptable to silence (by shouting) a speaker they find offensive. And, it gets worse:

## *A student group opposed to the speaker uses violence to prevent the speaker from speaking. Do you agree or disagree that the student group's actions are acceptable?*

|  |  | Political Affiliation | | | Type of College | | Gender | |
|---|---|---|---|---|---|---|---|---|
|  | All | Dem | Rep | Ind | Public | Private | Female | Male |
| Agree | 19 | 20 | 22 | 16 | 18 | 21 | 10 | 30 |
| Disagree | 81 | 80 | 78 | 84 | 82 | 79 | 90 | 70 |

These results are notable for several reasons. First, the fraction of students who view the use of violence as acceptable is extremely high. While percentages in the high teens and 20s are "low" relative to what they could be, it's important to remember that this question is asking about the acceptability of committing *violence* in order to silence speech. Any number significantly above zero is concerning. The gender difference in the responses is also notable.

## Does the First Amendment require presentation of counterpoints?

Of course, it does not. But, as the responses to a question on this topic illustrate, many students nonetheless believe that, under the First Amendment, presentation of counterpoints to offensive views is legally required in on-campus events. Here is the question and the breakdown of responses:

*Consider an event, hosted at a public U.S. university by an on-campus organization, featuring a speaker known for making statements that many students consider to be offensive and hurtful. A student group opposed to the speaker issues a statement saying that, under the First Amendment, the on-campus organization hosting the event is <u>legally required</u> to ensure that the event includes not only the offensive speaker but also a speaker who presents an opposing view. What is your view on the student group's statement?*

| | | Political Affiliation | | | Type of College | | Gender | |
|---|---|---|---|---|---|---|---|---|
| | All | Dem | Rep | Ind | Public | Private | Female | Male |
| Agree | 62 | 65 | 62 | 58 | 63 | 60 | 60 | 66 |
| Disagree | 38 | 35 | 38 | 42 | 37 | 40 | 40 | 34 |

Across all of the categories in the table, a majority of students expressed agreement with the assertion that in the scenario presented, compliance with the First Amendment requires offering a counterpoint. This shows an important misunderstanding, since the First Amendment of course involves no such requirement. Many of the respondents appear to be confusing good event design—which under some circumstances can indeed benefit from the presentation of counterpoints—with the completely different issue of what compliance with the First Amendment requires.

## What kind of learning environment should colleges foster?

One of the questions in the survey asked students to choose between <u>two types of</u>

learning environments (note: this question was also asked in a 2016 survey by Gallup and the Knight Foundation):

> *If you had to choose one of the options below, which do you think it is more important for colleges to do?*
>
> *Option 1: create a positive learning environment for all students by prohibiting certain speech or expression of viewpoints that are offensive or biased against certain groups of people*
>
> *Option 2: create an open learning environment where students are exposed to all types of speech and viewpoints, even if it means allowing speech that is offensive or biased against certain groups of people?*

|  |  | Political Affiliation | | | Type of College | | Gender | |
|---|---|---|---|---|---|---|---|---|
|  | All | Dem | Rep | Ind | Public | Private | Female | Male |
| Option 1 | 53 | 61 | 47 | 45 | 53 | 54 | 52 | 55 |
| Option 2 | 47 | 39 | 53 | 55 | 47 | 46 | 48 | 45 |

Interestingly (and in my view, discouragingly), across most categories, and in the aggregate, the majority of students appear to prefer an environment in which their institution is expected to create an environment that shelters them from offensive views. The exceptions are among Republicans and Independents, though even in those categories nearly half of the students still expressed a preference for the more sheltered environment.

## Some takeaways

As the above results make clear, among many current college students there is a significant divergence between the actual and perceived scope of First Amendment freedoms. More specifically, with respect to the questions explored above, many students have an overly narrow view of the extent of freedom of expression. For

example, a very significant percentage of students hold the view that hate speech is unprotected. In addition, a surprisingly large fraction of students believe it is acceptable to act—including resorting to violence—to shut down expression they consider offensive. And a majority of students appear to want an environment that shields them from being exposed to views they might find offensive.

Given these results, what should be done? First, I think that college faculty and administrators have a heightened responsibility to do a better job at fostering freedom of expression on their campuses. Getting this to occur will be challenging. I expect that if college faculty and administrators were asked the questions in this survey, the results would, at least in broad terms, be similar to the student results presented above. That said, I would hope that results such as these can help spur faculty members and university administrators to think about the importance of creating a campus environment in which students are exposed to a broad range of views, including some that students may find disagreeable.

More fundamentally, I think that there is insufficient attention given to the First Amendment, and to constitutional principles generally, in pre-college education. Most middle and high school students are taught, for example, that there is a Bill of Rights. But very few of them receive significant instruction on how key Supreme Court rulings have shaped contemporary interpretations of the First (or other) Amendments.

We don't need to turn middle and high school students into experts on constitutional law. But we can do a better job of giving them a fuller explanation of the scope of the First Amendment, and the fact that it protects the expression of offensive views. And, I would hope that we can do a better job at convincing current and future college students that the best way to respond to offensive speech is with vigorous debate, or peaceful protest—and not, as many seem to believe, with violence.

---

Here is some more detailed information regarding the survey: This web survey of 1,500 undergraduate students at U.S. four-year colleges and universities was conducted between August 17 and August 31, 2017. Financial support for the survey was provided

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 470 of 552

by the Charles Koch Foundation to UCLA. I designed the survey questions and then requested that UCLA contract with a vendor for the data collection. I then performed the data analysis, including weighting. The survey results presented here have been weighted with respect to gender to adjust for the reported 57 percent/43 percent gender split among college students; by contrast, 70 percent (1,040 of the 1,500) of the survey respondents identified as female. The percentages in the tables in this article, with the exception of the percentages in the gender-specific (rightmost two) columns of the tables, have been subject to weighting in relation to gender.

Of the 1,500 respondents, 697 identified a Democrats, 261 as Republicans, and 431 as Independents. Another 111 respondents stated "Don't Know" when asked to state their political affiliation. Of the 1,500 respondents, 1,116 are students at public institutions, and 384 are students at private institutions. This public/private split of 74 percent/36 percent among respondents approximately mirrors the split in the broader undergraduate population.

To the extent that the demographics of the survey respondents (after weighting for gender) are probabilistically representative of the broader U.S. college undergraduate population, it is possible to estimate the margin of error in the tables above. For a confidence level of 95 percent, the margin of error is between approximately 2 percent and 6 percent—the margin of error is smaller for the categories with larger numbers of respondents (such as "All" category in the tables, which has 1,500 respondents), and larger for the categories with smaller numbers of respondents (such as "Republicans").

The survey was limited to students who indicated that they are U.S. citizens (this is relevant because non-citizens, particularly those who have very recently arrived in the U.S., cannot be expected to have as full an understanding of the First Amendment as U.S. citizens). I would like to thank Kelsey Naughton of the Foundation for Individual Rights in Education (FIRE) for helpful discussions as I was designing this survey.

# EXHIBIT HH

# 'Junk science': experts cast doubt on widely cited college free speech survey

*Lois Beckett*

Polling experts are raising concerns about a new survey that found nearly 20% of American college students believe it's appropriate to use violence to silence offensive speech.

The results of the survey have been widely cited in conservative media outlets, including by the editorial board of the Wall Street Journal, and were written up by an opinion columnist for the Washington Post.

The way the survey results have been presented are "malpractice" and "junk science" and "it should never have appeared in the press", according to Cliff Zukin, a former president of the American Association of Public Opinion Polling, which sets ethical and transparency standards for polling.

John Villasenor, a professor of electrical engineering at the University of California Los Angeles, defended his survey as an important window into what he had called a troubling atmosphere on American campuses in which "freedom of expression is deeply imperiled". Villasenor, a cybersecurity expert, said this was the first public opinion survey he had conducted.

However, his survey was not administered to a randomly selected group of college students nationwide, what statisticians call a "probability sample". Instead, it was given to an opt-in online panel of people who identified as current college students.

"If it's not a probability sample, it's not a sample of anyone, it's just 1,500 college students who happen to respond," Zukin said, calling it "junk science".

"It's an interesting piece of data," Michael Traugott, a polling expert at the University of Michigan's Center for Political Studies, said. "Whether it represents the proportion of all college students who believe this is unknown."

Villasenor said his survey had been inspired by the "increasing trend towards censorship on college campuses in recent years", which included outright censorship and "self-censorship".

Like many other academics, Villasenor has remained concerned that university campuses are not sufficiently open to "reasonable perspectives".He secured funding from the conservative Charles Koch Foundation to survey students this August about their views on free speech. Rather than write an academic paper, he posted some of his results online this week, arguing that given "the timeliness of the topic, I believe it is important to get some of the key results out into the public sphere immediately".

"A surprisingly large fraction of students believe it is acceptable to act – including resorting to violence – to shut down expression they consider offensive," he wrote.

His survey also found that college students had deep misunderstandings about the scope of the first amendment's free speech protections.

Some journalists and activists greeted his findings with shock, labeling them "chilling" and a call to arms. "Faculty have failed them," a Yale professor tweeted of America's "illiberal" college students.

Villasenor's results had gone through no peer review process. The methodology section of his online post was vague, prompting several polling experts to question how reliable the survey's conclusions might be.

Villasenor wrote in an email that he was reluctant to give a yes or no "sound bite" answer to the question of whether the students he surveyed were nationally representative of college students or not.

By some measures, Villasenor wrote, the 1,500 respondents to his survey had seemed to reflect the rough demographic makeup of American college students. By others, they might not.

Villasenor had calculated a margin of error for his survey results and included it in the public writeup of his report, even though the sample of students he had surveyed was not random. Public polling experts said this was inappropriate and a basic error. Zukin called it "very misleading" and "malpractice".

By including a margin of error, the author appears to be "trying to overstate the quality of his survey", said Chris Jackson, the vice-president of Ipsos Public Affairs, a public opinion firm.

Timothy Johnson, the current president of the American Association for Public Opinion Research, called it "really not appropriate".

Villasenor said he disagreed that including a margin of error was any kind of "malpractice", noting that he had included a caveat in his online post, warning that a margin of error was relevant "to the extent" that his survey respondents were actually representative of US college undergraduates.

Some journalists writing up his results, including at the Washington Post, made no mention of his caveat, Villasenor noted. He said they should have: "The caveat was there."

His results "do say something useful about the national on-campus climate in relation to free expression," he said, noting that the survey included respondents from 49 states.

His survey had posed the question about violence and speech to students in late August, in the days immediately after neo-Nazis and white supremacists marched through the university town of Charlottesville, Virginia, leading to the murder of one young woman.

This was "purely coincidental", he said. "It wasn't planned that way."

Jackson, the Ipsos Public Affairs vice-president, said the post-Charlottesville moment would certainly have affected students' responses to a question about whether it was appropriate for a student group to use violence to prevent the speech

of a "very controversial speaker" who is "known for making offensive and hurtful statements".

"If someone asks you that two days after Charlottesville, who do you think of immediately? You think of neo-Nazis," Jackson said.

If the survey question had explicitly asked college students about neo-Nazis, and "19% of college students said it's okay to use violence against neo-Nazis on campus … I think people would find that more palatable."

Last year, a different, more nationally representative survey of American college student opinions on free speech on campus found strikingly different results from Villasenor's survey.

Villasenor's survey asked students if it was more important for colleges to create an "open learning environment where students are exposed to all types of speech and viewpoints, even if it means allowing speech that is offensive or biased against certain groups of people" or "a positive learning environment for all students by prohibiting certain speech or expression of viewpoints that are offensive or biased against certain groups of people".

He found that 53% of his respondents said they supported the "positive learning environment" that required "prohibiting certain speech", a result Villasenor called proof that "students appear to prefer an environment in which their institution is expected to create an environment that shelters them from offensive views".

The 2016 Gallup survey of more than 3,000 college students, who had been selected in a carefully randomized process from a nationally representative group of colleges, had asked students the same question. It found that 78% of students said colleges should create an "open learning environment".

# EXHIBIT II

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WILLIAM A. LINK et al.,

*Plaintiffs*,

v.

RICHARD CORCORAN, et al.,

*Defendants.*

Case No. 4:21-cv-271-MW/MAF

---

**PLAINTIFF DAVID PRICE'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff David Price ("Plaintiff"), by and through his attorneys, submits the following written responses and objections to Defendants' First Set of Interrogatories served on November 8, 2021.[1]

**PRELIMINARY STATEMENT**

Discovery is ongoing, and Plaintiff has not completed his investigation. These responses and objections are based on the information and documents currently available to Plaintiff, and Plaintiff reserves his rights to alter, supplement, amend, or

---

[1] The parties conferred and Defendants' counsel agreed that this Plaintiff should have until January 14, 2022 to respond to these interrogatories and a subset of other discovery that Defendants served on November 8, 2021.

otherwise modify these responses and objections in light of additional facts revealed through subsequent inquiry.

## GENERAL OBJECTIONS

1.      Nothing in these responses or objections can be taken as an admission that Plaintiff agrees with Defendants' use or interpretation of terms. These responses and objections are based on Plaintiff's understanding of each individual interrogatory. To the extent Defendants assert an interpretation of any interrogatory that is inconsistent with Plaintiff's understanding, Plaintiff reserves the right to supplement his responses and objections.

2.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to impose obligations greater than those imposed by the applicable Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of Florida.

3.      Plaintiff objects to Defendants' interrogatories to the extent that they purport to require Plaintiff to search for and produce documents and/or information that are not in his possession, custody, or control. An objection on this ground does not constitute a representation or admission that such information does in fact exist.

4.      Plaintiff objects to Defendants' interrogatories to the extent that they are overly broad and/or unduly burdensome, including where: (1) they seek information or documents obtainable from other sources that are more convenient, less burdensome, or less expensive; (2) they seek answers or information that may

2

be derived or ascertained from a review, examination, audit, or inspection of business records to be produced where the burden of deriving or ascertaining such answers or information is substantially the same for Plaintiff as for Defendants; (3) they are cumulative or duplicative of any other interrogatory or request for production; (4) they are cumulative or duplicative of information or documents already in the possession of Defendants; or (5) they require the expenditure of time and resources that outweighs the likely benefit of such efforts.

5.      Plaintiff objects to Defendants' interrogatories to the extent that they seek information that is not relevant or reasonably calculated to lead to the discovery of evidence admissible in this action.

6.      Plaintiff objects to Defendants' interrogatories to the extent that they are vague or ambiguous.

7.      Plaintiff objects to Defendants' interrogatories to the extent that they call for information or documents that fall within any relevant privilege (including, without limitation, the attorney-client privilege and the First Amendment privilege), are within the work product doctrine, constitute trial preparation materials within the meaning of Rule 26, constitute expert witness information that is not discoverable under Rule 26, and/or seek or call for information protected from discovery by any other applicable privileges, doctrines, or immunities. If any protected information is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

8.     Plaintiff objects to this interrogatory to the extent that it would require him to divulge information or documents protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which guarantees the privacy of the "education records" of students at post-secondary educational institutions. Under FERPA, "education records" has a broad definition, encompassing all documents "directly related to a student" and "maintained by . . . a person acting for [an educational] agency or institution." 20 U.S.C. § 1232g(a)(4). As a professor, Plaintiff is such a person. Plaintiff cannot produce covered information or documents unless four requirements are met. First, the disclosure must be "in compliance with [a] judicial order, or pursuant to any lawfully issued subpoena." *Id.* at 1232g(b)(2)(B). Second, "parents and the students" must be "notified of all such orders or subpoenas in advance of the compliance" with that order or subpoena. *Id.* Third, a protective order must be in place to "restrict[] disclosure of the information to the purposes of the litigation." *C.T. v. Liberal Sch. Dist.*, No. 06-2093-JWL, 2008 WL 394217, at *4 (D. Kan. Feb. 11, 2008). Fourth, "the party seeking disclosure" must "demonstrate a genuine need for the information that outweighs the privacy interest of the students." *Rios v. Read*, 73 F.R.D. 589, 599 (E.D.N.Y. 1977); *accord Daywalker v. Univ. of Texas Med. Branch at Galveston*, No. 3:20-CV-00099, 2021 WL 4099827, at *3 (S.D. Tex. Sept. 9, 2021). None of these requirements are met: Defendants' First Set of Interrogatories to David Price are neither a court order nor a subpoena; Defendants have produced no evidence that

4

they have notified parents or students of these interrogatories; there is no protective order in place relating to student records; and Defendants have not demonstrated a "genuine need" for the information. Accordingly, Plaintiff cannot comply with any interrogatory that seeks disclosure of information or documents encompassed by FERPA.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please identify with specificity the viewpoints you contend HB 233 targets and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 was enacted to target viewpoints with which Governor Ron DeSantis ("Governor"), Defendant Commissioner Corcoran ("Corcoran"), and others in Florida government disagree, including specifically viewpoints they deem to be progressive or liberal viewpoints. To achieve these aims, HB 233 broadly targets the teaching, research into, and academic expression and exploration of viewpoints the Governor, Corcoran, and others in Florida government view as "left-wing," even in the context of historical, philosophical, or economic instruction. HB 233 also targets viewpoints the Governor, Corcoran, and others in Florida government associate with

what they perceive to be "liberal college professors" like Plaintiff, regardless of whether—or perhaps because—those viewpoints are supported by overwhelming data and/or have broad academic or historical support.

These include viewpoints regularly taught by Plaintiff. Plaintiff teaches courses in history and political science in which he instructs his students on a variety of perspectives through which to view the material—including Critical Race Theory. FAC ¶ 34. For example, in Plaintiff's courses on American government and history, he has "noted that some scholars contend that the Second Amendment was passed for the purpose of legitimizing and empowering slave patrols and other militias which had the primary purpose of stomping out slave revolts."

This is a subject strongly disfavored by Governor's party (also the majority party in the current Legislature). Defendants, including Corcoran, have specifically maligned these viewpoints, which fall under the umbrella of critical race theory, as 'crazy liberal stuff,' and Corcoran has made clear Defendants' intent to censor these viewpoints in Florida's public institutions. *Id*. The Governor has described Critical Race Theory as a "Marxist" ideology, has directed Defendant Florida Board of Education to ban Critical Race Theory in public schools (which it did), and has supported legislation to codify that ban on Critical Race Theory. HB 233 specifically is part of a broader right-wing drive to push back on what they view as progressive influences in education, including to impede or even prohibit teaching the subjects and viewpoints that Plaintiff actively teaches.

There have been extensive public reports about the purpose and intent of HB 233 both around the time of its enactment and since then; in addition, since its enactment there have been numerous public reports that further evidence the intent of Defendants and the Governor to chill and even punish speech that espouses viewpoints with which Defendants and/or the Governor disagrees. It would be impossible to list all of that evidence here. For a summary of much of the evidence available at the time the Amended Complaint was filed, Plaintiff refers Defendants to that pleading, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 2:**

Please identify with specificity the viewpoints you contend HB 233 protects

and the basis for your belief.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

HB 233 protects viewpoints considered to be "uncomfortable, unwelcome, disagreeable, or offensive." *See Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017) ("Giving offense is a viewpoint."). HB 233 does this through its Anti-Shielding Provision, which prohibits state post-secondary educational institutions from "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1001.03(19)(c), 1001.706(13)(c), 1004.097(3)(f). In Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." HB 233 also protects—and even advances and attempts to legitimize through governmental favoritism—the baseless narrative that post-secondary faculty are "indoctrinating" students with progressive beliefs and political viewpoints with which the Governor, the majority in the Legislature, and many among the Defendants disagree, as discussed at length in the Amended Complaint, ECF No. 35.

As part of HB 233's special protection of "uncomfortable, unwelcome, disagreeable, or offensive" speech, HB 233 protects the ability of—and even encourages—students to disrupt Plaintiff's teaching and the education experience

8

with comments that either do not substantively contribute to the learning environment or, possibly, actively harm the learning environment by diverting the class discussion, intimidating or harassing students or Plaintiff, or forcing Plaintiff to spend his limited instruction time addressing ideas that would not otherwise include in his curriculum, including ideas with which he does not agree, does not believe are well-founded, or even ideas that have been widely debunked.

HB 233 puts Plaintiff in an impossible situation, threatening him and his institution with retribution if his teaching is perceived as not including "uncomfortable, unwelcome, disagreeable, or offensive" viewpoints, whatever those may be, inducing Plaintiff to include such ideas in his curriculum when he otherwise would not. Indeed, it is not always clear whether HB 233's requirements apply, requiring Plaintiff to discern whether a given statement is a viewpoint—and therefore covered by HB 233—or merely a misstatement of fact. For example, a student recently suggested in Plaintiff's class that the most recent Democratic presidential candidate to prevail in the popular vote was Bill Clinton, in 1996. This is not a statement based in fact, but it could be a "viewpoint" based on some conspiracy theory. It can be quite difficult to tell the difference when these types of statements are made. Though Plaintiff has no objection to correcting misinformed or mistaken students, Plaintiff is concerned that he may need to treat as legitimate, or teach as equally valid, that or similar "viewpoints" as a result of HB 233.

Nor is it confined to just Plaintiff's teaching (which alone would be unlawful).

9

HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a).

