## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**WILLIAM A. LINK, et al.,**

     *Plaintiffs*,

v.                      **Case No.: 4:21cv271-MW/MAF**

**MANNY DIAZ, JR., in his official
capacity as Florida Commissioner
of Education, et al.,**

     *Defendants*,

_____/

## FINAL ORDER

This case proceeded to a bench trial in January 2023. The parties had several weeks to prepare and file written closing arguments following the bench trial and presented their final oral arguments to this Court on April 11, 2023. This Order is entered following review of the evidence, the voluminous briefing, and oral arguments the parties presented to this Court on April 11, 2023. For the reasons set out below, Plaintiffs' claims are **DISMISSED without prejudice for lack of standing**.

I

Plaintiffs challenge various provisions of Florida House Bill 233. These provisions include requiring postsecondary institutions to conduct "an annual assessment of . . . intellectual freedom and viewpoint diversity." § 1001.03(19)(b),

Florida Statutes (2021). It also bars those institutions from shielding "students, faculty, or staff from expressive activities," § 1004.097(3)(f), Fla. Stat., and creates a cause of action for any individual "injured by a violation of this section" that may be brought against their institution. *Id.* § 1004.097(4)(a). Finally, HB 233's recording provision authorizes students to "record video or audio of class lectures for his or her own personal educational use, in connection with a complaint to the public institution of higher education where the recording was made, or as evidence in, or in preparation for, a criminal or civil proceeding." *Id.* § 1004.097(3)(g). Plaintiffs challenge these provisions as violative of their First Amendment rights to free speech and association. In addition, Plaintiffs argue the anti-shielding provision is void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment.

At trial, this Court heard compelling testimony from Plaintiffs and other witnesses, including students, faculty, and various experts. This testimony, which this Court finds credible, described, among other things, the faculty witnesses' fears of how the challenged provisions would regulate their classroom speech in light of students' statutory authorization to record class lectures without their consent; Plaintiffs' concerns about the survey provisions, which now monitor student and faculty perceptions of free speech and viewpoint diversity on campus; and faculty witnesses' uncertainty as to whether they retain any discretion to guide class

discussions following passage of the anti-shielding provision. This Court also heard evidence concerning the Defendant Boards' abilities to generally enforce state laws and instances in the past when they have exercised such authority. And this Court heard abundant testimony on statements made by political players—among them lawmakers who sponsored or supported HB 233 in the Florida Legislature and Defendant Richard Corcoran, who embraced rhetoric directed at the "woke" boogeyman of the day—prior to the bill's passage. These statements signaled a suspicion of, and outright hostility toward, certain viewpoints in Florida's public education system.[1]

But this Court did not hear, and Plaintiffs have been unable to establish, that their asserted free-speech injuries—which include self-censorship and chilled speech—are objectively reasonable with respect to the challenged survey provisions. Nor have Plaintiffs established that such injuries are traceable to the Defendants' enforcement authority with respect to the anti-shielding and recording provisions.

---

[1] For example, the record is replete with examples of bill sponsors and other proponents labeling perceived opponents as "Marxists," regardless of their actual social, political, or economic beliefs. This is reminiscent of darker times in our nation and state's history. *See, e.g.*, *McCarthyism/The "Red Scare,"* Dwight D. Eisenhower Presidential Library, https://www.eisenhowerlibrary.gov/research/online-documents/mccarthyism-red-scare#:~:text= %5BThe%20American%20Heritage%20Dictionary%20gives,in%20order%20to%20suppress%2 0opposition.%5D; Ian Gaffney, *The Legacy of the Johns Committee*, UF Smathers Libraries, https://web.uflib.ufl.edu/spec/exhibits/altufjohns.htm (describing the Johns Committee as "operat[ing] in a McCarthyite manner, seeking to discover communist connections among integrationist organizations and purge academic liberals and so-called 'subversives' from [Florida's] educational institutions").

3

Before this Court dives into the jurisdictional analysis that it must perform, this Court notes at the outset that it is sympathetic to any layperson who has followed this case and never doubted that Plaintiffs pursued a live controversy. Plaintiffs' theory of the case presents somewhat novel free speech and association claims challenging laws that—on their face—neither compel, nor restrict, nor punish free speech or association. But according to Plaintiffs, Florida has created a statutory scheme of interrelated provisions that creates a subjective fear of punishment and chills speech, that was designed to chill certain speech, that is intentionally ambiguous in operation, and that lacks direct enforcement mechanisms by state actors, such that Florida can avoid any pre-enforcement challenge by crafting the laws at issue to avoid Article III's standing requirements. This tactic has been employed to violate once-recognized constitutional rights[2] and is likely to be used again, aided by the ever-evolving standing jurisprudence that binds this Court.[3] But

---

[2] *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 543–45 (2021) (Roberts, C.J., concurring in part and dissenting in part) ("Texas has employed an array of stratagems designed to shield its unconstitutional law from judicial review . . . . The clear purpose and actual effect of S.B. 8 has been to nullify this Court's rulings.").