Plaintiff also refers Defendants to the text of the Anti-Shielding Provision of HB 233 and to the Amended Complaint in this matter, ECF No. 35, including but not limited to ¶¶ 3, 5-9, 19, 22, 25, 27-37, 42-45, 48-52, 55-62, 77-81, 84, 86, 90-96, 102, 104-126, 133-135, 137-142, and the statements and facts discussed therein. Plaintiff further refers Defendants to Plaintiff's response in opposition to Defendants' motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-5, 11-12, 20-28, 31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as unduly burdensome and overbroad. Plaintiff further objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession, or that is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 3:**

Please identify any and all instances where students, faculty, or staff in the State's public post-secondary institutions have been required to register their political views because of HB 233.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given (or the procedures for its implementation) been produced yet to Plaintiffs in discovery. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views is serious, present, and remains ongoing. This is true whatever form the survey that is ultimately distributed this year contains, and whether it is initially designated as mandatory or anonymous.

That Defendants are now empowered—indeed, required—to conduct annual surveys into political and ideological viewpoints on campuses that they will publish (and may otherwise use however they wish) imposes its own First Amendment threat. The Legislature affirmatively refused to consider amendments that would have required that the survey be anonymous, and statements by proponents

affirmatively indicated they anticipated they would be mandatory, and would ask questions such as "Where are you on the political spectrum?" and "Do you believe that Republicans are evil?" The Survey Provisions themselves require that respondents be asked about "the extent to which . . . [they] feel free to express their beliefs and viewpoints on campus and in the classroom." Fla Stat. §§ 1001.03(19)(b), 1001.706(13)(b). A survey making such an inquiry in the name of "viewpoint diversity" would logically require at least some inquiry into what those "beliefs and viewpoints" are.

Documents produced by Defendants in discovery thus far relating to the development of the survey mandated by the Survey Provision indicate that the survey will likely include questions into the political views of respondents. The most recent draft of the survey produced includes questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the

12

middle, where would you place yourself?"; "Generally speaking, would you say that you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

In addition, HB 233 requires that the survey be "statistically valid." Fla. Stat. § 1001.03(19)(b). For the survey to be "statistically valid," it seems likely that responses to the survey will be required, either of all potential respondents or of a statistically representative sample of potential respondents. If the survey were entirely voluntary, it would be impossible for the survey to be "statistically valid," as statutorily required, because the results would be distorted by self-selection bias.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as vague specifically in its use of the terms "register" and "political views," which are not defined in these interrogatories or in HB 233. Plaintiff further objects to this interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of this case to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff cannot be reasonably expected to know of or identify every single such incident at every single "public post-secondary institution" in Florida. Plaintiff further objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this

13

response at a later time as appropriate.

**INTERROGATORY NO. 4:**

Please identify any and all facts you have concerning the contents of and the implementation of the survey required by HB 233, including the specific questions on the survey you contend violate your First Amendment rights.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff, nor has the final version of the survey as it will be given in this coming year been produced yet to Plaintiff in discovery. The discovery that Defendants have produced thus far includes what appear to be initial drafts of the survey; however, the most recent of those drafts appears to have been prepared in or around September 2021. Plaintiffs have specifically requested that Defendants supplement that discovery and provide any and all additional information that they have about this topic, but as of the date of these responses and objections, Defendants have yet to produce to Plaintiffs the final version of the survey that Defendants intend to implement as required by HB 233. Thus Plaintiff is not yet able to identify "the specific questions" on that survey that threaten their First Amendment rights.

However, as discussed at length in Plaintiff's Amended Complaint, opposition to the motion to dismiss, and in the response to Interrogatory Number 3, above, the

enactment of HB 233 and its broad mandate to Defendants to impose an annual survey that by its terms necessarily and logically must include questions that relate to the political viewpoints held by Plaintiffs and other students, faculty, and staff in Florida's public post-secondary institutions imposes its own threat to Plaintiff's First Amendment rights. As discussed above, because the Legislature chose not to impose any restrictions on the way in which the survey may be used, the manner in which it inquires into these politically sensitive and personal topics, or whether or how responses to the same may be made anonymously and/or kept from disclosure within the government, to other third parties, or publicly, as well as whether the annual survey that it requires made be made mandatory, the broad, unfettered empowerment given to Defendants to inquire into these matters – indeed, the law's *mandate* that they do so annually, and failure to restrict the use of that information for any purpose, including political retribution – imposes a severe and continuing injury to Plaintiff's First Amendment rights for as long as HB 233's Survey Provisions remain enforceable.

The facts that Plaintiff has concerning the contents of and implementation of the survey outside of the materials produced by Defendants in discovery are set forth in the Amended Complaint, ECF No. 35. For example, as set forth in the Amended Complaint, Representative Sabatini, who co-sponsored HB 233, said the survey would "say something along the lines of: 'Where are you on the political spectrum?'" FAC ¶ 74. He also made clear that the purpose of the survey was to tell people

"[what] to be honest, we already know, which is that we've lost these campuses to the radical left" and to justify "defunding the radical institutions on these campuses" and "insane professors that hate conservatives and hate this country." *Id.* at ¶ 80. Similarly, the Governor, who supported the passage of HB 233 and signed it into law, indicated that the results of the survey would be used to cut funding from post-secondary educational institutions that, in his view, had not done enough to foster "intellectual freedom and viewpoint diversity." *Id.* at ¶ 79. Plaintiff also refers Defendants to the rest of the Amended Complaint including, in particular, paragraphs 63 to 80.

Consistent with Plaintiffs' allegations, the drafts of the survey produced by Defendants in discovery thus far include questions such as: "Generally speaking, you would say that you think of yourself as a … Republican, Independent, Democrat" and "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?" Defendants_002971-002972. Defendants' production also reveals that the survey is based on other surveys which include similar questions, such as: "How would you describe your views? Radical left; liberal; moderate; conservative; ultraconservative"; "How would you characterize your political views? (Mark one) Far left – liberal – middle of the road – conservative – far right"; "On a scale from 1 to 7, where 1 is extremely liberal, 7 is extremely conservative, and 4 is exactly in the middle, where would you place yourself?"; "Generally speaking, would you say that

you usually think of yourself as a….? Democrat; Independent; Republican." Defendants_002200-002210.

These government inquiries into the political beliefs and associations of citizens constitute a violation of the First Amendment. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). That limitation exists because inquiries by the state, such as those in the survey, may "discourage citizens from exercising rights protected by the Constitution." *Id.* at 6-7. That is precisely the case here. Plaintiff also refers Defendants to Plaintiff's opposition to the motion to dismiss, ECF No. 43, including but not limited to the discussions at pages 3-4, 10-12, 15-16, 28-31.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information already within the public sphere or within Defendants' knowledge or possession or that is otherwise obtainable from sources that are source more convenient, less burdensome, or less expensive. Plaintiff further objects to this interrogatory to the extent that it is duplicative of other interrogatories promulgated by Defendants.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 5:**

Please identify any and all instances where HB 233 has required you to

espouse views you do not promote, including a description of the espoused viewpoint, date, location, medium of communication, individual(s) who were present for the espoused views, and the specific statutory basis for believing you were required to espouse views with which you disagreed.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff does not recall any specific "instances where HB 233 has required [him] to espouse views [he] do[es] not promote." However, the plain text of HB 233 threatens Plaintiff if he does not engage in speech in which he would not otherwise engage, making him and the institution where he teaches vulnerable to retributive action: it prohibits limiting "students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable or offensive." Fla. Stat. §§ 1001.03(19)(a)(2), 1001.706(13)(a)(2). The result is that Plaintiff may be compelled to teach or espouse views with which he disagrees—or perhaps even *agrees*, but would not otherwise teach or express in a given moment, absent the threats posed by HB 233. It is "a fundamental rule of protection under the First Amendment[] that the speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). "[T]his general rule that the speaker has the right to tailor the speech, applies not only to expressions

of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* HB 233 sets up an impossible task, rendering safe only those persons who somehow manage to anticipate all possible criticism that they are not teaching or discussing or covering "all sides," or else risk injury to themselves or their institutions. In Texas, similar legislation led to one school administrator directing teachers that "if you have a book on the Holocaust, that you have one that has an opposing—that has other perspectives." Given the topical nature of Plaintiff's work, he has serious concerns that it will cause him to be specifically targeted under HB 233.

Plaintiff also refers Defendants to the Amended Complaint in this matter, ECF No. 35, and specifically paragraphs 7, 9, 34, 81-86, 95, 98, 119, 149-157 and 161-163.

In addition to the General Objections set forth above, Plaintiff further objects to this interrogatory on the grounds that it is vague and confusing. It is not clear what means to obtain when it asks Plaintiff to identify a "specific statutory basis for believing you [i.e., Plaintiff] were required to espouse views with which you [Plaintiff] disagreed." Further, HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and

publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). As a result, the interrogatory is impermissibly overbroad; it would be impossible for Plaintiff to accurately identify all such instances in which HB 233 imposes a compelled speech threat. Plaintiff further objects to this interrogatory because it seeks information about Plaintiff's political views and associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his political associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed that any and all confidential disclosures about their personal views, or communications about times when they felt they were required to espouse views they did not believe in in order to avoid retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 6:**

Please identify any and all instances where you did not join an association or resigned from an association because of HB 233, including the date and your reason for not joining or resigning.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet declined to join, or resigned from, any associations due to HB 233.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 7:**

Please identify any and all instances where you were required by HB 233 to disclose your associations, including the date of the request, the date of your disclosure, the identity of the requestor, contents of the request, and your response.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet been "required by HB 233 to disclose [his] associations." As noted, the survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. However, for the reasons discussed at length in the Amended Complaint, the threat that HB 233 may be used to require students, faculty, or staff in the State's public post-secondary institutions to report, reveal, or "register" their political views or associations is serious, present, and remains ongoing. The threat posed by HB 233 which gives Defendants the power to mandate from all Florida faculty lists of all of their associations for any type of use or future disclosure threatens Plaintiff with forced disclosure of this association and operates to chill his protected associational and speech activities.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it seeks information about Plaintiff's political associations which are protected by the First Amendment privilege. Requiring Plaintiff to disclose his associations would have a chilling effect, beyond that created by HB 233, on his own associations and could also cause others not to associate with him or to cease associating with him if they believed communications about their fears of retribution from Defendants, their institutions, trustees, or any other number of third parties or Florida government actors, were subject to disclosure by Plaintiff

22

simply because of Plaintiff's involvement in a lawsuit that (ironically) seeks to protect these very rights.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 8:**

Please identify any and all instances where you have prohibited a student from recording a lecture, including the date, class, circumstances surrounding the prohibition, and reason for your prohibition.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff is not aware of any "instances where [he] . . . prohibited a student from recording a lecture." On the contrary, it is Plaintiff's understanding that his institution makes available recordings of his lectures to students with a reasonable accommodation for a disability. Plaintiff also refers Defendants to Fla. Stat. § 934.03.

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory because it is overbroad, unduly burdensome, and disproportionate to the needs of this case. This interrogatory is not limited in time. As phrased, the interrogatory seeks information reaching back decades, and which has no bearing whatsoever on this matter. Plaintiff further objects to this interrogatory to the extent

that it would require him to divulge information or documents protected by FERPA. Plaintiff further objects to the interrogatory to the extent it seeks information relating to reasonable accommodations made for disabled students. Such information is protected against disclosure under federal law and by the right to privacy guaranteed by the Art. I, § 23 of the Florida Constitution. *Cf. Gomillion v. State*, 267 So. 3d 502, 506 (Fla. 2d DCA 2019) ("[I]n Florida, medical records are protected as private by our state constitution.").

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 9:**

Please identify any and all instances where you revised your curriculum or syllabus because of HB 233, including the date you revised your curriculum or syllabus, how the curriculum or syllabus was revised, and the specific provision in HB 233 that required the revision or change.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds to this interrogatory as follows:

Plaintiff has not yet "revised [his] curriculum or syllabus because of HB 233." However, Plaintiff may still be forced to do so. The survey mandated by HB 233 has not yet been distributed to students, faculty, or staff. As discussed in the Amended Complaint and in Plaintiff's responses to Interrogatory Numbers 1, 2, 3, and 4, the

24

purpose of the survey is explicitly political. Its proponents intend to use the results of the survey to "defund[] the radical institutions on these campuses" and the "insane professors that hate conservatives and this country." Nor is it clear that the responses to the survey will be confidential or anonymous. Similarly, HB 233's Anti-Shielding Provision threatens Plaintiff and his institution with retribution if his teaching or other speech is perceived as not including "uncomfortable, unwelcome, disagreeable, or offensive" viewpoints. Given the vagueness of that provision, Plaintiff is not yet able to anticipate what viewpoints he must include in his curriculum or syllabus—but if he is sued, or threatened with litigation, under the cause of action HB 233 provides, Plaintiff may indeed "revise[] [his] curriculum or syllabus because of HB 233." Furthermore, as a result of HB 233, Plaintiff's institution may pressure or require him to alter his curriculum or syllabus, as other institutions in Florida have already done to other professors who teach Critical Race Theory. As a result, Plaintiff reasonably expects that he may in the future be forced to "revise[] [his] curriculum because of HB 233."

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory to the extent it seeks information within the public sphere or within Defendants' knowledge or possession, or is otherwise obtainable from sources that are more convenient, less burdensome, or less expensive.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

**INTERROGATORY NO. 10:**

Please identify any and all instances where you previously limited students, faculty members, or staff members from ideas which they may have found to be uncomfortable, unwelcome, disagreeable, or offensive, but which, because of HB 233, you would no longer be permitted to limit such access.

**RESPONSE:**

Subject to, expressly reserving, and without waiving the below objections and General Objections above, Plaintiff responds as follows:

Plaintiff has "limited students . . . from ideas which they may have found to be uncomfortable, unwelcome, disagreeable, or offensive." Because of the breadth of HB 233, it would be impossible for Plaintiff to enumerate every such instance. However, Plaintiff recalls two specific examples of "shielding." In one instance, because he was concerned it would be "uncomfortable, unwelcome, disagreeable, or offensive," Plaintiff declined to include in his curriculum about the Vietnam War a graphic description of American soldiers sexually abusing Vietnamese women. Similarly, after a student expressed concern to him, Plaintiff stopped showing students a video of the South Vietnamese brigadier general Nguyễn Ngọc Loan summarily executing Nguyễn Văn Lém, a member of the Viet Cong. Under the extraordinarily broad, and vague, terms of HB 233, Plaintiff may be required to add these "uncomfortable, unwelcome, disagreeable, or offensive" graphic depictions of violence to his curriculum, which he does not wish to do.

26

Furthermore, as a professor, Plaintiff necessarily "limit[s] students . . . from ideas which they may [find] to be uncomfortable, unwelcome, disagreeable, or offensive." In class, Plaintiff advises students not to express such ideas because they are corrosive to an open and effective learning environment, because avoiding the expression of such ideas helps them learn to think critically, and because avoiding expression of such ideas helps them learn to express their ideas in a scholarly and professional manner. For example, Plaintiff has rules for class discussions which include requests that students avoid the use of profanity or personal attacks on other students. Likewise, Plaintiff limits the range of ideas and viewpoints acceptable in response to course assignments: coursework must be responsive to the prompt and not be mere expressions of personal opinions. When Plaintiff makes decisions about his syllabus, he is necessarily limited by time and space in the topics he can cover and the readings he can assign; accordingly, Plaintiff must make editorial decisions about what readings or topics to include or exclude, including based in part on what ideas those readings express. Similarly, when Plaintiff makes statements, sends e-mails, or engages in any other communicative act, he necessarily must make similar editorial decisions as to what to include or exclude from his communication. Accordingly, Plaintiff reasonably does not make affirmative efforts to include views he does not believe would be conducive to learning, fruitful classroom discussion, or civil communication. It would be impracticable for Plaintiff to list every single instance where Plaintiff did not make such an effort.

27

In addition to the General Objections set forth above, Plaintiff objects to this interrogatory as overly broad, unduly burdensome, disproportionate to the needs of the case, and seeking information not relevant to the claims and/or defenses in this case. Plaintiff further objects to this interrogatory as vague to the extent it relies upon the text of the Anti-Shielding Provision, which Plaintiff has alleged is vague. *E.g.*, FAC ¶¶ 119, 121. Because both HB 233 and the interrogatory "leave[] undefined [the terms] 'uncomfortable, unwelcome, disagreeable, or offensive' speech," Plaintiff must "guess at their meaning." *Id*. at ¶ 121. For similar reasons, the interrogatory is also objectionably overbroad. HB 233's Anti-Shielding Provisions broadly apply to virtually every conceivable form of "oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus." *E.g.*, Fla. Stat. § 1004.097(3)(a). In addition, this interrogatory has no time limitation, seeking information relating to "instances" across all years of Plaintiff's many years of teaching. Requiring Plaintiff to identify all such instances would be burdensome. Plaintiff further objects to the scope of the interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it would be impossible for Plaintiff to "identify" every single instance in which Plaintiff excluded some viewpoint in one way or another in a forum that could

come within HB 233's extraordinarily broad reach.

Discovery is ongoing and Plaintiff reserves the right to supplement this response at a later time as appropriate.

Dated: January 14, 2022.                    Respectfully submitted,

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
Thomas A. Zehnder
Florida Bar No. 0063274
Robyn M. Kramer
Florida Bar No. 0118300
KING, BLACKWELL, ZEHNDER &
    WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com
rkramer@kbzwlaw.com

Marc E. Elias*
Elisabeth C. Frost*
Alexi M. Velez*
Jyoti Jasrasaria*
Spencer Klein*
Joseph Posimato*
Noah Baron*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
avelez@elias.law
jjasrasaria@elias.law

29

sklein@elias.law
jposimato@elias.law
nbaron@elias.law

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2022 I served a copy of the

foregoing via email to all counsel listed on the Service List below.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

## SERVICE LIST

George T. Levesque
James Timothy Moore, Jr.
Patrick M. Hagen
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, FL 32301
george.levesque@gray-robinson.com
tim.moore@gray-robinson.com
patrick.hagen@gray-robinson.com

*Counsel for Defendants*

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I, David Price, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief.  I verify as such under penalty of perjury under 28 U.S.C. § 1746.

*David Price*

David Price

2/8/2022

Date

# EXHIBIT JJ

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/231828459

# Indoctrination U.? Faculty Ideology and Changes in Student Political Orientation

**Article**  *in*  Political Science and Politics · October 2008

DOI: 10.1017/S1049096508081031

CITATIONS
65

READS
1,801

2 authors:



Mack Mariani
Xavier University

**21** PUBLICATIONS  **421** CITATIONS

SEE PROFILE

Gordon J. Hewitt
Hamilton College

**6** PUBLICATIONS  **95** CITATIONS

SEE PROFILE

All content following this page was uploaded by Mack Mariani on 27 February 2015.

The user has requested enhancement of the downloaded file.

# Indoctrination U.? Faculty Ideology and Changes in Student Political Orientation

**Mack D. Mariani,** *Xavier University*
**Gordon J. Hewitt,** *Hamilton College*

In the provocatively titled *Indoctrination U.*, David Horowitz argues that radical members of college faculties have "intruded a political agenda into the academic curriculum," engaging in propaganda rather than scholarship and indoctrinating students rather than teaching them (Horowitz 2007, xi). Although allegations of liberal bias in academia are nothing new, the issue has gained increased attention as the result of efforts by Horowitz and the Center for the Study of the Popular Culture (CSPC) to promote the Academic Bill of Rights for American colleges and universities.[1]

According to Horowitz, the goal of the Academic Bill of Rights is to inspire college officials "to enforce the rules that were meant to ensure the fairness and objectivity of the college classroom" (Horowitz 2007, 2).[2] Supporters argue that an Academic Bill of Rights is needed to "protect students from one-sided liberal propaganda . . . [and] to safeguard a student's right to get an education rather than an indoctrination."[3] Opponents of the initiative, including the American Association of University Professors, have characterized the Academic Bill of Rights as an assault on academic freedom (Jacoby 2005; Schrecker 2006) that is based on exaggerated claims of anti-conservative bias (Ehrlich and Colby 2004; Wiener 2005; Jacobson 2006a; 2006e; Jaschik 2006c).[4]

Although a growing body of social science research indicates that college faculties are disproportionately liberal and Democratic, at least when compared with the population in general (Brookings 2001; HERI 2002; Klein and West-

ern 2005; Jaschik 2005b; Klein and Stern 2005a; 2005b; 2006; Rothman, Lichter, and Nevitte 2005) there has been very little systematic research on whether faculty members' political leanings actually affect the ideological views of the students they teach. If students' political views are being changed by a left-leaning professorate, we should be able to see evidence of that influence; indeed, we would expect that changes in political orientation would be most dramatic among students at more ideologically liberal institutions.

This study utilizes empirical evidence from the CIRP Freshman Survey, the College Student Survey, and the Higher Education Research Institute (HERI) Faculty Survey to assess the effect of faculty ideology on the political attitudes of undergraduate students over the course of a four-year college career (2001–2005). Our analysis of 38 private colleges and 6,807 student respondents indicates that, consistent with a number of previous studies, faculty members are predominantly liberal and Democratic. We find little evidence, however, that faculty ideology is associated with changes in students' ideological orientation. The students at colleges with more liberal faculties were not statistically more likely to move to the left than students at other institutions.