[3] Critics of the practice of ignoring jurisdictional infirmities to reach the merits of a given case describe the offending courts as engaging in "judicial activism." But one could argue the opposite is also true. That is, reliance on contrived jurisdictional infirmities to avoid reviewing unconstitutional laws smacks of the same "activism" that so damages the judiciary's reputation. *See, e.g.*, Laura A. Smith, *Justiciability and Judicial Discretion: Standing at the Forefront of Judicial Abdication*, 61 Geo. Wash. L. Rev. 1548, 1615 (1993) (arguing that members of federal appeals court used "separate but equally effective justiciability doctrines as a pretext . . . [to] successfully bar [an] action and avoided a confrontation on the merits," thus "abidcat[ing] their responsibility to review a case properly before the court").

it is not this Court's place to apply what it thinks the law *should be*—instead, this Court can only decide each case based on the law as *it is*. Accordingly, this Court addresses whether Plaintiffs have proved their standing under binding precedent.[4]

## II

It is essential that this Court ensure that Plaintiffs have standing to challenge each of the provisions at issue with respect to each of their claims and against each Defendant. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision"). The Supreme Court has long held that an actual controversy exists when the parties have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr*, 369 U.S. 186, 204 (1962); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (explaining that standing doctrine "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial

---

[4] Proof of standing is critical here, given that Plaintiffs' claims reached the trial stage of this case. *See Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) ("[E]ach element of standing must be supported 'with the manner and degree of evidence required at the successive stages of the litigation.' ") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

action"). "This is the gist of the question of standing." *Carr*, 369 U.S. at 204.

Ultimately, when it comes to standing, the inquiry is whether "concrete adverseness" exists between the parties. Over time, the Supreme Court has developed a three-part test for determining when such adverseness exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) will likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. "[E]ach element of standing must be supported 'with the manner and degree of evidence required at the successive stages of the litigation.' " *Church*, 30 F.3d at 1336 (quoting *Lujan*, 504 U.S. at 561).

At oral argument, this Court's concerns focused primarily on the reasonableness of Plaintiffs' alleged injuries and on *Lujan*'s traceability and redressability requirements in light of the challenged provisions' enforcement mechanisms. This Court addresses those concerns below, beginning with Plaintiffs' standing to challenge the recording provision.

### A

The recording provision permits a student to "record video or audio of class lectures for his or her own personal educational use, in connection with a complaint to the public institution of higher education where the recording was made, or as evidence, in preparation for, a criminal or civil proceeding." § 1004.097(3)(g), Fla. Stat. Such recordings "may not be published without the consent of the lecturer." *Id.*

In addition, a person injured based on the publication of a recording without the lecturer's consent can bring an action for damages and attorney's fees—up to $200,000—against the person who published the recording. *Id*.; § 1004.097(4)(b), Fla. Stat. But the recording provisions say nothing about the Defendants or their role in enforcing students' statutory permission to record class lectures.

Instead, Plaintiffs argue that Defendants derive enforcement authority from other provisions in the Florida Statutes and that this authority permits Plaintiffs to trace their chilled speech injuries to Defendants. The evidence Plaintiffs presented at trial reinforced this argument. Specifically, Plaintiffs point to the Boards' general enforcement powers under sections 1001.10(1), 1008.32(2)(a), 1001.02(1), 1001.03(8), 1008.32(4)(b)–(c), 1001.705(2), and 1001.706(8), Florida Statutes, as well as to the Board of Governors's Regulation 4.004, as authority to enforce the recording provision. *See* ECF No. 279 at 69–75. None of these provisions, however, establishes the necessary causal link between Plaintiffs' asserted injuries and any action by Defendants.