## Is the Academy Liberal?

The argument that liberal faculty members are indoctrinating students goes back to the very beginnings of the modern conservative movement and publication of William F. Buckley's *God and Man at Yale: The Superstitions of "Academic Freedom"* (Buckley 1951). Indeed, the subject has been periodically revisited by a number of right-leaning authors who have criticized the academy for "moral relativism," "political correctness," and "liberal orthodoxy" (see for example Bloom 1987; Kimball 1990; D'Souza 1991; Bennett 1992; Bork 1996).

Faculty ideology has become a subject of considerable debate in recent years as the result of publication of a number of

studies (some of which were sponsored by the CSPC), which suggest that college faculties are ideologically and politically out-of-step with the general public. In 2002, *American Enterprise* magazine highlighted the results of 18 studies of faculty party registration patterns on American college campuses (American Enterprise 2002). The data from these studies indicated that faculty members affiliated with "parties of the right" (i.e., Republican, Conservative, or Libertarian) were vastly outnumbered by those affiliated with "parties of the left" (i.e., Democrat, Green, or Working Families). According to two of the studies cited in the report, for example, professors on the right were outnumbered 166 to 6 at Cornell, and 72 to 1 at University of California, Santa Barbara (American Enterprise 2002, 19–23). The editor-in-chief of *American Enterprise*, Karl Zinsmeister, argued that the study results indicate that colleges and universities are "virtual one-party states, ideological monopolies, badly unbalanced ecosystems. They are utterly flightless birds with only one wing to flap. They do not, when it comes to political and cultural ideas, look like America" (2005, 18).

The *American Enterprise* report also included results from a 2001 survey of 151 Ivy League faculty members. The survey, which was sponsored by the CSPC and administered by Republican pollster Frank Luntz, found that 64% of survey respondents described themselves as "liberal" or "somewhat liberal," while only 6% of respondents described themselves as "conservative" or "somewhat conservative" (Luntz 2001). In addition, only 3% of Ivy League faculty members surveyed identified themselves as Republicans compared with 57% that identified themselves as Democrats.[5] Likewise, another CSPC study examined party registration data for faculty at 32 elite colleges and found that Democrats outnumbered Republicans by a ratio of more than 10 to 1 (Horowitz and Lehrer 2003).[6]

In October 2006, the Institute for Jewish and Community Research (IJCR) announced the results of a broad national survey of 1,259 college professors. The

**Gordon Hewitt** is assistant dean of the faculty for institutional research at Hamilton College in Clinton, New York. He holds a Ph.D. in higher education administration from the University of Wisconsin–Madison.

**Mack Mariani** is an assistant professor of political science at Xavier University in Cincinnati, Ohio. He holds a Ph.D. in political science from the Maxwell School of Citizenship and Public Affairs at Syracuse University.

IJCR survey, which was administered online, found that respondents were three times more likely to describe themselves as liberal than conservative and 72% reported voting for John Kerry in the 2004 presidential election (Wilson 2006). Likewise, a review of political donations by the Center for Responsive Politics indicated that faculty members and educational employees were far more likely to contribute to Democratic candidates and PACs than Republican ones during the 2004 and 2006 election cycles (Smith 2006). Similar studies have also found that law school professors donate disproportionately to Democratic candidates (McGinnis and Schwartz 2003; McGinnis, Schwartz, and Tisdell 2005; Liptak 2005).

In addition to the many studies sponsored by ideologically oriented groups, a growing body of social science research lends additional support to the argument that American college faculties are disproportionately liberal and Democratic.[7] Several large-scale faculty surveys, for instance, have identified a leftward tilt within specific academic disciplines, including the social sciences (Klein and Stern 2005a; 2005b; Klein and Western 2005)[8] and sociology (Klein and Stern 2006).[9]

Similarly, in a survey of 550 professors in economics, history, political science, and sociology sponsored by the Brookings Institution—a center-left think tank—only 8% of respondents described themselves as conservative or very conservative, compared with 31% who described themselves as liberal or very liberal. In that same survey, 77% of respondents identified themselves as Democrat or lean Democrat compared with 13% who were Republican or lean Republican (Brookings 2001).

Other studies have reached across multiple disciplines to examine the ideological and political orientations of a broad cross section of faculty members. A 2001–2002 survey of more than 55,000 faculty and administrators at 416 colleges by the nonpartisan Higher Education Research Institute found that 47.6% of faculty members were on the left, compared with just 18% on the right (Jaschik 2005b; HERI 2002).[10] Similar results were also reported by Rothman, Lichter, and Nevitte (2005) in their analysis of a national survey of more than 1,600 randomly selected faculty members from 183 four-year colleges and universities. In their study, Rothman, Lichter, and Nevitte found that 72% of faculty self-identified as liberal and just 15% as conservative. In addition, 50% of faculty members self-identified as Democrats, compared with just 11% who were Re-

publicans. Though liberal and Democratic majorities were most pronounced among the humanities and social sciences, a liberal orientation was also found in business and economic departments, albeit to a somewhat lesser extent.[11] Rothman, Lichter, and Nevitte compared their results with those from a 1985 Carnegie study and concluded that faculty ideology has veered sharply to the left:

> Over the course of 15 years, self-described liberals grew from a slight plurality to a 5 to 1 majority on college faculties. By comparison, among the general population in 1999, 18% viewed themselves as liberal and 37% conservative. In 2004 the figures were almost unchanged—18% liberal and 33% conservative. Thus, according to these self-descriptions, college faculty are about four times as liberal as the general public. (Rothman, Lichter, and Nevitte 2005, 4–5)

In addition to survey-based research, several methodologically sophisticated studies of voter registration patterns suggest that faculty members' liberal ideological preferences are likely to translate into partisan preferences that favor the Democrats. A study by Klein and Western (2005) looked at the party identification of faculty members across 23 academic departments at University of California, Berkeley, and Stanford found ratios of Democrats to Republicans of 9.9 to 1 and 7.6 to 1, respectively. Cardiff and Klein (2005) expanded on this study by examining the partisan affiliations of tenured and tenure-track faculty at 11 California colleges and universities. The authors found that Democrats outnumbered Republicans by a 5 to 1 ratio and, though there was variation across disciplines, Democrats outnumbered Republicans in all fields. The ratio of Democrats to Republicans was highest within the liberal arts (8 to 1 Democrat to Republican) and lowest in the field of business (1.3 to 1).

To be certain, many in the academy and elsewhere have taken issue with the methodology employed and conclusions drawn by the (mostly) conservative groups and right-leaning scholars who have addressed the issue of faculty ideology and politics (Jacoby 2005; Berube 2006). Zipp and Fenwick (2006), for example, argue that many of the studies that purport to show liberal dominance are unrepresentative, focusing on a small number of elite colleges and a small range of academic disciplines. They also criticize the decision to focus on party identification, arguing that the most use-

ful measure of political diversity on campus is political ideology rather than party membership or voting history. Zipp and Fenwick also point out that larger and more representative studies of faculty ideology indicate that faculty divisions are more narrow than conservative critics suggest, citing Ladd and Lipset's (1975) finding of a 2 to 1 liberal to conservative ratio in their analysis of 1969 data, HERI's finding of 2.6 to 1 (2002) and Hamilton and Hargens (1993) finding of 1.2 to 1.

Although Zipp and Fenwick conclude that "it is misleading to claim that faculty at American colleges and universities are overwhelmingly and increasingly liberal" they also note that "there are relatively few conservatives in the academy" (2006, 316).[12] Indeed, the Carnegie Foundation data the authors rely on indicates that left-of-center faculty members far outnumber those on the right. Nearly 56% of faculty members are liberal or moderately liberal, compared with just 24% that are conservative or moderately conservative. The difference is particularly stark at the farthest points of the ideological spectrum, with more than three times as many faculty members describing themselves as "liberal" as "conservative" (23% versus 7%). In addition, though Zipp and Fenwick do find evidence of ideological variation across institutions and disciplines, their figures (collapsed and re-presented here in Table 1) actually show a decidedly left-wing orientation for all types of four-year colleges, with the ratio of liberals to conservatives particularly high in top-tier liberal arts colleges (8 to 1 liberal to conservative) and elite research universities (a 5 to 1 ratio). Though conservatives fare better at two-year colleges, comprehensive colleges, and lower-tiered liberal arts and research institutions, the Carnegie data presented by Zipp and Fenwick indicate that college faculties do lean to the left, though perhaps not as far out as conservative critics allege.

## Causes and Consequences

The debate over faculty ideology has shifted away from whether college faculties are liberal (the evidence from most studies suggests that they are) towards an examination of the causes and consequences of a left-leaning professoriate. Arguments about the causes of the ideological imbalance often center on whether the liberal makeup of the academy is due to ideological bias and discrimination against conservatives, or merely the result of the self-selection of conservatives into other professions (see Jacoby 2005, or the exchange between

## Table 1
## Percent of Faculty Identifying as Liberal versus Conservative, by Institutional Type

| Institutional Type | Liberal/Moderately Liberal | Conservative/Moderately Conservative | Ratio |
|---|---|---|---|
| Research I | 68.1 | 13.8 | 4.9:1 |
| Research II | 59.7 | 22.4 | 2.7:1 |
| Doctorate I | 52.4 | 25.0 | 2.0:1 |
| Doctorate II | 57.7 | 21.3 | 2.7:1 |
| Comprehensive I | 61.3 | 20.5 | 3.0:1 |
| Comprehensive II | 51.3 | 30.4 | 1.7:1 |
| Liberal Arts I | 78.2 | 9.6 | 8.0:1 |
| Liberal Arts II | 52.5 | 23.6 | 2.2:1 |
| Two-Year | 44.3 | 35.0 | 1.3:1 |

Source: 1989 Carnegie survey data presented by Zipp and Fenwick (2006) Table 3, 312. Categories were collapsed to provide comparable categories of liberal/moderately liberal and conservative/moderately conservative.

Rothman, Lichter, and Nevitte 2005 and Ames et al. 2005).[13]

The debate over consequences revolves around the allegations made by conservative groups like the CSPC that ideological imbalance in the academy has led to discrimination against conservative students and faculty (Wilson 2005; Jacobson 2004a; 2004b; Braunlich 2004), a one-sided approach to scholarship and political debate (Pilger 2004; Bauerlein 2004; 2005), and the indoctrination of college students to liberal viewpoints (Salerno 2003, 12; Horowitz 2005; 2007; Neal, French, and Siegel 2005).[14] Allegations of discrimination in hiring and promotion, for instance, are the subject of a vigorous but as yet inconclusive debate. A 2005 study by Rothman, Lichter, and Nevitte concluded that conservative scholars are discriminated against in hiring and promotion. The Rothman study has been criticized by some members of the academy, however, who argue that the sample is unrepresentative; these critics point to self-selection, not discrimination, as the key factor that accounts for varying levels of professional success for liberals and conservatives in academia (Ames et al. 2005; Berube 2006, 68–70).[15]

Both liberals and conservatives have presented examples and counterexamples of student-faculty interactions that support their opposing positions on the intellectual climate of the academy (see Horowitz 2007; Berube 2006). Thus far there is no definitive empirical evidence of widespread or systematic ideology-based bias on the part of faculty. Indeed, Kemmelmeier, Danielson, and Basten's recent study (2005) of the relationship between ideology and grading patterns at a single large public university casts

doubt on previous studies that found that liberal faculty members in some disciplines grade conservative students more harshly than liberals. The study, which included 3,890 students, found that conservative students received grades equal to or higher than more liberal students; in fact, conservatives actually scored higher grades than liberals in the fields of business and economics and there was no difference between the grades received by liberals and conservatives in sociology, African American studies, and other more liberal fields of study (Kemmelmeier, Danielson, and Basten 2005).[16]

Only a handful of studies have attempted to assess whether faculty liberalism actually affects the political beliefs of college students. Zipp and Fenwick (2006) used faculty responses to questions about the goals of undergraduate education, intellectual freedom, and standards of scholarship as a means to assess the willingness of faculty members to impose their views on students and their commitment to intellectual and academic freedom. Zipp and Fenwick concluded that, compared to conservatives, more liberal faculty members were more supportive of tenure and other protections of academic freedom and less likely to agree that "shaping students' values" is as an important goal of undergraduate education. Unfortunately, for our purposes the Zipp and Fenwick study is more useful as an indicator of how ideology shapes faculty perceptions about professional norms and their place in the profession than as a measure of indoctrination. Conservatives have long alleged that the academy has embraced liberal ideals and rejected Western values in favor of postmodern relativism; thus, it is

not surprising that conservative faculty members are less supportive of tenure and more supportive of "value-based" education than their more liberal colleagues. Likewise, if liberal indoctrination is as commonplace in the academy as has been alleged, liberal professors may be less likely to recognize it and conservatives more likely to push back.

Kelly-Woessner and Woessner (2006) examined faculty ideology more directly by assessing the impact of faculty members' political dispositions on nearly 1,400 students taking introductory political science courses at 29 colleges and universities. Although this study found that students perceive most faculty members to be liberal, it also concluded that students give less credence to the statements of faculty members who did not share the students' own political views (Kelly-Woessner and Woessner 2006; Jaschik 2006b).[17] Thus, even if faculty members are disproportionately liberal, this study suggests that faculty ideology is unlikely to have much of an impact on student views.[18] The main benefit of this approach is that it provides insight into the way ideology shapes student and faculty assessments of one another. The study is limited, however, in that it examines the impact of faculty ideology on students taking a single course. Additional research is needed to take into account the effect of faculty ideology on student ideology across multiple classes or over the duration of a college career.

The indoctrination argument is fundamentally an argument about *change*, the main point being that liberal professors indoctrinate students to become more liberal over the course of their college careers. Thus, in order to assess whether there is evidence of indoctrination, additional empirical research is needed that takes into account both faculty ideology and changes in student political orientation that occurs between the time that students start and finish college.

## Research Question

Our primary research question is whether there is a significant relationship between the liberalism of faculty at an institution and changes in the political orientation of students over the course of their college careers. Simply put: is there evidence that students shift their political orientations to correspond more closely to the political dispositions of the faculty at their college or university? In addition to faculty ideology, we are also interested in assessing the effect of other potentially relevant factors that may contribute to student ideological change, including institutional type (religious or

## Table 2
## Institutional Profile

| Type | Institution N | Institution % | Student N | Student % | Faculty N | Faculty % |
|---|---|---|---|---|---|---|
| Control: | | | | | | |
|   Religious | 19 | 50.0% | 1,742 | 25.6% | 1,067 | 37.0% |
|   Non-religious | 19 | 50.0% | 4,963 | 74.4% | 1,816 | 63.0% |
| Selectivity: | | | | | | |
|   Highly selective | 23 | 60.5% | 5,153 | 75.7% | 1,694 | 58.8% |
|   Not highly selective | 15 | 39.5% | 1,552 | 24.3% | 1,189 | 41.2% |
| Carnegie classification: | | | | | | |
|   Doctoral/research | 4 | 10.5% | 1,787 | 26.3% | 641 | 22.2% |
|   Masters | 16 | 42.1% | 2,247 | 33.0% | 1,248 | 43.3% |
|   Baccalaureate | 18 | 47.4% | 2,773 | 40.7% | 994 | 34.5% |
| Total | 38 | 100.0% | 6,807 | 100.0% | 2,883 | 100.0% |

nonsectarian), institutional selectivity, and peer orientation. It should be emphasized, however, that we are not attempting to study the behavior of college professors or to argue that the ideological makeup of the professoriate is a good or bad thing. Our focus is limited to one of *impact*: is there evidence that faculty ideology affects student ideology over the course of students' four years in college?

## Sample and Variables

Data for this study came from the Cooperative Institutional Research Program's (CIRP) 1999 Freshman Survey, the 2003 College Student Survey (CSS), and the 2003–2004 Faculty Survey, all sponsored by the HERI at the University of California, Los Angeles. The overall student sample consisted of 7,999 students attending 47 different private institutions, both nonsectarian and religiously affiliated. Students completed the freshman survey upon entering college in the fall of 1999 and the CSS in their fourth year of college, in 2003. The CSS results included only students who were still at the same institution in 2003 that they entered in 1999. After taking out CSS non-completers, nine institutions had an unacceptably low number of respondents remaining, and those schools were taken out of the sample. The final sample consisted of 38 institutions with 6,807 student respondents (see Table 2).

The faculty sample consisted of 2,883 useable responses from faculty members participating in the 2003–2004 HERI faculty survey. Faculty members came from the same set of institutions as those examined in the CSS/CIRP studies and respondents represented a broad array of discipline areas (see Table 3). The institutions included in this study represent the four-year institutions that administered all three of the surveys in the same years. In order to maintain the anonymity of institutions, a masked dummy variable was created by HERI that allowed for the matching of students and faculty by institution. For each institution, HERI also provided a unique identifier and a stratification code indicating control and selectivity for each institution.

### Freshman Survey

This study utilized data from the (fall) 1999 CIRP freshman survey. The CIRP freshman survey consists of a variety of items aimed at measuring the characteristics, attitudes, values, and aspirations of students (HERI 2007). To preserve anonymity, masked unique identifiers were assigned by HERI so that student and faculty data could be matched. A CIRP stratification code indicating institution type (religious/non-religious) and Carnegie classification were also provided for each respondent. Political orientation is a standard item on the freshman survey instrument every year, as students are asked to identify their political orientation on a five-point scale from far right to far left.

### College Student Survey (CSS)

The College Student Survey (CSS) was developed to measure students' cognitive and affective growth during college as well as their post-college plans (HERI 2007). It is administered to students in their final (senior) year of college and many of the items on the CSS are similar to, or the same as, items on the CIRP freshman survey. This study utilized data from the (spring) 2003 CSS.

When considered together, CSS and CIRP datasets enable researchers to measure changes in student responses over time for a number of key attitudinal measures, including political orientation

### HERI Faculty Survey

The HERI faculty survey was designed to provide information about the attitudes, experiences, concerns, job satisfaction, workload, teaching practices, and professional activities of college and university faculty (HERI 2007). As in the freshman survey and the CSS, faculty members were asked to identify their political orientation on the same five-point scale. As shown in Table 3, the orientation of the faculty is predominately liberal. Of all faculty respondents, 53% identified themselves as "liberal" or "far left" compared with 16% of respondents who identified themselves as "conservative" or "far right." For comparative purposes, a 2004 American National Election Study (ANES) survey found that approximately 25% of the general population identified themselves as left-of-center and 41% to the right (ANES 2004).

### Variables

Our first step was to develop an institutional faculty political orientation variable using responses to the political orientation item on the faculty survey. The average responses for each institution were calculated and used to populate this variable. The averages for institutions range from 2.61 to 4.53, with the lower averages representing more conservative faculty and the higher averages representing more liberal faculty (a list of faculty political orientation by institution is provided in Appendix 1).[19]

## Table 3
## Faculty Political Orientation by Institutional Types and Disciplines

| | N | Far Left | Liberal | Middle of the Road | Conservative | Far Right | Ratio Left to Right |
|---|---|---|---|---|---|---|---|
| **Institution control:** | | | | | | | |
| Religious | 1,067 | 4.4% | 39.3% | 32.9% | 23.1% | 0.4% | 1.9:1 |
| Non-religious | 1,816 | 7.7% | 50.7% | 29.2% | 12.1% | 0.3% | 4.7:1 |
| **Selectivity:** | | | | | | | |
| Highly selective | 1,694 | 7.6% | 48.3% | 28.9% | 14.9% | 0.4% | 3.7:1 |
| Not highly selective | 1,189 | 5.0% | 43.8% | 33.1% | 17.9% | 0.3% | 2.7:1 |
| **Carnegie classification:** | | | | | | | |
| Doctoral/research | 641 | 6.1% | 49.3% | 30.4% | 13.7% | 0.5% | 3.9:1 |
| Masters | 1,248 | 4.5% | 38.9% | 34.6% | 21.9% | 0.2% | 2.0:1 |
| Baccalaureate | 994 | 9.3% | 54.2% | 25.7% | 10.5% | 0.4% | 5.8:1 |
| **Discipline:** | | | | | | | |
| Agriculture or forestry | 5 | 0.0% | 0.0% | 60.0% | 40.0% | 0.0% | 0.0:1 |
| Biological sciences | 157 | 2.5% | 45.9% | 39.5% | 12.1% | 0.0% | 4.0:1 |
| Business | 221 | 1.8% | 26.7% | 37.6% | 32.1% | 1.8% | 0.8:1 |
| Education | 175 | 4.6% | 39.4% | 30.9% | 25.1% | 0.0% | 1.8:1 |
| Engineering | 45 | 0.0% | 33.3% | 44.4% | 22.2% | 0.0% | 1.5:1 |
| English | 219 | 12.8% | 58.4% | 19.2% | 9.1% | 0.5% | 7.4:1 |
| Health sciences | 115 | 0.0% | 27.8% | 43.5% | 28.7% | 0.0% | 1.0:1 |
| History/political science | 234 | 10.7% | 57.7% | 20.5% | 11.1% | 0.0% | 6.2:1 |
| Humanities | 440 | 8.4% | 49.1% | 31.8% | 10.7% | 0.0% | 5.4:1 |
| Fine arts | 258 | 5.4% | 57.0% | 23.3% | 14.0% | 0.4% | 4.3:1 |
| Math/statistics | 131 | 2.3% | 43.5% | 30.5% | 22.9% | 0.8% | 1.9:1 |
| Physical sciences | 199 | 3.5% | 47.7% | 36.2% | 12.6% | 0.0% | 4.1:1 |
| Social sciences | 390 | 10.0% | 52.3% | 26.9% | 10.5% | 0.3% | 5.8:1 |
| Other technical | 47 | 2.1% | 36.2% | 31.9% | 27.7% | 2.1% | 1.3:1 |
| Other | 108 | 5.6% | 28.7% | 42.6% | 23.1% | 0.0% | 1.5:1 |
| Unknown | 139 | 7.9% | 45.3% | 30.2% | 16.5% | 0.0% | 3.2:1 |
| Total | 2,883 | 6.4% | 46.5% | 30.6% | 16.1% | 0.3% | 3.2:1 |

Second, we measured the degree of change in students' political orientation from their first year to their fourth year by subtracting the CSS political orientation scale response from the freshman political orientation scale response. Students who completed the freshman survey but did not complete the CSS were dropped from the analysis. Third, we developed an institutional peer-orientation variable by averaging the student responses on political orientation from the freshman survey. This will tell us, in relative terms, the political orientation of the students as they arrived at college.