Start with the State Board of Education. Section 1001.10(1) establishes the Commissioner of Education as the "chief educational officer of the state" and tasks the Commissioner with "giving full assistance to the State Board of Education in enforcing compliance with the mission and goals" of the state's public education system (except for the state university system). § 1001.10(1), Fla. Stat. Section

1008.32(2)(a) authorizes the Commissioner of Education to "investigate allegations of noncompliance with law or state board rule and determine probable cause." § 1008.32(2)(a), Fla. Stat. If the Commissioner reports probable cause for such a violation, the State Board of Education "shall require the . . . *Florida College System institution board of trustees* to document compliance with law or state board rule." *Id*. (emphasis added).

In addition, section 1001.02(1) designates the State Board of Education as the "chief implementing and coordinating body of public education in Florida except for the State University System," and requires that the State Board of Education focus on "high-level policy decisions." § 1001.02(1), Fla. Stat. Section 1001.02 further sets out the duties and responsibilities of the State Board of Education, including the general duty to conduct business and "perform such other duties as may be necessary for the enforcement of laws and rules relating to the state system of public education." § 1001.02(2)(f), Fla. Stat.

Finally, section 1001.03(8) requires the State Board of Education to "enforce compliance with law and state board rule *by all . . . public postsecondary educational institutions*, except for the State University System, in accordance with" the Board's enforcement authority under section 1008.32. § 1001.03(8), Fla. Stat. (emphasis added). Sections 1008.32(4)(b)–(c) set out various penalties that the State Board of Education can impose in the event the "Florida College System institution board of

trustees is unwilling or unable to comply with law or state board rule within [a] specified time," including withholding state funds from the institution until the institution complies with state law or board rule and declaring the institution ineligible for competitive grants. §§ 1008.32(4), 4(b)–(c), Fla. Stat.

As for the Board of Governors, section 1001.705(2) sets out the constitutional duties of the Board in accordance with the Florida Constitution. § 1001.705(2), Fla. Stat. These duties include, among other things, "[c]omplying with, and enforcing for institutions under the board's jurisdiction, all applicable local, state, and federal laws." § 1001.705(2)(l), Fla. Stat. Section 1001.706(8) provides that the "Board of Governors has responsibility for compliance with state and federal laws, rules, regulations, and requirements." § 1001.706(8), Fla. Stat. And Board of Governors's Regulation 4.004 sets out authority to investigate and punish *institutions* that are out of compliance with state law or governing regulations. *See* BOG Reg. 4.004, available at https://www.flbog.edu/wp-content/uploads/2022/07/Regulation_4.004_ BOGOversightEnforcementAuthority_Final.pdf (last visited Apr. 12, 2023).

Together, these provisions address either the Defendants' "general enforcement authority" with respect to their constituent *institutions* (not individual professors or students) or Defendants' own responsibility to comply with state and federal law. Indeed, Plaintiffs point to no law or rule that specifically ties any general supervisory or enforcement authority over the institutions within the Boards'

jurisdiction to enforcement of the recording provision against individuals in this case. This is simply not sufficient to establish traceability for standing purposes. *Compare Support Working Animals, Inc. v. DeSantis*, 8 F.4th 1198, 1204–05 (11th Cir. 2021) (finding plaintiffs failed to establish traceability to Attorney General's actions because "as of this moment, they don't face any penalties as a result of the Attorney General's actions in enforcing or threatening to enforce the law") *with Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (recognizing that the Eleventh Circuit has previously rejected litigants' reliance upon "a host of provisions" of state law that "generally describe the [Defendant's] enforcement authority to establish traceability" (quotation marks omitted)) *and Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1261–62 (N.D. Fla. 2021) (finding plaintiffs' injuries were fairly traceable to Governor in challenge to anti-riot law because (1) the Governor has specific authority to order sheriffs to suppress riots and unlawful assemblies, (2) the Governor has specific authority to directly command the Florida Highway Patrol (FHP) to do the same, (3) the plaintiffs had identified evidence of the Governor having used his authority in the past to mobilize FHP troopers, (4) the Governor has specific authority to suspend sheriffs who disobey his directives to suppress riots, and (5) the Governor has specific authority to order the Florida Department of Law Enforcement to investigate sheriffs before suspending them).