We then ran a multiple regression analysis to assess the relationship between the independent institution-wide variables of faculty political orientation, peer (student) political orientation, control type, and selectivity level, and the dependent variable, change in student orientation. We also ran a regression analysis with those same institution-wide characteristics combined with the personal student characteristics of gender, race/ethnicity, and family income.

## Results and Analysis

We first took a descriptive look at the students' political orientation as identified in their freshman and senior years. As shown in Table 4, there were slightly more students who identify as conservative or Far Right than liberal or Far Left when entering college, with almost one-half identifying as middle of the road. By the time these students graduated, their orientation had moved to the left and liberal/Far Left students outnumbered conservative/Far Right students by more than 8%. While the net change of more than 10% toward the left seems like a significant swing, this can be put in the context of the more left-of-center political orientation of 18–24-year-olds in the general population. Indeed, an examination of the self-identified political ideology of 18–24-year-olds who participated in the ANES (also presented in Table 4) indicates that the senior-year students in our sample identify as being left or right of center at the same general rates as members of this age group in the voting population. Thus, even though

there as a net shift of 10% toward the left in our sample, the students were actually moving towards the population norm, not away from it.

Table 5 shows the degree to which student political orientation changed from freshman to senior year. Almost 57% of the students identified the same orientation as seniors as they did as freshmen. Another 23% reported a change of one scale placement to the left, and another 4% reported a change of two or more to the left. To the right, 14% reported a change of one scale placement and a little more than 2% reported movement of two or three placements. In all, 27% moved to the left and 16% moved to the right.

### Regression

Our analysis focused on the change in political orientation at the institutional level and, using change in student political orientation as the dependent variable, we ran a regression model with the following institutional characteristics:

**Table 4**
**Self-Identified Political Orientation**

| Political Orientation of Student Sample, Freshman and Senior Years | | | | | |
|---|---|---|---|---|---|
| | Far Left | Liberal | Middle of the Road | Conservative | Far Right |
| First-Year (1999) | 1.6% | 23.3% | 47.8% | 26.0% | 1.3% |
| Senior (2003) | 3.6% | 29.1% | 42.8% | 23.6% | 0.9% |
| N = 6,807 | | | | | |

| Political Orientation of Population, 2004 | | | | | |
|---|---|---|---|---|---|
| | Extremely Liberal | Liberal/Slightly Liberal | Moderate, Middle of the Road | Conservative/Slightly Conservative | Extremely Conservative |
| Population at Large* | 3.0% | 22.0% | 33.5% | 37.4% | 4.0% |
| 18–24 Years Old** | 5.3% | 28.7% | 38.3% | 23.4% | 2.1% |

*N = 907 **N = 94

Source: 2004 American National Election Study

**Table 5**
**Change in Political Orientation by Degree of Movement on Orientation Scale, All Students**

| | Moved Left | | | | No Change | Moved Right | | |
|---|---|---|---|---|---|---|---|---|
| First-Year Orientation | −4 | −3 | −2 | −1 | 0 | 1 | 2 | 3 |
| Far Right (N = 87) | 1.1% | 3.4% | 14.9% | 58.6% | 21.8% | | | |
| Conservative (N = 1772) | | 1.1% | 10.3% | 32.0% | 54.9% | 1.6% | | |
| Middle of the Road (N = 3254) | | | 1.5% | 25.1% | 58.6% | 14.5% | 0.3% | |
| Liberal (N = 1586) | | | | 8.4% | 58.8% | 25.7% | 6.8% | 0.3% |
| Far Left (N = 108) | | | | | 38.9% | 42.6% | 15.7% | 2.8% |
| Total (N = 6807) | 0.1% | 0.3% | 3.6% | 23.0% | 56.9% | 14.0% | 2.0% | 0.1% |

- average faculty political orientation,
- average freshman political orientation,
- institutional control (religious/non-religious), and
- selectivity (highly selective/not highly selective).

Understanding and controlling for the interaction between faculty orientation and other characteristics is important because these characteristics allow us to take into account other factors related to institutional culture. The political orientation of a freshman is important because it tells us the orientation of the student prior to attending college and if students of a certain orientation self-select into specific schools. Institutional control based on religion can certainly affect the political culture of a college or university as well as the type of students who self-select into those institutions. Institutional selectivity is particularly relevant be-

cause the literature and rhetoric on faculty bias specifically identifies elite institutions as being some of the worst offenders (Horowitz and Light 2006).

Table 6 shows the results of the regression model using the institutional characteristics noted above. Institutional control was the only variable to reach a level of significance ($p < .05$), where students at non-religious schools moved farther to the left than their counterparts at religiously affiliated schools.

We also ran a second regression model to assess the impact of individual student characteristics as well as institutional characteristics. In addition to the institutional factors included in the original model, the second model also considered gender, race (white/non-white), and estimated family income. As shown in Table 7, both gender and family income reach levels of significance. Based on these findings we can tell that women move more to the left while in college

than men, and that as a student's family income becomes higher, change in political orientation moves to the right. In neither of these regression models did faculty orientation have a significant relationship with the independent variable.

Finally, we categorized the 38 institutions into relative faculty orientation groups; the third with the lowest average faculty orientation scores were labeled more conservative, the middle third were labeled moderate, and the top third were labeled more liberal. Students in the more conservative third of the institutions (in terms of faculty orientation) had a mean orientation of 2.81, compared with 2.93 for students in the moderate group and 3.12 for students in the more liberal third (see Table 8). An analysis of variance (ANOVA) finds that the difference in freshman political orientation between these groups is statistically significant. Students entering the institutions with more conservative faculty tended to

## Table 6
**Regression Analysis of Institution-Wide Variables on Student Change in Political Orientation**

| Model | B | SE | $\beta$ | t | Sig. |
|---|---|---|---|---|---|
| Average faculty political orientation by institution | −.064 | .039 | −.026 | −1.627 | .104 |
| Average freshman orientation by institution | .086 | .051 | .025 | 1.675 | .094 |
| Control (religious/non-religious) | −.053 | .024 | −.030 | −2.212 | .027 |
| Selectivity (highly selective/not highly selective) | .012 | .023 | .006 | .517 | .605 |

$F(4,6,802) = 3.343$, $R = .044$, $R^2 = .002$

## Table 7
**Regression Analysis of Institution-Wide and Student Demographic Variables on Student Change in Political Orientation**

| Model | B | SE | $\beta$ | t | Sig. |
|---|---|---|---|---|---|
| Average faculty political orientation by institution | −.064 | .041 | −.027 | −1.574 | .115 |
| Average freshman orientation by institution | .100 | .055 | .029 | 1.820 | .069 |
| Control (religious/non-religious) | −.079 | .026 | −.044 | −3.088 | .002 |
| Selectivity (highly selective/not highly selective) | .034 | .024 | .018 | 1.395 | .163 |
| Gender | −.081 | .021 | −.050 | −3.895 | .000 |
| Race/ethnicity (white/non-white) | −.024 | .031 | −.010 | −.779 | .436 |
| Estimated parental income | .009 | .004 | .031 | 2.338 | .019 |

$F(7, 6185) = 5.295$, $R = .077$, $R^2 = .006$.

be more conservative, students entering the liberal institutions were more liberal, and the students entering the moderate institutions fell between the two other groups.

We also examined the differences in the mean change in political orientation from freshman to senior year for the students in each of the three groups. As Table 8 also shows, all three groups moved slightly to the left. Though the conservative group shifted to the left to a lesser degree than the other two groups, the differences in mean change

between the groups is very small and not statistically significant.

## Discussion

The goal of this study is to assess whether faculty political orientation is associated with changes in student political orientation. The findings presented here suggest that faculty political orientation at the institutional level does not significantly influence student political orientation. The descriptive data also indicate that while faculty orientation is overwhelmingly liberal, student orientation when leaving college is not significantly different than the population at large. Our analysis did find that other institutional and personal characteristics, including institutional control, gender, and socio-economic status, have an effect on changes in student political ideology. It should be noted that neither of the regression models had a high level of predictive value ($R^2 = .002$, $R^2 = .006$), but they did show which key variables were significantly correlated with change in student political orientation.

The finding that institutional control is correlated with change in political orientation is not surprising. Students at religiously controlled institutions were less likely to move to the left during their college career and we believe that this is most likely due to self-selection. Students with strong religious beliefs are probably more likely to attend religiously controlled institutions. Institutional culture may also play a part, as both the freshman and faculty surveys indicate higher levels of conservatism among peers and faculty members at religious institutions.

Our results show that female college students are more likely than men to move to the left during the course of

## Table 8
**Mean Freshman and Senior Political Orientation by Relative Faculty Institutional Orientation**

| Relative Faculty Orientation | N | Freshman Political Orientation | | Senior Political Orientation | | Mean Change |
|---|---|---|---|---|---|---|
| | | Mean | SD | Mean | SD | |
| More Conservative | 1,149 | 2.81 | 0.738 | 2.91 | .758 | .10 |
| Moderate | 3,161 | 2.93 | 0.758 | 3.06 | .828 | .13 |
| More Liberal | 2,497 | 3.12 | 0.802 | 3.26 | .852 | .14 |
| Total | 6,807 | 2.98 | 0.779 | 3.11 | .835 | .13 |

Differences across faculty orientation groups were statistically significant at both the freshman and senior levels, $F(2, 6807) = 72.93$, $77.14$, $p < .000$. The differences in mean change were not significant, $F(2, 6807) = 1.09$, $p = .333$. Institutions were ranked from liberal to conservative and divided into thirds for the purpose of this analysis. Political orientation scale is as follows: 1 = Far Right, 2 = conservative, 3 = middle of the road, 4 = liberal, 5 = Far Left.

their college careers. It is well established that in the general population women are more liberal than men and according to Dey (1997) and data from the ANES that is also the case for college-aged women.[20] Our results also indicate that higher socioeconomic status (as measured by estimated parental income) is associated with changes in political orientation toward the right. The finding that more wealthy students are more likely to move to the right during the course of their college careers (and vice versa) may reflect increasing student awareness about political parties and ideologies and where they stand on issues related to wealth, taxes, and government assistance for lower-income Americans (see for instance Stonecash, Brewer, and Mariani 2002).

Though we are hopeful that this study contributes to ongoing debates about faculty ideology and indoctrination, there are some limitations to this study that should be taken into account by other researchers. We are mindful, for instance, that our finding that students move leftward during college is not, by itself, evidence of indoctrination. Students may move to the left as a result of other factors, such as shared cultural influences, a common stage in personal development, or as a reaction to peer pressure, current events, or political developments. We have tried to deal with this problem by controlling for faculty ideology; if faculty ideology has an impact on student ideology then changes in student ideology should be more pronounced at institutions with more liberal faculty members and vice versa. We find little evidence that this is the case. Of course, this finding does not necessarily mean that professors act fairly or without ideological bias in their teaching, subject matter, or selection of reading materials. Professors could, after all, be *failing* to indoctrinate students despite their concerted efforts to do so! Regardless of any biases (intentional or unintentional) that professors bring to their teaching, the findings presented here may help alleviate the concern that students, on a widespread basis, are

adopting the political positions of their liberal professors.

Another limitation of this paper is that it focuses on institutions and, in doing so, it does not tell us much of anything about a student's individual experiences or the ideological views of the particular professors a student interacted with during their college career. While it would be preferable to take into account the ideology of the faculty members who actually taught each particular student, privacy laws make it very difficult to gather the data without running into considerable problems with regard to sample size and representativeness. In addition there are some advantages to our approach of looking at overall faculty ideology. Part of the argument is that students are being indoctrinated not just in class, but from the general climate created by faculty members that pervades their teaching, scholarship, and outside of the classroom activities. The indoctrination argument is, in large part, about what goes on in the classroom. But what goes on in the classroom is affected by the broader campus culture and vice versa. Thus, the overall faculty ideology of the institution is likely to influence all students in some way.

Though the number of students examined here is considerable (6,807), the number of institutions remains relatively small (38). We were limited by the fact that relatively few institutions participate in all three of the surveys needed to account for faculty ideology and changes in student ideology over time. There are no public universities in the sample, and large percentages are selective liberal arts colleges. Though this is a limitation, many of the conservative critiques focus in particular on elite and private colleges, so it is not entirely without merit to use this sample as a test of the indoctrination argument. It should also be noted that students at these institutions who take longer than four years to complete their programs are unlikely to be included in the senior year surveys used in this study (and were therefore likely to be dropped from the dataset).

A final limitation of this study relates to the potential impact of an exogenous

shock—the September 11 terrorist attacks. The college students in our sample began college in the fall of 1999 and finished in the spring of 2003. For the students in this sample, the terrorist attacks of September 11, 2001, took place at the start of their junior year in college, roughly midway through their college careers. Clearly, the September 11 attacks have the potential to impact this cohort of students' political viewpoints. For this reason, further research is needed to assess whether similar changes occur for other groups of students whose college careers occurred under different historical circumstances.

To summarize, there are four important findings here related to questions about faculty ideology and fears that liberal faculty members are indoctrinating students to adopt a liberal ideology. First, it is very clear that faculty members tend to be liberal and are much more liberal than the general population. Second, there is evidence that there is a degree of self-selection going on among students when they choose a college. Students tend to enroll at institutions that have a faculty orientation make up more similar to their own. This area is ripe for further research, for there may be other institutional factors at play, such as campus culture or history. Third, students whose ideology changes while in college tend to change to the left, but that movement is within the normal orientation range of 18–24-year-olds in the general population. Fourth, and most important, there is no evidence that faculty ideology at an institutional level has an impact on student political ideology. Student political orientation does not change for a majority of students while in college, and for those that do change there is evidence that other factors have an effect on that change, such as gender and socioeconomic status. Based on the data presented in this study, college students appear to be more firm in their political beliefs than conventional wisdom suggests. Though students' political ideology is not set in stone, it does not appear to change as a result of faculty ideology, at least at an institutional level.

## Notes

*We wish to thank John Pryor of the Higher Education Research Institute at UCLA, Daniel Klein at GMU, and our colleagues at Hamilton College and Xavier University for their support and assistance on this project. Given that this is a study of faculty ideology, it seems reasonable to be open about our own ideological dispositions. We come from divergent political and ideological perspectives. One author is conservative and has worked extensively for Republican candidates and officeholders, while the other is liberal and active in Democratic politics at the local level.

1. The Center for the Study of Popular Culture was launched by Horowitz in 1988. In 2006, the center was renamed the David Horowitz Freedom Center. See David Horowitz Freedom Center, "About Us." www.horowitzfreedomcenter.org/FlexPage.aspx?area=aboutus (June 8, 2007).

2. The full text of the Academic Bill of Rights is available at www.studentsforacademicfreedom.org. A print version can be found in Horowitz (2007, 129–132). See also Horowitz 2004, Hebel 2004, and Klein 2004.

3. Rep. Jack Kingston (R-GA), as cited in Alyson Klein (2004). See also Horowitz 2004.

Note too that there are those on the right who have voiced their opposition to the Academic Bill of Rights; see for instance Beck 2005.

4. In 2005 and 2006, the Academic Bill of Rights was introduced in Congress and at least 21 state legislatures. It resulted in a series of highly contentious state legislative hearings (Schrecker 2006; Jacobson 2006a) but little concrete legislative action. See, for instance, Jacobson 2005, 2006a, 2006c, 2006d, 2006e, and Jaschik 2006a. For a state by state roundup on the status of legislation related to the Academic Bill of Rights, see the Free Exchange Coalition's "Legislative Tracker" at www.freeexchangeoncampus.org/index.php? option=com_content&task=section&id=5& Itemid=61 (September 24, 2007). Note that the AAUP, which strongly opposes the Academic Bill of Rights, is a member of the Free Exchange Coalition.

5. The CSPC has also criticized the lack of ideological balance among commencement speakers. See Horowitz 2003.

6. Similar efforts to detail disparities in party identification among the faculty at specific college campuses were also launched by local chapters of a CPSC spinoff organization known as Students for Academic Freedom (SAF). See, for instance, the report compiled by students affiliated with the SAF chapter at the University of Nevada Las Vegas (Jawel et al. 2004).

7. Conservative critics have pointed to these studies as final confirmation that the professoriate is disproportionately left-wing in political orientation. See, for instance, Zinsmeister 2005.

8. Klein and Stern's (2005a) survey of academics in six social science disciplines (anthropology, sociology, political science, political and legal philosophy, economics, and history) found that respondents voted overwhelmingly Democratic and that the support for Democratic candidates among academics has increased since the 1970s. In their survey, 80% of respondents were identified as Democrats and only 8% Republicans. Based on this data, the authors estimate that a 7 to 1 Democrat to Republican ratio is a "safe lower bound estimate" for the ideological tilt of faculty in the disciplines that they examined (47). In another study based on the same data, Klein and Stern also found few conservatives and libertarians in those six disciplines (Klein and Stern 2005b).

9. Klein and Stern's survey of members of the American Sociology Association found an almost complete absence of classical liberals and a 28 to 1 Democrat to Republican vote tendency (Klein and Stern 2006: 44). The authors conclude that sociologists are "predominantly left-

wing" (46). Similarly, a study of sociologists at Berkeley and Stanford (Klein and Western 2005) found 27 registered Democrats and zero registered Republicans (60). Rothman, Lichter, and Nevitte's (2005) study, which utilized 1999 survey data, found 59 Democrats and zero Republicans among sociology professors examined in their sample.

10. These findings include data from community college faculty, who were more evenly split ideologically than their colleagues at four-year institutions; as a result, HERI's findings likely understate the liberalism of faculty members at four-year institutions. Note that one prominent opponent of the Academic Bill of Rights, Michael Berube, views the HERI data as particularly definitive. Berube concludes that "there's really no question, then, that campuses are teeming with liberal faculty, especially when campuses are compared with the rest of the country. That 48–18 differential is pretty significant" (Berube 2006, 41). Berube argues that conservatives' studies, however, magnify the ratio of liberals to conservatives by "cherry-picking," "cooking data," and making up "new numbers more to their liking" (41–2).

11. In business, the breakdown was 49 to 39 liberal to conservative, 26 to 26 Democrat to Republican. In economics, the breakdown was 55 to 39 liberal to conservative and 36 to 17 Democrat to Republican. Note too that Rothman, Lichter, and Nevitte (2005) concluded that conservatives, women, and Christians were more likely to work at lower-tier institutions, even when controlling for qualifications.

12. Zipp and Fenwick (2006) appear to be referring to faculty who label themselves as "conservative" as opposed to the somewhat larger group of faculty members who consider themselves "moderately conservative." Indeed, the percentage of faculty members who identify as strictly "conservative" is so small (just 6.6% of the sample) that Zipp and Fenwick collapse the two conservative categories into one while retaining two separate categories for liberal and moderately liberal faculty members.

13. UCLA historian Russell Jacoby (2005) argues that "More leftists undoubtedly inhabit institutions of higher education than they do the FBI or the Pentagon or local police and fire departments, about which conservatives seem little concerned, but who or what says every corner of society should reflect the composition of the nation at large? Nothing has shown that higher education discriminates against conservatives, who probably apply in smaller numbers than liberals. Conservatives who pursue higher degrees may prefer to slog away as junior partners in law of-

fices rather than as assistant professors in English departments. Does an 'overrepresentation' of Democratic anthropologists mean Republican anthropologists have been shunted aside?" For additional examples of this argument, see Jaschik 2005b, Fogg 2005, and Knepp 2006.

14. For its part, the public seems to have accepted the argument that college faculties are liberal but remains unclear as to the consequences. This is evident from the results of a 2004 survey of 1,000 adults by *The Chronicle of Higher Education*, which found that although half of all respondents agree that "colleges improperly introduce a liberal bias into what they teach," the overall level of public trust in colleges remains quite high (Selingo 2004).