    Likewise, the evidence at trial confirmed that Defendants play no role in

"enforcing" the recording provision. Plaintiffs pointed to no evidence demonstrating that the Defendants have required colleges or universities to develop policies to implement or enforce the recording provision. *Cf. Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, --- F. Supp. 3d. ---, 2022 WL 16985720 at *28 (N.D. Fla. 2022) (finding plaintiffs established injury traceable to Board of Governors and respective boards of trustees where enforcement regulation mandated each institution pass corresponding regulations to enforce challenged provisions). Instead, this Court heard ample evidence concerning various colleges' and universities' independent attempts to interpret this provision and provide some guidance to faculty members with respect to whether a given course may be considered a "class lecture" subject to the recording provision. Indeed, Plaintiffs' standing arguments may have been stronger had they sued the members of their respective Boards of Trustees, who appear to have taken the lead with respect to "enforcing" the recording provision at the institutional level. But Plaintiffs did not sue the members of their institutions' Boards of Trustees.

Further, Plaintiffs' evidence of the Defendant Boards' recent exercise of their general enforcement authority to discipline other actors not before this Court does not move the ball. Those examples involved disciplinary action against governing bodies—like the members of the Broward County School Board—and not individual professors or teachers who ran afoul of state law or policy. And Plaintiffs have failed

11

to come forth with any evidence demonstrating that the Defendant Boards are authorized and likely to take any action against an individual professor pursuant to their general authority to ensure system-wide, institutional compliance with state laws.

Finally, Plaintiffs assert that HB 233's anti-shielding prohibition on the Defendants themselves incorporates by reference the recording provision and, thus, provides an enforcement mechanism traceable to Plaintiffs' injuries. But this argument is beyond a stretch. The statutory language Plaintiffs refer to states that the Defendant Boards "may not shield students, faculty, or staff at [Florida College System institutions or state universities] from free speech protected under the First Amendment to the United States Constitution, Art. I of the State Constitution, or s. 1004.097." §§ 1001.03(19)(c), 1001.706(13)(c), Fla. Stat. (2021). Although section 1004.097, Florida Statutes, includes the recording provision, this prohibition on the Boards from shielding individuals from protected speech is by no means a grant of authority to *enforce* the recording provision. When pressed at oral argument, Plaintiffs' counsel conceded as much on the record.

So, where does this leave Plaintiffs? The Boards' general supervisory and enforcement authority is not enough to establish traceability. The evidence at trial did not establish that the Boards are likely to enforce the recording provision against any individuals. Nor did the evidence establish that the Boards have taken any steps

to regulate state colleges or universities with respect to enforcement of the recording provision. And Plaintiffs' argument that the anti-shielding provision creates some enforcement mechanism with respect to recording is nonsensical. In short, Plaintiffs have failed to prove, by a preponderance of the evidence, that their asserted injuries are fairly traceable to the Defendants with respect to the recording provision.

B

Next, this Court addresses Plaintiffs' standing to challenge the anti-shielding provision under the First and Fourteenth Amendments. Plaintiffs assert these provisions are unconstitutionally vague in violation of the Fourteenth Amendment and violate their right to free speech under the First Amendment. But before this Court may reach the merits of these claims, it must determine if Plaintiffs' asserted self-censorship injuries are fairly traceable to Defendants' actions. For many of the same reasons set out above with respect to the recording provision, Plaintiffs have failed to establish traceability for purposes of standing to challenge the anti-shielding provisions.

As noted above, Defendants are themselves prohibited from "shielding" students, faculty, or staff at state colleges and universities from protected speech. *See* §§ 1001.03(19)(c) & 1001.706(13)(c), Fla. Stat. But Plaintiffs' challenge to the anti-shielding provisions is directed chiefly at section 1004.097, Florida Statutes—the provision applicable to state colleges and universities. Specifically, section

13

1004.097(3)(f) prohibits Florida College System institutions and state universities from "shielding" students, faculty, and staff from "expressive activities," including "any lawful oral or written communication of ideas . . . [such as] faculty research, lectures, writings, and commentary . . . ." §§ 1004.097(3)(a) (defining "expressive activities"), 1004.097(3)(f) (prohibiting institutions from "shielding" individuals), Fla. Stat. Section 1004.097(4)(a) creates a cause of action against "a public institution of higher education based on the violation of [a person's] expressive rights" pursuant to the anti-shielding provisions. § 1004.097(4)(a), Fla. Stat. Thus, the anti-shielding provision's primary enforcement mechanism is a private cause of action that an individual may bring against a public college or university that has "violat[ed] the individual's expressive rights." *Id*.