15. Rothman's sample of 1,643 faculty members at 183 colleges was dismissed by Michael Berube, for instance, because the study is "based on an astonishingly smaller data sample than that of the Higher Education Research Institute" (Berube 2006, 68).

16. See also Jaschik 2006b and Jacobson 2006b. Note that George Leef (2006) and Stephen Balch (2006) at NRO's Phi Beta Cons raise concerns that the study does not refute grading bias since it does not take into account changes in student ideology or student efforts to accommodate liberal professors' views in their own coursework.

17. See, for instance, the results of a survey of students at the top 50 colleges and universities that was sponsored by the American Council of Trustees and Alumni (ACTA)—an organization launched with the help of former NEH chair Lynn Cheney, former Colorado governor Richard Lamm, and Senator Joe Lieberman (American Council of Trustees and Alumni 2004). According to the ACTA survey, 48% of students reported that campus presentations on political issues "seem totally one-sided" and 46% agreed that professors "use the classroom to present their personal political views" (American Council of Trustees and Alumni 2004). See also Neal, French, and Siegel (2005).

18. In the words of one of the authors of the study: "student's aren't simply sponges" (Jaschik 2006b).

19. The following values were assigned: 1 = Far Right, 2 = conservative, 3 = middle of the road, 4 = liberal, 5 = Far Left.

20. According to the American National Election Study of 2004, 29.6% of females of all ages self-identified as left-of-center (slightly liberal, liberal, or extremely liberal), compared to 20.7% of males. Among 18–24-year-olds, 38.9% of females identified themselves as left of center, compared to 33.3% of males (ANES 2004).

## References

American Council of Trustees and Alumni. 2004. "Survey Reveals Pervasive Political Pressure in the Classroom (Press Release)." November 30. www.goacta.org/press/Press% 20Releases/11-30-04PR.htm (June 8, 2007).

American Enterprise. 2005. "Professors Who Preach." *American Enterprise* 16 (June): 30–1.

———. 2002. "The Shame of America's One-Party Campuses." *American Enterprise* 13 (September): 18–25.

The American National Election Studies. 2004. Ann Arbor, MI: University of Michigan, Center for Political Studies.

Ames, Barry, David C. Barker, Chris W. Bonneau, and Christopher J. Carman. 2005. "Hide the Republicans, the Christians, and the Women: A Response to 'Politics and Professional Advancement Among College Faculty.'" *The Forum* 3 (2). www.bepress. com/forum/vol3/iss2/art7/ (June 20, 2008).

Balch, Stephen. 2006. "The Study Needs Study." Blog posting. *National Review Online: Phi Beta Cons*, March 30. http://phibetacons. nationalreview.com/post/?q=ODJjM2U1Y Tg5M2VkNjYzZGI4NGIzODFiYWJiZGFh OTk= (September 24, 2007).

Bauerlein, Mark. 2005. "The Ideological Corruption of Scholarly Principles." *Chronicle of Higher Education*, September 9. http:// chronicle.com/weekly/v52/i03/03b00801. htm (June 8, 2007).

———. 2004. "Liberal Groupthink is Anti-Intellectual." *Chronicle of Higher Education*, November 12. http://chronicle.com/weekly/ v51/i12/12b00601.htm (June 8, 2007).

Beck, Stefan. 2005. "Time in the Trenches: Campus Conservatives Need to Toughen Up." *National Review Online*, April 13. www.nationalreview.com/comment/ beck200504130758.asp (June 8, 2007).

Bennett, William. 1992. *The De-Valuing of America: The Fight for Our Culture and Our Children*. New York: Touchstone.

Berube, Michael. 2006. *What's Liberal About the Liberal Arts? Classroom Politics and "Bias" in Higher Education*. New York: W.W. Norton.

Bloom, Alan. 1987. *The Closing of the American Mind: How Higher Education Has Failed Democracy and Impoverished the Souls of Today's Students*. New York: Simon and Schuster.

Bork, Robert H. 1996. *Slouching Towards Gomorrah: Modern Liberalism and America's Decline*. New York: Regan Books.

Braunlich, Stephen. 2004. "Political Contributions Show Bias at College." *The Flat Hat: The Student Newspaper of the College of William and Mary*, September 17. http://flathat.wm.edu/2004-09-17/story.php?type=2&aid=4 (June 8, 2008).

Brookings Institution. 2001. "National Survey on Government Endeavors." www.brook.edu/comm/reformwatch/rw04_surveydata.pdf (June 8, 2007).

Buckley, William F. 1951. *God and Man at Yale: The Superstitions of "Academic Freedom."* Washington, D.C.: Regnery.

Cardiff, Christopher, and Daniel B. Klein. 2005. "Faculty Partisan Affiliations in all Disciplines: A Voter-Registration Study." *Critical Review* 17 (3–4): 237–55.

Dey, Eric L., 1997. "Undergraduate Political Attitudes: Peer Influence in Changing Social Contexts." *The Journal of Higher Education* 68 (4): 398–413.

D'Souza, Dinesh. 1991. *Illiberal Education: The Politics of Race and Sex on Campus*. New York: The Free Press.

Ehrlich, Tom, and Anne Colby. 2004. "Political Bias in Undergraduate Education." *Carnegie Perspectives: The Carnegie Foundation for the Advancement of Teaching* 90 (3). www.carnegiefoundation.org/perspectives/sub.asp?key=245&subkey=1135 (June 8, 2007).

Fogg, Piper. 2005. "Study Finds Conservatives are Less Likely to Advance in Academe." *Chronicle of Higher Education*, April 8. http://chronicle.com/weekly/v51/i31/31a01201.htm (June 8, 2008).

Hamilton, Richard F., and Lowell L. Hargens. 1993. "The Politics of the Professors: Self-Identifications, 1969–1984." *Social Forces* 71 (March): 603–27.

Hebel, Sara. 2004. "Patrolling Professors' Politics." *Chronicle of Higher Education*, February 13. http://chronicle.com/weekly/v50/i23/23a01801.htm (June 8, 2008).

Higher Education Research Institute (HERI). 2002. "The American College Teacher: National Norms for 2001–2002: UCLA Study Finds Growing Gap in Political Liberalism between Male and Female Faculty." Press release. www.gseis.ucla.edu/heri/act_pr_02.html (May 29, 2007).

———. 2007. "CIRP Surveys and Services." www.gseis.ucla.edu/heri/herisurveys.php.

Horowitz, David. 2007. *Indoctrination U.: The Left's War on Academic Freedom*. New York: Encounter Books.

———. 2005. "How to Get an 'A' at One Elite School." *FrontPage Magazine*, May 11. http://studentsforacademicfreedom.org/archive2005/DHHowtogetanA051105.htm (June 8, 2008).

———. 2004. "In Defense of Intellectual Diversity." *Chronicle of Higher Education*, 13 February. http://chronicle.com/weekly/v50/i23/23b01201.htm (June 8, 2007).

———. 2003. "Study of Bias in the Selection of Commencement Speakers at 32 Elite Colleges and Universities." Students for Academic Freedom Report, August 28. http://studentsforacademicfreedom.org/reports/liberalbias.html (September 24, 2007).

Horowitz, David, and Eli Lehrer. 2003. "Political Bias in the Administrations and Faculties of 32 Elite Colleges and Universities (Executive Summary)." Center for the Study of Popular Culture. http://studentsforacademicfreedom.org/reports/lackdiversity.html (June 8, 2007).

Horowitz, David, and Joseph Light. 2006. "Representation of Political Perspectives in Law and Journalism Faculties." Center for the Study of Popular Culture. http://studentsforacademicfreedom.org/archive/2005/November2005/lawjournalismstudyRevisedFinal112205.htm (June 8, 2008).

Jacobson, Jennifer. 2006a. "Pa. Lawmakers Get Mixed Message on Fixing Perceived Liberal Bias in Academe." *Chronicle of Higher Education*, April 7. http://chronicle.com/weekly/v52/i31/31a03701.htm (June 8, 2007).

———. 2006b. "Study Casts Doubt on Claims that Conservatives Students Face Discrimination in Classes." *Chronicle of Higher Education*, March 30.

———. 2006c. "Tilting at Academe." *Chronicle of Higher Education*, March 24. http://chronicle.com/weekly/v52/i29/29a02501.htm (June 8, 2007).

———. 2006d. "Political-Bias Bill Passes S.D. House." *Chronicle of Higher Education*, February 17. http://chronicle.com/weekly/v52/i24/24a03201.htm (June 8, 2007).

———. 2006e. "Conservative Activist Admits Lack of Evidence for Some Allegations of Faculty Bias." *Chronicle of Higher Education*, January 20. http://chronicle.com/weekly/v52/i20/20a03301.htm (June 8, 2007).

———. 2005. "Pennsylvania Lawmakers Hold Hearings on Political Bias in College Classrooms." *Chronicle of Higher Education*, November 25. http://chronicle.com/weekly/v52/i14/14a03201.htm (June 8, 2007).

———. 2004a. "Conservative in a Liberal Landscape." *Chronicle of Higher Education*, September 24. http://chronicle.com/weekly/v51/i05/05a00801.htm (June 8, 2007).

———. 2004b. "Conservative Professor Accuses Law School of Political Bias." *Chronicle of Higher Education*, July 16. http://chronicle.com/weekly/v50/i45/45a01202.htm (June 8, 2007).

Jacoby, Russell. 2005. "So Universities Hire Liberal Faculty—This is News?" History News Network, George Mason University, March 28. http://hnn.us/article/10836.html (June 8, 2007).

Jaschik, Scott. 2006a. "Grading Edge for Conservative Students." *Inside Higher Ed.*, March 30.

———. 2006b. "The Real Bias in the Classroom." *Inside Higher Ed.*, March 30.

———. 2006c. "Retractions from David Horowitz." *Inside Higher Ed.*, January 11.

———. 2005a. "A Win for 'Academic Bill of Rights.'" *Inside Higher Ed.*, July 7. www.insidehighered.com/news/2005/07/07/tabor (June 8, 2007).

———. 2005b. "Leaning to the Left." *Inside Higher Ed.* March 30. http://insidehighered.com/news/2005/03/30/politics (June 8, 2007).

Jawel, Adriana, Amanda Moran, Brandon Robison, and Roger Roots. 2004. "Political Diversity of UNLV Faculty: A Report by the UNLV Students for Academic Freedom (SAF) and the UNLV College Libertarians." UNLV Students for Academic Freedom. www.studentsforacademicfreedom.org/reports/UNLV.pdf (June 8, 2007).

Kelly-Woessner, April, and Mathew Woessner. 2006. "My Professor is a Partisan Hack: How Perceptions of a Professor's Political Views Affect Student Course Evaluations." *PS: Political Science and Politics* 39 (July): 495–501.

Kemmelmeier, Martin, Cherry Danielson, and Jay Basten. 2005. "What's in a Grade? Academic Success and Political Orienation." *Personality and Social Psychology Bulletin* 31 (October): 1,386–99.

Kimball, Roger. 1990. *Tenured Radicals: How Politics Has Corrupted Our Higher Education*. New York: Harper and Row.

Klein, Alyson. 2004. "Worried on the Right and the Left." *Chronicle of Higher Education*, July 9. http://chronicle.com/weekly/v50/i44/44a02101.htm (June 8, 2007).

Klein, Daniel B., and Charlotta Stern. 2006. "Sociology and Classical Liberalism." *The Independent Review: A Journal of Political Economy* 11 (1): 37–52.

———. 2005a. "Political Diversity in Six Disciplines." *Academic Questions* 18 (1): 40–52.

———. 2005b. "Professors and Their Politics: The Policy Views of Social Scientists." *Critical Review: An Interdisciplinary Journal of Politics and Society* 17 (3 & 4): 257–303.

Klein, Daniel B., and Andrew Western. 2005. "Voter Registration of Berkeley and Stanford Faculty." *Academic Questions* 18 (1): 53–65.

Knepp, Dennis. 2006. "'Obvious' Biases in Academe." Letter to the Editor. *Chronicle of Higher Education*, January 13. http://chronicle.com/weekly/v52/i19/19a06305.htm (June 8, 2007).

Ladd, Everett Carll Ladd, Jr., and Seymour Martin Lipset. 1975. *The Divided Academy: Professors and Politics*. New York: McGraw-Hill.

Leef, George. 2006. "Re: Classroom Bias." Phi Beta Cons. *National Review Online*, March 30. http://phibetacons.nationalreview.com/post/?q=YzI5ZjJmMmNmM2YwZTg1NGNmOTg2ZDJmOGFhNjI3ODc= (September 24, 2007).

Liptak, Adam. 2005. "If the Law Is an Ass, the Professor is a Donkey." *New York Times*, August 28.

Luntz, Frank. 2001. "Professor Survey for the Center for Study of Popular Culture." *Luntz Research Report*. www.studentsforacademicfreedom.org/reports/luntz.html (June 8, 2007).

McGinnis, John O., Matthew A. Schwartz, Benjamin Tisdell. 2005. "The Patterns and Implications of Political Contributions by Elite Law School Faculty." *Georgetown Law Journal* 93 (April): 1,167.

McGinnis, John O., and Matthew Schwartz. 2003. "Conservatives Need Not Apply." *Wall Street Journal*, April 1.

Neal, Anne, David French, and Fred Siegel. 2005. "Professors Who Preach." *American Enterprise* 16 (June): 30.

Pilger, William. 2004. "In but Not of Academe." *Chronical of Higher Education*, December

17. http://chronicle.com/weekly/v51/i17/17c00201.htm

Rothman, Stanley, S. Robert Lichter, and Neil Nevitte. 2005. "Politics and Professional Advancement Among College Faculty." *The Forum* 3 (1).

Salerno, Steve. 2003. "Propaganda U." *The American Enterprise* 14 (April/May): 11–2.

Selingo, Jeffrey. 2004. "U.S. Public's Confidence in Colleges Remains High." *Chronicle of Higher Education*, May 7. http://chronicle.com/weekly/v50/i35/35a00101.htm (June 8, 2007).

Schrecker, Ellen. 2006. "Worse than McCarthy." Point of View. *Chronicle of Higher Education*, February 10. http://chronicle.com/weekly/v52/i23/23b02001.htm (June 8, 2007).

Stonecash, Jeff, Mark Brewer, and Mack Mariani. 2002. *Diverging Parties Realignment, Social Change, and Political Polarization.* Boulder, CO: Westview.

Smith, Matthew V. 2006. "Political Science 101." *National Review Online*, November 21. http://article.nationalreview.com/?q=NGEyZTRhNTNmMGNjNTdkYmRiNWQwMTc2MWI3NzgyM2M= (June 8, 2007).

Wiener, Jon. 2005. "When Students Complain About Professors, Who Gets to Define the Controversy?" *Chronicle of Higher Education*, March 13. http://chronicle.com/weekly/v51/i36/36b01201.htm (May 25, 2006).

Wilson, Robin. 2006. "Liberal 'Groupthink' Puts Professors at Odds with Most Americans, Report Says." *Chronicle of Higher Education*, October 19.

———. 2005. "We Don't Need that Kind of Attitude." *Chronicle of Higher Education*, December 16. http://chronicle.com/weekly/v52/i17/17a00801.htm (June 8, 2007).

Zinsmeister, Karl. 2005. "Case Closed." *The American Enterprise* 16 (January/February): 42–5.

Zipp, John F., and Rudy Fenwick. 2006. "Is the Academy a Liberal Hegemony? The Political Orientations and Educational Values of Professors." *Public Opinion Quarterly* 70 (3): 304–26.

## Appendix 1
## Mean Faculty Political Orientation by Institution

| Institution Code | N | Mean | SD |
|---|---|---|---|
| 1 | 56 | 3.16 | .848 |
| 3 | 56 | 3.77 | .632 |
| 4 | 56 | 3.15 | .826 |
| 5 | 112 | 3.74 | .836 |
| 6 | 122 | 2.61 | .686 |
| 7 | 53 | 2.96 | .831 |
| 10 | 73 | 3.42 | .912 |
| 11 | 48 | 3.71 | .683 |
| 12 | 47 | 3.68 | .862 |
| 14 | 43 | 3.63 | .817 |
| 15 | 53 | 3.42 | .795 |
| 16 | 83 | 3.66 | .830 |
| 17 | 277 | 3.38 | .796 |
| 18 | 88 | 3.78 | .780 |
| 19 | 59 | 3.80 | .783 |
| 20 | 81 | 3.26 | .833 |
| 21 | 60 | 3.03 | .920 |
| 22 | 176 | 3.59 | .837 |
| 23 | 61 | 3.33 | .889 |
| 24 | 52 | 3.10 | .799 |
| 25 | 94 | 3.66 | .665 |
| 26 | 188 | 3.28 | .715 |
| 27 | 82 | 3.55 | .848 |
| 28 | 62 | 3.50 | .805 |
| 29 | 27 | 3.37 | .884 |
| 30 | 14 | 3.43 | .756 |
| 32 | 20 | 3.65 | .745 |
| 34 | 68 | 3.32 | .871 |
| 35 | 66 | 2.71 | .739 |
| 38 | 67 | 3.51 | .766 |
| 39 | 51 | 3.55 | .673 |
| 40 | 28 | 4.21 | .686 |
| 41 | 135 | 4.53 | .845 |
| 42 | 121 | 3.66 | .737 |
| 43 | 54 | 3.31 | .843 |
| 45 | 50 | 3.80 | .700 |
| 46 | 66 | 3.35 | .903 |
| 47 | 38 | 3.42 | .889 |
| Total | 2,883 | 3.43 | .846 |

Scale: 1 = Far Right, 2 = conservative, 3 = middle of the road, 4 = liberal, 5 = Far Left

# EXHIBIT KK

# Why College Students Drift Left: The Stability of Political Identity and Relative Malleability of Issue Positions among College Students

**Matthew Woessner,** *The United States Army War College*
**April Kelly-Woessner,** *Elizabethtown College*

**ABSTRACT**   In considering the liberalizing effect of college on students' political values, we argue that political identities—in the form of self-identified ideology or partisanship—are components of social identity and are resistant to change. Using data from the Higher Education Research Institute's student surveys, we show that what movement in identity does occur is mostly a regression to the mean effect. On several issue positions, however, students move in a more uniform leftward direction. We find that liberal drift on issues is most common among students majoring in the arts and humanities. Self-reported ideology does drift left at liberal arts colleges, but this is explained by a peer effect: students at liberal arts colleges drift more to the left because they have more liberal peers. The results have implications for future research on college student political development, suggesting that attitudinal change can be more easily identified by examining shifts in policy preferences rather than changes in political identity.

In the past decade, scholars have used rigorous empirical studies to advance our understanding of how the college experience influences students' political attitudes. Studies in political science and sociology conclude that concerns about political indoctrination in college are overstated because students show little change in their social and political attitudes over the course of their undergraduate education (Mariani and Hewitt 2008[1]; Rothman, Kelly-Woessner, and Woessner 2011).

However, studies in student development have found that college leads to more liberal views on issues of abortion (Astin 1993; Bolzendahl and Myers 2004); civil liberties (Bobo and Licari 1989; Campbell and Horowitz 2016); and gender roles (Astin 1993; Bolzendahl and Myers 2004; Campbell and Horowitz 2016; Pascarella and Terenzini 2005). One possible explanation for these differences is that interpretation of research findings has been

motivated such that scholars find no evidence of attitude change when change is defined as "indoctrination" yet do find evidence of change when it is framed as positive social growth. We offer an alternative explanation, based on different measures of attitude change.

Studies that address the indoctrination claim tend to measure shifts in college students' political party identification and ideological self-identification, whereas studies that focus on college student social and political development as a measure of educational success tend to find evidence of change in students' issue positions. We argue that the two sets of findings are not incongruent. Rather, political party and ideology are forms of social identity, making them more resistant to change than issue positions. Therefore, it is reasonable and predictable that college students would move more on specific issues than on party affiliation or ideological identification.

## THE RESILIENCE OF POLITICAL IDENTITY AND IDEOLOGICAL SELF-IDENTIFICATION

Political scientists tend to fall into two primary schools of thought on the nature of party identification. Scholars from the first group,

**Matthew Woessner** *is professor of institutional research at The United States Army War College. He can be reached at matthew.woessner@armywarcollege.edu. The views expressed are those of the author and do not reflect the official policy or position of the Department of the Army, Department of Defense or the US Government.*
**April Kelly-Woessner** *is professor of political science at Elizabethtown College. She can be reached at kellya@etown.edu.*

   © American Political Science Association 2020

often referred to as the Michigan model, argue that party affiliation is a psychological attachment to a political party and is relatively stable over time (Campbell et al. 1960; Miller 1976; 1991; Miller, Shanks, and Shapiro 1996). For example, in *The American Voter*, Campbell et al. (1960, 146) concluded that party attachments are formed early, often as the result of parental influence, and are characterized by a "persistent adherence and a resistance to contrary influences."

The second school of thought, the revisionist school, emerged from Fiorina's (1981) work, which argued that party identification is a retrospective analysis of political events and candidates that is subject to change over time (see also Brody and Rothenberg 1988; Franklin and Jackson 1983; Jennings and Markus 1984).

More recently, researchers have returned to the original school of thought, arguing that party affiliation is an enduring psychological attachment, formed early in the socialization process.

influence on left–right self-placement….[t]he resulting identifications tend to persist as long as one's relational context does not change markedly."