For the reasons already articulated above, Plaintiff's reliance upon Defendants' general supervisory and enforcement authority is insufficient to establish traceability. Likewise, the Boards' affirmative duty not to shield students, faculty, and staff from expressive activities grants them no authority to enforce the anti-shielding provisions against individual professors. And Plaintiffs have failed to point to any evidence that the Boards could or would take any action against an individual professor in the event they receive a complaint that the professor "shielded" anyone from protected speech. Nor have Plaintiffs identified any Board rule or regulation that connects the Boards, via any enforcement action against their

constituent institutions, to Plaintiffs. In short, Plaintiffs have failed to prove, by a preponderance of the evidence, that their asserted injuries are fairly traceable to Defendants with respect to the anti-shielding provisions.

C

Next, this Court considers Plaintiffs' standing to challenge the survey provisions and, within that discussion, the reasonableness of Plaintiffs' chilled speech and associational injuries based on those provisions. Plaintiffs contend that the survey provisions violate their rights to free speech and free association under the First Amendment. This Court finds that Plaintiffs also lack standing for these claims, albeit for a different reason; namely, they failed to establish an injury-in-fact.

Threatened enforcement of a law can create an injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]' " *Wollschlaeger*, 848 F.3d at 1304 (quoting *Susan B. Anthony List*, 573 U.S. at 159). When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). Ultimately, for self-censorship injuries, "[t]he fundamental question . . . is whether the challenged policy 'objectively chills'

protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

Here, sections 1001.03(19)(b) and 1001.706(13)(b) direct the Defendant Boards to require each institution under their purview to conduct an annual survey measuring "intellectual freedom and viewpoint diversity." The survey provisions direct the Boards to "create an objective, nonpartisan, and statistically valid survey to be used by each institution which considers the extent to which competing ideas and perspectives are presented and members of the" institution's community, "including students, faculty, and staff, feel free to express their beliefs and viewpoints on campus and in the classroom." §§ 1001.03(19)(b) & 1001.706(13)(b), Fla. Stat.

Plaintiffs testified at length that the survey provisions have led them, or their members, to self-censor out of fear that their desired speech may influence the survey's results, which may then be used to defund or otherwise punish public colleges and universities if the atmosphere on campus appears to deviate from the State of Florida's preferred political views. *See, e.g.*, ECF No. 279 at 90, 93, & 102. Likewise, Plaintiffs testified that the survey provisions, along with the other statutes challenged in this case and actions by third parties not before this Court, have harmed recruitment efforts for the Organizational Plaintiffs. *Id.* at 74. And Plaintiffs introduced evidence that Organizational Plaintiff March For Our Lives diverted

resources to quell subjective fears with respect to speculative future harms as a result of the surveys. *Id*. at 135–37.

Trial testimony also demonstrated that the surveys Defendants created are optional. While much of the testimony criticized the wisdom and construction of the surveys—as well as their partisan aims—neither side presented evidence that a professor or student is required to, pressured to, or rewarded for filling out the survey. Further, a survey participant is not required to submit any readily identifying information.[5] In short, this Court is tasked with determining the reasonableness of Plaintiffs' self-censorship due to Defendants' optional, anonymous surveys, the potential punishments the surveys may prompt at the institutional level, and the potential sanctions those institutions may, as a result, impose on Plaintiffs.

This Court finds that, under these facts, Plaintiffs' self-censorship due to the survey provisions is not reasonable. Plaintiffs' fear of harm from engaging in their desired speech is too attenuated—it generally hinges on both (1) the fact that Defendants are monitoring speech in classrooms with the surveys and (2) speculation as to what Defendants or other political entities may do to institutions

---

[5] That is, respondents are not required to list their names, dates of birth, etc. However, this Court recognizes that there was evidence at trial demonstrating that it might be possible to identify a particular faculty respondent based on the respondent's voluntarily reported demographic data, among other information, especially if the respondent was the only identified minority employed at a smaller institution.

based the surveys' results.[6] The Supreme Court's decision in *Laird v. Tatum*, 408 U.S. 1, 13 (1972) found that similar self-censorship injuries were insufficient to confer standing. There, the Supreme Court explained that a government domestic surveillance program failed to confer an injury-in-fact on those subject to surveillance where their self-censorship turned on "the very existence" of the surveillance program and, in part, on what the government would do with the information in the future. *Id.* at 13.

The Supreme Court acknowledged the viability of a self-censorship injury in pre-enforcement cases where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11. Such cases differ, however, from self-censorship injuries that "arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* The latter type of self-censorship injury is not cognizable under Article III.

---

[6] These considerations have multiple layers of inferences built into them as well, as discussed *infra*.