We argue, therefore, that students' ideological identities are resistant to change, whereas their issue positions are more malleable. If this is the case, any "liberalizing" effect of college would appear first in students' issue positions.

### DATA AND METHODS

Our analysis was based on student surveys from the Higher Education Research Institute (HERI) at the University of California, Los Angeles, including the 2009 CIRP Freshman Survey (TFS) and the 2013 CIRP College Senior Survey (CSS). The combined TFS-CSS data include 17,667 students at 156 campuses who completed both the freshman and senior surveys at the same institution.

Both the TFS and CSS ask students about their demographic

*Rather, political party and ideology are forms of social identity, making them more resistant to change than issue positions.*

Bartels (2002), for example, found that party identification is a "pervasive dynamic force" consistent with the Michigan-model view that "partisan loyalties are formed early in life, remain perfectly stable throughout adulthood, and serve as the unmoved movers of more specific political attitudes and behavior." Green and colleagues argued that revisionist interpretations are the result of measurement error and that accounting for such error eliminates the effects of short-term forces on party identification (Green and Palmquist 1990; 1994; Schickler and Green 1997). These findings support the conceptualization of party identification as a form of social identity (Green, Palmquist, and Schickler 2002; Mason 2015).

Compared to party identification, ideology is a more amorphous concept. Although scholars debate the meaning, definition, and measurement of ideology, most of the debate centers on what Ellis and Stimson (2012) classified as "operational" ideology. Operational ideology is a measure of actual issue positions, making ideological placement dependent on how we define political dimensions. "Symbolic" ideology, conversely, is a measure of self-identification or social identity.

In fact, Mason (2015) found that increased political polarization in recent years has created greater alignment between party identification and ideological identification, with people showing stronger attachments to both. Thus, party affiliation and ideological self-identification work together as a bias to shape political behaviors and interpretation of information.

The argument that symbolic ideology and operational ideology are separate constructs is supported by the fact that self-reported ideologies often are at odds with issue positions (Stimson 2004). This also is true in studies specifically of college students, who tend to express greater support for progressive policy positions than their self-reported ideological identifications would predict (Bailey and Williams 2016).

Self-reported ideology, as used on surveys of college students' political attitudes, is therefore similar to party affiliation in that it has strong affective components, is a form of social identity, and is resistant to change. According to Jost, Federico, and Napier (2009), "peer and reference groups also exert a reasonably strong

background, political attitudes, and college experiences (HERI 2018a; 2018b). Because the two surveys ask certain identical questions, we could measure shifts in students' political attitudes over time on both specific issues and self-placement using a symbolic five-point ideological scale (i.e., "far left," "liberal," "centrist," "conservative," and "far right"). This ideology variable also allowed us to measure the mean student ideology for students at a particular campus. Finally, the data include institutional variables such as college ranking and Carnegie classification.

### RESULTS

The results of the 2009–2013 panel study (figure 1; table 1) reveal that, consistent with previous studies (Mariani and Hewitt 2008; Rothman, Kelly-Woessner, and Woessner 2011; Woessner and Kelly-Woessner 2009), students' ideological self-placement is relatively stable, with changes tending to regress toward the mean. Most respondents reported exactly the same ideological identification in their first and fourth year of college. Ideological shifts, to the extent that they occur, typically are a single-unit change (e.g., moving from far left to liberal or from centrist to conservative). We also see evidence of a regression toward the mean. Students who identified as right-of-center (i.e., conservative or far right) moved to the left. However, figure 1 shows that among left-leaning students (i.e., liberal or far left) whose ideological views changed, a majority moved right rather than farther left.

Although both sides regress toward the mean, the net effect is a slight overall shift to the left. Conservative students are more likely than liberal students to regress toward the mean. Students who start out as centrist are as likely to move left than right. The net impact of these shifts is shown in the bar chart to the right of the table in figure 1. Here and in the remaining bar charts in the article, a negative number shows the mean shift to the left over four years whereas a positive number shows the mean shift to the right. On ideological self-identification, a typical left-of-center student moves, on average, 0.27 units to the right in four years. A typical centrist student drifts 0.13 units to the left in four years. A typical right-leaning student moves 0.48 units to the left in four years.


..........................................................................................................................................

*Figure 1*

## Shift in Ideological Self-Placement* from the First to the Fourth Year



Net Shift in Ideological Placement by 1st Year Ideology

| Left | Middle | Right |
| --- | --- | --- |
| 0.2728 | -0.1273 | -0.4803 |

*Table 1*

## Shift in Ideological Self-Placement* from the First to the Fourth Year

| | 1st Year Ideological Self-Placement | | | | |
| --- | --- | --- | --- | --- | --- |
| Shift in Ideology | Left | Middle | Right | Percent | n |
| >1 units Left | 0% | 1% | 8% | 3% | 397 |
| 1 unit Left | 5% | 24% | 33% | 20% | 3,323 |
| Same | 66% | 63% | 57% | 62% | 10,245 |
| 1 unit Right | 24% | 12% | 2% | 13% | 2,191 |
| >1 unit Right | 4% | 0% | 0% | 1% | 222 |
| Total | 100% | 100% | 100% | 100% | |
| n | 5,392 | 6,514 | 4,520 | | 16,426 |

* Note Pew Shows from 2007 to 2010 the public's PID shifted slightly to the Republicans (http://www.people-press.org/2018/03/20/party-identification-trends-1992-2017/).

Whereas ideology tends to be stable over time, issue positions are more fluid. Figures 2 and 3 and tables 2 and 3 are overall breakdowns of two issue positions measured in both the first and second waves of the panel study. The top table shows the shift in students' support for affirmative action—or "preferential treatment in college admissions"—over four years. The bottom table shows shifts in students' assessment of whether "racism is a serious problem." Whereas approximately 60% of students had consistent than one unit on the ideological scale, 9% moved more than one unit on racism and 11% moved more than one unit on affirmative action. What movement did occur was overwhelmingly to the left.

Figures 4 and 5 and tables 4 and 5 are overalls breakdowns of students' agreement with the two statements: "same-sex couples should have the right to legal marital status" and "abortion should be legal." As in figure 2, about half of the students did not change their view on gay marriage or abortion over time. Among students who altered their position, respondents tended to move consistently leftward, regardless of their initial ideological identification. On same-sex marriage, 40% of students moved to the left, with 14% moving more than one unit. On abortion, 35% of students moved to the left, with 11% moving more than one unit. Right-leaning students moved the most, shifting an average of 0.84 units left on same-sex marriage and 0.39 units left on abortion.

The shifts in student views of gay marriage from 2009 to 2013 are hardly surprising; the public was undergoing a similar turnabout. The Pew Center polling shows a 5% shift in overall support for gay marriage in roughly the same period. However, the public's overall views on abortion changed hardly at all.[2] Yet, we saw students moving left on abortion far more often than they drifted right. Thus, attitudes toward abortion are at least one example of how the college experience contributes to a substantive shift in political views over a relatively short period. This movement on abortion is consistent with Astin's (1993) analysis 27 years earlier, which found abortion to be the issue on which students' views changed the most.

In addition to issue positions, we examined change in student attitudes on the question of whether "dissent is a critical component of

*Thus, attitudes toward abortion are at least one example of how the college experience contributes to a substantive shift in political views over a relatively short period.*

ideological self-identification from the first to the second wave of the panel study, slightly less than 50% had consistent answers to questions about race. Overall, students across the ideological spectrum moved to the left on the issue of affirmative action. They showed little net movement on the question of whether racism is a serious problem. Yet, on both questions, more than twice as many students reported significant changes in attitudes than on the question of ideology. Whereas only 4% of students moved more

the political process." On this question (figure 6, table 6), students across all ideological groups gained in their appreciation for dissent, countering popular claims that colleges and universities make students less tolerant of opposing viewpoints. At least in principle, students appeared to gain an appreciation for the value of dissenting voices.

To access the factors that might contribute to leftward issue drift, we created a series of regression models (table 7) predicting students' ideological change, issue-position change on the four

*Figure 2*

## Shift in Student Views First to the Fourth Year by First Year Ideological Self-Placement: Affirmative Action



Net Ideological Shift in Affirmative Action by 1st Year Ideology

| Left | Middle | Right |
|------|--------|-------|
| -0.2256 | -0.105 | -0.1215 |

*Figure 3*

## Shift in Student Views First to the Fourth Year by First Year Ideological Self-Placement: Racism

Net Ideological Shift in "Racism is a Serious Problem" by 1st Year Ideology

| Left | Middle | Right |
|------|--------|-------|
| -0.0567 | 0.0217 | -0.0141 |

*Table 2*

### Shift in Student Views on Affirmative Action by First to Fourth Year by First-Year Ideological Self Placement

**Shift in View Affirmative Action***

| Shift 1st to 4th Year | 1st Year Ideological Self-Placement | | | Percent | n |
|---|---|---|---|---|---|
| | Left | Middle | Right | | |
| >1 units Left | 8% | 6% | 8% | 8% | 599 |
| 1 unit Left | 28% | 25% | 23% | 26% | 2,254 |
| Same | 43% | 44% | 48% | 45% | 3,943 |
| 1 unit Right | 17% | 20% | 18% | 18% | 1,554 |
| >1 unit Right | 3% | 4% | 4% | 3% | 257 |
| Total | 100% | 100% | 100% | 100% | |
| n | 4,699 | 5,684 | 4,025 | | 8,724 |

* Note Pew Shows from 2007 to 2010 the public's views on Affirmative Action & Racism was static. http://www.people-press.org/2012/06/04/section-8-values-about-immigration-and-race/#affirmative-action.

*Table 3*

### Shift in Student View on Racism by First to Fourth Year by First-Year Ideological Self-placement

**Shift in View that "Racism is a Serious Problem"**

| Shift 1st to 4th Year | 1st Year Ideological Self-Placement | | | Percent | n |
|---|---|---|---|---|---|
| | Left | Middle | Right | | |
| >1 units Left | 4% | 4% | 5% | 4% | 391 |
| 1 unit Left | 23% | 22% | 24% | 22% | 2,400 |
| Same | 49% | 47% | 45% | 48% | 5,113 |
| 1 unit Right | 20% | 22% | 20% | 21% | 2,241 |
| >1 unit Right | 4% | 5% | 5% | 5% | 424 |
| Total | 100% | 100% | 100% | 100% | |
| n | 4,819 | 5,887 | 4,129 | | 10,706 |

* Note Pew Shows from 2007 to 2010 the public's views on Affirmative Action & Racism was static. http://www.people-press.org/2012/06/04/section-8-values-about-immigration-and-race/#affirmative-action.

*Figure 4*

## Net Ideological Shift in Gay Marriage by First Year Ideology



*Figure 5*

## Net Ideological Shift in Abortion by 1st Year Ideology



*Table 4*

## Shift in Student Views of Gay Marriage by First to Fourth Year-Ideological Self-Placement

| | Shift in View Gay Marriage* | | | | |
|---|---|---|---|---|---|
| | 1st Year Ideological Self-Placement | | | | |
| Shift 1st to 4th Year | Left | Middle | Right | Percent | n |
| >1 units Left | 5% | 13% | 27% | 14% | 2,131 |
| 1 unit Left | 16% | 31% | 31% | 26% | 3,867 |
| Same | 74% | 48% | 36% | 53% | 7,844 |
| 1 unit Right | 4% | 6% | 5% | 5% | 752 |
| >1 unit Right | 1% | 2% | 2% | 1% | 205 |
| Total | 100% | 100% | 100% | | 100% |
| n | 4,699 | 5,684 | 4,025 | | 14,799 |

* Note Pew Shows from 2007 to 2010 the public's PID shifted about 5% in favor of Gay Marriage (http://www.pewforum.org/fact-sheet/changing-attitudes-on-gay-marriage/)

*Table 5*

## Shift in Student Views on Abortion by First to Fourth Year by First-Year Ideological Self-Placement

| | Shift in View on Abortion** | | | | |
|---|---|---|---|---|---|
| | 1st Year Ideological Self-Placement | | | | |
| Shift 1st to 4th Year | Left | Middle | Right | Percent | n |
| >1 units Left | 7% | 12% | 14% | 11% | 1,617 |
| 1 unit Left | 21% | 29% | 23% | 24% | 3,600 |
| Same | 61% | 44% | 53% | 52% | 7,710 |
| 1 unit Right | 9% | 12% | 7% | 10% | 1,407 |
| >1 unit Right | 2% | 3% | 3% | 3% | 407 |
| Total | 100% | 100% | 100% | | 100% |
| n | 4,792 | 5,832 | 4,117 | | 14,741 |

** Note Pew Shows from 2007 to 2010 the public's views on abortion did not meaningfully change. (See: http://www.pewforum.org/fact-sheet/public-opinion-on-abortion/)

................................................................

*Figure 6*

### Shift in "Dissent Is a Critical Component of the Political Process" First to Fourth Year



Net Shift in Support for Dissent by 1st Year Ideology

| Left | Middle | Right |
|------|--------|-------|
| 0.0957 | 0.0486 | 0.0664 |

*Table 6*

### Shift in "Dissent Is a Critical Component of the Political Process" First to Fourth Year

| Shift in Ideology | 1st Year Ideological Self-Placement | | | | |
|---|---|---|---|---|---|
| | Left | Middle | Right | Percent | n |
| >1 units pro dissent | 5% | 5% | 6% | 5% | 615 |
| 1 unit pro dissent | 24% | 23% | 22% | 23% | 3,138 |
| Same | 48% | 48% | 50% | 48% | 6,659 |
| 1 unit anti dissent | 21% | 22% | 19% | 21% | 2,840 |
| >1 unit pro dissent | 3% | 3% | 3% | 3% | 356 |
| Total | 100% | 100% | 100% | 100% | |
| n | 3,868 | 5,436 | 4,431 | | 13,735 |

policy questions, and changes in their belief that "dissent is a critical component of the political process."

On the demographic variables, results are somewhat mixed. Women moved more to the left than men on general ideological identification and the view that racism is a serious problem. Men, however, moved more leftward than women on the issue of gay marriage. Men also shifted more than women toward the view that dissent is important to the political process. Nonwhite students moved more to the left in four years than white students on self-reported ideology, abortion, and gay marriage.

We hypothesized that leftward movement is related to students' majors, with students in the arts, humanities, and social sciences moving farther to the left than those in professional majors and the hard sciences. We made this assumption for two reasons. First, debates about social policy are more likely to occur in the liberal arts than in the hard sciences and professional programs. Second, the greatest concentration of left-leaning faculty are in the humanities and social sciences (Rothman, Kelly-Woessner, and Woessner 2011). The positive coefficients on ideological drift, abortion position, affirmative action, and racism point toward what we expected. Students in the arts and humanities drifted left more so than other students. Yet, they also showed greater gains than other students in appreciation for dissent.

Almost across the board, being at a highly ranked school was associated with more leftward movement of students over four years. It is especially noteworthy that this was true even when controlling for students' ideological self-placement in their freshman year and the average ideological placement of peers at their institution. This suggests that there is an effect of elite education on political values that is independent of the political ideological views of students who attend the university. Whereas it may be the fact that faculty at these institutions are different and exert a stronger effect on students, Campbell and Horowitz (2016) argued that there is a family effect for students: that is, wealthier families influence students' politics to the left in their college years. Accordingly, university ranking may serve as a proxy for these family characteristics.

The relationship between liberal arts college classification and students' drift to the left was confounded by peer ideology. When peer ideology was removed from our models, liberal arts colleges tended to produce more leftward movement on overall ideological identification (p<0.001). The addition of peer ideology eliminated the effect. This means that the leftward drift of students at liberal arts colleges is explained by the fact that their peers tend to be more liberal than those at other universities.

*This means that the leftward drift of students at liberal arts colleges is explained by the fact that their peers tend to be more liberal than those at other universities.*

Peers have an independent effect in several of the models. With the exception of gay marriage, the effect is positive; this means that students move more to the left—independent of their ideological self-placement—when their peers are more to the left. Students also learn to value dissent more when exposed to liberal versus conservative peers.

*Table 7*
## Regression Predicting Shifts in Student Views from the First to Fourth Years

| Independent Variable | Ideology | Abortion | Gay Marriage | Affirm Action | Racism Problem | Dissent Vital |
|---|---|---|---|---|---|---|
| (Constant) | 0.249*** | 0.218* | 1.669*** | -0.569*** | -0.015 | -0.046 |
| | (0.060) | (0.094) | (0.089) | (0.093) | (0.090) | (0.090) |
| Sex | 0.073*** | 0.03 | -0.155*** | -0.031 | 0.061*** | -0.064*** |
| | (0.011) | (0.017) | (0.016) | (0.017) | (0.016) | (0.016) |
| Is R non-white? | 0.094*** | 0.076*** | 0.078*** | -0.037 | 0.025 | 0.033 |
| | (0.012) | (0.020) | (0.018) | (0.019) | (0.019) | (0.019) |
| Arts & Humanities or Social Sciences Major? | 0.122*** | 0.069*** | 0.025 | 0.107*** | 0.113*** | 0.081*** |
| | (0.011) | (0.017) | (0.016) | (0.017) | (0.016) | (0.016) |
| School Ranking | 0.029*** | 0.02* | 0.051*** | 0.113*** | 0.038*** | -0.01 |
| | (0.006) | (0.009) | (0.008) | (0.009) | (0.008) | (0.008) |
| Liberal Arts College? | 1.9E-02 | -3.2E-02 | -4.0E-03 | -9.1E-02*** | 4.0E-03 | 2.9E-02 |
| | 1.3E-02 | 2.1E-02 | 1.9E-02 | 2.0E-02 | 2.0E-02 | 2.0E-02 |
| Average Peer Ideology | 0.28*** | 0.095** | -8.3E-02** | 1.2E-01*** | -5.0E-02 | 7.2E-02* |
| | (0.021) | (0.033) | 3.1E-02 | 3.2E-02 | 3.2E-02 | 3.1E-02 |
| Ideological Self-Placement (1st Year) | -4.2E-01*** | -1.0E-01*** | -2.7E-01*** | 2.8E-02** | -2.7E-02** | -9.0E-03 |
| | 7.0E-03 | 1.0E-02 | 1.0E-02 | 1.0E-02 | 1.0E-02 | 1.0E-02 |
| Adjusted R² | 0.228 | 0.009 | 0.074 | 0.02 | 0.006 | 0.004 |
| n | 14,486 | 14,234 | 14,290 | 13,927 | 14,322 | 13,276 |

Abortion −liberal +conser; Sex: M=1 f=2; Car 1=bac 3=research; Rank 1=low 3=high; Relig 0=no 1=yes; Expen

There is a significant difference in the explanatory power of the regression models for ideological drift compared to issue-position drift. Almost a quarter (22.8%) of the variation in ideological drift can be explained by the regression model. By contrast, the model explains only 7% of variation in views on gay marriage; 2% of the drift in views on affirmative action; and less than 1% of the drift in views on abortion, racism, and dissent. Whereas being an arts, humanities, or social science major tends to predict more leftward movement on issue positions, the majority of variance in students' views is unexplained. This raises the possibility that the liberalizing effect of college is not tied to a student's major but rather is a byproduct of the college experience common to all students. The common element could include the impact of the liberal arts core curriculum. Alternatively, it might be the result of nonacademic influences such as student-life organizations, which often deliberately promote the value of tolerance and diversity in a manner that overlaps with left–right ideological debates.

### CONCLUSION

Our analysis supports the conclusion that students' views on policy issues are more malleable than their political self-identification. Students' ideological change over four years has a slight liberal drift, although the majority of movement can be summarized as a regression toward the mean effect. It is worth noting that few students actually change from the left side of the ideological scale to the right or from the right side to the left: only 4% change more than one unit on the scale.

However, on a number of social and political issues, we saw more uniform shifts over time and in the direction that is consistent with a "liberalizing" effect of higher education. On the issues of abortion, affirmative action, and same-sex marriage, students across the political spectrum appear to drift left from

their first to fourth year in college. Moreover, these issue-position changes often are predicted by the average student views at the institution. Students with more liberal peers tend to move more to the left on ideological self-placement, abortion, and affirmative action when compared to students with more conservative peers. The evidence is consistent with research in political socialization that shows a significant peer effect on young people's political values (Milem 1998).

The fact that arts, humanities, and social science students move leftward faster than students in the hard sciences and professional majors certainly raises the possibility that left-leaning faculty—however unintentionally—transmit their beliefs to their students. Yet, it is also possible that the socializing influence of peers is more intense in majors in which fellow students are more liberal. Because our measurement for "average peer ideology" can capture the views of students only at the college rather than in the major, it is difficult to know if the arts, humanities, and social sciences variable denotes influence by the faculty or by peers in the major. We will explore this topic in future work.

Finally, although college does appear to have some impact on undergraduates' political views, most students, overall, will complete their four-year degree with their ideological identity and views largely intact. Change in ideological identity appears to be a regression to the mean effect. On specific issues, students drift more uniformly to the left, suggesting that future studies of political change during the college years should focus first on shifts in issue positions. ∎

### NOTES

1. Mariani and Hewitt (2008) found slight drift to the left among students overall but concluded that the majority do not change in political orientation during their

college experience. They also concluded that what change does occur is not sufficient to support an indoctrination hypotheses, especially because student change seems to be unrelated to professors' political orientations.