Plaintiffs latch on to the first type of injury discussed in *Laird*, arguing that "the challenged provisions here are 'regulatory, proscriptive, or compulsory in nature,' and Plaintiffs are 'subject' to them." ECF No. 281 at 37 (citing *Laird*, 408 U.S. at 11). This argument is misplaced. Plaintiffs attempt to lump all of the challenged provisions from HB 233 together, but as this Court explained above, they must demonstrate standing for each challenged provision. On their own, the survey provisions—which led to the voluntary, anonymous surveys developed by Defendants—cannot reasonably be characterized as "regulatory, proscriptive, or compulsory." As *Laird* makes clear, self-censorship based on the state monitoring protected speech and potentially regulating it in the *future* is insufficient to confer standing in the *present*.

At its core, the fact that Defendants administer optional, anonymous surveys at Plaintiffs' institutions would not cause a reasonable person to self-censor. Nor would the combination of this fact with speculation as to what the surveys will prompt Defendants or other political entities to do. True, political entities have expressed clear animosity to the views Plaintiffs seek to express, and the evidence presented at trial demonstrated that the surveys' design is seriously flawed, calling into question the statistical value of their results. These factors, however, would not cause a reasonable person to infer that they should self-censor now based on how the state may use the results of the surveys in the future. For Plaintiffs' self-

censorship to be reasonable, this Court would have to find that (1) students and faculty will voluntarily respond to the surveys; (2) the surveys are likely to reveal an ideological skew, as predicted by Plaintiffs; (3) Defendants will present this information to political entities in Florida; (4) these political entities will then act to punish or impose new speech restrictions on state universities and colleges based, at least in part, on the results of the surveys; and (5) Plaintiffs' respective universities and colleges will enforce subsequent restrictions or act to mitigate future punishments so as to restrict Plaintiffs' free speech and association rights. While this scenario is not wholly unrealistic, *see generally Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, --- F. Supp. 3d. ---, 2022 WL 16985720 (N.D. Fla. 2022), this chain of inferences is too attenuated for this Court to find that Plaintiff's present self-censorship is reasonable.

Relatedly, Plaintiff March For Our Lives's diversion of resources is insufficient to prove an injury-in-fact for standing purposes. Evidence pertaining to its diversion of resources related to quelling its members' and would-be members' "fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). "Although an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' 'fears of hypothetical future harm that is not certainly impending.' " *City of South Miami, et al. v. DeSantis*, No. 21-13657, slip

op. at 12 (11th Cir. Apr. 13, 2023) (quoting *Clapper*, 568 U.S. at 416)). Accordingly, Plaintiffs have failed to demonstrate an injury-in-fact as to the challenged survey provisions.

III

The State of Florida appears to have decided that it is good policy to deputize students and faculty to monitor their peers and inform the government of the speech and perceived political leanings of their classmates and colleagues.[7] At the same time, Florida has incentivized the most litigious individuals in class to push professors to limit their speech and potentially drag their colleges and universities into costly lawsuits as a result. This Court is sympathetic to the argument that laws like these—which were apparently designed to chill speech and, though left intentionally toothless for enforcement purposes, remain hanging over students' and professors' heads like the proverbial sword of Damocles[8]—ought to be enough to challenge their constitutionality.[9] Nonetheless, Plaintiffs' suggestion that the

---

[7] It is not for this Court to say whether it is a good or bad policy for Florida to transform its public colleges and universities into "vessel[s] for seagoing snitches." SCENT OF A WOMAN (Universal Pictures 1992).

[8] *See* Transcript at 503 ("All these are things that are threatened, I think, by the sword of Damocles kind of hanging over the faculty member in terms of how they teach and what they teach.").

[9] This is not the first time this Court has encountered a state law that lacks an enforcement mechanism, but which arguably achieves the state's alleged policy goals while also depriving litigants of Article III standing. *See Support Working Animals, Inc. v. Moody*, Case No. 4:19CV570-MW/MAF, 2020 WL 10728640, at *1 (N.D. Fla. June 12, 2020), *aff'd sub nom. Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198 (11th Cir. 2021).

amorphous threat Defendants play by generally enforcing state laws trickles down to cause their fears of speculative future punishment fails to establish, pursuant to binding precedent, Plaintiffs' standing to challenge Florida's policy choices. Accordingly,

**IT IS ORDERED:**

The Clerk shall enter judgment stating, "Plaintiffs' claims are **DISMISSED without prejudice for lack of standing**." The Clerk shall close the file.

**SO ORDERED on April 17, 2023.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**