2. For example, see www.pewforum.org/fact-sheet/public-opinion-on-abortion and www.pewforum.org/fact-sheet/changing-attitudes-on-gay-marriage, both accessed January 28, 2019.

## REFERENCES

Astin, Alexander W. 1993. *What Matters in College: Four Critical Years Revisited.* San Francisco: Jossey-Bass.

Bailey, Mandi, and Lee R. Williams. 2016. "Are College Students Really Liberal? An Exploration of Student Political Ideology and Attitudes toward Policies Impacting Minorities." *Social Science Journal* 53 (3): 309–17.

Bartels, Larry M. 2002. "Beyond the Running Tally: Partisan Bias in Political Perceptions." *Political Behavior* 24 (2): 117–50.

Bobo, Lawrence, and Frederick C. Licari. 1989. "Education and Political Tolerance: Testing the Effects of Cognitive Sophistication and Target Group Affect." *Public Opinion Quarterly* 53 (3): 285–308.

Bolzendahl, Catherine I., and Daniel J. Myers. 2004. "Feminist Attitudes and Support for Gender Equality: Opinion Change in Women and Men, 1974–1998." *Social Forces* 83 (2): 759–89.

Brody, Richard A., and Lawrence S. Rothenberg. 1988. "The Instability of Partisanship: An Analysis of the 1980 Presidential Election." *British Journal of Political Science* 18 (4): 445–65.

Campbell, Angus, Philip E. Converse, Warren E. Miller, and Donald E. Stokes. 1960. *The American Voter.* New York: Wiley.

Campbell, Colin, and Jonathan Horowitz. 2016. "Does College Influence Sociopolitical Attitudes?" *Sociology of Education* 89 (1): 40–58.

Ellis, Christopher, and James A. Stimson. 2012. *Ideology in America.* New York: Cambridge University Press.

Fiorina, Morris P. 1981. *Retrospective Voting in American National Elections.* New Haven, CT: Yale University Press.

Franklin, Charles H., and John E. Jackson. 1983. "The Dynamics of Party Identification." *American Political Science Review* 77 (4): 957–73.

Green, Donald P., and Bradley Palmquist. 1990. "Of Artifacts and Partisan Instability." *American Journal of Political Science* 34:872–902.

Green, Donald P., and Bradley Palmquist. 1994. "How Stable Is Party Identification?" *Political Behavior* 16 (4): 437–66.

Green, Donald P., Bradley Palmquist, and Eric Schickler. 2002. *Partisan Hearts and Minds: Political Parties and the Social Identities of Voters.* New Haven, CT: Yale University Press.

Higher Education Research Institute (HERI). 2018a. "Freshman Student Survey." Available at https://heri.ucla.edu/cirp-freshman-survey.

Higher Education Research Institute (HERI). 2018b. "College Senior Survey." Available at https://heri.ucla.edu/college-senior-survey.

Jennings, M. Kent, and Gregory B. Markus. 1984. "Partisan Orientations over the Long Haul: Results from the Three-Wave Political Socialization Panel Study." *American Political Science Review* 78 (4): 1000–1018.

Jost, John T., Christopher M. Federico, and Jaime L. Napier. 2009. "Political Ideology: Its Structure, Functions, and Elective Affinities." *Annual Review of Psychology* 60: 307–37.

Mariani, Mark D., and Gordon J. Hewitt. 2008. "Indoctrination U.? Faculty Ideology and Changes in Student Political Orientation." *PS: Political Science & Politics* 41 (4): 773–83.

Mason, Lilliana. 2015. "'I Disrespectfully Agree': The Differential Effects of Partisan Sorting on Social and Issue Polarization." *American Journal of Political Science* 59 (1): 128–45.

Milem, Jeffrey F. 1998. "Attitude Change in College Students: Examining the Effect of College Peer Groups and Faculty Normative Groups." *Journal of Higher Education* 69 (2): 117–40.

Miller, Warren E. 1976. "The Cross-National Use of Party Identification as a Stimulus to Political Inquiry." In *Party Identification and Beyond: Representations of Voting and Party Competition*, ed. Ian Budge, Ivor Crewe, and Dennis Farlie, 21–31. London: Wiley.

Miller, Warren E. 1991. "Party Identification, Realignment, and Party Voting: Back to the Basics." *American Political Science Review* 85 (2): 557–68.

Miller, Warren E., J. Merrill Shanks, and Robert Y. Shapiro. 1996. *The New American Voter.* Cambridge, MA: Harvard University Press.

Pascarella, Earnest T., and Patrick T. Terenzini. 2005. *How College Affects Students: A Third Decade of Research (Vol. 2).* San Francisco: Jossey-Bass.

Rothman, Stanley, April Kelly-Woessner, and Matthew Woessner. 2011. *The Still Divided Academy: How Competing Visions of Power, Politics, and Diversity Complicate the Mission of Higher Education.* Lanham, MD: Rowman & Littlefield.

Schickler, Eric, and Donald Philip Green. 1997. "The Stability of Party Identification in Western Democracies: Results from Eight Panel Surveys." *Comparative Political Studies* 30 (4): 450–83.

Stimson, James A. 2004. *Tides of Consent: How Public Opinion Shapes American Politics.* New York: Cambridge University Press.

Woessner, Matthew, and April Kelly-Woessner. 2009. "'I Think My Professor Is a Democrat': Considering Whether Students Recognize and React to Faculty Politics." *PS: Political Science & Politics* 42 (2): 343–52.

# EXHIBIT LL

Case 4:21-cv-00271-MW-MAF   Document 75-1   Filed 03/26/22   Page 530 of 552



LEFT TO RIGHT: SUSAN SEUBERT (GILLEY); SYLVIA JOHNSON (MEAD); WILLIAM FIGG (WAX)

# When Professors' Speech Is Disqualifying

Should academic freedom really protect those who make false and morally repellent claims? It's time for a rethink.

Michael Bérubé, Jennifer Ruth  /  March 21, 2022

Does academic freedom protect professors espousing white supremacist ideas?

The answer, for the past hundred-and-more years since the founding of the American Association of University Professors (AAUP) in 1915, has been yes. This is a disturbing realization for anyone who thinks of academic freedom as one of the

cornerstones of a free and open society—and who understands how profoundly it is threatened by Republican state legislatures trying to criminalize the teaching of critical race theory (CRT). Also disturbing is the fact that, over the past decade, the concept of academic freedom has been confused—sometimes innocently, sometimes not—with free speech. The result is that even while pusillanimous university administrators remove a professor from his class for using a Chinese term that sounds like the N-word, *seriously* racist work continues to enjoy protection on the grounds that academic freedom is co-extensive with free speech, and scholars like University of Pennsylvania law professor Amy Wax can call for a "cultural distance nationalism" whose core belief is that "our country will be better off with more whites and fewer non-whites." Indeed, in Wax's case, this strange idea of academic freedom has permitted her to lie in public, in a 2017 interview with Glenn Loury, about the academic achievements of Black law students at Penn.

Wax did not emerge entirely unscathed; she was removed from required first-year law classes, and her misrepresentations of Penn's Black students were repudiated by her dean. But she remains on the faculty, and she remains a hero on the right and a cause célèbre for libertarians; in 2018, Penn trustee emeritus and law school overseer Paul S. Levy actually resigned in protest over Penn's decision to remove Wax from those required first-year courses, writing to then-President Amy Gutmann that the decision effectively suppresses "open, robust, and critical debate over differing views of important social issues."

---

Spring special: 50% off fearless reporting.
**1 year for $10.**

Subscribe

---

And then there is the curious case of Bruce Gilley, a colleague of Jennifer Ruth's at Portland State University. Gilley made a name for himself as the author of the article "THE CASE FOR COLONIALISM," whose publication by the journal *Third World Quarterly* in 2017 led to considerable controversy. He has emphatically doubled

down since, giving a talk to the German far-right AfD Party about the glories of their colonial past. In 2019, publishing on the website of the National Association of Scholars, he asked, "Was it Good Fortune to be Enslaved by the British Empire?" His answer is yes: "To be Black in America is, historically speaking, to have hit the jackpot." "For those who came ashore at Jamestown and in the centuries that followed," Gilley concludes, "being enslaved under the British empire was about as good as it got." On Twitter, he refers to George Floyd as a "thug" and King Leopold II, whose brutal practices in the Congo Free State resulted in an estimated 10 million deaths, as a "hero." In a June 30, 2020, tweet, Gilley wrote that the Belgians should apologize to Congo, not for the murder of 10 million Congolese, but for

*not colonizing the King's estates sooner
*ending colonial rule despite mainstream Congolese opposition to independence
*not arresting or killing Patrice Lumumba sooner
And nothing else.

These remarks are of course protected by the First Amendment. Whether they are also protected by academic freedom is the trickier question—and it is the one we want to ask. The American concept of academic freedom is distinctive insofar as it covers not only research and teaching but also "extramural utterances"—statements beyond research and teaching, including Twitter and podcasts. The idea is that no professor gives up their First Amendment rights as a citizen when they take an academic position. And ever since the infamous Leo Koch case at the University of Illinois at Urbana-Champaign in 1960, in which Koch was fired for writing a letter to the student paper arguing that students should engage in premarital sex, the AAUP has consistently held that faculty should not be fired for extramural speech unless that speech calls into question a professor's fitness to serve. Ordinarily, that speech has to bear directly on the faculty member's field of study. The idea is that a historian who is a Holocaust denier is obviously unfit, whereas an electrical engineer who is a Holocaust denier is just a crank. This position makes perfect sense, though few people realize that it entails the unsettling corollary that professors enjoy *greater* protection for extramural speech when they have no idea what they're talking about than for speech within the areas of their research and teaching.

So how does this principle guide us with professors espousing white supremacist ideas and defenses of colonialism and slavery when they claim to be speaking and

writing on the basis of their scholarly expertise?

## When Gilley compares BLM "criminals" to the Red Guards of the Chinese Cultural Revolution, his First Amendment rights protect him. But that's not the same thing as saying that his claims have the protection of academic freedom.

When Gilley compares BLM "criminals" to the Red Guards of the Chinese Cultural Revolution, his First Amendment rights protect him. But that's not the same thing as saying that his claims have the protection of academic freedom. He is not, after all, platforming as an ordinary citizen; he's doing it, as he says in a <u>tweet</u> on June 16, 2020, "based on my knowledge of Mao's politics." This is critical. For here he is saying that his extramural commentary is manifestly an extension of what he considers his area of expertise—the history and politics of various regimes. He's not staking his rights to this speech on the First Amendment, but on his claim to expertise as a scholar of political science.

Professors like Gilley provoke the question: If we are renaming a college that honors John C. Calhoun (as Yale <u>did</u> in 2017) and taking Woodrow Wilson's name off a School of Public and International Affairs (as Princeton <u>did</u> in 2020), why are we not rethinking academic freedom for racists? If Princeton were to say, for example, "We are removing Woodrow Wilson's name from the School of Public and International Affairs, but we will continue to employ and support faculty members who share Wilson's beliefs about race and eugenics," surely one would be right to dismiss the renaming as a purely symbolic public relations gesture involving no substantial reckoning with the legacy of eugenics and white supremacy. A more honest and thorough reckoning would ask whether those beliefs have any legitimacy whatsoever, and, if not, why they should continue to be promoted with the imprimatur of a university rather than relegated to the "race realist" fever swamp of the Pioneer Fund.

Most discussions of "free speech on campus" don't really concern academic freedom; rather, they tend to involve arguments that "<u>cancel culture</u>" and "<u>wokeness</u>" are making it impossible for Charles Murray to get a hearing for what are almost always

disingenuously called "controversial ideas." But some ideas don't deserve a hearing, and one of the primary roles of the university is to distinguish between those that do —and should continue to be explored and built upon—and those that should not be seriously entertained by any legitimate institution of higher education. Conflating free speech with academic freedom obscures this basic truth.

Regrettably, the AAUP itself has contributed to this conflation—in its 1994 statement, "On Freedom of Expression and Campus Speech Codes," which concludes with the ringing words, "Free speech is not simply an aspect of the educational enterprise to be weighed against other desirable ends. It is the very precondition of the academic enterprise itself." The political pressures of the 1990s remain legible today: The AAUP's response to the advent of speech codes was not merely a response to the advent of speech codes, but to the broader phenomenon of "political correctness" as allegedly instantiated by those speech codes. For us, however, those ringing words ring false. To be sure, some version of free speech is indispensable to the academic enterprise: Universities must be intellectually autonomous from the state, and faculty members intellectually autonomous from university administrators, trustees, and donors. That is the rock on which the AAUP is founded. Students, for their part, may not enjoy academic freedom in the way that faculty do, but must be free to pursue and to contribute to their education in any manner that does not violate or jeopardize the educational mission of the university.

Astonishingly, however, the statement argues that universities violate or jeopardize their mission if they try to adjudicate between good and bad ideas:

> An institution of higher learning fails to fulfill its mission if it asserts the power to proscribe ideas—and racial or ethnic slurs, sexist epithets, or homophobic insults almost always express ideas, however repugnant. Indeed, by proscribing any ideas, a university sets an example that profoundly disserves its academic mission.

The "ideas" expressed by slurs and insults are typically limited to the literal terms of the utterance itself. But even more mistaken is the statement's insistence that "by proscribing any ideas, a university sets an example that profoundly disserves its academic mission." This dogmatic proscription of proscription suffuses the document, and it is nothing short of bizarre. It manifestly defaults on one of the primary responsibilities of institutions of higher education. "A college or university,"

it claims, "sets a perilous course if it seeks to differentiate between high-value and low-value speech." On the contrary, it is one of the primary functions of a college or university, if not *the* primary function, to distinguish between high-value and low-value speech. This is what professors do every time they grade student papers, write student recommendations, evaluate the work of their colleagues (especially for tenure and promotion), or participate in routine committee work. What is the intellectual mission of the university, we wonder, if it abandons the obligation to exercise critical judgment about the comparative value of different speech acts?

That abnegation of critical judgment is the most important feature of the 1994 statement. It is announced in the document's short, emphatic second paragraph, which reads like a pull quote for the statement as a whole (and has often been cited that way): "On a campus that is free and open, no idea can be banned or forbidden. No viewpoint or message may be deemed so hateful or disturbing that it may not be expressed." This may be the case when it comes to students; that's what they are there for—to test out their thoughts and ideas and develop them. But one wonders why professors would be so allergic to the idea that some ideas have no place on their campuses—say, ideas that climate change is a hoax, that creationism is as legitimate as the theory of evolution, that phrenology has much to teach us, that vaccines cause autism, that Jews control the world banking system and the mass media, or that—as liberal lion Oliver Wendell Holmes once argued—the state has a perfectly legitimate interest in promoting the <u>involuntary</u> sterilization of people with intellectual disabilities.

At stake here is whether American universities can serve democracy, as they should, without turning into places where anything goes and knowledge is determined by those with the most money or the loudest voices. In <u>*Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence for the Modern State*</u>, Yale law professor Robert C. Post distinguishes "democratic legitimation," which is why we have the First Amendment, from "democratic competence," which is why we have universities and academic freedom. As he <u>explained</u> in a 2012 interview, he developed these terms after realizing "that First Amendment protections can function to debase knowledge into mere opinion and thereby to undercut the very political conversation that the First Amendment otherwise fosters." Democratic legitimation, he writes, "requires that the speech of all persons be treated with toleration and equality." Democratic competence, by contrast, "requires that speech

be subject to a disciplinary authority that distinguishes good ideas from bad ones." How to reconcile the two? Post concludes that we must understand academic freedom to be based on democratic competence but not on democratic legitimation. Democratic competence—the knowledge and insight made available to society through its universities that are based on study and knowledge and not reducible to mere opinion or viewpoint—can be ensured when academic freedom, not free speech, is the ruling principle: Universities must be "free to evaluate scholarly speech based upon its content."

Universities are thus critical institutions in democratic countries because the work they perform—discriminating between opinion or propaganda on the one hand and reasoned argument on the other—inhibits the development of alternate realities rooted in power and special interests. Why, then, has it been so easy and tempting for everyone to treat academic freedom as a synonym for free speech? For two reasons, we suspect. One, "expertise," some conception of which is integral to academic freedom, is in bad odor these days, for some good and some bad reasons. Two, the idea of "competence" pales next to the triumphant rhetoric of free speech—the idea that everyone has a right to speak their mind. According to Post, while "it is not intelligible to believe that all ideas are equal," Americans gravitate to free speech over the cognitive ideal embedded in academic freedom because "Americans are committed to the equality of persons," and "the deep egalitarian dimension of the First Amendment resonates far more with this ethical value than with any cognitive ideal."

Post is probably right about this—with the proviso that not *all* Americans are committed to the equality of persons, and that the conflict between those who are and those who are not has been central to the country's legacy of racism. Acknowledging this reality—even in states where it is now illegal to acknowledge that legacy in schools—is the first step toward ensuring that white supremacist beliefs do not regain the academic legitimacy they enjoyed for so many years.

We didn't choose to write about the problem of white supremacist professors simply because of the rise of Trumpism and the vicious backlash against BLM and CRT. Those are factors, to be sure. But the larger problem, which theorists of academic freedom have yet to confront, is that white supremacism has a very long and deeply

entrenched history in American higher education. It was for many years the dominant strain of historiography in the United States, <u>inaugurated</u> by Columbia professor William Archibald Dunning in the late nineteenth century and carried on by his legions of students for generations. The Dunning School was, in effect, the intellectual arm of the neo-Confederate, white supremacist movement that continued to prosecute the Civil War—with great success. The <u>derogatory and heavily laden terms</u> "carpetbagger" (for Northerners who came to the South for political or economic reasons) and "scalawag" (for Southerners who supported Reconstruction) made their way into countless American history textbooks, and there was an entire cottage industry devoted specifically to besmirching the record and the person of President Ulysses S. Grant. The archive of the Dunning School is impressively large, and impressively influential. It was, in effect, the academic accomplice to Jim Crow.

Nor is the Dunning School itself anomalous in the history of American academe. As scholars of literature, we can add that the field of American literary study, from its origins in the 1920s, was almost exclusively an all-white affair as well, and remained so until the 1980s. For much of the first half of the twentieth century, the work produced in elite universities, in many fields, was either complicit with or actively engaged in promoting the projects of white supremacy. Again, Columbia University provides a shining example: John W. Burgess, whose influential two-volume 1890 work, *Political Science and Comparative Constitutional Law,* assured a generation and more of theorists and policymakers that "the highest talent for political organization has been exhibited by the Aryan nations" and that "Teutons" (by which he meant Anglo Americans, Germans, and Scandinavians) rule by right over their inferiors: "In a state whose population is composed of a variety of nationalities the Teutonic element, when dominant, should never surrender the balance of political power, either in general or local organization, to the other elements. Under certain circumstances it should not even permit participation of the other elements in political power." Burgess is often considered to be among the scholars responsible for establishing political science as a discipline.

So for those of us living and working in academe today, what is to be done? Are we to retroactively cancel William Dunning, John Burgess, and all their epigones, firing them posthumously and removing their books from the libraries? Of course not. Like D.W. Griffith's *The Birth of a Nation* and Thomas Dixon's *The Clansman,* the novel on

which the groundbreaking film was based, they are part of the legacy of American white supremacy just as surely as Black disenfranchisement, persecution, and lynching. We need to acknowledge that today and continue to study its implications, not cancel it. But we also need to say, after 250 years of slavery and another 150 of systemic racism in American life, that *enough is enough*. White supremacist scholarship is bad scholarship; it serves morally and politically repugnant ends; and though we can't wish its legacy away, we can and should say that it has long outlived its expiration date. Like Holocaust denial by historians of Germany, it needs to be understood as a sign of unfitness that needs to be assessed by a panel of disciplinary peers.

## We need to say, after 250 years of slavery and another 150 of systemic racism in American life, that *enough is enough*. White supremacist scholarship is bad scholarship; it serves morally and politically repugnant ends; and though we can't wish its legacy away, we can and should say that it has long outlived its expiration date.

Let us be clear about where we are setting the bar. We are not saying that widely held political positions on the right, like opposition to affirmative action or immigration, are grounds for determining a faculty member's unfitness. Affirmative action and immigration are subjects about which there can be legitimate political disagreement. But the assertion that Black people are biologically or culturally less capable of self-government than others is qualitatively different—and disqualifying. Versions of that belief have poisoned so-called Western culture for more than 500 years, and arguably reached an apex in the early twentieth century, when pseudoscientific racism laid the groundwork for eugenics and genocide. It is past time for them to go the way of beliefs in phlogiston, the philosopher's stone, and the efficacy of human sacrifice—beliefs that every American is free to espouse but no one would defend on the basis of academic freedom.

So, this brings us to the money question: Amy Wax made headlines again in early 2022, this time for complaining that there are too many Asians in the country. In response, Keith E. Whittington, professor of politics at Princeton, rushed to her

defense, as he has before—this time under the aegis of the newly formed Academic
Freedom Alliance. "Wax should suffer no formal consequences as the result of these
public statements," Whittington wrote. "Regardless of what one thinks about
Professor Wax's personal political views, the only appropriate action that the
University of Pennsylvania should take in this situation is to publicly reaffirm the
free speech rights of the members of its faculty." The idea, once again, is that
academic freedom is identical with free speech, and that accordingly, *nothing* a
professor says can be considered grounds for "formal consequences."

To be sure, professors should not be fired simply for obnoxious beliefs. But if those
beliefs demonstrate unfitness—professional incompetence—then they are grounds
not merely for criticism but dismissal. Incompetence has *always* been the criterion,
as it should be; and while the AAUP has rightly insisted that the bar for determining
unfitness must be very high, surely it is not so high that it disappears from view
altogether. Occasionally, faculty do face consequences for espousing beliefs with no
tether to any plausible reality known to humankind; James Tracy at Florida Atlantic
University and Joy Karega at Oberlin College are two recent examples. Tracy was a
communications scholar and a Sandy Hook truther who made a point of tormenting
the grieving parents of children murdered in that massacre; Karega was a professor
of rhetoric and composition who promoted a panoply of antisemitic conspiracy
theories, including the claims that ISIS is a CIA/Mossad front and that the 2015
Islamist attack on the Paris offices of *Charlie Hebdo* was in fact a false flag operation
conducted by Israel. Both were rightly determined to be in the ballpark of Holocaust-
denying historians (though Tracy was technically fired for insubordination).

But who gets to decide unfitness, and how is due process ensured? The AAUP has
always been resolute in its conviction that only one's peers can decide one's fitness.
An engineer does not review a literary critic for promotion and tenure; only other
literary critics do. A Republican governor does not decide what political scientists
determine should be in their curricula. Furthermore, administrators are supposed to
defer to the mechanisms of peer review. But when it comes to dealing with allegedly
racist faculty, there is no system of peer review whatsoever—and so decisions are
handed by default to administration, and procedures are opaque if not Kafkaesque.

We therefore call on faculty senates across the country to develop "academic
freedom committees" comprising faculty elected to adjudicate cases by establishing
field-appropriate review panels in the physical sciences, social sciences, arts, and

humanities. Some senates have standing committees with "academic freedom" as their charge already; their jurisdiction should be enlarged to ensure that cases of disciplinary incompetence can be brought to them and panels created by them. Faculty at institutions with strong traditions of shared governance understand the power of universitywide faculty committees, but they may harbor doubts about such committees nonetheless. The vast majority of faculty do not labor under the illusion that some *other* body, one not made up of one's peers, is gifted with a degree of clarity and insight that eludes faculty, but they still have reason to wonder if we can trust one another. We understand that we, the faculty, lose academic freedom the moment we search for recourse in any authority but our own. But then again, who are *we*? *We* exist in the same typically predominantly white institutions that have housed white nationalists and Western chauvinists for years. *We* are the people who have been unable or unwilling to integrate what Black intellectuals from George Washington Williams to Charles W. Mills have repeatedly pointed out about the structural racism that is baked into higher education no less than it is in democracy itself. *We* are also the people who jealously guard any apparent infringement on absolute autonomy, willing to protect those we abhor if we think it makes our own protection more invincible.

Yes, the faculty are still dominated by a "we" for whom largely libertarian defenses of academic freedom remain persuasive. *But only by a slight margin*. These traditional defenders for whom free speech and academic freedom are synonymous have grown increasingly alarmed by what they interpret to be the younger generation's ignorance regarding academic freedom's purpose and importance. This is the generation that will populate and direct academic freedom committees—and the same signs that worry free-speech absolutists and those who conflate free speech with academic freedom are the ones that give us hope. There is much more to be said on this question of the emergent values of the next cohort of academics, of course, and much that remains unclear. But we cannot look outside the university for the help we need to solve a problem specific to universities; and academic freedom, unlike free speech, is specific to universities. And we believe we need to do something. We will offer one last example of why.

In July 2020, Lawrence M. Mead, a professor of politics and public policy at NYU, published an essay in the journal *Society* titled "POVERTY AND CULTURE." The article immediately sparked controversy and calls for its retraction, on the grounds

that its argument was not only overtly racist but utterly unsupported by scholarship on poverty. There is no question, we think, that the argument is racist. The really challenging and daunting thing about it, however, is that it is not an outlier, and not unsupported by other scholarship. On the contrary, it draws on decades of white supremacist work in the social sciences, including much of Mead's prior work.

The thesis is simple and familiar: Poverty is not, by and large, caused by structural oppression, historical and compounded inequities, or racism. It is caused primarily by cultural differences, by which Mead means the enterprising individualist culture of "the West" and the collective, less-than-enterprising cultures of the "non-West": "Today, the seriously poor are mostly blacks and Hispanics, and the main reason is cultural difference. The great fact is that these groups did not come from Europe.... Their native stance toward life is much more passive than the American norm." Mead argues that the non-West is the source of "minorities": "the West has simply chosen a more ambitious way of life than the non-West, where minorities originate.... An enterprising temperament, historians suggest, chiefly explains why the West has dominated the globe in recent centuries." You will not be surprised to learn that there is no footnote to indicate which "historians" have suggested this. But you might be surprised to learn that Hispanics—who, last we checked, came to the Americas from Spain—are part of the "non-West" in which minorities originate.

If the relegation of Hispanics to the non-West were not bad enough, Mead treats his readers to some straight-up anti-Black racism, laced with a degree of ignorance that should embarrass anyone claiming the title of professor:

> Academics blame black social problems on white oppression. By that logic, the problems should have been worst prior to the civil rights reforms in the 1960s. But in fact the opposite occurred. The collapse of the black family occurred mostly *after* civil rights rather than before. Most blacks came from a highly collective society in Africa, then lived under slavery and Jim Crow in the South. Those structures kept disorder at a low level. In that era, black levels of crime and female-headedness were not much higher than among whites. But blacks lost that structure after many migrated to the Northern cities in the last century, and especially after Jim Crow was abolished in the 1960s. So black social problems escalated even as opportunities broadened.

One hardly knows where to begin. Should one point out that the Black family was all but nonexistent under slavery, insofar as marriage was illegal and children were routinely sold away from their mothers? Natal alienation would seem relevant to any historical understanding of the "Black family." Or should one remark on the Gilley-esque implication that slavery and Jim Crow had benefits for Black families, by keeping "disorder at a low level"? Or should one stop and marvel at the culturally illiterate claim—again, embarrassing for anyone with the title of professor—that "Africa" is a highly collective society? It is surely but a half-step from there to the belief that Africa is a backward continent.

Not long after Mead's essay was published, Mohamad Bazzi, a professor of journalism at NYU, tweeted a series of screenshots of excerpts of what he called "this stunning article." The tweets drew the attention of Timothy Burke, a historian and Africanist at Swarthmore who from 2002 to 2021 maintained a highly respected blog, Easily Distracted (he has since moved, like so many other bloggers, to Substack). Burke proceeded to compose a nearly 3,500-word blog post detailing the numerous inaccuracies and failures of scholarship in Mead's essay. What was especially striking about Burke's response was his breakdown of the claim that Africa is a highly collective society, offering quick sketches of "Igbo-speaking communities in the Niger Delta/Cross River area between 1600–1800," "Mande-speaking societies associated with the formation of the empire of Mali in the upper Niger and the savannah just west of the Niger," the Asante Empire, and the Kingdom of Dahomey. "I'm going to be somewhat crudely comparative here," Burke wrote, "but what I'm calling crude is essentially about ten magnitudes of sophistication above Mead's crayon scrawling."

Burke's post is dated July 28, 2020; the following day, an "editor's note" appeared online at the head of Mead's article, reading, "Concerns have been raised with this article and are being investigated. Further editorial action will be taken as appropriate once the investigation into the concerns is complete and all parties have been given an opportunity to respond in full." (We do not mean to imply that Burke's post alone was responsible for this note; the outcry sparked by Mead's article was immediate, loud, and widespread.) Two days later, the editor in chief of *Society*, Jonathan B. Imber, Jean Glasscock Professor of Sociology at Wellesley College, together with Springer Nature, the publisher, retracted the article. Imber has since stepped down as editor in chief.

This regrettable sequence of events seems to us right and just, for as with Gilley's "the case for colonialism," the publication of "POVERTY AND CULTURE" appears to have rested on editorial judgment that is questionable at best, and certainly not in line with standard academic practice. As Imber explained in a statement, his decision "was a mistake, and one I deeply regret. My intent was to have this commentary published alongside two critical reviews of Mead's 2019 book, *Burdens of Freedom*, on which Mead's commentary is based, that identify flaws in Mead's arguments. The decision was entirely my responsibility and no other member of the editorial board of *Society* was consulted or participated in that decision." Mead, for his part, refused to agree to the retraction.

But the mention of Mead's book *Burdens of Freedom: Cultural Difference and American Power* raises the larger question at stake. *Burdens of Freedom* was published by the conservative press Encounter Books, not by an academic press, but it testifies to the fact that for Mead, "POVERTY AND CULTURE" was not a one-off. Quite the contrary, the ideas in that essay are the foundation of Mead's career; in fact, *Society* had recently published (in 2018) a substantially similar essay by Mead, "CULTURAL DIFFERENCE." And Mead has been recycling this material for quite some time. Furthermore, it is not as if Mead is an obscure academic, quietly ruminating on why people of color lack individual initiative while whittling on his front porch; he is, by all accounts, one of the most influential voices in American public policy on welfare, having provided the intellectual apparatus for welfare "reform" in the 1990s as enacted by Rudolph Giuliani in New York City and (to some extent) President Clinton at the federal level.

The problem with Mead, therefore, is not the narrow question of whether "POVERTY AND CULTURE" was properly peer reviewed. It is not even whether his account of poverty or his characterization of "African society" makes any sense. Timothy Burke understood the stakes immediately: When a work "is not only bad," he wrote, "but makes morally and politically repellant [sic] claims, it's right to not merely offer public criticism but to raise questions about why a respectable scholarly journal would offer a place to such work."

There is no question, we believe, that Mead's article makes morally and politically repellent claims, just as Gilley's "THE CASE FOR COLONIALISM" and "Was it Good Fortune to be Enslaved by the British Empire?" do. As to the question of whether it is "bad" in a scholarly sense—well, yes, of course. It is very bad. But then that judgment

is an indictment not merely of this essay but of the entire tradition of pseudoscholarship of which it is a part. "But wait," you say. "This argument extends well beyond the kind of white supremacism you're targeting, and you're assuming that it will be adopted only by people you agree with. What if leftist pseudoscholarship were at stake? Wouldn't you close ranks and invoke the very idea of academic freedom you're critiquing here?"

No, we wouldn't. Pseudoscholarship knows no party affiliation, and the arguments of Joy Karega and James Tracy should be subject to the same scrutiny we're applying to Mead. As if to make our case for us, renowned leftist media theorist Mark Crispin Miller has for many years offered an impressive array of "alternative" accounts of reality, from 9/11 and Sandy Hook to the little-known "fact" that Black Lives Matter is funded by the CIA. In the era of Covid-19, Miller has turned the volume up to 11, proclaiming that the vaccines are an "inhuman witch's brew of nanoparticles, human DNA (from fetal cells), and toxic adjuvants" and warning all and sundry of the global eugenicist conspiracy being carried out by Bill Gates, George Soros, the Rockefellers, the House of Windsor, and Ted Turner.

If Miller is indeed teaching such material in his courses on Mass Persuasion and Propaganda, we think he should be treated identically to someone who tells students that *The Protocols of the Elders of Zion* is a reliable source. But instead, what happened to Miller at NYU was that in 2020 his colleagues called for an "expedited review" of his alleged "intimidation tactics, abuses of authority, aggressions and microaggressions, and explicit hate speech." In 2021, Miller was cleared, and declared victory over the forces of woke oppression; he sued his colleagues for defamation, and that suit was dismissed in February of this year.

But there is a crucial question here. Mark Dery asked it in his *Chronicle of Higher Education* essay on Miller: "Why did his colleagues, in the letter that provoked his lawsuit, focus not on his seeming disregard for core academic values like intellectual rigor and objective fact, at a moment when the very notions are under assault, but rather his alleged 'hate speech,' 'microaggressions,' and transphobia?" The answer, we propose, is that NYU has an office and a procedure for dealing with hate speech, microaggressions, and transphobia. It does not have an office or a procedure for dealing with faculty whose teachings violate every standard of legitimate and responsible research. And so Mark Crispin Miller's case was adjudicated by means of

a category error, as if the real problem is his allegedly nasty attitude and transphobia rather than his manifestly falsifiable conspiracy-mongering.

*That* is why universities need academic freedom committees: to differentiate between professors' high-value and low-value speech, and to determine whether a professor's beliefs can be, at an extreme, disqualifying. That is how we can maintain the *academic* integrity of academic freedom.

Excerpted and adapted primarily from Michael Bérubé and Jennifer Ruth's *It's Not Free Speech: Race, Democracy, and the Future of Academic Freedom*. © 2022 Johns Hopkins University Press. Reprinted with permission of Johns Hopkins University Press.

---

Michael Bérubé is an Edwin Erle Sparks Professor of Literature at Penn State University.

---

Jennifer Ruth is a professor of film studies at Portland State University in Portland, Oregon.

---

**Read More:** Magazine, April 2022, Feature, Culture, Politics, The Soapbox, Academic Freedom, Free Speech, College, Racism

---

Latest From the Magazine
Fanfare for the Common Good
Win McCormack
Win McCormack
Fanfare for the Common Good



Make America Good Again
Parker Richards



Parker Richards
Make America Good Again
Evictions Are Back. Black Renters Are Suffering the Most—Again.
Lori Teresa Yearwood
Lori Teresa Yearwood
Evictions Are Back. Black Renters Are Suffering the Most—Again.



John von Neumann Thought He Had the Answers
Samanth Subramanian



Samanth Subramanian
John von Neumann Thought He Had the Answers

## Exhibit MM

Placeholder for Videotaped Recording

Ybeth Bruzul, *New Florida bill calls for annual evaluations of all university viewpoints*, Spectrum News 13 (July 18, 2021), available at https://www.mynews 13.com/fl/orlando/political-connections/2021/07/16/political-connections?cid= share_fb&fbclid=IwAR3SNMHL5SOQGh1cXeCPhRCERjTAarfftJB6rf8g-egSS3VAtPiCrK3-uLY.

# EXHIBIT NN



Login | Join / Renew | My Cart | Contact Us

*search* 

For: **Graduate Students** | **Divisions** | **SIGs** | **AERA-CURI**   Connect  

**Newsroom** » AERA Statement on the Significance of Academic Freedom in a Divisive Political Climate

# AERA Statement on the Significance of Academic Freedom in a Divisive Political Climate ▸

**News Releases and Statements**

**AERA in the News**

**Recent AERA Research**

**Trending Research Topics**

**Communication Resources for Researchers**

**AERA Highlights E-newsletter**

**AERA Video Gallery**

**SHARE** 



**For Immediate Release**
February 22, 2022

**Contacts:**
Tony Pals, tpals@aera.net
(202) 238-3235

Marla Koenigsknecht, mkoenigsknecht@aera.net
(202) 238-3233

**AERA Statement on the Significance of Academic Freedom in a Divisive Political Climate**

**Felice J. Levine, AERA Executive Director**
**Na'ilah Suad Nasir, AERA President, 2021–2022**

**February 22, 2022**

Our democracy is in a precarious moment. There are many disturbing signs. Most notable for higher education institutions that serve as the bedrocks for the free expression of ideas and innovation is the evident effort to suppress academic freedom. These attacks come at a time when such freedoms are the solution to, rather than the cause of, a divisive political climate.

We support higher education institutions and urge them to stand firm for what is foundational to their purpose. Universities and colleges are core contributors to the advancement of societies through faculty research, the conveyance of knowledge to the next generation of students, and the dissemination of new knowledge and discoveries to the public. These institutions are in many respects the centerpiece of a vibrant democracy, where ideas—no matter the viewpoint—are shared, challenged, and improved in the service of our communities and the world at large.

A central tenet undergirding this ecosystem is the free exchange of ideas—in the classroom, in research topics studied, and in the communication of research findings to public and policy audiences. A right to academic freedom is fundamental to this ecosystem. Indeed, the U.S. Supreme Court has repeatedly emphasized the need to protect academic freedom under the First Amendment.

As early as 1967, the Court stated: "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom" (*Keyishian v. Board of Regents*, 1967).[1] Acknowledging the important role of the university in creating a climate for the free expression of ideas, at the beginning of this century the Court reaffirmed: "We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition" (*Grutter v. Bollinger*, 2003).[2]

Threats to academic freedom are not new, but the political climate in which we now live is putting those freedoms at grave risk. Some state legislators and executive branch leaders are functionally treating the view that public academic institutions are extensions of government. Courses are being removed from the curriculum or threatened with removal; those engaged in teaching or undertaking research on such topics as racism, critical race theory, or gender identity are being scrutinized or chilled from pursuing those lines of inquiry, whether directly by their institutions or more broadly by the pressures exerted on their institutions. While some of the most egregious suppression is directed to social issues, many other areas (e.g., pressure to destroy COVID research data) have experienced suppression effects as well.

There is good reason for being both alarmed and vigilant. A wave of legislation that aims to restrict academic freedom, limit anti-racist education and research, and even prohibit the discussion of "divisive" concepts in the classroom is beginning to flood state legislatures. Several bills proposed in Alabama would make it illegal to teach students to believe "divisive concepts" regarding race or gender, including critical race theory. One bill goes so far as to require the termination of faculty who do so.

Other examples of restrictive legislation are evident in Florida. The state has cast a pall over higher education with the passage of a law with a provision that allows postsecondary students to record faculty without their knowledge for possible violations of "intellectual freedom and viewpoint diversity." The chilling effects of such state laws can be seen in the actions by one Florida public institution barring faculty from testifying in voting rights and mask-mandated court cases and pressuring faculty to remove race-related language from course materials and destroy COVID-19 data.

In Texas, a faculty research project on anti-racist education was paused without investigation following a Title VI complaint. Although the university subsequently lifted the hold, this type of disruption sends a paralyzing chill throughout an academic setting. Faculty should be guaranteed the right to due process before administrative actions are taken if universities are to truly remain fertile ground for the exchange and advancement of ideas.

These threats to academic freedom are serious, and they are spreading. In January, the Mississippi Senate passed one of several bills directed to banning critical race theory in public K–12 schools and public higher education institutions. Laws like these have been rebutted through lawsuits that make a case for the dangers to a democracy when freedom of expression is stifled, which did occur in the case of Florida. If we are, however, to promote and foster a free and civil society, we need to work proactively, especially with higher education institutions and with scientific and scholarly societies, to steward academic freedoms rather than only to position ourselves to defend fundamental rights.

This is not the first time that AERA or other scholarly societies have confronted the need to protect academic freedom in the face of political pressure. But we are at a critical juncture when we are also confronting a U.S. history of racism, debating public health measures during a pandemic, engaging with other challenging issues in the public sphere (e.g., limiting the rights of transgender and nonbinary youths), and undergoing a rapid change in the demography of our population. At times like these, scholars and students must be free to explore ideas, test them, and widely share and communicate findings, even if they challenge current narratives or political views.

AERA is prepared to act on matters that affect the ability of its members to conduct research, communicate findings, and teach students in an environment free of political interference. We endorsed the *1940 Statement of Principles on Academic Freedom and Tenure*; issued a joint "Statement in Support of Anti-Racist Education"; and co-signed a "Joint Statement on Legislative Efforts to Restrict Education about Racism and American History." Based on what we have showed already, it is none too soon to challenge the growing state legislative efforts and the policies of state-level government officials that can undermine or even more severely damage academic freedom in our educational institutions.

AERA joins other scientific societies, institutions of higher education, and faculty in the U.S. and throughout the world in a commitment to academic freedom as a fundamental principle central to the development of knowledge, an informed public, and the advancement of society. We encourage higher education institutions to implement policies that safeguard faculty in the exercise of that right and create a culture that celebrates that right as a core part of their mission. If colleges and universities are to remain the center of intellectual debate and the pursuit of knowledge, efforts to insulate academia from political pressure must be advanced.

[1]Keyishian v. Board of Regents, 385 U.S. 589 (1967). https://supreme.justia.com/cases/federal /us/385/589/ (under headline, click "Case"). See Section III, para. 21. This paragraph count treats each part of a broken paragraph as if it were separate.

[2]Grutter v. Bollinger, 539 U.S. 306 (2003). https://supreme.justia.com/cases/federal/us/539/306/ (under headline, click "Case"). See Section IIIA, para. 6. This paragraph count treats each part of a broken paragraph as if it were separate.

###

**About AERA**

*The American Educational Research Association (AERA) is the largest national interdisciplinary research association devoted to the scientific study of education and learning. Founded in 1916, AERA advances knowledge about education, encourages scholarly inquiry related to education, and promotes the use of research to improve education and serve the public good. Find AERA on Twitter, Facebook, and Instagram.*

©2022 American Educational Research Association. All rights reserved.

Terms Of Use  | Privacy Policy | Site Map  |  Contact Us

1430 K Street NW, Suite 1200, Washington, DC 20005
Phone: (202) 238-3200 | Fax: (202) 238-3250

Designed by Weber-Shandwick   Powered by eNOAH